IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE PACKARD, EDWARD BECK, MICHELLE BERGER, ARI COWAN, CONNOR HICKS, CHARLES MEACHEM, CHRIS PHILLIPS, LARRY SWETMAN and AMADON DELLERBA, individually and on behalf of all others similarly situated,<br><br>PLAINTIFFS,<br><br>vs.<br><br>THE CITY OF NEW YORK, a municipal entity, FORMER NYPD CHIEF OF PATROL JOSEPH ESPOSITO, FORMER NYPD COMMISIONER RAY KELLY, FORMER MAYOR MICHAEL BLOOMBERG,  NYPD CHIEF THOMAS P. PURTELL,  NYPD DEPUTY CHIEF STEVEN ANGER, NYPD DEPUTY CHIEF JAMES MCNAMARA,<br><br>DEFENDANTS. | Index No.<br><br><br>ECF CASE<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs George Packard, Edward Beck, Michelle Berger, Ari Cowan, Connor Hicks, Charles Meacham, Chris Phillips, Larry Swetman, and Amadon Dellerba ("Plaintiffs"), individually and on behalf of all others similarly situated, through their attorneys, respectfully file this complaint against the Defendants named herein.  The allegations in the complaint are based on the knowledge of the Plaintiffs as to themselves, and on information and belief, including the investigation of counsel, as to all other matters.

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which the Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violations of

Plaintiffs' rights and privileges secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

2.      The Defendants in this action, the City of New York, former New York City Police Commissioner Ray Kelly, former Mayor of the City of New York Michael Bloomberg, and members of the New York Police Department ("NYPD") (listed below), have implemented and are continuing to enforce, encourage, and sanction a policy, practice, and/or custom of the arrest of individuals, including Plaintiffs, engaged in expressive speech activity absent actual criminal conduct in violation of each individual's right to protest under the First Amendment and the Fourth Amendment's prohibition against unlawful searches and seizures.

3.      The NYPD's widespread constitutional abuses have flourished as a result of, and are directly and proximately caused by, the policies, practices, and/or customs devised, implemented and enforced by the City of New York, Commissioner Kelly, and Mayor Bloomberg.  The City of New York, Commissioner Kelly, and Mayor Bloomberg acted with deliberate indifference to the constitutional rights of those who would come into contact with NYPD officers in expressive speech situations by (a) failing to properly screen, train, and supervise NYPD officers, (b) inadequately monitoring NYPD officers and their improper arrest practices, (c) failing to sufficiently supervise NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning, and failing to prevent NYPD's unconstitutional practices.

4.      The City of New York is constantly alive with citizens exercising their right to protest and bringing a voice to the issues of the disenfranchised through the chorus of the multitude.  Even so, the City of New York has continually failed to

appropriately police the many non-violent and lawful expressions of speech, resulting in the continual breach of individual rights, the waste of judicial and civic resources, and the need for appropriate training policies, methodologies, and systems to address individuals conducting peaceful and legal expressive speech as protected under the First Amendment.

5.      On September 11, 2011, the Occupy Wall Street ("OWS") movement engaged in expressive protest activity with a march into the Financial District of Manhattan, and conducted protest activity for the following months and years.

6.      In preparation for Occupy Wall Street, the NYPD, at the behest of the City of New York, Mayor Bloomberg, and Commissioner Kelly, trained for mass protest situations, but the training failed to address the First Amendment rights of the protestors, and correct the customs and policies of the NYPD for disregarding these rights, as had occurred during the protests surrounding the 2004 Republican National Convention in New York City.

7.      Indeed, the training failed to address the defective and unlawful policies, customs, and practices of the NYPD to such an extent that even though over 2,000 arrests were made of those engaged in expressive speech activity, the majority of those arrests resulted in dismissals, adjournments in contemplation of dismissal ("ACD's"), and declined prosecutions.

8.      Further, the improper and unlawful policies and practices of the NYPD subjected the City of New York to over a dozen lawsuits from unlawful arrests in the year following September 11, 2011.  Moreover, the NYPD and the City of New York was the recipient of extensive public condemnation for their policies and practices towards Occupy Wall Street, resulting in international human rights and U.S. civil liberties

experts from law schools across the United States banding together and creating the *Protest and Assembly Project*, which in turn released the comprehensive and damning report entitled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* on July 21, 2012.[1]  The Suppressing Protest Report documented numerous violations of the NYPD, such as the arbitrary and selective rule enforcement and baseless arrests, the unjustified closures of public space, and the dispersal of peaceful assemblies.[2]

9.      Even with the high dismissal rate, the numerous lawsuits, and the public castigation of the NYPD's unlawful policies, practices, and tactics, the City of New York, Mayor Bloomberg, Commissioner Kelly, and the Chief Defendants (defined below) exhibited a deliberate indifference towards the unconstitutional conduct of the NYPD police officers to the detriment of the protesters' civil rights at the First Anniversary of Occupy Wall Street.

10.      On September 17, 2012, the City of New York knew that a large number of peaceful protesters would gather in downtown Manhattan to celebrate the First Anniversary of Occupy Wall Street and instructed its officers to anticipate acts of civil disobedience with the warning that "the group will attempt to 'Storm Wall Street' by conducting 'roving intersection occupations.'"[3]

11.      Instead of learning from the prior year's interactions with Occupy Wall Street, on September 17, 2012 the NYPD and the Chief Defendants oversaw over one-

---

[1] The Global Justice Clinic (NYU School of Law), Walter Lestner Int'l Human Rights Clinic (Fordham Law School), *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (July 21, 2012). Hereafter, referred to as the "Suppressing Protest Report".
[2] Suppressing Protest Report at vi.
[3] NYPD PMBS Detail #FY13-289 9/12/12.

hundred and eighty (180) arrests.  Most of those arrested were charged with disorderly conduct even though their conduct often amounted to no more than a mere inconvenience of pedestrian or vehicular traffic.

12.     This action seeks to end the pattern, policy, and practice of the NYPD misapplying the disorderly conduct statute to peaceful protesters in New York City and the continued arrest and seizure of individuals engaged in expressive speech activity protected by the First Amendment in violation of the Fourth Amendment.

13.     Plaintiffs George Packard, Edward Beck, Michelle Berger, Ari Cowan, Connor Hicks, Charles Meacham, Chris Phillips, Larry Swetman, and Amadon Dellerba, bring this action for monetary damages, and for certain injunctive relief, individually and on behalf of all others similarly situated who were wrongfully arrested under a subsection of P.L. 240.20 between September 15 to September 17, 2012, and to redress Defendants' violations of their rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution.

## JURISDICTION

14.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution.

15.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

16.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## VENUE

17.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## JURY DEMAND

18.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

### Plaintiffs

19.     Plaintiff George Packard is a resident of the State of New York, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct.  Mr. Packard was detained for eighteen (18) hours in connection with this arrest.

20.     Plaintiff Edward Beck is a resident of the State of Pennsylvania, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Beck was detained for eighteen (18) hours in connection with this arrest.

21.     Plaintiff Michelle Berger is a resident of the State of Pennsylvania, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when she was arrested and charged with disorderly conduct.  Ms. Berger was detained for twelve (12) hours in connection with this arrest.

6

22.     Plaintiff Ari Cowan is a resident of the State of New York, who was lawfully present on the sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Cowan was detained for twenty-four (24) hours in connection with this arrest.

23.     Plaintiff Connor Hicks is a resident of the State of New York, who was lawfully present in a crosswalk on West Street helping a female friend to her feet on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct.  Mr. Hicks was detained for twenty-four (24) hours in connection with this arrest.

24.     Plaintiff Charles Meacham is a resident of the State of New York, who was lawfully present on the sidewalk in downtown New York City on September 15, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Meacham was detained for six (6) hours in connection with this arrest.

25.     Plaintiff Chris Phillips is a resident of the State of Colorado, who was lawfully present on the sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Meacham was detained for seven (7) hours in connection with this arrest.

26.     Plaintiff Larry Swetman is a resident of the State of Pennsylvania, who was lawfully present on the sidewalk in downtown New York City on September 17,

2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Swetman was detained for thirty-six (36) hours in connection with this arrest.

27.     Plaintiff Amadon Dellerba is a resident of the State of Arizona, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct.  Mr. Dellerba was detained for twelve (12) hours in connection with this arrest

**Defendants**

28.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York.

29.     Defendant City of New York maintains the New York City Police Department, which is authorized to perform all functions of a police department per the applicable sections of the New York State Criminal Procedure Law.

30.     Defendant Michael Bloomberg, at all relevant times herein, was the Mayor of the City of New York and took a direct interest in overseeing the policing of Occupy Wall Street.  At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of the highest ranking NYPD personnel.  As Mayor of the City of New York, Michael Bloomberg was a policy-maker with respect to the decisions on training and supervision of police officers in relation to Occupy Wall Street and expressive speech activity protected by the First

Amendment to the United States Constitution. Michael Bloomberg is sued in his individual and official capacities.

31.     At all times relevant herein, Defendant Former Commissioner Ray Kelly ("Commissioner Kelly") was a duly sworn police officer of the NYPD and acted under the supervision of the NYPD and according to his official duties. At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of all of the NYPD members of service including the highest ranking NYPD personnel. Commissioner Kelly is sued in his individual and official capacities.

32.     At all times relevant herein, Defendant Former Chief of Patrol Joseph Esposito ("Chief Esposito") was a duly sworn police officer of the NYPD.  At all times relevant to the conduct of the NYPD, he was the second highest ranking member of the NYPD, responsible for the policy, practice, supervision, implementation, and conduct of virtually all NYPD matters and responsible for the appointment, training, supervision, and conduct of virtually all of the NYPD members of service including the highest ranking NYPD personnel. Chief Esposito is sued in his individual and official capacities.

33.     Defendant New York City Police Chief Thomas P. Purtell ("Chief Purtell") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief Purtell was the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Purtell was the borough commander of Manhattan, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD

members of service including high ranking NYPD personnel. Chief Purtell is sued in his individual and official capacities.

34.     Defendant New York City Police Deputy Chief Steven Anger ("Chief Anger") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief Anger was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Anger was an assistant to the borough commander of Manhattan, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel.  Chief Anger is sued in his individual and official capacities.

35.     Defendant New York City Police Deputy Chief James McNamara ("Chief McNamara") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief McNamara was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief McNamara was responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel. Chief McNamara is sued in his individual and official capacities.

36.     The Defendants listed in paragraphs 32 – 35 are hereafter collectively referred to as the Chief Defendants.

37.     Each and all of the acts of the Defendants alleged herein were done while acting within the scope of their employment with Defendant City of New York and/or the NYPD.

38.     During all times mentioned in this complaint, Defendants, separately and in concert, engaged in acts which constituted deprivations of Plaintiffs' constitutional rights, and the privileges and immunities of the Plaintiffs, and while these acts were carried out under color of law and pursuant to the policies of the City of New York and the NYPD, these acts had no justification or excuse, and were instead unlawful, unconstitutional, and improper.

## CLASS ALLEGATIONS

39.     Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a class consisting of all persons who were wrongfully arrested and charged with at least one count of disorderly conduct on September 15, 16 or 17, 2012 by police officers while they were engaged in expressive speech activity in connection with Occupy Wall Street activities.

40.     The members of the class are so numerous as to render joinder impracticable.  Based on information made publicly available by the NYPD, at least 220 people had their First Amendment rights interfered with and were arrested without articulable criminal conduct.

41.     In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights were violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many class members who were victimized by the NYPD's and Defendants' unconstitutional policies and practices may not bring individual claims for fear of retaliation and reprisals by NYPD officers.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

42.     The class members share a number of questions of law and fact in common, including, but not limited to:

a)      whether the members of the class were engaged in expressive speech activity protected by the First Amendment;

b)      whether the NYPD and Defendants participated in policies, procedures, customs, and/or practices of arresting individuals engaged in expressive speech activity absent actual criminal conduct;

c)      whether the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants exhibited deliberate indifference and failed to adequately and properly screen, train, supervise, monitor, and discipline more junior NYPD officers, and whether those failures have caused the constitutional violations inflicted by NYPD officers against class members;

d)      whether the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants have encouraged, authorized, sanctioned, and failed to prevent the unconstitutional arrests by NYPD of individuals engaged in expressive speech activity, and whether such acts and omissions have caused constitutional violations by NYPD officers against class members;

e)      whether the members of the class who were unlawfully arrested while engaged in expressive speech activity were damaged by the

deprivation of their constitutional rights in common ways, and the nature of that damage; and

f)      whether the members of the class who were unlawfully arrested while engaged in expressive speech activity are entitled to punitive damages, who is liable for these damages, and in what amounts.

43.     The Plaintiffs' claims are typical of those of the class.  Like the other members of the class, the Plaintiffs were victims of the NYPD's policy, practice, and/or custom of arresting individuals engaged in expressive speech activity absent actual criminal conduct.

44.     The legal theories under which the Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by the class members.

45.     The Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interests with members of the class, and will fairly and adequately protect the interests of the class.  The Plaintiffs have all been arrested for expressive speech activities absent actual criminal conduct and are members of, or otherwise participated in, the Occupy Wall Street movement.  Furthermore, they are engaged citizens interested in utilizing and protecting their First Amendment rights as guaranteed under the United States Constitution.

46.     The Plaintiffs are represented by experienced civil rights and class action counsel.  Plaintiffs' Counsel have the resources, expertise, and experience to prosecute this action.  Plaintiffs' Counsel know of no conflicts among members of the class or between the attorneys and members of the class.

47.     The Plaintiff class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to class members, the interests of the Plaintiffs and potential class members are aligned, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

## STATEMENT OF FACTS

## OCCUPY WALL STREET

48.     The Plaintiffs were participants in the Occupy Wall Street movement.

49.     OWS, among other things, protests the institutionalized inequality that funnels political power, wealth, and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans and people their fair share.  In particular, OWS sought, and seeks, to bring attention to the unfair way in which ordinary people are allowed to suffer terrible hardship due to mortgage debt, student loan debt, or lack of affordable healthcare, as politicians and businessmen blame these people for "irresponsibility," while huge banks were rescued from any consequences of their own decision-making and actions by government bailouts funded by those same ordinary people's taxes.

50.     On September 17, 2011, the first OWS march occurred in the Financial District of Manhattan and the protesters were blocked from entering the Wall Street area by the NYPD, who had set up narrow choke points of ingress and egress.  The protesters found their way to Zuccotti Park and remained there for almost two months effectuating their political speech goals of drawing attention and raising awareness to the many issues of inequity.

51.     During this period, the NYPD continually arrested members of OWS for peaceful protest activity.  For example, on September 19, 2011, individuals associated with OWS marched from Zuccotti Park to the financial center area and back to Zuccotti Park.  During this march, NYPD Inspector Edward Winski reached across a police barricade and tried to drag an individual over the barricade.  The New York Times wrote about this arrest and the police statements regarding the conduct underlying this arrest:

> Another man was arrested, and the police initially said he was charged with jumping a police barrier and resisting arrest. But a reporter and a photographer for the [NY T]imes who witnessed and documented the episode between the man in the orange hat and the police did not see him attempting to jump a barrier. Late in the afternoon, the police said the man was charged with committing disorderly conduct by impeding pedestrian traffic, not with jumping a barrier.

52.     The following day, September 20, 2011, a slightly rainy morning, Inspector Edward Winski, along with other officers, entered Zuccotti Park and unlawfully ordered the OWS media team to remove protective tarps from its computers and video-gear.

53.     Approximately three (3) individuals were arrested on that date, and sued Inspector Edward Winski and the City of New York, for the unlawful arrests.

54.     Initially, Inspector Edward Winski reported that the tarps had been hanging from trees and this allegation was part of the criminal complaint.  However, after the District Attorney of New York was alerted to video of the incident, a superseding complaint was filed removing the allegation that the tarps were tied to trees.

55.     Upon information and belief, Inspector Winski was not disciplined in any manner for his conduct of September 19 or 20, 2011 or for the misreporting of the facts in

the initial criminal complaint.  Instead, Winski was promoted from Deputy Inspector to Inspector in November 2013.

56.     Over the course of the following year, numerous similar altercations occurred between the police and OWS, many resulting lawsuits for improper arrests and the improper actions of the police towards protesters, including, among other things, pepper spraying individuals engaged in expressive speech activities.[4]

57.     Despite the numerous altercations and resulting arrests, most of the arrests culminated in dismissals, ACD's, or declined prosecutions.  For example, on October 14, 2011 the City of New York sought to physically remove Occupy Wall Street from Zuccotti Park.  Hundreds of people flocked to the park to defend it from this physical eviction.  After an announcement that the NYPD would stand down and that the park would not be cleared, fifteen (15) individuals were arrested but the arrests ultimately resulted in twelve (12) dismissals, ACD's, or declined prosecutions.

58.     The NYPD crowd control protocols employed were similarly ineffective and indicative of the poorly tailored policies and procedures employed by the NYPD to handle the peaceful protests of OWS.  For example, on November 5, 2011, the success of an Occupy supported program, Bank Transfer Day - to have individuals move their savings from institutional banks to community banks - was celebrated with a march from

---

[4]Joseph Ax, *NY City To Pay $330,000 To Settle Pepper-Spray Occupy Lawsuits,* Reuters, http://www.reuters.com/article/2015/07/06/us-usa-occupy-lawsuit-idUSKCN0PG2GK20150706; *see also Laugier v. The City of New York, et al.,* 13CV6171 (JMF)(settling lawsuit stemming from OWS protest at Brooklyn Bridge); *Appel v. The City of New York, et al.*, 14CV7992 (KPF)(lawsuit from OWS protest at Foley Square); *Global Revolution TV v. City of New York, et al.*, 12CV5086(GBD)(lawsuit related to property damage from police activity); *Occupy Wall Street, et al. v. City of New York*, 12CV4129(GBD)(same).

Zuccotti Park to Foley Square. The New York Times wrote about the incident that occurred once the marchers reached Foley Square:

> Hundreds of Occupy Wall Street demonstrators streamed into a desolate part of Foley Square on Saturday afternoon, but their slow-moving march turned chaotic as a phalanx of police officers issued orders to vacate the sidewalks — and then swept in to force the issue…. As the confrontation continued, the police kept yelling orders that the sidewalk was closed, or temporarily closed, or had to be closed to keep order. They fanned out in a line, stretching orange mesh netting across the breadth of the sidewalk, and walked along, pushing protesters back and sweeping them away.
>
> The strategy drew expressions of puzzlement from many in the area.
>
> "The police warned these people to move because of pedestrian traffic, but this is an empty place," said Robert Rosen, 66. "Who are they talking about?"[5]

59.    There were twenty-one (21) arrests on this date that resulted in fifteen (15) dismissals, ACD's, declined prosecutions and/or acquittals.

60.    The arbitrary and unreasonable crowd control measures employed by the NYPD were documented and analyzed in the Suppressing Protest Report:[6]

> The pervasive NYPD practice of frequently "closing" sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly. There may be circumstances in which the closure of otherwise public space is a proportionate and necessary measure to achieve a legitimate aim, such as public safety. Dispersal and closure may be appropriate where, for example, a protest has taken on a violent character, and the closure is needed to restore public order. But mere assembly on public sidewalks is not just cause to move protesters on, or to "close" a sidewalk. If protesters are in

---

[5] Al Baker, *Police Force Wall Street Protesters Off Sidewalks*, NY TIMES, http://cityroom.blogs.nytimes.com/2011/11/05/police-force-wall-street-protesters-off-sidewalks/.
[6] Suppressing Protest Report at 118.

fact actually "blocking" pedestrian traffic, whether intentionally or inadvertently, police should facilitate assembly rights by informing protesters that they are free to protest on sidewalks, and should assist protesters to ensure that building entrances are not blocked and that others may pass.

The NYPD's frequent practice of "closing" sidewalks during protests also appears to violate U.S. constitutional law, which protects First Amendment activity on public sidewalks. The U.S. Supreme Court has held that:

[W]hen the use of its public streets and sidewalks is involved….a [government] may not empower its….officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

Many areas of New York City are heavily congested with pedestrian traffic, and the difference in treatment between congested resident or tourist pedestrian traffic and protester pedestrian traffic is at times stark. Lawyers described the police enforcement against protesters of the disorderly conduct statute for blocking pedestrian traffic as a tactic to "stifle political protest" that, when combined with physical force, created "a climate of fear."

61.     The large majority of Occupy Wall Street related arrests during the first year in New York City were for offenses such as disorderly conduct—a non-criminal violation akin to jaywalking.  Indeed, Defendant Mayor Michael Bloomberg recognized that, "the majority of the protesters have been peaceful and responsible."[7] Yet, the majority of the protestors who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.  Furthermore, between

---

[7] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, GUARDIAN (Nov. 15, 2011, 8:39 EST),
http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested. Only 409 of these arrests resulted in a plea or conviction for any charge.  That is a conversion rate of just over 15% for the thousands of Occupy Wall Street related arrests during the one-year period.  The remainder of the arrests, the overwhelmingly vast majority, were dismissed.

62.     As the dismissal record of the cases against OWS protestors shows, the majority of the people arrested had not done anything wrong.

63.     Indeed, further proof of the improper policing of members of Occupy Wall Street can be seen by the voluminous litigation that has arisen related to the improper policing of the constitutionally protected expressive speech activity.

64.     Since 2011, more than eighty (80) separate litigations have been filed in the Southern District of New York alone.  Approximately fifty (50) of these litigations have been settled at a cost in excess of $1,500,000 dollars, not including the defense costs associated with these matters.

65.     Seventeen (17) of these litigations were filed before September 15, 2012, and the First Anniversary of OWS.

### DELIBERATE INDIFFERENCE AND FAILURE TO PROPERLY TRAIN

66.     By July or August 2012, Defendant City of New York knew or should have known that members of its police force would encounter individuals engaged in expressive speech activity, especially after months of continued protests, news stories, and  multiple  lawsuits  alleging  unlawful  arrests.   Even  so,  the  City  of  New  York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants failed to provide

adequate training to NYPD police officers in the handling of protesters exercising First Amendment rights.

67.    For example, Inspector Winski testified in a deposition about the multitude of training he has received since becoming a member of the NYPD, including Sergeant training, Lieutenant training, Captain training, Inspector training, lead training, baton training, pepper spray training, and mass formation training, but Inspector Winski could not recall any training pertaining to an individual's constitutional rights and appropriate policing of First Amendment activity.  Nor did Winski recall any training on the First Amendment or its effect on protestor activities prior to the First Anniversary of Occupy Wall Street.

68.    Inspector Winski, however, testified that he believed that the fact that individuals are engaged in First Amendment-protected activity has no effect on the manner with which Penal Law 240 (disorderly conduct) is charged against them, in contravention of established legal precedent.

### The Principles of Proper Policing of Expressive Speech Activity

69.    Such training would have consisted of clearly established guidelines for police conduct in expressive speech protest situations, including but not limited to these well established legal rights and principles:

♦ Under New York State and federal law, a person cannot be arrested for disorderly conduct for the "mere inconveniencing of pedestrians."

♦ Under New York State and federal law, even if protestors block the entire sidewalk, causing pedestrians to step into the street, such conduct is not enough to justify arrest for disorderly conduct.

♦ Under federal law, when a person is engaged in political or expressive speech activity, the First Amendment of the Constitution requires that the government, including the police, give fair warning to protestors that they must disperse before arresting them.

♦ Under New York State law, if a person's conduct does not cause, or recklessly threaten to cause, a substantial impact on the public at large, such as a breach of the peace, then there is no probable cause for an arrest for disorderly conduct.

♦ Under New York State and federal law, a person may only be subject to arrest if there is individualized probable cause to believe that the particular individual arrested committed an offense. Further, probable cause to make an arrest does not arise merely because of a person's presence within a group of people, even if some people in that group are committing offenses.

♦ Under New York State and federal law, the police may not disperse a protest without having a lawful reason to do so.

♦ Under New York State and federal law, a civilian breaks no law by refusing to obey an unlawful order to disperse.

♦ Under New York State and federal law, a civilian cannot be arrested for obstructing governmental administration, for refusing to obey an unlawful order to disperse.

♦ Under federal law and the First Amendment, it is unlawful to arrest a protestor for disorderly conduct unless the protestor is creating a "clear and present danger" of breach of the peace.

♦   Under federal law and the First Amendment, where the municipality and/or the police seek to regulate the time, place or manner of public protest, protestors must be provided an adequate forum for their expression.

70.     Proper training in these clearly-established principles of lawful police conduct would have prevented unlawful arrests of OWS protestors on September 15-17, 2012.

71.     Furthermore, Inspector Winski, like many NYPD officers, underwent extensive training as he progressed through the ranks of the NYPD and did not receive any additional training on these issues.  Like most NYPD officers, Inspector Winski's training on these issues only occurred during the brief six-month period spent at the Police Academy, without any subsequent trainings on these issues.[8]

***The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants Knew or Should Have Known That Police Officer Training Was Insufficient Yet Was Needed For the OWS Protests***

72.     Even before the Occupy Wall Street movement, from the NYPD's failure to properly protest the large protests surround the Republican National Convention that cost the City of New York in excess of thirty million dollars, Defendants understood their officers needed training in policing expressive speech activity.[9]

73.     In anticipation of Occupy Wall Street, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants did conduct large-scale training for the NYPD in August 2011 on Randall's Island, but this training did not

---

[8] Numerous other members of the NYPD have testified in depositions that they received no First Amendment training after leaving the Police Academy.

[9] The City paid approximately $18 million dollars in damages and fees to plaintiffs, and spent $16 million defending the lawsuits to outside counsel and the NYC Law Department. http://www.reuters.com/article/2014/01/15/us-usa-newyork-rnc-settlement-idUSBREA0E1S120140115.

address First Amendment issues or how this changed the policing methods.  Instead, this training included policing and formations to be used to splinter and control mass protest. This training included non-verbal commands for disorder control formations such as that holding both arms flat out to each side indicates line formation; and holding both arms extended in a circle above your head is encirclement formation.

74.     Importantly, and unfortunately for the innumerable protesters whose rights were violated, the August 2011 training did not include any training about proper policing of expressive speech activity protected by the First Amendment.  Nor did this training include the proper standards for arrest related to disorderly conduct when expressive speech activity was involved.

75.     Furthermore, the inadequacy of the training was continually highlighted over the following year by the extensive arrests, the exceptional dismissal rate, and the resulting lawsuits.  Additionally, the vehement public reaction and subsequent reports, such as the Suppressing Protest Report which even tried to directly engage with the NYPD, detailed and highlighted the unlawful policies and arrests.[10]

76.     By September 2012, the City of New York was aware that a large amount expressive speech activity would occur within the confines of the First Precinct, and due to this actual knowledge the NYPD prepared the PBMS Detail #FY13-2809.

77.     The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants knew or should have known that in September 2012 members of the NYPD would encounter individuals engaged in expressive speech activity, especially

---

[10] *See Suppressing Protest* at Appx. II.

after the two-month occupation of Zuccotti Park and the continual protests arising from the Occupy Wall Street Movement.

78. The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants knew or should have known that in September 2012 members of the NYPD would encounter individuals engaged in expressive speech activity within the confines of the First Precinct.

79. Yet, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants failed to train the individual street level police officers on the proper treatment of individuals engaged in expressive speech activity.

80. The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the policer officers of the First Precinct.

81. The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly supervise the officers who were assigned to police Occupy Wall Street.

82. The City of New York, Mayor Michael Bloomberg, Commissioner Kelly, and the Chief Defendants, showed deliberate indifference to the unlawful implementation of the policies and practices of the NYPD and failed to properly train the NYPD officers in relation to how the exercise of expressive speech affects the policing of protests, including, among other things, the policing for the offense of disorderly conduct.

83. Instead of taking necessary steps to curb the number of unlawful arrests of OWS protestors during the year leading up to the Plaintiffs' arrests, the NYPD made no

policy changes, even though the vast majority of the 2,644 arrests resulted in a form of dismissal.

84. Further, the NYPD and the Chief Defendants made no effort to find out why so many OWS arrests were not prosecuted by the District Attorney's office, or why so many arrests were dismissed.  Nor did the Chief Defendants consider changing the policies or procedures as a result of the dismissal rate.

85. The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants never corrected the implemented policies by training, and never conducted training to prevent or address the problematic policies, and instead in an exhibition of deliberate indifference and/or deliberate disregard allowed the activity to continue.

86. Almost all of the NYPD police officers had only a cursory training on these issues during the brief (six months) time spent in the police academy.

87. OWS protests were policed not merely by patrol officers, but by high-ranking officers such as the Chief Defendants, among others.

88. These high-ranking officers had the ability to see that NYPD officers were incorrectly understanding and applying the law.

89. These high ranking officers had the ability and the duty to set policies that would prevent NYPD officers from making unlawful arrests because of a failure to understand the law.

90. These high ranking officers had the ability and the duty to ensure that NYPD officers had training that would prevent the officers from making unlawful arrests because of a failure to understand the law.

### Police Officers in Charge of the Arrests

91.    On September 15-17, 2012, Defendant Police Assistant Chief Thomas Purtell was the member of the NYPD who was the highest uniformed ranking police supervisor assuming command.  Further, Chief of Department Joseph Esposito was the second in command to Commissioner Ray Kelly, having command over Patrol Services Bureau, Patrol Borough Manhattan South, Assistant Chief Thomas Purtell, and the officers detailed to the OWS anniversary on September 15-17, 2012.  Moreover, in 2011 and 2012, the Chief Defendants were employee of the NYPD who were identified by the NYPD as having "substantial policy discretion" and thus policy makers of the NYPD and the City of New York.

92.    As the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the overall management of the policing activities concerning the event.

93.    As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* as the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the command, control and coordination of all incident operations, including the supervision of all police officers there that day.

94.    In anticipation of the expected expressive speech activity to occur in downtown Manhattan in the days leading up to and on the day of the anniversary of the first march of Occupy Wall Street, Assistant Chief Purtell, along with his two aides, Chiefs Anger and McNamara, prepared a Patrol Borough Manhattan South Detail, that

set out which supervising officers would be working on September 17, 2012, and the location and basic duties of their tour for the day.

95.     The majority of the NYPD officers detailed to the First Anniversary of Occupy Wall Street were members of, and supervised by, the Patrol Services Division; in particular, Patrol Borough Manhattan South, which was under the command of Chief Purtell.

96.     On September 17, 2012 alone, there were more than 1,300 police officers from the Patrol Services Bureau deployed to the immediate area around Wall Street. Further, more than 150 additional officers were deployed to Zuccotti Park and 40 mounted police units were deployed.

97.     Upon information and belief, Defendant Chief Esposito and the Chief Defendants, were aware of the fact that large numbers of the police officers assigned to police OWS events were not properly trained, and did not have a proper understanding of the law governing lawful arrests at such events.

98.     Upon information and belief, Defendant Chief Purtell and the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012 OWS anniversary events consisted of officers who were properly trained and had a proper understanding of the law governing lawful arrests at such events.

99.     Upon information and belief, Defendant Chief Purtell and the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012 OWS anniversary events performed their duties on that day with a proper understanding of the law governing lawful arrests at such events.

100.    Throughout the period of time from September 17, 2011 and through September 15, 2012, the Chief Defendants were aware of information that placed them on clear notice that officers under their command were pursuing arrest practices that violated the Constitutional rights of OWS protestors.

101.    Upon information and belief, throughout the period of time from September 17, 2011 and through September 15, 2012, the Chief Defendants did nothing to impose, develop or modify any policies or practices that would prevent further unlawful arrests.

102.    Upon information and belief, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants did not train officers assigned to OWS events in how to make lawful arrests, and how to avoid unlawful arrests.

103.    Upon information and belief, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants did not assign officers who had proper training to police such arrests.

### The First Anniversary of OWS

104.    In the run-up to the First Anniversary of OWS, expressive activity increased and on September 15, 2012, twenty-seven (27) individuals were arrested which resulted in thirteen arrests (13) resolved with a dismissal, ACD, decline to prosecute and/or acquittal.  On September 16, 2012, fifteen (15) individuals were arrested which resulted in eleven (11) of those arrests resolved with a dismissal, ACD, declined prosecution, and/or acquittal.

105.    The September 15, 2012 on the ground events are detailed by the New York Times:

[On September 15th at 8:30 p.m.], near Thames Street, a commander ordered the crowd to disperse, and a moment later officers pushed into the crowd, knocking down some protesters and arresting some.

The police repeated that maneuver a few minutes later, and then pushed a group of protesters against the side of a building. One man objected, and an officer pulled him from the crowd and arrested him. At least two other arrests followed, with officers appearing to grab some people almost at random.

Across Broadway, a commander announced that protesters could not stand on a stretch of sidewalk. A man yelled that he had the right to be there and the commander chased him for several feet before the man scrambled away.

By 9 p.m., almost all of the remaining protesters left the area as a line of officers advanced toward a group standing on the corner of Liberty Street and Broadway while a captain announced through a megaphone that the group was blocking pedestrian traffic.[11]

106.   On September 17, 2012, thousands of individuals came to New York City to meet downtown and celebrate the First Anniversary of Occupy Wall Street.

107.   Nonetheless, the Defendants failed to assign officers to these expressive speech activities who understood the proper policing of constitutionally protected activity.

108.   On September 17, 2012, the First Anniversary of Occupy Wall Street was celebrated around the world, including within the confines of the NYPD's First Precinct. According to records provided by the New York County District Attorney's office, a report, under a notation "Happy Birthday OWS", listed on this date over one-hundred and

---

[11] Colin Moynihan, *Several Arrests at Occupy Wall Street March*, NY TIMES, http://www.nytimes.com/2012/09/16/nyregion/several-arrests-at-occupy-wall-street-march.html.

eighty (180+) individuals arrested in relation to OWS anniversary expressive speech activity (of which 88% were resolved with a decline to prosecute, dismissal, or ACD).

**The Individual Named Plaintiffs' Experiences**

**Bishop George Packard**

109.    On the morning of September 17, 2012, Plaintiff George Packard was leading a group of individuals in expressive speech activity on the sidewalk in downtown Manhattan.  Many of the individuals were carrying signs and banners, and engaging in verbal political speech.

110.    As the group led by Plaintiff George Packard approached a sidewalk that led to the New York Stock Exchange and Wall Street, the group was stopped by NYPD Police Officers.  The group was not able to proceed, nor was it allowed to turn back.

111.    Plaintiff George Packard was thereafter arrested.   All charges were dismissed with an adjournment in contemplation of dismissal.

**Edward Beck**

112.    On the morning of September 17, 2012, Plaintiff Edward Beck was marching with a group of individuals on the sidewalks in downtown Manhattan, near the iconic Wall Street bull, engaging in expressive speech activity including carrying banners and signs.

113.    While Plaintiff Edward Beck and the group of individuals were on the sidewalk in front of a building on lower Broadway near the corner of Morris Street, engaging in expressive speech activity, other pedestrians were able to walk on the sidewalk in both directions in front of and passed the area where Plaintiff Edward Beck and the group of individuals were standing.

114.    Plaintiff Edward Beck and the group of individuals were on the sidewalk in front of a building on lower Broadway engaging in expressive speech activity when Inspector Edward Winski, among others, entered the sidewalk and grabbed Plaintiff Edward Beck and placed him under arrest along with other individuals.

115.    Plaintiff Edward Beck and others were placed under arrest and detained and charged with disorderly conduct.  All of the charges were dismissed.

**<u>Michelle Berger</u>**

116.    On the morning of September 17, 2012, Plaintiff Michelle Berger was walking with a group of individuals on the sidewalks in downtown Manhattan, near the New York Stock Exchange, engaging in expressive speech activity.

117.    Plaintiff Michelle Berger was with a group of individuals that had come to New York from Pennsylvania to march and engage in expressive speech activity in the financial area of downtown New York City in honor and celebration of the First Anniversary Occupy Wall Street.

118.    Plaintiff Michelle Berger was wearing a backpack and carrying a cup of coffee as she entered a crosswalk, and heard her name behind her.

119.    Plaintiff Michelle Berger turned and saw her friend being swarmed by police and arrested, and she yelled "false arrest" while continuing to cross the street in the crosswalk.

120.    Before Plaintiff Michelle Berger could reach the other side of the street, she was grabbed from behind and twisted around and thrown to the ground.

121.    Plaintiff Michelle Berger was arrested and detained and charged with disorderly conduct.  The Manhattan District Attorney's Office declined to prosecute the charges.

**Ari Cowan**

122.    On the morning of September 17, 2012, Plaintiff Ari Cowan was walking with a group of individuals on the sidewalks in downtown Manhattan, near Zuccotti Park, the Federal Reserve Bank, and the Chase Manhattan Building while engaging in expressive speech activity.

123.    Plaintiff Ari Cowan was with a group of individuals that had come to downtown New York to march and engage in expressive speech activity in the financial area in honor and celebration of the First Anniversary of Occupy Wall Street.

124.    Plaintiff Ari Cowan and the group he was marching with were on Liberty Street as they approached scaffolding overhanging the sidewalk.

125.    Some of the individuals marching with Plaintiff Ari Cowan were carrying signs, and some individuals were carrying banners.

126.    As Plaintiff Ari Cowan and the individuals marched through the sidewalk area underneath the scaffolding, a NYPD police officer ordered individuals to make room on the sidewalk and to stay to one side of the sidewalk.

127.    Immediately after the officer made this announcement, he entered the sidewalk, along with other police officers, and grabbed Plaintiff Ari Cowan and detained and arrested him.

128.    While Plaintiff Ari Cowan was arrested, other police officers detained other individuals that were also engaged in expressive speech activity in the group marching with Plaintiff Ari Cowan.

129.    Plaintiff Ari Cowan and charged with disorderly conduct. The charges were dismissed in an adjournment in contemplation of dismissal.

**Connor Hicks**

130.    On the morning of September 17, 2012, Plaintiff Connor Hicks joined friends to march on the sidewalks of downtown Manhattan and engage in expressive speech activity.

131.    Plaintiff Connor Hicks was with a group on West Street near Albany Street, and they sought to engage in expressive speech activity at the entrance to the Goldman Sachs office building. NYPD police officers would not allow these individuals to engage in expressive speech activity in front of the Goldman Sachs office building and the Plaintiff Connor Hicks and other individuals were forced by the officers to continue walking.

132.    These individuals were carrying signs and banners expressing political speech. These individuals were also engaged in verbal expressive speech activity.

133.    As the individuals crossed West Street, an unknown female was walking in the crosswalk when she was pushed from behind.

134.    Plaintiff Connor Hicks had been engaging in expressive speech activities with this group of individuals. Plaintiff Connor Hicks cautiously approached this female to help her to her feet, but waited to ensure nobody from the NYPD had his or her hands on this female.

135.   Plaintiff Connor Hicks began to help this female to cross the street and was pushed violently from behind by a police officer, knocked to the ground, brought to the middle of the street, and arrested.  The charges were dismissed via an adjournment in contemplation of dismissal.

136.   The arrest of Plaintiff Connor Hicks, and the other individuals that were arrested and brought into the roadway of this intersection, caused more vehicular traffic to be blocked than the momentary blockage the initial individuals made.

**Charles Meacham**

137.   Around 8:25 pm on September 15, 2012, near Trinity Church on lower Broadway within the confines of the First Precinct, an individual was being arrested, and a group of photographers was taking photographs nearby.

138.   Approximately ten minutes after this arrest, Inspector Winski came onto the sidewalk and grabbed Plaintiff Charles Meacham.

139.   Plaintiff Charles Meacham is a professional photographer who was present in his professional capacity.

140.   Plaintiff Charles Meacham was detained by Inspector Winski and passed to Police Officer Thomas Doonan to process Plaintiff's arrest.

141.   Plaintiff was charged with disorderly conduct.  The charges were subsequently dismissed.

142.   Plaintiff was one of twenty-seven individuals arrested on September 15, 2012.

**Chris Phillips**

143.   On the morning of September 17, 2012, Plaintiff Chris Phillips was walking with a group of individuals on the sidewalks in downtown Manhattan, near the

Federal Reserve Bank and the Chase Manhattan Building, engaging in expressive speech activity.

144.    Plaintiff Chris Phillips was with a group of individuals that had come to downtown New York to march and engage in expressive speech activity in the financial area in honor and celebration of the First Anniversary of Occupy Wall Street.

145.    Plaintiff Chris Phillips and the group he was marching with were stopped near the intersection of Liberty Street and Broadway when he was grabbed from behind by the neck and pushed to the ground.

146.    Plaintiff Chris Phillips was arrested and detained and charged with disorderly conduct.  The Manhattan District Attorney's Office declined to prosecute these charges.

**Larry Swetman**

147.    On the morning of September 17, 2012, Plaintiff Larry Swetman was standing with a group of individuals in front of a Bank of America branch on lower Broadway across the street from Zuccotti Park.

148.    Plaintiff Larry Swetman and the other individuals standing with him were engaged in expressive speech activity including holding signs, banners, and making verbal speeches.

149.    While Plaintiff Larry Swetman and the other individuals were standing in front of the Bank of America branch, no individual sought to enter or exit the Bank of America branch.  Similarly, the sidewalk was not blocked and pedestrians were able to walk by the area where these individuals were standing.

150.    While Plaintiff Larry Swetman and the other individuals were standing in front of the Bank of America branch engaging in expressive speech activity, without warning that they were engaged in unlawful conduct, NYPD Sergeant Arthur Smarsch, among other police officers, began to grab Plaintiff Larry Swetman and others.

151.    As these police officers began to physically grab Plaintiff Larry Swetman and the other individuals who were engaged in expressive speech activity in front of the Bank of America branch, Plaintiff Larry Swetman and other individuals placed their hands in the air and asked to be able to disperse.

152.    Plaintiff Larry Swetman and the other individuals who were standing in front of the Bank of America branch were not allowed to disperse and were arrested.

153.    The charges were dismissed via an adjournment in contemplation of dismissal.

**Amadon Dellerba**

154.    On the morning of September 17, 2012, Plaintiff Amadon Dellerba was live streaming from the sidewalk of a street near the New York stock exchange.

155.    Plaintiff Dellerba was utilizing a monopod with a cell phone on top of it to engage in First Amendment activity.

156.    Plaintiff Dellerba's livestreaming had an audience that was watching the events of the First Anniversary of Occupy Wall Street live.

157.    While walking on the sidewalk in downtown Manhattan, Plaintiff Dellerba was tackled from behind, picked up and shoved up against scaffolding by a NYPD police officer.

158.    Plaintiff Dellerba was placed under arrest and detained and charged with disorderly conduct and other charges.

159.    All of the charges against Plaintiff Dellerba were resolved via an adjournment in contemplation of dismissal.

160.    The Plaintiffs' individual accounts are illustrative of the numerous arbitrary arrests conducted throughout the day, where police officers frequently roamed through the crowds of protesters and picked individuals to arrest without witnessing actual criminal conduct or having probable cause.  There were no warrants out for the Plaintiffs' arrests, and instead they were attempting to exercise their First Amendment right to protest.

161.    These violations of the Plaintiffs' constitutional rights as protected by the First and Fourth Amendment occurred because the City of New York, Mayor Bloomberg, Commissioner Kelly, and the Chiefs Defendants all exhibited deliberate indifference and disregard to the effect of the policies and practices of the NYPD towards protestors acting without criminal conduct despite the numerous lawsuits, stemming from the 2004 Republic National Committee Convention and the prior year's arrests; the vast majority of the prior year's arrest resulting in dismissal; and the scathing reports in the newspapers and from human rights organizations highlighting the unlawful and harmful policies and practices of the NYPD.

## FIRST CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

162.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

163.   At all relevant times herein, Defendant City of New York established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments.  All of the aforementioned acts of the Chief Defendants, their agents, servants and employees, were carried out under the color of state law.

164.   The City of New York, Mayor Bloomberg, Commissioner Kelly, and the Chief Defendants at all times relevant to the class, had a duty to the Plaintiffs and the class to make the appropriate choice to (1) establish, implement and follow policies, procedures, customs, and or practices which conform to and provide for the protections guaranteed to Plaintiffs and the class under the United States Constitution, including the First, Fourth, and Fourteenth Amendment; (2) select, supervise, train, control, and review the activities of all agents, servants, employees, and police officers in their employ, and (3) refrain from deliberate indifference to the Constitutional rights of the Plaintiffs and the class so as to not cause them injuries and damages alleged herein.

165.   The City of New York, Mayor Bloomberg, Commissioner Kelly, and the Chief Defendants breached their duties and obligations to the Plaintiffs and the class by, making the wrong choice when: (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with Constitutional safeguards; (3) permitting their agents, servants, employees, and police officers to engage in the unlawful

and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to the Plaintiffs and the class by disregarding the numerous lawsuits, statistical evidence, and reports indicating that the policies, procedures, customs, and/or practices were improper and violated the Plaintiffs' and class' Constitutional rights.

166.    Furthermore, the members of the NYPD carried out the alleged conduct in their capacities as police officers and under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendant the City of New York and the NYPD, all under the supervision of the Chief Defendants, Commissioner Kelly, and Mayor Bloomberg.

167.    Defendants knew, or should have known, that by breaching the aforesaid duties and obligations, it was foreseeable that these choices would and did cause Plaintiffs and the class to be injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the policies, procedures, customs, and/or practices, and that such decisions occurred in contravention of public policy and their legal duties and obligations to Plaintiffs and the class.

168.    The decisions, actions, and inactions, of Defendants and their agents are the legal cause of injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

## SECOND CLAIM FOR RELIEF

## FALSE ARREST

169.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

170.    Plaintiffs were arrested by the members of the NYPD without probable cause, without a warrant, and without the Plaintiff's consent.

171.    As a result of the above constitutionally impermissible conduct, Plaintiffs and the class suffered violations of their civil rights, loss of liberty, and other special damages.

172.    As a result of the police officers' impermissible conduct, the Plaintiffs demand judgment against the City of New York and the Chief Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

a)  Certify the class as requested herein, appoint Plaintiffs as the class representatives, and the undersigned counsel as counsel to the class, and require Defendants to bear the cost of class notice;

b)  Award general damages in an amount to be determined by proof at trial;

c)  Award appropriate compensatory and punitive damages;

d)  Enter an order enjoining the City of New York and the NYPD from continuing the unconstitutional policies, procedures, customs, and/or practices of arresting

individuals engaged in expressive free speech, as protected under the First

Amendment, for disorderly conduct without actual criminal conduct;

e) Invoke pendent party and pendent claim jurisdiction;

f) Award attorneys' fees and costs;

g) Provide such further relief as may be just and proper and in the interests of justice.


DATED:        September 10, 2015        **WOLF HALDENSTEIN ADLER**
                                        **FREEMAN & HERZ LLP**

                                          _/s/ Jeffrey G. Smith_____
                                        Jeffrey G. Smith
                                        Janine L. Pollack
                                        Kevin G. Cooper
                                        270 Madison Ave.
                                        New York, NY 10016
                                        Tel.:    (212) 545-4600
                                        Fax:     (212) 686-0114
                                        Smith@whafh.com
                                        Pollack@whafh.com
                                        KCooper@whafh.com


                                        **STECKLOW & THOMPSON**
                                        Wylie M. Stecklow (WS6012)
                                        David A. Thompson (DT3991)
                                        217 Centre Street, 6th Floor
                                        New York, New York 10013
                                        Tel.:    (212) 566-8000
                                        Fax:     (212) 202-4952
                                        Wylie@sctlaw.nyc
                                        DThompson@sctlaw.nyc


                                        *Counsel for Plaintiffs*