UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE PACKARD, EDWARD BECK,
MICHELLE BERGER, ARI COWAN, CONNOR
HICKS, CHARLES MEACHAM, CHRIS
PHILLIPS, LARRY SWETMAN, and AMADON
DELERBA, *individually and on behalf of all others
similarly situated*,

                                        Plaintiffs,

                    -against-

THE CITY OF NEW YORK, a municipal entity,
FORMER NYPD CHIEF OF PATROL JOSEPH
ESPOSITO, FORMER NYPD COMMISSIONER
RAY KELLY, FORMER MAYOR MICHAEL
BLOOMBERG, NYPD CHIEF THOMAS P.
PURTELL, NYPD DEPUTY CHIEF STEVEN
ANGER, and NYPD DEPUTY CHIEF JAMES
MCNAMARA,

                                        Defendants.

Index No. 15-cv-7130(AT)


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................6

LEGAL STANDARD .........................................................................................................10

ARGUMENT.......................................................................................................................12

I.  PLAINTIFFS HAVE PLEAD FACTS BEYOND WHAT IS NEEDED TO
    MAKE THEIR *MONELL* CLAIMS AGAINST DEFENDANTS PLAUSIBLE..............12

II. PLAINTIFFS MEET THE STANDARDS FOR ALLEGING
    *MONELL* CLAIMS AGAINST DEFENDANTS FOR A FAILURE
    TO TRAIN AND A PERVASIVE PRACTICE................................................................21

    A.  The City Deprived Plaintiffs Of Their First Amendment Rights .........................21

        1.  Plaintiffs Were Engaged In Political
            Speech Protected by the First Amendment...............................................22

        2.  The City Deprived Plaintiffs of Their First Amendment Rights
            Through The Illegal Application Of The Disorderly Conduct Statute ......23

    B.  City Policymakers Failed to Properly Train or Supervise
        Subordinates On The First Amendment Rights of Protestors .............................24

        1.  The City Failed to Properly Train the NYPD ...........................................25

        2.  The City Had Notice That Training Was Deficient...................................30

    C.  The City's Practice Was So Pervasive That Policymakers
        Had Constructive Knowledge of the Practice......................................................33

    D.  The City's Practice and Policy Caused the Violation
        of Plaintiffs' Constitutional Rights.....................................................................33

III. PLAINTIFFS HAVE ADEQUATELY ALLEGED SUFFICIENT
     FACTS IN SUPPORT OF THEIR UNLAWFUL ARREST CLAIMS ..........................34

CONCLUSION....................................................................................................................36

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Amnesty America v. Town of West Hartford,*
  361 F.3d 113 (2d Cir. 2004) ...................................................................................25, 26, 27

*Anderson News, LLC v. American Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012) ...........................................................................................10, 18

*Arista Records LLC v. Doe,*
  604 F.3d 110 (2d Cir. 2010) ...........................................................................................10, 14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................................................................10

*Awelewa v. New York City,*
  11 Civ. 778, 2012 U.S. Dist. LEXIS 24244 (S.D.N.Y. Feb. 22, 2012) .....................................14

*Battle v. City of New York,*
  No. 11 Civ. 3599 (RMB), 2012 U.S. Dist. LEXIS 5256 (S.D.N.Y. Jan. 13, 2012) .............13, 27

*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996) ...................................................................................................22

*Broughton v. State,*
  37 N.Y.2d 451 (1975),
  *cert denied sub nom. Schanbarger v. Kellogg,* 423 U.S. 929 (1975) ................................*passim*

*Brown v. City of New York,*
  306 F. Supp. 2d 473 (S.D.N.Y. 2004) ..............................................................................4, 18

*Candelario v. City of New York,*
  No. 12 Civ. 1206 (LAP), 2013 U.S. Dist. LEXIS 48412 (S.D.N.Y. Mar. 29, 2013) ................18

*Cantey v. City of New York,*
  No. 10-cv-4043, 2012 U.S. Dist. LEXIS 182323 (S.D.N.Y. Dec. 11, 2012) (Oetken, J.) ... 10-11

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940).................................................................................................................23

*City of Chicago v. Morales,*
  527 U.S. 41 (1999)...................................................................................................................23

*Collins v. City of New York,*
  923 F. Supp. 2d 462 (E.D.N.Y. 2013) ...................................................................................14

*Connick v. Thompson*,
  563 U.S. 51 (2011)..................................................................................11, 29

*Curry v. City of Syracuse*,
  316 F.2d 324 (2d Cir. 2003) .......................................................................4

*Dickerson v. Napolitano*,
  604 F.3d 732 (2d Cir. 2010) .............................................................*passim*

*Edwards v. City of New York*,
  14-cv-10058, 2015 U.S. Dist. LEXIS 114039 (S.D.N.Y. Aug. 27, 2015) ...............26

*Edwards v. South Carolina*,
  372 U.S. 229 (1963)..................................................................................23

*Evans v. City of New York*,
  12-cv-5341, 2015 U.S. Dist. LEXIS 38546 (E.D.N.Y. Feb. 24, 2015) ...................23

*Feliciano v. County of Suffolk*,
  419 F. Supp. 2d 302 (E.D.N.Y. 2005) .........................................................15

*Fiacco v. Rensselaer*,
  783 F.2d 319 (2d Cir. 1986) ................................................................ 31-32

*Floyd v. City of New York*,
  813 F. Supp. 2d 417 (S.D.N.Y. 2011) .........................................................20

*Fulton v. Robinson*,
  289 F.3d 188 (2d Cir. 2002) .......................................................................18

*Frisby v. Schultz*,
  487 U.S. 474 (1988)..................................................................................22

*Hickey v. City of New York*,
  01 Civ. 6506, 2004 U.S. Dist. LEXIS 23941 (S.D.N.Y. Nov. 24, 2004) ...............14

*Higginbotham v. City of New York*,
  105 F. Supp. 3d 369 (S.D.N.Y. 2015) .........................................................19

*Holmes v. City of New York*,
  14-cv-5253, 2016 U.S. Dist. LEXIS 27945 (S.D.N.Y. Mar. 4, 2016)...................26

*Jaegly v. Couch*,
  439 F.3d 149 (2d Cir. 2006) .......................................................................34

*Jenkins v. City of New York*,
478 F.3d 76 (2d Cir. 2007) ..................................................................................26

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015) ................................................................................18

*Marcavage v. City of New York*,
689 F.3d 98 (9th Cir. 2012) ......................................................................22, 23, 29

*Marisa Holmes v. The City of New* York,
No. 14-CV-5253(LTS), slip op. at 13-14 (S.D.N.Y. Mar. 4, 2016) .........................25

*Marom v. City of New York*,
15-cv-2017, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016).......................27

*Mateo v. County of Suffolk*,
12-cv-6160, 2014 U.S. Dist. LEXIS 150393 (E.D.N.Y. Oct. 23, 2014) .....................2

*Matos v. City of New York*,
10-cv-4558, 2012 U.S. Dist. LEXIS 186250 (E.D.N.Y. Nov. 30, 2012) ....................4

*Monell v. Department of Social Services*,
436 U.S. 658 (1978)...................................................................................*passim*

*NCUA Board v. Wachovia Capital Markets, LLC*,
13-cv-6719, 2014 U.S. Dist. LEXIS 62592 (S.D.N.Y. May 6, 2014).....................5, 6

*Okin v. Village of Cornwall-on-Hudson Police Department*,
577 F.3d 415 (2d Cir. 2009) ........................................................................*passim*

*Papineau v. Parmley*,
465 F.3d 46 (2d Cir. 2006) .........................................................................21, 23, 29

*People v. Johnson*,
22 N.Y.3d 1162 (2014)........................................................................................23

*People v. Jones*,
9 N.Y.3d 259 (2007) ...........................................................................................23

*People v. Munafo*,
50 N.Y.2d 326 (1980) ..........................................................................................23

*People v. Tichenor*,
89 N.Y.2d 769 (1997)..........................................................................................23

*Sletten v. LiquidHub, Inc.*,
  13-cv-1146, 2014 U.S. Dist. LEXIS 94697 (S.D.N.Y. July 10, 2014).......................................14

*Snyder v. Phelps*,
  562 U.S. 443 (2011).........................................................................................................22

*Torraco v. Port Authority*,
  615 F.3d 129 (2d Cir. 2010) ............................................................................................18

*Walker v. New York*,
  974 F.2d 293 (2d Cir. 1992) ............................................................................................11

*Weyant v. Okst*,
  101 F.3d 845 (2d Cir. 1996) ............................................................................................34

*Wray v. City of New York*,
  490 F.3d 189 (2d Cir. 2007) ....................................................................................4, 11, 25

## STATUTES AND RULES

42 U.S.C. § 1983....................................................................................................1, 10, 11

Federal Rules of Civil Procedure
  8 .........................................................................................................................................10
  12(b).....................................................................................................................................5
  12(b)(6).................................................................................................................................4

New York Penal Law
  240 .......................................................................................................................................7
  240.20(5)............................................................................................................................29
  250.20(5)............................................................................................................................28

Plaintiffs George Packard, Edward Beck, Michelle Berger, Ari Cowan, Connor Hicks, Charles Meachem, Chris Phillips, Larry Swetman, and Amadon Dellerba ("Plaintiffs") submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Motion") submitted by the City of New York (the "City") as well as Former NYPD Chief of Patrol Joseph Esposito, Former NYPD Commissioner Ray Kelly, Former Mayor Michael Bloomberg, NYPD Chief Thomas P. Purtell, NYPD Deputy Chief Steven Anger, and NYPD Deputy Chief James McNamara (the "Individual Defendants" and collectively with the City, "Defendants").

## INTRODUCTION

Plaintiffs, nine protesters engaged in the Occupy Wall Street Movement ("OWS"), were unlawfully arrested without probable cause or warrants while engaged in expressive speech activity during the First Anniversary of Occupy Wall Street. These arrests were conducted with deliberate indifference to the rights of protestors pursuant to a practice, policy, and/or custom well-known to and approved by the named Individual Defendants. Moreover, as part and parcel of that deliberate indifference, this practice, policy, and custom (hereafter, "practice") was the direct and proximate result of the City of New York's failure to train its police officers in the proper methods of policing those engaged in expressive speech activity and the protections guaranteed to such individuals under the First Amendment of the United States Constitution.

Plaintiffs seek redress on behalf of themselves and a class of similarly situated individuals for the violations of their constitutional rights under 42 U.S.C. § 1983 and *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), and allege claims against the City and the Individual Defendants for violations of Plaintiffs' civil rights as secured and protected by

the Constitution and laws of the United States and State of New York. *See* Class Action Complaint (the "Complaint"), Dkt. No. 7.[1]

Plaintiffs allege that the constitutional violations are a direct and proximate result of Defendants' failure to train NYPD police officers in the proper methods of policing individuals engaged in expressive speech activity protected by the First Amendment of the United States Constitution. ¶ 4.[2] Plaintiffs concurrently allege that the City's failure to train its officers has resulted in sustaining a practice so pervasive that the Individual Defendants were deliberately indifferent to the result of this failure to train and this failure's effect on the constitutional rights of individuals such as Plaintiffs. ¶¶ 3; 161. As such, Plaintiffs have pled a practice of "arresting individuals engaged in expressive speech activity [i.e., political protests] absent actual criminal conduct." ¶ 42(b).

Specifically, the Complaint alleges that during the First Anniversary of Occupy Wall Street, Plaintiffs' rights were directly violated by this failure to train when Plaintiffs engaged in expressive speech activity and were wrongfully arrested without warrants or probable cause in contravention of established legal precedent. ¶¶ 109-60. Plaintiffs were among over 180 similarly situated individuals who had their rights violated by Defendants during the First Anniversary of Occupy Wall Street protests. ¶ 11.[3]

---

[1] Municipal liability is based on two of the four well-established means of stating a *Monell* claim, alleging "a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials," and concurrently, "a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." *Mateo v. County of Suffolk*, 12-cv-6160, 2014 U.S. Dist. LEXIS 150393, at *24 (E.D.N.Y. Oct. 23, 2014).

[2] All paragraph references ("¶") are to the Complaint, unless otherwise specified.

[3] The First Anniversary of Occupy Wall Street occurred September 15-17, 2012.

Despite Plaintiffs' factual allegations, which are founded upon five pillars of facts, *inter alia*, sworn statements of senior police officials, scholarly reports, newspaper articles, civil cases, and statistics relating to the dismissal of arrests, Defendants' Motion trots out threadbare anti-*Monell* arguments typically used in defense of garden-variety individual police brutality claims that include a *Monell* claim aimed at the individual officer but lack the extensive factual bases of the instant Complaint.

Defendants' Motion misses the mark in several key respects. First, Defendants contend that there are no allegations linking the City's policy to the violation of Plaintiffs' rights. Motion at 4. Defendants' contention fails as the Complaint alleges that the police officers made the arrests at issue because of a failure to understand the law, which is a direct result of the City's failure to train the officers in the relevant law. ¶¶ 6-11; 68-71; 74.

Second, Defendants contend that a specific deficiency in the training is not alleged and that the Complaint is premised on the need for more training. Motion at 8. But in fact the Complaint alleges not only that there was not sufficient training, for instance during the August 2011 training, but that there was *no training on First Amendment issues* at that training exercise or at any other point after the academy. ¶¶ 68; 71; 73.[4]

Third, Defendants argue that the factual bases for the allegations are not sufficient to establish that Defendants were deliberately indifferent. Motion at 7. Defendants' third contention presents this Court with a false question. Defendants erroneously describe the Complaint as "littered with unsupported accusations and bald assertions" and "phantom 'facts,'"[5]

---

[4] Plaintiffs do not waive any arguments regarding any purported training on First Amendment issues at the Police Academy.

[5] *See* Motion at 1.

"devoid of substance,"[6] "a screed,"[7] and then ask this Court to apply a summary judgment standard to the Complaint on this Rule 12(b)(6) motion. Defendants repetitively cite cases with fully developed records that apply summary judgment standards. *See, e.g., Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007) (summary judgment); *Brown v. City of New York*, 306 F. Supp. 2d 473 (S.D.N.Y. 2004) (summary judgment); *Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) (summary judgment). Indeed, Defendants rely on an astonishing twenty-one (21) cases in support of their arguments that are judicial opinions relating to summary judgment proceedings or appeals from trial judgments. Defendants' reliance on these summary judgment opinions may have led them to believe that the proof of facts is necessary at this juncture, such as deliberate indifference,[8] but this is wholly inappropriate at this stage of the litigation.

While Defendants point to a few decisions which criticized a pleading's reliance on citations to particular sources such as other civil lawsuits, the true weakness of the pleadings in such cases was their lack of substance *other than* such citations to civil lawsuits. For example, Defendants cite a case criticizing reliance solely on other civil suits, where the entire *Monell* claim was four paragraphs, and simply alleged the existence of "notices of claim, lawsuits, [and] complaints" without any further elaboration. *See Matos v. City of New York*, 10-cv-4558, 2012 U.S. Dist. LEXIS 186250, at *4 (E.D.N.Y. Nov. 30, 2012); Matos Complaint at ¶¶ 20-23, 10-cv-04558, Dkt. 1. Plaintiffs' Complaint alleges much more than in these cases, including direct sworn testimony from a high level police official containing critical admissions about the lack of training on First Amendment arrests.

---

[6] *See* Motion at 7.

[7] *See id.*

[8] *See* Motion at 18.

Defendants further seek to obfuscate the issue before the Court, and attempt to posit a question about whether certain allegations taken separately and deprived of context would state a claim. This is not the proper standard at the 12(b) stage. Instead, the proper standard is whether all the allegations taken together state a cause of action. *See NCUA Bd. v. Wachovia Capital Mkts., LLC*, 13-cv-6719, 2014 U.S. Dist. LEXIS 62592, at *8 (S.D.N.Y. May 6, 2014) ("[E]ach complaint must be examined in its totality to determine whether its set of allegations and the context it provides for those allegations meet the pleading standard at issue.").

Defendants' Motion illustrates the City's obstinacy and refusal to acknowledge that there is a need for change to the NYPD's training policies in order to comply with established legal precedent. Indeed, the caustic brief and many sets of quotation marks around "protests" and "protestors" signify a clear disregard for those who expressed their First Amendment beliefs during the Occupy Wall Street protests.[9] Further, Defendants reprehensibly throw the New York District Attorneys' Office under the bus when they argue that the sheer amount of cases dismissed were possibly because the District Attorney's Office dismissed the charges against each of the hundreds of individuals due to, *inter alia*, "convenience" or an "abdication of prosecutorial responsibilities." Motion at 10. Defendants ignore that the District Attorneys' job is to decide whether the City has a valid criminal case against an individual. Instead, their willingness to impugn their colleagues rather than take notice of the high dismissal and settlement payment rates as indications that perhaps there is a problem with the underlying arrests, shows a conscious disregard for the rights of those arrested individuals. A change is necessary to ensure that the pattern, policy, and practice of the NYPD misapplying the disorderly

---

[9] Despite Defendants' continued assertions to the contrary, Occupy Wall Street was a globally recognized protest. *See, e.g.,* ¶¶ 49-50 (describing Occupy Wall Street); ¶ 61 (statement of Defendant Bloomberg regarding Occupy Wall Street protestors in the UK news source, *The Guardian*).

conduct statute to peaceful political protesters ends and no longer results in the unlawful arrest of individuals engaged in expressive speech activity.

The City has maintained these practices and policies that violate the constitutional rights of individuals engaged in expressive speech activity for far too long. Instead of learning from the mistakes of the past, including the altercations at the 2004 Republican Convention through the beginning of Occupy Wall Street, the City and the Individual Defendants ignored the almost certain risk that unlawful arrests would occur during the First Anniversary of Occupy Wall Street as the untrained police officers on the scene followed this standing policy and practice. The City's and the Individual Defendants' actions are the very definition of "deliberate indifference" and, as such, their Motion should be denied.

## STATEMENT OF FACTS

*Plaintiffs' Facts Supporting Monell Claims*

Despite Defendants' arguments to the contrary, Plaintiffs have pled five factual pillars that when taken together support the *Monell* claim based on the NYPD's sustained practice of arresting protestors engaged in First Amendment protected speech without warrants or probable cause. These five pillars should be viewed in totality, not individually alone.[10]

First, Plaintiffs rely in part on the sworn testimony of NYPD Inspector Winski which confirmed that while police officers undergo numerous types of training as they progress through the ranks of the NYPD, such as Sergeant training, Lieutenant training, pepper spray training, baton training, and mass formation training, police officers do not receive any additional training on the First Amendment or its effect on protestor activities after the police academy. ¶ 67.

---

[10] *See NCUA*, 2014 U.S. Dist. LEXIS 62592, at *8 ("[E]ach complaint must be examined in its totality to determine whether its set of allegations and the context it provides for those allegations meet the pleading standard at issue.").

Further, when questioned about the rights of protestors engaged in First Amendment protected-activity, Inspector Winski testified that the First Amendment-protected activity has no bearing on the manner with which New York Penal Law 240 (disorderly conduct) is charged against them, in contravention of established legal precedent. ¶ 68. The testimony of this high level police officer speaks clearly and directly to the lack of training and the need for specific training as well as to the existence of a policy deliberately indifferent to the civil rights of political protestors.

Second, Plaintiffs also rely on the highly regarded Suppressing Protest Report, a 195 page report summarizing extensive research concerning NYPD policing of protests from September 2001 to July 2012, conducted by faculty and student researchers at the law schools of NYU, Fordham, Stanford, and Harvard. ¶ 60. The Suppressing Protest Report and its thorough research highlights the NYPD's continued violation of protestors' First Amendment rights over a prolonged period of time. ¶¶ 8; 60. Moreover, the City and the Individual Defendants were aware of the Report and its contents as it was provided to the NYPD and the Individual Defendants by its writers. ¶ 75.

Third, Plaintiffs also rely on news reports of professional observers on the ground which highlighted the complete disregard of New York police officers to the rights of protestors. For example, Plaintiffs provided an excerpt from The New York Times detailing the arrest of a protestor from a trove of news articles written about the Occupy Wall Street protests, which specifically detailed the initial rationale for the subject arrest, and a different rationale for the arrest later, despite the reporter's own eyewitness account differing from either official rationale provided by the NYPD. ¶ 51.

Fourth, Plaintiffs also rely on numerous civil litigations that have sprung up as a result of this policy and practice, from at least 2004,[11] as evidenced from the numerous lawsuits spawned, litigated, and settled from protest situations since the 2004 Republican National Convention, which, for example, resulted in a settlement of $18 million for unlawfully arresting protestors. ¶ 72. City officials surely took notice, or should have but for their deliberate indifference. Similar lawsuits arose from the arrests of Occupy Wall Street protestors that resulted in numerous settlements for the actions of the NYPD and its officers. ¶¶ 56; 64-65. Seventeen lawsuits arising from the Occupy Wall Street protests were filed prior to the First Anniversary of Occupy Wall Street. ¶ 65.

Fifth, Plaintiffs rely on the high dismissal rates of those arrested during the first year of Occupy Wall Street. From September 17, 2011 through September 17, 2012, 2,644 members of Occupy Wall Street were arrested in Manhattan alone. ¶ 61. Of these 2,644 arrests, only 409 resulted in a plea or a conviction, indicating an extremely low conviction rate of just over 15% for the thousands of arrests. *Id.*

*Plaintiffs' Arrests*

Plaintiffs' claims arise from their arrests during the First Anniversary of Occupy Wall Street. ¶¶ 13; 19-27. Each plaintiff was engaged in expressive speech activity related to the First Anniversary of Occupy Wall Street. ¶¶ 19-27. Each plaintiff was arrested either on the sidewalk or in the cross-walk. *Id.* Each plaintiff was arrested without a warrant or probable cause. ¶ 160. Each plaintiff was charged with disorderly conduct and detained for a minimum of six hours. ¶¶ 19-27. All charges against each plaintiff were subsequently dismissed, dismissed with an

---

[11] Plaintiffs can even point to eyewitness reports from as far back as 2003 relating to the unlawful arrest of protestors on New York City sidewalks and the resultant cases and settlements. *See, e.g., Kunstler v. City of New York*, No. 04-cv-1145(RWS) (involving 52 protestors who were unlawfully arrested during an anti-war rally in New York in April 2003).

adjournment in contemplation of dismissal, or declined to be prosecuted by the Manhattan District Attorney's Office. ¶¶ 111, 115, 121, 129, 135, 141, 146, 153, 159.

Plaintiffs were arrested among over 180 other class members pursuant to a practice of "arresting individuals engaged in expressive speech activity absent actual criminal conduct." ¶¶ 42(b); 108. The arrests deprived Plaintiffs and the other class members of their right to engage in expressive speech activity as guaranteed by the First Amendment of the United States Constitution. ¶¶ 39-40. As explained below, this practice must be considered the City's policy because the City failed to train NYPD police officers in the proper methods of policing the First Amendment. The practice is so widespread that policymakers had knowledge of the practice and are deliberately indifferent to its effect on citizens' civil rights as evidenced by the disregard for the many civil lawsuits, news articles, reports, and dismissal records that occurred due to the practice.

Plaintiffs' arrests, as well as the arrests of the 180 other class members during the First Anniversary of Occupy Wall Street, resulted in an 88% dismissal rate due to dismissal, adjournment in contemplation of dismissal, or declined prosecutions by the Manhattan District Attorney's Office. ¶ 108.

*The City's Failure to Train*

In August 2011, in preparation for Occupy Wall Street and the large number of expected protestors, the City of New York and the Individual Defendants conducted a large-scale training for the NYPD on Randall's Island. ¶ 73. This training did not address First Amendment issues or the First Amendment's effect on policing methods or on how policing efforts might accommodate the First Amendment. *Id.* Instead, the training focused solely on standard disorder control formations. *Id.*

Similarly, as identified through the deposition testimony of NYPD Inspector Winski and multiple other officers, while police officers undergo numerous types of training as they progress through the ranks of the NYPD, they do not receive any additional training on the First Amendment or its effect on policing methods of protestor activity after the police academy. ¶¶ 67; 71. The amount of training received at the academy is also ambiguous given that when questioned about the rights of protestors engaged in First Amendment protected-activity, Inspector Winski testified that the First Amendment-protected activity has no bearing on the manner with which New York Penal Law 240 (disorderly conduct) is charged against them, in contravention of established legal precedent. ¶¶ 68; 86.

## LEGAL STANDARD

Fed. R. Civ. P. 8 requires that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief." In order to meet this standard and survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Neither *Twombly* nor *Iqbal* "require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010). In the plausibility analysis, the Court must accept all allegations in the pleading as true and "draw[ ] all reasonable inferences and resolve[ ] all conflicts and ambiguities in favor of plaintiffs." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 168 (2d Cir. 2012) (citing *Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81, 85 n.1 (2d Cir. 2011)).

Claims based on *Monell* and 42 U.S.C § 1983 do not require any heightened pleading standards. *See, e.g., Cantey v. City of New York*, No. 10-cv-4043, 2012 U.S. Dist. LEXIS

182323, at *12 (S.D.N.Y. Dec. 11, 2012) (Oetken, J.) ("*Monell* claims are subject to the same liberal pleading standards of Rule 8(a)(2).").

Under *Monell,* a city can be found liable for "constitutional deprivations visited pursuant to governmental custom." *Monell,* 436 U.S. at 690-91. Further, "[to] hold a city liable under § 1983 for the unconstitutional actions of is employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray*, 490 F.3d at 195.

A city's Section 1983 liability may be "premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). The Second Circuit requires a showing of three elements to support a claim that a city's failure to train amounted to or amounts to a deliberate indifference of the rights of citizens: (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Walker v. New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

"[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v.*

*Thompson*, 563 U.S. 51, 61-62 (2011). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

In addition to liability for a failure to train, a city violates Section 1983 when it is "found to have a custom that causes a constitutional violation when 'faced with a pattern of misconduct[, it] does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Okin*, 577 F.3d at 439 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

## ARGUMENT

## I. PLAINTIFFS HAVE PLEAD FACTS BEYOND WHAT IS NEEDED TO MAKE THEIR *MONELL* CLAIMS AGAINST DEFENDANTS PLAUSIBLE

Plaintiffs have plead multiple factual supports for their claims that Defendants maintained a practice of arresting individuals engaged in expressive speech activity absent probable cause or warrants, surpassing the requisite standard of plausibility at the 12(b) stage. Plaintiffs rely on these factual supports to show that Defendants failed to train NYPD police officers in the proper methods of policing individuals engaged in expressive speech activity protected by the First Amendment and, concurrently, that the City's failure to train its officers has resulted in sustaining a practice so pervasive that the Individual Defendants were deliberately indifferent to the result of this failure to train and this failure's effect on the constitutional rights of individuals such as Plaintiffs. Defendants speciously attack the factual supports individually in an effort to counter the allegations, ignoring motion to dismiss standards and instead relying on summary judgment standards. Even so, contrary to Defendants' contentions of deficiency, Plaintiffs allege this practice's existence with five pillars of facts that, when taken together, support the plausible

conclusion that this practice existed and caused the constitutional violations of Plaintiffs and the members of the class.

First, Plaintiffs rely on the sworn testimony of NYPD Inspector Winski regarding the specific training failures of the NYPD, and as an illustration of the City's policy of NYPD officers failing to correctly apply the First Amendment to protestors. ¶¶ 67-68. Even though Inspector Winski's testimony regarding the policy is pled jointly with the four other pillars of facts, testimony regarding a police officers' understanding of a particular policy has alone been deemed sufficient to make the leap to plausible allegations related to a failure to train. *See, e.g., Battle v. City of New York*, No. 11 Civ. 3599 (RMB), 2012 U.S. Dist. LEXIS 5256, at *16 (S.D.N.Y. Jan. 13, 2012) (denying motion to dismiss *Monell* claim where plaintiff alleged facts regarding NYPD officers' understanding of policy); *Okin*, 577 F.3d at 441 ("Because some of the officers were unable during their depositions to remember basic details regarding their training [on the specific issue], a reasonable factfinder could plausibly infer that the training program failed to impart with the necessary frequency or specificity how to appropriately respond to [the specific issue]. . .").

Second, Plaintiffs rely on the Suppressing Protest Report which, after study by legal academics, was provided to the City and Individual Defendants and highlights the First Amendment violations committed by New York police officers against protestors over a prolonged period of time. ¶¶ 8, 60, 75. The Suppressing Protest Report "documented numerous violations of the NYPD, such as arbitrary and selective rule enforcement and baseless arrests, the unjustified closures of public space, and the dispersal of peaceful assemblies," in New York City during the period of September 2011 through July 2012. The Report, which was published in July 2012, is also relevant to Defendants' notice of the unlawful practices of their officers.

Defendants argue that the allegations citing the Suppressing Protest Report should be disregarded as "hearsay." Hearsay, however, is an evidentiary concept that has nothing to do with the pleading standard of Rule 8: "Plaintiff may meet his initial pleading burden through the use of hearsay evidence. …[N]either *Twombly* nor *Iqbal* altered the rule that a plaintiff need not plead specific, admissible evidence in support of a claim, and a contrary rule would confuse the principles applicable to a motion to dismiss with those governing a motion for summary judgment." *Sletten v. LiquidHub, Inc.*, 13-cv-1146, 2014 U.S. Dist. LEXIS 94697, at \*\*30-31 (S.D.N.Y. July 10, 2014) (quoting *Campanella v. Cnty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012)). *See also Arista Records*, 604 F.3d at 119. Indeed, one of the two cases cited by the Defendants in support of this hearsay argument is a summary judgment decision. *See Hickey v. City of New York*, 01 Civ. 6506, 2004 U.S. Dist. LEXIS 23941 (S.D.N.Y. Nov. 24, 2004) (granting summary judgment where the plaintiff "failed to develop a factual record") (Motion at 16). In the other case, the court took judicial notice of police reports to establish the existence of a complaining witness, which the court ruled permitted dismissal of the false arrest complaint on grounds of probable cause: an anomalous decision, but one which supports, rather than undermines, Plaintiffs' reliance on sources. *See Awelewa v. New York City*, 11 Civ. 778, 2012 U.S. Dist. LEXIS 24244, at \*\*9-10 (E.D.N.Y. Feb. 22, 2012) (Motion at 16).

Moreover, other reports detailing widespread misconduct in the NYPD have been deemed to provide sufficient factual basis for allegations at the 12(b) stage. *Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (S.D.N.Y. 2013) ("Of course, the Report's findings are not conclusive. *But they at least make it plausible* that the type of misconduct that led to [plaintiff's] arrest and prosecution was endemic within the NYPD.").

Third, in addition to the Suppressing Protest's Report's conclusion reports of police misconduct, Plaintiffs rely on numerous news reports relating specifically to Occupy Wall Street which documented the complete disregard of the NYPD to the rights of protestors. ¶ 51. These news reports detail the conduct of police officers towards protestors as well as indicating the widespread notice provided to Defendants through media outlets and the condemnation of the NYPD's policing activities towards protestors. Such sources were among those referenced by the complaint in *Floyd*, discussed below.[12] In the Complaint in this case, the allegations supported by newspaper articles include those alleging that in September 2011, Inspector Winski personally participated in several false arrests, that on November 5, 2011, police unlawfully dispersed a group of protestors from an otherwise empty sidewalk and unlawfully arrested several, and other allegations concerning the City's knowledge of the unlawful practices. ¶¶ 51-53, 58, 61, 72.

Defendants once again turn to summary judgment decisions to support their argument that, since a newspaper article would not normally be admissible in evidence, any allegation in the Complaint that refers to a newspaper article must be ignored. A published decision from the Eastern District addresses and refutes this argument: "The County trivializes Plaintiffs' claims, describing them as reliant 'upon a media report which is simply anecdotal without any statistical or other rational basis.' The Court disagrees with the County's characterization of Plaintiffs' allegations and finds that Plaintiffs have sufficiently alleged a Monell violation." *Feliciano v. County of Suffolk*, 419 F. Supp. 2d 302, 311-12 (E.D.N.Y. 2005) (denying motion to dismiss).

Fourth, Plaintiffs rely on the numerous civil litigations that have sprung up as a result of this policy and practice, costing the City millions of dollars in settlements. The 2004 Republican

---

[12] *Floyd v. City of New York*, 08-cv-01034, Second Amended Complaint, Document 50 Filed 10/20/08, ¶ 115.

National Convention resulted in a settlement of $18 million for unlawfully arresting protestors. ¶ 72. The City and the Individual Defendants surely took notice, or should have, but for their deliberate indifference. Similar lawsuits arose from the arrests of Occupy Wall Street protestors that resulted in numerous settlements for the actions of the NYPD and its officers. ¶¶ 8, 56; 64-65. Seventeen lawsuits arising from the Occupy Wall Street protests were begun *before* the First Anniversary of Occupy Wall Street. ¶ 65. Further, the Complaint alleges that in the Southern District of New York alone, 80 lawsuits alleging unlawful arrest of OWS protestors have been filed, 50 of which have settled. ¶ 64.

Defendants argue that the existence of lawsuits does not warrant the assumption that the subject arrests were unlawful, but then make their own unwarranted assumptions as to what these lawsuits demonstrate. For instance, Defendants present their own calculations of the number of arrests implicated by the 80 lawsuits. They begin by "[a]ssuming that there was on average one plaintiff in each of these lawsuits," implying that some of the lawsuits must have had *less* than one plaintiff. Motion at 12. They conclude that 80 lawsuits means 80 arrests. This is an incorrect assumption. For example, *Peat v. City of New York*, 12-cv-8230 (SAS), had 14 plaintiffs. Another case, *Wiles v. City of New York*, 13-cv-2898 (VSB), involves one plaintiff, but two arrests. The Office of Corporation Counsel is well aware that these 80 lawsuits implicate many more than 80 arrests.

Moreover, Plaintiffs have alleged facts regarding the numerous lawsuits spawned from NYPD activities towards protestors not to establish that each and every lawsuit signifies a concrete abuse of each and every plaintiff's First Amendment rights in those cases, but instead that the City had knowledge that numerous claims were made by protestors for unlawful arrests and failed to address the problems leading to these claims through training.

Fifth, Plaintiffs rely on the high dismissal rates of the protestors arrested during the first year of Occupy Wall Street as well as of the class members here. The Complaint's claim of a practice of unlawful arrests is further supported by allegations that within the year from September 17, 2011 through the dates of the arrests of the Plaintiffs, 85% of the arrests of Occupy Wall Street protestors in Manhattan resulted in a dismissal or declination to prosecute, and only 15% resulted in a conviction. ¶¶ 61-62, 75, 83-84. These allegations, which derive from information obtained from the Manhattan District Attorney's office and the NYPD Criminal Justice Bureau, strongly support the existence of an unlawful custom of improper arrests. To provide contrast, only 39.7% of all arrests disposed of in New York County in 2014 resulted in a dismissal, adjournment in contemplation of dismissal or declined prosecution.[13]

Logically, if the police pursued a practice of making unlawful arrests, and the system otherwise worked properly, one would expect that the high rate of unlawful arrests would result in a high rate of dismissals. This is indeed what has happened: 2,235 out of 2,644 protestor arrests from September 17, 2011 to September 17, 2012 were dismissed or declined to be prosecuted. ¶¶ 61-62, 75, 83-84. In response, Defendants somewhat incongruously argue that this dismissal rate could be because of an "abdication of prosecutorial responsibilities" by the District Attorney's office. Motion at 10. But they offer no evidence that it is *more* likely that the District Attorney's Office systematically failed to do its job, than that the NYPD systematically made unlawful arrests. As the Second Circuit has held: "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a [Fed. R. Civ. P.] 12(b)(6) motion. Fact-specific questions cannot be resolved on the pleadings.

---

[13]New York Division of Criminal Justice Services, Disposition of New York Adult Arrests, http://www.criminaljustice.ny.gov/crimnet/ojsa/dispos/newyork.pdf (last accessed: March 16, 2016). The Disposition of New York Adult Arrests notes that not all diverted and dismissed dispositions are reported, indicating an even lower percentage is possible.

…. A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News,* 680 F.3d 162, 185 (2d Cir. 2012).

Indeed, there is a legal presumption applicable to these arrests which the Court must take into account at the pleading stage. As a matter of substantive New York State law, each arrest which has not resulted in a conviction is *presumed* unlawful. "Whenever there has been an arrest . . . without a warrant . . . the presumption arises that such an arrest [is] unlawful." *Broughton v. State,* 37 N.Y.2d 451, 458 (1975) *cert denied sub nom. Schanbarger v. Kellogg,* 423 U.S. 929 (1975). The Second Circuit has held that a legal presumption "reduces the facts needed to be pleaded under *Iqbal.*" *Littlejohn v. City of New York,* 795 F.3d 297, 310 (2d Cir. 2015) (referring to presumptions in the McDonnell Douglas Title VII framework). Consistent with these principles, it is the ***defendant*** who bears the burden to plead and prove the existence of probable cause for an arrest. *See Dickerson v. Napolitano,* 604 F.3d 732, 751 (2d Cir. 2010) ("the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense"). While it is true that the fact of dismissal of a criminal case does not preclude the possibility that probable cause existed for these arrests, at the pleading stage, that is not the issue.[14]

---

[14] Defendants cite to *Torraco v. Port Auth.,* 615 F.3d 129, 139 (2d Cir. 2010), a summary judgment decision which affirmed judgment for the defendants, where the undisputed factual record showed that probable cause existed at the time of the arrest, although the charges were later dismissed. Defendants also cite *Brown,* 306 F. Supp. 2d 473, a summary judgment decision where the plaintiff provided no opposition. In the final case cited, the court based its decision on criminal complaints and arrest reports submitted by the defendants. *See Candelario v. City of New York,* No. 12 Civ. 1206 (LAP), 2013 U.S. Dist. LEXIS 48412, (S.D.N.Y. Mar. 29, 2013) (citing the Declaration of Joseph A. Marutollo, Docket No. 12 & Exs. A-E). The portion of *Fulton v. Robinson,* 289 F.3d 188, 196 (2d Cir. 2002) cited by Defendants states that an ACD is inconsistent with a claim for malicious prosecution, but has no effect on the analysis of probable cause for a false arrest claim.

Defendants cite a single case for the proposition that "as a matter of law," allegations of a high rate of dismissal can never support a *Monell* claim. *See Higginbotham*, 105 F. Supp. 3d at 382 (Motion at 10). Once again, this is not what the case actually says. The entire *Monell* claim in the *Higginbotham* complaint was seven paragraphs.[15] The policy that the plaintiff complained of was a "policy or practice of 'imped[ing] and arrest[ing] those individuals who were observed photographing, videotaping or otherwise recording the illegal and unconstitutional acts of the NYPD.'" *Higginbotham*, 105 F. Supp. 3d at 382 (quoting Compl. ¶ 39). The complaint alleged that there were 44 such arrests, but unlike here, that Complaint did not allege the outcome of any of them, or any other facts about them. The court explained that the plaintiff asserted that this practice of arresting journalists "arose in parallel to another City policy (which is not at issue here) of making unlawful mass arrests and using excessive force at Occupy Wall Street demonstrations, to discourage participation in the demonstrations." *Id.* (quoting Compl. ¶ 38.). In support of that not-at-issue policy, the complaint said simply that there was a "high percentage of dismissals and declinations of prosecution," with no further detail of any kind. The court held that this allegation did not support the plaintiff's *Monell* claim because it was not "link[ed] . . . to the alleged policy of specifically targeting journalists." *Id.* at 383. *Higginbotham* didn't announce (or cite) a rule of law about arrest and conviction statistics, it simply dismissed a seven paragraph claim which lacked detail and logical cohesion.

In fact, in *Floyd v. City of New York*, 08-cv-01034 (S.D.N.Y.), Judge Scheindlin of this district entertained a major *Monell* case predicated on identifying meaningful patterns in data of police activity, even though the lawfulness of many of the individual actions within the data set (police determinations of the existence of reasonable suspicion for a *Terry* stop) could never

---

[15] *Higginbotham v. City of New York*, 14-cv-08549-PKC Document 1, Filed 10/27/14, ¶¶ 34-40.

realistically be known. At the pleading stage, the plaintiffs cited the numerical rate of arrests per *Terry* stop, and the rate of recovery of contraband, both in general and for particular minority groups.[16]

The defendants in *Floyd* did not file a motion to dismiss on the pleadings, possibly recognizing its futility. As the factual record of the *Floyd* case developed, the plaintiffs proposed through expert testimony that stops could be classified into five different categories — including two categories of "justified" stops, one category of "unjustified" stops, and two categories of "indeterminate" stops. *See Floyd v. City of New York*, 813 F. Supp. 2d 417, 447 n. 251 (S.D.N.Y. 2011) (decision and order on summary judgment). On summary judgment, the court accepted for the purposes of the motion the assertion of the plaintiffs' expert "that 24.37 percent of recorded stops and frisks during the period 2004 through 2009 'lack sufficiently detailed documentation to assess their legality,' while 6 percent of stops 'lack legal justification.'" *Id.* at 447. On this basis, the court found that "plaintiffs have demonstrated that there is a disputed issue of fact as to whether the NYPD has engaged in a widespread practice of suspicionless stops and frisks." *Id.* at 448.

Thus, the *Floyd* case demonstrates that if an unlawful trend is discernible from statistics of police activity, the "indeterminate" status of even a large percentage of relevant events does not preclude plaintiffs from establishing an unlawful practice under *Monell*. The *Floyd* case is an example which shows that even where only a relatively small percentage of police actions clearly "lack legal justification," an unlawful custom may be shown. Finally, the *Floyd* case is an example showing that a *Monell* pleading is sufficient where it contains – as the Complaint in this case does – allegations stating the number of relevant events and the rate of positive and

---

[16] *Floyd v. City of New York*, 08-cv-01034, Second Amended Complaint, Document 50 Filed 10/20/08, ¶¶ 101, 103, 109-113, 116.

negative outcomes in a relevant unit of time. That is, the allegation that within 12 months, 2,235 out of 2,644 OWS protestor arrests (85%), were dismissed or declined to be prosecuted, is sufficient to plead a practice of unlawful arrests. ¶¶ 61-62, 75, 83-84.

Taken together, these five factual pillars support the existence of a prolonged practice of violating protestors' First Amendment rights that went uncurbed and directly caused the unlawful arrests of Plaintiffs in contravention to their First Amendment rights.

## II. PLAINTIFFS MEET THE STANDARDS FOR ALLEGING *MONELL* CLAIMS AGAINST DEFENDANTS FOR A FAILURE TO TRAIN AND A PERVASIVE PRACTICE

Plaintiffs were arrested among over 180 other class members pursuant to a practice of "arresting individuals engaged in expressive speech activity absent actual criminal conduct." ¶¶ 42(b); 108. The City's failure to train NYPD police officers in the proper methods of policing individuals engaged in expressive speech activity protected by the First Amendment directly caused the unlawful arrest of Plaintiffs and the other members of the class. Similarly, the City's failure to train its officers has resulted in sustaining a practice so pervasive that the City and the Individual Defendants were deliberately indifferent to this failure's effect on the First Amendment rights of individuals, resulting in the unlawful arrest of Plaintiffs.

### A. The City Deprived Plaintiffs Of Their First Amendment Rights

Plaintiffs' and the class's arrests, all conducted without warrants or probable cause while Plaintiffs were engaged in expressive speech activity, were clear violations of First Amendment rights. Under New York law, it is well settled that due to the high constitutional protections afforded to political speech, a public protest may only be dispersed by the police if it creates a "clear and present danger of riot, disorder, interference with traffic upon the streets, or other immediate threat to public safety." *Papineau v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006). Accordingly, the City's practice of misapplying the disorderly conduct statute to arrest protestors

not engaged in criminal activity and solely to disperse the First Anniversary of Occupy Wall Street protests constituted an improper government restriction in violation of Plaintiffs' and the class's First Amendment rights.

### 1. Plaintiffs Were Engaged In Political Speech Protected by the First Amendment

Plaintiffs were clearly engaged in political speech while participating in the Occupy Wall Street movement and warrant the protection of the First Amendment. Other than the political nature of the protest itself,[17] Plaintiffs were amongst others carrying signs and banners actively engaged in political speech and were in New York's Financial District to march with others expressing their support of Occupy Wall Street. ¶¶ 109; 112; 117; 125; 132; 144; 148. *See, e.g., Frisby v. Schultz,* 487 U.S. 474, 476-79 (1988) (expression by picketing in front of a business is political speech); *Marcavage v. City of New York,* 689 F.3d 98, 104 (2d Cir. 2012) (display of political sign is political speech); *Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir. 1996) (noting that the First Amendment's fundamental purpose "is to protect all forms of peaceful expression in all of its myriad manifestations" inclusive of parades with or without banners). Plaintiffs were also engaged in political speech in a traditional public forum while marching along the sidewalks of New York's Financial District. ¶¶ 109-110; 112-14; 116; 122-24; 130-31; 137-38; 143-45; 147; 154. *See Snyder v. Phelps,* 562 U.S. 443, 456 (2011) (quoting *Frisby,* 487 U.S. at 480) ("'[P]ublic streets [are] the archetype of a traditional public forum and 'time out of mind, public streets and sidewalks have been used for public assembly and debate.'"). As Plaintiffs were engaged in political speech activity in a traditional public forum, their activity occurred under the purview of the First Amendment and was entitled to its protections.

---

[17] A general description of the Occupy Wall Street movement is provided in Paragraph 49 of the Complaint.

### 2. The City Deprived Plaintiffs of Their First Amendment Rights Through The Illegal Application Of The Disorderly Conduct Statute

Under New York State and federal law, the police may not disperse a protest without having a lawful reason to do so. *See Marcavage*, 689 F.3d at 104; *Edwards v. South Carolina*, 372 U.S. 229, 233 (1963) (arrests unconstitutional even where political protestors defied dispersal order, because protest was not unlawful); *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940); *see also City of Chi. v. Morales*, 527 U.S. 41, 58-59 (1999); *People v. Munafo*, 50 N.Y.2d 326, 331 (1980); *People v. Tichenor*, 89 N.Y.2d 769, 777 (1997); *People v. Jones*, 9 N.Y.3d 259 (2007); *People v. Johnson*, 22 N.Y.3d 1162, 1164 (2014). The blockage of an entire sidewalk does not provide a lawful reason for arrest, nor does the mere inconveniencing of pedestrians. *See Jones*, 9 N.Y.3d at 262 ("Something more than a mere inconvenience of pedestrians is required to support the charge") (dismissing charge); *Papineau*, 465 F.3d at 59. Indeed, unless a person's conduct causes, or recklessly threatens to cause, a substantial impact on the public at large, such as a breach of the peace, then there is no probable cause for an arrest for disorderly conduct. *See Evans v. City of New York*, 12-cv-5341, 2015 U.S. Dist. LEXIS 38546, n. 19 (E.D.N.Y. Feb. 24, 2015) (collecting cases from 1950 to 2014).

In New York, the existence of probable cause is an affirmative defense. *Dickerson*, 604 F.3d at 751 (citing *Guntlow v. Barbera,* 907 N.Y.S.2d 86, 90 (3d Dep't 2010)) ("When an arrest is not made pursuant to a judicial warrant, the ***defendant*** in a false arrest case bears the burden of proving probable cause as an affirmative defense.") (emphasis added). As explained by the New York State Court of Appeals, "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton*, 37 N.Y.2d at 458.

Plaintiffs were engaged in protest activity and were not engaged in any criminal conduct. Plaintiffs were not acting recklessly, nor were Plaintiffs threatening to cause a breach of the peace. Nonetheless, Plaintiffs were arrested while exercising their First Amendment rights and protesting without probable cause or a warrant for disorderly conduct. As a result of the City's practice, as described in detail below, of misapplying the disorderly conduct statute in contravention of settled legal principles, Plaintiffs and the class had their First Amendment rights violated.

### B. City Policymakers Failed to Properly Train or Supervise Subordinates On The First Amendment Rights of Protestors

The City, and the Individual Defendants as policymakers, failed to train NYPD police officers in the proper methods of policing First Amendment activity and the proper application of the disorderly conduct statute when individuals are engaged in expressive speech activity. The City was on notice of the explicit deficiencies in the training through, *inter alia*, the dismissal rates of the arrests from the prior year of Occupy Wall Street protests; the numerous, costly lawsuits arising from similar conduct at least going as far back as the 2004 Republican National Convention; numerous news articles detailing the deficiencies; and the Suppressing Protest Report's explicit detailing of the improper application of the disorderly conduct statute. Moreover, the City's knowledge that police officers would come into contact with protestors is clearly shown and/or may be imputed by the police formation training conducted in direct preparation for the Occupy Wall Street protests. The City's failure to train its police officers resulted in the misapplication of the disorderly conduct statute and directly caused the unlawful arrest of the Plaintiffs in violation of their First Amendment rights.

### 1. The City Failed to Properly Train the NYPD

The Second Circuit has recognized the inherent difficulties of proving and documenting a failure to train claim under *Monell* at the pleading stage absent discovery. *See, e.g., Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 130 n.10 (2d Cir. 2004) ("It is unlikely that a plaintiff would have the information about the city's training programs or about the cause of misconduct at the pleading stage. . .").  Even though *Amnesty America* was decided prior to *Iqbal*, district courts have continued to apply its standard to *Monell* claims based off of failure to train. *See Marisa Holmes v. The City of New* York, No. 14-CV-5253(LTS), slip op. at 13-14 (S.D.N.Y. Mar. 4, 2016) (citing *Castilla v. City of New York*, No. 09-CV-5446(SHS), 2011 U.S. Dist. LEXIS 95619 at \*\*10-11 (S.D.N.Y. Aug. 11, 2011)) (approving *Amnesty America* standard at the motion to dismiss stage).

Defendants' argument is once again premised on the incorrect application of the summary judgment standard in *Wray* to the Complaint on this Rule 12 motion. Defendants insist that, at the pleading stage, "plaintiffs must do more by way of identifying a specific deficiency in the City's training program." Motion at 8 (citing *Wray*, 490 F.3d at 196). In requiring a "specific deficiency," however, *Wray* is applying a standard that arises only at summary judgment and not applicable at the pleading stage.

The Second Circuit, in *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, explained that evidence of a "specific deficiency" in the city's training program was necessary "in order to proceed beyond summary judgment." *Okin*, 577 F.3d at 440-41 (quoting *Amnesty Am.*, 361 F.3d at 129 (emphasis added)). The Second Circuit was very clear that it was describing a standard of proof, not pleading, referring to the obligation to raise "a triable issue of fact." *Id.* A 2007 Second Circuit decision further clarified, stating the elements of a failure to train claim, and then adding: "In addition, at the summary judgment stage, plaintiffs must 'identify a specific

deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) and *Amnesty Am.*, 361 F.3d at 129).

The Second Circuit's standard for a failure to train claim at the pleading stage is much different, and as articulated in *Amnesty America,* a plaintiff "need only plead that the city's failure to train caused the constitutional violation." 361 F.3d at 130 n.10. For example, where a plaintiff alleged that "the City: (1) had an official policy precluding interference with individuals attempting to record or document police actions (an established Constitutional right under the First Amendment), but (2) failed to properly train police officers to ensure that those individuals would not actually be interfered with," a court in this district recently found that the "allegations suffice, at the pleading stage, to state a claim for *Monell* liability." *Holmes v. City of New York*, 14-cv-5253, 2016 U.S. Dist. LEXIS 27945, at **18-19 (S.D.N.Y. Mar. 4, 2016) (citing *Amnesty Am.*, 361 F.3d at 130 n.10).

In another recent case in this district, the court applied the same standard to sustain a complaint with only some similar features to the Plaintiffs' Complaint. The complaint "cited government reports, news articles and eighteen prior lawsuits plausibly demonstrate that policymakers knew to a moral certainty that DOC officers routinely confront situations in which detainees provoke them and that there is a history of DOC officers mishandling such situations by responding with excessive force." *Edwards v. City of New York*, 14-cv-10058, 2015 U.S. Dist. LEXIS 114039, at **18-19 (S.D.N.Y. Aug. 27, 2015).

Even with the standard articulated in *Amnesty America* and the difficulties attendant thereto,[18] Plaintiffs have proffered five pillars of factual allegations, some developed from sources typically unavailable prior to discovery, many of which have been deemed to provide sufficient support for *Monell* claims with the application of *Iqbal*. For example, testimony regarding a police officers' understanding of a particular policy has alone been deemed sufficient to make the leap to plausible allegations related to a failure to train. *See, e.g., Battle*, 2012 U.S. Dist. LEXIS 5256, at *16 (denying motion to dismiss *Monell* claim where plaintiff alleged facts regarding NYPD officers' understanding of policy).

In support of this claim, the Complaint alleges that the police officers received some training in First Amendment issues in the six-month Police Academy at the very beginning of their careers, and none afterwards. ¶ 71 & n.8. The Complaint pleads that, as a result, most NYPD police officers fail to understand the legal principles necessary to police a protest without violating the rights of protestors. ¶¶ 66-71. The Complaint sets forth specific examples of legal principles which the untrained police officers fail to understand, and misapply. ¶ 69. The Complaint alleges that the City has long been on notice of the certainty that police would confront protest situations, and of their unpreparedness to deal with those situations without committing constitutional violations. ¶¶ 56-66, 72. In August 2011, in preparation for Occupy

---

[18] For example, in another recent decision relating to those arrested during Occupy Wall Street protests, related to the excessive force of arrests, *Marom v. City of New York*, 15-cv-2017, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) the Court noted that Marom relied on just the Suppressing Protest Report and the prior filing of cases to show the City's notice, and noted the lack of "testimony . . . taken during any of those lawsuits that shows a pattern and practice of constitutional abuse." *Id.* at *77. In this case, by contrast, Plaintiffs have plead testimony by high ranking police officers as to the lack of training or any understanding of the special care due political speech as well as the costly outcome of many of the prior cases. Further, in *Marom*, the Court also found issues with the pleadings such as a failure to show that the policy was connected to the training deficiencies. *Id.* at **70-71. Here, Plaintiffs have pled the connection between the training deficiencies and the arrests as occurring due to a narrower policy and with more factual support.

Wall Street and the large number of expected protestors, the City of New York and the Individual Defendants conducted a large-scale training for the NYPD on Randall's Island. ¶ 73. This training did not address First Amendment Issues or the First Amendment's effect on policing methods or on how policing efforts might accommodate the First Amendment. *Id.* Instead, the training solely focused on standard disorder control formations. *Id.*

Without proper training, the police engaged in arbitrary and selective rule enforcement and baseless arrests, the unjustified closures of public space, and the dispersal of peaceful assemblies in New York City during the period of September 2011 through July 2012. ¶ 60. As a result, some 2,235 out of 2,644 protestor arrests from Sept. 17, 2011 to Sept. 17, 2012 were presumptively unlawful. ¶¶ 61-62, 75, 83-84. As a further result of this failure to train, Plaintiffs and the class were unlawfully arrested.

The Complaint's allegations of this unlawful failure to train are supported by each category of allegations discussed in the previous section. Moreover, Plaintiffs identify through the testimony of NYPD Inspector Winski that while police officers undergo numerous trainings as they progress through the ranks of the NYPD, such as Sergeant training, Lieutenant training, pepper spray training, baton training, and mass formation training, police officers do not receive any additional training on the First Amendment or its effect on protestors and protestor activities after the police academy. ¶ 67. Indeed, when questioned about the rights of protestors engaged in First Amendment protected-activity, Inspector Winski testified that the First Amendment-protected activity has no bearing on the manner with which disorderly conduct is charged against protestors, in contravention of established legal precedent, as explained above. ¶ 68. This is, of course, constitutionally wrong. Ordinarily, there is probable cause to arrest for Penal Law 250.20(5) if the individual recklessly creates the risk of inconvenience, annoyance or alarm. *See*

Penal Law 240.20(5). In the First Amendment context, however, police may not arrest a protestor without a "*clear and present danger* of riot, disorder, interference with traffic upon the streets, or other immediate threat to public safety, peace, or order." *Papineau*, 465 F.3d at 57 (emphasis added). In addition, in the protest context the lawfulness of an order to disperse may depend on whether or not the protestor is provided an adequate alternate forum for expression – a factor that is not present when police issue a dispersal order in other contexts. *See, e.g., Marcavage,* 689 F.3d at 107-08 (examining whether protestors were offered an adequate alternative forum when ordered to leave a particular stretch of sidewalk before being arrested for disorderly conduct).

Further, insofar as Defendants argue that police academy training covered the First Amendment, *Connick v. Thompson*, an authority heavily cited in Defendants' Motion, indicates otherwise. The case in fact supports Plaintiffs' contention that the City was deliberately indifferent to the need for training in this respect. The court vacated the verdict for the plaintiff in large part because, in its view, the training attorneys receive to enter the profession prepares them for most tasks they face, such that a municipality would not anticipate the need to provide further training. In describing its reasoning, the court contrasted attorneys with police officers, whom the court stated normally do need training. The court explained that "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles." *Connick*, 563 U.S. at 68-70. For police, however, "[i]n the absence of training, there is no way for novice officers to obtain the legal knowledge they require." *Id*. at 63-64. Where the police will likely face a situation in which knowledge of constitutional limits will be required, "there is an obvious need for some form of training." *Id*.

Accordingly, based on the deposition testimony of NYPD officers and corroborated through the investigation of counsel to specific trainings, Plaintiffs have sufficiently alleged facts that plausibly suggest that the City failed to train NYPD officers in the correct application of the disorderly conduct statute and the effect of the First Amendment on individuals engaged in expressive speech activity. This not only focuses on the specific missing training, but also on the causal relationship between the missing training and the constitutional deprivations.

## 2.    The City Had Notice That Training Was Deficient

The City's practice of disregarding the rights of protestors exercising their First Amendment rights was consistent and widespread enough to be construed as notice to the City, as evidenced from the numerous lawsuits spawned, litigated, and settled from protest situations since the 2004 Republican National Convention, which resulted in a settlement of $18 million for unlawfully arresting protestors. ¶ 72.[19]  Similar lawsuits arose from the arrests of Occupy Wall Street protestors that resulted in numerous settlements for the actions of the NYPD. ¶¶ 56; 64-65.  Moreover, during the period between the initial Occupy Wall Street Protest and the First Anniversary of Occupy Wall Street, September 17, 2011 through September 17, 2012, 2,644 members of Occupy Wall Street were arrested in Manhattan alone. ¶ 61. Of these 2,644 arrests, only 409 resulted in a plea or a conviction, indicating a conviction rate of just over 15% for the thousands of arrests. *Id.*  This is far below normal conviction rates.[20]

---

[19] It should be noted that the non-admission nature of the settlements works both ways and that since the settlements occured prior to the People establishing that probable cause existed in those cases, the presumption of the warrantless arrests as being unlawful survives.  *See, e.g., Dickerson,* 604 F.3d at 751 ("When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense.")(internal citations omitted).

[20] For example, almost 60% of all arrests disposed of in New York County in 2014 resulted in a conviction. New York Division of Criminal Justice Services, Disposition of New York Adult Arrests, http://www.criminaljustice.ny.gov/crimnet/ojsa/dispos/newyork.pdf (last accessed: March 16, 2016).

In addition to the low conviction rate for arrests related to Occupy Wall Street protestors, the exploits of police officers were often detailed in articles by The New York Times and other publications. For example, The New York Times detailed the arrest of a protestor, the initial rationale for the arrest, and a different rationale for the arrest later, despite the reporter's own account differing from either official rationale. ¶ 51. The actions of police officers towards protestors were further documented and presented to the NYPD and policymaking officials in the Suppressing Protest Report. ¶¶ 60; 75.

Plaintiffs show that it is plausible that Defendants were deliberately indifferent given the pattern of dismissals and resultant expensive lawsuits, the testimony of high ranking police officers that they do not treat political speech any differently than they treat unprotected activity, the Suppressing Protest Report's conclusions that such conduct occurred, and the large press coverage devoted to the arrests.[21]

At this stage, Plaintiffs have alleged these statistical facts following the Second Circuit's reasoning when it allowed the admission of third-party claims and complaints as trial evidence in *Fiacco v. Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986):

> We have no doubt that, in the context of a theory that the City negligently supervised its officers in their use of force, the evidence that a number of claims of police brutality had been made by other persons against the City, together with evidence as to the City's treatment of these claims, was relevant. *Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force.* The City's knowledge of these allegations and the nature and extent of its efforts to investigate and record the claims were pertinent to Fiacco's contention that the City had a policy of nonsupervision of its policemen that reflected a deliberate indifference to their use of excessive force. *The fact that none of the claims had yet been adjudicated in favor of the*

---

[21] The Report's authors even tried to engage with the City and the Individual Defendants. ¶ 75.

*claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.*

Further, the value of such evidence to a plaintiff in a § 1983 action is clear. Since the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question, *see City of Oklahoma City v. Tuttle*; *Turpin v. Mailet*, 619 F.2d 196, 202-04 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S. Ct. 577, 66 L. Ed. 2d 475 (1980), a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence. ***Proof that other claims were met with indifference for their truth may be one way of satisfying the plaintiffs' burden.***

(emphasis added). Plaintiffs have alleged facts regarding the numerous lawsuits spawned from NYPD activities towards protestors not to establish that each and every lawsuit signifies a concrete abuse of each and every plaintiff's First Amendment rights in those cases, but instead that the City had knowledge that numerous claims were made by protestors for unlawful arrests and failed to address the problems leading to these claims through training.

While the numerous civil lawsuits, such as the lawsuit against the City for the Republican National Convention in 2004, did not result in a finding of liability for the City, such lawsuits did provide notice to the City of the unlawful arrests occurring without probable cause.[22] The many lawsuits filed against the City were premised upon allegations of arrests by the City without probable cause. The City never rebutted these allegations on a wide-scale basis. For example, while the City entered into an $18 million settlement without admitting liability for the arrests related to the Republican National Convention, the burden of proof was on the City to prove that

---

[22] Again, settlement of, for instance, the 2004 Republican National Convention Case claims, while not an admission by the City, does not prove the arrests were warranted and leaves standing the legal presumption that the arrests were not warranted, just as an ACD does not prove guilt but leaves standing the legal presumption of innocence following the dismissal.

there was probable cause for the underlying arrests. The City did not so prove. Even without admitting liability, the City was provided notice of a practice of unlawfully arresting protestors, and has been continuously provided such notice with each group of lawsuits that spawn from the unlawful arrest of protestors and are settled without findings of liability.

In short, these statistics and lawsuits serve to show that Defendants had notice that the practices of the NYPD were negatively affecting the rights of protestors.

### C. The City's Practice Was So Pervasive That Policymakers Had Constructive Knowledge of the Practice

In addition to the above-cited reasons that similarly would have provided notice to the City, the Individual Defendants were provided notice of the practice such as to be deliberately indifferent to the rights of protestors. The Individual Defendants were directly engaged by the authors of the Suppressing Protest Report, were privy to the NYPD's operational statistics by nature of their positions, and exposed to the widespread media attention on the actions of the NYPD towards protestors. Moreover, the Individual Defendants were aware of the large number of protestors to be encountered during Occupy Wall Street by arranging the large formation training exercises on Randall's Island and issuing PMBS Detail #FY13-2809 in preparation for the First Anniversary of Occupy Wall Street. ¶¶ 73-76.

### D. The City's Practice and Policy Caused the Violation of Plaintiffs' Constitutional Rights

Plaintiffs First Amendment rights were violated when they were arrested while engaging in expressive activity on the sidewalks of New York City, a traditional public forum. *See supra* § II.A.. Plaintiffs were arrested without warrants or probable cause, and in contravention to established legal precedent. *Id.* These arrests were conducted due to a failure to train police officers in the proper methods of policing First Amendment rights. ¶¶ 67-70. This failure to train was perpetuated through the complete and total disregard to numerous protestor complaints

about police activity as evidenced through civil complaints as well as news reports and the Suppressing Protest Report. *See supra* § I. Moreover, Defendants were aware that protestors and police officers were going to come into close and prolonged contact and thus conducted formation training and issued police bulletins in preparation for Occupy Wall Street activity. ¶¶ 73-76.

Accordingly, as a result of Defendants' failure to train NYPD officers in the proper method of policing protestors engaged in First Amendment activity and Defendants' disregard and deliberate indifference to the practice of arresting individual protestors engaged in First Amendment activity without warrants or probable cause, Plaintiffs were unlawfully arrested and had their First Amendment rights violated.

## III. PLAINTIFFS HAVE ADEQUATELY ALLEGED SUFFICIENT FACTS IN SUPPORT OF THEIR UNLAWFUL ARREST CLAIMS

Plaintiffs were unlawfully arrested while engaging in expressive speech activity at the First Anniversary of Occupy Wall Street. Under New York law, a plaintiff claiming false arrest must show, *inter* alia, (1) that the defendant intentionally confined plaintiff (2) without plaintiff's consent and (3) without justification. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A false arrest claim under Section 1983, resting on the Fourth Amendment's right of an individual to be free from unreasonable seizures, such as arrests, without probable cause, contains substantially the same elements for a false arrest claim in New York. *Weyant*, 101 F.3d at 852 (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). Justification may be established by showing that the arrest was based on probable cause. *Weyant*, 101 F.3d at 852. In determining if probable cause existed, the court looks to the law of the state in which the arrest occurred in order to determine the existence or non-existence of probable cause. *Jaegly v. Couch*, 439 F.3d 149, 151-52 (2d Cir. 2006).

In New York, the existence of probable cause is an affirmative defense. *Dickerson,* 604 F.3d at 751 (citing *Guntlow,* 907 N.Y.S.2d at 90 ("When an arrest is not made pursuant to a judicial warrant, the ***defendant*** in a false arrest case bears the burden of proving probable cause as an affirmative defense.") (emphasis added). As explained by the New York State Court of Appeals, "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton,* 37 N.Y.2d at 458.

Here, Plaintiffs were arrested by NYPD police officers without warrants. ¶¶ 19-27; 160. Each plaintiff was charged with disorderly conduct and detained for a minimum of six hours without their consent. ¶¶ 19-27; 170. Each plaintiff was engaged in expressive speech activity related to the First Anniversary Occupy Wall Street. ¶¶ 19-27. Each plaintiff was arrested either on the sidewalk or in the cross-walk. *Id.* All charges against each plaintiff were subsequently dismissed, dismissed with an adjournment in contemplation of dismissal, or declined to be prosecuted by the Manhattan District Attorney's Office. ¶¶ 111, 115, 121, 129, 135, 141, 146, 153, 159.

Despite the above facts alleged in the Complaint, Defendants speciously argue Plaintiffs fail to allege any factual basis for the unlawful arrest claims in a single bare conclusory sentence. Motion at 23. Defendants fail to provide any legal support for this conclusion and again ignore the substance of the allegations in the Complaint. Indeed, Defendants have failed to address any probable cause issues in the Motion, no less even raise the affirmative defense that probable cause existed for these arrests (which requires more than a general denial). [*See, e.g., Broughton,* 37 N.Y.2d at 458 ("As a matter of pleading the defendant will be precluded from introducing such evidence [of probable cause] under a general denial.").

Accordingly, Plaintiffs have pled sufficient facts to sustain their claims arising from their unlawful arrests during the First Anniversary of Occupy Wall Street.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety. In the alternative, if the Court is to consider any portion of Defendants' Motion, Plaintiffs respectfully request leave to amend the Complaint.

DATED:     March 17, 2016

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

 /s/ Jeffrey G. Smith
Jeffrey G. Smith
Janine L. Pollack
Kevin G. Cooper
270 Madison Ave.
New York, NY 10016
Tel.:   (212) 545-4600
Fax:   (212) 686-0114
Smith@whafh.com
Pollack@whafh.com
KCooper@whafh.com


**STECKLOW & THOMPSON**
Wylie M. Stecklow (WS6012)
David A. Thompson (DT3991)
217 Centre Street, 6th Floor
New York, New York 10013
Tel.:   (212) 566-8000
Fax:   (212) 202-4952
Wylie@sctlaw.nyc
DThompson@sctlaw.nyc


*Counsel for Plaintiffs*