**WYLIE M. STECKLOW**   WWW.LAWYERSFORTHERESTOFUS.COM

**STECKLOW & THOMPSON**
                                    217 CENTRE ST. FL. 6
                                    NEW YORK, NY 10013
                                    T(212) 566-8000
                                    F(888) 566-7999
                                    WYLIE@SCTLAW.COM

June 5, 2018

Honorable Stewart D. Aaron
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    Matter:   <u>Packard, et al. v. City of NY</u>
              Index #:  15CV7130 (AT)(SDA)

Dear Judge Aaron:

      Please accept this correspondence in reply to the letter filed by the defense yesterday.

      Defendant's response exemplifies the obstinacy that has left the parties without a substantive Rule 30(b)(6) deposition after a year's worth of discovery. First, Defendant appears to argue that Plaintiffs should be unable to take the requested discovery due to the findings of other Occupy Wall Street litigations asserting completely different claims, ignoring that Judge Torres twice found that Plaintiffs' sufficiently alleged their failure to train claim and should be able to conduct discovery in this matter.

      Indeed, Defendant's feigned confusion (after 10 hours of discussion) as to the time-frame of Rule 30(b)(6) deposition discovery highlights its refusal to engage in substantive discussions. Defendant has refused to agree to any time-period beyond January 1, 2011 through September 2012. Plaintiffs have continued their efforts to move this litigation forward by suggesting different sets of time frames, and have provided specific dates of protest incidents to support their position (as explained in detail below). Plaintiffs have sought to soften the City's stone-wall position as this information is necessary to show whether the NYPD has a history of improperly policing protests. This rationale is akin to the arguments Defendant made for the need for discovery of Plaintiffs' protest conduct from 2004 through present, **except here** Plaintiffs are not seeking discovery on ancillary issues of questionable admissibility, rather Plaintiffs seek information that is **central to their claim** and is unquestionably relevant. *See Boddie v. City of NY*, 15-cv-4275, 2016 WL 1466555, *12 (S.D.N.Y. 2016) ("there is a history of employees mishandling the situation.")

      Second, Defendant attempts to re-argue that discovery should be bifurcated with less than two months remaining before the close of discovery and over a year since the parties submitted a joint discovery plan, which did not provide for bifurcation in any manner. ECF No. 61. Defendant argued for a bifurcation of discovery during the initial pretrial conference on January 21, 2016, albeit with different counsel, and Judge Torres explicitly rejected that request. Discovery has now progressed extensively, with Defendant having produced over 25,000 pages of documents and plaintiffs having

produced over 20,000 pages. Defendant cites "efficiency and convenience" as its motive for the requested impediment, yet this last minute request is entirely undercut by Defendant's obstinacy in negotiation and failure to identify or produce a single 30(b)(6) witness since the 30(b)(6) notice was served on March 6, 2018.

*1. Time Frame*

Plaintiffs have invested significant effort to reduce the purported burden described by the Defense in their letter (*See* Dkt. No. 148, p. 3- 4 under objections for Topic 5).

Plaintiffs identified dates of protest to which these basic questions would apply: Did they NYPD police this constitutional activity appropriately? If no, what changes were undertaken due to the NYPD's conduct on these various dates?

The Defense urges this court to limit Plaintiffs' inquiry into Defendant's failure to train to the training that occurred during Occupy Wall Street ("OWS"). This disregards the historical context required by the failure to train claim, as well as any issues, complaints or even the existence of NYPD policing sidewalk protest prior to OWS. In the 9 years prior to the start of OWS, the main protest marches in the City of New York that implicated the same sidewalk protest issues at stake here occurred in 2002[1], 2003, and 2004. Moreover, as indicated by the discovery materials, there is a stark distinction between the training that occurs at the Police Academy, which occurs only during the first six months of an police officer's career, and the training conducted for NYPD Member of Service ("MOS") while in-service.

2002: World Economic Forum Protests. *See, e.g., Allen v. City of NY*, 03CV2829 (KMW)(GWG) (Third amended complaint attached hereto as Exhibit E, *see* ¶¶ 32-44 for the description of the unconstitutional police conduct in relation to the arrests of those plaintiffs' during their sidewalk protest);

2003: Iraq War Protests: *See, e.g., Kuntsler v. City of NY*, 04CV1145 (RWS)(First amended complaint attached hereto as Exhibit F, *see* ¶¶ 36-49 for the description of the unconstitutional police conduct in relation to the arrests of those plaintiffs' during their sidewalk protest ; *Haus v. City of NY*, 03CV4915 (RWS), *see* ¶¶ 56c, 58, 60, 62, 63, 67, 68, 73);

---

[1] According to an scholarly report, the NYPD policing of protests in its current stratagem began in 2002 as a continuation of the "broken windows' philosophy of policing that emphasizes the zero-tolerance control of disorder … this new style of protest policing "command control" because of its emphasis on the hierarchical micro-management of demonstrations. Vitale, Ales, *From Negotiated Management to Command and Control: How the NYPD Polices Protests,* Policing & Society at 284 (Sept 2005)(Attached as Exhibit G). Further, the NYPD successfully used, without concern of Constitutional protections, deterrent effects on protesters that were documented in a March 4, 2002 "after action report" by the head of Disorder Control, and made public as part of the *Allen* litigation. The NYPD admitted to using deterrent effects on protesters that included, (1) "the staging of large amounts of personnel and equipment that was observed by protesters…" (2) Using early arrests to "set a 'tone' with the demonstrators and their possible plans at other demonstrations… (3) Using undercover officers to distribute misinformation within the crowds… It should be noted that a large part of the success in policing the major demonstration on Saturday February 2, 2002 was due in part to the (4) proactive arrest policy that was instituted at the start of the march at 59th Street and 5th Ave, and directed toward demonstrators who were obviously potential rioters." See Exhibit H (yellow highlights added).

2004: Republican National Convention Protests: *See, e.g., Dinler v. City of NY*, 04CV7921 (RJS)(JCF), 2012WL4513352 (Sept. 30, 2012) (Wherein Judge Sullivan granted summary judgment to RNC sidewalk protesters falsely arrested quoting *Jones v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) to discuss disorderly conduct in sidewalk protest, "As the Second Circuit has noted, 'New York courts have interpreted this statute (disorderly conduct) to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." *Id.* at *31.

Between 2004 and 2011, the level of protest activity and volume of protesters participating in sidewalk protest dipped in New York City. The sidewalk protest activity memorialized in the above litigations in 2002, 2003, & 2004, are similar in size and nature to the protest activity seen during Occupy Wall Street from September 2011 to September 2012.

Defendant does not state that any particular training on the First Amendment occurred during its proposed time-period or at any point following the dates identified by Plaintiff. Defendant provides no factual support for its restrictive time-frame beyond citations to Defendant's litigation record for cases generally arising out of Occupy Wall Street, omitting material information such as the numerous settlements arising from Occupy-related claims.[2] Regardless, these cases did not assert the claims asserted here, nor are they binding on this Court.

The failure to train theory requires Plaintiffs to plead and prove a perspective that includes historical context ("there is a history of employees mishandling the situation." *Boddie v. City of NY,* 2016 WL 1466555, *12 (S.D.N.Y. 2016)). The dates identified for protest only contain 15 total entries[3] (with only one date between 2004 and 2011), and only six of these dates precede Occupy Wall Street.[4] These limited dates are not overly burdensome when the same police commissioner and Mayor were in charge of this great city during each and every date identified, and current members of the special federal litigation division have personal knowledge of each of the litigations underlying these identified dates. While Plaintiffs do not suggest that the members of litigation division

---

[2] The City of New York has already paid in excess of one million dollars to settle litigation brought against the NYPD arising from OWS sidewalk protests. *See Peat v. City of New York,* 12CV8230 (SRS) (January 1, 2012 incident, $598,000); *Fields v. City of New York*, 13CV8819 (JGK)($90,000), *Rodriguez v. Winski*, (12CV3389)(NRB)($405,250, multi-plaintiffs, some of which were not specifically sidewalk protest); Union Square Litigations (all 9/24/11 incident date, many mutli-plaintiff suits, final settlement numbers unknown but total in the hundreds of thousands paid out in these cases: *Elliot* (12CV992(RWS)), *Schomburg* (12CV7161(RWS)), *Dierken* (12CV7462(RWS)), *Dedrick* (12CV7165(RWS)), *Sterling* (12CV7086(RWS)), *Crisp* (12CV5482(RWS)), *Lawler* (12CV5843(RWS)), *Hanlin* (12CV5844(RWS)), *Clarke* (13CV5303(RWS)), *Ball* (13CV5563 (RWS)).

[3] This includes *Allen v. City of New York,* (03CV2829) that was inadvertently left off the Exhibit D (See Exhibit D2 attached hereto that should replace Exhibit D on Dkt. 143-4).

[4] The City's purported inability to prepare its witnesses due to the passage of time is belied by the fact that current members of the Special Federal Litigation division participated in each of the litigations cited by Plaintiffs. *I.e., Allen* (2/3/02)(lead City attorney Mark Zuckerman is currently Senior Counsel at NYC Law Department); *Haus* (2/15/03)(2nd listed City Attorney Dara Weiss is currently Senior Counsel and defense counsel in **this litigation**); *Kuntsler* (4/7/03)(lead City Attorney Elizabeth Dollin is currently Deputy Chief of NYC Law Department Special Federal Litigation), *RNC Litigation* (8/29/04 & 8/31/04)(City Attorney Peter Farrell is currently Deputy Chief of NYC Law Department Special Federal Litigation), *Osterhoudt* (11/4/2008)(City Attorney Max McCann is currently Senior Counsel at NYC Law Department).

should be designated as 30(b)(6) designees, their continued presence indicates that access remains to their institutional knowledge and files.

The defense states that this notice defeats the objective of a Rule 30(b)(6) notice, identified as 'streamlining discovery.' However, the streamlining identified in the decision cited is not as general as the defense submits. Rather it is simply to streamline the discovery process when binding a corporate entity to a factual position. "The rule has a number of purposes, one of which is to 'curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of the facts that are clearly known to persons in the organization and thereby to it.'" *Winfield v. City of New York*, 2018 U.S. Dist. LEXIS 22996 at *14-15 (S.D.N.Y. 2018). Similarly, Defendant's assertion that the need to provide multiple 30(b)(6) designees is overly burdensome in itself is completely mistaken and contradicted by the plain text of F.R.C.P. 30(b)(6)("The named organization must then designated **one or more** officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and **it may set out the matters on which each person designated will testify**.")

### *2. Notices of Deficiencies and Exhibit C*

Plaintiff identified thirty news articles, investigative reports, published op-eds, and legislative testimony concerning NYPD misconduct at protest activity. By identifying these items and asking how the NYPD collects and responds to such public complaints as an institution, Plaintiff has attempted to reduce the burden on the defense on an element that is clearly relevant to the sole claim in this litigation. As stated in *Cash v. Erie*, plaintiff must also demonstrate that the "policymaker's inaction was the result of conscious choice and not mere negligence." 654 F.3d 324, 334 (2d Cir. 2011). The Plaintiffs must be allowed to question the City of New York (and/or the NYPD) on how it decides to act or not to act in response to complaints made about police conduct during protest activity to understand whether such inaction has been the result of a choice or simply negligence. Plaintiffs identified various types of complaints– lawsuits (*see* Exhibit D list and following exhibit examples Ex. _ - _), investigative reports (such as Ex. 1-6, "Arresting Protest: A special report of the New York Civil Liberties Union on New York City's Protest Policies at the February 15, 2003 Antiwar Demonstration in New York City," New York Civil Liberties Union (April 2003)), public op-eds (Ex 1-2 , "OP-ED: Respecting the First Amendment Rights of Demonstrators at the World Economic Forum," By Christopher Dunn and Donna Lieberman for NYCLU (Feb.1, 2002); and legislative testimonies (Ex 1-5, Testimony of Donna Lieberman to the New York City Council Committee on Government Operations, on behalf of the New York Civil Liberties Union (February 25, 2003).

Further, Defendant characterizes this as an inquiry into which police officer rank MOS received this information. **That is not what Plaintiff seeks (nor the purpose of a 30(b)(6) directed to an entity).** Plaintiff seeks how the NYPD and the City of New York handles such information and its decision making process that occurs thereafter.

### *3. Other*

Legal Positions: The City has agreed to many of these and has not identified which they request additional case law. The undersigned will reach out for clarification.

Definitions: The defense had not previously raised confusion over roman numerals as an objection, the communicated objection was limited to only wanting to utilize the definitions that are used by the NYPD. These definitions are in the notice for efficiency purposes, so that all parties can participate in the deposition with the same understanding of terms that may be used.

Topic 5: Plaintiffs have served an interrogatory on the City of New York which may resolve this topic. This interrogatory seeks to identify mass arrest dates and was used in the RNC litigation.[5]

Topic 44 & 45: These topics anticipate a defense argument that even if its training was deficient, there was insufficient funding and resources available for this training and/or due to limitations on officers time, participating in such First Amendment training would not be possible. If the defense seeks to avoid providing discovery related to these topics, they must be estopped from raising this issue. Further, this issue was previously discussed during a meet and confer with Magistrate Judge Ellis on June 28, 2017. At that time, Defendant had objected to the issue of spending and Magistrate Ellis found that funding was relevant. However, Defendant stated that no such line-item documentation existed for Plaintiffs' document request (Plaintiff's First Set of Document Requests, No. 11), and thus the issue became moot.

### *4. Bifurcation*

Rife throughout Defendant's response is the thought that discovery issues previously decided in this case need to be re-litigated solely for the 30(b)(6) depositions. This is not only frivolous, but continues to serve as undue delay in taking of discovery in this matter. Underlining the nonsensical nature of Defendant's last minute request to bifurcate discovery is the scope of discovery produced to date. Defendant has produced over 25,000 documents relating to Plaintiff's *Monell* claims with documents dating from 1999. Defendant cites that bifurcation would result "efficiency and convenience," yet Defendant's continued insistence on re-litigating these settled issues (particularly at the end of discovery) belies any notion of comity or efficiency, and instead only serves to waste the resources of the parties and the Court. Indeed, Defendant's intransigence is amply shown by its failure to identify or produce a *single* 30(b)(6) witness since the 30(b)(6) notice was served on March 6, 2018.

Respectfully submitted,

--/s/--

Wylie M. Stecklow, Esq.

---

[5] "Identify every event (including but not limited to demonstrations) since January 1, 2004, for which the New York City Police Department has processed arrests through a centralized location (such as a mass arrest processing center) under the supervision of the Criminal Justice Bureau. In responding to this interrogatory, the defendants are requested to provide the date of the event, a general description of the event, and the name of the person or entity organizing the event."