UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

GEORGE PACKARD, EDWARD BECK, ARI COWAN and
MICHELLE BERGER, individually and on behalf of a class of
all others similarly situated,

**PLAINTIFFS' LOCAL CIVIL
RULE 56.1 STATEMENT**

Plaintiffs,

15-CV7130 (AT) (SDA)

-against-

THE CITY OF NEW YORK,

Defendant.

-------------------------------------------------------------------------------x

Plaintiffs, by and through their attorneys and in accordance with this honorable

Court's Order dated March 4, 2018, ECF No. 251, and Local Rule 56.1 submit their Affirmative

Rule 56.1 Statement.

1.      The NYPD is 100% sure that at some point, some of its officers will be required

to police sidewalk protest.  (Ex. 1: Raganella Dep. 267:5-21.)

2.      The New York State Court of Appeals issued its decision in *People v. Jones* in

2007.  (Ex. 2: D025777-778.)

3.      The NYPD compiles newspaper and other media reports concerning the NYPD,

including but not limited to its policing of OWS.  (Ex. 3: Gannon Dep. 49:11-51:9; Ex. 4:

D005707; Ex. 5: D005709; Ex. 6: D005710; Ex. 7: D005712; Ex. 8: D005758.)

4.      On October 20, 2011, the NYCLU wrote to the NYPD to bring to its attention

concerns regarding "the policing of the Occupy Wall Street demonstration," including, among

other things, incidents "where police officers aggressively dispersed people standing lawfully on

city sidewalks."  (Ex. 9: D015204-15207.)

5.      On December 13, 2011, State Senator Liz Krueger wrote to the NYPD "regarding concerns" about "police procedures used at protests conducted by the Occupy Wall Street Movement."  State Senator Krueger stated in the letter that review of  video of an Occupy Wall Street sidewalk protest conducted in the Bronx (hereinafter "the Bronx Incident") shows NYPD "practices that appear to interfere with peaceful and legal protest behavior . . . ." (Ex. 10: D015185-D015187.)

6.      In her letter of December 13, 2011, State Senator Liz Krueger references video of the Bronx Incident.  (Ex. 10: D015187; Ex. 11: PACKARD027513 [Bronx Incident Video].)

7.      State Senator Krueger's December 13, 2011 letter states that it concerns the arrest of protestors at a "demonstration that does not appear to be blocking the sidewalk.." (Ex. 10: D015187.)

8.      On January 19, 2012, City Council Member Jessica Lappin wrote to the NYPD about "serious concerns regarding police behavior at sidewalk protests conducted by the Occupy Wall Street Movement."  The letter concerned "a Bronx demonstration in which protestors were arrested for blocking the sidewalk." (Ex. 12: D014888-D014890.)

9.      On April 13, 2012, the Global Justice Clinic, which included lawyers, professors and students from law schools at Fordham, Harvard, NYU and Stanford, among others, sent a letter to the NYPD requesting a meeting regarding a report the Clinic was preparing at that time regarding "U.S. officials' response to the Occupy protests."  The meeting was declined by NYPD Police Commissioner Kelly.  (Ex. 13: D014958-D014964.)

10.     The finished report by the Global Justice Clinic, entitled "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street", features photographs of NYPD police actions against OWS protestors on its cover. (Ex. 14: PACKARD25779.)

11.     The finished Suppressing Protest Report was emailed to the NYPD by its authors on July 25, 2012.  (Ex. 15: D014998-015000.)

12.     On October 13, 2011, the NYPD received a petition with the signatures of 165,766 Americans which stated, in part, that "I stand with the protestors of Occupy Wall Street, and I demand that the NYPD respect their constitutional right to peaceful assembly."  (Ex. 16: D015074-D15116.)

13.     The NYPD received numerous other complaints from civilians and religious groups regarding the policing of OWS demonstrators.  (Ex. 17: D014914-D014915; Ex. 18: D015203; Ex. 19: D021291; Ex. 20: D021301-D021303.)

14.     All complaints concerning NYPD policing are treated in the same way, regardless of whether the complaint is made by a citizen or an elected official.  (Ex. 3: Gannon Dep. 54:8-17.)

15.     The handling of any complaint received by the NYPD concerning a constitutional violation is "hard to answer" because that is "such a broad topic."  (Ex. 3: Gannon Dep. 55:16-56:3.)

16.     The handling of any complaint received by the NYPD concerning a constitutional violation is "hard to answer" because "[t]here's no, you know, there's no box to check there." (Ex. 3: Gannon Dep. 57:21-22.)

17.     *Allen v. City of NY*, 03CV2829, *Haus v. City of NY*, 03CV4915, *Kunstler v City of NY*, 04CV1145, *Dinler v. City of NY*,04CV7921, alleged unconstitutional policing by the NYPD of various First Amendment sidewalk protests from 2002 through 2004.  (Ex. 21: Packard Docket # 150-1, #1, 2, 3, 4.)

18.     In *Kunstler v City of NY,* the plaintiffs alleged that demonstrators protesting against U.S. involvement in the Iraq War on April 7, 2003 sought to participate in free speech activity in front of, and across from, an office building in New York City in which Carlyle Corporation had corporate offices.  (Ex. 21: Packard Docket 150-1 #3; Ex. 21: Packard Docket 150-3, Page 9, Paragraph 25.)

19.     In *Kunstler v City of NY,* the plaintiffs alleged that on April 7, 2003 the protesters were split into two groups, one of which intended to participate in civil disobedience and risk arrest.  The plaintiffs alleged that a second group, across the street from the first, intended only to participate in sidewalk protest and not to risk arrest.  (Ex. 21: Packard Docket 150-3, Page 10, Paragraphs 31-33; Ex. 132: PACKARD 28109-28113 [Kunstler Videos].)

20.     In *Kunstler v City of NY,* the plaintiffs alleged that the NYPD arrested the individuals participating in the sidewalk protest on April 7, 2003. (Ex. 21: Packard Docket 150-3, Page 12, Paragraphs 41-45; Ex. 132: PACKARD 28109-28113 [Kunstler Videos].)

21.     A lawsuit was brought against the NYPD by these arrested individuals, including first named plaintiff Sarah Kunstler.  (Ex. 21: Packard Docket 150-3.)

22.     The City of New York defended the Kunstler lawsuit, utilizing City Law Department attorneys including current the lead City attorney and current Deputy Chief of NYC Law Department Special Federal Litigation Elizabeth Dollin.  (Ex. 22: Packard Docket 149, Footnote 4.)

23.     The City of New York paid in excess of $2,000,000 to settle the claims underlying the lawsuit.  (*Kunstler et al v. City of NY*, 04CV01145 (RWS), Docket 173.)

24.     In *Dinler v. City of New York,* the plaintiffs alleged that, on August 31, 2004, individuals sought to protest the Republican National Convention on Fulton Street in downtown

Manhattan by engaging in a sidewalk protest. (Ex. 21: Packard Docket 150-1-5; Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352; Ex. 23: TARU 62, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w.)

25.     In *Dinler v. City of New York,* the plaintiffs alleged that within minutes of the commencement of the march, protesters were arrested and charged with disorderly conduct, obstructing the sidewalk.  (Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352, *30; Ex. 23: TARU 62, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w).

26.     A lawsuit (hereinafter the "Fulton Street RNC Litigation") was filed by those arrested individuals. (Ex. 21: Packard Docket 150-1 #5; Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352, *7.)

27.     The City of New York defended this lawsuit, utilizing City Law Department attorneys including Peter Farrell (Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352, * 4), who is currently Deputy Chief of NYC Law Department Special Federal Litigation. (Ex. 22: Packard Docket 149, Page 3, Footnote 4.)

28.     Video of the incident, and other evidence of record, was available to all parties and their counsel since at least the date the cross-motions for summary judgment were fully briefed, November 23, 2011. (Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352,*8; Ex. 23: TARU 62, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w.)

29.     Judge Richard Sullivan issued a summary judgment decision in favor of the arrested individuals, finding that there was no probable cause for these arrests. (Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352,*39.)

30.     Judge Sullivan's decision relied in significant part on video of the incident.  (Ex. 22: Packard Docket 149, Page 3, *Dinler v. City of New York*, 2012WL14513352,*34-35; Ex. 23: TARU 62, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w.)

31.     On December 31, 2011, Occupy Wall Street protesters gathered in Zuccotti Park for New Years Eve.  (Ex. 24: D013942-D013945; Ex. 25: PACKARD 25178, Paragraph 19.)

32.     After the park closed, many protesters began to march away from Zuccotti Park on the sidewalk. (Ex. 24: D013942; Ex. 25: PACKARD 25178, Paragraph 20.)

33.     One group marched to the East Village of Manhattan on the sidewalk, shadowed by members of the NYPD.  (Ex. 24: D013943; Ex. 25: PACKARD 25179, Paragraphs 28-29.)

34.     When it reached the sidewalk at the corner of 11th Street and 2nd Avenue, this group was directed by members of the NYPD to turn North on Second Avenue on the East side of the sidewalk.  (Ex. 26: Raganella Deposition Exh. 1 PLAINTIFF - PEAT - VID - 007 - 1_9824271_19508535-1a.mpg; Ex. 27: Raganella Deposition Exh. 1 PLAINTIFF - PEAT - VID - 002 Sarah Knuckey video - IMG_0776.MOV; Ex. 28: PACKARD 26058, Paragraphs 4 & 5.)

35.     On Second Avenue near 13th Street, members of the NYPD blocked the path of the protesters and encircled them with police officers on foot, on scooters and utilizing the building line.  (Ex. 26: Raganella Ex. 1 PLAINTIFF - PEAT - VID - 007 - 1_9824271_19508535-1a.mpg; Ex. 27: Raganella Ex. 1 PLAINTIFF - PEAT - VID - 002 Sarah

Knuckey video - IMG_0776.MOV; Ex. 25: PACKARD 25179, Paragraphs 30-35; Ex. 28: PACKARD 26058, Paragraph 25.)

36.     According to an NYPD memorandum dated January 1, 2012, when the marchers were on Second Avenue near 13th Street, a "decision was made to effect the arrest of the protestors and terminate the march".  (Ex. 24: D013943.)

37.     Many of the protesters were arrested and issued Desk Appearance Tickets.  (Ex. 28: PACKARD 26058-26059, Paragraphs 27-29; Ex. 25: PACKARD 25179, Paragraphs 36 and 42; Ex. 24:  D013943, Paragraphs 7 & 8.)

38.     According to the New York County District Attorney's Office, of 61 total arrests made on January 1, 2012 at an OWS protest, there were 22 total dispositions; 7 dismissals; 1 acquittal; 8 Adjournments in Contemplation of Dismissal; 36 Declined Prosecutions; 2 warrants; and 1 consolidated case. (Ex. 29: PACKARD07361-07397 at 07373.)

39.     Fourteen individuals arrested on Second Avenue near 13th Street whose cases the District Attorney declined to prosecute then filed a lawsuit against members of the NYPD, alleging that dispersal orders issued by the NYPD failed to provide a path of egress.  (Ex. 25: PACKARD 25174-25210; Ex. 25: PACKARD 25179, Paragraphs 29-35.)

40.     The City settled this case for 14 plaintiffs, who were each held for approximately five hours, by paying nearly six hundred thousand ($600,000) dollars. (Ex.22: Packard Docket 149, page 3, Footnote 2.)

41.     In *Allen v. City of New York,* the plaintiffs alleged that on February 3, 2002, a group of approximately 200 hundred marchers sought to protest the World Economic Forum and engage in a sidewalk protest in Manhattan.  (Ex. 21: Packard Docket 150-2, paragraphs 31-34.)

42.     In *Allen v. City of New York,* the plaintiffs alleged that the protesters stayed on the sidewalk, marched 2 abreast, and that other pedestrians were able to walk in the opposite direction on the sidewalk during the protest march.  (Ex. 21: Packard Docket 150-2, paragraphs 36-40.)

43.     The plaintiffs in *Allen v. City of New York* alleged that even though the marchers followed all of the rules and stayed on the sidewalk and did not block pedestrian traffic, virtually an entire group was arrested by executive officers including Chief Monahan.  (Ex. 21: Packard Docket 150-2.)

44.     As a rule, the City does not make changes to NYPD procedures based on press coverage, pending litigation, or legal determinations made in litigation, and it did not do so as a result of the arrest of protestors at the 2004 RNC.  (Ex. 3: Gannon Dep. 151:5-9.)

45.     The City of New York has stated that the NYPD did not change its policies and practices with respect to filed lawsuits and settled litigation. (Ex. 30: Perkins Dep. 94:14-18.)

46.     The NYPD compiles press clippings concerning complaints about NYPD policing of First Amendment protests to alert the department and not to take any action concerning the identified complaints.  (Ex. 3: Gannon Dep. 48:23-50:9, 53:6-54:7.)

47.     The City of New York does not make changes to its policing of First Amendment sidewalk protests as a result of facts alleged in settled lawsuits.  (Ex. 3: Gannon Dep. 76:5-12.)

48.     The City of New York did not know of any specific changes to how the NYPD policed sidewalk protests as a result of the arrests that resulted in the *Kunstler* litigation.  (Ex. 3: Gannon Dep. 38:8-15.)

49.     The City of New York did not know whether the NYPD policing of the sidewalk protest that resulted in the *Kunstler* litigation indicated to the City of New York that the NYPD

procedures regarding policing of sidewalk protest were sufficient to comply with constitutional limits on police power.  (Ex. 3: Gannon Dep. 39:24-40:6.)

50.     The City of New York could not identify any review of the procedures utilized by the NYPD in policing the sidewalk protest that resulted in the *Kunstler* litigation.  (Ex. 3: Gannon Dep. 40:13-17.)

51.     The City of New York did not make any changes to the policing of sidewalk protest as a result of the Fulton Street RNC Litigation.  (Ex. 3: Gannon Dep. 151:10-15.)

52.     The City of New York was unable to identify any changes made in regards to the policing of sidewalk protest as a result of legal determinations made in the Fulton Street RNC Litigation. (Ex. 3: Gannon Dep. 151:16-20.)

53.     The City of New York does not believe that it exceeded the limits of constitutional power in policing of sidewalk protest during the Republican National Convention of 2004.  (Ex. 3: Gannon Dep. 152:10-20.)

54.     The City of New York did not make any changes in the way it policed sidewalk protest in the time period from the Republican National Convention until Occupy Wall Street. (Ex. 3: Gannon Dep. 152:21-24; 68:18-22.)

55.     The City of New York could not identify if it had updated its lesson plans due to the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation.  (Ex. 30: Perkins Dep. 97:4-11.)

56.     The City of New York could not identify any update to a lesson plan on substantial blockage of a sidewalk due to the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation.  (Ex. 30: Perkins Dep. 98:2-9.)

57.     The City of New York could not identify any update to a lesson plan regarding whether a pedestrian is impeded or merely inconvenienced due to the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation.  (Ex. 30: Perkins Dep. 98:18-99:2.)

58.     The City of New York did not know if it utilized the policing that led to false arrests on August 31, 2004 on Fulton Street to update curriculum, lessons or classes.  (Ex. 30: Perkins Dep. 99:14-18.)

59.     The City of New York did not know if it had examined the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation to update training in curriculum, lesson or classes regarding the policing of sidewalk protest. (Ex. 30: Perkins Dep. 99:19-100:2.)

60.     The City could not identify any changes made to training as a result of the granting of summary judgment against it in the Fulton Street RNC Litigation.  (Ex. 30: Perkins Dep. 97:4-11.)

61.     The City of New York could not identify any review undertaken of the NYPD's policing of the January 1, 2012 march and arrest. (Ex. 3: Gannon Dep. 105:22 – 106:10.)

62.     The City of New York did not know whether the policing of the sidewalk protest on January 1, 2012 complied with constitutional limits on police power. (Ex. 3: Gannon Dep. 106:11-14.)

63.     The City of New York did not consider whether the police procedures utilized in policing sidewalk protest on January 1, 2012 needed to be reviewed based on the events of this specific sidewalk protest. (Ex. 3: Gannon Dep. 106:15-23.)

64.     The NYPD Legal Bureau creates Legal Bureau Bulletins to inform NYPD officers on legal implications of their job based on a legal issue or court case. (Ex. 1: Raganella Dep. 262:9-17.)

65.     The NYPD issued a Legal Division Bulletin dated April 15, 1971 advising members of service that an arrest under the disorderly conduct statute is proper when a person refuses to move on "even though it is not shown that pedestrians . . . were obstructed."  (Ex 31: D019527; Ex. 32: Vega Dep. 17:20-18:2 50:18-25; Ex. 1: Raganella Dep. 264:7 - 266:18.)

66.     Between April 15, 1971 and February 2017, the NYPD did not issue any Legal Division or Legal Bureau Bulletins to members of service regarding the conduct for which an arrest for obstruction of vehicular or pedestrian traffic is justified.  (Ex. 32: Vega Dep. 17:20-18:2 50:18-25; Ex. 33 & 34: Vega Exhibits 4 & 5;  Ex. 1: Raganella Dep. 264:7 -266:18, Ex. 35 & 36: Raganella Exhibits 34 & 35.)

67.     The NYPD issued an updated Legal Bureau Bulletin dated February 2017 that "specifically explains the circumstances under which an officer can charge a person with . . . 'obstruction of vehicular or pedestrian traffic".  (Ex. 37: D020862.)

68.     The NYPD did not create a Legal Bureau Bulletin on disorderly conduct which included *People v. Jones* until February 2017. (Ex. 32: Vega 17:20-18:2 50:18-25; Ex. 33 & 34: Vega Exhibits 4 & 5;  Ex. 1: Raganella 264:7 - 266:18; Ex. 35 & 36: Raganella Exhibits 34 & 35.)

69.     The NYPD maintained a three-page document explaining what conduct justifies an arrest for Resisting Arrest.  (Ex. 38: D006065-6067.)

70.     The City is unaware that the NYCLU wrote a letter dated October 20, 2011 to NYPD Commissioner Ray Kelly regarding policing of the Bronx Incident.  (Ex. 1: Raganella Dep. 43:11-22.)

71.     The City of New York is unaware of any actions taken by the NYPD in response to State Senator Liz Krueger's letter dated December 13, 2011 regarding the policing of the Bronx Incident.  (Ex. 3: Gannon Dep. 186:15-23.)

72.     The City of New York is unaware of any actions taken by the NYPD in response to City Council Member Jessica Lapin's letter dated January 19, 2012 regarding the policing of the Bronx Incident.  (Ex. 3: Gannon Dep. 185-186.)

73.     The NYPD Disorder Control Unit (hereinafter "DCU") updated no training on the basis of the matters raised in, or in response to, City Council Member Jessica Lapin's letter regarding the policing of the Bronx Incident.  (Ex. 1: Raganella Dep. 47:22-24.)

74.     DCU updated no training on the basis of the matters raised in, or in response to, State Senator Liz Krueger's letter regarding the policing of the Bronx Incident.  (Ex. 1: Raganella Dep. 47:22-24.)

75.     The City testified that the Bronx Incident arrests of sidewalk protestors were within the constitutional limits on policing of First Amendment sidewalk protests.  (Ex. 3: Gannon 103:18-104:4.)

76.     The City testified that the Bronx Incident arrest of sidewalk protestors on a clear sidewalk where there was no blockage of pedestrian traffic were within the limits constitutional limits on policing of First Amendment sidewalk protests despite the fact that the City could not identify any pedestrian blockage.  (Ex. 3: Gannon Dep. 102:4-6.)

77.     The City could not identify within a twelve-minute video of the incident any pedestrian blockage during the Bronx Incident and acknowledges that pedestrian blockage is necessary to justify a disorderly conduct arrest for obstructing pedestrian traffic. (Ex. 3: Gannon Dep. 102:24-103:12.)

78.     The City testified that an investigation of the Bronx Incident did not determine "whether there was probable cause or not" for arrests at the Bronx Incident.  (Ex. 3: Gannon Dep. 101:7-14.)

79.     Deputy Inspector Raganella, the head of DCU, testified in regard to the Bronx Incident that "there was no need to move those people under the circumstances of the few minutes that I saw there."  (Ex. 1: Raganella Dep. 26:21-24.)

80.     Deputy Inspector Raganella, the head of DCU, testified in regard to the Bronx Incident that "From what I saw on the video, no, [conduct of the police] does not comport with the training."  (Ex. 1: Raganella Dep. 27:6-7.)

81.     The City of New York could not identify any changes made by Defendant in policing or procedures used in policing sidewalk protests in response to the multi-plaintiff class action and two million dollar settlement arising out of the 2003 Kunstler arrests.  (Ex. 3: Gannon Dep. 39:24 – 40:46.)

82.     The NYPD did not update its training based on the allegations or the $2 million settlement in the Kunstler litigation.  (Ex. 30: Perkins Dep. 88:3-7; 89:3-8.)

83.     The City of New York could not identify any changes the NYPD made in its policing of First Amendment sidewalk protests as a result of arrests made on January 1, 2012. (Ex. 3: Gannon Dep. 105:22-106:4.)

84.     The City of New York could not identify any changes the NYPD made in its use of the subsection of the disorderly conduct statute dealing with obstruction of pedestrian traffic in its policing of First Amendment sidewalk protests as a result of the rule announced in the New York State Court of Appeals decision in *People v. Jones*.  (Ex. 3: Gannon Dep. 41:3-42; Ex. 30: Perkins Dep. 52:10-53:15).

85.     An NYPD memo dated December 2007 and entitled "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct" (hereinafter the "Jones Memo") describes the facts of the case and the rule announced in the New York State Court of Appeals decision in *People v. Jones*.  (Ex. 2: D025777-778.)

86.     The Jones memo states that: "Under this decision . . . not only must the defendant's conduct result in a **substantial** obstruction of pedestrian or vehicular movement, defendant must have either intended to create the obstruction or be aware of the condition his behavior is causing and refuse to change his behavior."  (Ex. 2: D0257778, emphasis in original.)

87.     The City testified that a court's decision on constitutional issues "restricts or permits our action as police officers based on what the court decides."  (Ex. 30: Perkins Dep. 41:21-42:3.)

88.     The City testified that "You can never train enough", in part because laws change and those changes need to be reflected in updated training.  (Ex. 1: Raganella Dep. 112:16-113:6.)

89.     The Jones Memo was not incorporated into Academy training.  (Ex. 30: Perkins Dep. 50:2-5; 51:6-14.)

90.     The NYPD did not update any lesson plans or other training materials with the information contained in the Jones Memo.  (Ex. 30: Perkins Dep. 53:11-15.)

14

91.     A September 30, 2009 memo (hereinafter "Schwach Memo") from Lt. Robert Schwach, the "Commanding Officer, Disorder Control Unit", entitled "Proposal For Borough Task Force Training" proposed "a two-day disorder control training course" after four members of service from DCU attended a course given by the Department of Homeland Security.  (Ex. 39: D025605-608.)

92.     The Schwach Memo included sessions on "Legalities of Civil Disorder" to include, among other things, "[a] review of the first amendment, disorderly conduct, riot, etc., and review of arrest warnings and proper legal procedures at protests."  (Ex. 39: D025606.)

93.     In 2000, Lt. Robert Schwach prepared a lesson plan on "Legalities at protest/demonstrations."   (Ex. 40: D004307.)

94.     The Instructor's Guide for the training on "Legalities at protest/demonstrations" prepared by Lt. Robert Schwach included a "Learning Outcome" stating "The rights of free speech and assembly as they pertain to current NYPD polices."   (Ex. 41: D029994.)

95.     The Schwach Memo was not approved and not implemented.  (Ex. 32: Vega Dep. 80:21-81:12.)

96.     The training session on the Legalities of Civil Disorder as recommended n the Schwach Memo was not taught.  (Ex. 32: Vega Dep. 84:13-21.)

97.     The NYPD made no "specific updates to training between August 2010 and September 17th of 2012."  (Ex. 1: Raganella Dep. 30:5-7.)

98.     The NYPD made no updates to training concerning First Amendment sidewalk protestors' right to free assembly or free speech between August 2010 and September 17th of 2012.  (Ex. 1: Raganella Dep. 30:9-12.)

99.     The City of New York did not conclude as a result of arrests of protestors demonstrating against the Republican National Convention on August 31, 2004 on Fulton Street that any procedures used by NYPD in policing First Amendment sidewalk protests needed to be reviewed.  (Ex. 3: Gannon Dep. 77:25-78:7.)

100.    The City is not aware of any incidents or of anything else from September 2011 to August 2012 that caused it to update or modify any lesson plan regarding the balance of mere inconvenience of pedestrians versus a full impedance of pedestrians.  (Ex. 1: Raganella Dep. 217:7-13.)

101.    The City is not aware of any incidents or of anything else from September 2011 to August 2012 that caused it to update or modify any lesson plan regarding the clear and present danger standard.  (Ex. 1: Raganella Dep. 217:17-24.)

102.    The City is not aware of any incidents or of anything else from September 2011 to August 2012 that caused it to update or modify any lesson plan regarding the requirement that a means of egress be provided to First Amendment sidewalk protestors who are subject to a dispersal order.  (Ex. 1: Raganella Dep. 218:9-17.)

103.    The City of New York could not identify any changes to its policing of First Amendment sidewalk protests as a result of the dismissal of charges on 92% of arrests of protestors made on September 24, 2011.  (Ex. 3: Gannon Dep. 93:14 – 19.)

104.    The City of New York is unaware of any actions taken by the NYPD in response to the Suppressing Protest Report bringing to its attention constitutional violations in its policing of First Amendment sidewalk protests.  (Ex. 3: Gannon Dep. 186:24-187:23.)

105.    The NYPD did not update its training based on the allegations in multiple litigations arising out of the policing of the 2004 RNC, or the $18 million in settlements of those

litigations, because it does not update training based on settled of filed lawsuits.  (Ex. 30: Perkins

Dep. 93:22-95:3.)

106.    All changes made by the NYPD to its procedures in response to multiple

litigations arising from the policing of the 2004 RNC related to the processing of arrestees after

arrest, not to procedures or standards used to decide whether to arrest.  (Ex. 3: Gannon Dep.

149:11-150:25.)

107.    The City testified that it is not important for the Police Academy to know about

complaints lodged against policing at protests.  (Ex. 30: Perkins Dep. 125:9-12.)

108.    The Legal Bureau provided training in preparation for 2004 RNC Convention.

(Ex. 32: Vega Dep. 108:6-110:16.)

109.    The 2004 RNC Legal Bureau Training included training on First Amendment

standards (Ex. 32: Vega Dep. 108:13-15).

110.    The 2004 RNC Legal Bureau Training included training on protestor conduct

necessary to make a disorderly conduct arrest (Ex. 32: Vega Dep. 107:11-13; 108:2-4.)

111.    The 2004 RNC Legal Bureau Training included training on the constitutional

policing of sidewalk protests (Ex. 32: Vega Dep. 110:13-16.)

112.    The "Instructor Assessment Guide" for "RNC Role-Play" stated that a dispersal

order must be given "[b]efore arresting a protestor for impeding pedestrian" traffic.  (Ex. 42:

D020972.)

113.    Training regarding impeding pedestrian traffic during protests that was provided

in preparation for the NYPD's policing the RNC was not provided any time after 2004.  (Ex. 30:

Perkins Dep. 76:1- 77:9.)

114.    In preparation for the RNC, the NYPD trained both executive and non-executive level officers on the requirements of providing an alternative avenue of protest as part of a dispersal order.  (Ex. 32: Vega 112:17 - 114:11.)

115.    This training did not occur in 2011, or at any time after the RNC training and prior to, during, or after Occupy Wall Street.  (Ex. 32: Vega 112:17 - 114:11.)

116.    The NYPD used "Legal Guide for the Republican National Convention" to provide that training. (Ex. 43: D015271-D015310; Ex. 44: D032133- D032155.)

117.    The NYPD did not incorporate training regarding First Amendment protest activity and sidewalk protest standards into any training delivered after the RNC. (Ex. 30: Perkins Dep. 76:1-77:9; Ex. 32: Vega Dep. 110:6 – 111:13.)

118.    The NYPD did not incorporate training regarding First Amendment protest activity and sidewalk protest standards into training delivered in preparation for OWS. (Ex. 30: Perkins Dep. 76:1-77:9; Ex. 32: Vega Dep. 110:6 – 111:13.)

119.    In 2007, the U.S. Department of Justice requested that the NYPD allow it to incorporate  "Legal Guidelines for the Republican National Convention" in a training that the U.S. DOJ developed regarding managing security at major events.  (Ex. 45: D015268.)

120.    The NYPD's "Command Officer, Office of Management and Planning" recommended that the U.S. DOJ request be granted in part because it "it will showcase our efforts at "Best Practices."  (Ex. 45: D015269.)

121.    The RNC Guidelines instructed that carrying signs at a demonstration is protected First Amendment activity.  (Ex. 1: Raganella Dep. 293:16-294:4.)

122.    DCU issued no such instruction in preparation for OWS.  (Ex. 1: Raganella Dep. 294:4-7.)

123.    The DCU is "a paramilitary organization, and some of the training and maneuvers that we use are based on military maneuvers that the armed services use."  (Ex. 1: Raganella Dep. 127:21-25.)

124.    DCU training is designed to deal with "confrontations with raucous crowds that developed into riots." (Ex. 46: Purtell Dep. 167:20-21)

125.    The primary goal of DCU training for policing of demonstrations is to maintain order.  (Ex. 47: D015339-D015349.)

126.    DCU training material states that a "mass arrest" situation is one in which demonstrators want to be arrested and are passive.  (Ex. 48: D004377.)

127.    DCU training material states that civil disorder is a "riotous situation. (Ex. 48: D004377.)

128.    DCU training material for "dealing with demonstrations and disorders" instructs that "Team approach intimidates a crowd and reduces the need for force."  (Ex. 48: D004380.)

129.    DCU training material does not distinguish between tactics needed to deal with demonstrations and disorders.  (Ex. 48: D004380.)

130.    The City of New York testified that "95 percent of protests history has shown do not become riotous, do not become dangerous."  (Ex. 32: Vega Dep. 153:15-23.)

131.    The City of New York testified that when DCU conducts training "we get them ready for what could be the worst thing. But we remind them that the stats say between 95, 99 percent of the time, every protest nothing happens. We're getting you ready for that one to five percent in case something happens."  (Ex. 32: Vega Dep. 93:20-94:2.)

132.    DCU teaches that "All crowds can grow from Peaceful to Violent Dependent on Internal or external stimulus."  (Ex. 49: D003981.)

133.     A DCU training slide entitled "Demonstrator Tactics" shows a picture of rioters. Ex. 50: D004024.)

134.     A DCU training slide states that "Disorders are by nature military engagements" and that "Tactics to control disorders are copied from the military."  (Ex. 51: D004224.)

135.     DCU does not do any instruction on probable cause.  (Ex. 32: Vega Dep. 69:17-22.)

136.     For policing large groups, DCU teaches a "Disperse & Demoralize" strategy. (Ex. 1: Raganella Dep. 153:21-154:11; Ex. 52: D003900; Ex. 49: D003992.)

137.     The DCU lesson plan for the "Disperse & Demoralize" strategy does not state that the strategy is inapplicable to the policing of First Amendment sidewalk protests.  The City testified that is not necessary because DCU instructors "understand that inherently."  (Ex. 1: Raganella Dep. 157:9-22.)

138.     DCU trains officers to police demonstrations by using a strategy that "intimidates a crowd and reduces the need for force."  (Ex. 32: Vega Dep. 159:19-160:2.)

139.     A DCU memo dated August 29, 2011 entitled "Submission of Disorder Control Lesson Plans" lists 17 lesson plans.  It includes Lesson Plans on, among other things: "Civil Disorder"; "Rapid Mobilization"; "Containing the Event – Barrier Plans"; "Use of Protective Shields"; "Gas Mask Deployment"; "Looting Scenario Training"; "Man Portable Air Defense Systems"; and "Incident Command Post Setup and Operations".  (Ex. 53: D025550.)

140.     In 2002, the NYPD policed a protest related to the World Economic Forum.  (Ex. 21: Packard Docket 150-5.)

141.    Inspector Thomas Graham, an executive officer of the NYPD, wrote an after action report regarding policing of the World Economic Forum entitled, "After Action Report on World Economic Forum Meetings and Demonstrations." (Ex. 21: Packard Docket 150-5.)

142.    Within this memorandum, the NYPD stated that the staging of large amounts of personnel and equipment that was observed by protesters was a deterrent.  (Ex. 21: Packard Docket 150-5, page 3 of 7.)

143.    Within this memorandum, the NYPD stated that the wearing of disorder helmets proved to be a deterrent to confrontation. (Ex. 21: Packard Docket 150-5, page 4 of 7.)

144.    Within this memorandum, the NYPD stated that arrests made at West 59th Street set a "tone" with the demonstrators and their possible plans at other demonstrations.  (Ex. 21: Packard Docket 150-5, page 4 of 7.)

145.    Among the recommendations in this memorandum was to use undercover officers to distribute misinformation to the crowds.  (Ex. 21: Packard Docket 150-5, page 6 of 7.)

146.    The City testified that the following subjects are "relevant training subjects": "Policing public assemblies, marches or demonstrations"; "The constitutional right of individuals and/or groups to protest on streets or sidewalks"; "Arresting protestors engaged in first amendment speech"; "Arresting protestors"; "First amendment principles as they concern policing public assemblies, demonstrations, or protests"; "Application of the disorderly conduct statute in the context of the first and fourth amendment rights of protestors"; "Application of the obstruction of governmental administration statute in the context of the first and fourth amendment rights of protestors". (hereinafter the "Relevant Training Subjects") (Ex. 30: Perkins Dep. 11:18-12:3; Ex. 54: Perkins Dep. Exh. 1 at p. 2.)

147.    The City's 30(b)(6) witness was ready to testify about the Relevant Training Subjects.  (Ex. 30: Perkins Dep. 13:19-23; Ex. 54: Perkins Dep. Exh. 1 at p. 2.)

148.    The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects.  (Ex. 30: Perkins Dep. 128:19-25.)

149.    Command level training is training delivered at roll call by "training sergeants [who] take it out to the commands."  (Ex. 30: Perkins Dep. 50:8-18; 55:9-11.)

150.    The NYPD's Training Course Catalogue "is "a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street. (Ex. 30: Perkins Dep. 43:13 – 44:8; Ex. 55: D021127-D021238.)

151.    The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects.  (Ex. 30: Perkins Dep. 45:24 – 46:14; Ex. 55: D021127-D021238.)

152.    The NYPD provides no training to Members of Service, other than that provided by the DCU, on the policing of First Amendment sidewalk protests.  (Ex. 30: Perkins Dep. 11:18-12:3; 128:19-25; Ex. 54: Perkins Dep. Exh. 1 at p. 2.; Ex. 55: D21127-D021238.).

153.    DCU's "Six Month Plan (June 1 to December 1, 2011)" contains no training with regard to the First Amendment rights of sidewalk protestors.  (Ex. 56: D004683-D004686.)

154.    The DCU memo dated August 29, 2011 entitled "Submission of Disorder Control Lesson Plans" lists no lesson plan on the First Amendment rights of sidewalk protestors. (Ex. 53: D025550.)

155.    DCU does not do any instruction on policing in First Amendment contexts.  (Ex. 32: Vega Dep. 69:23-70:9.)

156.     DCU training was "about giving them a dispersal and getting them out.  It wasn't getting into a finesse of demonstrations." (Ex. 46: Purtell Dep. 167:23-25)

157.     DCU does not teach what is required to make a dispersal order compliant with the First Amendment.  (Ex. 32: Vega Dep. 73:18-21; 74:13-17.)

158.     DCU did not provide training related to First Amendment activity in 2011.  (Ex. 32: Vega Dep. 111:8-13.)

159.     The "types of training conducted by the [DCU]" listed in a March 2, 2011 memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" shows no training on the First Amendment rights of sidewalk protestors, or the application of the disorderly conduct statute to sidewalk protestors.  (Ex. 57: D025519-D025520.)

160.     The City of New York testified that the training delivered by DCU from 2009 through 2012 included nothing on the First Amendment, the disorderly conduct statute, dispersal orders, or how to properly police sidewalk protests.  (Ex. 32: Vega Dep. 99:23-102:15.)

161.     DCU "do[es] not teach anything when it came to" the disorderly conduct statute and how it is in play during sidewalk protests.  (Ex. 32: Vega Dep. 67:4-8; 76:17-20.)

162.     DCU does not train officers that the mere inconveniencing of pedestrian traffic does not constitute probable cause for a disorderly conduct arrest.  (Ex. 1: Raganella Dep. 276:23-277:6.)

163.     The City testified that "It's impossible to train on" the difference between merely inconveniencing a pedestrian and substantially impeding a pedestrian.  (Ex. 1: Raganella Dep. 37:19-24.)

164.     DCU does not "train on probable cause. That's not part of our training."  (Ex. 1: Raganella Dep. 36:2-3.)

165.    DCU does not train on when an arrest should be made; it trains only on how to make an arrest and post-arrest processing.  (Ex. 1: Raganella Dep. 57:11-18.)

166.    Training on probable cause is given solely during recruit training at the Police Academy.  (Ex. 1: Raganella Dep. 36:6-7; 58:5-10; Ex.32: Vega Dep. 70:23-71:4.)

167.    DCU did not change or update in any fashion the training it delivers for policing demonstrations and protests as a result of the Court of Appeals decision in *People v. Jones* or the Jones Memo. (Ex. 1: Raganella Dep. 81:22-83:7; 266:19-22.)

168.    The City testified that between 2004 and 2011, the DCU made no updates or changes to training as a result of changes in statutes or decisional law governing application of statutes.  (Ex. 32: Vega Dep. 146:3-12.)

169.    DCU updated its training to instruct that arrests of protestors are authorized if they are wearing masks. (Ex. 1: Raganella Dep. 81:10-18.)

170.    DCU does not give training on dispersal orders.  (Ex. 1: Raganella Dep. 77:21-78:15.)

171.    DCU lesson plans contain nothing about disorderly conduct.  (Ex. 1: Raganella Dep. 87:2-9.)

172.    The City of New York testified that no training was delivered by DCU to captains, deputy inspectors, inspectors and chiefs from 2009 through 2012 on the First Amendment, the disorderly conduct statute, dispersal orders, or how to properly police sidewalk protests.  (Ex. 32: Vega Dep. 99:23-102:24.)

173.    No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion.  (Ex. 30: Perkins Dep. 54:15-19.)

174.    No training concerning impeding pedestrian traffic at protests was provided to members with a rank of Captains and above after 2004.  (Ex. 30: Perkins Dep. 76:18-77:2.)

175.    The City could not identify any training in any of the Relevant Training Subjects provided to members with a rank of Captains and above after 2004 in which Legal Bureau personnel participated.  (Ex. 30: Perkins Dep. 85:2-5.)

176.    In 2011, DCU provided one classroom training for officers with a rank of Captain and above.  Probable cause is not covered in that training. (Ex. 30: Vega Dep. 32:16-33:7.)

177.    Supervisors at demonstrations receive no training, after recruit training, on what conduct meets the standard of substantial disruption establishing probable cause for a disorderly conduct arrest based on blockage of pedestrian traffic.  (Ex. 1: Raganella Dep. 39:21-40:7.)

178.    Questions in training for Executive Officers on disorder control do not have anything on the First Amendment or on policing sidewalk protests.  (Ex. 58: D005752-005755.)

179.    NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011.  None of these trainings included training on standards of the disorderly conduct statute. (Ex. 32: Vega Dep. 99:23 - 105:5.)

180.    NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011.  None of these trainings included training on policing of sidewalk protests. (Ex. 32: Vega Dep. 99:23 - 105:5.)

181.    NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011.  None of these trainings involved First Amendment training. ( Ex. 32: Vega Dep. 99:23 - 105:5.)

182.    NYPD Legal Bureau attorneys have a passive role and no authority during the policing of First Amendment sidewalk protests.  (Ex. 3: Gannon Dep. 163:3-12.)

25

183.     NYPD Legal Bureau attorneys are consulted during the policing of First Amendment sidewalk protests only if the incident commander chooses to do so.  (Ex. 3: Gannon Dep. 163:3-12.)

184.     Deputy Inspector Anthony Raganella testified that "I did not witness [OWS protestors] to be inherently violent or physical towards us."  (Ex. 1: Raganella Dep 198:5-7.)

185.     Deputy Inspector Raganella, the head of DCU, testified that the City of New York "did training for officers in regard to demonstrations and protest. I can't say that it was specific to Occupy Wall Street."  (Ex. 1: Raganella 70:17-20.)

186.     DCU made no updates to training in response to the NYPD's knowledge weeks in advance that OWS was organizing protests.  (Ex. 1: Raganella 110:10-16.)

187.     On November 8, 2011, the Commanding Officer of DCU wrote an email stating that "OWS has the DCU in training overdrive and we are loving every minute of it."  (Ex. 59: D005679.)

188.     DCU increased the amount of training in 2010 and 2011 in part because of OWS but the content of that training was neither updated nor modified in anticipation of Occupy Wall Street.  (Ex. 1: Raganella Dep. 114:19-115:4; 121:11-15.)

189.     The DCU created an Occupy Wall Street Training Agenda to prepare the NYPD to police OWS protestors.  (Ex. 60: D004729-D004734.)

190.     The Occupy Wall Street Training Agenda did not include any instruction on First Amendment activity or the requirements for dispersal orders.  (Ex. 60: D004729-D004734.)

191.     DCU did not provide training on providing alternative locations to protest in dispersal orders.  Such training was provided before the RNC.  (Ex. 32: Vega Dep. 113:7-114:8.)

192.     Training delivered with the Occupy Wall Street Training Agenda was designed to "get them ready for what could be the worst thing."  (Ex. 32: Vega Dep. 93:20-21.)

193.     In training provided in preparation for Occupy Wall Street, DCU "went over the same -- we gave them the same exact training that everybody else got."  (Ex. 32: Vega Dep. 94:15-17.)

194.     From September 17, 2011 to September 17, 2012  DCU trained over 12,000 members of service.  No training it delivered to these over 12,000 officers covered sidewalk protests.  (Ex. 1: Raganella Dep. 131:6-24.)

195.     A large scale Mobilization Exercise conducted by the DCU in August, 2011 on Randall's Island did not include any instruction on First Amendment activity, requirements for dispersal orders, or policing sidewalk protests.  (Ex. 32: Vega Dep. 89:16-91:2.)

196.     A December 20, 2011 memo from DCU's Commanding Officer concerning "Training Conducted For Occupy Wall Street Movement" shows that from November 7 to December 9, 2011, DCU "conducted a series of Mobilization Exercises (MobEx) . . . in an effort to be better prepared regarding the Occupy Wall Street movement."  (Ex. 60: D004729.)

197.     The December 20, 2011 memo concerning "Training Conducted For Occupy Wall Street Movement" states that in the November 7 to December 9, 2011 MobEx exercises, DCU provided training to 1,412 member of service, including 12 with a rank of Captain or above.  (Ex. 60: D004732.)

198.     Training conducted by the DCU from November 7, to December 9, 2011 "For Occupy Wall Street Movement" covered three topic areas: "i. Lines, wedges, and other disorder control formations"; "ii. Mass arrest techniques"; and "iii. Protective Shield and Mash [sic] Barrier Equipment Review".  (Ex. 61: D025580-D025585.)

199.    Training conducted by the DCU from November 7, to December 9, 2011 "For Occupy Wall Street Movement" did not include anything on the disorderly conduct statute. The First Amendment, or blockage of pedestrian traffic.  (Ex. 61: D25580.)

200.    The NYPD issued no specific instructions to incident commanders at OWS protests, including during the class period, to ensure that NYPD policing would be consistent with constitutional powers.  (Ex. 3: Gannon Dep.  42:23-43:9.)

201.    According to an August 27, 2012 memo entitled  "Mobilization exercises For Impact XVIII In Preparation For Occupy Wall Street Anniversary", training for supervisors on "protocols and legalities" for crowd control was to be delivered.  (Ex. 62: D025600-D025601.)

202.    Training for supervisors on "protocols and legalities" for crowd control was not delivered as part of the "Mobilization exercises For Impact XVIII In Preparation For Occupy Wall Street Anniversary".  (Ex. 32: Vega Dep. 69:23-70:9; 73:18-21; 74:13-17; 84:13-21; 99:23-102:15; 148:17-149:12; 110:6 – 11:13; Ex. 30: Perkins Dep. 76:1- 77:9.)

203.    On March 8, 2012, the Commanding officer of DCU sent an email conveying Chief Esposito's orders to "TRAIN, TRAIN, TRAIN … "Especially with the shields" in preparation for May Day and OWS protests. The email did not include any instruction to train on permissible conduct by demonstrators at sidewalk protestors of other First Amendment demonstrations.  (Ex. 63: D005562.)

204.    As a result of Chief Esposito's instruction to "TRAIN, TRAIN, TRAIN", DCU added a training component on shields.  It did not add components on First Amendment activity, disorderly conduct statute training, sidewalk protest standards.  (Ex.32: Vega Dep. 148:17-149:12.)

205.     According to an April 3, 2012 memo from the Commanding Officer of DCU,
training conducted by the DCU "in preparation for potential May Day protests and/or Occupy
Wall Street demonstrations" did not include any instruction to train on permissible conduct by
demonstrators at sidewalk protests or other First Amendment demonstrations.  The training
covered three topic areas: "i. Encirclement Maneuvers" "ii. Lines, wedges, and other disorder
control formations, including use of protective shields"; and "iii. Mass arrest techniques and
deployment of Millennium Masks".  (Ex. 64: D025592-D025593.)

206.     A November 11, 2011 memo from the Commanding Officer of DCU describes a
"High Profile Zuccotti Park Mobilization Exercise" in which DCU conducted a MobEx training
that culminated at Zuccotti Park.  The memo noted that "in consideration of their intended
purpose, these types of MobExes should continue in the Zuccotti Park vicinity concurrent with
the duration of the Occupy Wall Street demonstrations."  (Ex. 65: D025566-D025567.)

207.     On October 17, 2011 DCU sent a budget request for "Emergency Purchase Of
Equipment During the Occupy Wall Street Demonstrations" for $110,400 exclusively for flex-
cuffs, OC spray, pepper ball system, and orange barrier mesh system items. (Ex. 66: D014372.)

208.     In preparing to police Zuccotti Park from September 28, 2011 through October
10, 2011, the NYPD issued through the Citywide Incident Management System at least thirty
Sector/Group Assignment Lists mandating that "[a]ll responding MOS are to have their
Department issued PPE including their MSA Millennium gas mask and their Department issued
helmet and night sticks. Disorder Control personnel will be equipped with Arrest kits, Barrier
Mesh, Megaphones, MK-46 and MK-9 Pepper spray canisters."  (Ex. 67: D025616-D025650.)

209.     The City testified that "if you have someone go to training constantly then you are
kept up to date on how to do your job" and that "Crowd control training is a perishable skill.  If

you don't practice it . . . you forget what you learned when it comes to that."  (Ex. 32: Vega Dep. 62:19-63:3.)

210.    According to a January 15, 2010 memo, "Each spring the Disorder Control Unit endeavors to conduct disorder control refresher sessions for members of the service assigned to Patrol Borough Task Forces."  (Ex. 68: D025503.)

211.    A document entitled "DCU Level I & II Mobilizations & CRV Training for Task Forces-2010/2011" memo updated on August 25, 2011 states that the "numbers that follow are inclusive of all MOS who attended" DCU training from April 2010 until August 24, 2011 and states that DCU provided training to 9,972 members of service in that time.  (Ex. 69: D014538-D014549.)

212.    A DCU memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" dated March 2, 2011 "outlines all training conducted by the [DCU] beginning in the calendar year 2009, through this report date, 2011."  (Ex. 57: D025519.)

213.    The DCU memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" dated March 2, 2011 shows 11,707 "TOTAL MOS" under the heading "2011 YTD MOS trained."   (Ex. 57: D025519, Ex.57: D025527.)

214.    In addition to 2009-2011 training, the DCU memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" dated March 2, 2011 also shows 5,124 "TOTAL MOS" for 2012 under the heading "2012 YTD MOS trained."   (Ex. 57: D025519, Ex. 57: D025527.)

215.    The City of New York testified that, from 2009 through 2012, the total number of officers DCU trained was 24,835, from 2009 through 2012, including 22 chiefs, 29 inspectors, 37 deputy inspectors, and 184 captains.  (Ex.32: Vega Dep. 103:2-24.)

216.    In addition, from 2009 through 2012, DCU trained 1,456 Lieutenants, 3,402 Sergeants, 18,352 Police Officers from 2009 through 2012.  (Ex. 32: Vega Dep. 103:2-24.)

217.    On March 8, 2012, in an email recounting instructions from Chief Esposito, Deputy Inspector Raganella, Commanding Officer of DCU, relayed that "In regard to OWS demos and protestors …. Chief Espo's exact words to me were 'TRAIN, TRAIN, TRAIN ….. Especially with the shields'."  (Ex. 63: D005562.)

218.    On March 26, 2012, the Commanding Officer of DCU wrote an email stating that "DCU has been tasked by the Chief of Patrol with training 900 IMPACT officers over the next 3 weeks . . . ." (Ex. 70: D005622.)

219.    On April 4, 2012, the Commanding Officer of DCU wrote an email to "Task Force C.O.s" stating that "as per Chief Espo, DCU is mandated to conduct a minimum of two (2) MobExes per week with all 8 task forces . . . . please make sure that maximum personnel attend….." (Ex. 71: D029503.)

220.    On April 19, 2012 Terence McManus wrote an email to "Commanders" stating: "Please ensure that ALL AVAILABLE personnel attend the upcoming training which will be conducted by DCU."  (Ex. 72: D005655.)

221.    As the City testified, the "Disorder Control Unit is tasked with conducting tactical reviews and assessing department strategies at major events."  (Ex. 1: Raganella Dep. 251:10-13 Ex. 73: D005630; Ex. 74: D014380.)

222.    No changes to training with regard to sidewalk protests were ever made as a result of DCU's assessment of department strategies at major events.  (Ex. 1: Raganella Dep. 253:25-254:7.)

223.    Deputy Inspector Raganella was not "tasked with updating or modifying training regarding" sidewalk protests.  (Ex. 1: Raganella Dep. 191:6-12; 192:10-12.)

224.    When the Commanding Officer of DCU, Deputy Inspector Raganella, observed the policing of OWS protests and saw tactics used re "holding a line, escorting a group, or preparing to engage" that were not consistent with training, he wrote an email on March 8, 2012 to all Patrol Borough Task Force Commanders to correct that.  (Ex. 1: Raganella Dep. 211:17 - 212:11; 192:17-21; Ex. 73: D005630.)

225.    The Commanding Officer of DCU, Deputy Inspector Raganella, did not write any similar memo regarding police non-compliance with First Amendment rights of sidewalk protestors at OWS demonstrations.  (Ex. 1: Raganella Dep. 211:17 - 212:11; 192:17-21; Ex. 73: D005630.)

226.    On November 3, 2011, Deputy Inspector Raganella, the Commanding officer of DCU, was made aware that 9 or 10 officers made 16 arrests at an OWS demonstration, and responded that this constituted a problem that needed to be corrected.  (Ex. 75: D005506.)

227.    On November 3, 2011, Deputy Inspector Raganella, the Commanding officer of DCU, wrote an email stating that Chief Esposito was "not at all happy with some mass arrest incidents made by task force(s) lately" because certain cameras and bullhorns were not available. No mention was made of possible violations to First Amendment rights of sidewalk protestors. (Ex. 76: D005659.)

228.    On October 4, 2011, Deputy Inspector Raganella, the Commanding officer of DCU, wrote an email reporting that "Chief Espo and Chief Hall were less than pleased" with the response at the October 1, 2011 police response on the Brooklyn Bridge.  The sole topic

mentioned was equipment; no mention was made of the NYPD's response to First Amendment sidewalk protests. (Ex. 77: D005629.)

229.    On October 10, 2011, the commanding Officer of DCU sent an email to "Task Force C.O.s" requesting feedback on "how to better utilize the task forces for the OWS demos" in preparation for making recommendations to the Chief of Patrol.  (Ex. 78: D019454.)

230.    On October 14, 2011, the commanding Officer of DCU sent a memo entitled "Recommendations Regarding the Use of Patrol Borough Task Forces During Occupy Wall Street Demonstration" to the Chief of Patrol, stating, "[c]onsistent with O.G.101-04, the Disorder Order Control Unit (DCU) is tasked with . . . assessing Department strategies at major events." None of the recommendations in the October 14, 2011 memo relate to the Department's policing of First Amendment sidewalk protests.  (Ex. 79: D014374-375; *See also* Ex; 80: D014376; Ex. 81: D014378.)

231.    On October 7, 2011, the Commanding officer of the DCU sent an email to "Task Force COs" regarding "a couple of issues related to the Occupy Wall Street (OWS) demos that we need to look at."  (Ex. 73: D005630.)

232.    In his October 7, 2011 email, Deputy Inspector Raganella stated that OWS demonstrators are "not inherently violent or physical" but "can be very annoying."  (Ex. 73: D005630.)

233.    Deputy Inspector Raganella's October 7, 2011 email contains nothing concerning the First Amendment rights of sidewalk protestors.  (Ex. 73: D005630.)

234.    In his October 7, 2011 email, Deputy Inspector Raganella stated that "[w]hen task force personnel are out on foot . . . they must be equipped with not only flex cuffs and batons but also their Millennium Masks."   (Ex. 73: D005630.)

235.    In his October 7, 2011 email, Deputy Inspector Raganella stated that "I observed many officers" policing OWS demonstrators. (Ex. 73: D005630.)

236.    DCU Chief Raganella never saw Unusual Incident Reports from incidents during OWS which occurred on November 17, 2011, January 1, 2012, or March 17, 2012.  (Ex. 1: Raganella Dep. 93:15-94:9; 259:5-261:7; Ex. 24; D103942-45); Ex. 82: D013848; Ex. 83: D013839.)

237.    Deputy Inspector Raganella testified that a large number of Declined Prosecutions issued by the District Attorney's office, would indicate "some deficiency in the way  that we were conducting the arrests. That we had an issue that needed to be addressed."  (Ex. 1: Raganella Dep. 318:20-319:6.)

238.    In 2005, weekly submission "of decline prosecution affidavits [were] used for training purposes . . . ." (Ex. 84: D018169.)

239.    Deputy Inspector Raganella sent an email on May 3, 2012 in response to a report that no Declined Prosecution were likely to be issued on arrests made at the 2012 May Day protests, writing "Wow! Excellent! Thanks brother!" (Ex. 85: D019439-D019441.)

240.    Deputy Inspector Raganella testified that a large number of Declined Prosecutions would cause him to "have investigated further with Captain Hailey and may have even consulted with our legal bureau to find out what the issue was, and if it was in fact something that needed to be addressed in training or not."  (Ex. 1: Raganella Dep. 319:7-18.)

241.    Deputy Inspector Raganella testified that he did not investigate whether a large number of Declined Prosecutions were issued other than for the May Day 2012 arrests.  (Ex. 1: Raganella Dep. 319:7-18.)

242.     According to the New York County District Attorney's Office, of 91 total arrests made on September 24, 2011 at OWS protests, there were 85 total dispositions; 43 dismissals; and 36 Adjournments in Contemplation of Dismissal.   (Ex. 29: PACKARD07361-07397 @07362; Ex. 3: Gannon Dep. 90:10-91:13)

243.     According to the New York County District Attorney's Office, of 254 total arrests made on November 17, 2011 at an OWS protest, there were 226 total dispositions; 168 dismissals; 2 Trial Order of Dismissal; 169 Adjournments in Contemplation of Dismissal; 24 Declined Prosecutions; and 4 warrants. (Ex. 29: PACKARD07361-07397 @07369.)

244.     According to the New York County District Attorney's Office, of 61 total arrests made on January 1, 2012 at OWS protests, there were 22 total dispositions; 7 dismissals; 1 acquittal; 8 Adjournments in Contemplation of Dismissal; 36 Declined Prosecutions; 2 warrants; and 1 consolidated case. (Ex. 29: PACKARD07361-07397 @07373.)

245.     According to the New York County District Attorney's Office, of 67 total arrests made on March 17, 2012 at OWS protests, there were 40 total dispositions; 6 dismissals; 24 Adjournments in Contemplation of Dismissal; 3 Declined Prosecutions; 3 warrants; and 1 pending case. (Ex. 29: PACKARD07361-07397 @07378.)

246.     According to the New York County District Attorney's Office, of 63 total arrests made from March 20 to 25, 2012 at OWS protests, there were 48 total dispositions; 5 dismissals; 1 acquittal; 26 Adjournments in Contemplation of Dismissal; 11 Declined Prosecutions; 2 warrants; and 2 consolidated cases. (Ex. 29: PACKARD07361-07397 @07379-7380.)

247.     The "NYPD has a book that's about 65 pages long called The Disorder Control Guidelines Booklet."  It was initially published in 1993 and was revised in 1997.  (Ex.32: Vega Dep. 86:9-12.)

248.    In January, 2012, Deputy Inspector Raganella, the head of DCU, reviewed the Disorder Control Guidelines booklet, which had last been updated in October, 1997.  He recommended updating arrest techniques but no update to policing of sidewalk protests, the clear and present danger standard, or the extent of blockage of pedestrian traffic required to make an arrest for disorderly conduct. (Ex. 1: Raganella Dep. 161:10-17; Ex. 86: D005564; Ex.32  & Ex. 87: Vega Dep. 86:7-14 & Exh. 6.)

249.    The NYPD knew weeks in advance that OWS was organizing protests.  (Ex. 1: Raganella Dep. 107:12-108:10.)

250.    Inspector Winski admitted that the NYPD was aware that the Occupy Wall Street movement would begin on September 17, 2011 with a demonstration in the vicinity of Wall Street.  (Ex. 88: PACKARD 22916 [Winski Dep.] 72:19 – 73:2.)

251.    Chief Purtell testified that the appropriate role of the NYPD in policing the OWS protests during the class period was to achieve "a flexibility, trying to facilitate First Amendment speech rights and the ability to assemble, and balance that with the rest of the community's needs for access --  access and to facilitate vehicular and pedestrian traffic throughout the area."  (Ex. 46: Purtell Dep. 39:5-11.)

252.    Inspector Edward Winski, in conjunction with Chief Purtell, assigned on-scene supervisors for the policing of First Amendment sidewalk protests during OWS, including the class period.  (Ex. 3: Gannon Dep. 172-173.)

253.    Inspector Winski testified that he tried to choose police officers to police First Amendment sidewalk protests during OWS from the 1st Precinct.  (Ex. 89: Packard 23102 [Winski Dep.] 106:15-20).

254.     Inspector Winski testified that he tried to choose officers who were professional and had thick skin. (Ex. 89: Packard 23103 [Winski Dep.] 107:17-24.)

255.     Inspector Winski testified that to him, "professional is the way you talk to people, the way you do paperwork and the way you look." (Ex. 89: Packard 23104 [Winski Dep.] 108:22-25.)

256.     In selecting officers to police Occupy Wall Street demonstrations, Inspector Winski did not take into consideration whether a police officer understood the Constitution of the United States.  (Ex. 89: Packard 23111 [Winski Dep.] 115:15-18.)

257.     In selecting officers to police Occupy Wall Street demonstrations, Inspector Winski did not take into consideration whether a police officer understood the rights guaranteed by the First Amendment to the U.S. Constitution.  (Ex. 89: Packard 23111 [Winski Dep.] 115:19-23.)

258.     Inspector Winski does not recall reading any Legal Bureau Bulletins between June 10, 2013 and April 6, 2016.  [Ex. 88: Packard 22915 [Winski Dep.] 66:3 - 67:10; Ex. 89: Packard 23300 – 23302 [Winski Dep.] 304:15 - 306:6.)

259.     Inspector Winski testified that a person is subject to arrest for blocking pedestrian traffic under the disorderly conduct statute if he obstructs pedestrian traffic in a public place for any period of time.  (Ex. 88: Packard 22940 [Winski Dep.] 166:6-17, 167:19-23.)

260.     Inspector Winski has been a defendant in lawsuits arising from conduct at Occupy Wall Street at least nine (9) times.  *Rodriguez v. Winski,* 12CV3389 (settled); *Gold v. NYC,* 13CV02142(VSB)(settled); *Adsluf v. NYC,* 13CV02295(LGS) (settled); *Tardif v. NYC,* 13CV04056 (KMW)(KNF) (Jury trial – defense verdict); *Guest v. NYC,* 13CV04174 (PKC) (Summary judgment dismissal of federal claims); *Gersbacher v. NYC,* 14CV07600

(GHS)(KNF)(Jury trial - Verdict of liability with nominal damages); *Vincent v. Winski,*

14CV07744 (Settled); *Pesola v. NYC,* 15CV01917 (PKC)(SN)(Excessive Force claim against

Winski not dismissed, case remains open); *Allen v. NYC,* 15CV01918(PKC)(SN)(Case dismissed

on Rule 12b6 motion); *Marom v. NYC 15CV02107 (PKC)(SN) (Summary Judgment fully briefed*

*and pending).*

261.     Inspector Winski provided instruction or guidance to the majority of officers

present at Occupy Wall Street from the 1st Precinct regarding the application of the disorderly

conduct statute. (Ex. 88: PACKARD 22940 [Winski Dep.] 168:15-22.)

262.     Inspector Winski instructed many of the officers policing Occupy Wall Street on

how to enforce the disorderly conduct statute with regard to individuals involved in First

Amendment expressive speech activity.  Ex. 88: (Packard 22940 [Winski Dep.] 168:15-169:5.)

263.     On September 19, 2011, Inspector Winski was part of the NYPD policing of

Occupy Wall Street.  The NYPD had created a small pathway for protesters to march that

became tight.  When an individual in an Orange Hat was unable to move quickly enough,

Inspector Winski reached across the barrier and tackled the individual placing him under arrest.

(Ex. 21: Packard 150-1, #7, Ex.90: Packard 00336-00340; Ex. 91: Raganella Exhibit 4.)

264.     The NYPD initially stated "that the man was charged with jumping a police

barrier and resisting arrest."  (Ex. 90: Packard 00336-00340; Ex. 91: Raganella Exhibit 4.)

265.     A reporter and photographer for the New York Times witnessed and documented

the episode between the man in the Orange Hat and Inspector Winski, and reported that they did

not see the man attempt to jump a barrier. (Ex. 90: Packard 00336-00340; Ex. 91: Raganella

Exhibit 4.)

266.    Subsequent to the NY Times reporting, the NYPD changed its explanation and said the man was not charged with jumping a barrier but with committing disorderly conduct on the sidewalk by impeding pedestrian traffic. (Ex. 88: Packard 00336-00340; Ex. 91: Raganella Exhibit 4)

267.    The City of New York could not identify any review undertaken of Inspector Winski's conduct on September 19, 2011. (Ex. 3: Gannon Dep. 85:25 – 87:13)

268.    The City of New York does not know whether the policing of sidewalk protest on September 19, 2011 depicted in Gannon Exhibit 4 indicated to the City of New York that the NYPD's procedures regarding policing of sidewalk protests were sufficient to comply with constitutional limits on police power. (Ex. 3: Gannon Dep. 86:12-18)

269.    The City of New York does not know whether it reviewed the procedures used in policing the sidewalk protest of September 19, 2011. (Ex. 3: Gannon Dep. 86:19-23; Ex. 88: Packard 00336-00340.)

270.    One day later, September 20, 2011, Inspector Winski was involved in an enforcement action inside Zuccoti Park. (*Gersbacher v. Winski,* 14CV07600(GHW)[Docket 1, paragraphs 3-4.; Docket 202.)

271.    A Federal Jury found that Inspector Winski used excessive force and violated the constitutional rights of an Occupy Wall Street protester on September 20, 2011.  (*Gersbacher v. Winski,* 14CV07600(GHW)(Docket 202.)

272.    The City of New York made no change to its policing of First Amendment sidewalk protests as a result of Inspector Winski's actions on September 20, 2011 because "the NYPD doesn't -- doesn't necessarily change its policies based on an individual -- an individual act."  (Ex. 3: Gannon Dep. 81:6-23; 82:24-83:9.)

273.     When the NYPD cleared Zuccotti Park on November 15, 2011, Chief Purtell
ordered Inspector Winski to stay away from the park, over the complaints of Inspector Winski.
(Ex. 88: Packard 22931 [Winski Dep.] 130:19-132:13.)

274.     Chief Purtell chose captains and inspectors to be incident commanders at OWS
protests based on "my own personnel experience, by working with them, knowing them over the
years."  (Ex. 46: Purtell Dep. 28:7-9; 28:12-14.)

275.     The City of New York did not know whether the New York State Court of
Appeals decision in *People v. Jones* required any changes in the NYPD's use of the subsection
of the disorderly conduct statute dealing with obstruction of pedestrian traffic in its policing of
First Amendment sidewalk protests.  (Ex. 3: Gannon Dep. 41:3 – 42:13.)

276.     The City of New York did not know whether the NYPD made any changes in the
NYPD's use of the subsection of the disorderly conduct statute dealing with obstruction of
pedestrian traffic in its policing of First Amendment sidewalk protests as a result of the New
York State Court of Appeals decision in *People v. Jones*.  (Ex. 3: Gannon Dep. 41:3-42:13.)

277.     NYPD Lieutenant Konstantinidis was responsible for supervising officers at
Zuccotti Park during OWS a few days a week.  (Ex. 92: PACKARD 22674 (Konstantinidis Dep.)
30:15-22; Ex. 92: PACKARD 22677 (Konstantinidis Dep.); 33:12-14; Ex. 92: PACKARD
22708 (Konstantinidis Dep.) 64:3-6.)

278.     NYPD Lieutenant Konstantinidis, who was responsible for supervising officers at
Zuccotti Park during OWS a few days a week, testified that he did not remember training the
First Amendment rights of protestors and that "I don't know" what the First Amendment means
in police work.  (Ex. 92: PACKARD 22701-702 (Konstantinidis Dep.) 57:6 – 58:22.)

279.     Incident commanders and other on-scene supervisors are responsible for ensuring "that probable cause has been established" to make an arrest of protestors at First Amendment sidewalk protests.  (Ex. 3: Gannon Dep. 184:9-17.)

280.     The City takes no steps other than on scene supervisors' assessment of probable cause to review whether policing is within constitutional limits on police power.  (Ex. 3: Gannon Dep. 184:18-23.)

281.     Police Officers at First Amendment sidewalk protests make arrests at the direction of on-scene supervisors.  Decisions to make an arrest are "under the preview [sic] of an incident commander's discretion."  (Ex. 1: Raganella Dep.  61:9-17.)

282.     Arrests at OWS protests "would be directed by supervisors, unless it was extenuating circumstances."  (Ex. 46: Purtell Dep. 42:17-18.)

283.     "If a supervisor [at a First Amendment sidewalk protest] believes that there's a substantial disruption, they can instruct the officers to make the arrests."  (Ex. 1: Raganella Dep. 38:11-15; 39:12-20.)

284.     In reviewing video of the policing of a First Amendment sidewalk protest on September 17, 2012, at which the police separated protestors from each other into two groups, the City could not identify why police separated the protestors into two groups. (Ex. 3: Gannon Dep. 166:9-22; Ex. 93: PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

285.     In reviewing video of the policing of a First Amendment sidewalk protest on September 17, 2012, at which the police separated protestors from each other into two groups, the City could not identify any valid basis for those arrests.  (Ex. 3: Gannon Dep. 167:8-19; Ex. 93: PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

286.    In reviewing video of the policing of a First Amendment sidewalk protest on September 17, 2012, at which the police separated protestors from each other into two groups, the City, by its 30(b)(6) witness, testified that it heard no dispersal order given before four arrests were made.  (Ex. 3: Gannon Dep. 168:20 -169:6; Ex. 93: PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

287.    Chief Purtell testified that he heard no instructions to disperse or other instructions before arrests were made.  (Ex. 46: Purtell Dep. 138:21-139:2; Ex. 93: PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

288.    Chief Purtell observed the arrest of three OWS demonstrators on video and admitted that he could not identify in the video any probable cause for their arrests.  (Ex. 46: Purtell Dep. 137:5-138:10; Ex. 93: PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

289.    Chief Purtell testified that the NYPD does not give dispersal orders to sidewalk protestors who are standing on the sidewalk.  (Ex. 46: Purtell Dep. 187:16-21.)

290.    Chief Purtell had no training on dispersal orders of any kind since 1993 or 1994. (Ex. 46: Purtell Dep. 160:21-161:8.)

291.    Chief Purtell has never had training at any time regarding dispersal of First Amendment demonstrators. (Ex. 46: Purtell Dep. 165:20-166:7.)

292.     Chief Purtell has never had training at any time regarding provision of alternative avenues of protest for demonstrators who are ordered to disperse. (Ex. 46: Purtell Dep. 165:7-166:7.)

293.    During OWS and the class period, Chief Purtell understood that a dispersal order was not required to provide an alternative forum.  Chief Purtell's thought that an order solely

commanding protestors to "leave – to leave the area" was a constitutionally complaint dispersal order in the context of a First Amendment protest.  (Ex. 46: Purtell Dep. 166:12-167:6.)

294.    Chief Purtell testified that he never set up an alternative avenue of protest, "never set up a free speech zone", to facilitate First Amendment speech at an OWS protest.  (Ex. 46: Purtell Dep. 73:5-15.)

295.    Chief Purtell is unaware of what conduct justifies an arrest under the disorderly conduct statute, including the subsection regarding blockage of pedestrian traffic.  (Ex. 46: Purtell Dep. 162:15-163:3.)

296.    Deputy Inspector Raganella, the head of DCU, testified that dispersal orders and arrest warnings do not include providing an alternative avenue for protest "[u]nless it was written down and documented somehow on the actual arrest warnings, probably not."  (Ex. 1: Raganella Dep. 185:15-20.)

297.    During the class period, the City provided written dispersal orders for use during OWS protests.  (Ex. 1: Raganella Dep. 271:12-24.)

298.    Written dispersal orders were distributed by DCU at Mobilization Exercises.  (Ex. 1: Raganella Dep. 272:20-273:2.)

299.     DCU copied these dispersal orders from pre-existing orders "where it was a piece of paper on a shelf that we continually make copies of."  (Ex. 1: Raganella Dep. 273:7-20; 274:23-275:2.)

300.    These dispersal orders were pre-printed cards that "had been in use for years." (Ex. 46: Purtell Dep. 53:23-54:2 55:13-16.)

301.     An NYPD pre-printed card with a dispersal order contains no place for instructions for demonstrator egress or for instructions on how to access an alternative forum for protest.  (Ex. 94: D019526.)

302.     The DCU created a handout for use during OWS entitled "Police Officer's Guideline at Demonstrations".  (Ex. 1: Raganella Dep. 289:21-24; Ex. 95: D025703.)

303.     The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" does not include anything on the First Amendment requirements of policing sidewalk protests.  (Ex. 1: Raganella Dep. 289:25-290:8; Ex. 95: D025703).

304.     The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" does not include anything on the requirement that a means of egress be provided to protestors subject to a dispersal order,  (Ex. 1: Raganella Dep. 290:9-14; Ex. 95: D025703.)

305.     The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" does not include anything on the requirement that an alternative avenue of protest be provided to protestors subject to a dispersal order.  (Ex 1: Raganella Dep. 290:22-291:6; Ex. 95: D025703.)

306.     The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" states that "Sidewalks must remain clear to pedestrian traffic."  (Ex. 95: D25704.)

307.     Deputy Inspector Raganella concluded based on the video of Ari Cowan's arrest, that the arrest was not consistent with training.  (Ex. 1: Raganella Dep. 229:25-230:9.)

308.     The march in which Ari Cowan was participating consisted of a peaceful crowd that was not riotous.  (Ex. 1: Raganella Dep. 228:7-10.)

309.    A September 5, 2012 NYPD Intelligence Briefing regarding the One Year Anniversary of OWS cites no plans for violence by OWS protestors or any intent to shut down the Stock Exchange.  (Ex. 96: D019374-D019376.)

310.    The Commanding Officer of DCU was on duty all day on September 12, 2012. (Ex. 97: D019504.)

311.    Chief Purtell was the Incident Commander on September 12, 2012.  (Ex. 98: D019541.)

312.    At 7:47:45am on September 17, 2012, pedestrians were able to walk on the sidewalk on both sides of Broadway near Wall Street.  (Ex. 46: Purtell Dep. 91:21-92:6.)

313.    At 7:49:00am on September 17, 2012, the sidewalk on the east side of Broadway was "congested with demonstrators."  (Ex. 46: Purtell Dep. 96:9-97:10; 94:21-95:25.)

314.    Chief Purtell attended no trainings specific to OWS.  (Ex. 46: Purtell Dep. 158:12-16.)

315.    Chief Purtell testified "I don't recall" if he ordered the sidewalk on the east side of Broadway south of Wall Street blocked.  (Ex. 46: Purtell Dep. 97:25-98:6.)

316.    Chief Purtell testified that at 7:50:00am on on September 17, 2012, the marchers were "still predominantly stationary.  I don't know what their intent is at this point."  (Ex. 46: Purtell Dep. 97:15-24.)

317.    Chief Purtell testified that at 7:55:12am on September 17, 2012, "there's no barriers or obstructions or demonstrators clogging the sidewalk" on the west side of Broadway for at least one "hundred to two hundred yards."  (Ex. 46: Purtell Dep. 105:19-106:15.)

318.    Chief Purtell testified that throughout the ten minutes starting at 7:45am on September 17, 2012, vehicular traffic was flowing on Broadway, "albeit down to one lane, maybe two.  That would be a normal day."  (Ex. 46: Purtell Dep. 107:6-13.)

319.    Chief Purtell testified that at 7:56:30 on September 17, 2012, both lanes of traffic were moving.  (Ex. 46: Purtell Dep. 109:6-10.)

320.    Chief Purtell testified that by 7:58:04am on September 17, 2012, the sidewalk on the east side of Broadway north of Wall Street had opened up.  (Ex. 46: Purtell Dep. 109:19-110:3.)

321.    Chief Purtell testified that before Bishop Packard and others with him were arrested on September 17, 2012, he did not know if dispersal orders were given before arrests were made.  "I can't determine if they were given an opportunity to leave or not."  (Ex. 46: Purtell Dep. 112:16-22.)

322.    On September 17, 2012, Chief Purtell would not allow the demonstrators to proceed south on Broadway.  (Ex. 46: Purtell Dep. 118:19-23; 132:10-19; 177:17-25.)

323.    Chief Purtell does not dispute that he would not allow the demonstrators to go down Wall Street on September 17, 2012.  (Ex. 46: Purtell Dep. 119:12-15.)

324.    Chief Purtell could not identify any reason why the protestors should not have been allowed to cross to the west side of Broadway at Wall Street on September 17, 2012.  (Ex. 46: Purtell Dep. 127:14-20.)

325.    Chief Purtell did not deny that police officers were blocking the sidewalk from the building line all the way across the sidewalk to a pen which the NYPD had set up to contain the press on September 17, 2012.  (Ex. 46: Purtell Dep. 116:16-24.)

326.    The NYPD set up a barrier on the sidewalk at the intersection of Broadway and Wall Street extending 4.5 to 5 feet out from the building line onto the sidewalk on September 17, 2012.  (Ex. 46: Purtell Dep. 120:10-121:13.)

327.    Bishop Packard testified that on September 17, 2012 he spoke to other protestors during the march "who looked a little worried because there were so many policemen along the barricades, and they were very afraid."  He counselled them that, "This is – there is nothing to be afraid of.  You're exercising your constitutional rights.  There's some things you should keep in mind.  [. . .]  And I emphasized this is a nonviolent, peaceful protest.  We have no intention of getting arrested.  We are just going to circle Wall Street and - - as a testimony, silent testimony to the anniversary of Occupy."  (Ex. 99: Packard Dep. 279:22 - 280:1).

328.    Bishop Packard testified that "We [we]re just going to circle Wall Street and - - as a testimony, silent testimony to the anniversary of Occupy."  (Ex. 99: Packard Dep. 279:24 - 280:1).  He also testified that "we were trying to go to the marshaling area and the Vietnam Memorial."  (Id. at 277:3-5.)

329.    Multiple photographs show that Bishop Packard was stopped by NYPD officers who blocked the sidewalk, preventing pedestrians, including the group of pedestrians led by Bishop Packard, from proceeding.  (Ex. 100: PACKARD028132, Ex. 101: PACKARD028133, Ex. 102: PACKARD028136, Ex. 103: PACKARD028137, Ex. 104: PACKARD028138.)

330.    Chief Purtell testified that he has "no idea if they are stationary by personal choice" on September 17, 2012.  (Ex. 46: Purtell Dep. 96:18-19.)

331.    After and because the NYPD blocked the group of pedestrians led by Bishop Packard from proceeding on the sidewalk, the sidewalk became dense with people.  (Ex. 105: Defendant Disc 39, SEC Broadway-Wall, Video Still, 7:51:11.)

332.     Bishop Packard testified that he "said to [Chief Purtell], 'It's impossible for me to get everybody to turn around here.  There's too many people to do this'."  (Ex. 99: Packard Dep. 175:17-19.)

333.     Chief Purtell answered, "You can't go down there."  Bishop Packard responded, "Well, can we cross Broadway and proceed south on Broadway? [Chief Purtell] said No. He said that was blocked."  Chief Purtell told Bishop Packard that "I could not go down Broadway.  I couldn't proceed south on Broadway, and I could not cross Broadway because there were barriers all along the route."  (Ex. 99: Packard Dep. 175:17-19.)

334.     After Bishop Packard answered Chief Purtell that he would not be able to get the group of 500 marchers to turn around, "[t]here was this long pause, no more conversation.  [. . . ] So I was waiting for an answer, and I didn't get an answer.  And it was during this period that people, in ones and twos, started to sit down."  (Ex. 99: Packard Dep. 174:1-9.)

335.     Ex. 106: PACKARD028167 and Ex. 107: PACKARD028179 show that Bishop Packard was seated approximately two feet from the building and not in the middle of the sidewalk.

336.     Bishop Packard testified that "We were making particular effort not to sit in the middle of the sidewalk." (Ex. 99: Packard Dep., 166:5-7.)

337.     Bishop Packard testified that "When we were in line and I was talking to the officer, we were not blocking any sidewalk" and that "I did not think we were blocking traffic." (Ex. 99: Packard Dep. 211:4-5; 224:6-8.)

338.     No dispersal order is heard on the video prior to the time at which the police begin to arrest protestors.  (Ex. 108: Defendant's Disc 50, 00:24-00:33 [AP Video].)

339.   When the first order to disperse was given, Bishop Packard believed that "the arrest was commencing" because there "were police all over the place . . . in our midst as they are in that picture" and he believed he was under arrest.  (Ex. 99: Packard Dep. 224:25 – 225:11; 225:24 – 226:1.)

340.   Chief Purtell also testified that Bishop Packard was under arrest at this time. Chief Purtell testified that "I can't tell if his hands are cuffed. He seems to be in the presence of a police officer.  I'm going to make the assumption he is under arrest."  (Ex. 46: Purtell Dep. 104:2-6.)

341.   Bishop Packard testified that "I don't recall hearing a disperse -- dispersal call, until I'm well on my way into the paddy wagon." (Ex. 99: Packard Dep. 230:7-9.)

342.   The testimony of Chief Purtell establishes that the sidewalk on the west side of Broadway was clear and that pedestrians were able to move.  (Ex. 46: Purtell Dep. 88:20 – 89:2.) Chief Purtell testified that while the sidewalk was crowded on the east side of Broadway, "across the street . . . is apparently wide open; people can get down there with greater ease."  (Ex. 46: Purtell Dep. at 92:22 – 93:6).  Chief Purtell testified that at 7:55am the sidewalk on the west side of the street was accessible, "that there's no barriers or obstructions or demonstrators clogging the sidewalk."  (Ex. 46: Purtell Dep. at 105: 19 – 106:11.)

343.   Chief Purtell testified that from 7:45 to 7:55, "vehicular traffic was flowing, "albeit down to one lane, maybe two.  That would be a normal day."  (Ex. 46: Purtell Dep. 107:6-13.)

344.   Chief Purtell testified that at 7:56 and thirty seconds both lanes of traffic were moving.  (Ex. 46: Purtell Dep. 109:6-10.)

345.     Video shows police blocking the crosswalk on the west side of Broadway with barricades and preventing people from crossing Broadway. (Ex. 105: ARGUS Video 1, SEC Broadway-Wall, 7:48:15-7:48:33).

346.     Photographs show multiple pedestrians walking into the street because the police were blocking the sidewalk.  (Ex. 100: PACKARD028132, Ex. 101: PACKARD028133, Ex. 102: PACKARD028136, Ex. 103: PACKARD028137, Ex. 104: PACKARD028138.)

347.     Chief Purtell pushed a protestor towards other officers, who was then arrested. (Ex. 46: Purtell Dep. 133:18-134:13; Ex. 109: PACKARD Disc 8 Video 20120917075547.mts, at 00:00 - 01:46).

348.     Chief Purtell admitted in testimony that upon reviewing a video of the arrest of the protestor he pushed, he could not articulate the basis for the arrest or identify probable cause justifying the arrest.  (Ex. 46: Purtell Dep. 133:18-134:13; Ex. 109: PACKARD Disc 8 Video 20120917075547.mts, at 00:00 - 01:46).

349.     Mr. Beck testified that when he arrived in the Financial District on September 17, 2012, the sidewalks across from the Charging Bull on Broadway were not blocked by the presence of 50 to 100 people but instead that, "People were moving back and forth all the time." (Ex. 110: Beck Dep.,30:10-11.)

350.     Mr. Beck testified that "We were always moving up until the arrest, prior to mine" but that "The police department came up on the sidewalk, stood shoulder-to-shoulder, and blocked it."  (Ex. 110; Beck Dep. 30:18-25.)

351.     Mr. Beck stopped walking because NYPD officers blocked passage on the sidewalk.  (Ex. 110: Beck Dep. 30:18-25.)

352.    Mr. Beck stopped walking because NYPD officers began interacting with the protestors, including making arrests.  (Ex. 111: LMSI Video: ESide of Broadway 1 S of Morris St.mp4, Packard Disc 39, 18:50-19:50).

353.    Mr. Beck testified that he was not told he was blocking the sidewalk until after he had been arrested.  (Ex. 110: Beck Dep. 37:10-12.)

354.    A bird's eye-view of the sidewalk shows that it is not blocked building to curb, and that pedestrians are able to use the sidewalk.  (Ex. 111: LMSI Video: ESide of Broadway 1 S of Morris St.mp4, Packard Disc 39, 18:50-19:50).

355.    Ex. 112: TARU Marini Video, 9:34:29 at 00:00:24 – 1:02 shows that there is much more space on the sidewalk than on a typical afternoon in midtown, on a mid-afternoon subway platform at Herald Square, or a Saturday morning Farmers' Market at Grand Army Plaza or in Union Square.  Any New Yorker could easily walk down that sidewalk without any trouble at all without incurring anything more than mere inconvenience, if that.  The video shows may non-protestors pedestrians standing, watching, while others easily traverse the sidewalk.  (Ex. 112: TARU Marini Video, 9:34:29 at 00:41 – 00:48.)

356.    The video shows Mr. Beck comply with the order and move on.  (Ex. 112: TARU Marini Video, 9:34:29 at 00:41 – 00:35.)

357.    Ex. 112: TARU Marini Video, 9:37:05 at 01:16-01:29, Video Still at 01:20 depicts a moment from the arrest of a friend of Mr. Beck.  Mr. Beck did not interfere in that arrest or take hold of his friend during the arrest.  (Ex. 110: Beck Dep. 31:4-14.)

358.    Mr. Beck testified that while being arrested, Mr. Beck's friend fell.  He further testified that "When he fell, he fell into me, and I put my hands down to catch him, keep him from falling back into the concrete sidewalk or the building, which I was standing next to.  I

51

didn't try to pick him up." (Ex. 110: Beck Dep. 31:17-22.)  Ex. 112: TARU Marini Video,

9:37:05 at 01:16-01:29, Video Still at 01:20 shows Mr. Beck with his hands down to catch his

friend in an effort to prevent him from falling into the sidewalk, as he testified.

359.    Ari Cowan testified that "September 17th, 2012, was a celebration of the

anniversary of the start of Occupy Wall Street and a day of public protest to demonstrate that

people were still upset about continued economic inequality, et cetera and a venue to express

their political opinions in a visible way around Wall Street in New York City."  (Ex. 113: Cowan

Dep. 139:14-19.)

360.    Mr. Cowan testified that "I would like to state for the record that on the event in

question, specifically the protest of September 17th, 2012, I was engaging in -- I had no intention

to engage in anything other than the lawful political protest expressing my First Amendment

rights because I believe that that was the effective tactic to be used in this situation."  (Ex. 113:

Cowan Dep. 91:9-15.)

361.    Video shows that despite a police order to leave room on the sidewalk for

pedestrians, there are no pedestrians on the sidewalk.  (Ex. 114: PACKARD26113 [RT Video]

00:16-00:22.)

362.    Video shows the protestors were not blocking the sidewalk.  (Ex. 114: RT Video

00:16-00:22.)

363.    Mr. Cowan testified that "The police officer used a megaphone to say that we

were blocking pedestrian traffic and had to wait for the pedestrians to walk. *So we did. And

pedestrians walked in both directions during this part of the march.*"  (Ex. 113: Cowan Dep.

150:8-11) (emphasis added.)  Mr. Cowan testified that he personally remembered pedestrians

being able to walk past the protestors.  (Ex. 113: Cowan Dep. 151:19-21.)

364.    Video shows that there are a few feet of sidewalk between the protestors and the curb.  The video shows police standing on the sidewalk between the protestors and the curb.  The video shows an open lane for pedestrians to walk on the sidewalk.  (Ex. 114: RT Video, 00:16-00:30.)

365.    Immediately after Mr. Cowan was arrested, an officer told him, "we told you at least five times."  Mr. Cowan can be heard on video responding to that officer: "I was just trying to walk."  (Ex. 114 at 1:19 – 1:28.)

366.    Ms. Berger testified that she came to New York City on September 16, 2012 to "be an advocate of universal health care. I was planning on participating in the peaceful protest but unfortunately I was not given the opportunity before getting arrested."  (Ex. 115: Berger Dep. 120:22 – 121:1.)

367.    A voice in the Hujel video appears to say, "If you're not in the sidewalk or crosswalk you'll be arrested."  (Ex. 116: TARU Hujel Video, 7:56:48 at 00:00 – 00:14.)

368.    Video shows a line of police officers blocking all vehicle access to the intersection from Pine Street and barricades blocking access from Nassau Street.  Both Pine and Nassau are one-way streets.  (Ex. 116: TARU Hujel Video, 7:56:48 at 06:43-06:48.)

369.    Video shows that Ms. Berger is standing in front of the NYPD videographer who took the video, behind an Executive level officer in a white shirt, and beside at least two officers in blue shirts, one of whom is wearing a baseball cap.  She is not preventing any traffic from moving in the intersection or on either street leading to the intersection, *i.e.*, Ms. Berger is not blocking vehicular traffic.  (Ex. 116: TARU Hujel Video, 6:65:42 at 06:43.)

370.    Video shows that the police are occupying and using the intersection of Pine and Nassau Streets to zip-tie people who have been arrested and are waiting with people in custody,

in the center of the intersection, blocking any potential vehicle access.  (Ex. 117: TARU Lee

Video 6:56:42, at 004:02.)

371.    Video demonstrates that the NYPD videographer recording the video is standing

in the middle of a crowd of police officers who are in the center of the intersection.  (Ex. 117: *Id.*

at 05:00 – 05:20.)

372.    Video shows that Ms. Berger is standing in the middle of a crowd of police

officers watching the protestors.  The video does not show her feet or whether she is standing in

a crosswalk.  (Ex. 116: TARU Hujel Video, 7:56:48 at 07:17 – 07:20.)

373.    Video shows Ms. Berger in the crosswalk as the police seize her.  (Ex. 116:

TARU Hujel Video, 7:56:48 at 07:33 – 07:34.)

374.    Ms. Berger testified that people were "told by police to get on the sidewalk, get

into the crosswalk." (Ex. 115: Berger Dep., 84:9-11.)   Ms. Berger testified that every order she

heard included an instruction to stay on the sidewalk *or* crosswalk. (Ex. 115: Berger Dep., 84:8-

23, 86:3-4, 86:18-20.)

375.    Ms. Berger was asked "You heard the police officers instructing people to stay on

the sidewalk?" Her full answer was: "Correct. The sidewalk and crosswalk."  (Ex. 115: Berger

Dep., 84:21-23.)

376.    Ms. Berger testified that she heard "police officers instructing people to go on the

sidewalk, on the crosswalk, this way, that way and people were either saying okay or they were

saying I am trying to. I need to get over here."  (Ex. 115: Berger Dep. 86:6-11.)

377.    Ms. Berger was asked "Did you hear any conversations amongst police officers

prior to your arrest on September 17th 2012?"  She answered "I heard the police officers

instructing people to stay on the sidewalk and crosswalk."  (Ex. 115: Berger Dep., 86:1-4.)

378.    Ms. Berger testified "there are multiple police officers shouting stay on the sidewalk, stay on the crosswalk. I was one of them that said okay, I am or I am trying."  (Ex. 115: Berger Dep. 86:18-20.)

379.    When Ms. Berger was arrested, she told the officer who had custody of her, "All I was doing was trying to cross the road."  (Ex. 118: TARU Blanck Video, 8:03:52, 01:43-01:45.)

380.    George Packard was charged with violation of PL 240.20(5), obstructing pedestrian or vehicular traffic.  The criminal Complaint against him and others states that "numerous pedestrians ha[d] to walk around the defendants in order to pass the area of the sidewalk where the defendants were standing."  (Ex. 119: D000005.)

381.    The charge against George Packard was dismissed on June 3, 2013.  (Ex. 120: D000576.)

382.    Edward Beck was charged with violation of PL 240.20(5), obstructing pedestrian or vehicular traffic.  The criminal Complaint against him states that "numerous pedestrians [had] to walk into the street to get past the group standing stationary on the sidewalk."  (Ex. 121: D000544.)

383.    The charge against Mr. Beck was dismissed on February 27, 2014.  (Ex. 122: D000581.)

384.    Ari Cowan was charged with violation of PL 240.20(5), obstructing pedestrian or vehicular traffic, and PL 240.20(6), failure to comply with an order to disperse.  The criminal Complaint against him states that "approximately 10 pedestrians attempting to walk the other direction [were] unable to do so."  (Ex. 123: D000564.)

385.    The charges against Mr. Cowan were dismissed on June 10, 2013.  (Ex. 122: D000582.)

386.     Michelle Berger was arrested for violation of PL 240.20(5), obstructing pedestrian or vehicular traffic, and PL 240.20(6), failure to comply with an order to disperse.  The Arrest Report states that she was "standing in the middle of the sidewalk."  (Ex. 124: D000232.)

387.     The New York County District Attorney declined to prosecute Ms. Berger.  The "Declination of Prosecution" states that the arresting officer "did not personally observe the alleged conduct" and a Lieutenant who "informed" the arresting officer that Ms. Berger was blocking pedestrian traffic "does not have a specific recollection of this defendant."  (Ex. 125: D000225.)

388.     An IAB investigation was conducted for the Bronx Incident and a report was issued that did not mention pedestrians actually being impeded or being on the sidewalk.  Ex. 126:  D0214424-D021426; Ex. 127: D0214446.  The report did not discuss the lawfulness of the orders given to the protestors, nor did the report review that tactics used by the police officers. *Id.*

389.     The IAB investigators of the Bronx Incident failed to interview the on-scene Captain.  *Id.*

390.     On September 15 – 17, 2012, protestors from around the country came to New York to celebrate the First Anniversary of Occupy Wall Street. (Ex 128: PACKARD00809-11).

391.     The geographic focus of the protest was downtown Manhattan. (Ex 129: PACKARD00806-08).

392.     Defendant made choices on the types of training to have its employees attend in anticipation of Occupy Wall Street, including tactical and formation training, but not substantive training such as how to properly police sidewalk protest. Ex. 130: D019531.  As the City prepared, the NYPD did not provide training on the First Amendment, or the application of the

disorderly conduct and obstructing governmental administration statutes.  Ex. 46: Purtell Tr. at 48:15-49:14; 72:18-73:4.

393.    According to the New York County District Attorney's Office, between September 17, 2012 and October 13, 2011, here were 861 arrests of individuals participating in Occupy Wall Street in New York City (Ex. 29: PACKARD07361-07397 @07360-7363), and between October 14, 2011 and October 20 2011, there were an additional 106 arrest. (Ex. 29: PACKARD07361-07397 @ 07363-7364.)

394.    Starting in 1998, the NYPD changed from a communication and cooperation model of protest policing to a command and control model, that includes five general elements, aversion to disruption, controlled access, divide and conquer, shock and awe, and zero tolerance. (Ex. 322; PACKARD07127-07148, Vitale, Alex, *From Negotiated Management to Command and Control: How the New York Polices Department Polices Protest, Policing & Society, September 2005).*

395.    The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep.  47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep.  54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau,  in any relevant training subject; (Ex. 30: Perkins Dep.  85:2-10).

396.    The NYPD removed a lesson plan entitled *Demonstrations* from its curriculum in 2004.  (Ex. 30: Perkins Dep. 37:4-24).

Dated: New York, New York
       April 5, 2019

**WYLIE STECKLOW PLLC**

57

_/s/ Wylie M. Stecklow_
Wylie Stecklow, Esq.
Jon Avins, Esq.
217 Centre Street, Sixth Floor
New York, NY 10013
(212) 566-8000
ECF@Wylielaw.com

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**

Jeffrey G. Smith
Kevin G. Cooper
270 Madison Ave.
New York, NY 10016
Tel.:    (212) 545-4600
Fax:    (212) 686-0114
Smith@whafh.com
KCooper@whafh.com

**THE SULTZER LAW GROUP, P.C.**

Janine Pollack
351 W. 54th St., Suite 1C
New York, New York 10019
pollackj@thesultzerlawgroup.com
Telephone: (212) 969-7810
Fax: (888) 749-7747

_Attorneys for Plaintiffs and Proposed_
_Counsel for the Class_