Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - x

5   GEORGE PACKARD, et al,

6                       Plaintiffs,

7

8       -against-              CASE No.: 15-CV-7130

9                                   (AT)(SDA)

10

11  THE CITY OF NEW YORK, et al,

12                      Defendants.

13  - - - - - - - - - - - - - - - - - - - x

14                      Date: July 12, 2018

15                      Time: 10:10 a.m.

16

17

18      DEPOSITION of ANTHONY J. RAGANELLA, held at

19  217 Centre Street, New York, New York, pursuant

20  to Notice, taken before Judeen M. Denniston, a

21  reporter and Notary Public within and for the

22  State of New York.

23

24

25

1

2  A p p e a r a n c e s:

3  On behalf of Plaintiff:

4      WYLIE STECKLOW, PLLC

5      217 Centre Street, 6th Floor

6      New York, New York 10013

7      BY: WYLIE STECKLOW, ESQ.

8          wylie@wylielaw.com

9

10  On behalf of Defendant:

11      NEW YORK LAW DEPARTMENT

12      CORPORATION COUNSEL

13      100 Church Street

14      New York, New York 10007

15      BY: ALISON MITCHELL, ESQ.

16          amitchel@law.nyc.gov

17

18  ALSO PRESENT:

19  JONI FORSTER-GALVIN, ESQ.

20  JOE STARKEY

21

22

23

24                  *   *   *   *   *

25

1

2                    S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5     and between the attorneys for the respective

6     parties herein, that filing, sealing and

7     certification be and the same are hereby

8     waived.

9

10          IT IS FURTHER STIPULATED AND AGREED that

11    all objections, except as to the form of the

12    question shall be reserved to the time of

13    the trial.

14

15          IT IS FURTHER STIPULATED AND AGREED that

16    the within deposition may be signed and

17    sworn to before any officer authorized to

18    administer an oath, with the same force and

19    effect as if signed and sworn to before the

20    Court.

21

22

23

24                    *   *   *   *   *

25

Page 4

1

2              MR. STECKLOW:  The time

3         is now 10:10 AM. We are going

4         on the record in the deposition

5         of Inspector Anthony Raganella

6         both as a fact witness and a

7         30(B)(6) witness on behalf of

8         the City of New York, pursuant

9         to a deposition notice, dated

10        March 6, 2017, somehow.

11             Can you now swear in the

12        witness?

13             I'm sorry, before you

14        start, we're here today in my

15        office at 217 Center Street.

16        We're with the court reporter

17        whose name is?

18             COURT REPORTER:  Judeen

19        Denniston.

20             MR. STECKLOW:  Judeen

21        Denniston, and with the witness

22        Mr. Raganella, with counsel

23        Alison Mitchell, with counsel

24        from the Police Department.

25             MS. FORSTER-GALVIN:  Joni

```
                                        Page 5
 1            A.  RAGANELLA
 2                 Forster Galvin.
 3                      MR.  STECKLOW:   Joni
 4                 Forster-Gallagher.
 5                      MS.  FORSTER-GALVIN:
 6                 Galvin.
 7                      ME.  STECKLOW:   Galvin, and
 8                 with an assistant of mine, Joe
 9                 Sharkey.
10                      Please swear in the
11                 witness.
12                      COURT REPORTER:
13                 Inspector, please raise your
14                 right hand.
15                      Do you promise the
16                 testimony you're about to give
17                 this morning is the whole
18                 truth, nothing but the truth,
19                 subject to the penalties of
20                 perjury?
21                      THE WITNESS:   I do.
22    A N T H O N Y  J.  R A G A N E L L A, the
23         witness herein, having first been
24         duly sworn by a Notary Public of the
25         State of New York, was examined and
```

```
                                            Page 6

 1              A. RAGANELLA

 2        testified as follows:

 3                    COURT REPORTER:  State

 4              your name for the record,

 5              please.

 6                    THE WITNESS:  Anthony J.

 7              Raganella.

 8                    COURT REPORTER:  Spell

 9              your last name for the record.

10                    THE WITNESS:  R-A-G-A-N-E-

11              L-L-A.

12                    COURT REPORTER:  State

13              your address for the record,

14              please.

15                    THE WITNESS:  Home

16              address?  Work address?

17                    MS. MITCHELL:  Yes.

18                    THE WITNESS:  Current

19              command is 179 Wilson Avenue,

20              Brooklyn, New York.

21                    COURT REPORTER:  Thank

22              you.

23                    First two questions are on

24              the record.

25                    MR. STECKLOW:  Thank you.
```

1          A. RAGANELLA

2    CROSS-EXAMINATION

3    BY MR. STECKLOW:

4        Q.   What precinct is that address from?

5    179 Wilson.

6        A.   Patrol Borough Brooklyn North.

7        Q.   What is your current position

8    there?

9        A.   Deputy Inspector in the Patrol

10   Borough, as a Duty Inspector.

11       Q.   Where does that put you in the

12   hierarchy in the Patrol Borough of Brooklyn

13   North?

14       A.   Above Captains and below Chiefs.

15       Q.   How many Chiefs are assigned to the

16   PBBN?

17       A.   Three.

18       Q.   Who are they?

19       A.   That would be Chief Madry

20   [phonetic] Chief Macavoy [phonetic] and

21   Chief Trabitz [phonetic]

22       Q.   How many other Deputy ... I'm

23   sorry. Are there any Inspectors there?

24       A.   There are, I don't recall how many

25   though.

```
                                            Page 8

 1             A. RAGANELLA
 2      Q.   How many DIs are there?
 3      A.   Myself and one other.
 4      Q.   Who's the other?
 5      A.   The other one is Deputy Inspector
 6   Carrie Owen.
 7      Q.   I want to go through a history that
 8   I believe is somewhat accurate of your time
 9   at the Police Department, to see if we can
10   get through that quickly. I believe you
11   joined the Police Academy in June of '95,
12   is that accurate?
13      A.   Correct.
14      Q.   Your first assignment after the
15   Academy was at the 75?
16      A.   Correct.
17      Q.   You were in there from March '96 to
18   June '97?
19      A.   That sounds right.
20      Q.   Then you were assigned, at that
21   point, to your current command, although
22   you didn't stay consistently there, to the
23   Patrol Borough of Brooklyn North?
24      A.   Yeah, it was the Taskforce.
25      Q.   It was the Patrol Borough ...
```

```
 1              A. RAGANELLA
 2         A.  Patrol Borough Brooklyn North
 3    Taskforce.
 4         Q.  Taskforce, okay. You were there
 5    until 2000, when you were promoted to
 6    Sergeant and moved to the 111?
 7         A.  Correct.
 8         Q.  Then from 2000 to 2003, you were
 9    then at the 111 as a Taskforce Sergeant, is
10    that right?
11         A.  I left the 111 and went to Patrol
12    Borough Queens North Taskforce.
13         Q.  Okay. You were there until you were
14    promoted to Lieutenant in 2003?
15         A.  Correct.
16         Q.  At that point, you were moved to
17    the 81?
18         A.  Correct.
19         Q.  You were there until you were
20    promoted to ... I'm sorry. You were there
21    until you were moved to the 79th in 2005?
22         A.  Correct.
23         Q.  Then you were there until you moved
24    to the Brooklyn North Taskforce again, in
25    2007?
```

```
 1                A. RAGANELLA
 2        A.   As a Lieutenant, yes.
 3        Q.   You're promoted to Lieutenant and
 4   moved there. Then you stayed there until
 5   you made Captain, July 2, 2010, and moved
 6   to DCU?
 7        A.   Correct.
 8        Q.   You stayed there until December 23,
 9   2013, when you became a Deputy Inspector?
10        A.   I continued there. I was promoted
11   within the assignment.
12        Q.   When did you leave to go back to
13   Patrol Borough Brooklyn North?
14        A.   February of this year.
15        Q.   From July 2010 til February 2018,
16   you were at DCU?
17        A.   Correct.
18        Q.   You were promoted from Captain to
19   DI on December 23, 2013?
20        A.   That's correct.
21        Q.   Thank you. During your career, have
22   you received any commendations?
23        A.   Yes.
24        Q.   Can you tell me about them?
25        A.   I believe I was awarded three
```

```
1              A. RAGANELLA
2   meritorious accommodations, and I believe
3   approximately 26 excellent police duties.
4        Q.  Since there's so many excellents,
5   let's stick with the meritorious. Can you
6   tell me about those? When was the first one
7   you received?
8        A.  I don't recall.
9        Q.  Do you recall any of them?
10       A.  No.
11       Q.  You recall the number, but you
12   don't recall what they were for?
13       A.  I would only be speculating if I
14   told you what they were for, unless I had
15   something that showed me what they were
16   exactly for. I wouldn't be able to tell you
17   with any certainty.
18       Q.  Sure. Of the 29 commendations you
19   received, do you remember what any of them
20   were for?
21       A.  Sure.
22       Q.  Why don't you tell us what you
23   remember?
24       A.  Gun arrest, VTL violations over a
25   period of time, kidnapping arrest, those
```

```
                                      Page 12

 1              A. RAGANELLA
 2    are the ones that jump off my mind at me.
 3         Q.  Were these commendations, when you
 4    receive them, do you receive them in a
 5    ceremony? Do you receive them just in the
 6    mail? How are they given?
 7         A.  The supervisor does a written
 8    request for them, through a process, and
 9    then it goes before a committee, to decide
10    whether you're awarded them or not.
11         Q.  When you are awarded them, is it
12    done in a ceremony or is it done where you
13    just receive it in the mail?
14         A.  Not for those particular awards.
15    For higher awards in the Department, there
16    is a ceremony, but not for those.
17         Q.  Have you ever been nominated for
18    one of the higher awards?
19         A.  No.
20         Q.  During your time at DCU, can you
21    give me your general responsibilities?
22         A.  General responsibilities, I was the
23    commanding officer of the unit, both as a
24    Captain and a Deputy Inspector. My
25    responsibilities were to oversee the day to
```

```
 1              A. RAGANELLA
 2   day operations of the unit,
 3   administratively and operationally, for
 4   what goes on at the unit, policy procedure,
 5   operations, and supervise the staff that's
 6   there.
 7        Q.  How big is the staff that's there?
 8        A.  It varied over the seven plus years
 9   that I was there. It went anywhere from
10   approximately four members of the service
11   up to 20 plus, before I had left.
12        Q.  Was it four at the beginning and 20
13   when you left?
14        A.  Correct.
15        Q.  When you were there, it was a
16   smaller entity?
17        A.  Correct.
18        Q.  You helped build it up into a much
19   bigger entity?
20        A.  I like to think so, yes.
21        Q.  When you arrived, Lieutenant Shwock
22   [phonetic] if that's correct, was the
23   interim CO?
24        A.  He was not there when I got there.
25   He had already retired.
```

```
 1              A. RAGANELLA
 2        Q.  Prior to Lieutenant Shwock it was
 3   Inspector Graham who was in charge of DCU?
 4        A.  Chief Graham.
 5        Q.  Chief Graham was in charge of DCU?
 6        A.  Yes, he was the commanding officer
 7   prior to me, and then Lieutenant Shwock was
 8   more or less an acting commanding officer
 9   as a Lieutenant there in the interim.
10        Q.  In between Lieutenant Shwock's
11   retirement and your appointment to DCU, do
12   you know who was running things there?
13        A.  I don't understand the question.
14        Q.  You had said previously that
15   Lieutenant Shwock retired before you went
16   to DCU, correct?
17        A.  Correct.
18        Q.  I'm asking you who was in charge
19   when he retired, before you got there?
20        A.  It was a short amount of time, but
21   for the amount of time that it was, it was
22   Sergeant Jose Vega.
23        Q.  Who stayed on with you when you
24   came in?
25        A.  Correct.
```

```
 1              A. RAGANELLA
 2       Q.  Was he your second in command
 3  during your time at DCU?
 4       A.  I wouldn't say second. Well, when I
 5  first got there, yes, because there were no
 6  Lieutenants there, so he was the Sergeant.
 7       Q.  Did he stay with you during your
 8  entire tenure there?
 9       A.  Yes, he did.
10       Q.  Is he still at the DCU?
11       A.  He is.
12       Q.  What is his current title, his
13  current rank?
14       A.  Sergeant Special Assignment.
15       Q.  What does that mean, Sergeant
16  Special Assignment?
17       A.  That he was promoted within the
18  rank of Sergeant, to a Special Assignment
19  designation.
20       Q.  I understand that you're here for
21  a, in response to both a 30(B)(6) notice
22  and a fact notice, is that correct?
23       A.  Correct.
24       Q.  And that your 30(B)(6) is
25  specifically for the timeframe of 2011,
```

```
 1              A.  RAGANELLA
 2   January 1, 2011 til September 17, 2012, is
 3   that correct?
 4        A.  Yes.
 5              MS. MITCHELL:  It's August.
 6          August of 2010.
 7              THE WITNESS:  That's when I
 8          became the commanding officer of
 9          DCU.
10        Q.  The timeframe is limited to August
11   2010 until September 17, 2012.
12        A.  '12.
13        Q.  Your 30(B)(6) knowledge is limited
14   to Disorder Control Unit only, correct?
15        A.  Correct.
16        Q.  When we're looking at the position
17   notice, and we're going to look at certain
18   topics, it's understood between counsel
19   that you're going to be limited in your
20   answers, and that there's going to be other
21   witnesses produced, both for the timeframes
22   that aren't being covered here, that the
23   court has said can be covered, which I
24   think are both before this date and after
25   this date. I think it's also going to be
```

```
                                   Page 17
 1              A. RAGANELLA
 2   for a wider swath of knowledge for more of
 3   the city municipality going ons.
 4           Is that your understanding as well?
 5      A.   Yes.
 6      Q.   Because you're both a fact witness
 7   and a 30(B)(6) witness, there's going to be
 8   times where the answer is going to bind the
 9   city, and there's going to be times where
10   the answer only binds you, is that
11   understood?
12      A.   Yes.
13      Q.   I think that because this is going
14   to overlap sometimes, we should at
15   different times make sure that we're on the
16   same page, as to what you're answering as.
17   If at any point you think there's a
18   distinction that needs to be made, I'd ask
19   that you say that.
20      A.   Got it.
21      Q.   You've been deposed, I believe at
22   least two other times, correct?
23      A.   Correct.
24      Q.   Is it more than two or is it just
25   those two that I know about?
```

```
 1              A. RAGANELLA
 2        A.   Just those two.
 3        Q.   You've been told that, people ask
 4   you are you ready to be deposed? Is there
 5   anything that is going to impact your
 6   ability to testify truthfully and honestly?
 7   Have you taken any drugs? Have you not
 8   taken something you're supposed to take? Is
 9   there a prescription medication you haven't
10   taken? You know all of those questions,
11   correct?
12        A.   Yes.
13        Q.   Is there anything that you believe
14   has happened in the last 24 to 48 hours
15   that would impact your ability to testify
16   truthfully or honestly here today?
17        A.   No.
18        Q.   Let me first start with, when did
19   you first meet with any attorney in the
20   City Law Department about today's
21   deposition?
22        A.   I don't recall.
23        Q.   When was the last time you met with
24   somebody about today's deposition?
25        A.   About a half hour ago.
```

```
                                        Page 19
 1              A. RAGANELLA
 2       Q.  Before today, when was the last
 3  time you met with somebody about today's
 4  deposition?
 5       A.  Tuesday.
 6       Q.  Before Tuesday?
 7       A.  Monday.
 8       Q.  Before Monday?
 9       A.  Don't recall.
10       Q.  Was there a time before Monday?
11       A.  I don't recall.
12       Q.  Is there anything that would
13  refresh your recollection?
14       A.  Not that I can think of.
15       Q.  Who was it that you met with on
16  Monday?
17       A.  Alison Mitchell.
18       Q.  Who was it you met with on Tuesday?
19       A.  Alison Mitchell.
20       Q.  Alison Mitchell is the attorney
21  sitting to your left, correct?
22       A.  Correct.
23       Q.  That's also the attorney you met
24  with earlier today, correct?
25       A.  Correct.
```

```
 1            A.  RAGANELLA
 2       Q.  You see there's another attorney
 3   sitting next to Ms. Mitchell, correct?
 4       A.  Yes.
 5       Q.  Have you met with that attorney
 6   before today?
 7       A.  She was present for a short amount
 8   of time on Monday, with myself and Alison.
 9       Q.  Prior to Monday, had you met with
10   her any other time?
11       A.  Not that I recall.
12       Q.  Were there any other attorneys that
13   you met with, other than the two in this
14   room?
15       A.  Concerning this case?
16       Q.  Yes.
17       A.  Not that I recall, no.
18       Q.  Are there any other attorneys that
19   you spoke with, if you didn't meet with
20   them, about this case?
21       A.  No.
22       Q.  Do you recall the first time you
23   spoke to anybody about this case?
24       A.  No.
25                 (Document marked Exhibit 1
```

```
 1              A.  RAGANELLA
 2                   for identification as of this
 3                   date by the reporter.)
 4        Q.  We're going to watch a little
 5   video, and then we're going to talk about
 6   the video. What I'm going to do is mark ...
 7   This thumb drive has all the same videos as
 8   the ones that we're going to watch. I'm
 9   going to mark it as number I, and I'll move
10   it here. Can you come closer, and then your
11   attorney ...
12                   MS. MITCHELL:  Yeah, I'll
13               move.
14        Q.  It's a somewhat long video, so
15   we'll just let it watch all the way
16   through.
17        A.  Okay.
18                   (Whereupon, the witness
19               was shown a video.)
20                   (Back on the record.)
21        Q.  The video cuts to when people are
22   being released from the precinct.
23             Inspector, were you able to watch
24   and observe that entire video?
25        A.  Yes.
```

```
                                              Page 22

 1              A. RAGANELLA

 2       Q.   Have you seen that video before?

 3       A.   No.

 4       Q.   Are you aware of that incident?

 5       A.   No.

 6       Q.   Do you have an opinion on what you

 7   saw?

 8                    MS. MITCHELL:  Objection.

 9                    You can answer.

10       A.   No.

11       Q.   Did what you see comport with the

12   policies and practices of the City of New

13   York, in relation to crowd control?

14       A.   In what regard?

15       Q.   Did that comport with the City of

16   New York's policies and practices in

17   relation to crowd control? Did you see any

18   crowd control necessary there?

19       A.   From the small snippet of video

20   that I saw, at the exact moment that I was

21   watching it, no, but I don't know what

22   happened prior to that.

23       Q.   Did that comport with the policies

24   and practices of the City of New York on

25   the management of pedestrian traffic?
```

Page 23

```
1              A. RAGANELLA
2        A.  I wasn't there, so I can't speak
3    for what that Captain, what he was doing. I
4    don't know what he saw and observed prior
5    to the video starting.
6        Q.  Only from what you could observe on
7    this video, did you believe that the
8    Captain there and the way he handled it
9    comported with the policies and practices
10   of the City of New York in the management
11   of pedestrian traffic?
12                   MS. MITCHELL:  Objection.
13                   You can answer.
14       A.  From the parts of the video that I
15   saw, I did not see a need for moving
16   pedestrian traffic.
17       Q.  From the part that you saw, do you
18   believe that the police conduct that day
19   comported with the City's policies and
20   practice concerning First Amendment rights
21   to speech and assembly?
22                   MS. MITCHELL:  Objection.
23                   You can answer.
24       A.  In what regard?
25       Q.  Were they honoring people's rights
```

```
 1              A. RAGANELLA
 2   to free speech and assembly, or violating
 3   people's rights to free speech and
 4   assembly?
 5                   MS. MITCHELL:  Objection.
 6                   You can answer.
 7        A.  I don't know what they were
 8   speaking about, and I don't know what
 9   happened during that whole time that, that
10   video was playing.
11        Q.  You can see in that video, an
12   individual stated that they were there as
13   part of an Occupy the Bronx, to do a
14   general assembly. I think we can agree
15   that, that type of conduct is free speech,
16   protected by the First Amendment, correct?
17                   MS. MITCHELL:  Objection.
18                   You can answer.
19        A.  I can't answer that.
20        Q.  Why can't you answer that?
21        A.  Because I wasn't there. I didn't
22   see what they were speaking of or how it
23   was actually occurring.
24        Q.  Okay. I'm saying that we didn't see
25   it, because it didn't occur, because the
```

```
 1              A. RAGANELLA
 2    police frustrated it before it could occur.
 3    I'm asking you if individuals were seeking
 4    to have a general assembly in that area, on
 5    the sidewalk, in front of the community
 6    garden, would that be an exercise of free
 7    speech rights, protected by the First
 8    Amendment?
 9                    MS. MITCHELL:  Objection.
10                    You can answer.
11         A.  As long as they weren't committing
12    any offenses, yes.
13         Q.  Did you see them committing any
14    offenses in the video that you observed
15    just now?
16         A.  No.
17         Q.  If they didn't commit any offenses
18    ... Withdrawn.
19              In the video that you saw, did the
20    police honor the First Amendment rights of
21    these individuals, or did they violate
22    them?
23                    MS. MITCHELL:  Objection.
24                    You can answer.
25         A.  From the small amount of video that
```

```
1              A. RAGANELLA
2   I saw during that time, and again, I didn't
3   see what happened before or after the video
4   stopped, I did not see any need for that.
5        Q.  You believe from what you saw, they
6   violated these people's First Amendment
7   rights, is that correct?
8                    MS. MITCHELL:  Objection.
9                    You can answer.
10       A.  I can't answer that.
11       Q.  Why can't you answer that?
12       A.  Because, again, I wasn't there, so
13  I don't know exactly what went on.
14       Q.  I'm asking you from what you
15  observed in this video. From what you just
16  testified to, they violated these people's
17  First Amendment rights to free speech,
18  isn't that correct?
19                    MS. MITCHELL:  Objection.
20                    You can answer.
21       A.  From what I saw on the video, there
22  was no need to move those people under the
23  circumstances of the few minutes that I saw
24  there.
25       Q.  Did that conduct of the police
```

1              A.  RAGANELLA

2    comport with the training that you give at

3    Disorder Control?

4                    MS. MITCHELL:  Objection.

5                    You can answer.

6         A.  From what I saw on the video, no,

7    it does not comport with the training.

8         Q.  Did you observe the moments when an

9    individual police officer, who seemed to be

10   a Community Affairs Officer, because I

11   think he was wearing a light blue jacket,

12   started to speak to the news reporter?

13        A.  Yes, I saw that part.

14        Q.  Did that conduct comport with the

15   training of Disorder Control?

16                    MS. MITCHELL:  Objection.

17                    You can answer.

18        A.  We don't train on matters of media.

19        Q.  You would agree that free press is

20   part of the First Amendment, correct?

21        A.  Absolutely.

22        Q.  That officer seemed to interrupt

23   the press while they were working to ask

24   questions, correct?

25        A.  I don't know if it was an

Page 28

```
 1              A.  RAGANELLA
 2   interruption, but he did speak to her, yes.
 3        Q.  She was interviewing somebody at
 4   the time that he started to speak to her,
 5   correct?
 6        A.  Okay.
 7        Q.  That's her job, correct?
 8        A.  Yes.
 9        Q.  He started asking her questions
10   while she was doing her job, and asking her
11   about a press pass, correct?
12        A.  Correct.
13        Q.  Does that comport with the training
14   at Disorder Control?
15                    MS. MITCHELL:  Objection.
16                    You can answer.
17        A.  There are times where members of
18   the service are required to ask for press
19   credentials, yes.
20        Q.  Did this moment in time that you
21   could observe in the video comport with the
22   times when you believe somebody from the
23   Police are supposed to ask for a press
24   pass?
25                    MS. MITCHELL:  Objection.
```

Page 29

```
 1              A.  RAGANELLA
 2                      You can answer.
 3       A.   From what I saw in that small
 4  window of time, no.
 5       Q.   Are you aware that at least two
 6  elected officials complained about this
 7  incident and brought it to the attention of
 8  the Commissioner of the NYPD?
 9                      MS. MITCHELL:  Objection.
10                      You can answer.
11       A.   I'm unaware of that.
12       Q.   During the time that we're here
13  for, which I believe is August 2010 til
14  September 17, 2012, you were solely in
15  charge of Disorder Control and the training
16  that Disorder Control gave, correct?
17       A.   Correct.
18       Q.   If an update to training was
19  needed, you would either tell somebody you
20  believed that was so, or somebody would
21  come to you and say an update was needed,
22  correct?
23       A.   Correct.
24       Q.   During that time period, was any
25  update to the training needed?
```

```
 1              A. RAGANELLA
 2        A.  In regard to what specifically?
 3   There's always updates that are done and
 4   revisions to lesson plans, yes.
 5        Q.  Sure. Do you recall any specific
 6   updates to training between August 2010 and
 7   September 17th of 2012?
 8        A.  No.
 9        Q.  Do you recall any updates to
10   training regarding assembly or free speech
11   rights in that timeframe?
12        A.  No.
13        Q.  Having seen this video, if that in
14   fact showed the full conduct and the full
15   scope of what was going on, would you
16   believe that an update to training would be
17   required for those individual police
18   officers?
19                  MS. MITCHELL:  Objection.
20                  You can answer.
21        A.  Yes, to those specific members.
22        Q.  If somebody had brought this video
23   to your attention during the timeframe
24   we're talking about, would you have
25   suggested to anybody that perhaps an update
```

```
                                           Page 31
 1              A. RAGANELLA
 2   to training, regarding free speech rights,
 3   is necessary?
 4                    MS. MITCHELL:  Objection.
 5       A.  Not generally, no. To those
 6   particular officers, possibly re-
 7   instruction.
 8       Q.  Okay.
 9                    MS. FORSTER-GALVIN:  Can
10              we just have a moment?
11                    MR. STECKLOW:  Sure.
12                    (Whereupon, a short recess
13              was taken.)
14                    (Back on the record.)
15   BY MR. STECKLOW:
16       Q.  Just to be clear, you're not here
17   to talk about any Academy training,
18   correct?
19       A.  Correct.
20       Q.  You're not here to talk about any
21   leadership training, correct?
22       A.  Correct.
23       Q.  You're only here to talk about
24   Disorder Control training, correct?
25       A.  Correct.
```

```
 1              A. RAGANELLA
 2         Q.  I think this may be redundant, but
 3    I'm going to ask it again, just so I have
 4    it properly asked. Were the arrests that
 5    ... Withdrawn.
 6              Within that video, we saw a couple
 7    of arrests being made, correct?
 8         A.  Yes.
 9         Q.  Were those arrests consistent with
10    the Disorder Control training?
11                    MS. MITCHELL:  Objection.
12                    You can answer.
13         A.  I don't understand what you mean.
14         Q.  From what you could observe in the
15    video, were those arrests consistent with
16    the training that you gave at Disorder
17    Control?
18         A.  I still don't understand. I don't
19    understand what you mean.
20         Q.  Do you believe there was probable
21    cause to effectuate those arrests?
22         A.  I wasn't there, so it's impossible
23    for me to answer that question.
24         Q.  Did you see probable cause in the
25    video that we just watched for the arrests
```

1           A. RAGANELLA

2    that were made in that video?

3                    MS. MITCHELL:  Objection.

4                    You can answer.

5       A.  No.

6       Q.  Those arrests were not consistent

7    with the training you give at Disorder

8    Control, about when it's appropriate to

9    make an arrest in that situation, for the

10   video you saw, correct?

11                   MS. MITCHELL:  Objection.

12                   You can answer.

13      A.  Our training dictates that we make

14   arrests when there's probable cause.

15      Q.  You just testified there was not

16   probable cause, from what you could see in

17   that video, correct?

18      A.  From what I could see.

19      Q.  Those arrests did not comport with

20   the training you give regarding probable

21   cause, correct?

22      A.  Again, I wasn't there to see if

23   there was probable cause.

24      Q.  From what you could see on the

25   video, those arrests did not comport with

```
 1              A. RAGANELLA
 2   the training Disorder Control gives about
 3   probable cause, correct?
 4                    MS. MITCHELL:  Objection.
 5                    You can answer.
 6        A.  I can't answer that.
 7        Q.  For the video that you could watch,
 8   those arrests did not comport with the
 9   training you give at Disorder Control
10   regarding probable cause, correct?
11                    MS. MITCHELL:  Objection.
12                    You can answer.
13        A.  The training we give at Disorder
14   Control Unit, again, is based on probable
15   cause. I can't testify or answer as to what
16   those officers saw, as far as probable
17   cause.
18        Q.  I'm asking you for what you could
19   observe of this video. You've already
20   testified that you didn't observe any
21   probable cause in the video for the arrest,
22   correct?
23        A.  From the part of the video that I
24   saw, I did not see probable cause.
25        Q.  I'm asking you, does that mean that
```

```
 1              A. RAGANELLA
 2  these arrests for the conduct that you
 3  could observe in the video, these arrests
 4  did not comport with the training you gave
 5  at Disorder Control, regarding proper
 6  arrest and probable cause, correct?
 7                  MS. MITCHELL:  Objection.
 8                  You can answer.
 9      A.  Again, I did not see probable cause
10  on the video. I can't testify as to what
11  the officers saw.
12      Q.  I'm not asking you to.
13      A.  Okay.
14      Q.  I'm asking you to testify as to
15  what you could observe in the video and
16  whether those arrests comported with the
17  training you give at Disorder Control for
18  probable cause?
19                  MS. MITCHELL:  Objection.
20                  You can answer.
21      A.  I did not see probable cause.
22      Q.  Did it comport with the training
23  you give at Disorder Control?
24                  MS. MITCHELL:  Objection.
25                  You can answer.
```

```
 1              A. RAGANELLA
 2        A.  I don't train on probable cause.
 3   That's not part of our training.
 4        Q.  Disorder Control does not do any
 5   training on probable cause for arrest?
 6        A.  That's done at the Police Academy
 7   during recruit training.
 8        Q.  In that video that we watched, did
 9   you see any riotous conduct?
10                   MS. MITCHELL:  Objection.
11                   You can answer.
12        A.  From the portion of the video that
13   I saw, I did not see riotous behavior or
14   conduct.
15        Q.  Did you see any clear and present
16   danger of public disorder?
17                   MS. MITCHELL:  Objection.
18                   You can answer.
19        Q.  In the video we just watched.
20        A.  I did not, no.
21        Q.  In that video that we observed,
22   could pedestrians pass without significant
23   inconvenience?
24                   MS. MITCHELL:  Objection.
25                   You can answer.
```

```
 1              A. RAGANELLA
 2        A.  From what I saw, it seemed that
 3   pedestrians could pass.
 4        Q.  Does Disorder Control train on
 5   substantial impedance of the public, in
 6   regard to sidewalk?
 7        A.  I don't understand the question.
 8        Q.  I'm trying to understand, you just
 9   decided that you didn't see people blocking
10   the sidewalk, that pedestrians could walk,
11   correct?
12        A.  Correct.
13        Q.  I think that there's a standard
14   that mere inconvenience is not sufficient,
15   it has to be some substantial impedance, in
16   order for a protest to crossover from legal
17   to illegal, correct?
18        A.  Correct.
19        Q.  I'm asking if that training occurs
20   at Disorder Control, about where that
21   crossover occurs, between merely
22   inconveniencing a pedestrian and
23   substantially impeding a pedestrian?
24        A.  It's impossible to train on that.
25        Q.  Why is that?
```

```
                                    Page 38
1              A. RAGANELLA
2         A.  There's so many different varied
3    circumstances and dynamics. One situation
4    doesn't apply to another situation.
5         Q.  How are officers trained to make
6    these decisions when they're out in the
7    field?
8         A.  At a demonstration or a protest, or
9    on normal patrol?
10        Q.  Demonstration or protest.
11        A.  At a demonstration or a protest,
12   they're going to use either their
13   discretion, along with their supervisor, or
14   a member of our legal bureau would be there
15   to guide them.
16        Q.  The Disorder Control training is
17   both for the rank and file officers, as
18   well as people above the police officer
19   rank, correct?
20        A.  Correct.
21        Q.  You just talked about how a
22   supervisor would be somebody who might give
23   guidance. How are the supervisors trained
24   in where that distinction comes between
25   merely inconvenienced and substantially
```

```
                                          Page 39
 1              A.  RAGANELLA
 2   impeding?
 3        A.  That would be the same answer as I
 4   gave before.
 5        Q.  Can you give it again? I'm asking
 6   specifically about the supervisors. You
 7   said the supervisors would be on scene to
 8   help the POs make these decisions.
 9        A.  Correct.
10        Q.  How is it the supervisors are
11   trained in that knowledge?
12        A.  The supervisors, when we're doing
13   Disorder Control work or crowd management
14   and crowd control, there's a team led
15   concept that goes into that, where police
16   officers will act as a team, and not
17   necessarily take action, unless directed by
18   a supervisor. If a supervisor believes that
19   there's a substantial disruption, they can
20   instruct the officers to make the arrests.
21        Q.  How are those supervisors trained
22   to understand when there's substantial
23   disruption compared to merely
24   inconveniencing?
25        A.  That's something they would get
```

```
 1              A. RAGANELLA
 2  through training at the Police Academy,
 3  when they learn about disorderly conduct
 4  and probable cause.
 5       Q.  That training takes place during
 6  the cadet period, not later on, correct?
 7       A.  Recruit period, yes.
 8       Q.  Recruit period, like you said.
 9       A.  Right.
10       Q.  That's not training supervisors get
11  as they rise through the ranks. That's
12  something done at the Academy during their
13  recruit time, correct?
14       A.  Again, I can't, as far as training
15  is concerned, there's no cookie cutter
16  approach to being able to dictate what
17  probable cause means for disorderly
18  conduct, when it comes to blocking
19  vehicular or pedestrian traffic. There's no
20  defined term on that, as far as when you
21  have probable cause.
22       Q.  It's your belief that, that
23  training doesn't take place because it is
24  impossible to take place?
25                  MS. MITCHELL:  Objection.
```

```
 1              A. RAGANELLA
 2         You can answer.
 3         A.   We can give examples of how it
 4    happens and how it occurs, and we do, but I
 5    can't stand in front of a classroom and
 6    tell officers, "This is in fact when you
 7    have probable cause for disorderly
 8    conduct," unless I'm giving them an example
 9    of what it looks like and how it takes
10    place.
11         Q.   Is that training you give? Those
12    examples?
13         A.   There are examples that are given,
14    yes.
15         Q.   Is that training that Disorder
16    Control gives?
17         A.   Yes.
18         Q.   In which documents are those
19    examples found?
20         A.   That would be something that my
21    instructors would discuss with them.
22         Q.   It's not something that's in a
23    writing, it's something that's part of a
24    discussion?
25         A.   Correct.
```

1          A. RAGANELLA

2      Q.   In which component of Disorder

3  Control training does that discussion take

4  place?

5      A.   During mass arrest techniques.

6      Q.   The mass arrest techniques, is that

7  a classroom setting or is that part of a

8  mobile exercise setting outside the

9  classroom?

10     A.   It could be both.

11     Q.   For the time period between August

12 2010 and September 17th of 2012, which one

13 was it?

14     A.   Both.

15     Q.   Is that documented somewhere, about

16 whether or not it's a classroom or it's a

17 mobile exercise outside of the classroom?

18     A.   Not that I'm aware of.

19     Q.   When the mobile exercises took

20 place on Randall's Island, are there

21 classrooms on Randall's Island for these

22 instructions to take place in a classroom

23 setting?

24     A.   No.

25     Q.   For sure, any of the mobile

```
 1              A. RAGANELLA
 2   exercises that occurred on Randall's
 3   Island, this stuff wasn't taught in a
 4   classroom setting or discussed, correct?
 5        A.  I didn't say that. It was
 6   discussed, not in a classroom setting
 7   though
 8        Q.  Even when it's not in a classroom
 9   setting, it's still discussed?
10        A.  Yes.
11        Q.  Were you aware that the New York
12   Civil Liberties Union also sent a letter to
13   Commissioner Kelly, raising concerns about
14   the police aggressively dispersing people
15   standing lawfully on city sidewalks, and
16   urging the NYPD to do a better job of
17   writing warnings to Occupy Wall Street
18   protestors... unlawfully parading in
19   streets or blocking sidewalks?
20                   MS. MITCHELL:  Objection.
21                   You can answer.
22        A.  No, I was not aware of that.
23        Q.  Okay. I'm going to mark this as,
24   I'm going to put these together since
25   they're similar, and make it II. Exhibit II
```

Page 44

1              A.  RAGANELLA

2    is Bates stamped D14888 through 14896, as

3    well as D15187 through 15195.

4                      (Document marked Exhibit 2

5                      for identification as of this

6                      date by the reporter.)

7         Q.  I'd ask you to look at that and

8    tell me if you've seen it before. The top

9    ones are documents related to a complaint

10   by City Council Member Jessica Lappin,

11   considering the video we just saw. The

12   second set of pages is the complaint by

13   State Senator Liz Krueger, about the same

14   video of the incident in the Bronx.

15        A.  Thank you. (Witness perusing

16   document.)

17                      MR. STECKLOW:  While you

18                      are doing that, I have a

19                      question for counsel on the

20                      record, which is these

21                      documents indicate that there

22                      was an Internal Affairs

23                      investigation opened, and I

24                      don't believe we received any

25                      Internal Affairs records

```
 1            A.  RAGANELLA
 2                  concerning this complaint.
 3                  Obviously, that would be
 4                  responsive to our request. My
 5                  belief is there are no
 6                  documents, and I just want to
 7                  make sure that, that's an
 8                  accurate belief.
 9                  MS. MITCHELL:  Regarding
10                  this specific investigation?
11                  MR. STECKLOW:  Both
12                  letters complain about this
13                  incident in the Bronx that we
14                  just watched the video of. Both
15                  responses by Commissioner Kelly
16                  state that this has been
17                  referred to Internal Affairs
18                  and there's an investigation.
19                  We've never received any of
20                  those documents. We've asked
21                  for them. My belief is it
22                  doesn't exist, but before I
23                  rely upon that belief, I'd like
24                  to be sure about it.
25                  MS. MITCHELL:  I don't
```

```
 1            A.  RAGANELLA

 2                 believe that you made a

 3                 specific request for Internal

 4                 Affairs investigations. We can

 5                 have a discovery dispute on the

 6                 record, but I don't think that,

 7                 that would be a beneficial use

 8                 of your time.

 9                 MR. STECKLOW:  That's at

10                 least clearing it up for me,

11                 that you don't believe that

12                 this has been requested. It's

13                 not that it doesn't exist, it

14                 hasn't been ...

15                 MS. MITCHELL:  Well, let

16                 me cache that with there are

17                 five sets of documents demands

18                 in this case, and I don't have

19                 all of them in front of me or

20                 my notes in front of me.

21                 MR. STECKLOW:  Okay.

22                 MS. MITCHELL:  I would not

23                 be prepared to answer that

24                 question off the cuff.

25                 MR. STECKLOW:  Fair
```

```
 1              A.  RAGANELLA

 2                   enough. That's why I wanted to

 3                   ask the question, because I

 4                   wanted to understand whether

 5                   it's been sought and hasn't

 6                   been found, or hasn't been

 7                   sought, and it seems like we're

 8                   not sure. You and I will

 9                   discuss this off the record.

10                        MS. MITCHELL:  I would say

11                   if you'd like to have a

12                   discovery discussion related to

13                   that specific request, we could

14                   do that at a later date and

15                   time. I'm perfectly happy to do

16                   that. I'm not prepared to have

17                   that discussion right now.

18                        MR. STECKLOW:  Great.

19                        (Whereupon, a short recess

20                   was taken.)

21                        (Back on the record.)

22        Q.  Have you ever seen these documents

23   before?

24        A.  I have not.

25        Q.  You haven't been aware of these
```

```
                                        Page 48
 1              A.  RAGANELLA
 2    complaints before?
 3         A.   I was not.
 4         Q.   To your knowledge is disorder
 5    control training updated based on these
 6    complaints?
 7                    MS. MITCHELL:  Objection.
 8                    You can answer.
 9         A.   I don't understand your question.
10         Q.   Was disorder control training
11    updated based on the complaints that you
12    just reviewed?
13         A.   No.
14         Q.   Those complaints concerned the
15    conduct of the video that we just observed,
16    correct?
17         A.   I believe so, yeah.
18                    (Document marked Exhibit 3
19                 for identification as of this
20                 date by the reporter.)
21         Q.   So, I'm going to show you what's
22    marked as, I think, it's exhibit three, and
23    ask you to review that.
24         A.   (Witness perusing document.)
25         Q.   Let me know after you've had a
```

```
 1              A. RAGANELLA
 2   chance to see it. Do you recognize that
 3   document?
 4        A.  Yes.
 5        Q.  Is it from disorder control
 6   training?
 7        A.  Yes.
 8        Q.  Is it a document ... Is the
 9   information onto something that you
10   created?
11        A.  Not myself personally, my staff.
12        Q.  But under your instruction?
13        A.  It's possible that this was a pre-
14   existing lesson plan prior to my arrival,
15   but it was something that I reviewed.
16        Q.  It was something that you continued
17   to utilize, correct?
18        A.  Correct.
19        Q.  It gives a definition of what a
20   riots situation is, correct?
21        A.  I don't understand your question.
22        Q.  This is a PowerPoint screen,
23   correct?
24        A.  Correct.
25        Q.  This is utilizing in some classroom
```

```
 1              A. RAGANELLA
 2   setting of disorder control training,
 3   correct?
 4        A.  Correct.
 5        Q.  In the mass arrest component that
 6   we discussed previously, correct?
 7        A.  Correct.
 8        Q.  In this PowerPoint, it says, "Riots
 9   situation - violent civil disorder." So,
10   it's defining what a riots situation is,
11   correct?
12        A.  It's giving an example of a riots
13   situation, yes.
14        Q.  Okay. And it's giving us an example
15   because it's trying to help members of the
16   service distinguish what a mass arrest is
17   concern to what a riots situation is,
18   correct?
19        A.  That's correct.
20        Q.  So, mass arrest is the situation
21   where demonstrators wish to be arrested and
22   are being passive, correct?
23        A.  Correct.
24        Q.  So, that's not when people don't
25   wish to be arrested, and they're not
```

```
                                        Page 51
 1              A. RAGANELLA
 2   engaging in civil disobedience. Is it your
 3   words here mass arrest means people intend
 4   to be arrested?
 5                    MS. MITCHELL:  Objection.
 6                    You can answer.
 7        A.  No, there are a lot of times where
 8   we make multiple arrest for people not
 9   wanting to be arrested.
10        Q.  Okay. When it says, "A mass arrest
11   is a situation where demonstrators wish to
12   be arrested," you're saying this is just an
13   example of it? It's not definition of it?
14        A.  That's correct.
15        Q.  Okay. So, there are other examples
16   of mass arrest?
17        A.  I don't understand your question.
18        Q.  Are there other examples of mass
19   arrest, other than what you've defined on
20   this PowerPoint?
21        A.  I don't have a definition of it,
22   no.
23        Q.  Okay. Are there other examples of
24   riots situation, other than what's
25   identified here?
```

```
 1              A.  RAGANELLA
 2        A.   It could be.
 3        Q.   Do you train on other examples?
 4        A.   Possibly using different words, but
 5   that's a synopsis of what we use.
 6        Q.   So, disorder control training, in
 7   the most basic way, states that a riots
 8   situation is a violent civil disorder,
 9   correct?
10        A.   That's an example. It's not a
11   definition.
12        Q.   Okay. So, what are other examples
13   of riots situation that are not violent
14   civil disorder?
15        A.   A riot, by definition, is a
16   statutorily defined event consisting of a
17   certain number or people engaging in
18   certain behavior. So, this is just an
19   example of a riots situation to let the
20   students know this is different than this
21   example of a mass arrest.
22        Q.   You said that a riots situation is
23   defined by the number of people and their
24   conduct? Is that right?
25        A.   Correct.
```

```
                                    Page 53
 1              A. RAGANELLA
 2       Q.  So, what kind of conduct can be a
 3  riots situation that's distinguish from a
 4  violent civil disorder?
 5                    MS. MITCHELL:  Objection.
 6                    You can answer.
 7       A.  People engaging in property damage,
 8  or multiple people engaging in assaults to
 9  other people.
10       Q.  Assault to other people would still
11  be violent, correct?
12       A.  Could be.
13       Q.  It can be nonviolent assaults?
14       A.  I don't know. I would have to think
15  about it.
16       Q.  But to a riots situation, this term
17  violent civil disorder is a fairly good
18  general idea of what it is, correct?
19       A.  Absolutely.
20       Q.  And that's why you're training the
21  uniform member service on that, correct?
22       A.  Correct.
23       Q.  We're going to watch another video
24  now. I'd like you to watch it to the end,
25  and then we'll discuss it.
```

```
 1            A.  RAGANELLA
 2                   MS. MITCHELL:  This is
 3               plaintiff one?
 4                   MR. STECKLOW:  This is all
 5               plaintiff one, yes.
 6                   (Whereupon, the witness
 7               was shown a video.)
 8                   (Back on the record.)
 9      Q.  Inspector Raganella, have you ever
10  seen that video before?
11      A.  No.
12      Q.  Did you recognize the area?
13      A.  Yes.
14      Q.  Where was that?
15      A.  It appeared to be the perimeter of
16  Zuccotti Park in lower Manhattan.
17      Q.  How many arrests were you able to
18  observe in that video?
19      A.  I saw two.
20      Q.  How many pedestrians did you
21  observe in that video that were not part of
22  the police or the group of protestors?
23                   MS. MITCHELL:
24               Objection.
25                   You can answer.
```

```
                                     Page 55
 1            A. RAGANELLA
 2       A.   There's no way for me to know that.
 3       Q.   Did you see any pedestrians walking
 4   by?
 5                       MS. MITCHELL:
 6                  Objection.
 7                       You can answer.
 8       A.   Not that I recall.
 9       Q.   Did the two arrests that you
10   observe comport with the training of
11   disorderly control, from what you can see
12   on the video?
13                  MS. MITCHELL:  Objection.
14                  You can answer.
15       A.   In what regard?
16       Q.   We've already established that you
17   don't train on probable cause. I can't ask
18   about that, correct?
19                  MS. MITCHELL:  Objection.
20                  You can answer.
21       A.   You can ask about it. I just don't
22   know that ... I can't tell you what their
23   probable cause was. I can't testify as to
24   what that officer saw.
25       Q.   Okay. From what you could observed,
```

1             A. RAGANELLA

2    did you see probable cause for an arrest?

3                      MS. MITCHELL:  Objection.

4                      You can answer.

5        A.  During that time period of the

6    video that I saw, I did not see probable

7    cause.

8        Q.  Did you see any clear and present

9    danger of public disorder?

10                     MS. MITCHELL:  Objection.

11                     You can answer.

12       A.  During the period that I saw the

13   video, no.

14       Q.  Do you train on clear and present

15   danger?

16       A.  Yes.

17       Q.  Disorder control training. That

18   training is part of when an arrest can be

19   made, or when a protest can be moved on the

20   sidewalk and pushed somewhere else? Is that

21   correct?

22       A.  That's part of it, yes.

23       Q.  Did the arrest and the conduct from

24   what you could see in this video comport

25   with the training of the clear and present

```
                                        Page 57
 1              A.  RAGANELLA
 2    danger of when an arrest can be made for
 3    sidewalk protest?
 4                    MS. MITCHELL:  Objection.
 5                    You can answer.
 6         A.  From the part of the video that I
 7    saw, no.
 8         Q.  Did you hear a couple of warnings
 9    of clear the sidewalk?
10         A.  Yes.
11         Q.  Do you train in disorder control
12    training on when it's appropriate to clear
13    a sidewalk?
14                    MS. MITCHELL:  Objection.
15                    You can answer.
16         A.  Not when it's appropriate to do it,
17    but how to do it is more of what we train
18    on.
19         Q.  Where does the training take place
20    on when an officer is authorized to clear a
21    sidewalk?
22         A.  That would be a discretionary
23    matter up to the incident commander on
24    scene.
25         Q.  Do you know where the incident is
```

```
                                      Page 58
 1              A. RAGANELLA
 2   trained on that issue?
 3                   MS. MITCHELL:  Objection.
 4                   You can answer.
 5       A.  Again, just discretion probable
 6   cause is all the matters that are taught at
 7   the police academy.
 8       Q.  During the recruit training,
 9   correct?
10       A.  Correct.
11       Q.  Did you see any substantial
12   impedance of any pedestrians in the video
13   you just watched?
14                   MS. MITCHELL:  Objection.
15                   You can answer.
16       A.  The portion that I saw, no I did
17   not.
18       Q.  So, in the training that you give
19   as part of your mass arrest about
20   substantial impedance, would that be an
21   example of when an arrest could be made or
22   could not be made?
23       A.  If I were to use that as an example
24   on that clip of timeframe that I saw, that
25   would not be an arrest situation.
```

1         A. RAGANELLA

2      Q.  If this video had been brought to

3   your attention, would you have updated the

4   disorder control training concerning these

5   issues?

6      A.  No.

7      Q.  Why is that?

8      A.  I'm very happy with the way our

9   training and policy is on mass arrest.

10      Q.  Okay. Now, I'm talking specifically

11   about sidewalk and substantial impedance

12   and clear and present danger, of which

13   we've discussed that what we saw in the

14   video, the officers did not act within line

15   of the training that you give, correct?

16      A.  Based on what I saw, no.

17      Q.  Okay. I'm asking you if you believe

18   the training need to be updated, and you

19   say it does not, correct?

20      A.  That is correct.

21      Q.  Do you believe these officers would

22   need an update of refresher course in the

23   training?

24      A.  Without speaking to them, I

25   wouldn't be able to answer that.

```
 1            A.  RAGANELLA
 2       Q.  Based on what you could observe in
 3   the video.
 4                    MS. MITCHELL:  Objection.
 5                    You can answer.
 6       A.  Based solely on what I saw in the
 7   video without speaking to them, or knowing
 8   the background of the situation prior to
 9   what I saw on the video, I would say no.
10       Q.  You saw that last individual who
11   seemed to have a hoodie on being pulled out
12   of the back and being arrested?
13       A.  Yes.
14       Q.  Do you believe that there was
15   anything that you could see in the video
16   that gave cause for that arrest?
17                    MS. MITCHELL:  Objection.
18                    You can answer.
19       A.  From what I saw on the video, using
20   that solely, no.
21       Q.  So, do you believe the officers
22   there were following the training they had
23   been given by disorder control in making
24   those arrest?
25                    MS. MITCHELL:  Objection.
```

```
 1              A.  RAGANELLA
 2                      You can answer.
 3       A.   The way that they affected the
 4   arrest seem to comport with our procedures.
 5       Q.   You're talking about specifically
 6   the way they handled the body once the
 7   arrest decision had been made?
 8       A.   Which is what we train on, yes.
 9       Q.   I'm asking about the decisions to
10   make the arrest, and handling the sidewalk
11   protest, did the officers follow the
12   training of DCU in regards to those topics.
13                      MS. MITCHELL:  Objection.
14                      You can answer.
15       A.   We don't give training on those
16   topics. That's under the preview of an
17   incident commander's discretion.
18       Q.   That training, again, takes place
19   at the academy during their recruit time,
20   correct?
21       A.   There's also training that happens
22   in service with incident commanders during
23   tabletop exercises and such, where that may
24   become a topic of conversation, but it's
25   not something that I can specifically point
```

1              A. RAGANELLA

2    to to say that that particular incident

3    commander received that type of training.

4                    (Document marked Exhibit 4

5                 for identification as of this

6                 date by the reporter.)

7         Q.  Okay. Now, I'm going to mark as

8    exhibit four, some images. I'm going to ask

9    you to look at this and let me know when

10   you've had a chance to do so.

11        A.  (Witness perusing document.)

12        Q.  Have you ever seen these images

13   before?

14        A.  Not that I recall.

15        Q.  Do you recognize anybody?

16        A.  I do not.

17        Q.  Do you recognize the white shirt?

18        A.  I do not.

19        Q.  Do you know who Edward Winski

20   [phonetic] is?

21        A.  Yes.

22        Q.  Okay. Having been told that's

23   Edward Winski, does that refresh your

24   memory as who it is? Pull it up on the

25   screen please.

```
                                          Page 63

 1              A. RAGANELLA

 2        A.  It's hard from the photos to say

 3   that that's [crosstalk]...

 4        Q.  ... on the computer for you. I'm

 5   sorry for over-speaking. I have him on the

 6   computer, so I'll make it easier.

 7        A.  Thanks.

 8        Q.  All right. We're now looking at the

 9   second of the third image. Does that make

10   it easier for you to see who it is?

11        A.  Yes.

12        Q.  Do you recognize him? Is it?

13        A.  That appears to be Edward Winski,

14   yes.

15        Q.  Okay. Do you recognize the

16   location?

17        A.  No.

18        Q.  Do you see barriers set up in these

19   images?

20        A.  I do.

21        Q.  In the third image, do you see two

22   barriers set up?

23        A.  I do.

24        Q.  One seems to be against the

25   building, and the other one seems to be a
```

```
                                        Page 64
 1              A. RAGANELLA
 2   portion on the sidewalk.
 3         A.  Yes, sir.
 4         Q.  Does that comport with the training
 5   of DCU to set up barriers to give the
 6   protestors a place to march?
 7         A.  Yes, sir.
 8         Q.  And not block the entire sidewalk?
 9         A.  Yes.
10         Q.  Do you see where the police are
11   standing in the photos?
12                    MS. MITCHELL:  Objection.
13                    You can answer.
14         A.  Are we speaking about police
15   officers uniformed or plain clothes?
16         Q.  All.
17         A.  Yes, I see where they're standing.
18         Q.  Okay. Is that in the street?
19         A.  It appears to be on the ... Well,
20   depending on which photo we're looking at.
21         Q.  Let's look at the middle one.
22         A.  It appears that they are in the
23   street if that is a street.
24         Q.  So, why did the police create a
25   narrow passageway for a large group of
```

```
                                    Page 65
 1              A. RAGANELLA
 2   people while occupying a larger passageway
 3   that seems to be unused by vehicles.
 4                    MS. MITCHELL:  Objection.
 5                    You can answer.
 6        A.   There's multiple reasons why that
 7   may happen.
 8        Q.   Okay. So, let's go through those.
 9        A.   Okay. When we set up barriers ...
10   From what I'm seeing in the third photo, it
11   seems that there's a barrier up against the
12   building one, and another barrier on what
13   appears to be the sidewalk. Those two
14   barrier lines, I should say, are
15   adjustable, meaning at a moments notice
16   with the amount of officers needed, those
17   barrier lines could be moved and adjusted
18   to allow for more restricted flow or
19   increase flow of pedestrians within the
20   barrier line.
21           Based on what I'm seeing here, I
22   don't know if that's a public roadway or
23   not, if vehicles travel up and down that
24   roadway. It appears to be like Belgium
25   block roadway. So, I don't know. I see a
```

```
1            A. RAGANELLA
2    line. In the first photo and the second
3    photo actually, I see what appears to be a
4    black iron gate on the other side. That
5    doesn't look like something that the police
6    department would put up [crosstalk]...
7         Q.  The black iron gate looks to be in
8    the middle of the roadway, correct?
9         A.  Right, which is why I
10   [crosstalk]...
11        Q.  ... are parallel with the roadway,
12   correct?
13        A.  Correct, which is why I suggest or
14   inquire as to whether this is a publicly
15   accessible roadway or not for vehicles to
16   travel down.
17        Q.  If it's not a publicly accessible
18   roadway, is there a reason why the police
19   would put the protestors in such a narrow
20   passageway while keeping such a large
21   passageway for themselves to stand in?
22        A.  Yes.
23        Q.  What is that?
24        A.  It's depending upon the number of
25   protestors or demonstrators that are
```

1          A.  RAGANELLA

2   present. The incident commander will make a

3   determination as of what size or width of

4   barriers are needed to accommodate the

5   number of people that are there, while also

6   on the opposite side where the police are

7   standing, allow free passage for officers

8   and other uninvolved pedestrians to move up

9   and down. If it is a roadway where vehicles

10  can get through, we need to allow enough

11  room for public safety vehicles or just

12  regular vehicles to get through.

13       Q.  Okay. If we ... I want you to

14  understand this individual was eventually

15  arrested, and I'd like for you to accept

16  the fact he was charged with disorderly

17  conduct of blocking pedestrian traffic.

18                 MS. MITCHELL:  Objection.

19       A.  Okay.

20       Q.  Can you, by looking at these three

21  images, understand how he could possibly be

22  blocking pedestrian traffic?

23                 MS. MITCHELL:  Objection.

24                 You can answer.

25       A.  Just based on what I'm seeing in

```
                                        Page 68
1              A.  RAGANELLA
2    the photos?
3         Q.  Yes.
4         A.  I don't see him ... Based on three
5    snaps of a photo, I don't see him blocking
6    pedestrian or vehicular traffic.
7         Q.  Okay. Do you have an understanding
8    of what Ed Winski's role at Occupy Wall
9    Street or withdrawn.
10             Do you have an understanding of the
11   role Inspector Winski played in policing
12   Occupy Wall Street?
13        A.  No.
14        Q.  Do you know where his commander was
15   during the time of Occupy Wall Street?
16        A.  I do not.
17        Q.  You don't know that he was the
18   commanding officer of the first precinct at
19   that time period?
20        A.  I recall him being commanding
21   officer of the first precinct. I'm not sure
22   as to the timeframe of when that occurred,
23   if that was during that time of those
24   photos, or even during the time of Occupy
25   Wall Street.
```

1              A.  RAGANELLA

2         Q.  Are you aware of where Occupy Wall

3    Street occurred?

4         A.  Yes.

5         Q.  Was it generally within the

6    confines of the first precinct

7    jurisdiction?

8         A.  Occupy Wall Street occurred

9    worldwide.

10        Q.  I'm talking about New York City's

11   Occupy Wall Street and when it occurred

12   here. Did it generally occur within the

13   confines of the first precinct?

14        A.  The focal point, as we call it, for

15   Occupy Wall Street in New York City was

16   Zuccotti Park.

17        Q.  As well as marches from Zuccotti

18   that would go downtown into the financial

19   district, correct?

20        A.  That's correct.

21        Q.  And those were all within the

22   confines of the first precinct, correct?

23        A.  Wall Street, yes. I'm not sure

24   about the jurisdiction of Zuccotti Park.

25   That might be the first precinct also.

1           A.  RAGANELLA

2       Q.  Did DCU conduct any specific

3   training for the first precinct officers

4   that would be assigned to Occupy Wall

5   Street?

6       A.  I'm not sure of what you're asking.

7       Q.  Was there specific training for the

8   officers of the first precinct that were

9   assigned to Occupy Wall Street?

10      A.  Specific to Occupy Wall Street or

11  trained in general? I don't understand the

12  question.

13      Q.  Specific to the first precinct

14  officers being trained because they were

15  going to be policing constitutional

16  activity at Occupy Wall Street.

17      A.  We did training for officers in

18  regard to demonstrations and protest. I

19  can't say that it was specific to Occupy

20  Wall Street.

21      Q.  In the trainings you did, were

22  there mobile exercises?

23      A.  That was one training that we did,

24  yes.

25      Q.  What are the other trainings that

```
 1              A. RAGANELLA
 2   you did for these officers in
 3   demonstrations?
 4        A.  Mobilization exercises. We also did
 5   training for impact officers. We also did
 6   training for officers that were assigned to
 7   CRV. We also did tabletop exercises. We did
 8   functional exercises. There's a multitude
 9   of different types of training that the
10   Disorder Control Unit conducts.
11                     (Document marked Exhibit 5
12                  for identification as of this
13                  date by the reporter.)
14        Q.  I'm going to mark as exhibit five,
15   demonstration lesson plan. I'm going to ask
16   you to review that and let me know when you
17   get a chance to do so.
18                  MS. MITCHELL:  Objection.
19                  You can answer.
20        A.  (Witness perusing document.) Now.
21        Q.  Is this something planned from the
22   academy?
23        A.  It appears to be.
24        Q.  So, there's nothing in here that
25   would be utilized as disorder control?
```

Page 72

```
 1              A. RAGANELLA

 2       A.  I don't understand your question

 3  when you say utilize.

 4       Q.  Well, I'm being told by your

 5  counsel it's beyond the scope because this

 6  doesn't have to do with the timing or for

 7  disorder control. If disorder control

 8  utilizes this lesson plan, or the

 9  information in it, then it's not beyond the

10  scope. So, I'm asking if disorder control

11  utilizes this lesson plan or the

12  information in it in its training?

13       A.  No, it did not.

14       Q.  I'd like to ask you to look at page

15  one. It's been marked as what is number one

16  at the bottom. Page one. They list five

17  performance objectives. The second one

18  states that the primary police role at

19  demonstrations is to maintain order and

20  prevent delays to non-demonstrators. Is

21  that a performance objective that was

22  taught at disorder control?

23                  MS. MITCHELL:  Objection.

24                  You can answer.

25       A.  That is one of the objectives that
```

1              A. RAGANELLA
2    we teach, yes.
3         Q.  And you teach that the primary
4    police role at demonstrations is to
5    maintain order and prevent delays to non-
6    demonstrators.
7         A.  That is not what we teach.
8         Q.  What do you teach?
9         A.  The primary role at any police
10   event is to protect life.
11        Q.  Okay. So, do you agree or disagree
12   that the primary police role at
13   demonstrations is to maintain order and
14   prevent delays to non-demonstrators?
15        A.  I would disagree with that.
16        Q.  Okay. If we remove the concept of
17   protecting life, and say that's always the
18   first thought for police, outside of that,
19   would you agree or disagree that the
20   primary police role in a demonstration is
21   to maintain order and prevent delays of
22   non-demonstrators?
23                  MS. MITCHELL:  Objection.
24                  You can answer.
25        A.  No.

1          A. RAGANELLA

2      Q.  No, you would agree or no you

3  would ...

4      A.  I would disagree that that's the

5  primary role.

6      Q.  What is the primary role outside of

7  protecting life at demonstrations?

8      A.  Protecting locations.

9      Q.  And does that mean protecting

10  property?

11      A.  Protecting property.

12      Q.  Okay. So, protecting life,

13  protecting property. Would you then agree

14  that the next primary goal is as stated

15  here is to maintain order and prevent

16  delays to non-demonstrators?

17      A.  After protecting life and after

18  protecting property, I would say that next

19  role that is important would be protecting

20  the rights of both the demonstrators and

21  the non-involved citizens.

22      Q.  Okay. So, the way it's stated here,

23  it does say protecting the demonstrators,

24  right? It only says maintain order and

25  prevent delays to non-demonstrators.

```
 1              A.  RAGANELLA
 2      A.   You believe that's an incorrect
 3  performance objective?
 4                    MS. MITCHELL:   I'm going
 5                    to object to why you're
 6                    questioning this. This is an
 7                    academy training document, and
 8                    he's here to testify about DCU
 9                    training from August 2010 to
10                    September 2012. He has told you
11                    that this is not a document
12                    that DCU gives.
13                    MR. STECKLOW:  Okay. I'm
14                    just trying to understand DCU's
15                    view of a specific line in this
16                    item.
17      Q.   So, you can answer the question.
18      A.   Repeat the question.
19      Q.   You disagree that one of the
20  polices primary role of the demonstrations
21  is to solely maintain order and prevent
22  delays to non-demonstrators. Do you believe
23  that it has to be balanced with honoring
24  the demonstration in some fashion?
25      A.   I do.
```

```
                                          Page 76

 1              A.  RAGANELLA

 2                      MS. MITCHELL:  Can we

 3              take a quick bathroom

 4              break?

 5                      MR. STECKLOW:  Sure.

 6              The time is now 11:37, and

 7              we're going to take a

 8              quick break.

 9                      (Whereupon, a short

10              recess was taken.)

11                      (Back on the record.)

12                      MR. STECKLOW:  The

13              time is now 11:42.

14                      We're still in my

15              office at 273 Center

16              Street. We are with each

17              of the same individuals we

18              identified earlier, and we

19              are back on the record.

20      Q.  Inspector Raganella, are orders to

21  disperse written down?

22      A.  They could be.

23      Q.  Are they handed out prior to days

24  of large protests?

25      A.  Sometimes.
```

1          A. RAGANELLA

2      Q.  Are there different types of orders

3  to disperse?

4      A.  Yes.

5      Q.  Do some of them provide an

6  alternative place to protest?

7      A.  I don't understand the question.

8      Q.  Do some orders to disperse provide

9  an alternative place that people can go to

10  protest?

11      A.  They could.

12      Q.  Okay. When in a sidewalk protest

13  would such an order be necessary?

14                  MS. MITCHELL:  Objection.

15                  You can answer.

16      A.  I don't understand the question.

17      Q.  You said that an order to disperse

18  can contain a separate location to continue

19  to protest, correct?

20      A.  Correct.

21      Q.  So, in a sidewalk protest, when

22  would such an order be necessary?

23      A.  If it was a substantial disruption

24  on the sidewalk, and demonstrators needed

25  to be moved, they would be given an order

```
 1              A.  RAGANELLA

 2    to disperse, or to move to another location

 3    if an accommodation was made for them.

 4         Q.  So, that's my question. When is

 5    that accommodation being made? Withdrawn.

 6              Is that something that disorder

 7    control trains on?

 8         A.  No, it is not.

 9         Q.  So, they don't train on the

10    distinction between when an order to

11    disperse should contain an alternative

12    location to protest and when it does not to

13    contain such an alternative location to

14    protest, correct?

15         A.  That is correct.

16         Q.  Do you know where that training

17    does take place, if at all?

18         A.  I do not know where that takes

19    place.

20                       (Document marked Exhibit 6

21                    for identification as of this

22                    date by the reporter.)

23         Q.  Okay. You see what I've marked as

24    plaintiff exhibit six, which are the RMC

25    legal guidelines Bates stamped 15270 to
```

```
 1              A. RAGANELLA

 2   15304.

 3        A.  (Witness perusing document.)

 4        Q.  I understand that these are prior

 5   to the dates that we're discussing here, so

 6   I'm not going to ask you about the RMC. I

 7   am going to ask you about specific papers

 8   from them. I would like you to look at page

 9   15284. Before we get to that, do you know

10   whether or not there was any legal

11   guidelines for Occupy Wall Street created

12   by the NYPD?

13        A.  Not that I'm aware of.

14        Q.  The document you're looking at, are

15   the legal guidelines created for the

16   Republican National Convention in 2004 in

17   New York City, correct?

18        A.  Correct.

19        Q.  Do you have any idea why the police

20   did not create legal guidelines to police

21   Occupy Wall Street?

22        A.  I do not know why.

23        Q.  Is it your understanding that the

24   Republican National Convention lasted three

25   or four days.
```

```
                                          Page 80
 1              A. RAGANELLA
 2        A.  Correct.
 3        Q.  Occupy Wall Street lasted in
 4   Zuccotti Park almost 60 days, and in New
 5   York City probably close to a year. Is that
 6   accurate?
 7        A.  Seems reasonable, yeah.
 8        Q.  But then NYPD did not create real
 9   guidelines for the Occupy Wall Street?
10        A.  Not that I'm aware of.
11        Q.  Now looking at page 15284 of the
12   RMC legal guidelines, there is at the top,
13   sub A is masks. This is on their chapter
14   two demonstrator tactics specific types of
15   conflict, correct?
16        A.  Correct.
17        Q.  In that under-subdivision A mask,
18   it talks about how the police can make an
19   arrest because there's a recent case that
20   says that's still constitutional to arrest
21   people if more than two of them are wearing
22   masks in public, correct?
23        A.  This is under A, correct?
24        Q.  Yes.
25        A.  Okay. Yes.
```

```
 1              A. RAGANELLA
 2        Q.  Okay. So, this is the NYPD
 3   instructing its officers that they can make
 4   an arrest for two people wearing masks, and
 5   that federal courts have recently upheld
 6   these arrests as constitutionally
 7   compliant, correct?
 8        A.  That's not the way I read that.
 9        Q.  How do you read that?
10        A.  To me, it says when persons
11   congregate in a public place with at least
12   two other similarly disguised or masked.
13   So, to me that means three.
14        Q.  Okay. So, it's updating in telling
15   officers they can make arrests if three
16   people are masked in public, even at a
17   protest, correct?
18        A.  Correct.
19                      (Document marked Exhibit 7
20                       for identification as of this
21                       date by the reporter.)
22        Q.  I'm now going to show you what's
23   going to be marked as plaintiff seven,
24   which is Bates stamped D14658 through
25   14660. This I call the Jones Memo.
```

```
                                            Page 82
 1              A. RAGANELLA
 2        A.   (Witness perusing document.)
 3        Q.   This document is dated December
 4   2007, correct?
 5        A.   Yes.
 6        Q.   It concerns an update to penal law
 7   24020 Sub-5, correct?
 8        A.   Yes.
 9        Q.   In the RMC guidelines, what we just
10   looked at, was an update to penal law 24034
11   Sub-4, correct?
12        A.   24035 Sub-5, correct.
13        Q.   Do you know if an update concerning
14   24020 Sub-5 of the case law that is
15   contained in plaintiff exhibit seven made
16   its way into any legal guideline for the
17   police department as related to Occupy Wall
18   Street?
19        A.   I do not know that.
20        Q.   Did it make its way into any
21   training for disorder control during Occupy
22   Wall Street?
23        A.   We received copies of this material
24   in the disorder control unit. What is your
25   question?
```

```
                                            Page 83
 1                A. RAGANELLA
 2        Q.   So, you've seen this document
 3   before?
 4        A.   I'm sure I have.
 5        Q.   Okay. Did you incorporate this
 6   document into disorder control training?
 7        A.   I don't know.
 8        Q.   What could you do to find out?
 9        A.   I would have to review lesson plans
10   to see if this particular topic is even
11   mentioned in the training.
12        Q.   Which lesson plan would you review?
13        A.   Most likely either our legalities
14   at demonstrations or protesting, or mass
15   arrest lesson plan.
16        Q.   I'd like to look at 15310.
17        A.   153...
18        Q.   310.
19        A.   310.
20        Q.   I want to ask you this question.
21   Remind me if that you've not answered the
22   prior question. Does disorder control train
23   about arrest warnings?
24        A.   Yes.
25        Q.   Does disorder control train about
```

```
1              A. RAGANELLA
2   dispersal orders?
3        A.  Yes.
4        Q.  Does disorder control train about
5   dispersal orders that contain an
6   alternative location to protest?
7        A.  Not specifically, no.
8        Q.  Looking at 15310, are these
9   warnings that are trained at disorder
10  control?
11       A.  I don't know that this specific
12  warning is trained or used by disorder
13  control.
14       Q.  There's two warnings there,
15  correct?
16       A.  I don't understand the question.
17       Q.  There are two specific warnings or
18  there. Are they not?
19       A.  There's multiple warnings here.
20       Q.  Okay.
21       A.  There's more than two.
22       Q.  On that page there's three?
23       A.  On 15310, I see the second half of
24  a warning from the previous page, and one
25  warning regarding disorder conduct.
```

Page 85

```
 1              A. RAGANELLA
 2        Q.  Okay. So, there's two warnings
 3   there.
 4        A.  No, there's one and a half.
 5        Q.  There's one and a half warnings
 6   there. Does this disorder control thing
 7   [crosstalk]... Looking at the page report
 8   as well, does disorder control train on
 9   both of those?
10        A.  I don't understand your question.
11        Q.  I'm asking if you trained on these
12   specific warnings at disorder control?
13                  MS. MITCHELL:  You think
14              you could identify which part
15              of the page you're asking him
16              about?
17        Q.  So, there's two warnings if you
18   look at the prior page and this page,
19   correct?
20        A.  Yes.
21        Q.  Okay. Do you train on the first
22   one?
23        A.  In what regard?
24        Q.  Do you train those warnings at
25   disorder control?
```

1           A. RAGANELLA

2       A.   We disseminate warnings at disorder

3   control. We don't write them specifically,

4   but we disseminate them, and they are

5   discussed during training.

6                       (Document marked Exhibit 8

7                        for identification as of this

8                        date by the reporter.)

9       Q.   Thank you.

10      I'm now going to hand you what has been

11   marked as plaintiff's eight.

12      A.   (Witness perusing document.)

13      Q.   I'm going to ask you if this is the

14   lesson plan that you discussed earlier

15   about possibly containing the information

16   from the Jones Memo called Legalities of

17   Protest and Demonstrations.

18      A.   Yeah.

19      Q.   Is this the one that was in effect

20   during the relevant time period that we're

21   discussing today?

22      A.   No.

23      Q.   Is that because it seems like it

24   was updated most recently in June of 2014?

25      A.   Correct.

```
 1              A. RAGANELLA
 2        Q.   If the Jones Memo was updated into
 3   the lesson plan, it would still be in this
 4   document, correct?
 5        A.   Could be.
 6        Q.   Do you see it in here?
 7        A.   From my first review of this, I do
 8   not see anything regarding disorderly
 9   conduct in here specifically.
10        Q.   There is something in there about
11   case law or decisions effecting how a
12   person and their rights, and policing a
13   person and their rights occur, correct?
14        A.   Correct.
15        Q.   But there's no specific case cited
16   at all in that, correct?
17        A.   Correct.
18        Q.   Okay. Going back to plaintiff's
19   seven, the Jones Memo, do you know how this
20   is issued...
21        A.   Yes.
22        Q.   How is that?
23        A.   Through what we called command
24   level training in the individual commands
25   and units of the department.
```

1              A. RAGANELLA

2       Q.   Can you explain to me what that

3   means?

4       A.   Sure. So, the police academy will

5   issue a training memo. Usually, I believe,

6   they come out monthly on different topics,

7   and then it is disseminated through what we

8   call training sergeants in the individual

9   units and commands who will go to the

10  police academy, pick up the training

11  material, be taught on it, and then

12  translate those lessons to the members of

13  the service.

14      Q.   Those lessons are taught at the

15  command level during roll call?

16      A.   Usually, yes.

17      Q.   How much time is usually focused on

18  it during roll call?

19      A.   It varies. 15 minutes to a half

20  hour, 45 minutes possibly.

21      Q.   But if there's multiple trainings

22  or other things going on, it's a shorter

23  amount of time? It's not an hour of class.

24  It's not focused attention. It's at the

25  command level. During roll call, a training

Page 89

```
 1              A. RAGANELLA
 2    sergeant will review something, correct?
 3                      MS. MITCHELL:  Objection.
 4                      You can answer.
 5         A.  There's no way of me knowing that.
 6         Q.  Okay. Is there any other way that
 7    this was disseminated to the members of the
 8    service, holding up the Jones Memo? We're
 9    talking about plaintiff's seven.
10         A.  I'm unaware of ... Not saying that
11    there aren't other ways that it could've
12    been, not that I'm aware of. I wouldn't
13    know. Can we take a two-minute break?
14         Q.  Absolutely.
15         A.  Because mother nature decided to
16    call at a different time than everybody
17    else.
18                      MR. STECKLOW:  It's 11:58.
19                      We're going to take a short
20                      break.
21                         (Whereupon, a short recess
22                      was taken.)
23                         (Back on the record.)
24                      MR. STECKLOW:  All right
25                      Alison, it's 12:00. Should we
```

```
 1          A.  RAGANELLA
 2              continue?
 3                   MS. MITCHELL:  Yes.
 4                   MR. STECKLOW:  Do you want
 5              to stop for lunch soon? I mean
 6              this is obviously going the
 7              full seven hours. What do you
 8              guys prefer?
 9                   MS. MITCHELL:  I really
10              leave it up to you two. I feel
11              like the burden is really on
12              the reporter and the witness
13              answering the questions. When
14              would you like to take a lunch?
15              Do you want to keep going?
16                   THE WITNESS:  I'm not
17              starving yet.
18                   MS. MITCHELL:  You want to
19              go for like another hour, so
20              maybe around 1:00?
21                   THE WITNESS:  Let's check
22              again around 1:00.
23                   MS. MITCHELL:  Okay, all
24              right. Let's do that.
25                   MR. STECKLOW:  Okay.
```

```
1            A.  RAGANELLA

2                    MS. MITCHELL:  This is a

3            side note. Are these videos

4            that plaintiffs have produced?

5                    MR. STECKLOW:  All of them

6            have either been produced or

7            available publicly. So far, the

8            ones we've seen have been

9            produced.

10                   MS. MITCHELL:  Okay.

11                   MR. STECKLOW:  Right,

12           because the Gothamist one, I

13           think I pointed it out to you

14           guys, and it was part of that

15           list of cases.

16               I want to watch the full

17           one first and then go into the

18           other one.  From this list,

19           this one is, where are we? This

20           is the Bronx one we saw. These

21           are the photos that we just

22           saw, with Winski in it. This is

23           the video we saw of the

24           sidewalk in front of the...

25                   MS. MITCHELL:  Okay.
```

```
                                            Page 92
 1              A.  RAGANELLA
 2                      MR.  STECKLOW:   Now we're
 3                 going to watch something from
 4                 this date. We'll get to the
 5                 time that I want it to start.
 6                      MS.  MITCHELL:   Sure.
 7    BY MR. STECKLOW:
 8         Q.   I'm going to have you watch a video
 9    now, we're going to watch a bit of it, then
10    I'll stop it and then ask you some
11    questions about it, as I ask it. Sorry, one
12    second.
13                      MR.  STECKLOW:   The time is
14                 now 12:05. We have all the same
15                 individuals in my office at 217
16                 Center Street, along with
17                 Inspector Raganella. We're
18                 about to watch another video
19                 from Plaintiff's Exhibit I.
20         Q.    Inspector Raganella, I would like
21    you to watch this video. We're going to
22    watch a portion of it, and then at the end,
23    we're then going to ask some questions, and
24    we'll go from there.
25         Okay, start the video.
```

```
                                            Page 93
 1            A. RAGANELLA
 2                    (Whereupon, the witness
 3                 was shown a video.)
 4                    MR. STECKLOW:  We're
 5                 stopping the video at 12:49.
 6       Q.  Inspector, were you able to observe
 7   that video?
 8       A.  Yes.
 9       Q.  Are you familiar with that
10   incident?
11       A.  I do not have a recollection of it.
12                    (Document marked Exhibit 9
13                 for identification as of this
14                 date by the reporter.)
15       Q.  I'm going to mark as the next
16   exhibit, a document that is Bates stamped
17   starting at D13492. We're now on, I
18   believe, Exhibit IX. I believe this is
19   called an unusual incident report. It
20   relates to the incident we were just
21   observing.
22            Review that and let me know if
23   you've ever seen it before.
24       A.  (Witness perusing document.) Do you
25   need me to review it or are you just asking
```

```
 1                A. RAGANELLA
 2   if I've ever seen it before?
 3        Q.  I'm asking if you've ever seen it
 4   before.
 5        A.  No.
 6        Q.  In relation to this incident, did
 7   the NYPD update any of its training at
 8   Disorder Control?
 9        A.  Not that I'm aware of.
10        Q.  From the video you could see, was
11   their substantial impedance of pedestrians
12   prior to the police and the protestors
13   stopping at the corner, towards the end of
14   the video?
15                     MS. MITCHELL:  Objection.
16                     You can answer.
17        A.  From what I've seen during the time
18   period on that video, prior to that point,
19   it did not appear to be substantial
20   disruption.
21        Q.  Did you see any clear and present
22   danger present in any of this video?
23                     MS. MITCHELL:  Objection.
24                     You can answer.
25        A.  Based solely on the view from the
```

Page 95

1           A. RAGANELLA

2    camera, no.

3         Q.  From the view that you could see on

4    this video, did the NYPD prevent and forbid

5    one or more protestors, who were not at

6    that point under arrest and who requested

7    to leave the protest ... Withdrawn.

8              From what you could observe in the

9    video, did the NYPD prevent any of these

10   protestors who are not yet under arrest and

11   who had asked to leave from leaving?

12        A.  I did not witness that, no.

13        Q.  Did you witness any of the

14   protestors who were asking to leave being

15   allowed to leave?

16        A.  Yes.

17        Q.  Were you able to observe any of

18   them actually leaving?

19        A.  Yes.

20        Q.  Who was that? Which ones were they?

21        A.  Which ones what?

22        Q.  Were able to leave.

23        A.  It appeared to me that all of them

24   were given an egress to what would be their

25   left.

```
 1              A. RAGANELLA
 2         Q.  I agree that the officer said to
 3    leave in that direction. They were not
 4    allowed to leave in that direction. It may
 5    not be obvious from the video.
 6         A.  It's not.
 7         Q.  Why don't we play the other one, of
 8    Sarah showing that? I'm going to show you
 9    another video that's taken at the same
10    time, of a legal observer who went to each
11    spot, asking officers if she was able to
12    leave. I'm going to ask you to accept that,
13    that is temporally the same time, and then
14    I'll ask you questions on that.
15                   MS. MITCHELL:  Objection.
16         Q.  Is it starting?
17                   (Whereupon, the witness
18              was shown a video.)
19                   MR. STECKLOW:  Stopping
20              the video at 1:32.
21         Q.  You can see from this video, I
22    believe that was within the same timeframe,
23    because you saw some of the same people.
24    You saw that one individual who was the
25    first male arrested, was not yet arrested,
```

```
                                        Page 97
 1              A. RAGANELLA
 2   but was subsequently taken by the police in
 3   this video, correct?
 4                    MS. MITCHELL:  Objection.
 5       A.  It's hard for me to tell if that's
 6   the same location.
 7       Q.  You didn't see the same players in
 8   this? The same individuals?
 9       A.  I saw some of the same individuals,
10   yes, and some of the same police officers,
11   yes.
12       Q.  With that, we can, I hope, take the
13   understanding that even if you can't know
14   for sure, I'm going to say for purposes of
15   these questions, please understand that
16   this is the same location, the same time.
17                    MS. MITCHELL:  Objection.
18       Q.  Did this video indicate that even
19   though they were being given a path of
20   egress, they were being told ... Withdrawn.
21          Did this video explain that even
22   though they were being instructed to a path
23   of egress to your left, as you stated
24   earlier, they weren't being allowed that
25   path of egress?
```

```
 1              A.  RAGANELLA
 2                      MS. MITCHELL:  Objection.
 3                      You can answer.
 4      A.  That's not what I saw.
 5      Q.  Can you look and see the two framed
 6  images up on the wall?
 7                      MS. MITCHELL:  Objection.
 8      Q.  I'm asking if you can see those
 9  from here.
10      A.  Yes, I can see them.
11      Q.  Those are settlements for these
12  arrests. The largest settlement for Occupy
13  Wall Street was based on this conduct of
14  the police.
15                      MS. MITCHELL:  Objection.
16      Q.  Because these individuals were not
17  allowed to leave. They weren't given a path
18  of egress, even they were told to. I'd like
19  you to accept that as a fact for these
20  questions, even if you can't see it from
21  the video.
22      A.  Sir, you're asking me to accept
23  something that I don't see.
24      Q.  Yes, I am.
25      A.  You can't do that.
```

```
 1              A. RAGANELLA
 2        Q.  I'm asking you for the questions
 3    we're about to ask, you to accept the fact
 4    that the police did not give these people a
 5    path of egress.
 6                        MS. MITCHELL:  Objection.
 7                        You can answer.
 8        Q.  There's an objection, but you can
 9    still answer the questions.
10             Do you train, at Disorder Control,
11    on giving proper orders to disperse,
12    including a path of egress?
13        A.  Yes.
14        Q.  If a path of egress is not given,
15    as I indicated it was not in this video,
16    would that be against the training of
17    Disorder Control?
18        A.  I thought we just agreed that they
19    were given a path of egress. They were
20    instructed to exit to the left. I heard one
21    of the demonstrators say, "Exit to the
22    left."
23        Q.  Yes, everyone said that. What I'm
24    saying is that was verbal, it wasn't
25    physical. Physically, they were not given
```

```
                                          Page 100
 1              A. RAGANELLA
 2   the path to exit. They were told there's a
 3   path to exit. When they went there, the
 4   officers would not let them. That's why one
 5   of the protestors said, "This officer right
 6   here told us we could exit this way." The
 7   officers were not letting them out. I'm
 8   asking you just to accept that as part of
 9   this question. If that is true, does that
10   comport with Disorder Control training?
11                   MS. MITCHELL:  Objection.
12                   You can answer.
13        A.  If that is true, which I'm not
14   saying that it is, no, that would not
15   comport.
16        Q.  Because under the order to
17   disperse, has to be a clear path and time
18   to exit, correct?
19        A.  No.
20        Q.  Why would that not comport if that
21   is true?
22        A.  Because there are times that we can
23   instruct crowds to disperse, but not
24   necessarily point them in a direction to
25   disperse. It depends on the environment
```

```
                                    Page 101
 1              A. RAGANELLA
 2    that we're in.
 3         Q.   In this type of environment, where
 4    you had police officers at one end of the
 5    block, you had scooters at the other end of
 6    the block, you had a wall on one side, and
 7    you also had scooters and police on the
 8    fourth side, on the street side. In that
 9    setting, in order to give people a place to
10    disperse and a proper order to disperse,
11    they would need to give a direction,
12    correct?
13                   MS. MITCHELL:  Objection.
14                   You can answer.
15         A.   No.
16         Q.   What should the police have done in
17    that setting? What would be within the
18    training of Disorder Control?
19                   MS. MITCHELL:  Objection,
20                   calls for speculation.
21                   You can answer.
22         A.   From what I've seen on the video, I
23    think that the police officers that were
24    there on scene did what they were trained
25    to do.
```

```
 1              A. RAGANELLA
 2        Q.  The police stopped the protestors
 3   as they were marching on the street,
 4   correct? On the sidewalk ... Withdrawn.
 5              The police stopped the protestors
 6   as they were marching on the sidewalk,
 7   correct?
 8        A.  Correct.
 9        Q.  Was that comporting within the
10   training of Disorder Control?
11        A.  Yes.
12        Q.  Why is that?
13        A.  Because there are times where we
14   have to redirect or reroute crowds.
15        Q.  What was going on in this incident,
16   that you could see in the video, that made
17   it appropriate to redirect that group of
18   protestors?
19        A.  I do not know.
20        Q.  If there was no reason for it ...
21   Withdrawn.
22              Give me some examples of why it
23   would be appropriate to redirect.
24        A.  There may be instances where we
25   have to redirect crowds away from a public
```

```
 1              A. RAGANELLA
 2   safety issue, away from a crime scene, away
 3   from something, a vulnerable or critical
 4   location that we don't want tumultuous
 5   crowds going to. That's a possibility of
 6   why we may redirect crowds.
 7        Q.  Was this a violent crowd from what
 8   you could see in this video?
 9                   MS. MITCHELL:  Objection.
10                   You can answer.
11        A.  From the clip that I saw, they did
12   not appear to be violent at that point.
13        Q.  Was it a riotous crowd from the
14   video you could see?
15                   MS. MITCHELL:  Objection.
16                   You can answer.
17        A.  No.
18        Q.  Are there any instances, other than
19   what you've explained already, where a non-
20   riotous, non-violent crowd, needs to be
21   redirected, if there's not a safety issue?
22        A.  If there's not a safety issue, if
23   we need to prevent them from going onto
24   private property, that could be another
25   reason.
```

```
1              A. RAGANELLA
2         Q.  Did it seem in this video that they
3    are marching onto private property?
4                        MS. MITCHELL:  Objection.
5                        You can answer.
6         A.  I don't know what was behind or on
7    the other side of that police line, so I
8    can't answer that.
9         Q.  That was the intersection of Second
10   Avenue and 13th Street.  They were marching
11   north on Second Avenue, on the East side,
12   on the sidewalk.
13                       MS. MITCHELL:  Objection.
14                       You can answer.
15        Q.  Was there anything in the video you
16   could see that would give the police the
17   authorization to stop that march?
18        A.  Based solely on what I saw on the
19   video, I did not see anything, no.
20        Q.  Did you hear the dispersal order
21   being given by the officer, at the
22   beginning of the police interaction with
23   the individuals?
24        A.  Yes.
25        Q.  Did the officer tell people they
```

```
 1                A. RAGANELLA
 2   were blocking pedestrian traffic?
 3        A.  I recall him saying that, yes.
 4        Q.  From your view of the video, were
 5   the pedestrian protestors blocking
 6   pedestrian traffic?
 7                     MS. MITCHELL:  Objection.
 8                     You can answer.
 9        A.  At the point that they were bunched
10   up and not egressing to the left, yes, they
11   were blocking pedestrian traffic.
12        Q.  His order came prior to that
13   moment, correct?
14        A.  Which order?
15        Q.  Withdrawn.
16            You saw these individuals marching
17   on the sidewalk, correct?
18        A.  Correct.
19        Q.  You saw them prior to the time the
20   police stopped them on the corner, correct?
21        A.  Correct.
22        Q.  Prior to that moment, were they
23   blocking pedestrian traffic when they were
24   marching on the sidewalk?
25        A.  They didn't appear to be, no.
```

1              A.  RAGANELLA

2        Q.   Their blockage only occurred once

3    the police stopped them, correct?

4        A.   That's not what I said.

5        Q.   They were marching, they were not

6    impeding pedestrian traffic, correct?

7        A.   Correct.

8        Q.   You said that the blockage occurred

9    once the announcement was given, and they

10   were all bunched up where the police were,

11   correct?

12       A.   That's not what I said.

13       Q.   Tell me where the blockage occurs.

14       A.   The blockage occurs when the police

15   form a line to stop the crowd from getting

16   to a certain point, and we reroute them.

17   Once they bunch up and we redirect the

18   crowd, that egress is to the left, and they

19   refuse to move, at that point they're

20   blocking pedestrian traffic.

21       Q.   It's only if they refuse to move

22   and exit to the left would they be blocking

23   pedestrian traffic.

24       A.   Correct.

25       Q.   How much time should they be given

```
 1              A. RAGANELLA
 2    to exit?
 3          A.  That's discretionary, up to the
 4    incident commander on the scene.
 5          Q.  Is that trained at Disorder
 6    Control?
 7          A.  No.
 8          Q.  Prior to Occupy Wall Street, the
 9    NYPD was aware that it was going to occur
10    downtown in September of 2011, correct?
11          A.  Restate the question.
12          Q.  Prior to September 17, 2011, when
13    Occupy Wall Street began in the financial
14    center, the NYPD was aware that there was
15    organizing efforts for that protest
16    movement, correct?
17          A.  I believe so, yes.
18          Q.  You were specifically aware of it,
19    correct?
20          A.  Yes.
21          Q.  In fact, you had received emails
22    from other people about it, and you had
23    been communicating with other members of
24    the NYPD about it, correct?
25          A.  Yes.
```

Page 108

```
1              A. RAGANELLA
2         Q.   How much before September 17, 2012,
3    did you become aware of these efforts to
4    organize Occupy Wall Street?
5         A.   I don't know.
6         Q.   Do you think it was a day? A month?
7    A year? How best can you describe it?
8         A.   You're asking me to approximate.
9         Q.   Yes.
10        A.   Weeks.
11                    (Document marked Exhibit
12                    10 for identification as of
13                    this date by the reporter.)
14        Q.   Thank you. Now I'm going to show
15   you what's being marked as Exhibit X.
16        A.   Do you need this back?
17        Q.   Exhibit X, which is Bates stamped
18   19460 through 19462. I'll ask you to look
19   at that and let me know if you've seen it
20   before.
21        A.   (Witness perusing document.)
22        Q.   By the name of John Rogers, on
23   September 12, 2011, correct?
24        A.   Correct.
25        Q.   Who's John Rogers?
```

```
 1              A. RAGANELLA
 2        A.   John Rogers was a Lieutenant, and I
 3   don't recall where he was assigned.
 4        Q.   Okay. In this, he was trying to
 5   give you a heads up that Occupy Wall Street
 6   was coming, correct?
 7        A.   Information on it, yes.
 8        Q.   Had you spoken to him in any
 9   fashion, communicated with him in any way
10   about it, prior to this email?
11        A.   I do not recall.
12        Q.   In this email, you tell him that
13   you already knew about this, and to quote
14   it, "10 of these idiots did a test run a
15   couple weeks ago and they all got collared
16   within five minutes," correct?
17        A.   That's what it states, yes.
18        Q.   Those are your words, correct?
19        A.   Correct.
20        Q.   When you say they did a test run a
21   couple weeks ago, what did you mean by
22   that?
23        A.   I don't recall.
24        Q.   Do you recall people being arrested
25   a few weeks prior to September 12, 2011,
```

```
                                    Page 110
 1              A. RAGANELLA
 2    protesting in the financial center?
 3         A.  I do, but I don't recall the
 4    location or what they were arrested for. I
 5    do know that it came to my attention that
 6    people were arrested prior to this.
 7         Q.  How was it brought to your
 8    attention?
 9         A.  I don't recall how.
10         Q.  Did this knowledge that Occupy Wall
11    Street was coming, not necessarily what's
12    in this particular email, but your general
13    knowledge it was coming, did that elicit
14    any specific update to Disorder Control
15    training?
16         A.  No.
17         Q.  Did that create any specific
18    Disorder Control training that wasn't
19    previously scheduled?
20         A.  At this time, no.
21         Q.  Did it change any training that was
22    previously scheduled?
23         A.  No.
24         Q.  You just, in your prior answer,
25    modified it to say not at this time,
```

Page 111

1              A. RAGANELLA

2    meaning September 12, 2011, correct?

3         A.   Correct.

4         Q.   Did there come a time when Occupy

5    Wall Street and the existence of it did

6    create an update to Disorder Control

7    training?

8         A.   Not specifically the quality or

9    method of training, but the quantity of

10   training did increase, yes.

11        Q.   We're talking about, I think, the

12   mobile exercises?

13        A.   Yes, but we had increased it at the

14   Disorder Control Unit when I took command

15   back in 2010. There was an immediate

16   increase, which was long before Occupy Wall

17   Street started, there was an immediate

18   increase in the amount of mobilization

19   exercises and training that we were doing,

20   which was part of my vision for the

21   Disorder Control Unit. It wasn't

22   specifically related to Occupy Wall Street,

23   that the increase in training was taking

24   place. That was already being done prior to

25   this.

Page 112

1          A. RAGANELLA

2      Q.  Why did you think it was necessary

3   to increase the amount of training, the

4   volume of training at Disorder Control?

5      A.  I have a training background. From

6   my perspective, you can never train enough.

7   Any moment that we're not actually doing

8   police work is an opportunity to train and

9   practice, to continually make ourselves

10  more effective and efficient at what we're

11  doing.

12     Q.  Is it your belief that the training

13  that's done at the recruit level isn't

14  sufficient and that additional training is

15  required thereafter?

16     A.  As I stated, you can never train

17  enough.

18     Q.  Is part of the reason that over the

19  course of time, people's memories fade, and

20  refresher courses are needed in order to

21  refresh people as to the training that

22  they've already had.

23          MS. MITCHELL:  Objection.

24          You can answer.

25     A.  Yes.

```
                                        Page 113

  1              A. RAGANELLA
  2         Q.  Is it also because things change,
  3    laws change, tactics change, and therefore
  4    updates to training need to be taught as
  5    well?
  6         A.  That's possible, yes.
  7         Q.  Now you said that once Occupy came,
  8    at some point, you increased the volume of
  9    mobile X training, correct?
 10         A.  Mobex.
 11         Q.  Mobex training, which I believe
 12    stands for mobilization exercises?
 13         A.  Exercises, correct.
 14         Q.  If I mangle those words, please
 15    correct me. You stated that the volume of
 16    Mobex training increased because Occupy
 17    Wall Street came to be, is that correct?
 18         A.  No.
 19         Q.  Tell me what you meant by that?
 20         A.  The volume of Mobex's increased
 21    from the moment that I took over the
 22    Disorder Control Unit in 2010.
 23         Q.  I asked you before if the training
 24    changed at all ... Withdrawn.
 25              I asked you before if the training
```

```
 1              A. RAGANELLA
 2  had been updated at all, because of Occupy
 3  Wall Street, you said no. I asked you if it
 4  had been increased or changed in any
 5  fashion because of Occupy, you said not at
 6  this time, and we agreed that was because
 7  the date on that was September 12, 2011.
 8  Then you said later on, because of Occupy,
 9  the number of mobile Mobex trainings
10  increased, is that accurate or no?
11      A.  I clarified it by saying that it
12  started immediately upon me taking over
13  command of Disorder Control Unit, that
14  those training exercises increased in
15  quantity.
16      Q.  Right, but that was from 2010,
17  correct? You took over in 2010?
18      A.  Correct.
19      Q.  We're now talking about September
20  2011. During September 2011 and September
21  2012, did the volume of Mobex trainings
22  increase?
23      A.  Yes.
24      Q.  Was that in part due to Occupy Wall
25  Street?
```

```
 1              A. RAGANELLA
 2        A.   Because of the movement that was
 3   going on, I'm sure that had some bearing on
 4   the need to make time for training, yes.
 5        Q.   Was there another reason why the
 6   volume of training increased between
 7   September 2011 and September 2012?
 8        A.   Yes.
 9        Q.   What were the other reasons?
10        A.   Because that's what I wanted.
11        Q.   This is based on your request?
12        A.   That the training increased in
13   cooperation with the Chief of Patrol and
14   the Chief of Department, yes.
15        Q.   Who was the Chief of Patrol at the
16   time?
17        A.   Chief Paul.
18        Q.   Who was the Chief of Department at
19   the time?
20        A.   Chief Esposito, which is the reason
21   why I was brought into the Disorder Control
22   Unit, is to increase the amount of training
23   and the quality of training.
24              MS. MITCHELL:  Do you
25              mean... I think you said Wool.
```

```
 1          A. RAGANELLA
 2                    THE WITNESS:  Huh?
 3                    MS. MITCHELL:  Did you
 4             mean Wool or White being ...
 5                    THE WITNESS:  No.
 6                    MS. MITCHELL:  Okay,
 7             sorry.
 8                    THE WITNESS:  No, no.
 9                    MR. STECKLOW:  He said
10             Paul.
11                    MS. MITCHELL:  Paul, okay.
12             I'm sorry, I thought I heard
13             you say Wool.
14                    THE WITNESS:  No, no, no,
15             no. Paul, Paul, Paul.
16                    MS. MITCHELL:  Sorry.
17                    (Document marked Exhibit
18             11 for identification as of
19             this date by the reporter.)
20      Q.  Let's see about this. I'm going to
21   mark as 11, Plaintiff's 11, a document that
22   is Bates stamped D14368.
23      A.  Do you need this back? Okay.
24      Q.  You've seen that document before?
25      A.  Yes.
```

```
1              A. RAGANELLA
2         Q.  It's in fact a memo that you
3    created, correct?
4         A.  Correct.
5         Q.  This memo is a document explaining
6    that you're going to do a training ...
7    Withdrawn.
8              This memo is a document creating a
9    command training, based on explosives
10   concealed in a Thermos, correct?
11        A.  Restate the question, the beginning
12   of it.
13        Q.  Withdrawn.
14             Can you explain to me what this
15        document is?
16        A.  Yes. This is a response to a
17   communication from my overhead command,
18   which was Special Operations Division. We
19   were directed, or we were given a tactical
20   brief, regarding explosives concealed in
21   Thermos's. It had to be disseminated at
22   five consecutive roll calls, to the members
23   under my command. This is a communication
24   going back to the Chief of Special
25   Operations, confirming that, that directive
```

1              A. RAGANELLA

2   was complied with.

3        Q.   There's an underlying training

4   document that is referenced in here,

5   correct?

6        A.   I don't know that it's a training

7   document. It's a tactical brief.

8        Q.   Okay. When we looked at the Jones

9   memo, that was not a tactical brief, that

10  was a training memo, correct?

11       A.   That's correct.

12       Q.   What this is, is different than

13  that, correct?

14       A.   Could be.

15       Q.   You created this tactical brief?

16       A.   I did not.

17       Q.   You just passed it along and made

18  sure it was disseminated at command

19  trainings?

20       A.   I ensured that it was disseminated

21  to the members in my command.

22       Q.   This was not to all the roll calls

23  throughout NYPD, this is solely for the

24  Disorder Control roll calls?

25       A.   I don't know.

Page 119

1            A. RAGANELLA

2      Q.   What is this memo telling us?

3      A.   This memo is telling us that the

4   members of, those members listed, with the

5   exception of Sergeant Phil McCabe, were in

6   receipt of the tactical brief, regarding

7   explosives concealed in Thermos's.

8      Q.   You were never given an order to

9   disseminate any sort of tactical brief or

10   memo on the Jones' items, correct?

11      A.   I don't recall.

12      Q.   I'm sorry. Do you know if there's

13   ever been a Thermos that exploded in the

14   City of New York in the timeframe we're

15   talking about, August 2010 to September

16   2012?

17      A.   I don't recall that happening.

18      Q.   Do you know what the cause was for

19   putting this tactical brief together and

20   making sure you were trained on it?

21      A.   I don't recall, no.

22                 (Document marked Exhibit

23              12 for identification as of

24              this date by the reporter.)

25      Q.   I'd like to mark some Mobile X

```
 1                A. RAGANELLA
 2   memos. Let's start with this one. I'm going
 3   to mark this as 12. I'm going to ask you to
 4   look at it.
 5        A.  (Witness perusing document.)
 6        Q.  Let me know once you've had a
 7   chance to do so.
 8        A.  Okay.
 9        Q.  Does this document ... Withdrawn.
10             Did Disorder Control train
11   specifically for Occupy Wall Street?
12        A.  I don't understand what your
13   question is.
14        Q.  I asked before whether or not there
15   was an increase in the training relating to
16   Occupy, you said it was mostly because it's
17   what you had planned to do anyway. I'm
18   asking you specifically, did Disorder
19   Control conduct training for MOS in
20   relation to Occupy Wall Street?
21        A.  What we taught, or what we
22   instructed and trained on was not modified
23   in any way because of Occupy Wall Street.
24   These officers that were trained, in regard
25   to Occupy Wall Street, was because of
```

1          A. RAGANELLA

2    Occupy Wall Street, if that's what you're

3    asking.

4          Q.  The training wasn't updated, wasn't

5    modified, wasn't changed, but this is a

6    list of the number of officers trained

7    during this specific timeframe, and it was

8    in relation to Occupy Wall Street, correct?

9          A.  I'm confused as to what you're

10   asking.

11         Q.  We'll start with this first. You

12   said that the training was neither updated

13   nor modified because of Occupy Wall Street,

14   correct?

15         A.  Correct.

16         Q.  And that this document that we're

17   looking at now, which is Plaintiff's 11,

18   sorry, Plaintiff's 12?

19                    MS. MITCHELL:  12.

20         A.  12.

21         Q.  Plaintiff's 12, does not indicate

22   that there was a specific training related

23   to Occupy Wall Street, but more talks about

24   just the people who happen to attend this

25   specific training that occurred in this

```
                                        Page 122
 1              A. RAGANELLA
 2   timeframe, is that right?
 3        A.  Correct.
 4        Q.  In this Mobex training, that was
 5   from November 7, 2011 through December 9,
 6   2011, it does indicate in the memo that
 7   this training is done to be better prepared
 8   regarding Occupy Wall Street, correct?
 9        A.  Correct.
10        Q.  And that there were three designs
11   in this training that were included,
12   correct?
13        A.  Yes.
14        Q.  Those were those military
15   formations, correct?
16                    MS. MITCHELL:  Objection.
17                    You can answer.
18        A.  I don't understand what you mean by
19   military formations.
20        Q.  Didn't you previously testify that,
21   that's what you guys train on, these line
22   wedges, these are military formations that
23   you're training on?
24                    MS. MITCHELL:  Objection.
25                    You can answer.
```

Page 123

1          A. RAGANELLA

2      A.  They're used by police departments.

3  We're not the military.

4      Q.  I know you're not the military.

5      A.  I don't understand.

6      Q.  The Police Department, NYPD, is

7  operated as a military type organization,

8  with rank and hierarchy, and these wedges

9  and other formations are military type

10  formations, are they not?

11                  MS. MITCHELL:  Objection.

12                  You can answer.

13      A.  The Police Department operates as a

14  paramilitary organization, and some of

15  these techniques that we use for crowd

16  control have been adopted and modified from

17  some military maneuvers.

18                      (Document marked Exhibit

19                  13 for identification as of

20                  this date by the reporter.)

21      Q.  I'm going to mark this as 13. I'll

22  quickly ask the questions on this.

23      A.  (Witness perusing document.)

24      Q.  Please look at this and let me know

25  once you've had a chance to read it.

```
                                    Page 124
 1              A. RAGANELLA
 2       A.   Okay.
 3       Q.   Is this from a Disorder Control
 4  training?
 5       A.   Yes.
 6       Q.   Does it describe the police to act
 7  in a military manner?
 8       A.   Restate the question.
 9       Q.   Is the heading on this document,
10  Military Manner?
11       A.   It says, "Military Manner," yes.
12       Q.   Then the subheadings are, "Require
13  strict command and control. Must extricate
14  people carefully. Is essential to correctly
15  perform the various type of carries,"
16  correct?
17       A.   Correct.
18       Q.   Does this document, this is used in
19  training at Disorder Control, correct?
20       A.   Correct.
21       Q.   It's to give the MOS the
22  understanding that they're to act in a
23  military manner, correct?
24       A.   When performing these techniques,
25  yes.
```

1            A.  RAGANELLA

2       Q.  Okay, thank you. You were

3   previously deposed, we already discussed

4   that, correct?

5       A.  Yes.

6       Q.  In one of those depositions ...

7   Withdrawn.

8            You were deposed twice. I believe

9   we discussed once was on May 14, 2014 in

10   the matter of Joshua Wiles [phonetic]

11   against the City of New York, correct?

12       A.  Correct.

13       Q.  Is there anything that you stated

14   within that deposition that you know now to

15   be incorrect or false?

16       A.  I don't know.

17       Q.  Is it possible that there are

18   statements you testified to previously that

19   are no longer accurate?

20       A.  I'm sure there's that possibility.

21       Q.  Do you know of anything that's no

22   longer accurate?

23       A.  Not that strikes me, no.

24       Q.  Are you provided with a copy of

25   that transcript?

```
                                      Page 126
 1              A. RAGANELLA
 2       A.   Yes.
 3       Q.   Did you make any changes to the
 4  transcript after you were provided it?
 5       A.   Not that I recall.
 6       Q.   You were also deposed on December
 7  14, 2017 and April 27, 2018, that
 8  deposition continued, correct? In the
 9  matter of Benjamin Case et al v. the City
10  of New York?
11       A.   Yes.
12       Q.   Is there anything within that
13  testimony that you believe currently to be
14  inaccurate or to have changed?
15       A.   Not that I recall.
16       Q.   Were you provided a copy of that
17  transcript?
18       A.   I don't recall if I received a copy
19  of that. I believe I did.
20       Q.   Do you recall being asked the
21  following question in the Wiles deposition
22  and giving the following answer, "A large
23  part of the contents of the documents seem
24  to relate to formations of officers, lines,
25  wedges, and things of that nature. Other
```

```
                                    Page 127
 1                A. RAGANELLA
 2   than training and formations, is there
 3   other training that officers receive in
 4   Disorder Control?" Answer, "There's many
 5   different types of training that we do. Not
 6   all necessarily relate to forming. You
 7   know, military formations of lines and
 8   wedges."
 9            Do you remember giving that answer
10   to that question?
11       A.   Yes.
12       Q.   That's the only thing I was asking
13   you, was are these military type
14   formations?
15       A.   Okay.
16       Q.   Would you like to change the answer
17   you gave to that question?
18       A.   No.
19       Q.   These are military type formations.
20       A.   Sir, you're trying to insinuate
21   that we're the military. We're a
22   paramilitary organization, and some of the
23   training and maneuvers that we use are
24   based on military maneuvers that the armed
25   services use. That's my answer.
```

```
 1              A. RAGANELLA
 2         Q.  I'm not trying to insinuate that. I
 3    don't believe you're the military. I think
 4    paramilitary is the right answer.
 5         A.  Thank you.
 6         Q.  I do think that these formations
 7    are military style formations, that's what
 8    I was asking.
 9         A.  Military style?
10         Q.  Military style formations, yes. I
11    think we can agree on that.
12         A.  The style, yes.
13         Q.  I'm going back to ... In the
14    training that's referenced in Plaintiff's
15    12, it covers three things. The lines,
16    wedges, and other Disorder Control
17    formations, what I will be just ...
18    Withdrawn.
19              It covers those lines, wedges, and
20    other Disorder Control formations that are
21    military style formations, correct?
22         A.  Yes.
23         Q.  It covers mass arrest techniques,
24    correct?
25         A.  Yes.
```

Page 129

1              A. RAGANELLA

2         Q.   It covers protective shields and

3    mash barrier equipment review, correct?

4         A.   That's a typo, it should say mesh

5    barrier.

6         Q.   Thank you.

7         A.   Sorry.

8         Q.   No problem. There's oftentimes a

9    fourth component of Disorder Control

10   training that's not included in this one,

11   correct?

12        A.   There's many components that aren't

13   included here.

14        Q.   Correct, but oftentimes, I believe

15   you testified to this in the Case

16   deposition, there are four common designs,

17   the lines, wedges, and military formations,

18   the mass arrest techniques, the protective

19   shields, and the high-profile car ...

20        A.   High profile vehicle rescue.

21        Q.   Right.

22        A.   Correct.

23        Q.   Those are the four standard ones

24   that are trained on, correct?

25        A.   Generally.

1           A. RAGANELLA

2      Q.  Was there ... Withdrawn.

3           We've already agreed that there's

4  been no update or modification of the mass

5  arrest training received by these

6  individuals, correct?

7      A.  Correct.

8      Q.  This indicates that in that 32 or

9  33-day period, 1,412 members of the service

10 received this training, correct?

11     A.  Of these particular units, yes.

12     Q.  It's possible that there were more

13 people who received training in that

14 timeframe?

15     A.  Significantly more.

16     Q.  How come they're not indicated in

17 this document?

18     A.  Because this is specifically

19 related to these particular units. This was

20 a communication outlining that small window

21 of time, which was just slightly over one

22 month. Units outside the Patrol Borough

23 Taskforces that were trained.

24     Q.  Within that timeframe of that one

25 month, there were more than 1,400 officers

```
 1              A. RAGANELLA
 2   trained? You said many more.
 3        A.  Absolutely.
 4        Q.  Would you be able to give an
 5   estimate of how many?
 6        A.  I could tell you that from
 7   September 17, 2011 through September 17,
 8   2012, the Disorder Control Unit trained in
 9   excess of 12,000 members of the service
10   from 29 different boroughs, units, and
11   divisions.
12        Q.  In that training, the Disorder
13   Control did not update the training on
14   sidewalk protests, correct?
15        A.  I don't have any lesson plan
16   dedicated to sidewalk protests
17   specifically.
18        Q.  Whatever topic that would cover
19   sidewalk protests ... Withdrawn.
20              Was there any topic that covered
21   sidewalk protests in those trainings for
22   those officers?
23        A.  Not that I could think of
24   specifically related to that.
25        Q.  Was there any training for those
```

```
 1              A. RAGANELLA
 2   officers in that timeframe for the
 3   standards of clear and present danger?
 4        A.   Repeat the question.
 5        Q.   We're talking about, I think you
 6   said around 12,000, I'm sorry, was it a
 7   bigger number than that?
 8        A.   In excess of 12,000.
 9        Q.   In excess of 12,000 in that one-
10   year timeframe.
11        A.   Yeah.
12        Q.   Between September 2011 and the
13   date, we're here about, which is around
14   September 15th to the 17th of 2012,
15   Disorder Control trained in excess of
16   12,000 members of the NYPD, correct?
17        A.   Yes, sir.
18        Q.   We agree that they did not train at
19   all in sidewalk protests, correct?
20        A.   I didn't say we didn't train at
21   all. It could have been incorporated into
22   lectures by my instructors as examples to
23   what they were teaching. I don't know that.
24        Q.   You don't know if that happened or
25   did not happen?
```

```
 1              A.  RAGANELLA
 2        A.   Correct.
 3        Q.   You know there's no lesson plan
 4   focused on that, correct?
 5        A.   I don't have a lesson plan
 6   dedicated to sidewalk protests, no.
 7        Q.   Those 12,000, in excess of 12,000
 8   members, did not receive a specific lesson
 9   plan related to sidewalk protests, correct?
10        A.   Specifically related to that, no,
11   they did not.
12        Q.   Those 12,000 members didn't receive
13   a specific lesson plan about impeding
14   pedestrian traffic on sidewalks, correct?
15        A.   Correct.
16        Q.   They didn't receive a lesson plan
17   about clear and present danger and how that
18   impacts First Amendment rights to protest,
19   correct?
20                  MS. MITCHELL:  Objection.
21                  You can answer.
22        A.   There is a lesson plan based on
23           that.
24                  (Document marked Exhibit 14
25              for identification as of this
```

```
 1              A.  RAGANELLA

 2                  date by the reporter.)

 3       Q.  I'm going to mark now as

 4  Plaintiff's 14, hopefully what you meant by

 5  there's a lesson plan on that.

 6       A.  (Witness perusing document.)

 7       Q.  Is this the lesson plan you just

 8  referenced?

 9       A.  Yes.

10       Q.  This is the training that was given

11  to those 12,000 or more officers during

12  that time period?

13       A.  It may have been.

14       Q.  You're unsure if this was given?

15       A.  It may have been incorporated into

16  the lecture portion of the mass arrest

17  techniques.

18       Q.  But you're not sure if it was?

19       A.  I am not.

20       Q.  It may have been, it may not have

21  been?

22       A.  Correct.

23                  (Document marked Exhibit

24                  15 for identification as of

25                  this date by the reporter.)
```

```
 1              A. RAGANELLA
 2        Q.   Then I'll mark as 15, what's been
 3   previously identified as D4344, and ask you
 4   to review that.
 5        A.   (Witness perusing document.)
 6        Q.   Is this a Disorder Control training
 7   document?
 8        A.   Yes.
 9        Q.   Is this the only document in
10   Disorder Control that deals with time,
11   place, and manner?
12        A.   No.
13        Q.   What else does?
14        A.   The corresponding lesson plans with
15   the PowerPoint.
16        Q.   Is the corresponding lesson plan,
17   is that something that's handed out, or is
18   that something the instructor uses to teach
19   this?
20        A.   Something the instructor would use
21   to teach.
22        Q.   This slide plus whatever the
23   instructor tells them is the extent of what
24   those 12,000 plus officers would receive,
25   as far as training, concerning time, place,
```

```
1              A. RAGANELLA
2    and manner, correct?
3         A.  I believe so. From the Disorder
4    Control Unit.
5         Q.  Do you know if anybody else trains
6    on these things?
7         A.  I'm relatively certain that the
8    Police Academy, during recruit training,
9    goes deeply into legalities.
10        Q.  To your knowledge, there's no
11   refresher course on it once people leave
12   the recruit Academy training?
13        A.  There is refresher training?
14        Q.  When is that?
15        A.  I don't know, but that is part of
16   what we looked at before with command level
17   training. The Police Academy may or may not
18   issue command level training memos related
19   to specific topics, and this very well
20   could have been one of those topics. I
21   don't know.
22                    (Document marked Exhibit
23                    16 for identification as of
24                    this date by the reporter.)
25        Q.  Let's mark this as 16. I'll ask you
```

Page 137

```
 1              A.  RAGANELLA
 2   to look at that.
 3        A.  (Witness perusing document.)
 4        Q.  Is that part of Disorder Control
 5   training?
 6        A.  Yes.
 7        Q.  Is this a slide that those 12,000
 8   plus officers who received training in that
 9   timeframe would have seen?
10        A.  I don't know if they would have
11   specifically seen the slide itself, but the
12   information in the slide may have been
13   relayed to the officers that were trained.
14        Q.  Is one of the instructions in this
15   slide to intimidate a crowd?
16        A.  It specifically states, "Team
17   approach intimidates a crowd and reduces
18   need for force."
19        Q.  The team approach is something you
20   train at Disorder Control, correct?
21        A.  In certain circumstances, yes.
22        Q.  Is policing First Amendment
23   activity, street ... Withdrawn.
24            Is policing sidewalk protests
25   something you train the team approach for?
```

1              A. RAGANELLA

2        A.   It could be.

3        Q.   Is it that at sidewalk protests, it

4   could be that the first thing a police

5   presence is supposed to do is to intimidate

6   the crowd?

7        A.   Depending upon what the crowd is

8   doing, it could be.

9        Q.   Now I'm going to mark as 17, or was

10  that ...

11                 COURT REPORTER:  17.

12                 (Document marked Exhibit

13            17 for identification as of

14            this date by the reporter.)

15       Q.   17, another slide.

16       A.   (Witness perusing document.)

17       Q.   Is this a document that is used for

18  training?

19       A.   Yes.

20       Q.   It's used at Disorder Control?

21       A.   Yes.

22       Q.   Is this for protests specifically?

23       A.   Restate the question, rephrase

24  that. I don't understand what you mean.

25       Q.   What is this document utilized for?

1              A. RAGANELLA
2        A.  I believe that this is part of the
3   mass arrest.
4        Q.  Does it say at the top, "Protestor
5   (Sit in type arrest)"
6        A.  Yes, sir.
7        Q.  Does it indicate that this lesson
8   is about the police conduct at protests?
9        A.  This particular slide does, yes.
10       Q.  The first item there, it says,
11   "Supervisor is team leader," correct?
12       A.  Correct.
13       Q.  At protests is a team that would be
14   identified, correct?
15       A.  When arrests need to be made, yes.
16       Q.  It also says that, "Arresting
17   officers are to give clear, audible
18   warnings," correct?
19       A.  Yes.
20       Q.  And that, "An additional officer
21   should be stationed at the rear of the
22   group, to ensure that a warning is heard,"
23   correct?
24       A.  Correct.
25       Q.  That's part of Disorder Control

```
                                      Page 140
 1            A. RAGANELLA
 2   training, correct?
 3        A.   Correct. You need this also?
 4        Q.   You can hold that. I'm going to
 5   mark this as 17.
 6                     MS. MITCHELL:  That's not
 7                18?
 8                     MR. STECKLOW:  18, what
 9                are we on?
10                     COURT REPORTER:  It's 18.
11                     (Document marked Exhibit
12                18 for identification as of
13                this date by the reporter.)
14        Q.   18.
15        A.   18. (Witness perusing document.)
16        Q.   Yeah, I thought it was wrong.
17        A.   Mother nature's calling again, so
18   make it snappy.
19        Q.   I'll be quick.
20        A.   I'm teasing. I'm teasing about make
21   it snappy, I'm not teasing about mother
22   nature's calling again.
23                     MS. MITCHELL:  Wylie can
24                take a joke.
25                     MR. STECKLOW:  Thank you,
```

```
                                    Page 141

 1              A.  RAGANELLA

 2                    I appreciate that. Okay, we're

 3              on the record.

 4                      It's 1:15, we're about to

 5              take a lunch break to the

 6              deposition.

 7                    Can we be back at 2:00?

 8                    MS. MITCHELL:  Yeah.

 9                    MR. STECKLOW:  Okay, so

10              we'll be back in 45 minutes to

11              continue at 217 Center Street.

12                      (Whereupon, a  luncheon

13              recess was taken.)

14                      (Back on the record.)

15                    MR. STECKLOW:  The time is

16              now 2:17, and we're back on the

17              record.

18                      We're at my office at 217

19              Center Street for the continued

20              deposition of fact witness

21              inspector Anthony Raganella. As

22              well as 30(B)(6) witness,

23              identified by state of New York

24              Inspector Anthony Raganella. We

25              have the same parties that were
```

```
                                            Page 142
 1            A.  RAGANELLA

 2                 here this morning, nothing has

 3                 changed, and we're going to

 4                 continue the deposition.

 5                      I believe the last exhibit

 6                 we marked was number 19, so

 7                 we're going to start on 20.

 8                      (Document marked Exhibit

 9                 19 and 20 for identification as

10                 of this date by the reporter.)

11   BY MR. STECKLOW:

12        Q.  I'm going to ask you to review what

13   I've marked as exhibit 20. And please let

14   me know after you've had a chance to do so.

15        A.  (Witness perusing document.)

16        Q.  For the record, this starts with

17   Bates stamped D14538, it continues until

18   D14549.

19        A.  Okay.

20        Q.  Are you familiar with this

21   document?

22        A.  Yes.

23        Q.  Did you create it?

24        A.  No.

25        Q.  What does CRV stand for?
```

1              A.  RAGANELLA

2       A.   Critical response vehicle.

3       Q.   So, is that the high value vehicle

4  that we've discussed before as one of the

5  four main modules of disorder control

6  training?

7       A.   No, critical response vehicle was

8  kind of like, it was a deployment that was

9  done by the counter-terrorism bureau. Where

10  they would take patrol officers from each

11  of the, at the time 76 precinct, bring them

12  together into a location, usually in

13  Manhattan. And then deploy them for high

14  visibility, counter terrorism deployments.

15       Q.   Okay. So, what does this document

16  represent?

17       A.   So, this is a running total of the

18  training that we did with the patrol bureau

19  task forces in conjunction with we would go

20  to CRV deployments. Prior to the officers

21  being turned out by the counter-terrorism

22  bureau, we were allotted time upfront to do

23  training with patrol services bureau,

24  members of the service that were there in

25  crowd management and crowd control.

1            A. RAGANELLA
2       Q.  And does this indicate the total
3  number of members of the service who
4  received level one and level two
5  mobilization and CRV training from April
6  21st, 2010 through August 23rd, 2011?
7       A.  It should, yes.
8       Q.  It indicates approximately 3,700
9  received taskforce only training, and
10 another 6,200 received CSV training. Is
11 that correct?
12      A.  Task force only ... 37, yes
13 correct.
14      Q.  Did this include the training that
15 was part of 19, plaintiff's 19?
16      A.  No, it did not.
17      Q.  Okay. So, what was the date for the
18 training?
19      A.  Actually, withdrawn it might have.
20 Just give me one second.
21      Q.  The document we're looking at does
22 not have an August 12th date, does it?
23      A.  No.
24      Q.  So, it doesn't include that?
25      A.  No, it doesn't.

Page 145

1                A. RAGANELLA

2         Q.   Okay. Do these numbers reflect the

3    same numbers you were discussing before

4    when you said that the DCU did training in

5    the time frame of occupy in excess of

6    12,000 MOS?

7         A.   Restate the question.

8         Q.   The 12,000, in excess of 12,000,

9    you discussed earlier about the number of

10   officers DCU trained during Occupy Wall

11   Street. These trainings, even though it's

12   reflected in 20 included in that number, or

13   is this in addition to that number?

14        A.   They're included.

15        Q.   Okay. So, would they be included,

16   some of this is 2010, correct?

17        A.   Yes.

18        Q.   And your answer that in excess of

19   12,000 was 2011 to 2012, August to

20   September.

21        A.   Correct.

22        Q.   I'll withdraw.

23             Your answer in excess of 12,000 was

24   in relation to trainings from August 2011

25   through September 2012?

```
                                        Page 146
 1              A. RAGANELLA
 2       A.  No.
 3       Q.  Okay. What was your number in
 4   excess of 12,000 in relation to?
 5       A.  September of 2011 through September
 6   of 2012.
 7       Q.  Okay. And this doesn't include
 8   September. Document 20 does not include
 9   September of 2011 at all. Correct?
10       A.  It doesn't appear to.
11       Q.  So, this would be in addition,
12   these 6,000 plus would be in addition to
13   the 12,000 we've already discussed.
14   Correct?
15       A.  Yes, this ends prior to that.
16       Q.  So, it would be in addition to the
17   12,000 we've already discussed, the numbers
18   contained in number 20.
19       A.  Yes.
20       Q.  Thank you.
21           Was there any other unit, other
22   than disorder control, that was tasked with
23   doing mass training during Occupy Wall
24   Street?
25                   MS. MITCHELL:  Objection.
```

Page 147

1          A. RAGANELLA

2                     You can answer, if you

3                know.

4     A.   There's many units in the

5  department that do training.

6     Q.   My question is about mass training.

7     A.   I don't know what you mean by mass

8  training.

9     Q.   Well we just went over that

10  disorder control did trainings for over

11  12,000 people, 12,000 members of the

12  service in September 2011 to September

13  2012, right?

14     A.   Correct.

15     Q.   And they did apparently somewhere

16  around 8,000 or 9,000 in the year before,

17  in April 2010 through August 2011. Correct?

18     A.   Correct.

19     Q.   And so, my question is, was

20  disorder control the group the unit tasked

21  with doing these mass trainings, or were

22  there other groups? Is there another

23  training organization similar to disorder

24  control within the NYPD, outside the

25  academy, that exists for training purposes?

```
 1              A. RAGANELLA
 2                   MS. MITCHELL:  Objection.
 3                   You can answer.
 4       A.   There are other units that conduct
 5  training outside of disorder control, and
 6  outside of the police academy, yes.
 7       Q.   And who are they?
 8       A.   Virtually every unit in every
 9  bureau in every division does some type of
10  training on their own.
11       Q.   Right. Do they do mass training,
12  large number training like disorder control
13  does?
14       A.   That I don't know.
15       Q.   You don't know if they do or they
16  don't?
17       A.   On what level, or what's the
18  definition of mass? I'm not clear on what
19  you're asking.
20       Q.   Okay. I'm asking whether or not
21  disorder control was the unit tasked with
22  doing training for the police officers that
23  were policing Occupy Wall Street in the
24  year during Occupy Wall Street?
25       A.   Yes.
```

```
                                        Page 149
 1              A. RAGANELLA
 2       Q.   Okay. Was there another unit tasked
 3   with those trainings?
 4       A.   Not that I'm aware of.
 5       Q.   Was there a specific anticipation
 6   of May 1st to have specific trainings to
 7   occur by disorder control unit?
 8       A.   Yes.
 9       Q.   And who had that specific concern?
10       A.   Virtually every member of the
11   service that does demonstrations or
12   protests.
13       Q.   Was that concern communicated to
14   you?
15                   MS. MITCHELL:   Objection.
16                   You can answer.
17       A.   I don't recall.
18       Q.   Did you communicate that concern to
19   anybody?
20                   MS. MITCHELL:   Objection.
21                   You can answer.
22       A.   I'm relatively certain I did.
23       Q.   And to whom do you think you
24   communicated that to?
25       A.   My staff.
```

```
                                    Page 150

 1              A. RAGANELLA
 2        Q.  Did Chief Esposito communicate a
 3   concern to you about May 1st protest and
 4   the need for additional mobile exercises?
 5        A.  It's possible, because it basically
 6   comes up every year.
 7        Q.  Isn't it true that disorder control
 8   undertook a large amount of disorder
 9   control training in anticipation of May 1st
10   in 2012?
11        A.  As we do every year, yes.
12        Q.  So, it was no different than any
13   other year?
14        A.  I didn't say it wasn't any
15   different, I say we do additional training
16   prior to May 1st every year.
17        Q.  In anticipation of the May Day
18   protests?
19        A.  That is correct.
20        Q.  And this particular year was no
21   different than any other year?
22        A.  I didn't say how.
23        Q.  Okay. How was it different than any
24   other year?
25        A.  I don't know.
```

Page 151

1            A. RAGANELLA

2        Q.  Was it different?

3        A.  It could have been.

4        Q.  But you don't know as you sit here?

5        A.  Unless I see something to refresh

6    my recollection, I don't recall what would

7    have been different.

8                        (Document marked Exhibit

9                    21 for identification as of

10                   this date by the reporter.)

11       Q.  I'm going to mark this as 21. I'm

12   showing the inspector a document previously

13   identified as D556.

14       A.  (Witness perusing document.)

15       Q.  Do you recognize this document,

16   inspector?

17       A.  Yes.

18       Q.  And is this document related to DCU

19   training for May Day?

20       A.  Yes.

21       Q.  And is it indicating that even

22   though DCU has already ramped up the

23   training, that you specifically were given

24   a directive by Chief Esposito to train,

25   train, train.

```
                                      Page 152
 1             A. RAGANELLA
 2        A.   That's what this says, yes.
 3        Q.   And so that would have been
 4   different than prior years?
 5        A.   The type of training we do, no. But
 6   the quantity may have been increased as a
 7   result of this.
 8        Q.   So, in other words, you would have
 9   done the same training as every other year.
10   You just may have done a lot more of it
11   because of this directive by Chief
12   Esposito?
13        A.   Yes.
14        Q.   And how would you know for sure
15   whether or not you did a higher volume of
16   it than you previously had done?
17        A.   I would have to look at our
18   training numbers during a certain period of
19   time and compare them to training numbers
20   for another period of time to see the
21   comparison.
22        Q.   And was there any specific
23   training, withdrawing. The sort of control
24   training that you did, the mob x training
25   that you did in anticipation of May Day
```

1              A. RAGANELLA

2    2012, was no different than the prior

3    trainings you had done. Correct?

4        A.   In regard to what we train on, no.

5        Q.   Okay. And so, as you previously

6    testified, there was no probably cause

7    training. So, there was no probably cause

8    training at this May 1st DCU training,

9    correct?

10       A.   I don't believe so.

11       Q.   And there was no specific sidewalk

12   protest lesson taught at these disorder

13   control trainings, correct?

14       A.   Not that I'm aware of.

15                  (Document marked Exhibit

16                  22 for identification as of

17                  this date by the reporter.)

18       Q.   Okay. I'm now going to show you

19   what's being marked as 22.

20       A.   Am I keeping this?

21       Q.   I'll take it back, thank you. And

22   22 has been previously identified as D3992.

23       A.   (Witness perusing document.)

24       Q.   Are you familiar with this

25   document?

```
 1              A. RAGANELLA
 2         A.  I am familiar with it, I'm not 100%
 3    sure which lesson plan it goes with though.
 4         Q.  Is it one that you teach?
 5         A.  Yes.
 6         Q.  And what is it meant, withdrawing.
 7    It talks about objectives, correct?
 8         A.  Yes.
 9         Q.  And the objective that's identified
10    in this is dispersed and demoralized
11    groups, correct?
12         A.  Correct.
13         Q.  And what is meant by that?
14         A.  What is meant by demoralized
15    groups?
16         Q.  Dispersed and demoralized groups,
17    what is meant by that objective?
18         A.  That objective is meant to
19    discourage an unlawful or violent group
20    from continuing in the conduct that they're
21    doing, and to disperse them.
22         Q.  Okay. So, it could be either
23    unlawful, or violent, or both? And then
24    demoralize and disperse would be
25    appropriate?
```

```
 1              A. RAGANELLA
 2        A.  No.
 3        Q.  Okay. So, what make it appropriate
 4   to be dispersed and demoralized to a group?
 5        A.  Well you're talking about two
 6   different things, disperse is not the same
 7   as demoralize.
 8        Q.  This objective, is this listed as
 9   separate and distinct, or is it listed as
10   something to disperse and demoralize?
11        A.  No, demoralize and disperse are two
12   distinct different things.
13        Q.  Okay. Is it trained as an either,
14   or, or is it trained as an and...
15        A.  An or.
16        Q.  Okay, even though it says and?
17        A.  It could be an and also, but it
18   depends on the circumstances.
19        Q.  Okay.
20        A.  There are times where we disperse a
21   group, and they're not demoralized. And
22   when I say demoralized, I refer to
23   discouraging the conduct that they're
24   engaged in, that's what demoralized means.
25   So, there are times that we want to
```

Page 156

```
 1              A.  RAGANELLA
 2   discourage them from doing what they're
 3   doing, and then disperse them. And there's
 4   other times that we don't need to
 5   discourage them, we just need to move them
 6   on and disperse them. So, it could be an
 7   and or an or.
 8        Q.  And this is policing large groups,
 9   correct?
10        A.  I don't know that it necessarily
11   applies to large groups. It could apply to
12   small groups also.
13        Q.  Okay. But it applies to groups,
14   groups of people, correct?
15        A.  It could.
16        Q.  Could it apply to something else?
17        A.  It could apply to a single person.
18        Q.  You can disperse and demoralize an
19   individual. But this particular training
20   doesn't talk about individual, it talks
21   about groups, correct?
22        A.  Again, I don't know which lesson
23   plan this comes from. So, it's hard for me
24   to ... But in general, yes. It's generally
25   understood that it applies to groups of
```

```
 1              A. RAGANELLA
 2    more than one person.
 3         Q.  And how is it distinguished in the
 4    disorder control that this applies to
 5    groups that are unlawful, as opposed to
 6    groups that are engaged in first amendment
 7    activity?
 8         A.  I don't understand your question.
 9         Q.  Does this objective apply to
10    protest groups engaged in first amendment
11    activity?
12         A.  No, it does not.
13         Q.  How is that taught to the people at
14    disorder control training?
15         A.  My instructors understand that
16    inherently, because they teach it. So
17    that's explained to the audience.
18         Q.  And how is it explained?
19         A.  Through our lesson plans and
20    legalities at demonstrations, that we
21    protect group first amendment rights to
22    first amendment speech and assembly. But
23    once it becomes unlawful, there may be
24    times where we have to disperse them. And
25    if it becomes riotous behavior, we may have
```

1           A. RAGANELLA
2    to discourage their behavior, and then
3    possible disperse them.
4         Q.  So, the demoralize wouldn't occur
5    unless it's riotous?
6         A.  That's correct.
7                        (Document marked Exhibit
8                    23 for identification as of
9                    this date by the reporter.)
10        Q.  Okay. I'm now going to show you
11   what's been marked as 23. I'll take that
12   one back.
13        A.  What is this marked as?
14        Q.  23.
15        A.  I need to put a number on there.
16        Q.  Thank you.
17        A.  No problem.
18        Q.  This is a document that has
19   previously been Bates stampeded starting at
20   4743 and ending at 4744.
21        A.  (Witness perusing document.)
22        Q.  Have you seen this document before?
23        A.  Yes.
24        Q.  And what is this document?
25        A.  This is in regard to our disorder

```
 1              A. RAGANELLA
 2  control guideline booklet that was created
 3  when the disorder control unit was created.
 4  And then I believe it was revised one more
 5  time in 1997. There was some inquiry from I
 6  believe an office of management analysis
 7  and planning.
 8       Q.  Yeah, I'm sorry. I'm going to
 9  restate this is the Bates stamped number
10  5564 to 5565.
11                  MS. MITCHELL:  23?
12                  MR. STECKLOW:  23,
13              correct.
14                  MS. MITCHELL:  Okay.
15       Q.  You had that document in front of
16  you when you were answering the question,
17  correct? It was the council that had the
18  wrong document, not the witness.
19       A.  Okay, I have 23 in front of me.
20       Q.  Right.
21       A.  So, there was some inquiry --
22                  MS. MITCHELL:  I'm sorry,
23              can we just back up. I think
24              the record might be incorrect
25              about the Bates stamped.
```

1          A. RAGANELLA

2                    MR. STECKLOW:  I changed

3              it.

4                    MS. MITCHELL:  Okay,

5              sorry. Go ahead, I'm sorry.

6      A.  There was some inquiry from the

7  office of management analysis and planning

8  regrading potentially updating the booklet.

9      Q.  Do you know how that occurred?

10     A.  I do not.

11     Q.  Did they ask you to make

12  recommendations on the update?

13     A.  They actually asked us to begin

14  doing the updates on it.

15     Q.  Did they tell you what the updates

16  needed to be, or did they ask you to figure

17  out what the updates should be?

18     A.  I don't recall.

19     Q.  In the top of the email is from

20  Anthony Raganella to Dennis Fulton. Is

21  Dennis Fulton an individual from that

22  division you discussed earlier, office of

23  management analysis and planning?

24     A.  Yes.

25     Q.  And you write, "On cursory

1              A. RAGANELLA

2    inspection, the following should at least

3    be revised." And then you identify a few,

4    correct?

5         A.  Correct.

6         Q.  Okay. And among the things that you

7    think should be added are mass arrest

8    tactics, correct?

9         A.  Yes.

10        Q.  But you don't put anything in here

11   about adding sidewalk protests, correct?

12        A.  Correct.

13        Q.  Nor clear and present danger,

14   correct?

15        A.  Correct.

16        Q.  Nor the standards for impeding

17   pedestrian traffic, correct?

18        A.  Correct.

19        Q.  Okay. Are those standards, or any

20   of those topics, covered in disorder

21   control guidelines?

22        A.  I don't understand your question.

23        Q.  The topics I just mentioned that

24   are not included in this email, are they

25   covered in disorder control guidelines?

```
                                    Page 162
 1              A. RAGANELLA
 2       A.   Which guidelines? I don't ...
 3       Q.   The ones that are referenced here
 4   in this document, plaintiff's 23.
 5       A.   I don't believe so.
 6       Q.   And prior to January 6, 2012, when
 7   was the last time the disorder control
 8   guidelines had been revised?
 9       A.   As I stated, I believe it was in
10   1997.
11       Q.   Had you ever recommended that the
12   disorder control guidelines booklet be
13   updated prior to this email exchange with
14   Dennis Fulton?
15       A.   I'm sorry, restate the question.
16       Q.   Did you ever recommend the disorder
17   control guidelines booklet be updated prior
18   to your emails with Dennis Fulton?
19       A.   I may have.
20       Q.   And who may you have made that
21   recommendation to?
22       A.   To myself.
23       Q.   Okay. To anyone else?
24       A.   Not that I recall.
25       Q.   Okay. And from this, it seems that
```

Page 163

1               A.  RAGANELLA

2    Dennis received a copy of the guideline

3    booklet, and then was surprised that it was

4    October 97. And then started to ask about

5    updating it. Does that seem accurate?

6         A.   Seems reasonable, yes.

7         Q.   And so, then it wasn't that you

8    made the recommendation. Somebody made the

9    recommendation to you that it should be

10   updated. And then you made recommendations

11   about what updates should be included,

12   correct?

13        A.   Correct.

14                    (Document marked Exhibit

15                    24 for identification as of

16                    this date by the reporter.)

17        Q.   I'm going to show you what's now

18   being marked as plaintiff's 24.

19                    MS. MITCHELL:  Should I

20                    have ...

21                    MR. STECKLOW:  I didn't

22                    mark it, sorry. It's not a

23                    secret, it's something you gave

24                    me at some point.

25        Q.   Okay, all right please review

```
1              A. RAGANELLA
2   what's been marked as plaintiff's 24. Which
3   is a memo dated September 30th, 2009 from
4   the commanding officer of the disorder
5   control unit. And it is Bates stamped 4756
6   through 4759.
7        A.  Okay.
8        Q.  Have you seen this document before?
9        A.  Yes.
10       Q.  When was the first time you saw it?
11       A.  Probably this week.
12       Q.  This week being July 2018?
13       A.  Yes.
14       Q.  Prior to this week, had you ever
15  seen the document?
16       A.  I don't recall seeing this.
17       Q.  All right, this gives me a good
18  chance to ask a different question that I
19  didn't ask. What documents did you review
20  in anticipation of today's deposition?
21       A.  Everything that was provided to me
22  by council.
23       Q.  And I absolutely do not want to
24  hear anything about your conversations with
25  Your counsel. What I do want to understand
```

```
 1              A. RAGANELLA
 2   is what those documents were. How many
 3   pages of documents do you believe you were
 4   provided?
 5        A.   Probably reviewed thousands of
 6   pages.
 7        Q.   Okay. And did any of it refresh
 8   your recollection as to information you did
 9   not previously have?
10        A.   Did it refresh my recollection as
11   to information that I previously, how would
12   it refresh my recollection?
13        Q.   Let me rephrase the question. Did
14   any of the documents either refresh your
15   recollection as to information you
16   previously had, but had forgotten, or
17   provide you new information that you did
18   not have previously?
19        A.   That's possible.
20        Q.   Do you know which documents those
21   were?
22        A.   No.
23        Q.   Do you have any way of identifying
24   the documents that you reviewed in
25   anticipation of today's deposition?
```

```
                                      Page 166
```

```
 1              A.  RAGANELLA
 2        A.   If I saw them, it may refresh my
 3   recollection that I reviewed them this
 4   week.
 5        Q.   Did you receive a copy of them?
 6        A.   Some things, yes.
 7                  MR. STECKLOW:  So, I would
 8              call for production of that
 9              since the witness's memory
10              isn't solid on what it was. I
11              would call for production,
12              because that seems to be the
13              best evidence of what it was he
14              reviewed. I'm sorry.
15                  MS. MITCHELL:  I can tell
16              you that he reviewed PowerPoint
17              slides and lesson plans from
18              DCU, and we went over his
19              email. I'm not going to
20              reproduce documents that you
21              already have in your
22              possession.
23        Q.   Okay. Other than lesson plans and
24   PowerPoint slides and emails, were there
25   other documents you reviewed?
```

```
                                    Page 167

 1              A. RAGANELLA
 2       A.  No.
 3       Q.  Okay. Is the document in front of
 4  you a lesson plan, PowerPoint slide or
 5  email?
 6       A.  It's a communication.
 7       Q.  And you reviewed this document in
 8  anticipation of today's deposition,
 9  correct?
10       A.  I believe so.
11       Q.  And it was neither an email, a
12  PowerPoint slide, or a lesson plan.
13  Correct?
14       A.  Correct.
15       Q.  Okay. So, were there other
16  documents that you reviewed in anticipation
17  of this litigation that were neither a
18  PowerPoint, an email, or a lesson plan?
19       A.  Not that I recall.
20       Q.  Okay. So, this is the only one that
21  would fall outside that scope.
22       A.  Outside which scope?
23       Q.  The description of those three sets
24  of items that Your counsel identified.
25       A.  This particular one? We've already
```

```
 1              A. RAGANELLA
 2    looked at other communications.
 3         Q.  Your counsel stated the only
 4    documents that you reviewed prior to
 5    today's deposition were emails,
 6    PowerPoints, and lesson plans. We then
 7    agreed that in fact the one document we're
 8    holding up right now, 24, is none of those.
 9    And yet, is something you identified as
10    having only seen this week in anticipation
11    of this deposition.
12         A.  Correct.
13         Q.  I'm asking you if there's any other
14    documents that you remember reviewing that
15    are not either a PowerPoint, and email, or
16    a lesson plan?
17         A.  Not that I remember.
18         Q.  Okay. So, this is the only one that
19    falls outside the description that your
20    attorney just gave, correct?
21         A.  I believe so.
22         Q.  Okay, all right. Paragraph three of
23    this document, plaintiff's 24. It states
24    that individuals are encouraged, task
25    forces are encouraged to conduct regular
```

```
 1              A. RAGANELLA
 2  disorder control training, correct?
 3       A.  That's what that says.
 4       Q.  Is that something that you
 5  continued once you took over disorder
 6  control?
 7       A.  Yes.
 8       Q.  Okay. And so, you agreed with this
 9  recommendation that the task forces should
10  conduct regular training sessions?
11       A.  Yes.
12       Q.  And you also, did you also
13  encourage them to conduct regular training
14  sessions?
15       A.  Yes.
16       Q.  Did you require them to conduct
17  regular training sessions?
18       A.  Yes.
19       Q.  Okay. In paragraph five, it seemed
20  to indicate that --
21       A.  Let me back up. I recommended that
22  they do training sessions. I was not in a
23  position to require it.
24       Q.  I'll re ask the question so we can
25  get a clean answer. Did you require that
```

```
                                      Page 170

 1                  A. RAGANELLA
 2   they conduct training sessions?
 3        A.  No.
 4        Q.  Okay. Paragraph five, it talks
 5   about, paragraph five identifies that
 6   insufficient training is happening, because
 7   it's only focusing on one to two different
 8   tactics. Is that accurate?
 9        A.  I don't know, I wasn't there then.
10        Q.  Is that accurate as to what is
11   described in paragraph five?
12        A.  Are you asking me if that's what it
13   says?
14        Q.  Yes.
15        A.  That's what it says.
16        Q.  So, does this memo indicate that
17   there was sufficient or insufficient
18   disorder control training occurring?
19                    MS. MITCHELL:  Objection.
20                    You're asking him to testify
21                    about training that was
22                    occurring in 2009 that was
23                    beyond the scope of the
24                    30(B)(6) notice that he's been
25                    prosecuted for.
```

```
 1            A.  RAGANELLA

 2                    MR. STECKLOW:  I'm asking

 3              him to explain if the memo

 4              identifies that. And since he

 5              has the knowledge of sufficient

 6              disorder control training, I'll

 7              rephrase it.

 8       Q.  How's this, in relation to what you

 9  believe was sufficient disorder control

10  frame that you instituted in 2010 and

11  forward. Do you believe the disorder

12  control training that's identified in this

13  2009 memo was sufficient?

14       A.  There's always room for

15  improvement, as I stated before.

16       Q.  Do you believe this memo is

17  identifying sufficient or insufficient

18  disorder control training?

19                    MS. MITCHELL:  Objection.

20              You're asking him to testify

21              about a document from 2009 that

22              is beyond the scope of what

23              this witness has been brought

24              here for.

25       Q.  Okay. You can answer the question.
```

Page 172

1          A. RAGANELLA

2      A.  So, reading what is written, it

3  appears that the author of this

4  communication would like to see an increase

5  in training.

6      Q.  And the amount of training that you

7  took over in 2010, you believe not to be of

8  a high enough volume. Correct?

9      A.  Correct.

10     Q.  And so, the concern that was in

11 this memo, which I believe you shared when

12 you took over, is that there was not a

13 sufficient amount of training by disorder

14 control. Correct?

15                 MS. MITCHELL:  Objection.

16                 You can answer.

17     A.  There will never be a sufficient

18 enough amount of training as far as I'm

19 concerned.

20     Q.  And why is that?

21     A.  Because I come from a training

22 background, as I stated earlier. And the

23 more training we can do, the better we

24 become at what we do. So, training is

25 always a priority as far as I'm concerned.

```
 1              A. RAGANELLA
 2  The more that we can do it, the better we
 3  become at what we're trying to do.
 4       Q.  Okay. Are there levels of training
 5  that are just plainly insufficient?
 6       A.  I would imagine so.
 7       Q.  Okay. And so, because you're
 8  talking about improving on a sufficient
 9  level, and I'm trying to get to the point
10  between sufficient and insufficient.
11       A.  You're trying to get me to say that
12  the training was insufficient back then. I
13  understand that.
14       Q.  I'm trying to understand that, and
15  if you believe --
16       A.  It's hard for me to understand it
17  when I wasn't there in 2009.
18       Q.  Really what I'm trying to say is
19  this memo seems to indicate it was
20  insufficient. Not that you have personal
21  knowledge of that, but that's what's in the
22  memo.
23       A.  I'll agree with that.
24       Q.  Okay. That's all I was trying to
25  get.
```

```
1                    A. RAGANELLA
2          A.  You should have just asked that
3     then.
4          Q.  Okay, I'm sorry. In a plain way.
5     Does this memo indicate that the author
6     believes that disorder control training at
7     this time was insufficient?
8                         MS. MITCHELL:  Objection.
9                    You're asking him to speculate
10                   as to what another person
11                   thought.
12         A.  My opinion on what another person
13    thought is that that may indicate that,
14    yes.
15         Q.  And the concern was not just about
16    the amount of training, but the scope of
17    training as well. Correct?
18         A.  Correct.
19         Q.  And it contains a proposal to
20    update the disorder control training, does
21    it not?
22         A.  Yes.
23         Q.  Do you know if this proposal was
24    accepted and instituted?
25         A.  I do not know.
```

1              A. RAGANELLA

2         Q.   Okay. Would you know if it had been

3    instituted?

4         A.   If I knew that, I would be able to

5    tell you that it was. So, I don't know.

6         Q.   Well this is from September 2009.

7    You took over disorder control in July of

8    2010, correct?

9         A.   August of 2010.

10         Q.   Okay. And so, this is less than a

11    year later, correct?

12         A.   Correct.

13         Q.   And so, there's specific lectures

14    that are listed here, do you know if each

15    of these were instituted?

16         A.   Yes, these are all blocks of

17    instruction that were being conducted when

18    I took over the disorder control unit. And

19    they were the same blocks of instruction

20    that were done for over a decade.

21         Q.   Over a decade before or after?

22         A.   Before.

23         Q.   Okay. So obviously this is a

24    proposal. So, it seems like it can't be

25    exactly the same as what was being done

```
 1              A. RAGANELLA
 2    before, or else it's not a proposal, it's a
 3    restatement of what's being done.
 4         A.   I'm speaking of the general topics
 5    of blocks of instruction. When we drill
 6    down and look at individual lesson plans, I
 7    don't know if anything was modified or
 8    changed in those blocks of instruction.
 9         Q.   Okay. Now this proposed a two-day
10    disorder control training, correct?
11         A.   Yes.
12         Q.   And it proposed two consecutive
13    days, correct?
14         A.   It says two consecutive days.
15         Q.   And it has it broken down by day
16    one and day two, correct?
17         A.   Correct.
18         Q.   And it talks about lecture times,
19    correct?
20         A.   Correct.
21         Q.   And so that would indicate
22    classroom time as opposed to field exercise
23    time, correct?
24         A.   No.
25         Q.   So, lecture time could be in the
```

```
 1              A. RAGANELLA
 2    field?
 3         A.   Absolutely.
 4         Q.   Okay. And so --
 5         A.   Where do you see lecture time?
 6         Q.   On the right-hand side of --
 7         A.   I only see the word time, I don't
 8    see the word lecture.
 9         Q.   Okay. So, when it talks about time,
10    this could just be the amount of time
11    focused on things. So, on the left where it
12    says training site, it talks about lecture.
13    Some says hands on, some says lecture.
14         A.   Okay, yes, I see that.
15         Q.   Hands on would probably correlate
16    to an exercise, and lecture would correlate
17    to a classroom.
18         A.   Yes and no, because there are times
19    where we have done hands on training in a
20    classroom. And there are times where we
21    have done lectures out in the field at a
22    training site, outside of a classroom.
23         Q.   Okay.
24         A.   So, this is a proposal of a
25    recommendation, I don't know that this is
```

```
 1              A. RAGANELLA
 2   what was actually done.
 3        Q.  All right. So, it seems like if you
 4   add up all the time, it's about eight hours
 5   on the first day, and eight hours on the
 6   second day. Is that how disorder control
 7   was undertaking during your time as
 8   commanding officer of the DCU?
 9        A.  Not clear on what you're asking.
10        Q.  This is proposing a two-day, two
11   consecutive day training, eight hours each
12   day, mix of lecture and hands on on each
13   day. I'm asking you if that's what occurred
14   while you were the commanding officer of
15   disorder control training.
16        A.  Two consecutive days?
17        Q.  Yes.
18        A.  Not that I recall.
19        Q.  And was the breakdown of lecture to
20   hands on the same as what occurred while
21   you were at disorder control as a
22   commanding officer?
23        A.  Well, if I don't recall this
24   occurring on two consecutive days, how
25   would I know that?
```

```
 1            A.  RAGANELLA
 2       Q.  So, okay, fair enough. Did you
 3   conduct disorder control training based on
 4   either day, day one or day two, and the
 5   component is there. Did either of those
 6   occur while you were the commanding officer
 7   of disorder control training?
 8       A.  Absolutely.
 9       Q.  Okay. Which day would you be
10   focused on?
11       A.  Both days.
12       Q.  Okay. You would teach it as it's
13   written here, or would it be merged
14   together into something different?
15       A.  We incorporated these blocks of
16   instruction into when we did mobilization
17   exercises primarily.
18       Q.  Okay. So, it talks here about on
19   day one introduction to disorder control,
20   right?
21       A.  Yes.
22       Q.  And so, would that be something
23   that was incorporated into mobile
24   exercises, would that be a lecture? How
25   would that be taught under your watch as
```

```
                                    Page 180

  1                A. RAGANELLA
  2   commanding officer of disorder control?
  3        A.   Normally that would be taught as
  4   classroom lecture.
  5        Q.   Okay. The next one is a guide to
  6   civil disorder. And that's, withdrawing.
  7   For the introduction of disorder control,
  8   here it's listed as 60 minutes.
  9             How long was it on disorder control
 10   while you were commanding officer?
 11        A.   I don't know.
 12        Q.   How would you find out?
 13        A.   I wouldn't be able to.
 14        Q.   Were all of these components that
 15   are listed here as day one and day two
 16   combined into one day training at disorder
 17   control?
 18        A.   Very well could have been.
 19        Q.   Okay. So obviously, the times
 20   aren't going to match up because this is
 21   two eight-hour blocks, and you guys are
 22   doing it in one eight-hour block. Correct?
 23        A.   Correct.
 24        Q.   So, you're not going to be able to
 25   know for sure how much of each component
```

```
                                    Page 181
 1              A. RAGANELLA
 2   was taught, correct?
 3        A.   That's correct.
 4        Q.   Okay. Are there any, withdrawn.
 5             I note that high profile vehicle
 6   rescue, that seems to be one of the main
 7   components of the disorder control under
 8   your watch, correct?
 9        A.   One of many, yes.
10        Q.   Well you've testified before that
11   there were four main components to the
12   disorder control training while you were at
13   disorder control.
14        A.   This is one of them, yes.
15        Q.   One of the four, correct?
16        A.   Correct.
17        Q.   Okay. Other one was alluding arrest
18   tactics, yes?
19        A.   Correct.
20        Q.   Other one was the disorder control
21   formations?
22        A.   Correct.
23        Q.   And the other was mass arrest
24   tactics?
25        A.   Correct.
```

```
 1              A. RAGANELLA
 2       Q.   Okay. Here under we've talked about
 3   the first one, the second one on day one is
 4   the legalities of civil disorder. And here
 5   they talk about a review of the first
 6   amendment, disorderly conduct, riots --
 7       A.   I'm sorry, where are we? I'm lost.
 8       Q.   We're on day one.
 9       A.   Day one, okay.
10       Q.   Second entry.
11       A.   Yes, sir.
12       Q.   It talks about legalities of civil
13   disorder, a review of the first amendment,
14   disorderly conduct, riot, and a review of
15   arrest warnings and proper legal procedures
16   at protests. Correct?
17       A.   Yes.
18       Q.   How did you teach those items at
19   disorder control?
20       A.   I don't understand your question.
21       Q.   Well this was something that was
22   being taught or was being proposed to be
23   taught in a fashion. And I'm wondering how
24   it did get taught while you were the
25   commanding officer of disorder control.
```

```
 1              A. RAGANELLA
 2       A.  Still don't understand what you're
 3  asking.
 4       Q.  Did you teach legalities of civil
 5  disorder as it's written here?
 6       A.  Yes.
 7       Q.  Okay, as it's explained. So how did
 8  you review the first amendment?
 9       A.  It could have been classroom, it
10  could have been out in the field during
11  mass arrest. There were times where
12  legalities of civil disorder, lectures from
13  the instructors were incorporated into mass
14  arrest out in the field.
15       Q.  Was there a specific 45-minute
16  lecture for legalities of civil disorder?
17       A.  There could have been.
18       Q.  Was there a specific 45-minute
19  classroom lecture during disorder control
20  in 2011 to 2012, in that time frame we're
21  talking about here?
22       A.  There could have been.
23       Q.  And how would you know for sure
24  where it happened or did not happen?
25       A.  That specific lesson plan being
```

```
1              A. RAGANELLA
2    used for a full 45 minutes, I wouldn't know
3    that.
4         Q.  Okay. So, this is obviously part of
5    the question is that the 30(B)(6) notice.
6    And so, the question is, you're supposed to
7    have obviously been prepared to answer the
8    questions on behalf of the city of New
9    York. So, if you're not going to know, how
10   are we going to get an answer from the city
11   of New York?
12        A.  You're probably not.
13        Q.  So, we're just not going to know
14   whether or not this was taught in a lecture
15   setting, in a classroom, or how long it was
16   taught, correct?
17        A.  It wasn't recorded, no.
18        Q.  I'm not asking if it was reported,
19   I'm asking what your memory is. What you
20   know, what your knowledge is.
21        A.  I said it was possible.
22        Q.  Okay. All right, here you see how
23   it talks about review of arrest warnings,
24   correct? On the --
25        A.  Are we still under --
```

```
                                    Page 185

 1            A. RAGANELLA

 2       Q.  Yeah.

 3       A.  Okay, yes.

 4       Q.  We discussed earlier that there is

 5   no arrest warning training when it involves

 6   telling protestors to go to an alternative

 7   location to protest, correct?

 8       A.  Restate the question.

 9       Q.  Previously you testified that you

10   do not do training at disorder control

11   about dispersal warnings or arrest warnings

12   when you're giving alternative locations to

13   protest, correct?

14       A.  Correct.

15       Q.  And so, the arrest warnings here

16   would not include any alternative location

17   type of warning, correct?

18       A.  Unless it was written down and

19   documented somehow on the actual arrest

20   warnings, probably not.

21       Q.  Okay. And we've reviewed the arrest

22   warnings, and there doesn't seem to be

23   anything like that. Correct?

24       A.  On the arrest warnings that I

25   reviewed here today, I didn't see that.
```

1              A.  RAGANELLA

2         Q.  And you don't have any knowledge of

3    any arrest warnings that you trained at

4    disorder control that do have that,

5    correct?

6         A.  Not that I recall. That doesn't

7    mean that there wasn't any though.

8         Q.  So, do you know, withdraw.

9              Would you be able to look at this

10   two-page class recommendation and identify

11   the times that each of them actually are

12   taught under your watch at disorder

13   control?

14        A.  No.

15                    MS. MITCHELL:  I need to

16                use the bathroom very quickly.

17                    MR. STECKLOW:  Okay, it's

18                3:06, we're taking a short

19                break.

20                    (Whereupon, a short recess

21                was taken.)

22                    (Back on the record.)

23                    (Document marked Exhibit

24                25 for identification as of

25                this date by the reporter.)

```
 1          A.  RAGANELLA

 2                    MR. STECKLOW:  The time is

 3               now 3:13. We're back on the

 4               record.

 5                    I've handed the witness

 6               document Plaintiff's Exhibit 25

 7               and asked if he can identify

 8               the document.

 9     A.  (Witness perusing document.) Yes.

10     Q.  And what can you identify it as?

11     A.  Communication from me to the

12  Patroller of Task Force Commanding Officers

13  and my staff.

14     Q.  And what is it that you're

15  identifying in that document?

16     A.  The potential issue with the use of

17  flex cuffs.

18     Q.  And what is the issue you're

19  identifying?

20     A.  That they should only be utilized

21  by the Patroller of the Task Forces.

22     Q.  And how did that information come

23  to you?

24     A.  I do not recall.

25     Q.  Were you overseeing many of the
```

1              A. RAGANELLA
2    mass protests, mass arrests at the protest
3    that were active on Wall Street?
4         A.  Not clear by what you mean by
5    overseeing.
6         Q.  Well, you made specific requests
7    for Task Force equipment multiple times
8    during Occupy Wall Street. Isn't that
9    correct?
10        A.  Yes.
11        Q.  And you made recommendations for
12   Command Post operations during Occupy Wall
13   Street. Isn't that right?
14        A.  Yes.
15        Q.  And you reviewed and made
16   recommendations regarding mass arrests
17   operations during Occupy Wall Street. Isn't
18   that right?
19        A.  Yes.
20        Q.  Did you review and make any
21   recommendations as to sidewalk policing?
22        A.  Which one?
23        Q.  Did you review and make any
24   recommendations as to the policing of the
25   sidewalk protests at Occupy Wall Street?

```
                                        Page 189
 1              A. RAGANELLA
 2        A.  Not that I recall.
 3        Q.  Did you review and make any
 4   recommendations as to the policing of "a
 5   clear and present danger" during Occupy
 6   Wall Street protests?
 7                   MS. MITCHELL:  Objection.
 8                   You can answer.
 9        A.  I don't specifically recall making
10   recommendations on legal matters. No.
11        Q.  Okay.
12             Did you review and make any
13   recommendations on the impedance of
14   pedestrians during Occupy Wall Street?
15                   MS. MITCHELL:  Objection.
16                   Asked and answered.
17        A.  Again, not that I recall.
18        Q.  And in this memo, you wrote that
19   the Department is critically low on
20   flexicuffs. Right?
21        A.  Yes.
22        Q.  And so, you were on top of the
23   equipment that the officers were using to
24   police Occupy Wall Street. Correct?
25        A.  Specifically, to Patrol Borough
```

1           A. RAGANELLA

2    Task Forces because one of TCU's core

3    functions was logistics related to the, we

4    acquired and disseminated a lot of

5    equipment for the Patrol Borough Task

6    Forces.

7           Q.   In addition to training the Patrol

8    Borough Task Forces, correct?

9           A.   Yes, sir.

10          Q.   And so, during Occupy Wall Street,

11   you were either tasked with or accepted the

12   responsibility for the review of the

13   equipment that these individuals had when

14   they were policing Occupy Wall Street.

15   Correct?

16          A.   Yes, sir.

17          Q.   You tasked with reviewing the

18   policing they were doing of Occupy Wall

19   Street? Their constitutionality of their

20   policing of sidewalk protests?

21                    MS. MITCHELL:  Objection.

22                    You can answer.

23          A.   I did not get involved in legal

24   matters or making recommendations on legal

25   matters. No.

```
1              A. RAGANELLA
2         Q.  Okay. I'm asking about the policing
3    aspect. Right?
4         A.  Then I don't understand what you're
5    asking.
6         Q.  I'm asking you if you were ever
7    tasked with a review of the police conduct
8    during sidewalk protests during Occupy Wall
9    Street.
10                   MS. MITCHELL:  Objection.
11                   You can answer.
12         A.  Not that I recall.
13         Q.  Is there anything that you could
14    look at that could refresh your
15    recollection?
16         A.  Not that I'm aware of.
17         Q.  You recall being tasked with
18    ensuring that there were sufficient amounts
19    of flexicuffs for the Task Force. Correct?
20         A.  Correct.
21         Q.  Were you also tasked with ensuring
22    there were sufficient amounts of pepper
23    spray canisters for the Task Force?
24         A.  Yes.
25         Q.  Were you tasked with ensuring they
```

1              A.  RAGANELLA

2    had sufficient millennium masks?

3         A.  Yes.

4         Q.  But you're not, you don't recall

5    whether or not you were tasked with

6    reviewing their sidewalk protests and

7    updating training?

8                      MS. MITCHELL:  Objection.

9                      You can answer.

10        A.  So, I don't recall specifically

11   being tasked with updating or modifying

12   training regarding to what it is that

13   you're asking. That is not to say that I

14   didn't have conversations about it though.

15   But I just don't recall having those

16   conversations.

17        Q.  You never wrote a memo about a need

18   to update training in regard to sidewalk

19   protests during Occupy Wall Street.

20   Correct?

21        A.  Not that I can recall.

22        Q.  And you haven't seen such memo.

23   Correct?

24        A.  Not that I'm aware of.

25        Q.  And disorder control training was

```
 1              A. RAGANELLA
 2   not updated in regard to sidewalk protest
 3   during Occupy Wall Street. Correct?
 4                   MS. MITCHELL:  Objection.
 5                   You can answer.
 6        A.  Not that I'm aware of.
 7        Q.  And you would be aware if it was
 8   updated, wouldn't you? You were the
 9   Commanding Officer of Disorder Control in
10   this time period.
11        A.  I should be. Yes.
12        Q.  So, if you're not aware of it,
13   that's because it did not happen. Correct?
14        A.  I can't say that.
15        Q.  So, somebody could have updated
16   Disorder Control training while you were
17   the Commanding Officer, and you wouldn't
18   know.
19        A.  I would hope that that doesn't
20   happen, but I can't say that it is an
21   impossibility.
22        Q.  You don't have any independent
23   knowledge that the training was ever
24   updated during Occupy Wall Street at
25   Disorder Control in regard to sidewalk
```

```
 1              A. RAGANELLA
 2   protests.
 3                  MS. MITCHELL:  Objection.
 4                  You can answer.
 5      A.  I'm a pretty hands-on guy, and I
 6   don't recall that happening.
 7                      (Document marked Exhibit
 8                  26 for identification as of
 9                  this date by the reporter.)
10      Q.  Let me show you what I'm now
11   marking as 26, Plaintiff's 26.
12      A.  (Witness perusing document.)
13      Q.  I know for sure that there's copies
14   of them in there, but I can't find them, so
15   you and I are going to have to just deal
16   with that.
17          Let me ask you if you've ever seen
18   that document before.
19                  MS. MITCHELL:  Okay.
20      Q.  Document, did I recommend that?
21          Document 26 is an Advance Command
22   Leadership. Is that correct?
23      A.  Yes, that's what it's titled. Yup.
24      Q.  Have you seen this document before?
25      A.  I don't recall seeing it.
```

```
 1            A. RAGANELLA
 2       Q.  Is it something that's taught at
 3   Disorder Control training or elsewhere?
 4       A.  I don't know where it's taught, but
 5   it's not something that came from the
 6   Disorder Control unit. And from what I'm
 7   reading on the cover, it appears to be a
 8   draft.
 9       Q.  It is says on the left side that it
10   was August 17, 2012. Is that correct?
11       A.  I'm sorry. Can you repeat that?
12       Q.  Does it say on there that the last
13   revision is August 17, 2012?
14       A.  No.
15       Q.  What does it say that the last
16   revision is?
17       A.  0900 hours, August 20, 2012.
18       Q.  I stand corrected.
19            Since you haven't seen this and
20   it's not from Disorder Control, I think
21   it's outside the scope, so I'm going to put
22   it away.
23            Looking back at 25, this is an
24   email from you to a bunch of chiefs,
25   correct?
```

```
1              A. RAGANELLA
2        A.   No.
3        Q.   Who's it to?
4        A.   It's addressed, the email
5   communication is addressed to the, at the
6   time, the Patrol Borough Task Force
7   Commanding Officers. CC'd on it was my
8   staff as well as my Commanding Officer at
9   the time.
10       Q.   So, this is all eight Patrol
11  Borough....
12       A.   Commanding Officers.
13       Q.   Commanding Officers. Are they all?
14       A.   Yes, sir. Thank you.
15       Q.   And it's from you to them, correct?
16       A.   Yes.
17       Q.   Okay.
18            And this document indicates that
19  the NYPD did not consider OWS protestors to
20  be violent. Correct?
21       A.   I'm sorry, repeat that.
22       Q.   This document indicates that the
23  NYPD did not consider Occupy Wall Street
24  protestors to be violent. Correct?
25                    MS. MITCHELL:  Objection.
```

```
                                    Page 197
 1            A. RAGANELLA
 2                    You can answer.
 3        A.  Can you give me a moment to review
 4    it?
 5            Okay, what's your question?
 6        Q.  Did the NYPD consider Occupy Wall
 7    Street protestors to be violent?
 8                    MS. MITCHELL:  Objection.
 9                    You can answer.
10        A.  Am I speaking on behalf of the
11    department or my email?
12        Q.  Is this an email from you or is it?
13        A.  Yes, it's an email from me.
14        Q.  It seems to have quotation marks
15    around it. Correct?
16                    MS. MITCHELL:  Isn't that
17              an asterisk?
18                    THE WITNESS:  That's an
19              asterisk.
20                    MS. MITCHELL:  Yeah.
21        A.  Yeah, those are asterisks at the
22    beginning of each paragraph.
23        Q.  Okay.
24        A.  Used as bullet points.
25        Q.  Okay. Sorry.
```

1          A.  RAGANELLA

2          You write in the third full

3   paragraph here that they are not inherently

4   violent or physical toward us. Correct?

5       A.  As of October 7, 2011, I did not

6   witness them to be inherently violent or

7   physical towards us.

8       Q.  And you believed that they were

9   disorganized.

10      A.  That was my opinion, yes.

11      Q.  And you believed that they were

12  annoying, yes?

13      A.  At times, yes.

14              MS. MITCHELL:  Wylie, I'm

15              going to interject here because

16              I think this goes to what we

17              were discussing prior to the

18              beginning of the deposition. I

19              think that it's not clear what

20              capacity the witness is

21              testifying is.

22              MR. STECKLOW:  Fair.

23              MS. MITCHELL:  Is he

24              testifying in his individual

25              capacity? Or are you asking

```
                                        Page 199
1              A. RAGANELLA
2   this question as those...
3                    MR. STECKLOW:  I believe
4               that he's been answering it in
5               his individual capacity.
6        Q.  Am I correct?
7        A.  Correct.
8        Q.  And I think that you made that
9   clear in an earlier answer.
10                   MS. MITCHELL:  But I just
11              wanted to clarify your intent.
12                   MR. STECKLOW:  I have no
13              problem with the clarification.
14              Okay?
15                   MS. MITCHELL:  Thank you.
16       Q.  Did you consider the Occupy
17  protestors to be unified?
18       A.  Not at.... As of this writing, no.
19       Q.  Did you consider them to be true
20  anarchists?
21       A.  No.
22       Q.  Now this was your opinion. Correct?
23       A.  This was my opinion of the movement
24  as a whole. Yes.
25       Q.  Okay.
```

```
                                    Page 200
 1              A. RAGANELLA
 2        A.  At that time.
 3        Q.  And you were communicating this to
 4   the 8 commanders of the Patrol Borough Task
 5   Force. Correct?
 6        A.  Correct.
 7        Q.  And do you believe that this was
 8   your opinion that you were giving them, and
 9   they were going to accept? Do you think
10   this was something they were going to
11   question? Something they were going to
12   share with the Task Force themselves? What
13   was your belief of why you were writing
14   this information in this email?
15        A.  It was just an FYI for their
16   information as to my observations and
17   opinions as to what we've experienced and
18   witnessed thus far in the movement.
19             Starting off with the issues about
20   equipment in the beginning.
21        Q.  Okay.
22             Did your opinions change at any
23   time?
24        A.  Yes.
25        Q.  And when was that?
```

1          A. RAGANELLA

2      A.   I don't know.

3      Q.   And what did your opinion change

4  to?

5      A.   As the movement went out,

6  subsequently, I did see some violent

7  tendencies. I did notice that there were

8  some anarchist tactics that were used. And

9  that they, at various points and different

10 demonstrations and protests, they did seem

11 to be more unified and organized than they

12 were previously.

13     Q.   Did you believe that they were a

14 violent organization or a non-violent

15 protest movement?

16     A.   So, you're asking me to speak about

17 the movement as a whole or individuals

18 within?

19     Q.   I'm asking for the movement as a

20 whole within New York City.

21     A.   The movement as a whole in New York

22 City, my opinion is that they were not

23 radically violent. No.

24                 (Document marked Exhibit

25              27 for identification as of

1          A.  RAGANELLA

2                this date by the reporter.)

3      Q.  I'm going to ask you to look at

4  what's marked as 27.

5            Do you recognize this document?

6      A.  Yes.

7      Q.  And what is this document?

8      A.  These are issues related to Occupy

9  Wall Street that, if I recall correctly,

10  they were notes that I had drafted to

11  myself as issues and points regarding the

12  movement.

13      Q.  Was this document disbursed or

14  distributed in any fashion?

15      A.  Not that I recall.

16      Q.  Was this document given to the Task

17  Force individuals in the email identified

18  as 26?

19      A.  Not that I'm aware of.  No.

20      Q.  Why did you create this document?

21      A.  I created this document for my own

22  personal knowledge to keep a record of what

23  I was witnessing within or during the

24  movement.

25      Q.  And when did you create this

1              A.  RAGANELLA

2    document?

3          A.   That I don't know.

4          Q.   Okay.

5               So, second from the bottom, it

6    says, "Drummers give warnings at 2130, then

7    he'd stop by 22. They don't stop entrance

8    into custody for evidence."

9               So, this a note to yourself,

10   correct?

11         A.   Yes.

12         Q.   So how is that information, which

13   seems like a very specific rule that you're

14   trying to institute, how is that

15   communicated to individuals on the scene

16   that will actually make that happen?

17         A.   That wouldn't be my call to make.

18   So, I don't recall where that came from.

19         Q.   So again, is something that you

20   thought up but never instituted? Or do you

21   think someone told you that and you were

22   just identifying it as something that's in

23   existence.

24         A.   I do not know. That doesn't look

25   familiar to me. Even though I'm reading it

1              A. RAGANELLA
2    and I know that I wrote it, I don't recall
3    where that came from.
4         Q.   Alright.
5              The second thing on the
6    recommendations: "Make a list of CUNY
7    residents who complain of noise and
8    nuisance abatement issues."
9         A.   Wait, I'm sorry, where are we?
10        Q.   Second under recommendations.
11        A.   Okay.
12        Q.   Is that a recommendation that you
13   made?
14        A.   Not that I recall.
15        Q.   So, you don't think that's your
16   writing?
17        A.   Well, that could very well be my
18   writing that I made a note to myself. I
19   don't know that that was a recommendation
20   that was made outside my head though.
21        Q.   Okay. Why do you believe that it
22   was a good idea to make a list of community
23   residents who complained of noise and
24   nuisance abatement issues?
25        A.   I don't recall what I was thinking

Page 205

```
 1              A. RAGANELLA
 2    at the moment that I wrote this.
 3         Q.   What does PPE stand for?
 4         A.   Personal Protective Equipment.
 5         Q.   And what does that consist of?
 6         A.   Personal Protective Equipment would
 7    be, during this time, the Disorder Control
 8    helmet, gloves, millennium mask, anything
 9    that could be used to protect the officer.
10         Q.   Now on the same document, you are
11    stating that they are not a violent towards
12    the police. Correct?
13              Not the same document. Under
14    protestor. Second one down.
15              Can you read that out loud?
16         A.   "Not very unified." Is that what
17    you're talking about? The second?
18              "Not very unified or organized. Nor
19    are they particularly violent towards us."
20         Q.   So that's your description of the
21    individual protestors. Correct? In this
22    document.
23         A.   I don't know that I was speaking of
24    any one particular protestor. This is the
25    movement as a whole. And again, I don't
```

```
 1              A. RAGANELLA
 2    know what the date was on this document.
 3         Q.  But on the same date that you're
 4    identifying them as not particularly
 5    violent towards the police, you're also
 6    stating that all this Personal Protective
 7    Equipment should be carried at all times.
 8    Correct?
 9         A.  Correct.
10         Q.  So that, the reason of that, is
11    towards the goals that we looked at
12    earlier, which is intimidation of large
13    groups. Correct?
14         A.  No.
15                   MS. MITCHELL:  Objection.
16                   You may answer.
17         Q.  No. It's the psychological response
18    that a large group of police have on a
19    group of people.
20                   MS. MITCHELL:  Objection.
21                   You can answer.
22         A.  The purpose for PPE is to make sure
23    that my officers get home safely at the end
24    of the night without injury.
25         Q.  Okay. Do they carry them 24/7 when
```

```
 1              A.  RAGANELLA
 2   they're working? When they're on tour?
 3       A.   The Patrol Borough Task Force
 4   members?
 5       Q.   Yes.
 6       A.   They are required to, yes.
 7       Q.   So, wherever they are, whatever
 8   they're doing, they're with their PPE on
 9   their bodies at all times.
10       A.   They should be. Yes.
11            What do you mean on their bodies?
12            No. Withdrawn.
13            No, not on their bodies. They're
14   not on patrol with their helmet on. No.
15       Q.   During their Occupy, were they on
16   patrol with their helmets on?
17       A.   At times during protests and
18   demonstrations, they donned their helmets,
19   yes.
20       Q.   During times. So, this is not
21   indicating that they should be walking
22   around with their equipment on. Correct?
23            It's not indicating that.
24       A.   It's indicating that it should be
25   readily available to them if the need
```

```
 1              A. RAGANELLA

 2   arises.

 3        Q.  Okay. Looking back at this email, I

 4   think it's 25, in here I think you raise

 5   concerns about the misuse of the Task Force

 6   operationally and tactically. Is that

 7   correct?

 8        A.  What are we looking at? You pointed

 9   to a specific spot.

10             I'm not seeing that.

11        Q.  Look at the second to the last

12   paragraph that starts with "As I'm sure."

13             That sentence, can you read that

14   first sentence all the way through to

15   "tactically"?

16        A.  Yeah.

17             "As I'm sure some of you have, I

18   have observed many misuses of the Task

19   Forces at OWS demo, both operationally and

20   tactically."

21        Q.  Okay, so how did you observe them

22   misusing the Task Force operationally?

23        A.  We trained the Patrol Borough Task

24   Forces, meaning the Disorder Control Unit,

25   the theory behind using the Patrol Borough
```

Page 209

```
 1            A. RAGANELLA
 2  Task Forces was to use them operationally
 3  and tactically to be available for
 4  arresting protestors and demonstrators who
 5  were engaged in unlawful behavior when an
 6  incident Commander made the authorization
 7  to make arrests.
 8            I witnessed prior or up to the
 9  writing of this email that some of, at
10  times some of the Patrol Borough Task
11  Forces were being used in a way that wasn't
12  consistent with what I believed they should
13  be used as, meaning that they were put out
14  on foot to escort or walk with
15  demonstrators and protestors.
16       Q.  Okay. Is that the only way that you
17  saw the misuse of them operationally?
18       A.  Yes.
19       Q.  Okay. What did you mean by the
20  misuse of them tactically?
21       A.  Well, I kind of used operationally
22  and tactically synonymously there. But
23  operation and the tactic of how they were
24  used pretty much covers the same idea as
25  what I just conveyed.
```

1          A. RAGANELLA
2      Q.  So, you observed the Task Forces
3  when they were policing Occupy Wall Street.
4      A.  Did I? I'm not clear on what you're
5  asking.
6      Q.  You're identifying here that you
7  saw them misuse the Task Force
8  operationally and tactically. Correct?
9      A.  At times.
10     Q.  Therefore, you had to observe that.
11 Correct?
12     A.  At times. Yes, I did observe.
13     Q.  So, there were times when you were
14 observing the policing of Occupy Wall
15 Street by the Task Force. Correct?
16     A.  At times. Yes.
17     Q.  Did you ever write an email or
18 identify any times that the Task Force
19 operated improperly as related to sidewalk
20 protests?
21                 MS. MITCHELL:
22                 Objection.
23                     You can answer.
24     A.  Not that I recall.
25     Q.  Did you ever write an email or

```
 1              A. RAGANELLA
 2   bring to anyone's attention any time you
 3   may have seen a Task Force operating
 4   outside of the training as given at
 5   Disorder Control?
 6                    MS. MITCHELL:  Objection.
 7                    You can answer.
 8        A.  Not that I recall.
 9        Q.  But that is what this letter does.
10   This email identifies a time when there's
11   operationally, tactically that's outside
12   the training that you give. Correct?
13        A.  So, was your question asking
14   outside of this email or including?
15        Q.  Yes, it was asking outside of this
16   email.
17             In fact, you did it when you saw
18   it. Operationally and tactically you saw a
19   problem, you wrote an email, you brought it
20   to people's attention. Correct?
21        A.  Not always. No.
22        Q.  In this instance, you did. Correct?
23        A.  Correct.
24        Q.  And this instance was October 7,
25   2011. Correct?
```

```
                                              Page 212
 1                   A. RAGANELLA
 2         A.   Correct.
 3         Q.   Almost in the middle of the
 4    occupations at Zuccotti Park. Correct?
 5         A.   Correct.
 6         Q.   But you didn't write any similar
 7    email when you observed policing of
 8    sidewalk protests. Correct?
 9                        MS. MITCHELL:  Objection.
10                        You can answer.
11         A.   Not that I recall.
12         Q.   And if you had written one, you
13    would have been searching for it in
14    response to discovery that we requested
15    like you searched and found this email.
16    Correct?
17         A.   Correct.
18         Q.   So, if you didn't produce it, it
19    means it doesn't exist. Correct?
20         A.   I.... I don't know.
21         Q.   So, it could exist. You may not
22    have produced it. You may have a decision
23    not to give it to your lawyer?
24         A.   That's what I'm saying.
25         Q.   Okay, so what are you saying?
```

```
 1                A. RAGANELLA
 2        A.  If something got deleted or if
 3   something didn't show up, I don't have
 4   control over the technology of emails. But
 5   if it was there and I saw it, we would be
 6   looking at it.
 7        Q.  Right.
 8            So other than a failure of
 9   technology or somebody fraudulently
10   deleting an email, if you had created such
11   an email, such a notice of sidewalk
12   protests issued outside of Disorder Control
13   training, it would be here. Correct?
14        A.  Correct.
15        Q.  And since it's not here, it's more
16   likely than not that it just doesn't exist.
17   Correct?
18        A.  Want my opinion on that?
19        Q.  Yes.
20        A.  I agree.
21        Q.  What training was developed on not
22   losing patience with non-violent sidewalk
23   protestors?
24        A.  That's incorporated as a staple to
25   all the training that we do. We instruct
```

Page 214

1          A. RAGANELLA

2     the officers to remain unbiased and to not

3     get baited by some of the protestor tactics

4     of what I call "in-your-face" passive

5     resistance.

6          Q.  Right. And was that something that

7     was developed in response to Occupy Wall

8     Street or something that existed

9     previously.

10         A.  It existed long before Occupy Wall

11    Street.

12         Q.  And is it the same type of training

13    that you wanted.... Withdrawn.

14             Is the same type of training that

15    would be related to keeping a check on your

16    emotions and dealing with non-violent

17    sidewalk protestors?

18         A.  Repeat that.

19         Q.  I believe I heard you talk about

20    losing patience with non-violent sidewalk

21    protestors, checking your emotions, and

22    remaining in control and professional.

23    Correct?

24         A.  Correct.

25         Q.  So, I'm asking you if it's the same

1              A. RAGANELLA

2    training that you just described for not

3    losing patience, is that the same, would

4    that be the same answer about keeping a

5    check on your emotions?

6         A.  I'm not clear on what you're asking

7    between patience and emotions.

8         Q.  No problem.

9              What training was developed on

10   helping officers deal with keeping a check

11   on their emotions when dealing with non-

12   violent sidewalk protestors?

13        A.  We have a lesson plan on

14   demonstrator tactics that deals with that

15   particular issue.

16        Q.  And what is the training that you

17   give to people on that?

18        A.  What I related to before that

19   officers when they are policing First

20   Amendment protected assemblages to remain

21   unbiased, to allow, to make accommodations

22   for people to exercise their First

23   Amendment right, and if they are engaging

24   in tactics where they are attempting to

25   engage the police in baiting them somehow

Page 216

1              A. RAGANELLA

2    to remain patient and not get their

3    emotions personally involved in the

4    policing of the demonstrators.

5         Q.   What training was developed to

6    remain in control and professional in

7    dealing with non-violent sidewalk

8    protestors?

9         A.   Repeat that.

10        Q.   What training was developed on

11   remaining in control and professional when

12   dealing with non-violent sidewalk

13   protestors?

14        A.   That would be the same training.

15   That covers both.

16        Q.   Okay. Perfect.

17            That was all that I was asking you

18   for. We had to go circular to get it, but

19   we got there.

20        A.   Gotcha.

21        Q.   Throughout the year from September

22   2011 to August 2012, were there any

23   incidents on the street or anything while

24   delivering training that caused you to

25   update or modify any lesson plan regarding

```
 1              A. RAGANELLA
 2   Disorderly Conduct?
 3        A.   Not that I recall.
 4        Q.   Is there anything that you could do
 5   to refresh your recollection?
 6        A.   Not that I can think of.
 7        Q.   Throughout the year, were there any
 8   incidents on the street or anything while
 9   delivering training that caused you to
10   update or modify any lesson plan regarding
11   the balance of mere inconvenience of
12   pedestrians versus a full impedance of
13   pedestrians.
14                   MS. MITCHELL:  Objection.
15                   You can answer.
16        A.   Not that I'm aware of.
17        Q.   Throughout the year, were there any
18   incidents on the street or anything while
19   delivering training that caused you to
20   update or modify any lesson plan regarding
21   the "clear and present danger" rule?
22                   MS. MITCHELL:  Objection.
23                   You can answer.
24        A.   Not that I'm aware of.
25        Q.   Throughout the year, were there any
```

1               A. RAGANELLA

2     incidents on the street or anything while

3     delivering training that caused you to

4     update or modify any lesson plan on the

5     time, place, and manner rule?

6                         MS. MITCHELL:  Objection.

7                         You can answer.

8         A.   Not that I'm aware of.

9         Q.   Throughout the year, were there any

10    incidents on the street or anything while

11    delivering training that caused you to

12    update or modify any lesson plan on

13    providing alternative location for people

14    to protest when giving a dispersal letter?

15                        MS. MITCHELL:  Objection.

16                        You can answer.

17        A.   Not that I'm aware of.

18        Q.   Throughout the year, were there any

19    incidents on the street or anything while

20    delivering training that caused you to

21    update or modify any lesson plan concerning

22    a means of egress after being a dispersal

23    order?

24                        MS. MITCHELL:  Objection.

25                        You can answer.

```
1                   A.  RAGANELLA
2         A.   Not that I'm aware of.
3         Q.   Alright. I'm going to mark this as.
4    Wait, that's 27. 28.
5         A.   Do I still need these?
6         Q.   I'd like to look at D-153. 1, 2,
7    no, that's the wrong document.
8                         MS. MITCHELL:  Do you want
9                    this back?
10                        MR. STECKLOW:  Yes,
11                   thanks.
12                        (Document marked Exhibit
13                   28 for identification as of
14                   this date by the reporter.)
15        Q.   Alright. I'm showing you what's
16   been marked as, I think that's 28. It
17   starts at D-15339.
18             Please go to D-15342.
19        A.   (Witness perusing document.)
20        Q.   Do you recognize that document?
21        A.   Yes.
22        Q.   And what is that document?
23        A.   It appears to be an instructor's
24   guide or lesson plan from the Police
25   Academy in regard to demonstrations.
```

1          A.  RAGANELLA

2      Q.   I'm going to take this back for a

3  second and say that this has already been

4  marked by 5.

5                    MS. MITCHELL:  Yeah.

6                    MR. STECKLOW:  So, we're

7              going to take the 28 off and

8              use that for something else.

9          So, this is 5.

10                    I'm going to ask you to

11              look at 15342.

12      Q.   I'm going to ask you to look at

13  number 5. That clause there. Is that part

14  of the training given at Disorder Control?

15      A.   In regard to "clear and present

16  danger", we have that in our guidelines,

17  legal guidelines, for demonstrations. Yes.

18      Q.   Is this standard accurate?

19                    MS. MITCHELL:  Objection.

20              Calls for legal conclusion.

21                    You can answer.

22      A.   I'm not an attorney. I don't know.

23      Q.   You train and oversaw the training

24  of over 12,000 officers in this current

25  year that we're talking about plus many

Page 221

```
 1              A. RAGANELLA
 2   more. So, I'm asking you, Is the standard,
 3   i.e., blocking pedestrian traffic, the
 4   standard for taking away somebody's right
 5   to assemble?
 6                  MS. MITCHELL:  Objection.
 7                  You can answer.
 8       A.  It very well could be.
 9       Q.  Those three words by themselves,
10   that's sufficient?
11                  MS. MITCHELL:  Objection.
12       A.  Depending on the context of what's
13   happening.
14       Q.  So that's the training that could
15   be given, is simply "blocking pedestrian
16   traffic"?
17       A.  I didn't say that.
18       Q.  Okay.
19           So, you believe that this possibly
20   the correct standard.
21                  MS. MITCHELL:  Objection.
22                  You can answer.
23       A.  Again, given the circumstances
24   surrounding how and why pedestrian traffic
25   is being blocked, could absolutely present
```

```
                                        Page 222
 1              A. RAGANELLA
 2     a "clear and present danger."
 3          Q.  By the way it's written, is that
 4     sufficient to explain the standard?
 5                      MS. MITCHELL:  Objection.
 6                      You can answer.
 7          A.  Again, the way it's written, I
 8     could see how blocking pedestrian traffic
 9     creates a "clear and present danger." Yes.
10          Q.  Okay. Is infringement of
11     unobstructed pedestrian passage the correct
12     standard for a disorderly conduct arrest
13     during a peaceful sidewalk protest in a
14     First Amendment setting?
15                      MS. MITCHELL:  Objection.
16                      Calls for legal conclusion.
17                      You can answer.
18          A.  Repeat the question.
19          Q.  Is the infringement of unobstructed
20     pedestrian passage the correct standard for
21     disorderly conduct arrest during a peaceful
22     sidewalk protest in a First Amendment
23     setting?
24                      MS. MITCHELL:  Again.
25                      Objection.
```

1           A. RAGANELLA

2                   You can answer.

3      A.   I imagine it could be.

4      Q.   Is that what's trained at Disorder

5 Control?

6      A.   What's trained at Disorder Control

7 could conceivably take into consideration

8 that people engaged in protests and

9 demonstrations can block pedestrian traffic

10 on the sidewalks, yes. There is that

11 possibility.

12     Q.   Alright. Let me go back to what's

13 been previously marked as number 6.

14          I'm going to ask you to look at

15 page 15278.

16     A.   Yes.

17     Q.   The first sentence at the top of

18 that page. It states. Can you read what it

19 states? We're talking about that first

20 sentence.

21     A.   Sure. We're talking about under "A.

22 Public Streets"?

23     Q.   Yes.

24     A.   "A strong governmental interest

25 must be established before a demonstration

```
 1              A. RAGANELLA
 2   on public streets may be restricted."
 3        Q.  And then, what's the next sentence?
 4        A.  "Inconvenience to the public
 5   without more is not adequate reason, is not
 6   an adequate reason, to restrict a
 7   demonstration."
 8             Want me to keep reading or?
 9        Q.  Is that the correct standard for
10   the sidewalk protest?
11                    MS. MITCHELL:  Objection.
12                    You can answer.
13        A.  I don't know.
14        Q.  Do you know what "strong government
15   interest" means?
16                    MS. MITCHELL:  Objection.
17                    You can answer.
18        A.  In legal terms? No.
19        Q.  In the way that you train at
20   Disorder Control.
21        A.  Yes.
22        Q.  And what does that mean in the way
23   that you train at Disorder Control?
24        A.  It means to me that the strong
25   governmental interest would mean that the
```

```
 1              A. RAGANELLA
 2   reason why the police department is moving
 3   people or doing something in regard to
 4   demonstrations or protests outweighs, that
 5   ability to do that outweighs the right for
 6   them to protest or demonstrate.
 7        Q.  And is that how it's trained at
 8   Disorder Control?
 9        A.  Yes.
10        Q.  And how is it explained when
11   something outweighs the right to the
12   protest?
13        A.  We would most likely use examples
14   to the students that we're teaching to be
15   able to convey what an example of that
16   would be.
17        Q.  Okay.
18             And for a pedestrian... Withdrawn.
19             For a sidewalk protest to be
20   restricted, must it impact pedestrian
21   traffic?
22                    MS. MITCHELL:  Objection.
23                    You can answer.
24        A.  Repeat the question?
25        Q.  For a sidewalk protest to be
```

```
                                         Page 226
 1              A.  RAGANELLA
 2   restricted, must it impact pedestrian
 3   traffic?
 4        A.   No.
 5        Q.   What other reasons would there be
 6   for a peaceful sidewalk protest to be
 7   restricted?
 8        A.   Public safety issue.
 9        Q.   Okay. And what would the public
10   safety issue have to be for a peaceful
11   sidewalk protest to be restricted?
12        A.   I could give you an example.
13        Q.   Please.
14        A.   If I have a group of people that
15   are legally protesting and demonstrating on
16   the sidewalk and if I was the Incident
17   Commander that was there and one of my
18   Officers or a member of the public not
19   involved in the demonstration or protest
20   came to me and said, 'Excuse me, but
21   there's a suspicious package/knapsack
22   that's on the sidewalk there. I think there
23   might be a bomb in there. There's wires
24   hanging out of it.' For public safety
25   reasons, I have the right to restrict that
```

```
                                              Page 227
 1              A. RAGANELLA
 2   demonstration or protest and move them to a
 3   different location.
 4                     MR. STECKLOW:  Okay. Let's
 5               watch the McCallan video.
 6                     MR. STARKEY:  Okay.
 7       Q.  Okay. Now I'm going to show you
 8   another video that's part of Exhibit 1,
 9   Plaintiff's Exhibit 1. We're going to start
10   it at, right around 45 seconds. I ask you
11   to watch this with me.
12       A.  Okay.
13                     (Whereupon, the witness
14               was shown a video.)
15                     (Back on the record.)
16       Q.  40 seconds of video. Have you see
17   that video before?
18       A.  I don't recall seeing that.
19       Q.  Okay. You saw the arrest that
20   occurred there of the individual in what
21   looks to be like a purple t-shirt? He was
22   at the front of a march, correct?
23       A.  It appears that way.
24       Q.  The march was on a street and then
25   was coming through a scaffolding area,
```

A Veritext Company
800-642-1099                                    www.veritext.com

```
 1              A. RAGANELLA
 2   correct?
 3        A.  Correct.
 4        Q.  The sidewalk was more narrow in the
 5   scaffolding area, correct?
 6        A.  Sure.
 7        Q.  Was this crowd riotous?
 8        A.  It didn't appear to be.
 9        Q.  Were they peaceful?
10        A.  It appeared to be.
11   Q.  They were joyous, no? Dancing even?
12                   MS. MITCHELL:  Objection.
13        A.  I can't tap into their emotions
14   but --
15        Q.  Were they dancing?
16        A.  I didn't see anybody dancing.
17        Q.  Let's go back. Does it look like
18   some people are dancing?
19        A.  Those are pretty bad dance moves,
20   but yeah. I didn't see that as a dance move
21   I guess.
22        Q.  All right. Do you see pedestrians
23   in here who are trying to go against the
24   march and can't got against the march, who
25   are having a difficult time on the
```

1             A. RAGANELLA

2    sidewalk?

3                    MS. MITCHELL:  Objection.

4                    You can answer.

5        A.  I did see an individual step out

6    into the roadway and come back around the

7    sidewalk.

8        Q.  Was that [crosstalk] --

9        A.  Traveling in the same direction.

10       Q.  Somebody with a camera who was

11   photographing?

12       A.  Correct.

13       Q.  You see the police are in the

14   middle of the street, as well as, you know,

15   close to the curb, but in the street?

16       A.  Yes.

17       Q.  Do you believe that the arrest of

18   the individual in the purple shirt is

19   consistent with the training received at

20   Disorder Control?

21                    MS. MITCHELL:  Objection.

22                    You can answer.

23       A.  I don't know what he was arrested

24   for.

25       Q.  If he was arrested for disorderly

```
                                          Page 230
 1              A. RAGANELLA
 2   conduct or blocking pedestrian traffic,
 3   would that be consistent with the training
 4   received at Disorder Control?
 5                    MS. MITCHELL:  Objection.
 6                    You can answer.
 7       A.  Based solely on the few seconds of
 8   the video that I saw I would say not from
 9   what I saw, no.
10       Q.  Okay. I'm going to show you another
11   video and then ask a similar question.
12       A.  Can you just tilt it? Yeah, that's
13   perfect.
14       Q.  Can you see the video?
15       A.  Yes, sir.
16                    (Whereupon, the witness
17               was shown a video.)
18                    (Back on the record.)
19       Q.  I'm interested in the first person
20   that's arrested, did you see him?
21       A.  Difficult to see.
22       Q.  Were you able to see anything that
23   individual had done that would warrant his
24   arrest there?
25                    MS. MITCHELL:  Objection.
```

1       A. RAGANELLA

2                   You can answer.

3       A.  First time I see that individual he

4   appears to be in handcuffs.

5       Q.  Did it seem that a line of officers

6   was led onto the sidewalk to what I would

7   say deep into the sidewalk, just meaning

8   away from the curb line towards the

9   building, and that's where they identified

10  and picked up that individual and arrested

11  him?

12                  MS. MITCHELL:  Objection.

13                  You can answer.

14      A.  We're talking about that first

15  individual?

16      Q.  Yeah. Pause for a second. These

17  individuals here that are lining up, are

18  they members of the task force?

19      A.  They appear to be.

20      Q.  Do you know who this individual is

21  in the white shirt who seems to be

22  supervising them?

23      A.  I do not, but he wouldn't be the

24  supervisor of the task force --

25                  (Whereupon, the witness

```
                                        Page 232

 1              A. RAGANELLA

 2                  was shown a video.)

 3                      (Back on the record.)

 4        Q.   I've stopped it at 1:43. At this

 5   point, does it seem that there's a line of

 6   blue shirt officers heading off the street,

 7   off the curb line, into the sidewalk?

 8        A.   Yes.

 9        Q.   Not the edge of the sidewalk, but

10   towards the building line of the sidewalk,

11   correct?

12        A.   Correct.

13        Q.   We can't tell any reason why they

14   would be doing that from the video we're

15   watching, correct?

16        A.   I would have no way of knowing

17   that.

18        Q.   It's showing a lot of different

19   people in different areas and they seem to

20   have gone away from the people who are on

21   the street and onto the sidewalk, correct?

22        A.   Those particular officers, yes.

23        Q.   They now, against the building

24   line, have detained one individual,

25   correct?
```

1           A.  RAGANELLA
2                 MS. MITCHELL:  Objection.
3                     You can answer.
4      A.  It doesn't seem like it's against
5   the building though, it seems like it's
6   against the entrance to a location, a
7   financial location it looks like, the
8   doorway entrance.
9      Q.  Okay, so did you see any reason ...
10  I understand it's hard to see here and I'll
11  show you another video, I'm asking you in
12  this video, were you able to see any reason
13  why this individual was picked out of that
14  entire crowd for arrest?
15                MS. MITCHELL:  Objection.
16                    You can answer.
17     A.  Yes.
18     Q.  What was that?
19     A.  It appeared to me, from the
20  location where I first observed him, that
21  he was standing in front of the entrance to
22  a location.
23     Q.  You think he may have been blocking
24  the doorway and that would give cause for
25  his arrest?

Page 234

1                    A. RAGANELLA

2        A.   It's possible.

3        Q.   Let's watch the other video. Okay.

4   Can you see the video?

5        A.   Yeah.

6        Q.   Okay. This white shirt officer

7   here?

8        A.   Yes.

9        Q.   Who is that?

10       A.   Chief Hall [phonetic].

11       Q.   Okay. Was Chief Hall the one who

12  led into that crowd and grabbed that

13  individual?

14       A.   I don't know, I can't tell.

15       Q.   Is this Chief Hall?

16       A.   No.

17       Q.   Who is that?

18       A.   That's Captain Gromner [phonetic],

19  who was the commanding officer for Brooklyn

20  North Task Force.

21       Q.   Okay, so he was the first one to

22  put hands on this individual, correct?

23       A.   From that ... I don't know what

24  happened prior to this, but from what I'm

25  seeing here, he's the first one.

1             A. RAGANELLA

2        Q.   Is he the only officer with his

3   hands on this individual?

4        A.   At this point, yes.

5        Q.   Okay. Are there other officers

6   within the screen at this point? Or is he

7   the only officer in the screen?

8        A.   He's the only officer I see in the

9   screen at this point.

10        Q.   Okay. Other than your statement

11   earlier that perhaps he was arrested for

12   blocking the doorway, is there any other

13   reason you can come up with or you can

14   identify that would establish a probable

15   cause for this man's arrest?

16        A.   Sure.

17        Q.   What is that?

18                    MS. MITCHELL:   Objection.

19                    You can answer.

20        A.   He may have committed a homicide,

21   he may have threw a bottle, I don't know

22   what he did.

23        Q.   Okay. From what you can see in the

24   video is there any reason, other than the

25   doorway that you've identified, for him to

                                        Page 236

1              A. RAGANELLA

2    have been arrested?

3         A.  I can't see much in the video, so

4    no.

5         Q.  Did you hear any warnings for

6    people to move away from the door, prior to

7    his arrest?

8                   MS. MITCHELL:  Objection.

9                      You can answer.

10        A.  As the person, whoever's video this

11   is, walks up ... I don't know what happened

12   prior to that, but from the moment that

13   that video camera comes up to that

14   individual, I did not hear any warnings.

15        Q.  We watched another video before

16   this that was... video that showed the

17   arrest from a different angle, correct?

18        A.  Correct.

19        Q.  In that video did you hear any

20   warnings about blocking the doorway prior

21   to the arrest?

22        A.  I did not hear that, no.

23        Q.  That video showed a bit longer of

24   the moments before the arrest, correct?

25                   MS. MITCHELL:  Objection.

```
                                    Page 237
 1              A. RAGANELLA
 2                  You can answer.
 3      A.  From farther away and a different
 4  angle, yes.
 5      Q.  Would it be consistent with
 6  Disorder Control training to arrest
 7  somebody in front of a doorway without
 8  giving them a warning?
 9      A.  That could potentially happen, yes.
10      Q.  When would that happen?
11      A.  When there's an offense that's
12  committed in front of an officer and he has
13  probable cause to make an arrest, there's
14  no requirement that he has to be given a
15  warning first.
16      Q.  If someone's standing in front of a
17  doorway, would somebody have to be blocked
18  from entering or exiting before that could
19  occur, before an arrest could happen with
20  probable cause?
21      A.  That would most likely taken into
22  consideration to establish probable cause,
23  sure.
24      Q.  Can they establish probable cause
25  for blocking a doorway if nobody is trying
```

1                  A.  RAGANELLA

2    to enter or exit that doorway?

3        A.   If they're being charged with

4    disorderly conduct, and again, I'm not an

5    attorney, but I think the way the statute

6    reads is that you have to intentionally or

7    recklessly create a risk thereof. By

8    standing in front of a doorway, even though

9    somebody wasn't in actuality blocked, they

10   created a risk thereof. That may establish

11   probable cause.

12       Q.   Okay. Outside of that, we've

13   already ... Withdrawn. If this individual

14   is arrested for blocking pedestrian

15   traffic, do you see a reason why he was

16   chosen for that arrest as opposed to

17   anybody else on the sidewalk?

18                      MS. MITCHELL:  Objection.

19                      You can answer.

20       A.   Well, there were multiple people

21   there from what I gathered from what I saw,

22   and the way that we train when we make

23   arrests in situations such as this, we

24   handle one arrest at a time. We're not

25   arresting multiple people all at the same

Page 239

```
 1              A. RAGANELLA
 2   time when they're fluid in motion, if that
 3   helps you.
 4        Q.  That does not.
 5        A.  Okay. I'm sorry.
 6        Q.  I'm asking if you can identify a
 7   blocking pedestrian traffic charge here, a
 8   probable cause for that arrest in this
 9   instance.
10                MS. MITCHELL:  Objection.
11                    You can answer.
12        A.  For me to establish probable cause,
13   me personally as an officer to establish
14   probable cause, I have to be able to take
15   into consideration facts and circumstances
16   that are known to me. I don't have that
17   from the clip of the video that you're
18   showing me. I don't know what happened
19   prior to that. I don't know if he was given
20   a warning. I don't know if there were
21   multiple people trying to get out of that
22   doorway, and when they saw the police
23   coming they turned around and went the
24   other way and now we don't see them in that
25   video clip ... I can't tell you that I have
```

Page 240

1            A. RAGANELLA
2    probable cause.
3        Q.  I'm asking about blocking
4    pedestrian traffic [crosstalk]...the
5    doorway, that was the question.
6        A.  Okay, okay.
7        Q.  I'm asking if in either of these
8    videos you can see probable cause to arrest
9    this individual for blocking pedestrian
10   traffic?
11                  MS. MITCHELL:  Objection.
12                  You can answer.
13       A.  That's possible.
14       Q.  How is it possible?
15       A.  Because it appeared to me that
16   there were multiple people on the sidewalk
17   and it didn't look to me as if uninvolved
18   passersby would be able to walk down that
19   sidewalk without stepping out into the
20   street and around the group that was on the
21   sidewalk.
22       Q.  The reason to arrest this
23   individual, who's deep into the sidewalk
24   towards the building, for that, would be to
25   intimidate and put fear into the rest of

```
 1              A. RAGANELLA
 2   the protestors, correct?
 3                  MS. MITCHELL:  Objection.
 4                  You can answer.
 5       A.  Those are your words, not mine. I
 6   don't know what was in the officer's mind
 7   that made the arrest or the supervisor who
 8   may or may not have directed that.
 9       Q.  You trained in at least two
10   separate locations in Disorder Control
11   about the psychological impact of having a
12   large group of officers show up, about
13   wearing the military type of uniform and
14   equipment, so isn't it true that the
15   psychological impact is what we're seeing
16   here? That someone's being arrested deep on
17   the sidewalk because it impacts the rest of
18   the protestors.
19                  MS. MITCHELL:  Objection.
20                  You can answer.
21       A.  No.
22       Q.  That's not possible that that's
23   what's going on here?
24       A.  That's not, no, I'm not ... What
25   I'm saying is that's not what we train for.
```

Page 242

```
 1              A. RAGANELLA
 2        Q.   You do train about the
 3   psychological impact of the police force
 4   around groups, correct?
 5        A.   Riotous and civil disturbance, yes.
 6   Not lawful demonstrations and protests.
 7        Q.   Was this riotous, this instance?
 8        A.   As far as I'm concerned, no.
 9        Q.   Therefore, the police shouldn't be
10   treating it as such, correct?
11        A.   The police what?
12        Q.   Should not be treating it as a
13   riotous situation, correct?
14                    MS. MITCHELL:  Objection.
15                    You can answer.
16        A.   Correct.
17        Q.   These people are involved in
18   expressive speech activity protected by the
19   First Amendment, correct?
20                    MS. MITCHELL:  Objection.
21        A.   Up to the point that they commit
22   and offense, yes.
23        Q.   The offense of being on the
24   sidewalk is sufficient for them to be
25   arrested in this instance?
```

Page 243

1              A.  RAGANELLA

2                   MS. MITCHELL:  Objection.

3                        You can answer.

4         A.  If I had all the facts and

5    circumstances, what's happened prior to the

6    arrest, it's very well possible.

7         Q.  Marking that as 28. I'm going to

8    ask you to look at this and tell me if

9    you've seen it before. This is a document

10   that's previously been Bates stamped

11   D19452. Do you recognize this document?

12        A.  Just give me one minute to review.

13   Yes.

14        Q.  Okay. What is this document?

15        A.  This is an email communication

16   between myself and a lieutenant who worked

17   in the chief of the department's office.

18        Q.  What is it about?

19        A.  It's in regard to the ratio of

20   police officers to arrestees.

21        Q.  This concerns arresting officers or

22   processing officers, what does it concern?

23        A.  Both.

24        Q.  Why don't you explain the

25   distinction?

1                A. RAGANELLA

2          A.   When we train the task forces on

3     massive arrest techniques, meaning we have

4     protestors who want to be arrested during

5     civil disobedience, we trained at that time

6     that in a slow-paced incident where there

7     wasn't a rush, or a public safety issue and

8     the protestors may have been passively

9     resisting or just passive, we would assign

10    one officer to take up to five arrests so

11    that we could maximize our resources and

12    not lose one officer for every single

13    person arrested is what we train for. In

14    this particular email it seems that there

15    was an issue of multiple officers taking

16    single arrests and that's what was being

17    conveyed to me.

18         Q.   What was the department response to

19    this email?

20         A.   Well, my response was that I would

21    remind the patrol borough task force COs

22    that during a mass arrest situation to

23    remind them about the standard or the

24    guideline that we have, the recommendation

25    of one AO, meaning arresting officer, for

```
 1            A. RAGANELLA
 2  every five arrestees.
 3       Q.  That would be the same arresting
 4  officer identified in all of the arrest
 5  paperwork, correct?
 6       A.  I'm not clear on what you're
 7  asking.
 8       Q.  You're saying that it is the
 9  training that for every arresting officer,
10  they should have at least five arrestees,
11  correct?
12       A.  Not at least. A maximum of five.
13       Q.  Okay, but when they have less, here
14  it talks about possibly having just two,
15  that was a problem, a sufficient enough
16  problem, to cause emails back and forth
17  between you and the chief of the
18  department's office, correct?
19       A.  Correct.
20       Q.  The idea is to maximize and hit
21  five, correct?
22       A.  I'm sorry?
23       Q.  To maximize and make sure that
24  every arresting officer has five arrestees.
25       A.  If it's a mass arrest situation,
```

Page 246

1           A. RAGANELLA

2    yes.

3          Q.   That arresting officer will be

4    listed as the arresting officer for all

5    five of those arrestees' paperwork.

6          A.   Correct.

7          Q.   Even though they are likely not the

8    person who physically arrested that

9    individual, correct?

10         A.   Well --

11         Q.   The arresting officer is not

12   necessarily the person who physically takes

13   a person and puts the cuffs on, correct?

14         A.   That's possible. If the arrest is

15   assigned to somebody. In other words, an

16   officer could observe the offense and

17   establish the probable cause and another

18   officer could be assigned the arrest, the

19   processing.

20         Q.   That's the way that you train,

21   correct?

22         A.   That's a possibility. It doesn't

23   necessarily have to go that way.

24         Q.   If the arresting officer does not

25   observe the arrest, that's a problem,

```
 1             A.  RAGANELLA
 2    correct?
 3                    MS. MITCHELL:  Objection.
 4                    You can answer.
 5        A.  If somebody is arrested without
 6    probable cause, that's an issue.
 7        Q.  I'm not saying that. I'm saying if
 8    the arresting officer, the person who was
 9    assigned the arrest, does not actually
10    observe the arrest, that's a problem, isn't
11    it?
12        A.  No, it's not.
13        Q.  Why is that not a problem?
14        A.  Because if an officer is assigned
15    an arrest, he can establish probable cause
16    through another officer that relays the
17    information to him.
18        Q.  Now the arresting officer in that
19    situation has no firsthand knowledge of the
20    actual conduct that caused the arrest,
21    correct?
22        A.  The arresting officer or the
23    assigned officer?
24        Q.  The assigned officer is now the
25    arresting officer, correct?
```

```
 1              A. RAGANELLA
 2       A.   No. We make the distinction between
 3   an arresting officer and an assigned
 4   officer and it stays that way throughout
 5   the process.
 6       Q.   In the police paperwork it'll list
 7   both?
 8       A.   It should.
 9       Q.   Okay. Have you ever reviewed police
10   paperwork to see if it does list both?
11       A.   On occasion, yes.
12       Q.   Okay. Would it be inconsistent with
13   the training if it doesn't list both?
14       A.   Yes.
15       Q.   That would be a problem because
16   then you don't know who has firsthand
17   knowledge of the actual arrest, correct?
18       A.   Correct.
19       Q.   In mass arrest situations it
20   becomes more difficult to keep that
21   straight, correct?
22       A.   Yes.
23       Q.   You provide training in order to
24   help the police keep that straight because
25   it's important, correct?
```

```
 1              A.  RAGANELLA
 2         A.  Yes, sir.
 3         Q.  In response to this email, was
 4    training modified in any fashion?
 5         A.  Training lesson plans were not
 6    modified in any way other than myself
 7    putting the word out to the patrol borough
 8    task force COs regarding the issue.
 9    However, in this particular email I don't
10    know that the concern from the chief of
11    department's office concerned a mass arrest
12    situation or a situation such as the video
13    that we just watched, which is not
14    considered a mass arrest situation. Because
15    in that particular instance, such as what
16    we saw on the video, I have no issue with
17    one officer taking one arrest.
18         Q.  In which instance are we talking
19    about?
20         A.  The last video that we watched on
21    the sidewalk.
22                   MR. STECKLOW:  All right.
23                   I'm going to take a five-minute
24                   break.
25                   The time is now 4:26 and
```

Page 250

1                A. RAGANELLA

2   we're taking a five-minute break.

3                      (Whereupon, a short recess

4                 was taken.)

5                      (Back on the record.)

6                      MR. STECKLOW:  The time is

7                 now, 4:34 and we're back on the

8                 record. I am going to mark the

9                 next document ...

10                     MS. MITCHELL:  I think

11                29.

12                     MR. STECKLOW:  29.

13                     (Document marked Exhibit

14                29 for identification as of

15                this date by the reporter.)

16                     MS. MITCHELL:  28 was the

17                email.

18                     MR. STECKLOW:  Okay. 29.

19                     There we go. Thank you.

20        A.   (Witness perusing document.)

21        Q.   Okay. Do you recognize this

22   document?

23        A.   Yes.

24        Q.   It has your name on it, does it

25   not?

```
 1              A. RAGANELLA
 2       A.   It does.
 3       Q.   In the very beginning of this
 4  document, in number one, can you read that
 5  out loud?
 6       A.   I'm sorry? Say --
 7       Q.   Can you read number one?
 8       A.   Paragraph one?
 9       Q.   The first sentence out loud.
10       A.   "Consistent with OG 101-04, the
11  Disorder Control Unit is tasked with
12  conducting tactical reviews and assessing
13  department strategies at major events."
14       Q.   Okay, so is that accurate?
15       A.   According to the Organizational
16  Guide 101-04, yes.
17       Q.   That is one of the responsibilities
18  of Disorder Control, correct?
19       A.   Correct.
20       Q.   "Tactical reviews and assessing
21  strategies at major events", does that
22  include how police ... Withdrawn.
23            Does that include reviewing police
24  conduct at sidewalk protests?
25       A.   It could.
```

1          A. RAGANELLA
2      Q.   Does that include reviewing how the
3  police acted at sidewalk protests and
4  whether or not their conduct was
5  constitutionally compliant?
6      A.   I guess, potentially, we could be
7  asked our recommendations on it or if it
8  could be something if it was some type of a
9  misconduct incident to be investigated by
10  internal affairs, there's different
11  situations.
12      Q.   Okay. That document that you're
13  reviewing, it was critical of the police
14  response on 11-15-11, correct?
15               MS. MITCHELL:  Objection.
16                    You can answer.
17      A.   Repeat the question?
18      Q.   The document you're reviewing...
19      A.   Yeah.
20      Q.   ... found imperfections with the
21  police conduct on November 15th, 2011
22  during the eviction of Occupy Wall Street
23  from Zuccotti Park.
24               MS. MITCHELL:  Objection.
25                    You can answer.

```
 1              A. RAGANELLA
 2        A.  Can I have a moment to review this?
 3        Q.  You can. I think while you're doing
 4   that I'm going search for another video
 5   that occurred during the police response to
 6   Zuccotti Park on November 15th, 2011?
 7                  MS. MITCHELL:  Objection.
 8                  You can answer.
 9        A.  It makes recommendations on how to
10   do things better, yes.
11        Q.  Because that was part of what you
12   were tasked with as head of Disorder
13   Control, correct?
14        A.  That's correct.
15        Q.  That comes out of OG 101-04?
16        A.  Correct.
17        Q.  Based on this document, were any
18   changes or adjustments or revisions given
19   to members of the service in the field?
20        A.  This was a review and
21   recommendation that was sent up my chain of
22   command to the commanding officer of the
23   special operations division. I do not know
24   what he did with it after that.
25        Q.  Did you make any changes to your
```

1                A. RAGANELLA

2    training at Disorder Control as a result of

3    the facts described within this document?

4         A.   No.

5         Q.   Did you submit any other critical

6    reviews of police conduct during Occupy

7    Wall Street?

8                    MS. MITCHELL:   Objection.

9                    You can answer.

10        A.   Other than what we discussed?

11        Q.   Yes.

12        A.   Not that I'm aware of.

13        Q.   Okay. Did you receive any

14   directives from supervisors to modify or

15   change the Disorder Control training

16   program in response to Occupy Wall Street

17   events?

18        A.   Not that I recall, no.

19        Q.   Did you direct any members of

20   Disorder Control to look for deficiencies

21   in training while they were being

22   conducted?

23        A.   Always.

24        Q.   Did this relate specifically to

25   First Amendment training?

Page 255

1            A. RAGANELLA

2                    MS. MITCHELL:  Objection.

3                        You can answer.

4      A.  I don't understand the question.

5      Q.  I asked if you had any of your

6  members look for deficiencies in training,

7  you said always. I asked if it was in

8  relation to First Amendment training.

9      A.  All training.

10      Q.  Okay, so what specific deficiencies

11  were reported to you concerning First

12  Amendment training at Disorder Control?

13      A.  None that I recall.

14      Q.  Did you ever hear from anybody

15  about a deficiency in sidewalk protest

16  training at Disorder Control?

17                    MS. MITCHELL:  Objection.

18                        You can answer.

19      A.  Not that I recall.

20                    (Document marked Exhibit

21                30 for identification as of

22                this date by the reporter.)

23      Q.  I'm going to mark as 30, this

24  document. Previously Bates stamped as 5389.

25  I ask you to look at it and let me know

```
 1              A. RAGANELLA
 2   after you've had a chance to do so. Have
 3   you seen this document before?
 4        A.  Yes.
 5        Q.  It's an email that you had with
 6   somebody?
 7        A.  Correct.
 8        Q.  Is that a person who used to be on
 9   the job with you?
10        A.  Yes, sir. It was one of my
11   lieutenants who had retired.
12        Q.  All right. This is in regard to
13   feedback on Disorder Control training?
14        A.  No, it was regard to a checklist
15   that I had created for the department.
16        Q.  Was it a checklist that was
17   relevant to Occupy Wall Street protests?
18        A.  Relevant to all situations where
19   there's a critical incident.
20        Q.  What do you mean by "critical
21   incident"?
22        A.  Anytime where there's any type of
23   emergency incident, critical incident, mass
24   demonstration, there's a lot of things that
25   are under the umbrella of what this
```

```
 1              A. RAGANELLA
 2  checklist would cover.
 3       Q.  The checklist covered mass
 4  demonstration?
 5       A.  If it was determined to be a
 6  critical incident or some type of an
 7  emergency incident, yes.
 8       Q.  What would make a mass
 9  demonstration a critical incident?
10       A.  If it became a civil disturbance or
11  riotous.
12       Q.  A mass demonstration by itself
13  would not be relevant to the checklist?
14       A.  Probably not. I would have to
15  actually look at the checklist to refresh
16  my recollection on it.
17       Q.  Okay. Do you see about halfway down
18  in the email to you, this individual says
19  ... It starts with the word "stress", do
20  you see that?
21       A.  Yes.
22       Q.  Can you read that sentence?
23       A.  "Stress psychological impact of
24  officers marching to location rather than
25  coming in as loose group."
```

1              A. RAGANELLA

2         Q.   What do you think he meant by that?

3         A.   Exactly what we were discussing

4    prior about the psychological advantages of

5    us acting as a force multiplier when we

6    march in a military fashion during a civil

7    disturbance or a riot.

8         Q.   But you don't believe the police

9    should be doing that for demonstrations or

10   protests that are not riotous, correct?

11        A.   I do believe that they should be

12   doing that when we ... In other words, when

13   we ... The whole concept behind the patrol

14   borough task forces is that they're a team

15   and they act as a team, a disciplined team.

16   Which is the whole reason why the armed

17   services uses lines and formations, it's to

18   efficiently move a group of individuals or

19   officers from one location to another in a

20   professional and a disciplined manner. It

21   doesn't necessarily imply that they're

22   trying to be imposing or militaristic to

23   impose their will on somebody. It's a

24   matter of efficiency at that point.

25        Q.   But there is a psychological impact

Page 259

```
1              A. RAGANELLA
2    that comes with that, correct?
3                  MS. MITCHELL:  Objection.
4        A.  There certainly could be.
5        Q.  Previously we looked at a document
6    that previously marked as 13942, which was
7    the unusual incident report around the
8    January 1st incident, and we watched a
9    little video. Do you recall seeing that
10   document?
11       A.  Yes.
12       Q.  Okay. You had testified that you
13   hadn't seen that document before, correct?
14       A.  I don't recall if that's what I
15   said.
16       Q.  This isn't a trick...
17       A.  [crosstalk] if that's what I ... I
18   didn't think that you were trying to trick
19   me, I just really don't recall that.
20                  (Document marked Exhibit
21                  31 for identification as of
22                  this date by the reporter.)
23       Q.  Okay. I'm now going to show you
24   what's been marked as 31 --
25       A.  Thank you for not trying to trick
```

```
                                        Page 260

 1              A.  RAGANELLA
 2   me.
 3                      (Document marked Exhibit
 4              32 and 33 for identification as
 5              of this date by the reporter.)
 6        Q.  32 and 33.
 7        A.  (Witness perusing document.)
 8        Q.  These are three other unusual
 9   incident reports arising out of Occupy Wall
10   Street. I'd ask you to look at them and let
11   me know if you've ever seen them before.
12   I'll tell you that. 31 is related to 11-17-
13   11.
14        A.  This one wasn't marked. I don't
15   know if you marked the other ones or not.
16        Q.  30, 31 is 11-17-11, 32 is related
17   to 10-1-11, and 33 is related to 03-17-12.
18   I'd ask you to look at those and let me
19   know if you've ever seen any of these
20   before.
21        A.  (Witness perusing document.)
22        Q.  Let me see if I can get your
23   counsel a copy.
24                  MS. MITCHELL:  11-17 of
25              what year?
```

1          A.  RAGANELLA

2                  MR.  STECKLOW:   2011.

3                  MS.  MITCHELL:   Thank you.

4       A.   (Witness perusing document.)

5       Q.   Okay. Have you ever seen these

6    documents before?

7       A.   Not that I recall seeing them, no.

8       Q.   Okay, so even though OG 101-04

9    tasked Disorder Control with conducting

10   tactical reviews and assessing department

11   strategies at major events, when there was

12   an unusual incident report written about a

13   major event that occurred at Occupy Wall

14   Street, those were not shared with Disorder

15   Control. Is that correct?

16      A.   In these particular incidents, no.

17      Q.   As well as the incidents we went

18   over that, the January 1 incidents,

19   correct?

20      A.   Correct.

21      Q.   At least in these four, the unusual

22   incident reports were not shared with

23   Disorder Control.

24      A.   Correct.

25      Q.   Disorder Control could not do a

```
 1              A. RAGANELLA
 2  review or overview or oversight of the
 3  tactics and department strategies at these
 4  events, correct?
 5      A.   Correct.
 6      Q.   Are you familiar with the term
 7  "legal bureau bulletin"?
 8      A.   Yes.
 9      Q.   Okay. What is a legal bureau
10  bulletin?
11      A.   A legal bureau bulletin is a
12  document that is produced by our legal
13  bureau in the police department which
14  informs officers in the department as to
15  legal implications of their job performance
16  based on some type of a legal issue or a
17  court case.
18      Q.   Are these required readings for all
19  the members of the service? Are they
20  considered part of the training? What is
21  their role within the NYPD?
22      A.   They're available on the department
23  intranet for officers to read, and then
24  some of them are also incorporated into
25  what we discussed earlier with the command
```

1          A. RAGANELLA
2    level training, where the training
3    sergeants in the commands would actually
4    instruct officers at roll call about them.
5         Q.  How is that reviewed? how is that
6    known to actually occur?
7         A.  I'm not clear on what you're
8    asking.
9         Q.  how do you know that these legal
10   bureau bulletins are actually being read,
11   being trained upon?
12                   MS. MITCHELL:  Objection.
13                   You can answer, if you
14              know.
15        A.  Training sergeants in particular
16   commands or units, when they do require
17   training such as command level training
18   they will keep some type of a log or a
19   record of the officers that were trained
20   and what the topic was that they were
21   trained on.
22        Q.  That's at the command level.
23        A.  Correct.
24        Q.  I'm going to show you what's now
25   been marked as 34 and ask if you've ever

```
1              A. RAGANELLA
2   seen this item before.
3        A.  Yes.
4                   (Document marked Exhibit
5                   34 and 35 for identification as
6                   of this date by the reporter.)
7        Q.  I believe during your prior
8   deposition in the case matter you were
9   shown this document as well as what's been
10  marked as 35 and you testified that in fact
11  between 1971, which is document 34, and
12  2017, which is 35, there was no additional
13  legal bureau bulletin updating disorderly
14  conduct standards. Is that correct?
15       A.  I believe that's what I testified
16  to.
17       Q.  Do you still believe that to be
18  true?
19       A.  To the best of my knowledge, yes.
20       Q.  Do you know if the standards for
21  disorderly conduct changed at all between
22  1971 and 2017?
23       A.  I don't understand what you mean by
24  "standards".
25       Q.  There are standards and elements to
```

Page 265

```
 1              A. RAGANELLA
 2   each crime that are part of the New York
 3   State penal law, correct?
 4        A.   Okay.
 5        Q.   Yes?
 6        A.   Yes.
 7        Q.   The NYPD is tasked with enforcing
 8   those penal laws, correct?
 9        A.   Yes.
10        Q.   They need to understand not just
11   the words that the statutes are written
12   with but what their standards are, how
13   they're interpreted. Correct?
14        A.   Correct.
15        Q.   Okay, so that's what I mean. I'm
16   asking you if between 1971 and 2017 did the
17   standard for disorderly conduct in New York
18   change?
19                   MS. MITCHELL:  Objection.
20                     You can answer, if you
21              know.
22        A.   I don't know.
23        Q.   You've seen the 2007 Jones
24   bulletin, correct?
25        A.   Correct.
```

Page 266

```
 1              A. RAGANELLA
 2        Q.   That was because in 2007 there was
 3   a New York State Court of Appeals case,
 4   People v. Jones, that interpreted the
 5   disorderly conduct statute in a way that
 6   somebody at the NYPD felt was important
 7   enough to disseminate to the rest of the
 8   members of the service, correct?
 9                    MS. MITCHELL:  Objection.
10                    You can answer.
11        A.   Potentially, yes.
12        Q.   Did that case, the Jones case,
13   change the standards for disorderly conduct
14   in New York?
15                    MS. MITCHELL:  Objection.
16                    You can answer, if you
17              know.
18        A.   I do not know.
19        Q.   Did the Disorder Control Unit
20   change its training in any fashion because
21   of the Jones case that came down in 2007?
22        A.   It did not.
23        Q.   Did the Disorder Control Unit
24   change ... Withdrawn. Does the NYPD
25   understand that members of the service at
```

Page 267

```
 1              A. RAGANELLA
 2  some point will be called on to police
 3  sidewalk protests?
 4      A.  Repeat that.
 5      Q.  This is again, now we're clearly in
 6  the 30 (B)(6) area, does the NYPD know that
 7  the members of the service at some point
 8  would be called upon to police sidewalk
 9  protests?
10              MS. MITCHELL:  Objection.
11                  You can answer.
12      A.  Potentially.
13      Q.  They're not sure if anyone will
14  ever have to police sidewalk protests?
15      A.  What I meant was potentially some
16  officers may be required to do that, not
17  all officers.
18      Q.  We can agree that some officers
19  will absolutely be required to do that at
20  some point, correct?
21      A.  100 percent.
22      Q.  That some of those members of
23  service will actually arrest individuals
24  participating in sidewalk protests at some
25  point, correct?
```

```
 1                A. RAGANELLA
 2        A.  Yes.
 3        Q.  That an arrest for disorderly
 4   conduct where the sidewalk protestor's
 5   conduct does not create the level of public
 6   inconvenience required to create probable
 7   cause would cause a constitutional
 8   violation, correct?
 9                   MS. MITCHELL:  Objection.
10                   You can answer.
11        A.  I'm not an attorney so I wouldn't
12   know.
13        Q.  You understand ... You train on the
14   constitution, correct?
15        A.  Correct.
16        Q.  More than just the words and the
17   history of it, which is a large part of the
18   training, correct?
19        A.  Yes.
20        Q.  You, as the former commanding
21   officer of Disorder Control training, would
22   have an understanding of the constitutional
23   protections around sidewalk protests. Isn't
24   that correct?
25        A.  Sure.
```

1          A. RAGANELLA

2      Q.  Okay, so with that understanding

3  don't the members of the service need to

4  understand the level of public

5  inconvenience required to create probably

6  cause in order to avoid constitutional

7  violations in arrest situations?

8                  MS. MITCHELL:  Objection.

9                  You can answer.

10     A.  I believe that they do.

11     Q.  You believe they do understand

12  that?

13     A.  Yes.

14     Q.  Although you previously testified

15  that it cannot be trained?

16                  MS. MITCHELL:  Objection.

17                  You can answer.

18     A.  Correct.

19     Q.  But you believe the members of the

20  service have that knowledge.

21     A.  I believe that the members of the

22  service have the knowledge to understand

23  what probable cause is and how that can

24  impact demonstrations and protests, yes.

25     Q.  You believe that Disorder Control

1            A. RAGANELLA

2    trains that.

3         A.   Yes. It's discussed.

4         Q.   Does Disorder Control do sergeant

5    leadership courses? Is that part of what

6    you're tasked with?

7         A.   Yes, but not in the realm of the

8    topic of leadership. During the time that a

9    sergeant, lieutenant, or captain is

10   promoted, and they are in training with the

11   police academy leadership section, the

12   Disorder Control Unit will come in and do

13   training with them.

14        Q.   Were any training materials at

15   Disorder Control updated due to a third-

16   party's complaint to the city of New York

17   or the NYPD concerning the conduct of

18   police officers at any sidewalk protest

19   held in New York City during the relevant

20   time period?

21             MS. MITCHELL:  Objection.

22                You can answer.

23        A.   Not that I'm aware of.

24        Q.   During the relevant ... Withdrawn.

25             During the class periods now, which

1              A. RAGANELLA
2    was September 15 to 17, 2012, did the city
3    of New York and the NYPD, in connection
4    with any Occupy protest, designate any
5    specific area as a place where sidewalk
6    protestors could go to exercise their First
7    Amendment rights?
8                   MS. MITCHELL:  Objection.
9                   You can answer, if you
10              know.
11        A.  I don't know.
12        Q.  During the class period, deemed
13   September 15 to 17, 2012, did the city of
14   New York and the NYPD, in connection with
15   any Occupy protest, provide pre-written
16   disbursal orders to members of the service?
17        A.  Repeat that question again.
18        Q.  During the class period...
19        A.  Right. Sorry.
20        Q.  ... did the city of New York and
21   the NYPD, in connection with any Occupy
22   protest, provide pre-written disbursal
23   orders to the members of the service?
24        A.  Yes.
25        Q.  We would make a request for the

```
 1              A. RAGANELLA
 2   production of that. We've made that request
 3   and we've been told they don't exist.
 4                   MS. MITCHELL:  I believe
 5                   the response is that we've
 6                   provided you with everything we
 7                   have in our custody at Control.
 8                   If you'd like to make further
 9                   inquiries with this witness I
10                   would invite you to do that.
11                   MR. STECKLOW:  Well, the
12                   witness just testified that
13                   they exist.
14                   MS. MITCHELL:  I don't
15                   believe that's what he said,
16                   but --
17        Q.  Do you know they were distributed?
18        A.  The pre-written arrest warnings?
19        Q.  Yes.
20        A.  They could distributed by an
21   incident commander at the scene of an event
22   prior to deploying the officers. Or there
23   have been times where the Disorder Control
24   Unit has disseminated arrest warnings at
25   mobilization exercises to the task force
```

1           A. RAGANELLA

2    supervisors.

3        Q.  How would those warnings be given

4    to the supervisors or the incident

5    commanders for them to distribute?

6        A.  Not clear on what you're asking.

7        Q.  Well, you're saying that it's

8    possible that these incident commanders or

9    the supervisor would distribute them,

10   they've got to get them somewhere. Are they

11   emailed to them? Do they come through a...

12   Is there some way that they obtain the

13   warnings and then say to Joe, "Go make 50

14   copies of these? I got roll call coming up.

15   I've got to distribute."

16            How would that occur?

17       A.  Speaking on behalf of the Disorder

18   Control Unit, we would hit the print button

19   and make however many copies that we

20   needed.

21                MR. STECKLOW:  I would

22                again ask the city to talk to

23                Disorder Control about finding

24                the warnings at least that are

25                in their possession.

Page 274

1          A.  RAGANELLA

2                  MS.  MITCHELL:   Again.

3              Defendant  has  produced  to

4              plaintiffs  everything  in

5              custody  of  Control  regarding

6              dispersal  orders  that  is  in

7              possession  of  the  Disorder

8              Control  Unit  which  is  no

9              documents.

10                 MR.  STECKLOW:   No

11             documents.

12                 MS.  MITCHELL:   No

13             documents.

14     Q.  Hearing  your  attorney  say  that

15   there  are  no  documents  that  satisfy  this,

16   is  it  still  your  testimony  that  you  would

17   push  the  print  button  and  these  documents

18   could  exist?

19     A.   Print  button  on  the  copy  machine,

20   yes.

21     Q.  How  would  you  get  the  piece  of

22   paper  that  you  were  copying?

23     A.   It  could've  been  preexisting  there

24   prior  to  me  coming  to  the  Disorder  Control

25   Unit  where  it  was  a  piece  of  paper  on  a

1           A. RAGANELLA

2    shelf that we continually make copies of.

3         Q.  Okay, so where is that piece of

4    paper today?

5         A.  I don't know.

6         Q.  Did you look for it?

7         A.  Perhaps. I don't recall looking for

8    it.

9         Q.  I think we're at an impasse here,

10   but I think that it definitely seems like

11   there are documents that may have existed

12   at some point. I understand the City

13   doesn't have it in their possession at this

14   point, but the witness has testified to

15   their existence and I can't really go in

16   circles on it anymore.

17                   MS. MITCHELL:  If you want

18              to go off the record for a

19              moment?

20                   MR. STECKLOW:  Sure.

21                   (Whereupon, a short recess

22              was taken.)

23                   (Back on the record.)

24                   MR. STECKLOW:  Back on the

25              record.

```
                                        Page 276
 1            A. RAGANELLA
 2   BY MR. STECKLOW:
 3        Q.  Any mobile exercise in 20,000 ...
 4   Withdrawn.
 5             Did any MobEx in 2011 or 2012
 6   include instructions that the mere
 7   inconveniencing of pedestrian traffic by
 8   protestors during a sidewalk protest does
 9   not constitute probable cause for DisCon
10   arrest?
11                  MS. MITCHELL:  Objection.
12                  You can answer.
13        A.  I don't know.
14        Q.  Did you conduct any in-service
15   trainings outside of disorder control?
16        A.  I'm not clear on what you're
17   asking.
18        Q.  Is disorder control considered in-
19   service training?
20        A.  We do in-service training. We also
21   train the recruits in the academy, which is
22   not considered in-service.
23        Q.  So, in the relevant time period,
24   was there any in-service training, in
25   addition to the question I previously asked
```

1              A. RAGANELLA
2     about disorder control training, that the
3     mere inconvenience of pedestrian traffic by
4     sidewalk protestors does not constitute
5     probable cause for a disorderly conduct
6     arrest?
7                    MS. MITCHELL:  Objection.
8                         You can answer.
9          A.  I don't know.
10         Q.  Did MobEx in 2011 or 2012 include
11    instruction that dispersal orders should
12    include an alternative avenue for
13    communication to non-violent, non-riotous
14    sidewalk protestors?
15         A.  I don't know.
16         Q.  Is there anything that you could do
17    to refresh your recollection?
18         A.  Not that I'm aware of.
19         Q.  You were, again, in charge of all
20    the training at disorder control at that
21    time, correct?
22         A.  Correct.
23         Q.  If that existed, you would, in
24    fact, know about it, correct?
25         A.  Most likely, yes.

Page 278

1              A. RAGANELLA
2         Q.  Did mobile exercises in 2011 or
3    2012 include instructions that an
4    alternative avenue of communication should
5    be provided to non-violent, non-riotous
6    sidewalk protestors who are subject to a
7    dispersal order?
8                        MS. MITCHELL:  Objection.
9                        You can answer.
10        A.  That could have been incorporated
11   in training. I don't know.
12        Q.  Have you seen it incorporated in
13   any training?
14        A.  Not that I'm aware of, no.
15        Q.  Did the large-scale level two
16   mobilization exercise on August 12, 2011,
17   include any training on the first amendment
18   requirements for policing a sidewalk
19   protest?
20                        MS. MITCHELL:  Objection.
21                        You can answer.
22        A.  I don't know.
23        Q.  Did you conduct that large-scale
24   training?
25        A.  Yes.

1              A. RAGANELLA

2         Q.  Did you observe any of the training

3    include training on any first amendment

4    requirements for police in a sidewalk

5    protest?

6         A.  No.

7         Q.  Did you instruct officers to

8    conduct training at that large-scale level

9    two mobilization exercise on August 12,

10   2011, to include training on any first

11   amendment requirements for police at a

12   sidewalk protest?

13        A.  Specifically related to sidewalk

14   protests, no, but, yes, they were

15   instructed to go over constitutional rights

16   of protestors, of first amendment

17   assemblages.

18        Q.  During the large-scale protest on

19   August ... I'm sorry, during the large-

20   scale level two mobilization on August 12,

21   2011?

22        A.  Correct.

23        Q.  What were they instructed?

24        A.  Part of that lesson plan on

25   legalities at demonstrations.

```
 1            A. RAGANELLA
 2       Q.  So, what was it that they were
 3   instructed that was a part of that lesson
 4   plan?
 5       A.  I don't know.
 6       Q.  How much of that lesson plan was
 7   included at the level two mobilization
 8   exercise on August 12, 2011?
 9       A.  I do not know.
10       Q.  Is there anything you could use to
11   refresh your recollection?
12       A.  No, sir.
13       Q.  I'm asking these questions as part
14   of your 30(b)(6) testimony so, when you're
15   saying you don't know, you're saying the
16   city of New York does not know?
17       A.  That's correct.
18       Q.  Okay. Was the MobEx training
19   conducted in anticipation of the one-year
20   anniversary of Occupy Wall Street designed
21   to include encirclement maneuvers?
22       A.  Yes, that is a technique that we
23   practiced.
24       Q.  Was the MobEx training conducted in
25   anticipation of the one-year anniversary of
```

Page 281

1              A.  RAGANELLA

2   Occupy Wall Street designed to include

3   lines, wedges, and other disorder control

4   formations?

5         A.  Yes.

6         Q.  Was the MobEx training conducted in

7   anticipation of the Occupy Wall Street one-

8   year anniversary protest designed to

9   include the use of protective shields?

10        A.  Yes.

11        Q.  Was it also designed to include the

12  use and deployment of protective millennium

13  masks?

14        A.  Yes.

15        Q.  What is a millennium mask?

16        A.  A millennium mask is a piece of

17  personal protective equipment that an

18  officer would use to cover his face to

19  protect his respiratory system from any

20  toxic substances or chemicals.

21        Q.  During Occupy Wall Street, 2011 to

22  2012, was there a time when they released

23  chemical material that would affect

24  somebody's respiratory system?

25                  MS. MITCHELL:  Objection.

1          A. RAGANELLA

2                    You can answer.

3        A.   Yes.

4        Q.   When was that?

5        A.   I don't recall.

6        Q.   Where was that?

7        A.   Multiple places.  There was pepper

8   spray that was used.

9        Q.   By the protestors or by the police?

10       A.   Both.

11       Q.   So, removing the police from the

12   equation, so we sure know the police used

13   pepper spray at protest activity, when did

14   the Occupy Wall Street individuals use

15   pepper spray at a protest activity?

16       A.   I don't recall a specific date.

17       Q.   What information or document do you

18   have to support your claim that that

19   occurred?

20       A.   Information from other members of

21   the service and news reports.

22       Q.   What news report are you referring

23   to?

24       A.   I don't know.

25       Q.   Which individuals, other members of

Page 283

```
 1              A.  RAGANELLA
 2   the service, are you referring to?
 3        A.   Don't recall.
 4        Q.   Do you recall a location where that
 5   occurred?
 6        A.   No, sir.
 7        Q.   Do you recall a date where that
 8   occurred?
 9        A.   No, sir.
10        Q.   Is there anything you could use to
11   refresh your recollection to identify this
12   alleged use of pepper spray by the Occupy
13   Wall Street individuals?
14        A.   Perhaps searching the internet for
15   news stories or surveying members of the
16   department that may have, in fact, been
17   there when it happened.
18        Q.   Mm-hmm (affirmative). Were you ever
19   present when the police deployed pepper
20   spray at an Occupy Wall Street protest?
21        A.   Not that I recall.
22        Q.   Was the MobEx training ...
23        A.   Withdrawn.
24             I was at it, the eviction of the
25   park in November. To my understanding, that
```

```
 1            A.  RAGANELLA
 2   it was used. I didn't personally witness
 3   it, but I was there at the incident.
 4        Q.  And you're saying that it was used
 5   by the police on the protestors?
 6        A.  Correct.
 7        Q.  Was the MobEx training conducted in
 8   anticipation of the one-year anniversary of
 9   Occupy Wall Street designed to include
10   specific instructions on policing sidewalk
11   protests?
12                   MS. MITCHELL:  Objection.
13                      You can answer.
14        A.  Not that I'm aware of, no.
15                   MR. STECKLOW:  I think
16                we're on, what, 12, 24, 36? 37?
17                   MS. MITCHELL:  Yep.
18                Plaintiff's 35.
19                   THE WITNESS:  35 or 34.
20                   (Document marked Exhibit
21                36 for identification as of
22                this date by the reporter.)
23                   MR. STECKLOW:  Here's 36.
24        A.  Yep.
25        Q.  I'm showing you what's being marked
```

```
 1                A. RAGANELLA
 2   as 36. It appeared to be identified as
 3   D5318.
 4        A.   (Witness perusing document.)
 5        Q.   Do you recognize this?
 6        A.   Yes.
 7        Q.   What do you recognize it as?
 8        A.   An Outlook calendar event.
 9        Q.   What is an Outlook calendar event
10   in relation to?
11        A.   It appears to be from my Outlook
12   calendar from my department Outlook account
13   indicating that I had a meeting at the
14   Chief of Department's conference room on
15   November 4, 2011, from 2:30 to 4:30 in the
16   afternoon.
17        Q.   What was that meeting concerning?
18        A.   It appears to be in regard to
19   Occupy Wall Street.
20        Q.   What about Occupy Wall Street?
21        A.   I do not know.
22        Q.   Wasn't this meeting concerning the
23   eviction of Occupy Wall Street and the
24   planning for it?
25        A.   I don't know.
```

1            A. RAGANELLA
2       Q.  Did you previously testify that the
3   only meeting you attended regarding Occupy
4   Wall Street was, in this time period, about
5   the eviction of Occupy Wall Street?
6       A.  That could very well be true.
7       Q.  So, is your memory different today
8   than it was at the prior deposition you had
9   with Gideon Oliver?
10       A.  That very well could be, that I
11   need to be refreshed on that.
12       Q.  Okay.
13       A.  Because as I sit here today, I
14   don't remember that.
15       Q.  Do you recall the meeting that I'm
16   referencing concerning the eviction of
17   Occupy Wall Street?
18       A.  I did attend a meeting regarding
19   the eviction of Occupy Wall Street. I can't
20   sit here and tell you that this was the
21   date and time that it happened, though.
22       Q.  Where was that meeting?
23       A.  At the Chief of Department's
24   conference room, and there was another
25   meeting, if I recall correctly, at the

```
                                        Page 287
 1              A. RAGANELLA
 2    joint operations center at 1 Police Plaza,
 3    on the second floor.
 4         Q.  Okay, so let's take the first one
 5    that was at the Chief of Department's
 6    conference room. Who else was at that
 7    meeting?
 8         A.  I don't recall.
 9         Q.  Do you recall anyone else that was
10    at that meeting?
11         A.  No.
12         Q.  Were you alone at that meeting?
13         A.  I certainly was not.
14         Q.  Was the Chief of Department at that
15    meeting?
16         A.  He could have been.
17         Q.  Is there anything you can do to
18    refresh your recollection about who was at
19    that meeting?
20         A.  No.
21         Q.  How many people were at that
22    meeting?
23         A.  Don't recall.
24         Q.  Was somebody from the Mayor's
25    office at that meeting?
```

1                A. RAGANELLA

2          A.   Don't recall.

3          Q.   Do you have any notes from that

4    meeting?

5          A.   No, I do not.

6          Q.   Do you often take notes when you're

7    at meetings such as this?

8          A.   It's possible.

9          Q.   Did you search for any notes you

10   might have had about this meeting?

11         A.   Yes.

12         Q.   What did you do to search for those

13   notes?

14         A.   Looked in the file cabinet where I

15   keep my important documents.

16         Q.   Did you do anything else to look

17   for those notes?

18         A.   If I would have taken notes, it

19   would have been, obviously, handwritten

20   notes, and that's where they would have

21   been, so there was no need to search

22   anywhere else other than my file cabinet.

23         Q.   Do you recall what occurred at the

24   meeting concerning the eviction of Occupy

25   Wall Street from Zuccotti Park?

```
 1              A. RAGANELLA
 2        A.  No.
 3        Q.  You said there was a second meeting
 4   that took place at the command center at 1
 5   Police Plaza, correct?
 6        A.  Yes.
 7        Q.  Do you recall if that was before or
 8   after the meeting that took place at the
 9   Chief of Department's conference room?
10        A.  Don't recall.
11        Q.  Do you recall who attended the
12   other meeting at the 1 Police Plaza command
13   center?
14        A.  The only other person I remember
15   being at the meeting at the joint
16   operations center would be my immediate
17   supervisor, Chief Weiner [phonetic].
18        Q.  Do you recall him being at both
19   meetings, or just one meeting?
20        A.  Just that one.
21        Q.  Did you create something called the
22   Police Officers Guideline at
23   Demonstrations?
24        A.  Yes.
25        Q.  Okay. Did that contain any
```

Page 290

A. RAGANELLA

1
2    instructions on the first amendment
3    requirement for policing of sidewalk
4    protests?
5                     MS. MITCHELL:  Objection.
6                     You can answer.
7         A.  Not specifically related to that,
8    no.
9         Q.  Did it include any specific
10   instruction that an adequate means of
11   egress should be provided to non-violent
12   sidewalk protestors who are subject to a
13   dispersal order?
14        A.  No, it did not.
15        Q.  Did the Police Officer Guidelines
16   at Demonstrations provide any guideline or
17   instruction that notice of an adequate
18   means of egress should be included in a
19   dispersal order issued to non-violent
20   sidewalk protestors?
21        A.  No, it did not.
22        Q.  Did the Police Officers Guidelines
23   at Demonstrations provide any guideline or
24   an instruction that notice of an
25   alternative avenue of communication should

```
 1              A.  RAGANELLA
 2    be included in a dispersal order issued to
 3    non-violent sidewalk protestors?
 4                    MS. MITCHELL:  Objection.
 5                    You can answer.
 6        A.  No, it did not.
 7        Q.  Did the Police Officer Guidelines
 8    at Demonstrations provide any guideline or
 9    instruction that an alternative avenue of
10    communication should be provided to non-
11    violent sidewalk protestors who are subject
12    to a dispersal order.
13                    MS. MITCHELL:  Objection.
14                    You can answer.
15        A.  No.
16        Q.  I want to look back at the RNC
17    guidelines and ask you if any of these
18    specific things were included or
19    incorporated into disorder control
20    training. Let me get that packet for you.
21    All right. I'd like you to look at ...
22    Okay. Looking at page 15277. Sorry. Turn to
23    the page before that, 15276. This is titled
24    "Police Protest and Street Encounters,"
25    correct?
```

```
 1              A. RAGANELLA
 2        A.   Yes.
 3        Q.   It talks about permissible
 4   limitations on first amendment rights,
 5   correct?
 6        A.   Yes.
 7        Q.   Okay. I'd like you to read that
 8   page and the next page. Let me know if any
 9   of this was specifically incorporated into
10   disorder control training.
11        A.   Can you clarify what you mean by
12   incorporated into disorder control lessons?
13        Q.   This is pretty specific, is it not,
14   about the standards of street protest,
15   sidewalk protest?
16        A.   Yes. Yes.
17        Q.   Does something this specific exist
18   at disorder control training?
19        A.   We talking about this whole section
20   as a whole or pieces and parts of it?
21        Q.   Let's start with the whole thing as
22   a whole.
23        A.   This is not repeated verbatim in
24   our lesson plans, to my knowledge.
25        Q.   Are pieces and parts of it repeated
```

Page 293

```
1              A. RAGANELLA
2   in your lesson plan?
3        A.   That's possible.
4        Q.   As you sit here, can you tell me
5   which parts are included? Not possibly
6   included, but actually included in the
7   lesson plan?
8        A.   I would have to compare what's
9   written here to our lesson plan to do that.
10       Q.   So, by reading this, you're not
11  able to identify anything that's here
12  that's actually included in the disorder
13  control lesson plan?
14       A.   My photographic memory fails me at
15  this particular time. I'm sorry.
16       Q.   Looking at page 15278 ... Sorry,
17  that's wrong. We've already discussed that.
18  Let's go to 15279. Look at letter C.
19       A.   Okay.
20       Q.   Can you read that first sentence
21  out?
22       A.   We're talking about C, under
23  "carrying signs or objects?"
24       Q.   Yes.
25       A.   First line states, "Like
```

```
1              A. RAGANELLA
2    leafleting, the carrying of signs or
3    objects at a demonstration is protected
4    first amendment activity."
5         Q.  Was that taught at disorder control
6    training?
7         A.  I don't recall.
8         Q.  Is there anything you could look at
9    that would refresh your recollection?
10        A.  I would have to look at the lesson
11   plan on legalities at demonstrations.
12                    MR. STECKLOW:  While I'm
13                    looking for that, can you tee
14                    up the S 50. Legalities of
15                    demonstrations ...
16                    Do you know which one I'm
17                    talking about?
18                    MR. STARKEY:  No, sorry.
19        Q.   While he's doing that, I'm going
20   to hand you what was previously marked as
21   eight, legalities at demonstrations, and
22   you let me know if you can find the issue
23   that we were just discussing, about signs,
24   carrying signs being a protected first
25   amendment right.
```

1          A.  RAGANELLA

2                    MR. STECKLOW:  I'm

3               embarrassed I've only had 36. I

4               thought I was going to be

5               closer to 50 by now.

6                    MS. MITCHELL:  How much

7               more do you have to go?

8                    MR. STECKLOW:  Well, I

9               figure...

10                    MS. MITCHELL:  Because ...

11                    MR. STECKLOW:  Tell me.

12                    MS. MITCHELL:  If you have

13               a lot more questions, and then

14               I have a number of questions

15               that I'm planning to ask, if it

16               makes more sense to continue

17               this to another day.

18                    MR. STECKLOW:  I'm not

19               available tomorrow.

20                    MS. MITCHELL:  Okay.

21                    MR. STECKLOW:  I was

22               planning on stopping myself at

23               6:00, regardless of where I

24               was, and then figuring out

25               whether we needed to do another

1        A. RAGANELLA

2            day. Would you rather me stop

3            earlier than that so you have

4            some time to ask questions

5            before we figure that out?

6                MS. MITCHELL:  Well, it's

7            up to you. We don't ... I don't

8            need to ...

9                MR. STECKLOW:  All right,

10           so let's go through the ...

11               MS. MITCHELL:  I've taken

12           notes, so I can ask questions

13           whenever.

14               MR. STECKLOW:  Okay.

15               MS. MITCHELL:  I just

16           wanted to ask you.

17               MR. STECKLOW:  Before we

18           watch the next video ... I'm

19           just going to wait for these if

20           you had time to review the

21           document he had asked for and

22           see if he can find in there

23           something about the sign.

24               MR. STARKEY:  Nope, I

25           don't see it.

```
 1              A.  RAGANELLA
 2         Q.   Okay, so that's not trained at
 3    disorder control, correct?
 4         A.   Regarding the carrying of signs or
 5    objects, no.
 6         Q.   All right. That ... It's not
 7    trained that the carrying of signs is a
 8    protected first amendment right, correct?
 9         A.    Through the disorder control unit,
10    no.
11         Q.   Okay. I'm going to show you a
12    video. This happened on September 15, so
13    it's starting what we call the class period
14    for this case. I'd like you to watch the
15    video. Then, I'll ask you a couple
16    questions.
17    (Whereupon, the witness was shown a video.)
18    (Back on the record.)
19         Q.   Were able to see that video?
20         A.   Yes.
21         Q.   Okay. Was that individual carrying
22    a sign?
23         A.   Yes.
24         Q.   Okay. It looked like the white
25    shirt officer pointed at the sign right
```

```
                                    Page 298
 1              A. RAGANELLA
 2    before the individual was arrested?
 3
                      MS. MITCHELL:  Objection.
 4                    You can answer.
 5        A.  No, it looked like he pointed at
 6    the individual.
 7        Q.  Okay. Did you see a reason for that
 8    individual to be arrested in that moment,
 9    from what you could see on the video?
10                    MS. MITCHELL:  Objection.
11                    You can answer.
12        A.  Taking into consideration only what
13    I saw, I did see him stop several times
14    while he was being asked to move along, so
15    there is the possibility that that may
16    establish probable cause.
17        Q.  Under what section of what law?
18        A.  Law of refusing a lawful order to
19    disperse.
20        Q.  What did you see on that video that
21    made you believe there was a lawful order
22    for these individuals to be dispersed
23    north?
24        A.  Well, as I said, I didn't see what
25    happened prior to that, so I don't know why
```

Page 299

```
 1              A. RAGANELLA
 2    they were being moved from that area.
 3         Q.  All right, because there didn't
 4    seem to be anything that we could see on
 5    the video, the reason they had to be forced
 6    north at that point, correct?
 7                   MS. MITCHELL:  Objection.
 8                   You can answer.
 9         A.  There was a substantial number of
10    demonstrators on the sidewalk itself that
11    appeared not to be moving. Other than that,
12    I don't ... As I said, I don't know what
13    happened prior to that, that they were
14    being moved out of that area.
15         Q.  Other than safety reasons, would
16    there be a reason why police officers would
17    form a wall and stop people from processing
18    south on Broadway on September 15, 2012?
19                   MS. MITCHELL:  Objection.
20                   You can answer.
21         A.  Yes.
22         Q.  What would that be?
23         A.  There could have been a crime scene
24    that we were trying to stop people from
25    getting into. There could have been some
```

Page 300

                    A. RAGANELLA

1

2   type of sensitive or a vulnerable location

3   there that we maybe we had potentially had

4   intelligence on that protestors,

5   demonstrators were going there to damage

6   it. I don't know.

7        Q.  So, it's possible that, if there's

8   a claim of intelligence that the protestors

9   were going towards a specific object, that

10  the police could stop them and tell them

11  they now have to go north, even if there

12  has been no criminal conduct that occurred?

13       A.  Well, one ... As I stated earlier

14  in my testimony, one of our core functions

15  besides protecting life is to protect

16  property.

17       Q.  So, does that ... Again, if they

18  ... Withdrawn.

19            Within the training of disorder

20  control, it's appropriate to stop

21  individuals from going south if there's

22  some sort of intel that there might be

23  property damage being contemplated in that

24  direction?

25       A.  Potentially.

1          A. RAGANELLA

2     Q.   And that's consistent with disorder

3  control training?

4     A.   I don't train on that, no.

5     Q.   Yeah. Was there any other reason

6  you can come up with why these officers

7  would stop these people from going south

8  that's a lawful reason?

9               MS. MITCHELL:  Objection.

10                   You can answer.

11     A.   Not that I can think of.

12     Q.   So, it's possible that they were

13  just stopping people and forcing them north

14  because that's what they chose to do, isn't

15  that correct?

16     A.   It's also possible that the

17  examples I gave were what also happened, so

18  yes, that's possible.

19     Q.   Okay. Did you ... I ... Did you

20  notice which officer was supervising there

21  and pointing out the person to arrest and

22  telling people to continue walking north?

23     A.   From what I saw on the video, it

24  appeared to me that the highest-ranking

25  member there was Inspector Winski. Or,

Page 302

```
 1              A.  RAGANELLA
 2    Deputy Inspector Winski at the time, I
 3    guess.
 4        Q.  And he seemed to be the individual
 5    that pointed out the person who was about
 6    to be arrested, correct?
 7        A.  That's what it appeared to me.
 8        Q.  So, the fact that that individual
 9    was carrying a sign by itself should not
10    have led to his arrest, correct?
11                    MS. MITCHELL:  Objection.
12                    You can answer.
13        A.  Based on what I saw, in and of
14    itself, the carrying of a sign that's made
15    of cardboard should not be a reason to be
16    arrested.
17                    MR. STECKLOW:  Okay. I'm
18                    going to show you ... No, it's
19                    fine. Just start there.
20                    MR. STARKEY:  Speaker 4:
21                    Start there?
22                    MR. STECKLOW:  Actually,
23                    that goes in the ground, right?
24                    Let's get past...
25                    MR. STARKEY:  Well,
```

```
                                          Page 303
 1              A.  RAGANELLA
 2                  it's ...
 3                        MR. STECKLOW:  Go a little
 4                  further back, a little further
 5                  back.
 6                        MR. STARKEY:  Go back?
 7                        MR. STECKLOW:  Stop right
 8                  there. Okay. Start it. Okay.
 9                  I'm going to show you another
10                  video.
11                        (Whereupon, the witness
12                  was shown a video.)
13                        (Back on the record.)
14       Q.  At that point that you just saw on
15   the sidewalk, did there seem to be a
16   pedestrian blockage?
17                        MS. MITCHELL:  Objection.
18                        You can answer.
19       Q.  We stopped the video at 1:15.
20       A.  You're asking me was there a
21   pedestrian ... I'm not clear on what you're
22   asking.
23       Q.  I'm asking, in the video we just
24   saw, is the sidewalk open or is the
25   sidewalk being blocked?
```

```
                                        Page 304
 1              A.  RAGANELLA
 2                      MS. MITCHELL:  Objection.
 3                          You can answer.
 4        A.  I'd have to see it again.
 5                          (Whereupon, the witness
 6                      was shown a video.)
 7                          (Back on the record.)
 8        Q.  Was that sidewalk being blocked or
 9   is that sidewalk being open?
10                      MS. MITCHELL:  Objection.
11                          You can answer.
12        A.  It appears to me at, what I'm
13   looking at right now, that that sidewalk is
14   blocked.
15        Q.  Is it being blocked by a line of
16   police officers stopping protestors?
17                      MS. MITCHELL:  Objection.
18                          You can answer.
19        A.  It appears that there's a line of
20   police officers across the sidewalk, yes.
21        Q.  And are the protestors on the other
22   side seemingly seeking to walk past where
23   the police officers are?
24        A.  I don't know if they ...
25                      MS. MITCHELL:  Objection.
```

```
 1              A. RAGANELLA
 2                    You can answer.
 3      A.  Yeah. I don't know if they're
 4  walking past or being redirected in a
 5  different direction.
 6      Q.  Okay, but, in some way, the police
 7  are the ones who are now involved with the
 8  protestors' direction. Whatever direction
 9  they want to go in, the police are now
10  making some sort of impact on that, is that
11  what you can see?
12                    MS. MITCHELL:  Objection.
13                    You can answer.
14      A.  At that particular point right
15  there that I'm looking at, that small
16  snippet of video, it appears that way, yes.
17      Q.  Okay.
18                    (Whereupon, the witness
19                 was shown a video.)
20                    (Back on the record.)
21      Q.  Looking at this individual here
22  with the hat on, do you see him? Is he
23  blocking the sidewalk at this point?
24                    MS. MITCHELL:  Objection.
25                    You can answer.
```

```
 1              A. RAGANELLA
 2      A.  By himself?
 3      Q.  Was he blocking the sidewalk
 4  sufficiently to be arrested for disorderly
 5  conduct, violating ... Blocking pedestrian
 6  traffic?
 7                  MS. MITCHELL:  Objection.
 8                  You can answer.
 9      A.  By himself?
10      Q.  I'm not sure what you mean. By
11  himself? I'm not [crosstalk]...
12      A.  I'm answering the question.
13      Q.  I'm asking if he's able
14  [crosstalk]... Yes, there's...
15      A.  It appears to me that he's part of
16  a group that's substantially interfering
17  with pedestrian flow.
18      Q.  So, you believe that he is allowed
19  ... There is probable cause for his arrest
20  for blocking the sidewalk?
21                  MS. MITCHELL:  Objection.
22                  You can answer.
23      A.  It's hard for me to answer that
24  because I wasn't there but, based on the
25  little bit of a snippet from what you are
```

Page 307

```
 1              A. RAGANELLA
 2   telling me, if we're to accept what you're
 3   saying, it appears to me that everybody on
 4   that sidewalk right now is substantially
 5   blocking pedestrian traffic in that still
 6   frame of what I'm looking at.
 7        Q.  And that is because ... Why? Why do
 8   you believe that they're blocking the
 9   pedestrian traffic substantial impediment?
10        A.  Because it appears to me that they
11   were being instructed to move and they
12   weren't moving.
13        Q.  So, they didn't seem like they were
14   backing up before this happened?
15                    MR. STECKLOW:  Do we have
16                the other video of this arrest,
17                because this is not the right
18                one.
19                    MS. MITCHELL:  Oh ...
20                Here. Is there a question there
21                or no? Okay.
22                    MR. STECKLOW:  Do we have
23                the other video or no?
24                    MR. STARKEY:  I have ...
25                Yeah, I do have the video,
```

```
                                              Page 308
 1              A.  RAGANELLA
 2                      other video. There. I don't
 3                      know if it's better than the...
 4                          (Whereupon, the witness
 5                      was shown a video.)
 6                          (Back on the record.)
 7                          MR. STECKLOW:  No, it's
 8                      not what I'm looking for but
 9                      let's just let it play for a
10                      minute.
11                          (Whereupon, the witness
12                      was shown a video.)
13                          (Back on the record.)
14      Q.  All right. I'm going to show you
15   another video and ask you if you can
16   identify probable cause to the arrest of
17   this individual.
18      A.  Okay.
19                          (Whereupon, the witness
20                      was shown a video.)
21                          (Back on the record.)
22      Q.  Okay, I'm going to stop the video
23   now... 2:05. Were you able to watch that
24   individual's arrest?
25      A.  Yes.
```

```
 1              A. RAGANELLA
 2         Q.  Did you recognize the white shirt
 3    officer that effectuated that arrest?
 4         A.  No.
 5         Q.  All right. Did you see probable
 6    cause for that arrest?
 7                   MS. MITCHELL:  Objection.
 8                   You can answer.
 9         Q.  In the video that you observed,
10    were you able to identify probable cause
11    for that arrest?
12                   MS. MITCHELL:  Objection.
13                   You can answer.
14         A.  Yes.
15         Q.  What was that probable cause?
16         A.  It appeared to me, from what I saw,
17    that multiple instructions to clear the
18    sidewalk were given. I also observed that
19    individual remain on the sidewalk. I also
20    witnessed a gentleman with a cap on with a
21    blue shirt who appeared to me not to be
22    involved in the protest group walk up the
23    sidewalk, stop, and have to turn around and
24    go back the other way because the sidewalk
25    appeared to be blocked.
```

Page 310

1        A. RAGANELLA

2        Q.   Okay. Why don't you tell me when

3   you see that person seemingly unable to

4   continue to walk on the sidewalk?

5                        (Whereupon, the witness

6                  was shown a video.)

7                        (Back on the record.)

8        Q.   You're looking at it. How many

9   police are on the sidewalk, compared to how

10  many protestors are on the sidewalk?

11                   MS. MITCHELL:  Objection.

12                   You can answer.

13       A.   At this point, there's more police

14  officers on the sidewalk than protestors

15  because they moved them off the sidewalk

16  and up onto the steps.

17       Q.   This is at approximately at 1:23 in

18  the video. Any blockage of the sidewalk now

19  is blockage by the police, isn't that

20  correct?

21                   MS. MITCHELL:  Objection.

22                   You can answer.

23       A.   I'm relatively certain that, if

24  somebody was coming through, they would

25  move out of the way and let people through.

```
                                        Page 311
 1              A. RAGANELLA
 2       Q.  Okay, so you believe that, while it
 3   might be blocked in this image, the police
 4   would move out of the way if they needed to
 5   in order to let people to walk by?
 6                  MS. MITCHELL:  Objection.
 7                  You can answer.
 8       A.  From what I'm seeing right there, I
 9   could ... I would ... I, myself, would have
10   no problem walking through there.
11                  (Whereupon, the witness
12              was shown a video.)
13                  (Back on the record.)
14       Q.  Okay, so, if you would no problem
15   walking through there, why are they giving
16   instructions to clear the sidewalk?
17       A.  The instructions were being given
18   behind them, not where they were standing.
19       Q.  Behind them is even less
20   pedestrians.
21                  (Whereupon, the witness
22              was shown a video.)
23       A.  Well, not what I'm seeing right
24   there.
25                  (Whereupon, the witness
```

Page 312

1          A. RAGANELLA

2               was shown a video.)

3      Q.  There's clearly less people in this

4  area than there were in the other area,

5  isn't that correct?

6      A.  I see ... All right, well, look

7  this is ... If you want to argue opinions,

8  I'm telling you, from my perspective and my

9  opinion right now, I see a woman with a

10  sign standing there, another individual in

11  a black shirt. I see several protestors

12  that are there, and I see a gentleman with

13  the blue shirt on who appears to be an

14  uninvolved witness who, to me, appears to

15  want to walk forward and can't because the

16  woman with the sign is in his way.

17      Q.  This person is the one you're

18  talking about, the one with his arms across

19  with a hat on?

20      A.  Correct.

21      Q.  You think that person is trying to

22  walk and can't?

23      A.  That's my observation.

24               (Whereupon, the witness

25            was shown a video.)

Page 313

1          A. RAGANELLA

2      Q.  Okay.

3      A.  Then, he turns around and goes back

4  the other way.

5      Q.  That's the person you believe who

6  was being serious impeded on the sidewalk

7  to cause probable cause ... To establish

8  probable cause to the arrest of this

9  individual?

10                  MS. MITCHELL:  Objection.

11                      You can answer.

12     A.  That's possible, yes.

13                  (Whereupon, the witness

14              was shown a video.)

15                  (Back on the record.)

16     Q.  Does there seem to be a serious

17  blockage at this point? We are not at 1:48.

18     A.  Yes.

19     Q.  Does there seem to be a clear and

20  present danger of disorder?

21     A.  No.

22                  MS. MITCHELL:  Objection.

23                      You can answer.

24     A.  Sorry.

25     Q.  But you believe that there's a

```
                                      Page 314
 1              A. RAGANELLA
 2   serious impediment to people walking on the
 3   sidewalk due to the protestors there?
 4       A.  100%.
 5       Q.  Okay.
 6                    (Whereupon, the witness
 7                was shown a video.)
 8                    (Back on the record.)
 9       Q.  Do you see people walking in that
10   direction?
11       A.  As you move the video forward, yes.
12       Q.  Okay.
13                    (Whereupon, the witness
14                was shown a video.)
15                    (Back on the record.)
16       Q.  Do you see room on the sidewalk as
17   this individual is being arrested for
18   anybody that wants to pass?
19       A.  Yes, sir.
20       Q.  Okay, so isn't it true that there
21   wasn't probable cause for this arrest, but
22   it's occurring because the officers were
23   trying to clear a sidewalk and just
24   determined to arrest this person for no
25   reason?
```

1           A. RAGANELLA

2                   MS. MITCHELL:  Objection.

3                   You can answer.

4       A.  I can't speculate that there was no

5   reason to arrest him.

6       Q.  Okay. There was no reason to arrest

7   him for blocking pedestrian traffic.

8       A.  I disagree.

9                   MR. STECKLOW:  All right.

10                  I'm going to take a couple

11                  minutes. I still have more.

12                  It's almost 6:00, so what

13                  would you like to do?

14                  MS. MITCHELL:  Well, how

15                  much more do you have left to

16                  do?

17                  MR. STECKLOW:  Well,

18                  that's what I'm going to figure

19                  out when I take my couple of

20                  minutes.

21                  MS. MITCHELL:  Well, why

22                  don't you take [crosstalk]...

23                  MR. STECKLOW:  I also

24                  wanted to see what more videos

25                  we haven't gone through yet,

1        A.  RAGANELLA

2            but I think we're all towards

3            the end of our productivity for

4            the day.

5                MS. MITCHELL:  Okay. Well,

6            why don't you let me know how

7            much more you think you have,

8            and then we can have a

9            discussion about dates?

10               (Whereupon, a short recess

11           was taken.)

12               (Back on the record.)

13       Q.  I'm going to ask a couple more

14   questions, then your counsel is going to

15   ask questions. Then we're going to end for

16   today, and there may or may not be another

17   hour or so after that, that we'll

18   reschedule.

19       A.  Okay.

20               (Document marked Exhibit

21           37 for identification as of

22           this date by the reporter.)

23               MR. STECKLOW:  I'm going

24           to show you just that we're

25           recording. We're back on the

```
 1          A.  RAGANELLA

 2             record.

 3                   The time is now 5:59 PM.

 4      Q.  I'm showing you what I've marked as

 5   Plaintiff's Exhibit 37.

 6          It's previously been stamped 19439

 7   through 19441. Let me just put them

 8   together. I'll ask you to review the

 9   document. Let me know after you'd had a

10   chance to do so.

11      A.  (Witness perusing document.) Okay.

12      Q.  Have you had a chance to review it?

13      A.  Yes.

14      Q.  Do you recognize it?

15      A.  Yes.

16      Q.  Is it an email exchange you had

17   after the May Day protest with Robert

18   Kelly?

19      A.  Yes.

20      Q.  Who is Robert Kelly?

21      A.  He was a Captain at the time, that

22   worked in the Criminal Justice Bureau for

23   the NYPD.

24      Q.  What information were you seeking

25   to identify here?
```

1              A. RAGANELLA

2        A.  How many arrests we had, and if any

3    of the arrests from the demonstration

4    related protest, if any of them were

5    declined to be prosecuted, and the quantity

6    of arrests that we had.

7        Q.  Why were you interested in that

8    information?

9        A.  Two reasons. One was that I was

10   collecting information on arrests to use in

11   a unit citation that we were writing for

12   the unit, to document the quantity of

13   arrests that were made that we may have

14   been involved in.

15          The second reason is just for

16   training purposes and FYI, to see if there

17   was anything that we needed to do or change

18   or modify in regard to training in relation

19   to demonstration-related protests.

20       Q.  What would indicate to you whether

21   or not there was a need to change training

22   in relation to demonstration protests?

23       A.  I think if I saw an exorbitant

24   amount of declined prosecutions, that would

25   make me curious as to whether the District

1              A. RAGANELLA
2    Attorney's office just didn't like us, or
3    if there was some deficiency in the way
4    that we were conducting the arrests. That
5    we had an issue that needed to be
6    addressed.
7         Q.  If you had seen a number of
8    decline-to-prosecutes, what would you have
9    done?
10        A.  I probably would have investigated
11   further with Captain Hailey and may have
12   even consulted with our legal bureau to
13   find out what the issue was, and if it was
14   in fact something that needed to be
15   addressed in training or not.
16        Q.  Is this something you've done other
17   times, other than May Day?
18        A.  Not that I recall.
19        Q.  During other times at Occupy Wall
20   Street when there were mass arrests, you
21   didn't inquire as to the number of arrests
22   and whether or not there was any decline-
23   to-prosecutes?
24        A.  I may have verbally through
25   telephone conversations or in person, but

```
                                    Page 320
 1              A. RAGANELLA
 2   nothing that I can remember formally
 3   documenting, like an email.
 4        Q.  Thank you. I'm going to show you
 5   another video. This one has not been turned
 6   over. It's publicly available. It's in the
 7   thumb drive. We're going to review it.
 8              I'd like you to watch this video
 9   and then we're going to have scintillating
10   conversation about it.
11        A.  I look forward to it.
12        Q.  Well, this one's dark.
13        A.  Can you tilt back a little bit the
14   top?
15        Q.  Yeah. It may help too much.
16        A.  Okay. Yeah, it's dark, but I'll
17   give it a shot.
18        Q.  Yeah, keep the volume down, because
19   it gets loud. You ready? Here we go.
20                    (Whereupon, the witness
21              was shown a video.)
22                    (Back on the record.)
23              Did you see the individual get
24   arrested there?
25        A.  It's very difficult to see that.
```

```
                                      Page 321
 1              A.  RAGANELLA
 2       Q.  Did you see it?
 3       A.  A short individual engaged in a
 4  conversation which I couldn't fully make
 5  out, with what appeared to be a supervisor.
 6  Then, make a left turn to continue on his
 7  way down the sidewalk.
 8            I can't even tell if it was another
 9  officer or somebody. It seems like there
10  was some type of struggle that ended up
11  over to the left up against the building,
12  behind the pillar.
13       Q.  Did the conversation that he had
14  with the supervisor proceeding this
15  physical interaction indicate he was asking
16  permission to go in a certain direction?
17                   MS. MTCHELL:  Objection.
18                   You can answer.
19       A.  I can't make that out.
20       Q.  You think he was asking the
21  weather? What do you think he was asking?
22                   MS. MTCHELL:  Objection.
23                   You can answer.
24       A.  Something involving directions,
25  because I see hands pointing.
```

```
                                        Page 322
1                 A.  RAGANELLA
2        Q.  Do you hear him say, If I go that
3   way, will I be detained?
4                       MS. MTCHELL:  Objection.
5                       You can answer.
6        A.  I heard him say, if I go that way.
7   I didn't hear the part about detained.
8        Q.  Did you hear there, him ask if he
9   would be detained if he walked this way?
10                      MS. MTCHELL:  Objection.
11                      You can answer.
12       A.  It sounded to me like he said
13  something about being handcuffed.
14       Q.  Did you hear him there where he
15  just said, will I be detained?
16                      MS. MTCHELL:  Objection.
17                      You can answer.
18       A.  No, I didn't. I heard him say
19  something about entrapment if I get
20  handcuffed.
21          Okay, now I hear it. Yes. Will I be
22  detained, yes.
23       Q.  I want you to see if this officer
24  responds to him. Do you hear the officer
25  respond, and say no?
```

```
1              A.  RAGANELLA
2                      MS. MTCHELL:  Objection.
3                      You can answer.
4       A.  I can't make out what the officer
5   is saying.
6       Q.  It's not easy, I'll grant you that.
7   It's not easy, there's a lot of background
8   noise. I'd ask you to really focus and try
9   to hear.
10                      MS. MTCHELL:  Objection.
11      Q.  Did you hear him respond?
12      A.  Yes.
13                      MS. MTCHELL:  Objection.
14      Q.  What did he say?
15      A.  It sounded to me like he said no.
16      Q.  Then the individual said thank you,
17  correct?
18                      MS. MTCHELL:  Objection.
19                      You can answer.
20      A.  Stand by for a second, because I
21  can't see the officer's face. Although I
22  may make out the word no, I can't with any
23  certainty say that it came from the
24  officer. It could have come from the person
25  holding the camera.
```

1           A. RAGANELLA
2       Q.  Did the interaction between the two
3   of them indicate it came from the officer?
4       A.  Yes, it did.
5       Q.  Because the individual asked the
6   question, we believe the officer responded,
7   and the individual said thank you, and then
8   started to walk in the direction he had
9   requested permission to walk in. Correct?
10                  MS. MTCHELL:  Objection.
11                  You can answer.
12      A.  Absolutely.
13      Q.  Let's turn the volume down since
14  people get pretty upset. Let's go back a
15  little bit just so we can see it.
16          There you're seeing a physical
17  interaction, correct?
18                  MS. MTCHELL:  Objection.
19                  You can answer.
20      A.  Yeah, it appears to me that a
21  Supervisor in a white shirt maybe, and
22  another officer approach him.
23      Q.  And stop him from proceeding in the
24  direction he was just given permission to
25  proceed in. Isn't that correct?

Page 325

```
1                    A. RAGANELLA
2          A.   Correct.
3          Q.   At that point, those officers then
4     take this individual and put him up against
5     the building, correct?
6          A.   Correct.
7          Q.   And they place him under arrest,
8     correct?
9                         MS. MTCHELL:  Objection.
10                        You can answer.
11         A.   It appears that's what they're
12    doing, yes.
13         Q.   Did the police conduct that you can
14    see in this video, comport with the
15    training of disorderly control?
16                        MS. MTCHELL:  Objection.
17                        You can answer.
18         A.   It's hard to know what the officers
19    knew at that time, so I can't answer that.
20         Q.   Did that seem like an appropriate
21    response by the police who arrested this
22    individual, to what was going on?
23         A.   It very well could have been, yes.
24         Q.   Did it seem like from what you
25    could see in the video, an appropriate
```

Page 326

```
 1          A. RAGANELLA
 2    response to what you could see in the
 3    video?
 4                    MS. MTCHELL:  Objection.
 5                    You can answer.
 6        A.  Yes.
 7        Q.  What in the video showed you that
 8    was an appropriate response?
 9                    MS. MTCHELL:  Objection.
10                    You can answer.
11        A.  From what I saw and what I heard in
12    the video, that was not an appropriate
13    response. However, the officer in the white
14    shirt whatever rank he was, and the officer
15    that was with him, I don't know that they
16    were privy to that conversation that
17    allowed that individual to make the left
18    and go through.
19              They may have been under the
20    guidance that nobody from that crowd is
21    allowed to walk down that sidewalk. Since
22    they didn't hear that conversation and they
23    saw an individual coming down the sidewalk,
24    that may have given them the probable cause
25    to believe that this individual disobeyed a
```

```
                                                 Page 327
 1              A.  RAGANELLA
 2   lawful order from a police officer.
 3              I don't know what he was arrested
 4   for, so I don't know.
 5        Q.   There's a lot of assumptions in the
 6   statement you just made.
 7        A.   Absolutely.
 8        Q.   They're not based on the video, and
 9   what you're seeing in the video. I'm asking
10   you to answer the questions based on what
11   you can see here.
12        A.   I have knowledge that those
13   arresting officers may not have. I believe
14   that you're asking me to go into the mind
15   of the police officers and if they have
16   probable cause.
17        Q.   You don't know if they have the
18   knowledge or not, correct?
19        A.   Correct.
20        Q.   So, you're imputing to them a lack
21   of knowledge that they may actually have.
22   Correct?
23                   MS. MITCHELL:  Objection.
24                   You can answer.
25        A.   There's a lot of maybes, yes.
```

1              A. RAGANELLA

2        Q.  Right, and the only reason you're

3   doing that is to justify what seems to be a

4   fairly obviously bad arrest.

5                    MS. MTCHELL:  Objection.

6                    You can answer.

7        A.  No.

8        Q.  Is there another reason you're

9   doing that?

10       A.  Yes.

11       Q.  What is that?

12       A.  Because I don't know what the

13   officers that made the arrest saw, heard,

14   or what directions they were given.

15       Q.  It's pretty loud where this is

16   happening, correct?

17       A.  Seems to be.

18       Q.  The person who's asking permission

19   starts by making a threat to somebody. Not

20   to the officer he's talking to. Correct?

21       A.  That I can't tell.

22       Q.  No? Let's watch it again.

23            Do you see all of these officers in

24   the background?

25       A.  Yes.

```
                                              Page 329
 1              A. RAGANELLA
 2        Q.   They are looking and facing this
 3   conversation?
 4        A.   Yes.
 5        Q.   Please pay attention to those. You
 6   see in the background, a lot of officers
 7   focused on this conversation. Correct?
 8                        MS. MTCHELL:   Objection.
 9                        You can answer.
10        Q.   Correct?
11        A.   I don't know that they're focused
12   on the conversation. They seem to be
13   focused on the interaction.
14        Q.   Between this individual and the
15   police officer.
16        A.   Correct, but just established that
17   it's very loud there.
18        Q.   Yes.
19        A.   So, I can't tell you that the
20   officers heard what the conversation was.
21        Q.   This white shirt here is the one
22   who stopped him. He's the one you're
23   indicating may not have been aware that
24   this officer right here gave him permission
25   to turn. Correct?
```

```
                                              Page 330

 1              A. RAGANELLA
 2       A.   Correct.
 3       Q.   I'm saying from this, it looks like
 4   they are just a couple of feet apart.
 5   Between the white shirt officer and the
 6   officer, you're saying gave this individual
 7   permission. Correct?
 8                    MS. MTCHELL:  Objection.
 9                    You can answer.
10       A.   What's your question?
11       Q.   It looks like they're just a couple
12   feet apart at this point?
13       A.   It looks like more than that to me.
14       Q.   How much feet does it look like
15   they're apart?
16       A.   I would say at least six or seven
17   feet.
18       Q.   Enough where the officer who gave
19   him permission could say, hey I just gave
20   him permission. I don't know if you heard.
21                    MS. MTCHELL:  Objection.
22                    You can answer, if you
23                    can.
24       A.   I guess that's possible.
25       Q.   But, he doesn't do that, does he?
```

```
                                    Page 331
 1               A. RAGANELLA
 2        A.  I don't see him do that.
 3        Q.  Right? And he allows the arrest to
 4   go forward. Doesn't he?
 5                     MS. MTCHELL:  Objection.
 6                     You can answer.
 7        A.  Can you continue playing it?
 8        Q.  I want to go back and see if you
 9   can watch the white shirt from before. See
10   if we can find him in the back of that
11   crowd.
12        A.  Yes, I see him.
13        Q.  Is he also paying attention to
14   what's going on?
15        A.  He seems to be looking around.
16        Q.  In the direction of where the
17   conversation is taking place, correct?
18                     MS. MTCHELL:  Objection.
19                     You can answer.
20        A.  He looked like he was looking at
21   the store at first.
22        Q.  It's still your testimony from
23   watching this video, that you don't know if
24   that white shirt officer could actually
25   have understood that this individual is
```

```
 1              A.  RAGANELLA
 2   being given permission by the officer he
 3   was speaking to, to turn and go in that
 4   direction?
 5        A.   That is correct. I do not know
 6   that.
 7        Q.   That's your testimony?
 8        A.   That is correct.
 9        Q.   You think it's more likely that
10   occurred, than that white shirt officer
11   just chose to make a bad arrest?
12                   MS. MTCHELL:  Objection.
13                   You can answer.
14        A.   I would hope that an officer
15   doesn't choose to make a bad arrest.
16           Based on the fact that I don't have
17   the knowledge of actually being there at
18   the scene, I have to make the assumption
19   that he did not make a bad arrest and he
20   was unaware that person was given
21   permission.
22        Q.   Okay.
23        A.   That's my testimony.
24        Q.   What does your training do, to tell
25   officers in that situation about how to
```

```
                                      Page 333
 1              A. RAGANELLA
 2   handle it. Once one officer has given
 3   permission to someone to do something,
 4   another officer starts making an arrest
 5   based on that same conduct, that this
 6   individual already had authorization to do?
 7                  MS. MTCHELL:  Objection.
 8                  You can answer, if you
 9            can.
10       A.  Then it goes back to what the
11   initial officer that he had the
12   conversation with. I don't know what he
13   knew or what he was told to do. It appears
14   to me, again going from only what I see
15   here. There may have been a
16   miscommunication between the officers.
17       Q.  That miscommunication led to the
18   arrest of the individual. Correct?
19                  MS. MTCHELL:  Objection.
20                  You can answer, if you
21            know.
22       A.  I don't know.
23       Q.  Well, you just said there appears
24   to be a miscommunication.
25       A.  Yes.
```

Page 334

1          A. RAGANELLA
2      Q.  Was the result of that
3  miscommunication that this individual went
4  home, or the individual got handcuffed?
5                    MS. MTCHELL:  Objection.
6                    You can answer, if you
7              know.
8      A.  If there was in fact a
9  miscommunication, it resulted in from what
10  I see, those officers having probable cause
11  to make an arrest.
12     Q.  The miscommunication gave the
13  officers probable cause to make an arrest?
14                    MS. MTCHELL:  Objection.
15                    You can answer.
16     A.  That's not what I said, no.
17     Q.  Why don't you clear that up for me?
18     A.  It's my testimony from what I see
19  here, again making assumptions, because
20  that's what you're asking me to do because
21  I wasn't there, and don't have the full
22  knowledge.
23     Q.  I'm not asking you to make
24  assumptions. I'm trying to --
25     A.  I can't answer the question.

1          A.  RAGANELLA

2      Q.  I'm trying to ask you questions on

3  just what you can observe in the video.

4  You're answering it by making many

5  assumptions.

6      A.  Okay.

7      Q.  I'm asking you, by what you observe

8  in the video, what can you tell us? Is

9  there probable cause. You're telling me

10  well, and then you make a bunch of

11  assumptions.

12          I'm not asking for the assumptions.

13  I'm allowing you to answer it the way you

14  want, but I'm not the one asking you to

15  make an assumption.

16          With that understanding, where I'm

17  only asking you to answer based on what you

18  can see in the video, do you see probable

19  cause for that arrest?

20                  MS. MTCHELL:

21                  Objection. Calls for

22                  speculation.

23                      You can answer.

24      A.  You're asking me to speculate. I

25  can't.

Page 336

```
 1              A.  RAGANELLA
 2        Q.  I'm not asking you to speculate,
 3    I'm asking you based on what you saw in the
 4    video.
 5        A.  So, you're asking me to speculate.
 6    If those officers were not told anything,
 7    then I could see that possibly they don't
 8    have probable cause.
 9              However, if those officers were
10    told this is a frozen area, we're not
11    allowing pedestrians to come down the
12    sidewalk, and then this individual comes
13    down the sidewalk, that could establish
14    probable cause. I don't know which way that
15    went.
16        Q.  Even if he had permission to go in
17    that direction, that would still give them
18    probable cause to make that arrest?
19                    MS. MTCHELL:  Objection.
20                    You can answer.
21        A.  Again, I don't know if the officers
22    knew that he was given permission or not.
23        Q.  I understand that.
24        A.  Okay.
25        Q.  Even if they didn't know that he
```

```
                                        Page 337
 1              A.  RAGANELLA
 2   was given permission.
 3        A.   Yes.
 4        Q.   The fact that he was given
 5   permission means he had the lawful right to
 6   be in that direction. To walk those steps.
 7              Even if the officers didn't know
 8   that, that doesn't establish probable
 9   cause. Perhaps it establishes arguable
10   probable cause and will grant those
11   officers qualified immunity from a false
12   arrest suit.
13              I do not believe it establishes
14   probable cause for that person's arrest. Do
15   you agree with that?
16                    MS. MTCHELL:  Objection.
17        A.   I disagree with that.
18        Q.   What is it you disagree with? How
19   do you see probable cause established there
20   if that individual had permission to take
21   that route?
22        A.   Again, I don't know that the
23   officers knew that he was given permission
24   to go down that sidewalk.
25        Q.   Understood.
```

```
 1              A. RAGANELLA
 2       A.  If the officers did not know that
 3   he had permission to go down that sidewalk,
 4   and those officers were given instructions
 5   or were under a mandate to maintain a
 6   frozen zone and not allow pedestrians to
 7   come down that sidewalk, and they believed
 8   that was being violated by the individual,
 9   that may establish probable cause for them.
10       Q.  You believe that a police officer
11   can utilize a mistake of knowledge to
12   establish probable cause for a lawful
13   arrest?
14                  MS. MTCHELL:  Objection.
15                  You can answer.
16       A.  Hindsight is 20/20 but I doubt that
17   they knew that they were mistaken.
18       Q.  I'm going to ask the question
19   again, because I'd like you to answer the
20   question I'm asking.
21       A.  Okay.
22       Q.  It's your belief that a mistake of
23   fact by a police officer can establish
24   probable cause for an arrest?
25                  MS. MTCHELL:  Objection.
```

```
 1              A. RAGANELLA
 2                   You can answer.
 3      A.  Does the officer know that he's
 4  under mistake at the point that he
 5  establishes probable cause? I don't
 6  understand what you're asking.
 7      Q.  Is probable cause established by
 8  the police or by the facts?
 9      A.  By a reasonable officer taking into
10  consideration the facts known to him at the
11  time that established that an offense was
12  committed, and that person to be arrested
13  is the person that committed the offense.
14      Q.  Right.
15      A.  That's what gives us probable
16  cause.
17      Q.  If an offense is committed. If a
18  person has permission to do something by
19  the police, he's not committing an offense.
20  If a police officer doesn't know that, he
21  makes a mistake and believe probable cause
22  is established when in fact it was not.
23  Isn't that accurate?
24                   MS. MTCHELL:  Objection.
25      A.  I agree.
```

```
                                              Page 340
 1              A.  RAGANELLA
 2         Q.   In this situation, if those two
 3    officers did in fact not know that this
 4    person was given permission and therefore
 5    made that arrest, that doesn't establish
 6    probable cause, that just makes them
 7    believe that they're seeing probable cause.
 8    When in fact, it doesn't exist. Is that
 9    true?
10                    MS. MTCHELL:  Objection.
11                    You can answer, if you
12              can.
13         A.   We're deep into semantics right
14    now, because for an officer to establish
15    probable cause, he has to believe certain
16    things.
17              Yes? If an officer believes that an
18    offense was committed, and the person to be
19    arrested is the person that committed it,
20    he has the standard of proof of probable
21    cause to make an arrest.
22              If he finds out later that
23    information was incorrect, and it was a
24    mistake, that doesn't take away the fact
25    that at the time he made the arrest, he in
```

```
 1              A. RAGANELLA

 2   his mind had probable cause.

 3       Q.  I agree that doesn't take it out of

 4   his mind. It does change the fact that

 5   there was no probable cause.

 6       A.  Okay, well I'm not a lawyer, so

 7   that part I can't get into.

 8       Q.  I think that you're right. We're

 9   deep into the weeds here, and I would enjoy

10   having this conversation with you over a

11   beer instead of --

12       A.  Good, I'll take you up on that.

13                 MR. STECKLOW:  At this

14                 point, as I said I was going to

15                 stop and let your counsel ask

16                 some questions. We were then

17                 going to keep the deposition

18                 open for approximately another

19                 hour, hour and a half time if

20                 we need to. We may not.

21                 MS. MTCHELL:  Okay, thank

22                 you. We can just go off the

23                 record for a couple of minutes,

24                 so I can speak to him.

25                 MR. STECKLOW:  Sure.
```

```
                                    Page 342
 1            A.  RAGANELLA
 2                     (Whereupon, a short recess
 3              was taken.)
 4                     (Back on the record.)
 5                     MS. MTCHELL:  Okay. I
 6              don't care to be in your video.
 7                     MR. STECKLOW:  The time is
 8              now 6:30 PM, we're back on the
 9              record.
10   DIRECT EXAMINATION
11   BY MS. MITCHELL:
12        Q.  Inspector Raganella, I just have a
13   couple of questions for you.
14        A.  Okay.
15        Q.  Plaintiff's counsel showed you a
16   number of video clips. In those video clips
17   that you saw, I believe that they were
18   approximately nine or ten video clips.
19            Do you know what happened prior to
20   the start of those video clips?
21        A.  No.
22        Q.  Do you know what, if any infraction
23   occurred prior to the start of those video
24   clips?
25        A.  No.
```

```
 1             A.  RAGANELLA
 2        Q.  Do you know if any pedestrians were
 3   blocked from passing on the sidewalks prior
 4   to the start of those video clips?
 5        A.  No.
 6        Q.  Did you see the entirety of all of
 7   those video clips?
 8        A.  No.
 9        Q.  Do you know if any orders to
10   disperse were given prior to the start of
11   those video clips?
12        A.  No.
13        Q.  Were you speculating when you
14   responded to plaintiffs counsel's questions
15   regarding determinations of probable cause
16   when answering questions regarding those
17   video clips?
18        A.  Yes, based on the limited
19   information that I had from the video clips
20   that I saw, I speculate on whether they had
21   the probable cause to make an arrest.
22        Q.  Showing witness Plaintiff's four,
23   the three photographs.
24        A.  (Witness perusing document.)
25        Q.  Do you know based on these photos
```

344 of 410

```
                                      Page 344
 1              A.  RAGANELLA
 2   whether or not any protestor committed any
 3   infraction?
 4        A.   I do not know.
 5        Q.   Do you know what happened prior to
 6   the taking of these photographs?
 7        A.   No.
 8        Q.   Do you know if any warnings were
 9   issued prior or during the taking of these
10   photographs?
11        A.   No.
12        Q.   When you answered questions
13   regarding these photographs, were you
14   speculating?
15        A.   Yes.
16        Q.   Do you believe that recruit
17   training is deficient?
18        A.   No.
19        Q.   Counsel showed you a number of
20   PowerPoint slides. Do PowerPoint slides
21   reflect everything that is explained and
22   taught during DCU Training?
23        A.   No.
24        Q.   What is the purpose of the
25   PowerPoint slides during DCU Training?
```

                    A. RAGANELLA

1

2          A.   The PowerPoint slides are a guide

3    for the instructor to use to convey certain

4    points within the lesson guide.

5          Q.   Plaintiff's counsel also showed you

6    lesson plans for disorder control unit

7    courses. Do lesson plans convey everything

8    that is taught during DCU course?

9          A.   No.

10         Q.   What is the purpose of a lesson

11   plan for the disorder control unit?

12         A.   A lesson plan is an instructor's

13   guide with information in it to convey to

14   students, recruits, officers, whoever it is

15   that we're teaching, as a guideline as to

16   what to teach them.

17         Q.   For both PowerPoint slides, and

18   lesson plans, is there additional

19   information that is conveyed to students

20   that would not be included in either of

21   those documents?

22         A.   Sure.

23         Q.   You previously testified regarding

24   police paperwork, and the indication of an

25   arresting officer and the assigned officer.

```
                                    Page 346

 1              A.  RAGANELLA

 2              In the narrative section of an

 3    arrest report, would that section indicate

 4    information regarding the arresting officer

 5    or the assigned officer's basis for

 6    arresting the individual?

 7         A.  Yes.

 8         Q.  Is unusual incident always shared

 9    with the disorder control unit?

10         A.  No.

11         Q.  Are unusual incident reports

12    required to be shared with the disorder

13    control unit?

14         A.  No.

15         Q.  Are unusual incident reports

16    required to be shared the disorder control

17    unit under the organizational guide?

18         A.  No.

19                   MS. MTCHELL:  I have no

20                   further questions.

21                   MR. STECKLOW:  This

22                   deposition is over for tonight.

23                   As we said, we might have you

24                   back, hopefully we'll be able

25                   to schedule that beer as well
```

```
                                    Page 347
1           A. RAGANELLA
2                 at some point.
3                       THE WITNESS:  Sounds good.
4                       MR. STECKLOW:  Thank you
5                 so much. The time is now 6:36
6                 PM, and I am turning off.
7                       (Whereupon, the deposition
8                 of Anthony J. Raganella was
9                 adjourned, at 6:36 p.m.)
10                           -o0o-
11                      COURT REPORTER:  Mr. Stecklow,
12                would like the exhibits attached to
13                the transcript?
14                      MR. STECKLOW:  Yes.
15                      COURT REPORTER:  Ms. Mitchell,
16                Are you ordering a copy?
17                      MS. MITCHELL:  Yes, we are.
18                           -o0o-
19
20
21
22
23                 *   *   *   *   *
24
25
```

Page 348

1

2  STATE OF _____ )

3                            )  :ss

4  COUNTY OF _____)

5

6

7          I, ANTHONY J. RAGANELLA, the witness

8  herein, having read the foregoing

9  testimony of the pages of this deposition,

10  do hereby certify it to be a true and

11  correct transcript, subject to the

12  corrections, if any, shown on the attached

13  page.

14

15                    _____

16                    ANTHONY J. RAGANELLA

17

18

19

20  Sworn and subscribed to before me,

21  this _____ day of _____, 2018.

22

23  _____

24          Notary Public

25

Page 349

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK)

5                        :ss

6    COUNTY OF QUEENS)

7

8            I, JUDEEN M. DENNISTON, a Shorthand

9        Reporter and Notary Public, within and for

10       the State of New York, do hereby certify:

11            That, the witness whose deposition

12       is hereinbefore set forth, was duly sworn by

13       me and that such deposition is a true record

14       of the testimony given by such witness.

15            I further certify that I am not

16       related to any of the parties to this action

17       by blood or marriage and that I am in no way

18       interested in the outcome of this matter.

19            IN WITNESS WHEREOF, I have

20       hereunto set my hand this 30th day of

21       July, 2018.

22

23

24              JUDEEN M. DENNISTON

25

Page 350

1

2                    I N D E X

3   EXAMINATION BY                              PAGE

4   Mr. Stecklow                               7

5   Ms. Mitchell                               342

6

7                 E X H I B I T S

8            (Exhibit are attached.)

9   EXHIBIT           DESCRIPTION             PAGE

10  Exhibit 1   Flash Drive                    20

11

12  Exhibit 2   Doc from the Ofc of the

13              Police Commissioner… date 1/24/12   44

14

15  Exhibit 3   Mass Arrest vs riot            48

16

17  Exhibit 4   Photo (3)                      62

18

19  Exhibit 5   Demonstration Lesson Plans     71

20

21  Exhibit 6   Police Department Legal Guide

22              lines for Republican National

23              Convention March 10, 2014      78

24

25  Exhibit 7   Police Academy Training Memo   81

Page 351

1

2   EXHIBIT              DESCRIPTION                    PAGE

3   Exhibit 8    Legalities at Demonstrations        86

4

5   Exhibit 9    Police Department City of New

6                York Dated 1/1/12                    93

7

8   Exhibit 10   Email dated 9/12/11                  108

9

10  Exhibit 11   Military Manner (D004390)            116

11

12  Exhibit 12   Clear & Present Danger Rule

13                (D004345)                           119

14

15  Exhibit 13   Time, Place & Manner Rule

16                (D004344)                           123

17

18  Exhibit 14   Police Omnipresence (D004380)        133

19

20  Exhibit 15   Time, Place & Manner Rule

21                (D004344)                           134

22

23  Exhibit 16   Police Department City June 3, 2011  136

24

25

Page 352

```
 1

 2    EXHIBIT              DESCRIPTION                 PAGE

 3    Exhibit 17  Protestor (sit-in Type)

 4                arrest (D004393)                     138

 5

 6    Exhibit 18  Memo dated 6/3/11 (D004683)         140

 7

 8    Exhibit 19  Memo dated 8/11/11 (D004693)        142

 9

10    Exhibit 20  DCU Level I & II Mobilizations & CRV

11                Training for Task Forces 2010/2011

12                (D014538-14549)                      142

13

14    Exhibit 21  Email dated 3/8/12 From

15                A. Raganella to W. Taylor

16                (D005562)                            151

17

18    Exhibit 22  NYPD Objectives (D003992)           153

19

20    Exhibit 23  Email dated 1/6/12 From

21                A. Raganella to D. Fulton            158

22

23    Exhibit 24  DCU09-053 Police Department City of

24                New York (D004756-4759)             163

25
```

Page 353

1

2   EXHIBIT              DESCRIPTION                    PAGE

3   Exhibit 25  Email dated 10/07/11 from

4              A. Raganella to D. Kastner        186

5

6   Exhibit 26  Leadership Training Section Advanced

7              Command (D006109-6134)            194

8

9   Exhibit 27  Issues Related to Occupy Wall

10             Street (D014429)                  201

11

12  Exhibit 28  Email dated 11/3/11 from

13             A. Raganella to R. Corbertt       219

14

15  Exhibit 29  Police Department City of

16             New York (D014380)                250

17

18  Exhibit 30  Email dated 9/10/12 from B. Cooke

19             to A. Raganella (D05389)          255

20

21  Exhibit 31  Police Department City of

22             New York (D013848-13850)          259

23

24  Exhibit 32  Police Department City of New

25             York dated 10/1/11 (D013902-13904)  260

Page 354

```
1

2   EXHIBIT              DESCRIPTION                  PAGE

3   Exhibit 33  Police Department City of

4               New York dated 3/18/12

5               (D013839-13847)                      260

6

7   Exhibit 34  Legal Division Bulletin

8               dated 4/15/71 (D019527-19539)        264

9

10  Exhibit 35  Legal Bureau Bulletin dated

11              2/2017 (D020862-20867)               264

12

13  Exhibit 36  Document dated 11/4/11 (D005318)    284

14

15  Exhibit 37  Email dated 5/3/12 from

16              A. Raganella to R. Haley

17              (D019439-19441)                      316

18

19

20  REQUEST PRODUCTION   DESCRIPTION            PAGE

21  Pre-written disbursal orders               271

22

23  INSERTS              DESCRIPTION            PAGE

24  None

25                  *   *   *   *   *
```

```
                                          Page 355

1                INSTRUCTIONS TO WITNESS

2

3       Please read your deposition over carefully

4   and make any necessary corrections. You should state

5   the reason in the appropriate space on the errata

6   sheet for any corrections that are made.

7       After doing so, please sign the errata sheet

8   and date it.

9       You are signing same subject to the changes

10  you have noted on the errata sheet, which will be

11  attached to your deposition.

12      It is imperative that you return the original

13  errata sheet to the deposing attorney within thirty

14  (30) days of receipt of the deposition transcript by

15  you. If you fail to do so, the deposition transcript

16  may be deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Page 356

1                       E R R A T A

2

3

4

5        I wish to make the following changes,

6     for the following reasons:

7

8     PAGE LINE

9     ___  ___  CHANGE:_____

10    REASON:_____

11    ___  ___  CHANGE:_____

12    REASON:_____

13    ___ ___  CHANGE:_____

14    REASON:_____

15    ___ ___  CHANGE: _____

16    REASON:_____

17    ___ ___  CHANGE: _____

18    REASON:_____

19

20    _____     _____

         ANTHONY J. RAGANELLA              DATE

21

22    SUBSCRIBED AND SWORN TO BEFORE

23    ME THIS ___DAY OF_____, 201 .

24

      _____        _____

25    NOTARY PUBLIC               COMMISSION EXPIRES

[& - 2010]

Page 1

**&**

**&**  351:12,15,20
352:10,10

**0**

**03-17-12**  260:17
**0900**  195:17

**1**

**1**  16:2 20:25 219:6
227:8,9 261:18
287:2 289:4,12
350:10
**1,400**  130:25
**1,412**  130:9
**1/1/12**  351:6
**1/24/12**  350:13
**1/6/12**  352:20
**10**  108:12 109:14
350:23 351:8
**10-1-11**  260:17
**10/07/11**  353:3
**10/1/11**  353:25
**100**  2:13 154:2
267:21 314:4
**10007**  2:14
**10013**  2:6
**101-04**  251:10,16
253:15 261:8
**108**  351:8
**10:10**  1:15 4:3
**11**  116:18,21,21
121:17 260:13
351:10
**11-15-11**  252:14
**11-17**  260:12,24
**11-17-11**  260:16
**11/3/11**  353:12
**11/4/11**  354:13
**111**  9:6,9,11
**116**  351:10

**119**  351:13
**11:37**  76:6
**11:42**  76:13
**11:58**  89:18
**12**  1:14 16:12
108:23 109:25
111:2 114:7
119:23 120:3
121:18,19,20,21
128:15 278:16
279:9,20 280:8
284:16 351:12
**12,000**  131:9 132:6
132:8,9,16 133:7,7
133:12 134:11
135:24 137:7
145:6,8,8,19,23
146:4,13,17
147:11,11 220:24
**123**  351:16
**12:00**  89:25
**12:05**  92:14
**12:49**  93:5
**12th**  144:22
**13**  123:19,21
351:15
**133**  351:18
**134**  351:21
**136**  351:23
**138**  352:4
**13850**  353:22
**13942**  259:6
**13th**  104:10
**14**  125:9 126:7
133:24 134:4
351:18
**140**  352:6
**142**  352:8,12
**14660**  81:25
**14896**  44:2

**15**  1:8 88:19
134:24 135:2
271:2,13 297:12
299:18 351:20
**151**  352:16
**15195**  44:3
**15270**  78:25
**15276**  291:23
**15277**  291:22
**15278**  223:15
293:16
**15279**  293:18
**15284**  79:8 80:11
**153**  83:17 219:6
352:18
**15304**  79:2
**15310**  83:16 84:8
84:23
**15339**  219:17
**15342**  219:18
220:11
**158**  352:21
**15th**  132:14
252:21 253:6
**16**  136:23,25
351:23
**163**  352:24
**17**  16:2,11 29:14
107:12 108:2
131:7,7 138:9,11
138:13,15 140:5
195:10,13 271:2
271:13 352:3
**179**  6:19 7:5
**17th**  30:7 42:12
132:14
**18**  140:7,8,10,12
140:14,15 352:6
**186**  353:4
**19**  142:6,9 144:15
144:15 352:8

**194**  353:7
**19439**  317:6
**19441**  317:7
354:17
**19460**  108:18
**19462**  108:18
**1971**  264:11,22
265:16
**1997**  159:5 162:10
**1:00**  90:20,22
**1:15**  141:4 303:19
**1:23**  310:17
**1:32**  96:20
**1:43**  232:4
**1:48**  313:17
**1st**  149:6 150:3,9
150:16 153:8
259:8

**2**

**2**  10:5 44:4 219:6
350:12
**2/2017**  354:11
**20**  13:11,12 142:7
142:9,13 145:12
146:8,18 195:17
350:10 352:10
**20,000**  276:3
**20/20**  338:16
**2000**  9:5,8
**2003**  9:8,14
**2004**  79:16
**2005**  9:21
**2007**  9:25 82:4
265:23 266:2,21
**2009**  164:3 170:22
171:13,21 173:17
175:6
**201**  353:10 356:23
**2010**  10:5,15 16:6
16:11 29:13 30:6
42:12 75:9 111:15

113:22 114:16,17
119:15 144:6
145:16 147:17
171:10 172:7
175:8,9
**2010/2011**   352:11
**2011**   15:25 16:2
107:10,12 108:23
109:25 111:2
114:7,20,20 115:7
122:5,6 131:7
132:12 144:6
145:19,24 146:5,9
147:12,17 183:20
198:5 211:25
216:22 252:21
253:6 261:2 276:5
277:10 278:2,16
279:10,21 280:8
281:21 285:15
351:23
**2012**   16:2,11 29:14
30:7 42:12 75:10
108:2 114:21
115:7 119:16
131:8 132:14
145:19,25 146:6
147:13 150:10
153:2 162:6
183:20 195:10,13
195:17 216:22
271:2,13 276:5
277:10 278:3
281:22 299:18
**2013**   10:9,19
**2014**   86:24 125:9
350:23
**2017**   4:10 126:7
264:12,22 265:16
**2018**   1:14 10:15
126:7 164:12

348:21 349:21
**21**   151:9,11 352:14
**2130**   203:6
**217**   1:19 2:5 4:15
92:15 141:11,18
**219**   353:13
**21st**   144:6
**22**   153:16,19,22
203:7 352:18
**23**   10:8,19 158:8
158:11,14 159:11
159:12,19 162:4
352:20
**23rd**   144:6
**24**   18:14 163:15,18
164:2 168:8,23
284:16 352:23
**24/7**   206:25
**24020**   82:7,14
**24034**   82:10
**24035**   82:12
**25**   186:24 187:6
195:23 208:4
353:3
**250**   353:16
**255**   353:19
**259**   353:22
**26**   11:3 194:8,11
194:11,21 202:18
353:6
**260**   353:25 354:5
**264**   354:8,11
**27**   126:7 201:25
202:4 219:4 353:9
**271**   354:21
**273**   76:15
**28**   219:4,13,16
220:7 243:7
250:16 353:12
**284**   354:13

**29**   11:18 131:10
250:11,12,14,18
353:15
**2:00**   141:7
**2:05**   308:23
**2:17**   141:16
**2:30**   285:15

---
**3**
---

**3**   48:18 350:15,17
351:23
**3,700**   144:8
**3/18/12**   354:4
**3/8/12**   352:14
**30**   4:7 15:21,24
16:13 17:7 141:22
170:24 184:5
255:21,23 260:16
267:6 280:14
353:18 355:14
**30th**   164:3 349:20
**31**   259:21,24
260:12,16 353:21
**310**   83:18,19
**316**   354:17
**32**   130:8 260:4,6
260:16 353:24
**33**   130:9 260:4,6
260:17 354:3
**34**   263:25 264:5,11
284:19 354:7
**342**   350:5
**35**   264:5,10,12
284:18,19 354:10
**36**   284:16,21,23
285:2 295:3
354:13
**37**   144:12 284:16
316:21 317:5
354:15
**3:06**   186:18

**3:13**   187:3

---
**4**
---

**4**   62:4 82:11
285:15 302:20
350:17
**4/15/71**   354:8
**40**   227:16
**44**   350:13
**45**   88:20 141:10
183:15,18 184:2
227:10
**4743**   158:20
**4744**   158:20
**4756**   164:5
**4759**   164:6
**48**   18:14 350:15
**4:26**   249:25
**4:30**   285:15
**4:34**   250:7

---
**5**
---

**5**   71:11 82:7,12,14
220:4,9,13 350:19
**5/3/12**   354:15
**50**   273:13 294:14
295:5
**5389**   255:24
**5564**   159:10
**5565**   159:10
**5:59**   317:3

---
**6**
---

**6**   4:7,10 15:21,24
16:13 17:7 78:20
141:22 162:6
170:24 184:5
223:13 267:6
280:14 350:21
**6,000**   146:12
**6,200**   144:10
**6/3/11**   352:6

**60**  80:4 180:8
**62**  350:17
**6:00**  295:23
  315:12
**6:30**  342:8
**6th**  2:5

**7**

**7**  81:19 122:5
  198:5 211:24
  350:4,25
**71**  350:19
**7130**  1:8
**75**  8:15
**76**  143:11
**78**  350:23
**79th**  9:21

**8**

**8**  86:6 200:4 351:3
**8,000**  147:16
**8/11/11**  352:8
**81**  9:17 350:25
**86**  351:3

**9**

**9**  93:12 122:5
  351:5
**9,000**  147:16
**9/10/12**  353:18
**9/12/11**  351:8
**93**  351:6
**95**  8:11
**96**  8:17
**97**  8:18 163:4

**a**

**a.m.**  1:15
**abatement**  204:8
  204:24
**ability**  18:6,15
  225:5

**able**  11:16 21:23
  40:16 54:17 59:25
  93:6 95:17,22
  96:11 131:4 175:4
  180:13,24 186:9
  225:15 230:22
  233:12 239:14
  240:18 293:11
  297:19 306:13
  308:23 309:10
  346:24
**absolutely**  27:21
  53:19 89:14 131:3
  164:23 177:3
  179:8 221:25
  267:19 324:12
  327:7
**academy**  8:11,15
  31:17 36:6 40:2
  40:12 58:7 61:19
  71:22 75:7 88:4
  88:10 136:8,12,17
  147:25 148:6
  219:25 270:11
  276:21 350:25
**accept**  67:15 96:12
  98:19,22 99:3
  100:8 200:9 307:2
**accepted**  174:24
  190:11
**accessible**  66:15
  66:17
**accommodate**
  67:4
**accommodation**
  78:3,5
**accommodations**
  11:2 215:21
**account**  285:12
**accurate**  8:8,12
  45:8 80:6 114:10

125:19,22 163:5
  170:8,10 220:18
  251:14 339:23
  355:16
**acquired**  190:4
**act**  39:16 59:14
  124:6,22 258:15
**acted**  252:3
**acting**  14:8 258:5
**action**  39:17
  349:16
**active**  188:3
**activity**  70:16
  137:23 157:7,11
  242:18 282:13,15
  294:4
**actual**  185:19
  247:20 248:17
**actuality**  238:9
**add**  178:4
**added**  161:7
**adding**  161:11
**addition**  145:13
  146:11,12,16
  190:7 276:25
**additional**  112:14
  139:20 150:4,15
  264:12 345:18
**address**  6:13,16,16
  7:4
**addressed**  196:4,5
  319:6,15
**adequate**  224:5,6
  290:10,17
**adjourned**  347:9
**adjustable**  65:15
**adjusted**  65:17
**adjustments**
  253:18
**administer**  3:18

**administratively**
  13:3
**adopted**  123:16
**advance**  194:21
**advanced**  353:6
**advantages**  258:4
**affairs**  27:10
  44:22,25 45:17
  46:4 252:10
**affect**  281:23
**affirmative**  283:18
**afternoon**  285:16
**aggressively**  43:14
**ago**  18:25 109:15
  109:21
**agree**  24:14 27:19
  73:11,19 74:2,13
  96:2 128:11
  132:18 173:23
  213:20 267:18
  337:15 339:25
  341:3
**agreed**  3:4,10,15
  99:18 114:6 130:3
  168:7 169:8
**ahead**  160:5
**al**  1:5,11 126:9
**alison**  2:15 4:23
  19:17,19,20 20:8
  89:25
**alleged**  283:12
**allotted**  143:22
**allow**  65:18 67:7
  67:10 215:21
  338:6
**allowed**  95:15
  96:4 97:24 98:17
  306:18 326:17,21
**allowing**  335:13
  336:11

allows 331:3
alluding 181:17
alright 204:4
219:3,15 223:12
alternative 77:6,9
78:11,13 84:6
185:6,12,16
218:13 277:12
278:4 290:25
291:9
amendment 23:20
24:16 25:8,20
26:6,17 27:20
133:18 137:22
157:6,10,21,22
182:6,13 183:8
215:20,23 222:14
222:22 242:19
254:25 255:8,12
271:7 278:17
279:3,11,16 290:2
292:4 294:4,25
297:8
amitchel 2:16
amount 14:20,21
20:7 25:25 65:16
88:23 111:18
112:3 115:22
150:8 172:6,13,18
174:16 177:10
318:24
amounts 191:18
191:22
analysis 159:6
160:7,23
anarchist 201:8
anarchists 199:20
angle 236:17
237:4
anniversary
280:20,25 281:8

284:8
announcement
106:9
annoying 198:12
answer 17:8,10
22:9 23:13,23
24:6,18,19,20
25:10,24 26:9,10
26:11,20 27:5,17
28:16 29:2,10
30:20 32:12,23
33:4,12 34:5,6,12
34:15 35:8,20,25
36:11,18,25 39:3
41:2 43:21 46:23
48:8 51:6 53:6
54:25 55:7,14,20
56:4,11 57:5,15
58:4,15 59:25
60:5,18 61:2,14
64:13 65:5 67:24
71:19 72:24 73:24
75:17 77:15 89:4
94:16,24 98:3
99:7,9 100:12
101:14,21 103:10
103:16 104:5,8,14
105:8 110:24
112:24 122:17,25
123:12 126:22
127:4,9,16,25
128:4 133:21
145:18,23 147:2
148:3 149:16,21
169:25 171:25
172:16 184:7,10
189:8 190:22
191:11 192:9
193:5 194:4 197:2
197:9 199:9
206:16,21 210:23

211:7 212:10
215:4 217:15,23
218:7,16,25
220:21 221:7,22
222:6,17 223:2
224:12,17 225:23
229:4,22 230:6
231:2,13 233:3,16
235:19 236:9
237:2 238:19
239:11 240:12
241:4,20 242:15
243:3 247:4
252:16,25 253:8
254:9 255:3,18
263:13 265:20
266:10,16 267:11
268:10 269:9,17
270:22 271:9
276:12 277:8
278:9,21 282:2
284:13 290:6
291:5,14 298:4,11
299:8,20 301:10
302:12 303:18
304:3,11,18 305:2
305:13,25 306:8
306:22,23 309:8
309:13 310:12,22
311:7 313:11,23
315:3 321:18,23
322:5,11,17 323:3
323:19 324:11,19
325:10,17,19
326:5,10 327:10
327:24 328:6
329:9 330:9,22
331:6,19 332:13
333:8,20 334:6,15
334:25 335:13,17
335:23 336:20

338:15,19 339:2
340:11
answered 83:21
189:16 344:12
answering 17:16
90:13 159:16
199:4 306:12
335:4 343:16
answers 16:20
anthony 1:18 4:5
6:6 141:21,24
160:20 347:8
348:7,16 356:20
anticipation 149:5
150:9,17 152:25
164:20 165:25
167:8,16 168:10
280:19,25 281:7
284:8
anybody 20:23
30:25 62:15 136:5
149:19 228:16
238:17 255:14
314:18
anymore 275:16
anyone's 211:2
anytime 256:22
anyway 120:17
ao 244:25
apart 330:4,12,15
apparently 147:15
appeals 266:3
appear 94:19
103:12 105:25
146:10 228:8
231:19
appeared 54:15
95:23 228:10
233:19 240:15
285:2 299:11
301:24 302:7

309:16,21,25
321:5
**appears** 63:13
64:19,22 65:13,24
66:3 71:23 172:3
195:7 219:23
227:23 231:4
285:11,18 304:12
304:19 305:16
306:15 307:3,10
312:13,14 324:20
325:11 333:13,23
**applies** 156:11,13
156:25 157:4
**apply** 38:4 156:11
156:16,17 157:9
**appointment**
14:11
**appreciate** 141:2
**approach** 40:16
137:17,19,25
324:22
**appropriate** 33:8
57:12,16 102:17
102:23 154:25
155:3 300:20
325:20,25 326:8
326:12 355:5
**approximate**
108:8
**approximately**
11:3 13:10 144:8
310:17 341:18
342:18
**april** 126:7 144:5
147:17
**area** 25:4 54:12
227:25 228:5
267:6 271:5 299:2
299:14 312:4,4
336:10

**areas** 232:19
**arguable** 337:9
**argue** 312:7
**arises** 208:2
**arising** 260:9
**armed** 127:24
258:16
**arms** 312:18
**arrest** 11:24,25
33:9 34:21 35:6
36:5 42:5,6 50:5
50:16,20 51:3,8,10
51:16,19 52:21
56:2,18,23 57:2
58:19,21,25 59:9
60:16,24 61:4,7,10
80:19,20 81:4
83:15,23 95:6,10
128:23 129:18
130:5 134:16
139:3,5 161:7
181:17,23 182:15
183:11,14 184:23
185:5,11,15,19,21
185:24 186:3
222:12,21 227:19
229:17 230:24
233:14,25 235:15
236:7,17,21,24
237:6,13,19
238:16,24 239:8
240:8,22 241:7
243:6 244:3,22
245:4,25 246:14
246:18,25 247:9
247:10,15,20
248:17,19 249:11
249:14,17 267:23
268:3 269:7
272:18,24 276:10
277:6 301:21

302:10 306:19
307:16 308:16,24
309:3,6,11 313:8
314:21,24 315:5,6
325:7 328:4,13
331:3 332:11,15
332:19 333:4,18
334:11,13 335:19
336:18 337:12,14
338:13,24 340:5
340:21,25 343:21
346:3 350:15
352:4
**arrested** 50:21,25
51:4,9,12 60:12
67:15 96:25,25
109:24 110:4,6
229:23,25 230:20
231:10 235:11
236:2 238:14
241:16 242:25
244:4,13 246:8
247:5 298:2,8
302:6,16 306:4
314:17 320:24
325:21 327:3
339:12 340:19
**arrestees** 243:20
245:2,10,24 246:5
**arresting** 139:16
209:4 238:25
243:21 244:25
245:3,9,24 246:3,4
246:11,24 247:8
247:18,22,25
248:3 327:13
345:25 346:4,6
**arrests** 32:4,7,9,15
32:21,25 33:6,14
33:19,25 34:8
35:2,3,16 39:20

54:17 55:9 81:6
81:15 98:12
139:15 188:2,16
209:7 238:23
244:10,16 318:2,3
318:6,10,13 319:4
319:20,21
**arrival** 49:14
**arrived** 13:21
**asked** 32:4 45:20
95:11 113:23,25
114:3 120:14
126:20 160:13
174:2 187:7
189:16 252:7
255:5,7 276:25
296:21 298:14
324:5
**asking** 14:18 25:3
26:14 28:9,10
34:18,25 35:12,14
37:19 39:5 59:17
61:9 70:6 72:10
85:11,15 93:25
94:3 95:14 96:11
98:8,22 99:2
100:8 108:8
120:18 121:3,10
127:12 128:8
148:19,20 168:13
170:12,20 171:2
171:20 174:9
178:9,13 183:3
184:18,19 191:2,5
191:6 192:13
198:25 201:16,19
210:5 211:13,15
214:25 215:6
216:17 221:2
233:11 239:6
240:3,7 245:7

263:8 265:16
273:6 276:17
280:13 303:20,22
303:23 306:13
321:15,20,21
327:9,14 328:18
334:20,23 335:7
335:12,14,17,24
336:2,3,5 338:20
339:6
**aspect** 191:3
**assault** 53:10
**assaults** 53:8,13
**assemblages**
215:20 279:17
**assemble** 221:5
**assembly** 23:21
24:2,4,14 25:4
30:10 157:22
**assessing** 251:12
251:20 261:10
**assign** 244:9
**assigned** 7:15 8:20
70:4,9 71:6 109:3
246:15,18 247:9
247:14,23,24
248:3 345:25
346:5
**assignment** 8:14
10:11 15:14,16,18
**assistant** 5:8
**assumption**
332:18 335:15
**assumptions** 327:5
334:19,24 335:5
335:11,12
**asterisk** 197:17,19
**asterisks** 197:21
**attached** 347:12
348:12 350:8
355:11

**attempting** 215:24
**attend** 121:24
286:18
**attended** 286:3
289:11
**attention** 29:7
30:23 59:3 88:24
110:5,8 211:2,20
329:5 331:13
**attorney** 18:19
19:20,23 20:2,5
21:11 168:20
220:22 238:5
268:11 274:14
355:13
**attorney's** 319:2
**attorneys** 3:5
20:12,18
**audible** 139:17
**audience** 157:17
**august** 16:5,6,10
29:13 30:6 42:11
75:9 119:15 144:6
144:22 145:19,24
147:17 175:9
195:10,13,17
216:22 278:16
279:9,19,20 280:8
**author** 172:3
174:5
**authorization**
104:17 209:6
333:6
**authorized** 3:17
57:20
**available** 91:7
207:25 209:3
262:22 295:19
320:6
**avenue** 6:19
104:10,11 277:12

278:4 290:25
291:9
**avoid** 269:6
**awarded** 10:25
12:10,11
**awards** 12:14,15
12:18
**aware** 22:4 29:5
42:18 43:11,22
47:25 69:2 79:13
80:10 89:12 94:9
107:9,14,18 108:3
149:4 153:14
191:16 192:24
193:6,7,12 202:19
217:16,24 218:8
218:17 219:2
254:12 270:23
277:18 278:14
284:14 329:23

**b**

**b** 4:7 15:21,24
16:13 17:7 141:22
170:24 184:5
267:6 280:14
350:7 353:18
**back** 10:12 21:20
31:14 47:21 54:8
60:12 76:11,19
87:18 89:23
108:16 111:15
116:23 117:24
128:13 141:7,10
141:14,16 153:21
158:12 159:23
169:21 173:12
186:22 187:3
195:23 208:3
219:9 220:2
223:12 227:15
228:17 229:6

230:18 232:3
245:16 250:5,7
275:23,24 291:16
297:18 303:4,5,6
303:13 304:7
305:20 308:6,13
308:21 309:24
310:7 311:13
313:3,15 314:8,15
316:12,25 320:13
320:22 324:14
331:8,10 333:10
342:4,8 346:24
**background** 60:8
112:5 172:22
323:7 328:24
329:6
**backing** 307:14
**bad** 228:19 328:4
332:11,15,19
**baited** 214:3
**baiting** 215:25
**balance** 217:11
**balanced** 75:23
**barrier** 65:11,12
65:14,17,20 129:3
129:5
**barriers** 63:18,22
64:5 65:9 67:4
**based** 34:14 48:5
48:11 59:16 60:2
60:6 65:21 67:25
68:4 94:25 98:13
104:18 115:11
117:9 127:24
133:22 179:3
230:7 253:17
262:16 302:13
306:24 327:8,10
332:16 333:5
335:17 336:3

343:18,25
**basic** 52:7
**basically** 150:5
**basis** 346:5
**bates** 44:2 78:25
  81:24 93:16
  108:17 116:22
  142:17 158:19
  159:9,25 164:5
  243:10 255:24
**bathroom** 76:3
  186:16
**bearing** 115:3
**beer** 341:11
  346:25
**began** 107:13
**beginning** 13:12
  104:22 117:11
  197:22 198:18
  200:20 251:3
**behalf** 2:3,10 4:7
  184:8 197:10
  273:17
**behavior** 36:13
  52:18 157:25
  158:2 209:5
**belgium** 65:24
**belief** 40:22 45:5,8
  45:21,23 112:12
  200:13 338:22
**believe** 8:8,10
  10:25 11:2 17:21
  18:13 23:7,18
  26:5 28:22 29:13
  30:16 32:20 44:24
  46:2,11 48:17
  59:17,21 60:14,21
  75:2,22 88:5
  93:18,18 96:22
  107:17 113:11
  125:8 126:13,19

128:3 129:14
  136:3 139:2 142:5
  153:10 159:4,6
  162:5,9 165:3
  167:10 168:21
  171:9,11,16 172:7
  172:11 173:15
  199:3 200:7
  201:13 204:21
  214:19 221:19
  229:17 258:8,11
  264:7,15,17
  269:10,11,19,21
  269:25 272:4,15
  298:21 306:18
  307:8 311:2 313:5
  313:25 324:6
  326:25 327:13
  337:13 338:10
  339:21 340:7,15
  342:17 344:16
**believed** 29:20
  198:8,11 209:12
  338:7
**believes** 39:18
  174:6 340:17
**beneficial** 46:7
**benjamin** 126:9
**best** 108:7 166:13
  264:19
**better** 43:16 122:7
  172:23 173:2
  253:10 308:3
**beyond** 72:5,9
  170:23 171:22
**big** 13:7
**bigger** 13:19 132:7
**bind** 17:8
**binds** 17:10
**bit** 92:9 236:23
  306:25 320:13

324:15
**black** 66:4,7
  312:11
**block** 64:8 65:25
  101:5,6 180:22
  223:9
**blockage** 106:2,8
  106:13,14 303:16
  310:18,19 313:17
**blocked** 221:25
  237:17 238:9
  303:25 304:8,14
  304:15 309:25
  311:3 343:3
**blocking** 37:9
  40:18 43:19 67:17
  67:22 68:5 105:2
  105:5,11,23
  106:20,22 221:3
  221:15 222:8
  230:2 233:23
  235:12 236:20
  237:25 238:14
  239:7 240:3,9
  305:23 306:3,5,20
  307:5,8 315:7
**blocks** 175:16,19
  176:5,8 179:15
  180:21
**blood** 349:17
**blue** 27:11 232:6
  309:21 312:13
**bodies** 207:9,11,13
**body** 61:6
**bomb** 226:23
**booklet** 159:2
  160:8 162:12,17
  163:3
**borough** 7:6,10,12
  8:23,25 9:2,12
  10:13 130:22

189:25 190:5,8
  196:6,11 200:4
  207:3 208:23,25
  209:10 244:21
  249:7 258:14
**boroughs** 131:10
**bottle** 235:21
**bottom** 72:16
  203:5
**break** 76:4,8 89:13
  89:20 141:5
  186:19 249:24
  250:2
**breakdown**
  178:19
**brief** 117:20 118:7
  118:9,15 119:6,9
  119:19
**bring** 143:11
  211:2
**broadway** 299:18
**broken** 176:15
**bronx** 24:13 44:14
  45:13 91:20
**brooklyn** 6:20 7:6
  7:12 8:23 9:2,24
  10:13 234:19
**brought** 29:7
  30:22 59:2 110:7
  115:21 171:23
  211:19
**build** 13:18
**building** 63:25
  65:12 231:9
  232:10,23 233:5
  240:24 321:11
  325:5
**bullet** 197:24
**bulletin** 262:7,10
  262:11 264:13
  265:24 354:7,10

bulletins 263:10
bunch 106:17
  195:24 335:10
bunched 105:9
  106:10
burden 90:11
bureau 38:14
  143:9,18,22,23
  148:9 262:7,9,11
  262:13 263:10
  264:13 317:22
  319:12 354:10
button 273:18
  274:17,19

**c**

c 2:2 293:18,22
  349:2,2
cabinet 288:14,22
cache 46:16
cadet 40:6
calendar 285:8,9
  285:12
call 69:14 81:25
  88:8,15,18,25
  89:16 166:8,11
  203:17 214:4
  263:4 273:14
  297:13
called 86:16 87:23
  93:19 267:2,8
  289:21
calling 140:17,22
calls 101:20
  117:22 118:22,24
  220:20 222:16
  335:21
camera 95:2
  229:10 236:13
  323:25
canisters 191:23

cap 309:20
capacity 198:20
  198:25 199:5
captain 10:5,18
  12:24 23:3,8
  234:18 270:9
  317:21 319:11
captains 7:14
car 129:19
cardboard 302:15
care 342:6
career 10:21
carefully 124:14
  355:3
carrie 8:6
carried 206:7
carries 124:15
carry 206:25
carrying 293:23
  294:2,24 297:4,7
  297:21 302:9,14
case 1:8 20:15,20
  20:23 46:18 80:19
  82:14 87:11,15
  126:9 129:15
  262:17 264:8
  266:3,12,12,21
  297:14
cases 91:15
cause 32:21,24
  33:14,16,21,23
  34:3,10,15,17,21
  34:24 35:6,9,18,21
  36:2,5 40:4,17,21
  41:7 55:17,23
  56:2,7 58:6 60:16
  119:18 153:6,7
  233:24 235:15
  237:13,20,22,24
  238:11 239:8,12
  239:14 240:2,8

245:16 246:17
  247:6,15 268:7,7
  269:6,23 276:9
  277:5 298:16
  306:19 308:16
  309:6,10,15 313:7
  313:7,8 314:21
  326:24 327:16
  334:10,13 335:9
  335:19 336:8,14
  336:18 337:9,10
  337:14,19 338:9
  338:12,24 339:5,7
  339:16,21 340:6,7
  340:15,21 341:2,5
  343:15,21
caused 216:24
  217:9,19 218:3,11
  218:20 247:20
cc'd 196:7
center 4:15 76:15
  92:16 107:14
  110:2 141:11,19
  287:2 289:4,13,16
centre 1:19 2:5
ceremony 12:5,12
  12:16
certain 16:17
  52:17,18 106:16
  136:7 137:21
  149:22 152:18
  310:23 321:16
  340:15 345:3
certainly 259:4
  287:13
certainty 11:17
  323:23
certification 3:7
certify 348:10
  349:10,15

chain 253:21
chance 49:2 62:10
  71:17 120:7
  123:25 142:14
  164:18 256:2
  317:10,12
change 110:21
  113:2,3,3 127:16
  200:22 201:3
  254:15 265:18
  266:13,20,24
  318:17,21 341:4
  356:9,11,13,15,17
changed 113:24
  114:4 121:5
  126:14 142:3
  160:2 176:8
  264:21
changes 126:3
  253:18,25 355:9
  356:5
chapter 80:13
charge 14:3,5,18
  29:15 239:7
  277:19
charged 67:16
  238:3
check 90:21
  214:15 215:5,10
checking 214:21
checklist 256:14
  256:16 257:2,3,13
  257:15
chemical 281:23
chemicals 281:20
chief 7:19,20,21
  14:4,5 115:13,14
  115:15,17,18,20
  117:24 150:2
  151:24 152:11
  234:10,11,15

243:17 245:17
249:10 285:14
286:23 287:5,14
289:9,17
**chiefs**  7:14,15
195:24
**choose**  332:15
**chose**  301:14
332:11
**chosen**  238:16
**church**  2:13
**circles**  275:16
**circular**  216:18
**circumstances**
26:23 38:3 137:21
155:18 221:23
239:15 243:5
**citation**  318:11
**cited**  87:15
**citizens**  74:21
**city**  1:11 4:8 17:3
17:9 18:20 22:12
22:15,24 23:10
43:15 44:10 69:15
79:17 80:5 119:14
125:11 126:9
184:8,10 201:20
201:22 270:16,19
271:2,13,20
273:22 275:12
280:16 351:5,23
352:23 353:15,21
353:24 354:3
**city's**  23:19 69:10
**civil**  43:12 50:9
51:2 52:8,14 53:4
53:17 180:6 182:4
182:12 183:4,12
183:16 242:5
244:5 257:10
258:6

**claim**  282:18
300:8
**clarification**
199:13
**clarified**  114:11
**clarify**  199:11
292:11
**class**  88:23 186:10
270:25 271:12,18
297:13
**classroom**  41:5
42:7,9,16,17,22
43:4,6,8 49:25
176:22 177:17,20
177:22 180:4
183:9,19 184:15
**classrooms**  42:21
**clause**  220:13
**clean**  169:25
**clear**  31:16 36:15
56:8,14,25 57:9,12
57:20 59:12 94:21
100:17 132:3
133:17 139:17
148:18 161:13
178:9 188:4 189:5
198:19 199:9
210:4 215:6
217:21 220:15
222:2,9 245:6
263:7 273:6
276:16 303:21
309:17 311:16
313:19 314:23
334:17 351:12
**clearing**  46:10
**clearly**  267:5
312:3
**clip**  58:24 103:11
239:17,25

**clips**  342:16,16,18
342:20,24 343:4,7
343:11,17,19
**close**  80:5 229:15
**closer**  21:10 295:5
**clothes**  64:15
**collared**  109:15
**collecting**  318:10
**combined**  180:16
**come**  21:10 29:21
88:6 111:4 130:16
172:21 187:22
229:6 235:13
270:12 273:11
301:6 323:24
336:11 338:7
**comes**  38:24 40:18
150:6 156:23
236:13 253:15
259:2 336:12
**coming**  109:6
110:11,13 227:25
239:23 257:25
273:14 274:24
310:24 326:23
**command**  6:19
8:21 15:2 87:23
88:15,25 111:14
114:13 117:9,17
117:23 118:18,21
124:13 136:16,18
188:12 194:21
253:22 262:25
263:17,22 289:4
289:12 353:7
**commander**  57:23
62:3 67:2 68:14
107:4 209:6
226:17 272:21
**commander's**
61:17

**commanders**
61:22 200:4 273:5
273:8
**commanding**
12:23 14:6,8 16:8
68:18,20 164:4
178:8,14,22 179:6
180:2,10 182:25
187:12 193:9,17
196:7,8,12,13
234:19 253:22
268:20
**commands**  87:24
88:9 263:3,16
**commendations**
10:22 11:18 12:3
**commission**
356:25
**commissioner**
29:8 43:13 45:15
350:13
**commit**  25:17
242:21
**committed**  235:20
237:12 339:12,13
339:17 340:18,19
344:2
**committee**  12:9
**committing**  25:11
25:13 339:19
**common**  129:16
**communicate**
149:18 150:2
**communicated**
109:9 149:13,24
203:15
**communicating**
107:23 200:3
**communication**
117:17,23 130:20
167:6 172:4

187:11 196:5
243:15 277:13
278:4 290:25
291:10
**communications**
168:2
**community** 25:5
27:10 204:22
**compare** 152:19
293:8
**compared** 39:23
310:9
**comparison**
152:21
**complain** 45:12
204:7
**complained** 29:6
204:23
**complaint** 44:9,12
45:2 270:16
**complaints** 48:2,6
48:11,14
**compliant** 81:7
252:5
**complied** 118:2
**component** 42:2
50:5 129:9 179:5
180:25
**components**
129:12 180:14
181:7,11
**comport** 22:11,15
22:23 27:2,7,14
28:13,21 33:19,25
34:8 35:4,22
55:10 56:24 61:4
64:4 100:10,15,20
325:14
**comported** 23:9
23:19 35:16

**comporting** 102:9
**computer** 63:4,6
**concealed** 117:10
117:20 119:7
**conceivably** 223:7
**concept** 39:15
73:16 258:13
**concern** 50:17
149:9,13,18 150:3
172:10 174:15
243:22 249:10
**concerned** 40:15
48:14 172:19,25
242:8 249:11
**concerning** 20:15
23:20 45:2 59:4
82:13 135:25
218:21 255:11
270:17 285:17,22
286:16 288:24
**concerns** 43:13
82:6 208:5 243:21
**conclusion** 220:20
222:16
**conduct** 23:18
24:15 26:25 27:14
30:14 35:2 36:9
36:14 40:3,18
41:8 48:15 52:24
53:2 56:23 67:17
70:2 84:25 87:9
98:13 120:19
139:8 148:4
154:20 155:23
168:25 169:10,13
169:16 170:2
179:3 182:6,14
191:7 217:2
222:12,21 230:2
238:4 247:20
251:24 252:4,21

254:6 264:14,21
265:17 266:5,13
268:4,5 270:17
276:14 277:5
278:23 279:8
300:12 306:5
325:13 333:5
**conducted** 175:17
254:22 280:19,24
281:6 284:7
**conducting** 251:12
261:9 319:4
**conducts** 71:10
**conference** 285:14
286:24 287:6
289:9
**confines** 69:6,13
69:22
**confirming** 117:25
**conflict** 80:15
**confused** 121:9
**congregate** 81:11
**conjunction**
143:19
**connection** 271:3
271:14,21
**consecutive**
117:22 176:12,14
178:11,16,24
**consider** 196:19
196:23 197:6
199:16,19
**consideration**
223:7 237:22
239:15 298:12
339:10
**considered** 249:14
262:20 276:18,22
**considering** 44:11
**consist** 205:5

**consistent** 32:9,15
33:6 209:12
229:19 230:3
237:5 251:10
301:2
**consistently** 8:22
**consisting** 52:16
**constitute** 276:9
277:4
**constitution**
268:14
**constitutional**
70:15 80:20 268:7
268:22 269:6
279:15
**constitutionality**
190:19
**constitutionally**
81:6 252:5
**consulted** 319:12
**contain** 77:18
78:11,13 84:5
289:25
**contained** 82:15
146:18
**containing** 86:15
**contains** 174:19
**contemplated**
300:23
**contents** 126:23
**context** 221:12
**continually** 112:9
275:2
**continue** 77:18
90:2 141:11 142:4
295:16 301:22
310:4 321:6 331:7
**continued** 10:10
49:16 126:8
141:19 169:5

**continues** 142:17
**continuing** 154:20
**control** 16:14
  22:13,17,18 27:3
  27:15 28:14 29:15
  29:16 31:24 32:10
  32:17 33:8 34:2,9
  34:14 35:5,17,23
  36:4 37:4,20
  38:16 39:13,14
  41:16 42:3 48:5
  48:10 49:5 50:2
  52:6 55:11 56:17
  57:11 59:4 60:23
  71:10,25 72:7,7,10
  72:22 78:7 82:21
  82:24 83:6,22,25
  84:4,10,13 85:6,8
  85:12,25 86:3
  94:8 99:10,17
  100:10 101:18
  102:10 107:6
  110:14,18 111:6
  111:14,21 112:4
  113:22 114:13
  115:21 118:24
  120:10,19 123:16
  124:3,13,19 127:4
  128:16,20 129:9
  131:8,13 132:15
  135:6,10 136:4
  137:4,20 138:20
  139:25 143:5,25
  146:22 147:10,20
  147:24 148:5,12
  148:21 149:7
  150:7,9 152:23
  153:13 157:4,14
  159:2,3 161:21,25
  162:7,12,17 164:5
  169:2,6 170:18

171:6,9,12,18
172:14 174:6,20
175:7,18 176:10
178:6,15,21 179:3
179:7,19 180:2,7,9
180:17 181:7,12
181:13,20 182:19
182:25 183:19
185:10 186:4,13
192:25 193:9,16
193:25 195:3,6,20
205:7 208:24
211:5 213:4,12
214:22 216:6,11
220:14 223:5,6
224:20,23 225:8
229:20 230:4
237:6 241:10
251:11,18 253:13
254:2,15,20
255:12,16 256:13
261:9,15,23,25
266:19,23 268:21
269:25 270:4,12
270:15 272:7,23
273:18,23 274:5,8
274:24 276:15,18
277:2,20 281:3
291:19 292:10,12
292:18 293:13
294:5 297:3,9
300:20 301:3
325:15 345:6,11
346:9,13,16
**convention** 79:16
  79:24 350:23
**conversation**
  61:24 320:10
  321:4,13 326:16
  326:22 329:3,7,12
  329:20 331:17

333:12 341:10
**conversations**
  164:24 192:14,16
  319:25
**convey** 225:15
  345:3,7,13
**conveyed** 209:25
  244:17 345:19
**cooke** 353:18
**cookie** 40:15
**cooperation**
  115:13
**copies** 82:23
  194:13 273:14,19
  275:2
**copy** 125:24
  126:16,18 163:2
  166:5 260:23
  274:19 347:16
**copying** 274:22
**corbertt** 353:13
**core** 190:2 300:14
**corner** 94:13
  105:20
**corporation** 2:12
**correct** 8:13,16
  9:7,15,18,22 10:7
  10:17,20 13:14,17
  13:22 14:16,17,25
  15:22,23 16:3,14
  16:15 17:22,23
  18:11 19:21,22,24
  19:25 20:3 24:16
  26:7,18 27:20,24
  28:5,7,11,12 29:16
  29:17,22,23 31:18
  31:19,21,22,24,25
  32:7 33:10,17,21
  34:3,10,22 35:6
  37:11,12,17,18
  38:19,20 39:9

40:6,13 41:25
43:4 48:16 49:17
49:18,20,23,24
50:3,4,6,7,11,18
50:19,22,23 51:14
52:9,25 53:11,18
53:21,22 55:18
56:21 58:9,10
59:15,19,20 61:20
66:8,12,13 69:19
69:20,22 77:19,20
78:14,15 79:17,18
80:2,15,16,22,23
81:7,17,18 82:4,7
82:11,12 84:15
85:19 86:25 87:4
87:13,14,16,17
89:2 97:3 100:18
101:12 102:4,7,8
105:13,17,18,20
105:21 106:3,6,7
106:11,24 107:10
107:16,19,24
108:23,24 109:6
109:16,18,19
111:2,3 113:9,13
113:15,17 114:17
114:18 117:3,4,10
118:5,10,11,13
119:10 121:8,14
121:15 122:3,8,9
122:12,15 124:16
124:17,19,20,23
125:4,11,12 126:8
128:21,24 129:3
129:11,14,22,24
130:6,7,10 131:14
132:16,19 133:2,4
133:9,14,15,19
134:22 136:2
137:20 139:11,12

139:14,18,23,24
140:2,3 144:11,13
145:16,21 146:9
146:14 147:14,17
147:18 150:19
153:3,9,13 154:7
154:11,12 156:9
156:14,21 158:6
159:13,17 161:4,5
161:8,11,12,14,15
161:17,18 163:12
163:13 167:9,13
167:14 168:12,20
169:2 172:8,9,14
174:17,18 175:8
175:11,12 176:10
176:13,16,17,19
176:20,23 180:22
180:23 181:2,3,8
181:15,16,19,22
181:25 182:16
184:16,24 185:7
185:13,14,17,23
186:5 188:9
189:24 190:8,15
191:19,20 192:20
192:23 193:3,13
194:22 195:10,25
196:15,20,24
197:15 198:4
199:6,7,22 200:5,6
203:10 205:12,21
206:8,9,13 207:22
208:7 210:8,11,15
211:12,20,22,23
211:25 212:2,4,5,8
212:16,17,19
213:13,14,17
214:23,24 221:20
222:11,20 224:9
227:22 228:2,3,5

229:12 232:11,12
232:15,21,25
234:22 236:17,18
236:24 241:2
242:4,10,13,16,19
245:5,11,18,19,21
246:6,9,13,21
247:2,21,25
248:17,18,21,25
251:18,19 252:14
253:13,14,16
256:7 258:10
259:2,13 261:15
261:19,20,24
262:4,5 263:23
264:14 265:3,8,13
265:14,24,25
266:8 267:20,25
268:8,14,15,18,24
269:18 277:21,22
277:24 279:22
280:17 284:6
289:5 291:25
292:5 297:3,8
299:6 301:15
302:6,10 310:20
312:5,20 323:17
324:9,17,25 325:2
325:5,6,8 327:18
327:19,22 328:16
328:20 329:7,10
329:16,25 330:2,7
331:17 332:5,8
333:18 348:11
**corrected** 195:18
**corrections** 348:12
355:4,6
**correctly** 124:14
202:9 286:25
**correlate** 177:15
177:16

**corresponding**
135:14,16
**cos** 244:21 249:8
**could've** 89:11
274:23
**council** 44:10
159:17 164:22
**counsel** 2:12 4:22
4:23 16:18 44:19
72:5 164:25
167:24 168:3
260:23 316:14
341:15 342:15
344:19 345:5
**counsel's** 343:14
**counter** 143:9,14
143:21
**county** 348:4
349:6
**couple** 32:6 57:8
109:15,21 297:15
315:10,19 316:13
330:4,11 341:23
342:13
**course** 59:22
112:19 136:11
345:8
**courses** 112:20
270:5 345:7
**court** 1:2 3:20
4:16,18 5:12 6:3,8
6:12,21 16:23
138:11 140:10
262:17 266:3
347:11,15 355:16
**courts** 81:5
**cover** 131:18
195:7 257:2
281:18
**covered** 16:22,23
131:20 161:20,25

257:3
**covers** 128:15,19
128:23 129:2
209:24 216:15
**create** 64:24 79:20
80:8 110:17 111:6
142:23 202:20,25
238:7 268:5,6
269:5 289:21
**created** 49:10
79:11,15 117:3
118:15 159:2,3
202:21 213:10
238:10 256:15
**creates** 222:9
**creating** 117:8
**credentials** 28:19
**crime** 103:2 265:2
299:23
**criminal** 300:12
317:22
**critical** 103:3
143:2,7 252:13
254:5 256:19,20
256:23 257:6,9
**critically** 189:19
**cross** 7:2
**crossover** 37:16
37:21
**crosstalk** 63:3
66:6,10 85:7
229:8 240:4
259:17 306:11,14
315:22
**crowd** 22:13,17,18
39:13,14 103:7,13
103:20 106:15,18
123:15 137:15,17
138:6,7 143:25,25
228:7 233:14
234:12 326:20

331:11

**crowds** 100:23
102:14,25 103:5,6

**crv** 71:7 142:25
143:20 144:5
352:10

**csv** 144:10

**cuff** 46:24

**cuffs** 187:17
246:13

**cuny** 204:6

**curb** 229:15 231:8
232:7

**curious** 318:25

**current** 6:18 7:7
8:21 15:12,13
220:24

**currently** 126:13

**cursory** 160:25

**custody** 203:8
272:7 274:5

**cuts** 21:21

**cutter** 40:15

**cv** 1:8

---

**d**

**d** 219:6,17,18
350:2 352:21
353:4

**d003992** 352:18

**d004344** 351:16
351:21

**d004345** 351:13

**d004380** 351:18

**d004390** 351:10

**d004393** 352:4

**d004683** 352:6

**d004693** 352:8

**d004756-4759**
352:24

**d005318** 354:13

---

**d005562** 352:16

**d006109-6134**
353:7

**d013839-13847**
354:5

**d013848** 353:22

**d013902-13904**
353:25

**d014380** 353:16

**d014429** 353:10

**d014538-14549**
352:12

**d019439** 354:17

**d019527-19539**
354:8

**d020862-20867**
354:11

**d05389** 353:19

**d13492** 93:17

**d14368** 116:22

**d14538** 142:17

**d14549** 142:18

**d14658** 81:24

**d14888** 44:2

**d15187** 44:3

**d19452** 243:11

**d3992** 153:22

**d4344** 135:3

**d5318** 285:3

**d556** 151:13

**damage** 53:7
300:5,23

**dance** 228:19,20

**dancing** 228:11,15
228:16,18

**danger** 36:16 56:9
56:15 57:2 59:12
94:22 132:3
133:17 161:13
189:5 217:21
220:16 222:2,9

---

313:20 351:12

**dark** 320:12,16

**date** 1:14 16:24,25
21:3 44:6 47:14
48:20 62:6 71:13
78:22 81:21 86:8
92:4 93:14 108:13
114:7 116:19
119:24 123:20
132:13 134:2,25
136:24 138:14
140:13 142:10
144:17,22 151:10
153:17 158:9
163:16 186:25
194:9 202:2 206:2
206:3 219:14
250:15 255:22
259:22 260:5
264:6 282:16
283:7 284:22
286:21 316:22
350:13 355:8
356:20

**dated** 4:9 82:3
164:3 351:6,8
352:6,8,14,20
353:3,12,18,25
354:4,8,10,13,15

**dates** 79:5 316:9

**day** 12:25 13:2
23:18 108:6 130:9
150:17 151:19
152:25 176:9,15
176:16 178:5,6,10
178:11,12,13
179:4,4,4,9,19
180:15,15,16
182:3,8,9 295:17
296:2 316:4
317:17 319:17

---

348:21 349:20
356:23

**days** 76:23 79:25
80:4 176:13,14
178:16,24 179:11
355:14

**dcu** 10:6,16 12:20
14:3,5,11,16 15:3
15:10 16:9 61:12
64:5 70:2 75:8,12
145:4,10 151:18
151:22 153:8
166:18 178:8
344:22,25 345:8
352:10

**dcu's** 75:14

**dcu09-053** 352:23

**deal** 194:15
215:10

**dealing** 214:16
215:11 216:7,12

**deals** 135:10
215:14

**decade** 175:20,21

**december** 10:8,19
82:3 122:5 126:6

**decide** 12:9

**decided** 37:9
89:15

**decision** 61:7
212:22

**decisions** 38:6
39:8 61:9 87:11

**decline** 319:8,22

**declined** 318:5,24

**dedicated** 131:16
133:6

**deemed** 271:12
355:16

**deep** 231:7 240:23
241:16 340:13

341:9
**deeply** 136:9
**defendant** 2:10
  274:3
**defendants** 1:12
**deficiencies**
  254:20 255:6,10
**deficiency** 255:15
  319:3
**deficient** 344:17
**defined** 40:20
  51:19 52:16,23
**defining** 50:10
**definitely** 275:10
**definition** 49:19
  51:13,21 52:11,15
  148:18
**delays** 72:20 73:5
  73:14,21 74:16,25
  75:22
**deleted** 213:2
**deleting** 213:10
**delivering** 216:24
  217:9,19 218:3,11
  218:20
**demands** 46:17
**demo** 208:19
**demonstrate**
  225:6
**demonstrating**
  226:15
**demonstration**
  38:8,10,11 71:15
  73:20 75:24
  223:25 224:7
  226:19 227:2
  256:24 257:4,9,12
  294:3 318:3,19,22
  350:19
**demonstrations**
  70:18 71:3 72:19

73:4,13 74:7
75:20 83:14 86:17
149:11 157:20
201:10 207:18
219:25 220:17
223:9 225:4 242:6
258:9 269:24
279:25 289:23
290:16,23 291:8
294:11,15,21
351:3
**demonstrator**
  80:14 215:14
**demonstrators**
  50:21 51:11 66:25
  72:20 73:6,14,22
  74:16,20,23,25
  75:22 77:24 99:21
  209:4,15 216:4
  299:10 300:5
**demoralize** 154:24
  155:7,10,11
  156:18 158:4
**demoralized**
  154:10,14,16
  155:4,21,22,24
**dennis** 160:20,21
  162:14,18 163:2
**denniston** 1:20
  4:19,21 349:8,24
**department** 2:11
  4:24 8:9 12:15
  18:20 66:6 82:17
  87:25 115:14,18
  123:6,13 147:5
  189:19 197:11
  225:2 244:18
  251:13 256:15
  261:10 262:3,13
  262:14,22 283:16
  285:12 287:14

350:21 351:5,23
352:23 353:15,21
353:24 354:3
**department's**
  243:17 245:18
  249:11 285:14
  286:23 287:5
  289:9
**departments**
  123:2
**depending** 64:20
  66:24 138:7
  221:12
**depends** 100:25
  155:18
**deploy** 143:13
**deployed** 283:19
**deploying** 272:22
**deployment** 143:8
  281:12
**deployments**
  143:14,20
**deposed** 17:21
  18:4 125:3,8
  126:6
**deposing** 355:13
**deposition** 1:18
  3:16 4:4,9 18:21
  18:24 19:4 125:14
  126:8,21 129:16
  141:6,20 142:4
  164:20 165:25
  167:8 168:5,11
  198:18 264:8
  286:8 341:17
  346:22 347:7
  348:9 349:11,13
  355:3,11,14,15
**depositions** 125:6
**deputy** 7:9,22 8:5
  10:9 12:24 302:2

**describe** 108:7
  124:6
**described** 170:11
  215:2 254:3
**description** 167:23
  168:19 205:20
  350:9 351:2 352:2
  353:2 354:2,20,23
**designate** 271:4
**designation** 15:19
**designed** 280:20
  281:2,8,11 284:9
**designs** 122:10
  129:16
**detained** 232:24
  322:3,7,9,15,22
**determination**
  67:3
**determinations**
  343:15
**determined** 257:5
  314:24
**developed** 213:21
  214:7 215:9 216:5
  216:10
**di** 10:19
**dictate** 40:16
**dictates** 33:13
**different** 17:15
  38:2 52:4,20 71:9
  77:2 88:6 89:16
  118:12 127:5
  131:10 150:12,15
  150:21,23 151:2,7
  152:4 153:2 155:6
  155:12 164:18
  170:7 179:14
  201:9 227:3
  232:18,19 236:17
  237:3 252:10
  286:7 305:5

**difficult** 228:25
230:21 248:20
320:25
**direct** 254:19
342:10
**directed** 39:17
117:19 241:8
**direction** 96:3,4
100:24 101:11
229:9 300:24
305:5,8,8 314:10
321:16 324:8,24
331:16 332:4
336:17 337:6
**directions** 321:24
328:14
**directive** 117:25
151:24 152:11
**directives** 254:14
**dis** 8:2
**disagree** 73:11,15
73:19 74:4 75:19
315:8 337:17,18
**disbursal** 271:16
271:22 354:21
**disbursed** 202:13
**disciplined** 258:15
258:20
**discon** 276:9
**discourage** 154:19
156:2,5 158:2
**discouraging**
155:23
**discovery** 46:5
47:12 212:14
**discretion** 38:13
58:5 61:17
**discretionary**
57:22 107:3
**discuss** 41:21 47:9
53:25

**discussed** 43:4,6,9
50:6 59:13 86:5
86:14 125:3,9
143:4 145:9
146:13,17 160:22
185:4 254:10
262:25 270:3
293:17
**discussing** 79:5
86:21 145:3
198:17 258:3
294:23
**discussion** 41:24
42:3 47:12,17
316:9
**disguised** 81:12
**disobedience** 51:2
244:5
**disobeyed** 326:25
**disorder** 16:14
27:3,15 28:14
29:15,16 31:24
32:10,16 33:7
34:2,9,13 35:5,17
35:23 36:4,16
37:4,20 38:16
39:13 41:15 42:2
48:4,10 49:5 50:2
50:9 52:6,8,14
53:4,17 56:9,17
57:11 59:4 60:23
71:10,25 72:7,7,10
72:22 78:6 82:21
82:24 83:6,22,25
84:4,9,12,25 85:6
85:8,12,25 86:2
94:8 99:10,17
100:10 101:18
102:10 107:5
110:14,18 111:6
111:14,21 112:4

113:22 114:13
115:21 118:24
120:10,18 124:3
124:19 127:4
128:16,20 129:9
131:8,12 132:15
135:6,10 136:3
137:4,20 138:20
139:25 143:5
146:22 147:10,20
147:23 148:5,12
148:21 149:7
150:7,8 153:12
157:4,14 158:25
159:3 161:20,25
162:7,12,16 164:4
169:2,5 170:18
171:6,9,11,18
172:13 174:6,20
175:7,18 176:10
178:6,15,21 179:3
179:7,19 180:2,6,7
180:9,16 181:7,12
181:13,20 182:4
182:13,19,25
183:5,12,16,19
185:10 186:4,12
192:25 193:9,16
193:25 195:3,6,20
205:7 208:24
211:5 213:12
220:14 223:4,6
224:20,23 225:8
229:20 230:4
237:6 241:10
251:11,18 253:12
254:2,15,20
255:12,16 256:13
261:9,14,23,25
266:19,23 268:21
269:25 270:4,12

270:15 272:23
273:17,23 274:7
274:24 276:15,18
277:2,20 281:3
291:19 292:10,12
292:18 293:12
294:5 297:3,9
300:19 301:2
313:20 345:6,11
346:9,12,16
**disorderly** 40:3,17
41:7 55:11 67:16
87:8 182:6,14
217:2 222:12,21
229:25 238:4
264:13,21 265:17
266:5,13 268:3
277:5 306:4
325:15
**disorganized**
198:9
**dispersal** 84:2,5
104:20 185:11
218:14,22 274:6
277:11 278:7
290:13,19 291:2
291:12
**disperse** 76:21
77:3,8,17 78:2,11
99:11 100:17,23
100:25 101:10,10
154:21,24 155:6
155:10,11,20
156:3,6,18 157:24
158:3 298:19
343:10
**dispersed** 154:10
154:16 155:4
298:22
**dispersing** 43:14

**dispute** 46:5
**disruption** 39:19
   39:23 77:23 94:20
**disseminate** 86:2,4
   119:9 266:7
**disseminated** 88:7
   89:7 117:21
   118:18,20 190:4
   272:24
**distinct** 155:9,12
**distinction** 17:18
   38:24 78:10
   243:25 248:2
**distinguish** 50:16
   53:3
**distinguished**
   157:3
**distribute** 273:5,9
   273:15
**distributed** 202:14
   272:17,20
**district** 1:2,3
   69:19 318:25
**disturbance** 242:5
   257:10 258:7
**division** 117:18
   148:9 160:22
   253:23 354:7
**divisions** 131:11
**doc** 350:12
**document** 20:25
   44:4,16 48:18,24
   49:3,8 62:4,11
   71:11,20 75:7,11
   78:20 79:3,14
   81:19 82:2,3 83:2
   83:6 86:6,12 87:4
   93:12,16,24
   108:11,21 116:17
   116:21,24 117:5,8
   117:15 118:4,7

119:22 120:5,9
121:16 123:18,23
124:9,18 130:17
133:24 134:6,23
135:5,7,9 136:22
137:3 138:12,16
138:17,25 140:11
140:15 142:8,15
142:21 143:15
144:21 146:8
151:8,12,14,15,18
153:15,23,25
158:7,18,21,22,24
159:15,18 162:4
163:14 164:8,15
167:3,7 168:7,23
171:21 186:23
187:6,8,9,15 194:7
194:12,18,20,21
194:24 196:18,22
201:24 202:5,7,13
202:16,20,21
203:2 205:10,13
205:22 206:2
219:7,12,19,20,22
243:9,11,14 250:9
250:13,20,22
251:4 252:12,18
253:17 254:3
255:20,24 256:3
259:5,10,13,20
260:3,7,21 261:4
262:12 264:4,9,11
282:17 284:20
285:4 296:21
316:20 317:9,11
318:12 343:24
354:13
**documented** 42:15
185:19

**documenting**
320:3
**documents** 41:18
44:9,21 45:6,20
46:17 47:22
126:23 164:19
165:2,3,14,20,24
166:20,25 167:16
168:4,14 261:6
274:9,11,13,15,17
275:11 288:15
345:21
**doing** 23:3 28:10
39:12 44:18
111:19 112:7,11
138:8 146:23
147:21 148:22
154:21 156:2,3
160:14 180:22
190:18 207:8
225:3 232:14
253:3 258:9,12
294:19 325:12
328:3,9 355:7
**donned** 207:18
**door** 236:6
**doorway** 233:8,24
235:12,25 236:20
237:7,17,25 238:2
238:8 239:22
240:5
**doubt** 338:16
**downtown** 69:18
107:10
**draft** 195:8
**drafted** 202:10
**drill** 176:5
**drive** 21:7 320:7
350:10
**drugs** 18:7

**drummers** 203:6
**due** 114:24 270:15
314:3
**duly** 5:24 349:12
**duties** 11:3
**duty** 7:10
**dynamics** 38:3

**e**

**e** 2:2,2 5:22 6:10
349:2,2 350:2,7
356:1
**earlier** 19:24
76:18 86:14 97:24
145:9 160:22
172:22 185:4
199:9 206:12
235:11 262:25
296:3 300:13
**easier** 63:6,10
**east** 104:11
**easy** 323:6,7
**ed** 68:8
**edge** 232:9
**edward** 62:19,23
63:13
**effect** 3:19 86:19
**effecting** 87:11
**effective** 112:10
**effectuate** 32:21
**effectuated** 309:3
**efficiency** 258:24
**efficient** 112:10
**efficiently** 258:18
**efforts** 107:15
108:3
**egress** 95:24 97:20
97:23,25 98:18
99:5,12,14,19
106:18 218:22
290:11,18

egressing 105:10
eight 86:11 178:4
   178:5,11 180:21
   180:22 196:10
   294:21
either 29:19 38:12
   83:13 91:6 154:22
   155:13 165:14
   168:15 179:4,5
   190:11 240:7
   345:20
elected 29:6
elements 264:25
elicit 110:13
email 109:10,12
   110:12 160:19
   161:24 162:13
   166:19 167:5,11
   167:18 168:15
   195:24 196:4
   197:11,12,13
   200:14 202:17
   208:3 209:9
   210:17,25 211:10
   211:14,16,19
   212:7,15 213:10
   213:11 243:15
   244:14,19 249:3,9
   250:17 256:5
   257:18 317:16
   320:3 351:8
   352:14,20 353:3
   353:12,18 354:15
emailed 273:11
emails 107:21
   162:18 166:24
   168:5 213:4
   245:16
embarrassed
   295:3

emergency 256:23
   257:7
emotions 214:16
   214:21 215:5,7,11
   216:3 228:13
encirclement
   280:21
encounters 291:24
encourage 169:13
encouraged
   168:24,25
ended 321:10
ends 146:15
enforcing 265:7
engage 215:25
engaged 155:24
   157:6,10 209:5
   223:8 321:3
engaging 51:2
   52:17 53:7,8
   215:23
enjoy 341:9
ensure 139:22
ensured 118:20
ensuring 191:18
   191:21,25
enter 238:2
entering 237:18
entire 15:8 21:24
   64:8 233:14
entirety 343:6
entity 13:16,19
entrance 203:7
   233:6,8,21
entrapment
   322:19
entry 182:10
environment
   100:25 101:3
equation 282:12

equipment 129:3
   188:7 189:23
   190:5,13 200:20
   205:4,6 206:7
   207:22 241:14
   281:17
errata 355:5,7,10
   355:13
escort 209:14
esposito 115:20
   150:2 151:24
   152:12
esq 2:7,15,19
essential 124:14
establish 235:14
   237:22,24 238:10
   239:12,13 246:17
   247:15 298:16
   313:7 336:13
   337:8 338:9,12,23
   340:5,14
established 55:16
   223:25 329:16
   337:19 339:7,11
   339:22
establishes 337:9
   337:13 339:5
estimate 131:5
et 1:5,11 126:9
event 52:16 73:10
   261:13 272:21
   285:8,9
events 251:13,21
   254:17 261:11
   262:4
eventually 67:14
everybody 89:16
   307:3
eviction 252:22
   283:24 285:23
   286:5,16,19

288:24
evidence 166:13
   203:8
exact 22:20
exactly 11:16
   26:13 175:25
   258:3
examination 7:2
   342:10 350:3
examined 5:25
example 41:8
   50:12,14 51:13
   52:10,19,21 58:21
   58:23 225:15
   226:12
examples 41:3,12
   41:13,19 51:15,18
   51:23 52:3,12
   102:22 132:22
   225:13 301:17
excellent 11:3
excellents 11:4
exception 119:5
excess 131:9 132:8
   132:9,15 133:7
   145:5,8,18,23
   146:4
exchange 162:13
   317:16
excuse 226:20
exercise 25:6 42:8
   42:17 176:22
   177:16 215:22
   271:6 276:3
   278:16 279:9
   280:8
exercises 42:19
   43:2 61:23 70:22
   71:4,7,8 111:12,19
   113:12,13 114:14
   150:4 179:17,24

272:25 278:2
**exhibit** 20:25
43:25 44:4 48:18
48:22 62:4,8
71:11,14 78:20,24
81:19 82:15 86:6
92:19 93:12,16,18
108:11,15,17
116:17 119:22
123:18 133:24
134:23 136:22
138:12 140:11
142:5,8,13 151:8
153:15 158:7
163:14 186:23
187:6 194:7
201:24 219:12
227:8,9 250:13
255:20 259:20
260:3 264:4
284:20 316:20
317:5 350:8,9,10
350:12,15,17,19
350:21,25 351:2,3
351:5,8,10,12,15
351:18,20,23
352:2,3,6,8,10,14
352:18,20,23
353:2,3,6,9,12,15
353:18,21,24
354:2,3,7,10,13,15
**exhibits** 347:12
**exist** 45:22 46:13
212:19,21 213:16
272:3,13 274:18
292:17 340:8
**existed** 214:8,10
275:11 277:23
**existence** 111:5
203:23 275:15

**existing** 49:14
**exists** 147:25
**exit** 99:20,21
100:2,3,6,18
106:22 107:2
238:2
**exiting** 237:18
**exorbitant** 318:23
**experienced**
200:17
**expires** 356:25
**explain** 88:2 97:21
117:14 171:3
222:4 243:24
**explained** 103:19
157:17,18 183:7
225:10 344:21
**explaining** 117:5
**exploded** 119:13
**explosives** 117:9
117:20 119:7
**expressive** 242:18
**extent** 135:23
**extricate** 124:13

**f**

**f** 349:2
**face** 214:4 281:18
323:21
**facing** 329:2
**fact** 4:6 15:22 17:6
30:14 41:6 67:16
98:19 99:3 107:21
117:2 141:20
168:7 211:17
264:10 277:24
283:16 302:8
319:14 332:16
334:8 337:4
338:23 339:22
340:3,8,24 341:4

**facts** 239:15 243:4
254:3 339:8,10
**fade** 112:19
**fail** 355:15
**fails** 293:14
**failure** 213:8
**fair** 46:25 179:2
198:22
**fairly** 53:17 328:4
**fall** 167:21
**falls** 168:19
**false** 125:15
337:11
**familiar** 93:9
142:20 153:24
154:2 203:25
262:6
**far** 34:16 40:14,20
91:7 135:25
172:18,25 200:18
242:8
**farther** 237:3
**fashion** 75:24
109:9 114:5
182:23 202:14
249:4 258:6
266:20
**fear** 240:25
**february** 10:14,15
**federal** 81:5
**feedback** 256:13
**feel** 90:10
**feet** 330:4,12,14
330:17
**felt** 266:6
**field** 38:7 176:22
177:2,21 183:10
183:14 253:19
**figure** 160:16
295:9 296:5
315:18

**figuring** 295:24
**file** 38:17 288:14
288:22
**filing** 3:6
**financial** 69:18
107:13 110:2
233:7
**find** 83:8 180:12
194:14 294:22
296:22 319:13
331:10
**finding** 273:23
**finds** 340:22
**fine** 302:19
**first** 5:23 6:23
8:14 11:6 15:5
18:18,19 20:22
23:20 24:16 25:7
25:20 26:6,17
27:20 66:2 68:18
68:21 69:6,13,22
69:25 70:3,8,13
73:18 85:21 87:7
91:17 96:25
121:11 133:18
137:22 138:4
139:10 157:6,10
157:21,22 164:10
178:5 182:3,5,13
183:8 208:14
215:19,22 222:14
222:22 223:17,19
230:19 231:3,14
233:20 234:21,25
237:15 242:19
251:9 254:25
255:8,11 271:6
278:17 279:3,10
279:16 287:4
290:2 292:4
293:20,25 294:4

294:24 297:8 331:21

**firsthand** 247:19 248:16

**five** 46:17 71:14 72:16 109:16 117:22 169:19 170:4,5,11 244:10 245:2,10,12,21,24 246:5 249:23 250:2

**flash** 350:10

**flex** 187:17

**flexicuffs** 189:20 191:19

**floor** 2:5 287:3

**flow** 65:18,19 306:17

**fluid** 239:2

**focal** 69:14

**focus** 323:8

**focused** 88:17,24 133:4 177:11 179:10 329:7,11 329:13

**focusing** 170:7

**follow** 61:11

**following** 60:22 126:21,22 161:2 356:5,6

**follows** 6:2

**foot** 209:14

**forbid** 95:4

**force** 3:18 137:18 144:12 187:12 188:7 191:19,23 196:6 200:5,12 202:17 207:3 208:5,22 210:7,15 210:18 211:3 231:18,24 234:20

242:3 244:21 249:8 258:5 272:25

**forced** 299:5

**forces** 143:19 168:25 169:9 187:21 190:2,6,8 208:19,24 209:2 209:11 210:2 244:2 258:14 352:11

**forcing** 301:13

**foregoing** 348:8

**forgotten** 165:16

**form** 3:11 106:15 299:17

**formally** 320:2

**formations** 122:15 122:19,22 123:9 123:10 126:24 127:2,7,14,19 128:6,7,10,17,20 128:21 129:17 181:21 258:17 281:4

**former** 268:20

**forming** 127:6

**forster** 2:19 4:25 5:2,4,5 31:9

**forth** 245:16 349:12

**forward** 171:11 312:15 314:11 320:11 331:4

**found** 41:19 47:6 212:15 252:20

**four** 13:10,12 62:8 79:25 129:16,23 143:5 181:11,15 261:21 343:22

**fourth** 101:8 129:9

**frame** 145:5 171:10 183:20 307:6

**framed** 98:5

**fraudulently** 213:9

**free** 24:2,3,15 25:6 26:17 27:19 30:10 31:2 67:7

**front** 25:5 41:5 46:19,20 91:24 159:15,19 167:3 227:22 233:21 237:7,12,16 238:8

**frozen** 336:10 338:6

**frustrated** 25:2

**full** 30:14,14 90:7 91:16 184:2 198:2 217:12 334:21

**fully** 321:4

**fulton** 160:20,21 162:14,18 352:21

**functional** 71:8

**functions** 190:3 300:14

**further** 3:10,15 272:8 303:4,4 319:11 346:20 349:15

**fyi** 200:15 318:16

**g**

**g** 5:22 6:10

**gallagher** 5:4

**galvin** 2:19 4:25 5:2,5,6,7 31:9

**garden** 25:6

**gate** 66:4,7

**gathered** 238:21

**general** 12:21,22 24:14 25:4 53:18 70:11 110:12 156:24 176:4

**generally** 31:5 69:5,12 129:25 156:24

**gentleman** 309:20 312:12

**george** 1:5

**getting** 106:15 299:25

**gideon** 286:9

**give** 5:16 12:21 27:2 33:7,20 34:9 34:13 35:17,23 38:22 39:5 41:3 41:11 58:18 59:15 61:15 64:5 99:4 101:9,11 102:22 104:16 109:5 124:21 131:4 139:17 144:20 197:3 203:6 211:12 212:23 215:17 226:12 233:24 243:12 320:17 336:17

**given** 12:6 41:13 60:23 77:25 95:24 97:19 98:17 99:14 99:19,25 104:21 106:9,25 117:19 119:8 134:10,14 151:23 202:16 211:4 220:14 221:15,23 237:14 239:19 253:18 273:3 309:18 311:17 324:24 326:24 328:14

332:2,20 333:2
336:22 337:2,4,23
338:4 340:4
343:10 349:14
**gives** 34:2 41:16
49:19 75:12
164:17 339:15
**giving** 41:8 50:12
50:14 99:11
126:22 127:9
185:12 200:8
218:14 237:8
311:15
**gloves** 205:8
**go** 8:7 10:12 65:8
69:18 77:9 88:9
90:19 91:17 92:24
143:19 160:5
185:6 216:18
219:18 223:12
228:17,23 246:23
250:19 271:6
273:13 275:15,18
279:15 293:18
295:7 296:10
300:11 303:3,6
305:9 309:24
320:19 321:16
322:2,6 324:14
326:18 327:14
331:4,8 332:3
336:16 337:24
338:3 341:22
**goal** 74:14
**goals** 206:11
**goes** 12:9 13:4
39:15 136:9 154:3
198:16 302:23
313:3 333:10
**going** 4:3 16:17,19
16:20,25 17:3,7,8

17:9,13 18:5 21:4
21:5,6,8,9 30:15
32:3 38:12 43:23
43:24 48:21 53:23
62:7,8 70:15
71:14,15 75:4
76:7 79:6,7 81:22
81:23 86:10,13
87:18 88:22 89:19
90:6,15 92:3,8,9
92:21,23 93:15
96:8,12 97:14
102:15 103:5,23
107:9 108:14
115:3 116:20
117:6,24 120:2,3
123:21 128:13
134:3 138:9 140:4
142:3,7,12 151:11
153:18 158:10
159:8 163:17
166:19 180:20,24
184:9,10,13
194:15 195:21
198:15 200:9,10
200:11 202:3
219:3 220:2,7,10
220:12 223:14
227:7,9 230:10
241:23 243:7
249:23 250:8
253:4 255:23
259:23 263:24
294:19 295:4
296:19 297:11
300:5,9,21 301:7
302:18 303:9
308:14,22 315:10
315:18 316:13,14
316:15,23 320:4,7
320:9 325:22

331:14 333:14
338:18 341:14,17
**good** 53:17 164:17
204:22 341:12
347:3
**gotcha** 216:20
**gothamist** 91:12
**government**
224:14
**governmental**
223:24 224:25
**grabbed** 234:12
**graham** 14:3,4,5
**grant** 323:6
337:10
**great** 47:18
**gromner** 234:18
**ground** 302:23
**group** 54:22 64:25
102:17 139:22
147:20 154:19
155:4,21 157:21
206:18,19 226:14
240:20 241:12
257:25 258:18
306:16 309:22
**groups** 147:22
154:11,15,16
156:8,11,12,13,14
156:21,25 157:5,6
157:10 206:13
242:4
**guess** 228:21
252:6 302:3
330:24
**guidance** 38:23
326:20
**guide** 38:15 180:5
219:24 251:16
345:2,4,13 346:17
350:21

**guideline** 82:16
159:2 163:2
244:24 289:22
290:16,23 291:8
345:15
**guidelines** 78:25
79:11,15,20 80:9
80:12 82:9 161:21
161:25 162:2,8,12
162:17 220:16,17
290:15,22 291:7
291:17
**gun** 11:24
**guy** 194:5
**guys** 90:8 91:14
122:21 180:21

**h**

**h** 5:22 350:7
**hailey** 319:11
**haley** 354:16
**half** 18:25 84:23
85:4,5 88:19
341:19
**halfway** 257:17
**hall** 234:10,11,15
**hand** 5:14 86:10
177:6 294:20
349:20
**handcuffed**
322:13,20 334:4
**handcuffs** 231:4
**handed** 76:23
135:17 187:5
**handle** 238:24
333:2
**handled** 23:8 61:6
**handling** 61:10
**hands** 177:13,15
177:19 178:12,20
194:5 234:22
235:3 321:25

**handwritten**
288:19
**hanging** 226:24
**happen** 65:7
121:24 132:25
183:24 193:13,20
203:16 237:9,10
237:19
**happened** 18:14
22:22 24:9 26:3
132:24 183:24
234:24 236:11
239:18 243:5
283:17 286:21
297:12 298:25
299:13 301:17
307:14 342:19
344:5
**happening** 119:17
170:6 194:6
221:13 328:16
**happens** 41:4
61:21
**happy** 47:15 59:8
**hard** 63:2 97:5
156:23 173:16
233:10 306:23
325:18
**hat** 305:22 312:19
**head** 204:20
253:12
**heading** 124:9
232:6
**heads** 109:5
**hear** 57:8 104:20
164:24 236:5,14
236:19,22 255:14
322:2,7,8,14,21,24
323:9,11 326:22
**heard** 99:20
116:12 139:22

214:19 322:6,18
326:11 328:13
329:20 330:20
**hearing** 274:14
**held** 1:18 270:19
**helmet** 205:8
207:14
**helmets** 207:16,18
**help** 39:8 50:15
248:24 320:15
**helped** 13:18
**helping** 215:10
**helps** 239:3
**hereinbefore**
349:12
**hereunto** 349:20
**hey** 330:19
**hierarchy** 7:12
123:8
**high** 129:19,20
143:3,13 172:8
181:5
**higher** 12:15,18
152:15
**highest** 301:24
**hindsight** 338:16
**history** 8:7 268:17
**hit** 245:20 273:18
**hmm** 283:18
**hold** 140:4
**holding** 89:8 168:8
323:25
**home** 6:15 206:23
334:4
**homicide** 235:20
**honestly** 18:6,16
**honor** 25:20
**honoring** 23:25
75:23
**hoodie** 60:11

**hope** 97:12 193:19
332:14
**hopefully** 134:4
346:24
**hour** 18:25 88:20
88:23 90:19
180:21,22 316:17
341:19,19
**hours** 18:14 90:7
178:4,5,11 195:17
**how's** 171:8
**huh** 116:2

**i**

**i.e.** 221:3
**idea** 53:18 79:19
204:22 209:24
245:20
**identification** 21:2
44:5 48:19 62:5
71:12 78:21 81:20
86:7 93:13 108:12
116:18 119:23
123:19 133:25
134:24 136:23
138:13 140:12
142:9 151:9
153:16 158:8
163:15 186:24
194:8 201:25
219:13 250:14
255:21 259:21
260:4 264:5
284:21 316:21
**identified** 51:25
76:18 135:3
139:14 141:23
151:13 153:22
154:9 167:24
168:9 171:12
202:17 231:9
235:25 245:4

285:2
**identifies** 170:5
171:4 211:10
**identify** 85:14
161:3 186:10
187:7,10 210:18
235:14 239:6
283:11 293:11
308:16 309:10
317:25
**identifying** 165:23
171:17 187:15,19
203:22 206:4
210:6
**idiots** 109:14
**ii** 43:25,25 352:10
**illegal** 37:17
**image** 63:9,21
311:3
**images** 62:8,12
63:19 67:21 98:6
**imagine** 173:6
223:3
**immediate** 111:15
111:17 289:16
**immediately**
114:12
**immunity** 337:11
**impact** 18:5,15
71:5 225:20 226:2
241:11,15 242:3
257:23 258:25
269:24 305:10
**impacts** 133:18
241:17
**impasse** 275:9
**impedance** 37:5
37:15 58:12,20
59:11 94:11
189:13 217:12

impeded 313:6
impediment 307:9
  314:2
impeding 37:23
  39:2 106:6 133:13
  161:16
imperative 355:12
imperfections
  252:20
implications
  262:15
imply 258:21
important 74:19
  248:25 266:6
  288:15
impose 258:23
imposing 258:22
impossibility
  193:21
impossible 32:22
  37:24 40:24
improperly
  210:19
improvement
  171:15
improving 173:8
imputing 327:20
inaccurate 126:14
incident 22:4 29:7
  44:14 45:13 57:23
  57:25 61:17,22
  62:2 67:2 93:10
  93:19,20 94:6
  102:15 107:4
  209:6 226:16
  244:6 252:9
  256:19,21,23,23
  257:6,7,9 259:7,8
  260:9 261:12,22
  272:21 273:4,8
  284:3 346:8,11,15

incidents 216:23
  217:8,18 218:2,10
  218:19 261:16,17
  261:18
include 144:14,24
  146:7,8 185:16
  251:22,23 252:2
  276:6 277:10,12
  278:3,17 279:3,10
  280:21 281:2,9,11
  284:9 290:9
included 122:11
  129:10,13 145:12
  145:14,15 161:24
  163:11 280:7
  290:18 291:2,18
  293:5,6,6,12
  345:20
including 99:12
  211:14
inconsistent
  248:12
inconvenience
  36:23 37:14
  217:11 224:4
  268:6 269:5 277:3
inconvenienced
  38:25
inconveniencing
  37:22 39:24 276:7
incorporate 83:5
incorporated
  132:21 134:15
  179:15,23 183:13
  213:24 262:24
  278:10,12 291:19
  292:9,12
incorrect 75:2
  125:15 159:24
  340:23

increase 65:19
  111:10,16,18,23
  112:3 114:22
  115:22 120:15
  172:4
increased 111:13
  113:8,16,20 114:4
  114:10,14 115:6
  115:12 152:6
independent
  193:22
indicate 44:21
  97:18 121:21
  122:6 139:7 144:2
  169:20 170:16
  173:19 174:5,13
  176:21 318:20
  321:15 324:3
  346:3
indicated 99:15
  130:16
indicates 130:8
  144:8 196:18,22
indicating 151:21
  207:21,23,24
  285:13 329:23
indication 345:24
individual 24:12
  27:9 30:17 60:10
  67:14 87:24 88:8
  96:24 156:19,20
  160:21 176:6
  198:24 199:5
  205:21 227:20
  229:5,18 230:23
  231:3,10,15,20
  232:24 233:13
  234:13,22 235:3
  236:14 238:13
  240:9,23 246:9
  257:18 297:21

298:2,6,8 302:4,8
  305:21 308:17
  309:19 312:10
  313:9 314:17
  320:23 321:3
  323:16 324:5,7
  325:4,22 326:17
  326:23,25 329:14
  330:6 331:25
  333:6,18 334:3,4
  336:12 337:20
  338:8 346:6
individual's
  308:24
individuals 25:3
  25:21 76:17 92:15
  97:8,9 98:16
  104:23 105:16
  130:6 168:24
  190:13 201:17
  202:17 203:15
  231:17 258:18
  267:23 282:14,25
  283:13 298:22
  300:21
information 49:9
  72:9,12 86:15
  109:7 137:12
  165:8,11,15,17
  187:22 200:14,16
  203:12 247:17
  282:17,20 317:24
  318:8,10 340:23
  343:19 345:13,19
  346:4
informs 262:14
infraction 342:22
  344:3
infringement
  222:10,19

inherently  157:16
  198:3,6
initial  333:11
injury  206:24
inquire  66:14
  319:21
inquiries  272:9
inquiry  159:5,21
  160:6
inserts  354:23
insinuate  127:20
  128:2
inspection  161:2
inspector  4:5 5:13
  7:9,10 8:5 10:9
  12:24 14:3 21:23
  54:9 68:11 76:20
  92:17,20 93:6
  141:21,24 151:12
  151:16 301:25
  302:2 342:12
inspectors  7:23
instance  211:22,24
  239:9 242:7,25
  249:15,18
instances  102:24
  103:18
institute  203:14
instituted  171:10
  174:24 175:3,15
  203:20
instruct  39:20
  100:23 213:25
  263:4 279:7
instructed  97:22
  99:20 120:22
  279:15,23 280:3
  307:11
instructing  81:3
instruction  31:7
  49:12 175:17,19

176:5,8 179:16
  277:11 290:10,17
  290:24 291:9
instructions  42:22
  137:14 276:6
  278:3 284:10
  290:2 309:17
  311:16,17 338:4
  355:1
instructor  135:18
  135:20,23 345:3
instructor's
  219:23
instructors  41:21
  132:22 157:15
  183:13
instructor's
  345:12
insufficient  170:6
  170:17 171:17
  173:5,10,12,20
  174:7
intel  300:22
intelligence  300:4
  300:8
intend  51:3
intent  199:11
intentionally
  238:6
interaction  104:22
  321:15 324:2,17
  329:13
interest  223:24
  224:15,25
interested  230:19
  318:7 349:18
interfering  306:16
interim  13:23 14:9
interject  198:15
internal  44:22,25
  45:17 46:3 252:10

internet  283:14
interpreted
  265:13 266:4
interrupt  27:22
interruption  28:2
intersection  104:9
interviewing  28:3
intimidate  137:15
  138:5 240:25
intimidates  137:17
intimidation
  206:12
intranet  262:23
introduction
  179:19 180:7
investigated  252:9
  319:10
investigation
  44:23 45:10,18
investigations
  46:4
invite  272:10
involved  74:21
  190:23 216:3
  226:19 242:17
  305:7 309:22
  318:14
involves  185:5
involving  321:24
iron  66:4,7
island  42:20,21
  43:3
issue  58:2 88:5
  103:2,21,22
  136:18 187:16,18
  215:15 226:8,10
  244:7,15 247:6
  249:8,16 262:16
  294:22 319:5,13
issued  87:20
  213:12 290:19

291:2 344:9
issues  59:5 200:19
  202:8,11 204:8,24
  353:9
it'll  248:6
item  75:16 139:10
  264:2
items  119:10
  167:24 182:18
ix  93:18

**j**

j  1:18 5:22 6:6
  347:8 348:7,16
  356:20
jacket  27:11
january  16:2
  162:6 259:8
  261:18
jessica  44:10
job  28:7,10 43:16
  256:9 262:15
joe  2:20 5:8
  273:13
john  108:22,25
  109:2
joined  8:11
joint  287:2 289:15
joke  140:24
jones  81:25 86:16
  87:2,19 89:8
  118:8 119:10
  265:23 266:4,12
  266:21
joni  2:19 4:25 5:3
jose  14:22
joshua  125:10
joyous  228:11
judeen  1:20 4:18
  4:20 349:8,24
july  1:14 10:5,15
  164:12 175:7

349:21
**jump** 12:2
**june** 8:11,18 86:24
　351:23
**jurisdiction** 69:7
　69:24
**justice** 317:22
**justify** 328:3

**k**

**kastner** 353:4
**keep** 90:15 202:22
　224:8 248:20,24
　263:18 288:15
　320:18 341:17
**keeping** 66:20
　153:20 214:15
　215:4,10
**kelly** 43:13 45:15
　317:18,20
**kidnapping** 11:25
**kind** 53:2 143:8
　209:21
**knapsack** 226:21
**knew** 109:13
　175:4 325:19
　333:13 336:22
　337:23 338:17
**know** 14:12 17:25
　18:10 22:21 23:4
　24:7,8 26:13
　27:25 48:25 52:20
　53:14 55:2,22
　57:25 62:9,19
　65:22,25 68:14,17
　71:16 78:16,18
　79:9,22 82:13,19
　83:7 84:11 87:19
　89:13 93:22 97:13
　102:19 104:6
　108:5,19 110:5
　118:6,25 119:12

119:18 120:6
123:4,24 125:14
125:16,21 127:7
132:23,24 133:3
136:5,15,21
137:10 142:14
147:3,7 148:14,15
150:25 151:4
152:14 156:10,22
160:9 165:20
170:9 174:23,25
175:2,5,14 176:7
177:25 178:25
180:11,25 183:23
184:2,9,13,20
186:8 193:18
194:13 195:4
201:2 203:3,24
204:2,19 205:23
206:2 212:20
220:22 224:13,14
229:14,23 231:20
234:14,23 235:21
236:11 239:18,19
239:20 241:6
248:16 249:10
253:23 255:25
260:11,15,19
263:9,14 264:20
265:21,22 266:17
266:18 267:6
268:12 271:10,11
272:17 275:5
276:13 277:9,15
277:24 278:11,22
280:5,9,15,16
282:12,24 285:21
285:25 292:8
294:16,22 298:25
299:12 300:6
304:24 305:3

308:3 316:6 317:9
325:18 326:15
327:3,4,17 328:12
329:11 330:20
331:23 332:5
333:12,21,22
334:7 336:14,21
336:25 337:7,22
338:2 339:3,20
340:3 342:19,22
343:2,9,25 344:4,5
344:8
**knowing** 60:7 89:5
　232:16
**knowledge** 16:13
　17:2 39:11 48:4
　110:10,13 136:10
　171:5 173:21
　184:20 186:2
　193:23 202:22
　247:19 248:17
　264:19 269:20,22
　292:24 327:12,18
　327:21 332:17
　334:22 338:11
**known** 239:16
　263:6 339:10
**krueger** 44:13

**l**

**l** 3:2 5:22,22 6:11
　6:11
**lack** 327:20
**lappin** 44:10
**large** 64:25 66:20
　76:24 126:22
　148:12 150:8
　156:8,11 206:12
　206:18 241:12
　268:17 278:15,23
　279:8,18,19

**larger** 65:2
**largest** 98:12
**lasted** 79:24 80:3
**law** 2:11 18:20
　82:6,10,14 87:11
　265:3 298:17,18
**law.nyc.gov** 2:16
**lawful** 242:6
　298:18,21 301:8
　327:2 337:5
　338:12
**lawfully** 43:15
**laws** 113:3 265:8
**lawyer** 212:23
　341:6
**leader** 139:11
**leadership** 31:21
　194:22 270:5,8,11
　353:6
**leafleting** 294:2
**learn** 40:3
**leave** 10:12 90:10
　95:7,11,14,15,22
　96:3,4,12 98:17
　136:11
**leaving** 95:11,18
**lecture** 134:16
　176:18,25 177:5,8
　177:12,13,16
　178:12,19 179:24
　180:4 183:16,19
　184:14
**lectures** 132:22
　175:13 177:21
　183:12
**led** 39:14 231:6
　234:12 302:10
　333:17
**left** 9:11 13:11,13
　19:21 95:25 97:23
　99:20,22 105:10

106:18,22 177:11
195:9 315:15
321:6,11 326:17
**legal** 37:16 38:14
78:25 79:10,15,20
80:12 82:16 96:10
182:15 189:10
190:23,24 220:17
220:20 222:16
224:18 262:7,9,11
262:12,15,16
263:9 264:13
319:12 350:21
354:7,10
**legalities** 83:13
86:16 136:9
157:20 182:4,12
183:4,12,16
279:25 294:11,14
294:21 351:3
**legally** 226:15
**lesson** 30:4 49:14
71:15 72:8,11
83:9,12,15 86:14
87:3 131:15 133:3
133:5,8,13,16,22
134:5,7 135:14,16
139:7 153:12
154:3 156:22
157:19 166:17,23
167:4,12,18 168:6
168:16 176:6
183:25 215:13
216:25 217:10,20
218:4,12,21
219:24 249:5
279:24 280:3,6
292:24 293:2,7,9
293:13 294:10
345:4,6,7,10,12,18
350:19

**lessons** 88:12,14
292:12
**letter** 43:12 211:9
218:14 293:18
**letters** 45:12
**letting** 100:7
**level** 87:24 88:15
88:25 112:13
136:16,18 144:4,4
148:17 173:9
263:2,17,22 268:5
269:4 278:15
279:8,20 280:7
352:10
**levels** 173:4
**liberties** 43:12
**lieutenant** 9:14
10:2,3 13:21 14:2
14:7,9,10,15 109:2
243:16 270:9
**lieutenants** 15:6
256:11
**life** 73:10,17 74:7
74:12,17 300:15
**light** 27:11
**limitations** 292:4
**limited** 16:10,13
16:19 343:18
**line** 59:14 65:20
66:2 75:15 104:7
106:15 122:21
231:5,8 232:5,7,10
232:24 293:25
304:15,19 356:8
**lines** 65:14,17
126:24 127:7
128:15,19 129:17
258:17 281:3
350:22
**lining** 231:17

**list** 72:16 91:15,18
121:6 204:6,22
248:6,10,13
**listed** 119:4 155:8
155:9 175:14
180:8,15 246:4
**litigation** 167:17
**little** 21:4 259:9
303:3,4 306:25
320:13 324:15
**liz** 44:13
**location** 63:16
77:18 78:2,12,13
84:6 97:6,16
103:4 110:4
143:12 185:7,16
218:13 227:3
233:6,7,20,22
257:24 258:19
283:4 300:2
**locations** 74:8
185:12 241:10
**log** 263:18
**logistics** 190:3
**long** 21:14 25:11
111:16 180:9
184:15 214:10
**longer** 125:19,22
236:23
**look** 16:17 44:7
62:9 64:21 66:5
72:14 79:8 83:16
85:18 98:5 108:18
120:4 123:24
137:2 152:17
176:6 186:9
191:14 202:3
203:24 208:11
219:6 220:11,12
223:14 228:17
240:17 243:8

254:20 255:6,25
257:15 260:10,18
275:6 288:16
291:16,21 293:18
294:8,10 312:6
320:11 330:14
**looked** 82:10
118:8 136:16
168:2 206:11
259:5 288:14
297:24 298:5
331:20
**looking** 16:16 63:8
64:20 67:20 79:14
80:11 84:8 85:7
121:17 144:21
195:23 208:3,8
213:6 275:7
291:22 293:16
294:13 304:13
305:15,21 307:6
308:8 310:8 329:2
331:15,20
**looks** 41:9 66:7
227:21 233:7
330:3,11,13
**loose** 257:25
**lose** 244:12
**losing** 213:22
214:20 215:3
**lost** 182:7
**lot** 51:7 152:10
190:4 232:18
256:24 295:13
323:7 327:5,25
329:6
**loud** 205:15 251:5
251:9 320:19
328:15 329:17
**low** 189:19

**lower**  54:16
**lunch**  90:5,14
  141:5
**luncheon**  141:12

**m**

**m**  1:20 349:8,24
**macavoy**  7:20
**machine**  274:19
**madry**  7:19
**mail**  12:6,13
**main**  143:5 181:6
  181:11
**maintain**  72:19
  73:5,13,21 74:15
  74:24 75:21 338:5
**major**  251:13,21
  261:11,13
**making**  60:23
  119:20 189:9
  190:24 305:10
  328:19 333:4
  334:19 335:4
**male**  96:25
**man's**  235:15
**management**
  22:25 23:10 39:13
  143:25 159:6
  160:7,23
**mandate**  338:5
**maneuvers**  123:17
  127:23,24 280:21
**mangle**  113:14
**manhattan**  54:16
  143:13
**manner**  124:7,10
  124:11,23 135:11
  136:2 218:5
  258:20 351:10,15
  351:20
**march**  4:10 8:17
  64:6 104:17

227:22,24 228:24
228:24 258:6
350:23
**marches**  69:17
**marching**  102:3,6
  104:3,10 105:16
  105:24 106:5
  257:24
**mark**  21:6,9 43:23
  62:7 71:14 93:15
  116:21 119:25
  120:3 123:21
  134:3 135:2
  136:25 138:9
  140:5 151:11
  163:22 219:3
  250:8 255:23
**marked**  20:25
  44:4 48:18,22
  62:4 71:11 72:15
  78:20,23 81:19,23
  86:6,11 93:12
  108:11,15 116:17
  119:22 123:18
  133:24 134:23
  136:22 138:12
  140:11 142:6,8,13
  151:8 153:15,19
  158:7,11,13
  163:14,18 164:2
  186:23 194:7
  201:24 202:4
  219:12,16 220:4
  223:13 250:13
  255:20 259:6,20
  259:24 260:3,14
  260:15 263:25
  264:4,10 284:20
  284:25 294:20
  316:20 317:4

**marking**  194:11
  243:7
**marks**  197:14
**marriage**  349:17
**mash**  129:3
**mask**  80:17 205:8
  281:15,16
**masked**  81:12,16
**masks**  80:13,22
  81:4 192:2 281:13
**mass**  42:5,6 50:5
  50:16,20 51:3,10
  51:16,18 52:21
  58:19 59:9 83:14
  128:23 129:18
  130:4 134:16
  139:3 146:23
  147:6,7,21 148:11
  148:18 161:7
  181:23 183:11,13
  188:2,2,16 244:22
  245:25 248:19
  249:11,14 256:23
  257:3,8,12 319:20
  350:15
**massive**  244:3
**match**  180:20
**material**  82:23
  88:11 281:23
**materials**  270:14
**matter**  57:23
  125:10 126:9
  258:24 264:8
  349:18
**matters**  27:18
  58:6 189:10
  190:24,25
**maximize**  244:11
  245:20,23
**maximum**  245:12

**maybes**  327:25
**mayor's**  287:24
**mccabe**  119:5
**mccallan**  227:5
**mean**  15:15 32:13
  32:19 34:25 74:9
  90:5 109:21
  115:25 116:4
  122:18 138:24
  147:7 186:7 188:4
  207:11 209:19
  224:22,25 256:20
  264:23 265:15
  292:11 306:10
**meaning**  65:15
  111:2 208:24
  209:13 231:7
  244:3,25
**means**  40:17 51:3
  81:13 88:3 155:24
  212:19 218:22
  224:15,24 290:10
  290:18 337:5
**meant**  113:19
  134:4 154:6,13,14
  154:17,18 258:2
  267:15
**media**  27:18
**medication**  18:9
**meet**  18:19 20:19
**meeting**  285:13,17
  285:22 286:3,15
  286:18,22,25
  287:7,10,12,15,19
  287:22,25 288:4
  288:10,24 289:3,8
  289:12,15,19
**meetings**  288:7
  289:19
**member**  38:14
  44:10 53:21

149:10 226:18
301:25
**members** 13:10
28:17 30:21 50:15
88:12 89:7 107:23
117:22 118:21
119:4,4 130:9
131:9 132:16
133:8,12 143:24
144:3 147:11
207:4 231:18
253:19 254:19
255:6 262:19
266:8,25 267:7,22
269:3,19,21
271:16,23 282:20
282:25 283:15
**memo** 81:25 86:16
87:2,19 88:5 89:8
117:2,5,8 118:9,10
119:2,3,10 122:6
164:3 170:16
171:3,13,16
172:11 173:19,22
174:5 189:18
192:17,22 350:25
352:6,8
**memories** 112:19
**memory** 62:24
166:9 184:19
286:7 293:14
**memos** 120:2
136:18
**mentioned** 83:11
161:23
**mere** 37:14 217:11
276:6 277:3
**merely** 37:21
38:25 39:23
**merged** 179:13

**meritorious** 11:2,5
**mesh** 129:4
**met** 18:23 19:3,15
19:18,23 20:5,9,13
**method** 111:9
**middle** 64:21 66:8
212:3 229:14
**militaristic** 258:22
**military** 122:14,19
122:22 123:3,4,7,9
123:17 124:7,10
124:11,23 127:7
127:13,19,21,24
128:3,7,9,10,21
129:17 241:13
258:6 351:10
**millennium** 192:2
205:8 281:12,15
281:16
**mind** 12:2 241:6
327:14 341:2,4
**mine** 5:8 241:5
**minute** 89:13
183:15,18 243:12
249:23 250:2
308:10
**minutes** 26:23
88:19,20 109:16
141:10 180:8
184:2 315:11,20
341:23
**miscommunicati...**
333:16,17,24
334:3,9,12
**misconduct** 252:9
**mistake** 338:11,22
339:4,21 340:24
**mistaken** 338:17
**misuse** 208:5
209:17,20 210:7

**misuses** 208:18
**misusing** 208:22
**mitchell** 2:15 4:23
6:17 16:5 19:17
19:19,20 20:3
21:12 22:8 23:12
23:22 24:5,17
25:9,23 26:8,19
27:4,16 28:15,25
29:9 30:19 31:4
32:11 33:3,11
34:4,11 35:7,19,24
36:10,17,24 40:25
43:20 45:9,25
46:15,22 47:10
48:7 51:5 53:5
54:2,23 55:5,13,19
56:3,10 57:4,14
58:3,14 60:4,17,25
61:13 64:12 65:4
67:18,23 71:18
72:23 73:23 75:4
76:2 77:14 85:13
89:3 90:3,9,18,23
91:2,10,25 92:6
94:15,23 96:15
97:4,17 98:2,7,15
99:6 100:11
101:13,19 103:9
103:15 104:4,13
105:7 112:23
115:24 116:3,6,11
116:16 121:19
122:16,24 123:11
133:20 140:6,23
141:8 146:25
148:2 149:15,20
159:11,14,22
160:4 163:19
166:15 170:19
171:19 172:15

174:8 186:15
189:7,15 190:21
191:10 192:8
193:4 194:3,19
196:25 197:8,16
197:20 198:14,23
199:10,15 206:15
206:20 210:21
211:6 212:9
217:14,22 218:6
218:15,24 219:8
220:5,19 221:6,11
221:21 222:5,15
222:24 224:11,16
225:22 228:12
229:3,21 230:5,25
231:12 233:2,15
235:18 236:8,25
238:18 239:10
240:11 241:3,19
242:14,20 243:2
247:3 250:10,16
252:15,24 253:7
254:8 255:2,17
259:3 260:24
261:3 263:12
265:19 266:9,15
267:10 268:9
269:8,16 270:21
271:8 272:4,14
274:2,12 275:17
276:11 277:7
278:8,20 281:25
284:12,17 290:5
291:4,13 295:6,10
295:12,20 296:6
296:11,15 298:3
298:10 299:7,19
301:9 302:11
303:17 304:2,10
304:17,25 305:12

305:24 306:7,21
307:19 309:7,12
310:11,21 311:6
313:10,22 315:2
315:14,21 316:5
342:11 347:15,17
350:5
**mix** 178:12
**mm** 283:18
**mob** 152:24
**mobex** 113:10,11
113:16 114:9,21
122:4 276:5
277:10 280:18,24
281:6 283:22
284:7
**mobex's** 113:20
**mobile** 42:8,17,19
42:25 70:22
111:12 113:9
114:9 119:25
150:4 179:23
276:3 278:2
**mobilization** 71:4
111:18 113:12
144:5 179:16
272:25 278:16
279:9,20 280:7
**mobilizations**
352:10
**modification**
130:4
**modified** 110:25
120:22 121:5,13
123:16 176:7
249:4,6
**modify** 216:25
217:10,20 218:4
218:12,21 254:14
318:18

**modifying** 192:11
**modules** 143:5
**moment** 22:20
28:20 31:10
105:13,22 112:7
113:21 197:3
205:2 236:12
253:2 275:19
298:8
**moments** 27:8
65:15 236:24
**monday** 19:7,8,10
19:16 20:8,9
**month** 108:6
130:22,25
**monthly** 88:6
**morning** 5:17
142:2
**mos** 120:19 124:21
145:6
**mother** 89:15
140:17,21
**motion** 239:2
**move** 21:9,13
26:22 67:8 78:2
106:19,21 156:5
227:2 228:20
236:6 258:18
298:14 307:11
310:25 311:4
314:11
**moved** 9:6,16,21
9:23 10:4,5 56:19
65:17 77:25 299:2
299:14 310:15
**movement** 107:16
115:2 199:23
200:18 201:5,15
201:17,19,21
202:12,24 205:25

**moves** 228:19
**moving** 23:15
225:2 299:11
307:12
**mtchell** 321:17,22
322:4,10,16 323:2
323:10,13,18
324:10,18 325:9
325:16 326:4,9
327:23 328:5
329:8 330:8,21
331:5,18 332:12
333:7,19 334:5,14
335:20 336:19
337:16 338:14,25
339:24 340:10
341:21 342:5
346:19
**multiple** 51:8 53:8
65:6 84:19 88:21
188:7 238:20,25
239:21 240:16
244:15 282:7
309:17
**multiplier** 258:5
**multitude** 71:8
**municipality** 17:3

**n**

**n** 2:2 3:2 5:22,22
5:22 6:10 350:2
**name** 4:17 6:4,9
108:22 250:24
**narrative** 346:2
**narrow** 64:25
66:19 228:4
**national** 79:16,24
350:22
**nature** 89:15
126:25
**nature's** 140:17,22

**necessarily** 39:17
100:24 110:11
127:6 156:10
246:12,23 258:21
**necessary** 22:18
31:3 77:13,22
112:2 355:4
**need** 23:15 26:4,22
59:18,22 67:10
93:25 101:11
103:23 108:16
113:4 115:4
116:23 137:18
139:15 140:3
150:4 156:4,5
158:15 186:15
192:17 207:25
219:5 265:10
269:3 286:11
288:21 296:8
318:21 341:20
**needed** 29:19,21
29:25 65:16 67:4
77:24 112:20
160:16 273:20
295:25 311:4
318:17 319:5,14
**needs** 17:18
103:20
**neither** 121:12
167:11,17
**never** 45:19 112:6
112:16 119:8
172:17 192:17
203:20
**new** 1:3,11,19,19
1:22 2:6,6,11,14
2:14 4:8 5:25 6:20
22:12,16,24 23:10
43:11 69:10,15
79:17 80:4 119:14

125:11 126:10
141:23 165:17
184:8,11 201:20
201:21 265:2,17
266:3,14 270:16
270:19 271:3,14
271:20 280:16
349:4,10 351:5
352:24 353:16,22
353:24 354:4
**news**  27:12 282:21
282:22 283:15
**night**  206:24
**nine**  342:18
**noise**  204:7,23
323:8
**nominated**  12:17
**non**  72:20 73:5,14
73:22 74:16,21,25
75:22 103:19,20
201:14 213:22
214:16,20 215:11
216:7,12 277:13
277:13 278:5,5
290:11,19 291:3
291:10
**nonviolent**  53:13
**nope**  296:24
**normal**  38:9
**normally**  180:3
**north**  7:6,13 8:23
9:2,12,24 10:13
104:11 234:20
298:23 299:6
300:11 301:13,22
**notary**  1:21 5:24
348:24 349:9
356:25
**note**  91:3 181:5
203:9 204:18

**noted**  355:10
**notes**  46:20 202:10
288:3,6,9,13,17,18
288:20 296:12
**notice**  1:20 4:9
15:21,22 16:17
65:15 170:24
184:5 201:7
213:11 290:17,24
301:20
**november**  122:5
252:21 253:6
283:25 285:15
**nuisance**  204:8,24
**number**  11:11
21:9 52:17,23
66:24 67:5 72:15
114:9 121:6 132:7
142:6 144:3 145:9
145:12,13 146:3
146:18 148:12
158:15 159:9
220:13 223:13
251:4,7 295:14
299:9 319:7,21
342:16 344:19
**numbers**  145:2,3
146:17 152:18,19
**nypd**  29:8 43:16
79:12 80:8 81:2
94:7 95:4,9 107:9
107:14,24 118:23
123:6 132:16
147:24 196:19,23
197:6 262:21
265:7 266:6,24
267:6 270:17
271:3,14,21
317:23 352:18

**o**

**o**  3:2 5:22
**o0o**  347:10,18
**oath**  3:18
**object**  75:5 300:9
**objection**  22:8
23:12,22 24:5,17
25:9,23 26:8,19
27:4,16 28:15,25
29:9 30:19 31:4
32:11 33:3,11
34:4,11 35:7,19,24
36:10,17,24 40:25
43:20 48:7 51:5
53:5 54:24 55:6
55:13,19 56:3,10
57:4,14 58:3,14
60:4,17,25 61:13
64:12 65:4 67:18
67:23 71:18 72:23
73:23 77:14 89:3
94:15,23 96:15
97:4,17 98:2,7,15
99:6,8 100:11
101:13,19 103:9
103:15 104:4,13
105:7 112:23
122:16,24 123:11
133:20 146:25
148:2 149:15,20
170:19 171:19
172:15 174:8
189:7,15 190:21
191:10 192:8
193:4 194:3
196:25 197:8
206:15,20 210:22
211:6 212:9
217:14,22 218:6
218:15,24 220:19
221:6,11,21 222:5

222:15,25 224:11
224:16 225:22
228:12 229:3,21
230:5,25 231:12
233:2,15 235:18
236:8,25 238:18
239:10 240:11
241:3,19 242:14
242:20 243:2
247:3 252:15,24
253:7 254:8 255:2
255:17 259:3
263:12 265:19
266:9,15 267:10
268:9 269:8,16
270:21 271:8
276:11 277:7
278:8,20 281:25
284:12 290:5
291:4,13 298:3,10
299:7,19 301:9
302:11 303:17
304:2,10,17,25
305:12,24 306:7
306:21 309:7,12
310:11,21 311:6
313:10,22 315:2
321:17,22 322:4
322:10,16 323:2
323:10,13,18
324:10,18 325:9
325:16 326:4,9
327:23 328:5
329:8 330:8,21
331:5,18 332:12
333:7,19 334:5,14
335:21 336:19
337:16 338:14,25
339:24 340:10
**objections**  3:11

**objective** 72:21
75:3 154:9,17,18
155:8 157:9
**objectives** 72:17
72:25 154:7
352:18
**objects** 293:23
294:3 297:5
**observation**
312:23
**observations**
200:16
**observe** 21:24
23:6 27:8 28:21
32:14 34:19,20
35:3,15 54:18,21
55:10 60:2 93:6
95:8,17 208:21
210:10,12 246:16
246:25 247:10
279:2 335:3,7
**observed** 23:4
25:14 26:15 36:21
48:15 55:25
208:18 210:2
212:7 233:20
309:9,18
**observer** 96:10
**observing** 93:21
210:14
**obtain** 273:12
**obvious** 96:5
**obviously** 45:3
90:6 175:23
180:19 184:4,7
288:19 328:4
**occasion** 248:11
**occupations** 212:4
**occupy** 24:13
43:17 68:8,12,15
68:24 69:2,8,11,15

70:4,9,10,16,19
79:11,21 80:3,9
82:17,21 98:12
107:8,13 108:4
109:5 110:10
111:4,16,22 113:7
113:16 114:2,5,8
114:24 120:11,16
120:20,23,25
121:2,8,13,23
122:8 145:5,10
146:23 148:23,24
188:8,12,17,25
189:5,14,24
190:10,14,18
191:8 192:19
193:3,24 196:23
197:6 199:16
202:8 207:15
210:3,14 214:7,10
252:22 254:6,16
256:17 260:9
261:13 271:4,15
271:21 280:20
281:2,7,21 282:14
283:12,20 284:9
285:19,20,23
286:3,5,17,19
288:24 319:19
353:9
**occupying** 65:2
**occur** 24:25 25:2
69:12 87:13 107:9
149:7 158:4 179:6
237:19 263:6
273:16
**occurred** 43:2
68:22 69:3,8,11
106:2,8 121:25
160:9 178:13,20
227:20 253:5

261:13 282:19
283:5,8 288:23
300:12 332:10
342:23
**occurring** 24:23
170:18,22 178:24
314:22
**occurs** 37:19,21
41:4 106:13,14
**october** 163:4
198:5 211:24
**ofc** 350:12
**offense** 237:11
242:22,23 246:16
339:11,13,17,19
340:18
**offenses** 25:12,14
25:17
**office** 4:15 76:15
92:15 141:18
159:6 160:7,22
243:17 245:18
249:11 287:25
319:2
**officer** 3:17 12:23
14:6,8 16:8 27:9
27:10,22 38:18
55:24 57:20 68:18
68:21 96:2 100:5
104:21,25 139:20
164:4 178:8,14,22
179:6 180:2,10
182:25 193:9,17
196:8 205:9 234:6
234:19 235:2,7,8
237:12 239:13
244:10,12,25
245:4,9,24 246:3,4
246:11,16,18,24
247:8,14,16,18,22
247:23,24,25

248:3,4 249:17
253:22 268:21
281:18 290:15
291:7 297:25
301:20 309:3
321:9 322:23,24
323:4,24 324:3,6
324:22 326:13,14
327:2 328:20
329:15,24 330:5,6
330:18 331:24
332:2,10,14 333:2
333:4,11 338:10
338:23 339:3,9,20
340:14,17 345:25
345:25 346:4
**officer's** 241:6
323:21 346:5
**officers** 30:18 31:6
34:16 35:11 38:5
38:17 39:16,20
41:6 59:14,21
60:21 61:11 64:15
65:16 67:7 70:3,8
70:14,17 71:2,5,6
81:3,15 96:11
97:10 100:4,7
101:4,23 120:24
121:6 126:24
127:3 130:25
131:22 132:2
134:11 135:24
137:8,13 139:17
143:10,20 145:10
148:22 187:12
189:23 196:7,12
196:13 206:23
214:2 215:10,19
220:24 226:18
231:5 232:6,22
235:5 241:12

243:20,21,22
244:15 257:24
258:19 262:14,23
263:4,19 267:16
267:17,18 270:18
272:22 279:7
289:22 290:22
299:16 301:6
304:16,20,23
310:14 314:22
325:3,18 327:13
327:15 328:13,23
329:6,20 332:25
333:16 334:10,13
336:6,9,21 337:7
337:11,23 338:2,4
340:3 345:14
**officials** 29:6
**oftentimes** 129:8
129:14
**og** 251:10 253:15
261:8
**oh** 307:19
**okay** 9:4,13 21:17
24:24 28:6 31:8
35:13 43:23 46:21
50:14 51:10,15,23
52:12 55:25 59:10
59:17 62:7,22
63:15 64:18 65:8
65:9 67:13,19
68:7 73:11,16
74:12,22 75:13
77:12 78:23 80:25
81:2,14 83:5
84:20 85:2,21
87:18 89:6 90:23
90:25 91:10,25
92:25 109:4 116:6
116:11,23 118:8
120:8 124:2 125:2

127:15 141:2,9
142:19 143:15
144:17 145:2,15
146:3,7 148:20
149:2 150:23
153:5,18 154:22
155:3,13,16,19
156:13 158:10
159:14,19 160:4
161:6,19 162:23
162:25 163:25
164:7 165:7
166:23 167:3,15
167:20 168:18,22
169:8,19 170:4
171:25 173:4,7,24
174:4 175:2,10,23
176:9 177:4,9,14
177:23 179:2,9,12
179:18 180:5,19
181:4,17 182:2,9
183:7 184:4,22
185:3,21 186:17
189:11 191:2
194:19 196:17
197:5,23,25
199:14,25 200:21
203:4 204:11,21
206:25 208:3,21
209:16,19 212:25
216:16 221:18
222:10 225:17
226:9 227:4,6,7,12
227:19 230:10
233:9 234:3,6,11
234:21 235:5,10
235:23 238:12
239:5 240:6,6
243:14 245:13
248:9,12 250:18
250:21 251:14

252:12 254:13
255:10 257:17
259:12,23 261:5,8
262:9 265:4,15
269:2 275:3
280:18 286:12
287:4 289:25
291:22 292:7
293:19 295:20
296:14 297:2,11
297:21,24 298:7
301:19 302:17
303:8,8 305:6,17
307:21 308:18,22
310:2 311:2,14
313:2 314:5,12,20
315:6 316:5,19
317:11 320:16
322:21 332:22
335:6 336:24
338:21 341:6,21
342:5,14
**oliver** 286:9
**omnipresence**
351:18
**once** 61:6 106:2,9
106:17 113:7
120:6 123:25
125:9 136:11
157:23 169:5
333:2
**one's** 320:12
**ones** 12:2 21:8
44:9 91:8 95:20
95:21 129:23
162:3 260:15
305:7
**ons** 17:3
**open** 303:24 304:9
341:18

**opened** 44:23
**operated** 123:7
210:19
**operates** 123:13
**operating** 211:3
**operation** 209:23
**operationally** 13:3
208:6,19,22 209:2
209:17,21 210:8
211:11,18
**operations** 13:2,5
117:18,25 188:12
188:17 253:23
287:2 289:16
**opinion** 22:6
174:12 198:10
199:22,23 200:8
201:3,22 213:18
312:9
**opinions** 200:17
200:22 312:7
**opportunity** 112:8
**opposed** 157:5
176:22 238:16
**opposite** 67:6
**order** 37:16 72:19
73:5,13,21 74:15
74:24 75:21 77:13
77:17,22,25 78:10
100:16 101:9,10
104:20 105:12,14
112:20 119:8
218:23 248:23
269:6 278:7
290:13,19 291:2
291:12 298:18,21
311:5 327:2
**ordering** 347:16
**orders** 76:20 77:2
77:8 84:2,5 99:11
271:16,23 274:6

277:11 343:9 354:21
**organization** 123:7,14 127:22 147:23 201:14
**organizational** 251:15 346:17
**organize** 108:4
**organized** 201:11 205:18
**organizing** 107:15
**original** 355:12
**outcome** 349:18
**outlining** 130:20
**outlook** 285:8,9,11 285:12
**outside** 42:8,17 73:18 74:6 130:22 147:24 148:5,6 167:21,22 168:19 177:22 195:21 204:20 211:4,11 211:14,15 213:12 238:12 276:15
**outweighs** 225:4,5 225:11
**overhead** 117:17
**overlap** 17:14
**oversaw** 220:23
**oversee** 12:25
**overseeing** 187:25 188:5
**oversight** 262:2
**overview** 262:2
**owen** 8:6
**ows** 196:19 208:19

**p**

**p** 2:2,2 3:2
**p.m.** 347:9
**paced** 244:6

**package** 226:21
**packard** 1:5
**packet** 291:20
**page** 17:16 72:14 72:16 79:8 80:11 84:22,24 85:7,15 85:18,18 186:10 223:15,18 291:22 291:23 292:8,8 293:16 348:13 350:3,9 351:2 352:2 353:2 354:2 354:20,23 356:8
**pages** 44:12 165:3 165:6 348:9
**paper** 274:22,25 275:4
**papers** 79:7
**paperwork** 245:5 246:5 248:6,10 345:24
**parading** 43:18
**paragraph** 168:22 169:19 170:4,5,11 197:22 198:3 208:12 251:8
**parallel** 66:11
**paramilitary** 123:14 127:22 128:4
**park** 54:16 69:16 69:24 80:4 212:4 252:23 253:6 283:25 288:25
**part** 23:17 24:13 27:13,20 34:23 36:3 41:23 42:7 54:21 56:18,22 57:6 58:19 85:14 91:14 100:8 111:20 112:18

114:24 126:23 136:15 137:4 139:2,25 144:15 184:4 220:13 227:8 253:11 262:20 265:2 268:17 270:5 279:24 280:3,13 306:15 322:7 341:7
**participating** 267:24
**particular** 12:14 31:6 62:2 83:10 110:12 130:11,19 139:9 150:20 156:19 167:25 205:24 215:15 232:22 244:14 249:9,15 261:16 263:15 293:15 305:14
**particularly** 205:19 206:4
**parties** 3:6 141:25 349:16
**parts** 23:14 292:20 292:25 293:5
**party's** 270:16
**pass** 28:11,24 36:22 37:3 314:18
**passage** 67:7 222:11,20
**passageway** 64:25 65:2 66:20,21
**passed** 118:17
**passersby** 240:18
**passing** 343:3
**passive** 50:22 214:4 244:9

**passively** 244:8
**path** 97:19,22,25 98:17 99:5,12,14 99:19 100:2,3,17
**patience** 213:22 214:20 215:3,7
**patient** 216:2
**patrol** 7:6,9,12 8:23,25 9:2,11 10:13 38:9 115:13 115:15 130:22 143:10,18,23 189:25 190:5,7 196:6,10 200:4 207:3,14,16 208:23,25 209:10 244:21 249:7 258:13
**patroller** 187:12 187:21
**paul** 115:17 116:10,11,15,15 116:15
**pause** 231:16
**pay** 329:5
**paying** 331:13
**pbbn** 7:16
**peaceful** 222:13 222:21 226:6,10 228:9
**pedestrian** 22:25 23:11,16 37:22,23 40:19 67:17,22 68:6 105:2,5,6,11 105:23 106:6,20 106:23 133:14 161:17 221:3,15 221:24 222:8,11 222:20 223:9 225:18,20 226:2 230:2 238:14

239:7 240:4,9
276:7 277:3
303:16,21 306:5
306:17 307:5,9
315:7
**pedestrians** 36:22
37:3,10 54:20
55:3 58:12 65:19
67:8 94:11 189:14
217:12,13 228:22
311:20 336:11
338:6 343:2
**penal** 82:6,10
265:3,8
**penalties** 5:19
**people** 18:3 21:21
26:22 37:9 38:18
43:14 50:24 51:3
51:8 52:17,23
53:7,8,9,10 65:2
67:5 77:9 80:21
81:4,16 96:23
99:4 101:9 104:25
107:22 109:24
110:6 112:21
121:24 124:14
130:13 136:11
147:11 156:14
157:13 206:19
215:17,22 218:13
223:8 225:3
226:14 228:18
232:19,20 236:6
238:20,25 239:21
240:16 242:17
266:4 287:21
299:17,24 301:7
301:13,22 310:25
311:5 312:3 314:2
314:9 324:14

**people's** 23:25
24:3 26:6,16
112:19 211:20
**pepper** 191:22
282:7,13,15
283:12,19
**percent** 267:21
**perfect** 216:16
230:13
**perfectly** 47:15
**perform** 124:15
**performance**
72:17,21 75:3
262:15
**performing**
124:24
**perimeter** 54:15
**period** 11:25
29:24 40:6,7,8
42:11 56:5,12
68:19 86:20 94:18
130:9 134:12
152:18,20 193:10
270:20 271:12,18
276:23 286:4
297:13
**periods** 270:25
**perjury** 5:20
**permissible** 292:3
**permission** 321:16
324:9,24 328:18
329:24 330:7,19
330:20 332:2,21
333:3 336:16,22
337:2,5,20,23
338:3 339:18
340:4
**person** 87:12,13
156:17 157:2
174:10,12 230:19
236:10 244:13

246:8,12,13 247:8
256:8 289:14
301:21 302:5
310:3 312:17,21
313:5 314:24
319:25 323:24
328:18 332:20
339:12,13,18
340:4,18,19
**person's** 337:14
**personal** 173:20
202:22 205:4,6
206:6 281:17
**personally** 49:11
216:3 239:13
284:2
**persons** 81:10
**perspective** 112:6
312:8
**perusing** 44:15
48:24 62:11 71:20
79:3 82:2 86:12
93:24 108:21
120:5 123:23
134:6 135:5 137:3
138:16 140:15
142:15 151:14
153:23 158:21
187:9 194:12
219:19 250:20
260:7,21 261:4
285:4 317:11
343:24
**phil** 119:5
**phonetic** 7:20,20
7:21 13:22 62:20
125:10 234:10,18
289:17
**photo** 64:20 65:10
66:2,3 68:5
350:17

**photographic**
293:14
**photographing**
229:11
**photographs**
343:23 344:6,10
344:13
**photos** 63:2 64:11
68:2,24 91:21
343:25
**physical** 99:25
198:4,7 321:15
324:16
**physically** 99:25
246:8,12
**pick** 88:10
**picked** 231:10
233:13
**piece** 274:21,25
275:3 281:16
**pieces** 292:20,25
**pillar** 321:12
**place** 40:5,23,24
41:10 42:4,20,22
57:19 61:18 64:6
77:6,9 78:17,19
81:11 101:9
111:24 135:11,25
218:5 271:5 289:4
289:8 325:7
331:17 351:15,20
**places** 282:7
**plain** 64:15 174:4
**plainly** 173:5
**plaintiff** 2:3 54:3,5
78:24 81:23 82:15
**plaintiff's** 86:11
87:18 89:9 92:19
116:21 121:17,18
121:21 128:14
134:4 144:15

162:4 163:18
164:2 168:23
187:6 284:18
317:5 343:22
**plaintiffs** 1:6 91:4
274:4 343:14
**plaintiff's** 194:11
227:9 342:15
345:5
**plan** 49:14 71:15
72:8,11 83:12,15
86:14 87:3 131:15
133:3,5,9,13,16,22
134:5,7 135:16
154:3 156:23
167:4,12,18
168:16 183:25
215:13 216:25
217:10,20 218:4
218:12,21 219:24
279:24 280:4,6
293:2,7,9,13
294:11 345:11,12
**planned** 71:21
120:17
**planning** 159:7
160:7,23 285:24
295:15,22
**plans** 30:4 83:9
135:14 157:19
166:17,23 168:6
176:6 249:5
292:24 345:6,7,18
350:19
**play** 96:7 308:9
**played** 68:11
**players** 97:7
**playing** 24:10
331:7
**plaza** 287:2 289:5
289:12

**please** 5:10,13 6:5
6:14 62:25 97:15
113:14 123:24
142:13 163:25
219:18 226:13
329:5 355:3,7
**pllc** 2:4
**plus** 13:8,11
135:22,24 137:8
146:12 220:25
**pm** 317:3 342:8
347:6
**point** 8:21 9:16
17:17 61:25 69:14
94:18 95:6 100:24
103:12 105:9
106:16,19 113:8
163:24 173:9
232:5 235:4,6,9
242:21 258:24
267:2,7,20,25
275:12,14 299:6
303:14 305:14,23
310:13 313:17
325:3 330:12
339:4 341:14
347:2
**pointed** 91:13
208:8 297:25
298:5 302:5
**pointing** 301:21
321:25
**points** 197:24
201:9 202:11
345:4
**police** 4:24 8:9,11
11:3 23:18 25:2
25:20 26:25 27:9
28:23 30:17 36:6
38:18 39:15 40:2
43:14 54:22 58:7

64:10,14,24 66:5
66:18 67:6 72:18
73:4,9,12,18,20
79:19,20 80:18
82:17 88:4,10
94:12 97:2,10
98:14 99:4 101:4
101:7,16,23 102:2
102:5 104:7,16,22
105:20 106:3,10
106:14 112:8
123:2,6,13 124:6
136:8,17 138:4
139:8 148:6,22
189:24 191:7
205:12 206:5,18
215:25 219:24
225:2 229:13
239:22 242:3,9,11
243:20 248:6,9,24
251:22,23 252:3
252:13,21 253:5
254:6 258:8
262:13 267:2,8,14
270:11,18 279:4
279:11 282:9,11
282:12 283:19
284:5 287:2 289:5
289:12,22 290:15
290:22 291:7,24
299:16 300:10
304:16,20,23
305:6,9 310:9,13
310:19 311:3
325:13,21 327:2
327:15 329:15
338:10,23 339:8
339:19,20 345:24
350:13,21,25
351:5,18,23
352:23 353:15,21

353:24 354:3
**polices** 75:20
**policies** 22:12,16
22:23 23:9,19
**policing** 68:11
70:15 87:12
137:22,24 148:23
156:8 188:21,24
189:4 190:14,18
190:20 191:2
210:3,14 212:7
215:19 216:4
278:18 284:10
290:3
**policy** 13:4 59:9
**portion** 36:12
58:16 64:2 92:22
134:16
**pos** 39:8
**position** 7:7 16:16
169:23
**possession** 166:22
273:25 274:7
275:13
**possibility** 103:5
125:20 223:11
246:22 298:15
**possible** 49:13
113:6 125:17
130:12 150:5
158:3 165:19
184:21 234:2
240:13,14 241:22
243:6 246:14
273:8 288:8 293:3
300:7 301:12,16
301:18 313:12
330:24
**possibly** 31:6 52:4
67:21 86:15 88:20
221:19 245:14

293:5 336:7
**post** 188:12
**potential** 187:16
**potentially** 160:8
    237:9 252:6
    266:11 267:12,15
    300:3,25
**powerpoint** 49:22
    50:8 51:20 135:15
    166:16,24 167:4
    167:12,18 168:15
    344:20,20,25
    345:2,17
**powerpoints**
    168:6
**ppe** 205:3 206:22
    207:8
**practice** 23:20
    112:9
**practiced** 280:23
**practices** 22:12,16
    22:24 23:9
**pre** 49:13 271:15
    271:22 272:18
    354:21
**precinct** 7:4 21:22
    68:18,21 69:6,13
    69:22,25 70:3,8,13
    143:11
**preexisting** 274:23
**prefer** 90:8
**prepared** 46:23
    47:16 122:7 184:7
**prescription** 18:9
**presence** 138:5
**present** 2:18 20:7
    36:15 56:8,14,25
    59:12 67:2 94:21
    94:22 132:3
    133:17 161:13
    189:5 217:21

220:15 221:25
222:2,9 283:19
313:20 351:12
**press** 27:19,23
    28:11,18,23
**pretty** 194:5
    209:24 228:19
    292:13 324:14
    328:15
**prevent** 72:20
    73:5,14,21 74:15
    74:25 75:21 95:4
    95:9 103:23
**preview** 61:16
**previous** 84:24
**previously** 14:14
    50:6 110:19,22
    122:20 125:3,18
    135:3 151:12
    152:16 153:5,22
    158:19 165:9,11
    165:16,18 185:9
    201:12 214:9
    223:13 243:10
    255:24 259:5,6
    269:14 276:25
    286:2 294:20
    317:6 345:23
**primarily** 179:17
**primary** 72:18
    73:3,9,12,20 74:5
    74:6,14 75:20
**print** 273:18
    274:17,19
**prior** 14:2,7 20:9
    22:22 23:4 49:14
    60:8 76:23 79:4
    83:22 85:18 94:12
    94:18 105:12,19
    105:22 107:8,12
    109:10,25 110:6

110:24 111:24
143:20 146:15
150:16 152:4
153:2 162:6,13,17
164:14 168:4
198:17 209:8
234:24 236:6,12
236:20 239:19
243:5 258:4 264:7
272:22 274:24
286:8 298:25
299:13 342:19,23
343:3,10 344:5,9
**priority** 172:25
**private** 103:24
    104:3
**privy** 326:16
**probable** 32:20,24
    33:14,16,20,23
    34:3,10,14,16,21
    34:24 35:6,9,18,21
    36:2,5 40:4,17,21
    41:7 55:17,23
    56:2,6 58:5
    235:14 237:13,20
    237:22,24 238:11
    239:8,12,14 240:2
    240:8 246:17
    247:6,15 268:6
    269:23 276:9
    277:5 298:16
    306:19 308:16
    309:5,10,15 313:7
    313:8 314:21
    326:24 327:16
    334:10,13 335:9
    335:18 336:8,14
    336:18 337:8,10
    337:14,19 338:9
    338:12,24 339:5,7
    339:15,21 340:6,7

340:15,20 341:2,5
343:15,21
**probably** 80:5
    153:6,7 164:11
    165:5 177:15
    184:12 185:20
    257:14 269:5
    319:10
**problem** 129:8
    158:17 199:13
    211:19 215:8
    245:15,16 246:25
    247:10,13 248:15
    311:10,14
**procedure** 13:4
**procedures** 61:4
    182:15
**proceed** 324:25
**proceeding** 321:14
    324:23
**process** 12:8 248:5
**processing** 243:22
    246:19 299:17
**produce** 212:18
**produced** 16:21
    91:4,6,9 212:22
    262:12 274:3
**production** 166:8
    166:11 272:2
    354:20
**productivity**
    316:3
**professional**
    214:22 216:6,11
    258:20
**profile** 129:19,20
    181:5
**program** 254:16
**promise** 5:15
**promoted** 9:5,14
    9:20 10:3,10,18

15:17 270:10
**proof** 340:20
**proper** 35:5 99:11
  101:10 182:15
**properly** 32:4
**property** 53:7
  74:10,11,13,18
  103:24 104:3
  300:16,23
**proposal** 174:19
  174:23 175:24
  176:2 177:24
**proposed** 176:9,12
  182:22
**proposing** 178:10
**prosecuted** 170:25
  318:5
**prosecutes** 319:8
  319:23
**prosecutions**
  318:24
**protect** 73:10
  157:21 205:9
  281:19 300:15
**protected** 24:16
  25:7 215:20
  242:18 294:3,24
  297:8
**protecting** 73:17
  74:7,8,9,11,12,13
  74:17,18,19,23
  300:15
**protections** 268:23
**protective** 129:2
  129:18 205:4,6
  206:6 281:9,12,17
**protest** 37:16 38:8
  38:10,11 56:19
  57:3 61:11 70:18
  77:6,10,12,19,21
  78:12,14 81:17

84:6 86:17 95:7
  107:15 133:18
  150:3 153:12
  157:10 185:7,13
  188:2 193:2
  201:15 218:14
  222:13,22 224:10
  225:6,12,19,25
  226:6,11,19 227:2
  255:15 270:18
  271:4,15,22 276:8
  278:19 279:5,12
  279:18 281:8
  282:13,15 283:20
  291:24 292:14,15
  309:22 317:17
  318:4
**protesting** 83:14
  110:2 226:15
**protestor** 139:4
  205:14,24 214:3
  344:2 352:3
**protestor's** 268:4
**protestors** 43:18
  54:22 64:6 66:19
  66:25 94:12 95:5
  95:10,14 100:5
  102:2,5,18 105:5
  185:6 196:19,24
  197:7 199:17
  205:21 209:4,15
  213:23 214:17,21
  215:12 216:8,13
  241:2,18 244:4,8
  271:6 276:8 277:4
  277:14 278:6
  279:16 282:9
  284:5 290:12,20
  291:3,11 300:4,8
  304:16,21 305:8
  310:10,14 312:11

314:3
**protests** 76:24
  131:14,16,19,21
  132:19 133:6,9
  137:24 138:3,22
  139:8,13 149:12
  150:18 161:11
  182:16 188:2,25
  189:6 190:20
  191:8 192:6,19
  194:2 201:10
  207:17 210:20
  212:8 213:12
  223:8 225:4 242:6
  251:24 252:3
  256:17 258:10
  267:3,9,14,24
  268:23 269:24
  279:14 284:11
  290:4 318:19,22
**provide** 77:5,8
  165:17 248:23
  271:15,22 290:16
  290:23 291:8
**provided** 125:24
  126:4,16 164:21
  165:4 272:6 278:5
  290:11 291:10
**providing** 218:13
**psychological**
  206:17 241:11,15
  242:3 257:23
  258:4,25
**public** 1:21 5:24
  36:16 37:5 56:9
  65:22 67:11 80:22
  81:11,16 102:25
  223:22 224:2,4
  226:8,9,18,24
  244:7 268:5 269:4
  348:24 349:9

356:25
**publicly** 66:14,17
  91:7 320:6
**pull** 62:24
**pulled** 60:11
**purple** 227:21
  229:18
**purpose** 206:22
  344:24 345:10
**purposes** 97:14
  147:25 318:16
**pursuant** 1:19 4:8
**push** 274:17
**pushed** 56:20
**put** 7:11 43:24
  66:6,19 158:15
  161:10 195:21
  209:13 234:22
  240:25 317:7
  325:4
**puts** 246:13
**putting** 119:19
  249:7

**q**

**qualified** 337:11
**quality** 111:8
  115:23
**quantity** 111:9
  114:15 152:6
  318:5,12
**queens** 9:12 349:6
**question** 3:12
  14:13 32:23 37:7
  44:19 46:24 47:3
  48:9 49:21 51:17
  70:12 72:2 75:17
  75:18 77:7,16
  78:4 82:25 83:20
  83:22 84:16 85:10
  100:9 107:11
  117:11 120:13

124:8 126:21
127:10,17 132:4
138:23 145:7
147:6,19 157:8
159:16 161:22
162:15 164:18
165:13 169:24
171:25 182:20
184:5,6 185:8
197:5 199:2
200:11 211:13
222:18 225:24
230:11 240:5
252:17 255:4
271:17 276:25
306:12 307:20
324:6 330:10
334:25 338:18,20
**questioning** 75:6
**questions** 6:23
18:10 27:24 28:9
90:13 92:11,23
96:14 97:15 98:20
99:2,9 123:22
184:8 280:13
295:13,14 296:4
296:12 297:16
316:14,15 327:10
335:2 341:16
342:13 343:14,16
344:12 346:20
**quick** 76:3,8
140:19
**quickly** 8:10
123:22 186:16
**quotation** 197:14
**quote** 109:13

**r**

**r** 2:2 5:22 6:10
349:2 353:13
354:16 356:1,1

**radically** 201:23
**raganella** 1:18 4:5
4:22 5:1 6:1,7 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1,9 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1,20 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1,17
92:20 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1

122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1,21,24
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1,20 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1

243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1,12 343:1
344:1 345:1 346:1
347:1,8 348:7,16
352:15,21 353:4
353:13,19 354:16
356:20
**raise** 5:13 208:4

raising 43:13
ramped 151:22
randall's 42:20,21
 43:2
rank 15:13,18
 38:17,19 123:8
 326:14
ranking 301:24
ranks 40:11
ratio 243:19
read 81:8,9 123:25
 205:15 208:13
 223:18 251:4,7
 257:22 262:23
 263:10 292:7
 293:20 348:8
 355:3
readily 207:25
reading 172:2
 195:7 203:25
 224:8 293:10
readings 262:18
reads 238:6
ready 18:4 320:19
real 80:8
really 90:9,11
 173:18 259:19
 275:15 323:8
realm 270:7
rear 139:21
reason 66:18
 102:20 103:25
 112:18 115:5,20
 206:10 224:5,6
 225:2 232:13
 233:9,12 235:13
 235:24 238:15
 240:22 258:16
 298:7 299:5,16
 301:5,8 302:15
 314:25 315:5,6

318:15 328:2,8
 355:5 356:10,12
 356:14,16,18
reasonable 80:7
 163:6 339:9
reasons 65:6 115:9
 226:5,25 299:15
 318:9 356:6
recall 7:24 11:8,9
 11:11,12 18:22
 19:9,11 20:11,17
 20:22 30:5,9 55:8
 62:14 68:20 105:3
 109:3,11,23,24
 110:3,19 119:11,17
 119:21 126:5,15
 126:18,20 149:17
 151:6 160:18
 162:24 164:16
 167:19 178:18,23
 186:6 187:24
 189:2,9,17 191:12
 191:17 192:4,10
 192:15,21 194:6
 194:25 202:9,15
 203:18 204:2,14
 204:25 210:24
 211:8 212:11
 217:3 227:18
 254:18 255:13,19
 259:9,14,19 261:7
 275:7 282:5,16
 283:3,4,7,21
 286:15,25 287:8,9
 287:23 288:2,23
 289:7,10,11,18
 294:7 319:18
receipt 119:6
 355:14
receive 12:4,4,5,13
 127:3 133:8,12,16

135:24 166:5
 254:13
received 10:22
 11:7,19 44:24
 45:19 62:3 82:23
 107:21 126:18
 130:5,10,13 137:8
 144:4,9,10 163:2
 229:19 230:4
recess 31:12 47:19
 76:10 89:21
 141:13 186:20
 250:3 275:21
 316:10 342:2
recklessly 238:7
recognize 49:2
 54:12 62:15,17
 63:12,15 151:15
 202:5 219:20
 243:11 250:21
 285:5,7 309:2
 317:14
recollection 19:13
 93:11 151:6 165:8
 165:10,12,15
 166:3 191:15
 217:5 257:16
 277:17 280:11
 283:11 287:18
 294:9
recommend 162:16 194:20
recommendation
 162:21 163:8,9
 169:9 177:25
 186:10 204:12,19
 244:24 253:21
recommendations
 160:12 163:10
 188:11,16,21,24
 189:4,10,13

190:24 204:6,10
 252:7 253:9
recommended
 162:11 169:21
record 4:4 6:4,9
 6:13,24 21:20
 31:14 44:20 46:6
 47:9,21 54:8
 76:11,19 89:23
 141:3,14,17
 142:16 159:24
 186:22 187:4
 202:22 227:15
 230:18 232:3
 250:5,8 263:19
 275:18,23,25
 297:18 303:13
 304:7 305:20
 308:6,13,21 310:7
 311:13 313:15
 314:8,15 316:12
 317:2 320:22
 341:23 342:4,9
 349:13
recorded 184:17
recording 316:25
records 44:25
recruit 36:7 40:7,8
 40:13 58:8 61:19
 112:13 136:8,12
 344:16
recruits 276:21
 345:14
redirect 102:14,17
 102:23,25 103:6
 106:17
redirected 103:21
 305:4
reduces 137:17
redundant 32:2

**refer** 155:22
**referenced** 118:4
  128:14 134:8
  162:3
**referencing**
  286:16
**referred** 45:17
**referring** 282:22
  283:2
**reflect** 145:2
  344:21
**reflected** 145:12
**refresh** 19:13
  62:23 112:21
  151:5 165:7,10,12
  165:14 166:2
  191:14 217:5
  257:15 277:17
  280:11 283:11
  287:18 294:9
**refreshed** 286:11
**refresher** 59:22
  112:20 136:11,13
**refuse** 106:19,21
**refusing** 298:18
**regard** 22:14
  23:24 30:2 37:6
  55:15 70:18 85:23
  120:24 153:4
  158:25 192:18
  193:2,25 219:25
  220:15 225:3
  243:19 256:12,14
  285:18 318:18
**regarding** 30:10
  31:2 33:20 34:10
  35:5 45:9 84:25
  87:8 117:20 119:6
  122:8 188:16
  192:12 202:11
  216:25 217:10,20

249:8 274:5 286:3
  286:18 297:4
  343:15,16 344:13
  345:23 346:4
**regardless** 295:23
**regards** 61:12
**regrading** 160:8
**regular** 67:12
  168:25 169:10,13
  169:17
**relate** 126:24
  127:6 254:24
**related** 44:9 47:12
  82:17 111:22
  121:22 130:19
  131:24 133:9,10
  136:18 151:18
  190:3 202:8
  210:19 214:15
  215:18 260:12,16
  260:17 279:13
  290:7 318:4,19
  349:16 353:9
**relates** 93:20
**relating** 120:15
**relation** 22:13,17
  94:6 120:20 121:8
  145:24 146:4
  171:8 255:8
  285:10 318:18,22
**relatively** 136:7
  149:22 310:23
**relayed** 137:13
**relays** 247:16
**released** 21:22
  281:22
**relevant** 86:20
  256:17,18 257:13
  270:19,24 276:23
**rely** 45:23

**remain** 214:2
  215:20 216:2,6
  309:19
**remaining** 214:22
  216:11
**remember** 11:19
  11:23 127:9
  168:14,17 286:14
  289:14 320:2
**remind** 83:21
  244:21,23
**remove** 73:16
**removing** 282:11
**repeat** 75:18 132:4
  195:11 196:21
  214:18 216:9
  222:18 225:24
  252:17 267:4
  271:17
**repeated** 292:23
  292:25
**rephrase** 138:23
  165:13 171:7
**report** 85:7 93:19
  259:7 261:12
  282:22 346:3
**reported** 184:18
  255:11
**reporter** 1:21 4:16
  4:18 5:12 6:3,8,12
  6:21 21:3 27:12
  44:6 48:20 62:6
  71:13 78:22 81:21
  86:8 90:12 93:14
  108:13 116:19
  119:24 123:20
  134:2,25 136:24
  138:11,14 140:10
  140:13 142:10
  151:10 153:17
  158:9 163:16

186:25 194:9
  202:2 219:14
  250:15 255:22
  259:22 260:5
  264:6 284:22
  316:22 347:11,15
  349:9
**reports** 260:9
  261:22 282:21
  346:11,15
**represent** 143:16
**reproduce** 166:20
**republican** 79:16
  79:24 350:22
**request** 12:8 45:4
  46:3 47:13 115:11
  271:25 272:2
  354:20
**requested** 46:12
  95:6 212:14 324:9
**requests** 188:6
**require** 124:12
  169:16,23,25
  263:16
**required** 28:18
  30:17 112:15
  207:6 262:18
  267:16,19 268:6
  269:5 346:12,16
**requirement**
  237:14 290:3
**requirements**
  278:18 279:4,11
**reroute** 102:14
  106:16
**reschedule** 316:18
**rescue** 129:20
  181:6
**reserved** 3:12
**residents** 204:7,23

resistance  214:5
resisting  244:9
resources  244:11
respective  3:5
respiratory
  281:19,24
respond  322:25
  323:11
responded  324:6
  343:14
responds  322:24
response  15:21
  117:16 143:2,7
  206:17 212:14
  214:7 244:18,20
  249:3 252:14
  253:5 254:16
  272:5 325:21
  326:2,8,13
responses  45:15
responsibilities
  12:21,22,25
  251:17
responsibility
  190:12
responsive  45:4
rest  240:25 241:17
  266:7
restate  107:11
  117:11 124:8
  138:23 145:7
  159:9 162:15
  185:8
restatement  176:3
restrict  224:6
  226:25
restricted  65:18
  224:2 225:20
  226:2,7,11
result  152:7 254:2
  334:2

resulted  334:9
retired  13:25
  14:15,19 256:11
retirement  14:11
return  355:12
review  48:23
  71:16 83:9,12
  87:7 89:2 93:22
  93:25 129:3 135:4
  142:12 163:25
  164:19 182:5,13
  182:14 183:8
  184:23 188:20,23
  189:3,12 190:12
  191:7 197:3
  243:12 253:2,20
  262:2 296:20
  317:8,12 320:7
reviewed  48:12
  49:15 165:5,24
  166:3,14,16,25
  167:7,16 168:4
  185:21,25 188:15
  248:9 263:5
reviewing  168:14
  190:17 192:6
  251:23 252:2,13
  252:18
reviews  251:12,20
  254:6 261:10
revised  159:4
  161:3 162:8
revision  195:13,16
revisions  30:4
  253:18
right  5:14 8:19
  9:10 40:9 47:17
  52:24 63:8 66:9
  74:24 89:24 90:24
  91:11 100:5
  114:16 122:2

128:4 129:21
147:13 148:11
159:20 163:25
164:17 168:8,22
177:6 178:3
179:20 184:22
188:13,18 189:20
191:3 213:7 214:6
215:23 221:4
225:5,11 226:25
227:10 228:22
249:22 256:12
271:19 291:21
294:25 296:9
297:6,8,25 299:3
302:23 303:7
304:13 305:14
307:4,17 308:14
309:5 311:8,23
312:6,9 315:9
328:2 329:24
331:3 337:5
339:14 340:13
341:8
rights  23:20,25
  24:3 25:7,20 26:7
  26:17 30:11 31:2
  74:20 87:12,13
  133:18 157:21
  271:7 279:15
  292:4
riot  52:15 182:14
  258:7 350:15
riotous  36:9,13
  103:13,20 157:25
  158:5 228:7 242:5
  242:7,13 257:11
  258:10 277:13
  278:5
riots  49:20 50:8,10
  50:12,17 51:24

52:7,13,19,22 53:3
53:16 182:6
rise  40:11
risk  238:7,10
rmc  78:24 79:6
  80:12 82:9
rnc  291:16
roadway  65:22,24
  65:25 66:8,11,15
  66:18 67:9 229:6
robert  317:17,20
rogers  108:22,25
  109:2
role  68:8,11 72:18
  73:4,9,12,20 74:5
  74:6,19 75:20
  262:21
roll  88:15,18,25
  117:22 118:22,24
  263:4 273:14
room  20:14 67:11
  171:14 285:14
  286:24 287:6
  289:9 314:16
route  337:21
rule  203:13 217:21
  218:5 351:12,15
  351:20
run  109:14,20
running  14:12
  143:17
rush  244:7

| s |
|---|

s  2:2 3:2,2 294:14
  350:7
safely  206:23
safety  67:11 103:2
  103:21,22 226:8
  226:10,24 244:7
  299:15

sarah 96:8
satisfy 274:15
saw 22:7,20 23:4
  23:15,17 25:19
  26:2,5,21,23 27:6
  27:13 29:3 32:6
  33:10 34:16,24
  35:11 36:13 37:2
  44:11 54:19 55:24
  56:6,12 57:7
  58:16,24 59:13,16
  60:6,9,10,19 91:20
  91:22,23 96:23,24
  97:9 98:4 103:11
  104:18 105:16,19
  164:10 166:2
  209:17 210:7
  211:17,18 213:5
  227:19 230:8,9
  238:21 239:22
  249:16 298:13
  301:23 302:13
  303:14,24 309:16
  318:23 326:11,23
  328:13 336:3
  342:17 343:20
saying 24:24 51:12
  89:10 99:24
  100:14 105:3
  114:11 212:24,25
  241:25 245:8
  247:7,7 273:7
  280:15,15 284:4
  307:3 323:5 330:3
  330:6
says 50:8 51:10
  74:24 80:20 81:10
  124:11 139:10,16
  152:2 155:16
  169:3 170:13,15
  176:14 177:12,13

177:13 195:9
  203:6 257:18
scaffolding 227:25
  228:5
scale 278:15,23
  279:8,18,20
scene 39:7 57:24
  101:24 103:2
  107:4 203:15
  272:21 299:23
  332:18
schedule 346:25
scheduled 110:19
  110:22
scintillating 320:9
scooters 101:5,7
scope 30:15 72:5
  72:10 167:21,22
  170:23 171:22
  174:16 195:21
screen 49:22 62:25
  235:6,7,9
sda 1:9
sealing 3:6
search 253:4
  288:9,12,21
searched 212:15
searching 212:13
  283:14
second 15:2,4
  44:12 63:9 66:2
  72:17 84:23 92:12
  104:9,11 144:20
  178:6 182:3,10
  203:5 204:5,10
  205:14,17 208:11
  220:3 231:16
  287:3 289:3
  318:15 323:20
seconds 227:10,16
  230:7

secret 163:23
section 270:11
  292:19 298:17
  346:2,3 353:6
see 8:9 20:2 22:11
  22:17 23:15 24:11
  24:22,24 25:13
  26:3,4 32:24
  33:16,18,22,24
  34:24 35:9,21
  36:9,13,15 37:9
  49:2 55:3,11 56:2
  56:6,8,24 58:11
  60:15 63:10,18,21
  64:10,17 65:25
  66:3 68:4,5 78:23
  83:10 84:23 87:6
  87:8 94:10,21
  95:3 96:21 97:7
  98:5,8,10,20,23
  102:16 103:8,14
  104:16,19 116:20
  151:5 152:20
  172:4 177:5,7,8,14
  184:22 185:25
  201:6 222:8
  227:16 228:16,20
  228:22 229:5,13
  230:14,20,21,22
  231:3 233:9,10,12
  234:4 235:8,23
  236:3 238:15
  239:24 240:8
  248:10 257:17,20
  260:22 296:22,25
  297:19 298:7,9,13
  298:20,24 299:4
  304:4 305:11,22
  309:5 310:3 312:6
  312:9,11,12 314:9
  314:16 315:24

318:16 320:23,25
  321:2,25 322:23
  323:21 324:15
  325:14,25 326:2
  327:11 328:23
  329:6 331:2,8,9,12
  333:14 334:10,18
  335:18,18 336:7
  337:19 343:6
seeing 65:10,21
  67:25 164:16
  194:25 208:10
  227:18 234:25
  241:15 259:9
  261:7 311:8,23
  324:16 327:9
  340:7
seeking 25:3
  304:22 317:24
seemingly 304:22
  310:3
seen 22:2 30:13
  44:8 47:22 54:10
  62:12 83:2 91:8
  93:23 94:2,3,17
  101:22 108:19
  116:24 137:9,11
  158:22 164:8,15
  168:10 192:22
  194:17,24 195:19
  211:3 243:9 256:3
  259:13 260:11,19
  261:5 264:2
  265:23 278:12
  319:7
semantics 340:13
senator 44:13
sense 295:16
sensitive 300:2
sent 43:12 253:21

sentence 208:13
208:14 223:17,20
224:3 251:9
257:22 293:20
separate 77:18
155:9 241:10
september 16:2,11
29:14 30:7 42:12
75:10 107:10,12
108:2,23 109:25
111:2 114:7,19,20
114:20 115:7,7
119:15 131:7,7
132:12,14 145:20
145:25 146:5,5,8,9
147:12,12 164:3
175:6 216:21
271:2,13 297:12
299:18
sergeant 9:6,9
14:22 15:6,14,15
15:18 89:2 119:5
270:4,9
sergeants 88:8
263:3,15
serious 313:6,16
314:2
service 13:10
28:18 50:16 53:21
61:22 88:13 89:8
130:9 131:9
143:24 144:3
147:12 149:11
253:19 262:19
266:8,25 267:7,23
269:3,20,22
271:16,23 276:14
276:19,20,22,24
282:21 283:2
services 127:25
143:23 258:17

sessions 169:10,14
169:17,22 170:2
set 44:12 63:18,22
64:5 65:9 349:12
349:20
sets 46:17 167:23
setting 42:7,8,23
43:4,6,9 50:2
101:9,17 184:15
222:14,23
settlement 98:12
settlements 98:11
seven 13:8 81:23
82:15 87:19 89:9
90:7 330:16
share 200:12
shared 172:11
261:14,22 346:8
346:12,16
sharkey 5:9
sheet 355:6,7,10
355:13
shelf 275:2
shields 129:2,19
281:9
shirt 62:17 227:21
229:18 231:21
232:6 234:6
297:25 309:2,21
312:11,13 324:21
326:14 329:21
330:5 331:9,24
332:10
short 14:20 20:7
31:12 47:19 76:9
89:19,21 186:18
186:20 250:3
275:21 316:10
321:3 342:2
shorter 88:22

shorthand 349:8
shot 320:17
show 48:21 81:22
96:8 108:14
153:18 158:10
163:17 194:10
213:3 227:7
230:10 233:11
241:12 259:23
263:24 297:11
302:18 303:9
308:14 316:24
320:4
showed 11:15
30:14 236:16,23
326:7 342:15
344:19 345:5
showing 96:8
151:12 219:15
232:18 239:18
284:25 317:4
343:22
shown 21:19 54:7
93:3 96:18 227:14
230:17 232:2
264:9 297:17
303:12 304:6
305:19 308:5,12
308:20 310:6
311:12,22 312:2
312:25 313:14
314:7,14 320:21
348:12
shwock 13:21 14:2
14:7,15
shwock's 14:10
side 66:4 67:6 91:3
101:6,8,8 104:7,11
177:6 195:9
304:22

sidewalk 25:5 37:6
37:10 56:20 57:3
57:9,13,21 59:11
61:10 64:2,8
65:13 77:12,21,24
91:24 102:4,6
104:12 105:17,24
131:14,16,19,21
132:19 133:6,9
137:24 138:3
153:11 161:11
188:21,25 190:20
191:8 192:6,18
193:2,25 210:19
212:8 213:11,22
214:17,20 215:12
216:7,12 222:13
222:22 224:10
225:19,25 226:6
226:11,16,22
228:4 229:2,7
231:6,7 232:7,9,10
232:21 238:17
240:16,19,21,23
241:17 242:24
249:21 251:24
252:3 255:15
267:3,8,14,24
268:4,23 270:18
271:5 276:8 277:4
277:14 278:6,18
279:4,12,13
284:10 290:3,12
290:20 291:3,11
292:15 299:10
303:15,24,25
304:8,9,13,20
305:23 306:3,20
307:4 309:18,19
309:23,24 310:4,9
310:10,14,15,18

311:16 313:6
314:3,16,23 321:7
326:21,23 336:12
336:13 337:24
338:3,7
**sidewalks** 43:15
43:19 133:14
223:10 343:3
**sign** 296:23 297:22
297:25 302:9,14
312:10,16 355:7
**signature** 349:23
**signed** 3:16,19
**significant** 36:22
**significantly**
130:15
**signing** 355:9
**signs** 293:23 294:2
294:23,24 297:4,7
**similar** 43:25
147:23 212:6
230:11
**similarly** 81:12
**simply** 221:15
**single** 156:17
244:12,16
**sir** 64:3,7 98:22
127:20 132:17
139:6 182:11
190:9,16 196:14
230:15 249:2
256:10 280:12
283:6,9 314:19
**sit** 139:5 151:4
286:13,20 293:4
352:3
**site** 177:12,22
**sitting** 19:21 20:3
**situation** 33:9 38:3
38:4 49:20 50:9
50:10,13,17,20

51:11,24 52:8,13
52:19,22 53:3,16
58:25 60:8 242:13
244:22 245:25
247:19 249:12,12
249:14 332:25
340:2
**situations** 238:23
248:19 252:11
256:18 269:7
**six** 78:24 330:16
**size** 67:3
**slide** 135:22 137:7
137:11,12,15
138:15 139:9
167:4,12
**slides** 166:17,24
344:20,20,25
345:2,17
**slightly** 130:21
**slow** 244:6
**small** 22:19 25:25
29:3 130:20
156:12 305:15
**smaller** 13:16
**snappy** 140:18,21
**snaps** 68:5
**snippet** 22:19
305:16 306:25
**solely** 29:14 60:6
60:20 75:21 94:25
104:18 118:23
230:7
**solid** 166:10
**somebody** 18:24
19:3 28:3,22
29:19,20 30:22
38:22 163:8
193:15 213:9
229:10 237:7,17
238:9 246:15

247:5 256:6
258:23 266:6
287:24 310:24
321:9 328:19
**somebody's** 221:4
281:24
**someone's** 237:16
241:16
**somewhat** 8:8
21:14
**soon** 90:5
**sorry** 4:13 7:23
9:20 63:5 92:11
116:7,12,16
119:12 121:18
129:7 132:6 159:8
159:22 160:5,5
162:15 163:22
166:14 174:4
182:7 195:11
196:21 197:25
204:9 239:5
245:22 251:6
271:19 279:19
291:22 293:15,16
294:18 313:24
**sort** 119:9 152:23
300:22 305:10
**sought** 47:5,7
**sounded** 322:12
323:15
**sounds** 8:19 347:3
**south** 299:18
300:21 301:7
**southern** 1:3
**space** 355:5
**speak** 23:2 27:12
28:2,4 201:16
341:24
**speaker** 302:20

**speaking** 24:8,22
59:24 60:7 63:5
64:14 176:4
197:10 205:23
273:17 332:3
**special** 15:14,16
15:18 117:18,24
253:23
**specific** 30:5,21
45:10 46:3 47:13
70:2,7,10,13,19
75:15 79:7 80:14
84:11,17 85:12
87:15 110:14,17
121:7,22,25 133:8
133:13 136:19
149:5,6,9 152:22
153:11 175:13
183:15,18,25
188:6 203:13
208:9 255:10
271:5 282:16
284:10 290:9
291:18 292:13,17
300:9
**specifically** 15:25
30:2 39:6 59:10
61:5,25 84:7 86:3
87:9 107:18 111:8
111:22 120:11,18
130:18 131:17,24
133:10 137:11,16
138:22 151:23
189:9,25 192:10
254:24 279:13
290:7 292:9
**speculate** 174:9
315:4 335:24
336:2,5 343:20
**speculating** 11:13
343:13 344:14

speculation
  101:20 335:22
speech  23:21 24:2
  24:3,15 25:7
  26:17 30:10 31:2
  157:22 242:18
spell  6:8
spoke  20:19,23
spoken  109:8
spot  96:11 208:9
spray  191:23
  282:8,13,15
  283:12,20
ss  348:3 349:5
staff  13:5,7 49:11
  149:25 187:13
  196:8
stamped  44:2
  78:25 81:24 93:16
  108:17 116:22
  142:17 159:9,25
  164:5 243:10
  255:24 317:6
stampeded  158:19
stand  41:5 66:21
  142:25 195:18
  205:3 323:20
standard  37:13
  129:23 220:18
  221:2,4,20 222:4
  222:12,20 224:9
  244:23 265:17
  340:20
standards  132:3
  161:16,19 264:14
  264:20,24,25
  265:12 266:13
  292:14
standing  43:15
  64:11,17 67:7
  233:21 237:16

238:8 311:18
  312:10
stands  113:12
staple  213:24
starkey  2:20 227:6
  294:18 296:24
  302:20,25 303:6
  307:24
start  4:14 18:18
  92:5,25 120:2
  121:11 142:7
  227:9 292:21
  302:19,21 303:8
  342:20,23 343:4
  343:10
started  27:12 28:4
  28:9 111:17
  114:12 163:4
  324:8
starting  23:5
  93:17 96:16
  158:19 200:19
  297:13
starts  142:16
  208:12 219:17
  257:19 328:19
  333:4
starving  90:17
state  1:22 5:25 6:3
  6:12 44:13 45:16
  141:23 265:3
  266:3 348:2 349:4
  349:10 355:4
stated  24:12 74:14
  74:22 97:23
  112:16 113:15
  125:13 162:9
  168:3 171:15
  172:22 300:13
statement  235:10
  327:6

statements  125:18
states  1:2 52:7
  72:18 109:17
  137:16 168:23
  223:18,19 293:25
stating  205:11
  206:6
stationed  139:21
statute  238:5
  266:5
statutes  265:11
statutorily  52:16
stay  8:22 15:7
stayed  10:4,8
  14:23
stays  248:4
stecklow  2:4,7 4:2
  4:20 5:3,7 6:25
  7:3 31:11,15
  44:17 45:11 46:9
  46:21,25 47:18
  54:4 75:13 76:5
  76:12 89:18,24
  90:4,25 91:5,11
  92:2,7,13 93:4
  96:19 116:9 140:8
  140:25 141:9,15
  142:11 159:12
  160:2 163:21
  166:7 171:2
  186:17 187:2
  198:22 199:3,12
  219:10 220:6
  227:4 249:22
  250:6,12,18 261:2
  272:11 273:21
  274:10 275:20,24
  276:2 284:15,23
  294:12 295:2,8,11
  295:18,21 296:9
  296:14,17 302:17

302:22 303:3,7
  307:15,22 308:7
  315:9,17,23
  316:23 341:13,25
  342:7 346:21
  347:4,11,14 350:4
step  229:5
stepping  240:19
steps  310:16 337:6
stick  11:5
stipulated  3:4,10
  3:15
stop  90:5 92:10
  104:17 106:15
  203:7,7 296:2
  298:13 299:17,24
  300:10,20 301:7
  303:7 308:22
  309:23 324:23
  341:15
stopped  26:4
  102:2,5 105:20
  106:3 232:4
  303:19 329:22
stopping  93:5
  94:13 96:19
  295:22 301:13
  304:16
store  331:21
stories  283:15
straight  248:21,24
strategies  251:13
  251:21 261:11
  262:3
street  1:19 2:5,13
  4:15 43:17 64:18
  64:23,23 68:9,12
  68:15,25 69:3,8,11
  69:15,23 70:5,9,10
  70:16,20 76:16
  79:11,21 80:3,9

82:18,22 92:16
98:13 101:8 102:3
104:10 107:8,13
108:4 109:5
110:11 111:5,17
111:22 113:17
114:3,25 120:11
120:20,23,25
121:2,8,13,23
122:8 137:23
141:11,19 145:11
146:24 148:23,24
188:3,8,13,17,25
189:6,14,24
190:10,14,19
191:9 192:19
193:3,24 196:23
197:7 202:9 210:3
210:15 214:8,11
216:23 217:8,18
218:2,10,19
227:24 229:14,15
232:6,21 240:20
252:22 254:7,16
256:17 260:10
261:14 280:20
281:2,7,21 282:14
283:13,20 284:9
285:19,20,23
286:4,5,17,19
288:25 291:24
292:14 319:20
353:10
**streets**  43:19
223:22 224:2
**stress**  257:19,23
**strict**  124:13
**strikes**  125:23
**strong**  223:24
224:14,24

**struggle**  321:10
**students**  52:20
225:14 345:14,19
**stuff**  43:3
**style**  128:7,9,10,12
128:21
**sub**  80:13 82:7,11
82:12,14
**subdivision**  80:17
**subheadings**
124:12
**subject**  5:19 278:6
290:12 291:11
348:11 355:9
**submit**  254:5
**subscribed**  348:20
356:22
**subsequently**  97:2
201:6
**substances**  281:20
**substantial**  37:5
37:15 39:19,22
58:11,20 59:11
77:23 94:11,19
299:9 307:9
**substantially**
37:23 38:25
306:16 307:4
**sufficient**  37:14
112:14 170:17
171:5,9,13,17
172:13,17 173:8
173:10 191:18,22
192:2 221:10
222:4 242:24
245:15
**sufficiently**  306:4
**suggest**  66:13
**suggested**  30:25
**suit**  337:12

**supervise**  13:5
**supervising**
231:22 301:20
**supervisor**  12:7
38:13,22 39:18,18
139:11 231:24
241:7 273:9
289:17 321:5,14
324:21
**supervisors**  38:23
39:6,7,10,12,21
40:10 254:14
273:2,4
**support**  282:18
**supposed**  18:8
28:23 138:5 184:6
**sure**  11:18,21
17:15 30:5 31:11
42:25 45:7,24
47:8 68:21 69:23
70:6 76:5 83:4
88:4 92:6 97:14
115:3 118:18
119:20 125:20
134:18 152:14
154:3 180:25
183:23 194:13
206:22 208:12,17
223:21 228:6
235:16 237:23
245:23 267:13
268:25 275:20
282:12 306:10
341:25 345:22
**surprised**  163:3
**surrounding**
221:24
**surveying**  283:15
**suspicious**  226:21
**swath**  17:2

**swear**  4:11 5:10
**sworn**  3:17,19
5:24 348:20
349:12 356:22
**synonymously**
209:22
**synopsis**  52:5
**system**  281:19,24

**t**

**t**  3:2,2 5:22 227:21
349:2,2 350:7
356:1
**tabletop**  61:23
71:7
**tactic**  209:23
**tactical**  117:19
118:7,9,15 119:6,9
119:19 251:12,20
261:10
**tactically**  208:6,15
208:20 209:3,20
209:22 210:8
211:11,18
**tactics**  80:14 113:3
161:8 170:8
181:18,24 201:8
214:3 215:14,24
262:3
**take**  18:8 39:17
40:23,24 42:3,22
57:19 76:3,7
78:17 89:13,19
90:14 97:12
140:24 141:5
143:10 153:21
158:11 220:2,7
223:7 239:14
244:10 249:23
287:4 288:6
315:10,19,22
325:4 337:20

340:24 341:3,12
**taken** 1:20 18:7,8
18:10 31:13 47:20
76:10 89:22 96:9
97:2 141:13
186:21 237:21
250:4 275:22
288:18 296:11
316:11 342:3
**takes** 40:5 41:9
61:18 78:18
246:12
**talk** 21:5 31:17,20
31:23 156:20
182:5 214:19
273:22
**talked** 38:21 182:2
**talking** 30:24
59:10 61:5 69:10
89:9 111:11
114:19 119:15
132:5 155:5 173:8
183:21 205:17
220:25 223:19,21
231:14 249:18
292:19 293:22
294:17 312:18
328:20
**talks** 80:18 121:23
154:7 156:20
170:4 176:18
177:9,12 179:18
182:12 184:23
245:14 292:3
**tap** 228:13
**task** 143:19
144:12 168:24
169:9 187:12,21
188:7 190:2,5,8
191:19,23 196:6
200:4,12 202:16

207:3 208:5,18,22
208:23 209:2,10
210:2,7,15,18
211:3 231:18,24
234:20 244:2,21
249:8 258:14
272:25 352:11
**tasked** 146:22
147:20 148:21
149:2 190:11,17
191:7,17,21,25
192:5,11 251:11
253:12 261:9
265:7 270:6
**taskforce** 8:24 9:3
9:4,9,12,24 144:9
**taskforces** 130:23
**taught** 43:3 58:6
72:22 88:11,14
113:4 120:21
153:12 157:13
179:25 180:3
181:2 182:22,23
182:24 184:14,16
186:12 195:2,4
294:5 344:22
345:8
**taylor** 352:15
**tcu's** 190:2
**teach** 73:2,3,7,8
135:18,21 154:4
157:16 179:12
182:18 183:4
345:16
**teaching** 132:23
225:14 345:15
**team** 39:14,16
137:16,19,25
139:11,13 258:14
258:15,15

**teasing** 140:20,20
140:21
**technique** 280:22
**techniques** 42:5,6
123:15 124:24
128:23 129:18
134:17 244:3
**technology** 213:4
213:9
**tee** 294:13
**telephone** 319:25
**tell** 10:24 11:6,16
11:22 29:19 41:6
44:8 55:22 97:5
104:25 106:13
109:12 113:19
131:6 160:15
166:15 175:5
232:13 234:14
239:25 243:8
260:12 286:20
293:4 295:11
300:10 310:2
321:8 328:21
329:19 332:24
335:8
**telling** 81:14 119:2
119:3 185:6
301:22 307:2
312:8 335:9
**tells** 135:23
**temporally** 96:13
**ten** 342:18
**tendencies** 201:7
**tenure** 15:8
**term** 40:20 53:16
262:6
**terms** 224:18
**terrorism** 143:9
143:14,21

**test** 109:14,20
**testified** 6:2 26:16
33:15 34:20
125:18 129:15
153:6 181:10
185:9 259:12
264:10,15 269:14
272:12 275:14
345:23
**testify** 18:6,15
34:15 35:10,14
55:23 75:8 122:20
170:20 171:20
286:2
**testifying** 198:21
198:24
**testimony** 5:16
126:13 274:16
280:14 300:14
331:22 332:7,23
334:18 348:9
349:14
**thank** 6:21,25
10:21 44:15 86:9
108:14 125:2
128:5 129:6
140:25 146:20
153:21 158:16
196:14 199:15
250:19 259:25
261:3 320:4
323:16 324:7
341:21 347:4
**thanks** 63:7
219:11
**theory** 208:25
**thereof** 238:7,10
**thermos** 117:10
119:13
**thermos's** 117:21
119:7

**thing** 85:6 127:12
138:4 204:5
292:21
**things** 14:12 88:22
113:2 126:25
128:15 136:6
155:6,12 161:6
166:6 177:11
253:10 256:24
291:18 340:16
**think** 13:20 16:24
16:25 17:13,17
19:14 24:14 27:11
32:2 37:13 46:6
48:22 53:14 85:13
91:13 101:23
108:6 111:11
112:2 115:25
128:3,6,11 131:23
132:5 149:23
159:23 161:7
195:20 198:16,19
199:8 200:9
203:21 204:15
208:4,4 217:6
219:16 226:22
233:23 238:5
250:10 253:3
258:2 259:18
275:9,10 284:15
301:11 312:21
316:2,7 318:23
321:20,21 332:9
341:8
**thinking** 204:25
**third** 63:9,21
65:10 198:2
270:15
**thirty** 355:13
**thought** 73:18
99:18 116:12

140:16 174:11,13
203:20 295:4
**thousands** 165:5
**threat** 328:19
**three** 7:17 10:25
48:22 67:20 68:4
79:24 81:13,15
84:22 122:10
128:15 167:23
168:22 221:9
260:8 343:23
**threw** 235:21
**thumb** 21:7 320:7
**tilt** 230:12 320:13
**time** 1:15 3:12 4:2
8:8 11:25 12:20
14:20,21 15:3
18:23 19:3,10
20:8,10,22 24:9
26:2 28:4,20 29:4
29:12,24 40:13
42:11 46:8 47:15
56:5 61:19 68:15
68:19,23,24 76:6
76:13 86:20 88:17
88:23 89:16 92:5
92:13 94:17 96:10
96:13 97:16
100:17 105:19
106:25 110:20,25
111:4 112:19
114:6 115:4,16,19
130:21 134:12
135:10,25 141:15
143:11,22 145:5
152:19,20 159:5
162:7 164:10
174:7 176:22,23
176:25 177:5,7,9
177:10 178:4,7
183:20 187:2

193:10 196:6,9
200:2,23 205:7
211:2,10 218:5
228:25 231:3
238:24 239:2
244:5 249:25
250:6 270:8,20
276:23 277:21
281:22 286:4,21
293:15 296:4,20
302:2 317:3,21
325:19 339:11
340:25 341:19
342:7 347:5
351:15,20
**timeframe** 15:25
16:10 30:11,23
58:24 68:22 96:22
119:14 121:7
122:2 130:14,24
132:2,10 137:9
**timeframes** 16:21
**times** 17:8,9,15,22
28:17,22 51:7
100:22 102:13
155:20,25 156:4
157:24 176:18
177:18,20 180:19
183:11 186:11
188:7 198:13
206:7 207:9,17,20
209:10 210:9,12
210:13,16,18
272:23 298:13
319:17,19
**timing** 72:6
**title** 15:12
**titled** 194:23
291:23
**today** 4:14 18:16
19:2,24 20:6

86:21 185:25
275:4 286:7,13
316:16
**today's** 18:20,24
19:3 164:20
165:25 167:8
168:5
**told** 11:14 18:3
62:22 72:4 75:10
97:20 98:18 100:2
100:6 203:21
272:3 333:13
336:6,10
**tomorrow** 295:19
**tonight** 346:22
**top** 44:8 80:12
139:4 160:19
189:22 223:17
320:14
**topic** 61:24 83:10
131:18,20 263:20
270:8
**topics** 16:18 61:12
61:16 88:6 136:19
136:20 161:20,23
176:4
**total** 143:17 144:2
**tour** 207:2
**toxic** 281:20
**trabitz** 7:21
**traffic** 22:25 23:11
23:16 40:19 67:17
67:22 68:6 105:2
105:6,11,23 106:6
106:20,23 133:14
161:17 221:3,16
221:24 222:8
223:9 225:21
226:3 230:2
238:15 239:7
240:4,10 276:7

277:3 306:6 307:5
307:9 315:7
**train** 27:18 36:2
37:4,24 52:3
55:17 56:14 57:11
57:17 61:8 78:9
83:22,25 84:4
85:8,21,24 99:10
112:6,8,16 120:10
122:21 132:18,20
137:20,25 151:24
151:25,25 153:4
220:23 224:19,23
238:22 241:25
242:2 244:2,13
246:20 268:13
276:21 301:4
**trained** 38:5,23
39:11,21 58:2
70:11,14 84:9,12
85:11 101:24
107:5 119:20
120:22,24 121:6
129:24 130:23
131:2,8 132:15
137:13 145:10
155:13,14 186:3
208:23 223:4,6
225:7 241:9 244:5
263:11,19,21
269:15 297:2,7
**training** 27:2,7,15
28:13 29:15,18,25
30:6,10,16 31:2,17
31:21,24 32:10,16
33:7,13,20 34:2,9
34:13 35:4,17,22
36:3,5,7 37:19
38:16 40:2,5,10,14
40:23 41:11,15
42:3 48:5,10 49:6

50:2 52:6 53:20
55:10 56:17,18,25
57:12,19 58:8,18
59:4,9,15,18,23
60:22 61:12,15,18
61:21 62:3 64:4
70:3,7,17,23 71:5
71:6,9 72:12 75:7
75:9 78:16 82:21
83:6,11 86:5
87:24 88:5,8,10,25
94:7 99:16 100:10
101:18 102:10
110:15,18,21
111:7,9,10,19,23
112:3,4,5,12,14,21
113:4,9,11,16,23
113:25 114:14
115:4,6,12,22,23
117:6,9 118:3,6,10
120:15,19 121:4
121:12,22,25
122:4,7,11,23
124:4,19 127:2,3,5
127:23 128:14
129:10 130:5,10
130:13 131:12,13
131:25 134:10
135:6,25 136:8,12
136:13,17,18
137:5,8 138:18
140:2 143:6,18,23
144:5,9,10,14,18
145:4 146:23
147:5,6,8,23,25
148:5,10,11,12,22
150:9,15 151:19
151:23 152:5,9,18
152:19,23,24,24
153:7,8,8 156:19
157:14 169:2,10

169:13,17,22
170:2,6,18,21
171:6,12,18 172:5
172:6,13,18,21,23
172:24 173:4,12
174:6,16,17,20
176:10 177:12,19
177:22 178:11,15
179:3,7 180:16
181:12 185:5,10
190:7 192:7,12,18
192:25 193:16,23
195:3 211:4,12
213:13,21,25
214:12,14 215:2,9
215:16 216:5,10
216:14,24 217:9
217:19 218:3,11
218:20 220:14,23
221:14 229:19
230:3 237:6 245:9
248:13,23 249:4,5
254:2,15,21,25
255:6,8,9,12,16
256:13 262:20
263:2,2,15,17,17
266:20 268:18,21
270:10,13,14
276:19,20,24
277:2,20 278:11
278:13,17,24
279:2,3,8,10
280:18,24 281:6
283:22 284:7
291:20 292:10,18
294:6 300:19
301:3 318:16,18
318:21 319:15
325:15 332:24
344:17,22,25
350:25 352:11

353:6
**trainings** 70:21,25
88:21 114:9,21
118:19 131:21
145:11,24 147:10
147:21 149:3,6
153:3,13 276:15
**trains** 78:7 136:5
270:2
**transcript** 125:25
126:4,17 347:13
348:11 355:14,15
**translate** 88:12
**travel** 65:23 66:16
**traveling** 229:9
**treating** 242:10,12
**trial** 3:13
**trick** 259:16,18,25
**true** 100:9,13,21
150:7 199:19
241:14 264:18
286:6 314:20
340:9 348:10
349:13
**truth** 5:18,18
**truthfully** 18:6,16
**try** 323:8
**trying** 37:8 50:15
75:14 109:4
127:20 128:2
173:3,9,11,14,18
173:24 203:14
228:23 237:25
239:21 258:22
259:18,25 299:24
312:21 314:23
334:24 335:2
**tuesday** 19:5,6,18
**tumultuous** 103:4
**turn** 291:22
309:23 321:6

324:13 329:25
332:3
**turned**  143:21
239:23 320:5
**turning**  347:6
**turns**  313:3
**twice**  125:8
**two**  6:23 17:22,24
17:25 18:2 20:13
29:5 54:19 55:9
63:21 65:13 80:14
80:21 81:4,12
84:14,17,21 85:2
85:17 89:13 90:10
98:5 144:4 155:5
155:11 170:7
176:9,12,14,16
178:10,10,16,24
179:4 180:15,21
186:10 241:9
245:14 278:15
279:9,20 280:7
318:9 324:2 340:2
**type**  24:15 62:3
101:3 123:7,9
124:15 127:13,19
139:5 148:9 152:5
185:17 214:12,14
241:13 252:8
256:22 257:6
262:16 263:18
300:2 321:10
352:3
**types**  71:9 77:2
80:14 127:5
**typo**  129:4

**u**

**u**  3:2
**umbrella**  256:25
**unable**  310:3

**unaware**  29:11
89:10 332:20
**unbiased**  214:2
215:21
**underlying**  118:3
**understand**  14:13
15:20 32:13,18,19
37:7,8 39:22 47:4
48:9 49:21 51:17
67:14,21 70:11
72:2 75:14 77:7
77:16 79:4 84:16
85:10 97:15
120:12 122:18
123:5 138:24
157:8,15 161:22
164:25 173:13,14
173:16 182:20
183:2 191:4
233:10 255:4
264:23 265:10
266:25 268:13
269:4,11,22
275:12 336:23
339:6
**understanding**
17:4 68:7,10
79:23 97:13
124:22 268:22
269:2 283:25
335:16
**understood**  16:18
17:11 156:25
331:25 337:25
**undertaking**  178:7
**undertook**  150:8
**unified**  199:17
201:11 205:16,18
**uniform**  53:21
241:13

**uniformed**  64:15
**uninvolved**  67:8
240:17 312:14
**union**  43:12
**unit**  12:23 13:2,4
16:14 34:14 71:10
82:24 111:14,21
113:22 114:13
115:22 131:8
136:4 146:21
147:20 148:8,21
149:2,7 159:3
164:5 175:18
195:6 208:24
251:11 266:19,23
270:12 272:24
273:18 274:8,25
297:9 318:11,12
345:6,11 346:9,13
346:17
**united**  1:2
**units**  87:25 88:9
130:11,19,22
131:10 147:4
148:4 263:16
**unlawful**  154:19
154:23 157:5,23
209:5
**unlawfully**  43:18
**unobstructed**
222:11,19
**unsure**  134:14
**unused**  65:3
**unusual**  93:19
259:7 260:8
261:12,21 346:8
346:11,15
**update**  29:18,21
29:25 30:16,25
59:22 82:6,10,13
94:7 110:14 111:6

130:4 131:13
160:12 174:20
192:18 216:25
217:10,20 218:4
218:12,21
**updated**  48:5,11
59:3,18 86:24
87:2 114:2 121:4
121:12 162:13,17
163:10 193:2,8,15
193:24 270:15
**updates**  30:3,6,9
113:4 160:14,15
160:17 163:11
**updating**  81:14
160:8 163:5 192:7
192:11 264:13
**upfront**  143:22
**upheld**  81:5
**upset**  324:14
**urging**  43:16
**use**  38:12 46:7
52:5 58:23 123:15
127:23,25 135:20
186:16 187:16
209:2 220:8
225:13 280:10
281:9,12,18
282:14 283:10,12
318:10 345:3
**uses**  135:18
258:17
**usually**  88:5,16,17
143:12
**utilize**  49:17 72:3
338:11
**utilized**  71:25
138:25 187:20
**utilizes**  72:8,11
**utilizing**  49:25

| v | | | |
|---|---|---|---|

**v**

**v**  126:9 266:4
**value**  143:3
**varied**  13:8 38:2
**varies**  88:19
**various**  124:15
  201:9
**vega**  14:22
**vehicle**  129:20
  143:2,3,7 181:5
**vehicles**  65:3,23
  66:15 67:9,11,12
**vehicular**  40:19
  68:6
**verbal**  99:24
**verbally**  319:24
**verbatim**  292:23
**versus**  217:12
**video**  21:5,6,14,19
  21:21,24 22:2,19
  23:5,7,14 24:10,11
  25:14,19,25 26:3
  26:15,21 27:6
  28:21 30:13,22
  32:6,15,25 33:2,10
  33:17,25 34:7,19
  34:21,23 35:3,10
  35:15 36:8,12,19
  36:21 44:11,14
  45:14 48:15 53:23
  54:7,10,18,21
  55:12 56:6,13,24
  57:6 58:12 59:2
  59:14 60:3,7,9,15
  60:19 91:23 92:8
  92:18,21,25 93:3,5
  93:7 94:10,14,18
  94:22 95:4,9 96:5
  96:9,18,20,21 97:3
  97:18,21 98:21
  99:15 101:22

102:16 103:8,14
104:2,15,19 105:4
227:5,8,14,16,17
230:8,11,14,17
232:2,14 233:11
233:12 234:3,4
235:24 236:3,10
236:13,15,16,19
236:23 239:17,25
249:12,16,20
253:4 259:9
296:18 297:12,15
297:17,19 298:9
298:20 299:5
301:23 303:10,12
303:19,23 304:6
305:16,19 307:16
307:23,25 308:2,5
308:12,15,20,22
309:9 310:6,18
311:12,22 312:2
312:25 313:14
314:7,11,14 320:5
320:8,21 325:14
325:25 326:3,7,12
327:8,9 331:23
335:3,8,18 336:4
342:6,16,16,18,20
342:23 343:4,7,11
343:17,19
**videos**  21:7 91:3
  240:8 315:24
**view**  75:15 94:25
  95:3 105:4
**violate**  25:21
**violated**  26:6,16
  338:8
**violating**  24:2
  306:5
**violation**  268:8

**violations**  11:24
  269:7
**violent**  50:9 52:8
  52:13 53:4,11,17
  103:7,12,20
  154:19,23 196:20
  196:24 197:7
  198:4,6 201:6,14
  201:14,23 205:11
  205:19 206:5
  213:22 214:16,20
  215:12 216:7,12
  277:13 278:5
  290:11,19 291:3
  291:11
**virtually**  148:8
  149:10
**visibility**  143:14
**vision**  111:20
**volume**  112:4
  113:8,15,20
  114:21 115:6
  152:15 172:8
  320:18 324:13
**vs**  350:15
**vtl**  11:24
**vulnerable**  103:3
  300:2

| w | | | |
|---|---|---|---|

**w**  352:15
**wait**  204:9 219:4
  296:19
**waived**  3:8
**walk**  37:10 209:14
  240:18 304:22
  309:22 310:4
  311:5 312:15,22
  324:8,9 326:21
  337:6
**walked**  322:9

**walking**  55:3
  207:21 301:22
  305:4 311:10,15
  314:2,9
**walks**  236:11
**wall**  43:17 68:8,12
  68:15,25 69:2,8,11
  69:15,23 70:4,9,10
  70:16,20 79:11,21
  80:3,9 82:17,22
  98:6,13 101:6
  107:8,13 108:4
  109:5 110:10
  111:5,16,22
  113:17 114:3,24
  120:11,20,23,25
  121:2,8,13,23
  122:8 145:10
  146:23 148:23,24
  188:3,8,12,17,25
  189:6,14,24
  190:10,14,18
  191:8 192:19
  193:3,24 196:23
  197:6 202:9 210:3
  210:14 214:7,10
  252:22 254:7,16
  256:17 260:9
  261:13 280:20
  281:2,7,21 282:14
  283:13,20 284:9
  285:19,20,23
  286:4,5,17,19
  288:25 299:17
  319:19 353:9
**want**  8:7 45:6
  67:13 83:20 90:4
  90:15,18 91:16
  92:5 103:4 155:25
  164:23,25 213:18
  219:8 224:8 244:4

275:17 291:16
305:9 312:7,15
322:23 331:8
335:14
**wanted**  47:2,4
115:10 199:11
214:13 296:16
315:24
**wanting**  51:9
**wants**  314:18
**warning**  84:12,24
84:25 139:22
185:5,17 237:8,15
239:20
**warnings**  43:17
57:8 83:23 84:9
84:14,17,19 85:2,5
85:12,17,24 86:2
139:18 182:15
184:23 185:11,11
185:15,20,22,24
186:3 203:6 236:5
236:14,20 272:18
272:24 273:3,13
273:24 344:8
**warrant**  230:23
**watch**  21:4,8,15
21:23 34:7 53:23
53:24 91:16 92:3
92:8,9,18,21,22
179:25 181:8
186:12 227:5,11
234:3 296:18
297:14 308:23
320:8 328:22
331:9
**watched**  32:25
36:8,19 45:14
58:13 236:15
249:13,20 259:8

**watching**  22:21
232:15 331:23
**way**  21:15 23:8
52:7 55:2 59:8
61:3,6 74:22 81:8
82:16,20 89:5,6
100:6 109:9
120:23 165:23
174:4 208:14
209:11,16 222:3,7
224:19,22 227:23
232:16 238:5,22
239:24 246:20,23
248:4 249:6 266:5
273:12 305:6,16
309:24 310:25
311:4 312:16
313:4 319:3 321:7
322:3,6,9 335:13
336:14 349:17
**ways**  89:11
**we've**  45:19,20
55:16 59:13 91:8
130:3 143:4
146:13,17 167:25
182:2 185:21
200:17 238:12
272:2,3,5 293:17
**wearing**  27:11
80:21 81:4 241:13
**weather**  321:21
**wedges**  122:22
123:8 126:25
127:8 128:16,19
129:17 281:3
**weeds**  341:9
**week**  164:11,12,14
166:4 168:10
**weeks**  108:10
109:15,21,25

**weiner**  289:17
**went**  9:11 13:9
14:15 26:13 96:10
100:3 147:9
166:18 201:5
239:23 261:17
334:3 336:15
**whereof**  349:19
**white**  62:17 116:4
231:21 234:6
297:24 309:2
324:21 326:13
329:21 330:5
331:9,24 332:10
**whoever's**  236:10
**wider**  17:2
**width**  67:3
**wiles**  125:10
126:21
**wilson**  6:19 7:5
**window**  29:4
130:20
**winski**  62:19,23
63:13 68:11 91:22
301:25 302:2
**winski's**  68:8
**wires**  226:23
**wish**  50:21,25
51:11 356:5
**withdraw**  145:22
186:8
**withdrawing**
152:23 154:6
180:6
**withdrawn**  25:18
32:5 68:9 78:5
95:7 97:20 102:4
102:21 105:15
113:24 117:7,13
120:9 125:7
128:18 130:2

131:19 137:23
144:19 181:4
207:12 214:13
225:18 238:13
251:22 266:24
270:24 276:4
283:23 300:18
**witness**  4:6,7,12
4:21 5:11,21,23
6:6,10,15,18 16:7
17:6,7 21:18
44:15 48:24 54:6
62:11 71:20 79:3
82:2 86:12 90:12
90:16,21 93:2,24
95:12,13 96:17
108:21 116:2,5,8
116:14 120:5
123:23 134:6
135:5 137:3
138:16 140:15
141:20,22 142:15
151:14 153:23
158:21 159:18
171:23 187:5,9
194:12 197:18
198:6,20 219:19
227:13 230:16
231:25 250:20
260:7,21 261:4
272:9,12 275:14
284:2,19 285:4
297:17 303:11
304:5 305:18
308:4,11,19 310:5
311:11,21,25
312:14,24 313:13
314:6,13 317:11
320:20 343:22,24
347:3 348:7
349:11,14,19

355:1
**witnessed**  200:18
  209:8 309:20
**witnesses**  16:21
**witnessing**  202:23
**witness's**  166:9
**woman**  312:9,16
**wondering**  182:23
**wool**  115:25 116:4
  116:13
**word**  177:7,8
  249:7 257:19
  323:22
**words**  51:3 52:4
  109:18 113:14
  152:8 221:9 241:5
  246:15 258:12
  265:11 268:16
**work**  6:16 39:13
  112:8
**worked**  243:16
  317:22
**working**  27:23
  207:2
**worldwide**  69:9
**write**  86:3 160:25
  198:2 210:17,25
  212:6
**writing**  41:23
  43:17 199:18
  200:13 204:16,18
  209:9 318:11
**written**  12:7 76:21
  172:2 179:13
  183:5 185:18
  212:12 222:3,7
  261:12 265:11
  271:15,22 272:18
  293:9 354:21
**wrong**  140:16
  159:18 219:7

293:17
**wrote**  189:18
  192:17 204:2
  205:2 211:19
**wylie**  2:4,7,8
  140:23 198:14
**wylielaw.com**  2:8

**x**

**x**  1:4,13 108:15,17
  113:9 119:25
  152:24 350:2,7

**y**

**y**  5:22
**yeah**  8:24 21:12
  48:17 80:7 86:18
  132:11 140:16
  141:8 159:8 185:2
  197:20,21 208:16
  220:5 228:20
  230:12 231:16
  234:5 252:19
  301:5 305:3
  307:25 320:15,16
  320:18 324:20
**year**  10:14 80:5
  108:7 132:10
  147:16 148:24
  150:6,11,13,16,20
  150:21,24 152:9
  175:11 216:21
  217:7,17,25 218:9
  218:18 220:25
  260:25 280:19,25
  281:8 284:8
**years**  13:8 152:4
**yep**  284:17,24
**york**  1:3,11,19,19
  1:22 2:6,6,11,14
  2:14 4:8 5:25 6:20
  22:13,24 23:10

43:11 69:10,15
  79:17 80:5 119:14
  125:11 126:10
  141:23 184:9,11
  201:20,21 265:2
  265:17 266:3,14
  270:16,19 271:3
  271:14,20 280:16
  349:4,10 351:6
  352:24 353:16,22
  353:25 354:4
**york's**  22:16
**you've**  116:24
**yup**  194:23

**z**

**zone**  338:6
**zuccotti**  54:16
  69:16,17,24 80:4
  212:4 252:23
  253:6 288:25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.