Page 1

```
 1
 2    UNITED STATES BANKRUPTCY COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    -----------------------------------------x
 5    GEORGE PACKARD, EDWARD BECK,
      MICHELLE BERGER, ARI COWAN, CONNOR
 6    HICKS, CHARLES MEACHEM, CHRIS PHILLIPS,
      LARRY SWETMAN and AMADON DELLERBA,
 7    individually and on behalf of all others
      similarly situated,
 8                          Plaintiffs,
 9             vs.
10    THE CITY OF NEW YORK, a municipal entity,
11                          Defendant.
12    -----------------------------------------x
13
14
15         DEPOSITION OF LT. DENNIS GANNON
16             September 7, 2018
17             New York, New York
18                10:14 a.m.
19
20
21
22    Reported by:
      Elizabeth Santamaria
23
24
25
```

Page 2

1

2                                    *  *  *

3

4            Deposition of LT. DENNIS GANNON,

5     held at the offices of Wylie Stecklow, PLLC,

6     217 Centre Street, New York, New York, before

7     Elizabeth Santamaria, Court Reporter and

8     Notary Public.

9

10                                   *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1

 2       A P P E A R A N C E S

 3

 4    ATTORNEYS FOR THE PLAINTIFFS:

 5    WYLIE STECKLOW, PLLC

 6    217 Centre Street - 6th Floor

 7    New York, New York 10013

 8    (212) 566-8000

 9    BY:  WYLIE M. STECKLOW, ESQ.

10         WYLIE@WYLIELAW.COM

11         JON AVINS, ESQ.

12

13    ATTORNEYS FOR THE Defendant:

14    ZACHARY W. CARTER

15    Corporation Counsel of the City of New York

16    100 Church Street

17    New York, New York 10007

18    (212) 356-1000

19    BY:  AMY ROBINSON, ESQ.

20         JONI FORSTER-GALVIN, ESQ.

21

22    ALSO PRESENT:

23         Carrie B. Talansky, Esq. NYPD Legal Bureau

24         Joseph Sharkey

25
```

Page 4

```
 1
 2
 3                    * * *
 4          IT IS HEREBY STIPULATED AND AGREED,
 5   by and between counsel for the respective
 6   parties hereto, that the filing, sealing and
 7   certification of the within deposition shall
 8   be and the same are hereby waived;
 9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of
11   the question, shall be reserved to the time of
12   the trial;
13          IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed
15   before any Notary Public with the same force
16   and effect as if signed and sworn to before
17   the Court.
18                    * * *
19
20
21
22
23
24
25
```

```
                                            Page 5

1                         Gannon

2    L T.   D E N N I S   G A N N O N, having been first

3            duly sworn according to law by the Officer,

4            testifies as follows:

5    EXAMINATION BY

6    MR. STECKLOW:

7         Q.    Please state your name for the

8    record.

9         A.    Lt. Dennis Gannon.

10        Q.    Good morning.  The time is now

11   10:14 a.m.  My name is Wylie Stecklow.  We're

12   in my office at 217 Centre Street.  Sitting to

13   my right is Jon Avins, another attorney with

14   my office.  Same to his right is Joseph

15   Sharkey, a video clerk who works with us.

16            In the room is the court reporter

17   whose name is --

18            COURT REPORTER:  Elizabeth

19        Santamaria.

20        Q.    -- Elizabeth Santamaria.

21            And then there are three attorneys

22   for Lt. Gannon, including Amy Robinson from

23   the City Law Department, Joni Forster-Galvin

24   and Carrie Talansky from the NYPD Legal

25   Bureau.
```

Page 6

```
 1                        Gannon
 2            Good morning, Lieutenant.
 3      A.      Good morning.
 4      Q.      I'm going to start off by going
 5   through some of the basics of the deposition
 6   and then get into more specifics.
 7            Have you been deposed before?
 8      A.      Yes.
 9      Q.      How many times?
10      A.      A few times.  The exact number I
11   don't know.  A few times.
12      Q.      So you have some basics down, so
13   I'm going to try and get through them quickly
14   so we don't waste time on that.
15      A.      Sure.
16      Q.      As you know, you need to wait for
17   me to finish all my questions and answer
18   verbally so that the court reporter can take
19   your answers down.  And if you don't
20   understand the question, you can let me know.
21   If you don't hear a question, you can let me
22   know.  If I'm unclear to you in any way, you
23   can let me know, and if you don't know the
24   answer to my question you can let me know.
25            Is all of that clear?
```

Page 7

1                          Gannon

2        A.    Yes.

3        Q.    And agreed to?

4        A.    Yes.

5        Q.    If there's something that might

6    help you remember an answer to my question,

7    you can let me know.  If there is any reason

8    you can't testify truthfully and accurately

9    here today?

10              (Reporter requested clarification.)

11       A.    No.

12       Q.    Have you consumed any drugs or

13   alcohol in the last 24 hours?

14       A.    The last 24 hours?

15       Q.    Yes.

16       A.    No.

17       Q.    Are you aware of any physical

18   condition that would affect your ability to

19   testify truthfully here today?

20       A.    No.

21       Q.    Are you aware of any mental

22   condition that would affect your ability to

23   testify truthfully and accurately here today?

24       A.    No.

25       Q.    Are you taking any medications that

Page 8

```
 1                       Gannon
 2     might affect your ability to testify
 3     truthfully and accurately here today?
 4          A.    No.
 5          Q.    Are there any medications you
 6     should be taking but you're not taking that
 7     might affect your ability to testify
 8     truthfully and accurately here today?
 9          A.    No.
10          Q.    So is there any reason whatsoever
11     why you cannot testify truthfully and
12     accurately here today?
13          A.    No.
14          Q.    And you're also aware that you were
15     just sworn in, you're under oath and that's
16     the same type of oath you would be taking if
17     you were in a court of law?
18          A.    Correct.
19          Q.    And the oath is to tell the truth,
20     correct?
21          A.    Correct.
22          Q.    Okay.  And that you understand that
23     after the deposition is over, some days in the
24     future you'll be given a copy of the
25     transcript and you will be given an
```

```
 1                      Gannon
 2   opportunity to review it and make changes to
 3   it, correct?
 4        A.    Correct.
 5        Q.    And you understand if you do make
 6   changes to it I may be able to question you
 7   about those changes if we get to trial and
 8   you're called as a witness?
 9        A.    Correct.
10        Q.    Okay.  If I ask you a question and
11   you know the answer because your recollection
12   was refreshed by a document or recording, you
13   need to let me know that when you are giving
14   the answer.  Is that understood?
15        A.    Sure.
16        Q.    As the deposition is going along if
17   you remember an answer that you gave
18   previously and you would like to change it,
19   you can let me know and we can go back to
20   that.  Okay?
21        A.    Okay.
22        Q.    As you know, you're here today on
23   behalf of the City of New York, correct?
24        A.    Correct.
25        Q.    And so when I refer to you in this
```

```
 1                        Gannon
 2   deposition I'm referring to you in your
 3   capacity as a representative of the City of
 4   New York, unless I expressly say otherwise.
 5   Is that okay?
 6        A.    Sure.
 7        Q.    So, for example, if I ask whether
 8   you know or believe something I'm really
 9   asking you to testify on behalf of the City of
10   New York.
11        A.    Okay.
12        Q.    So please note that in this
13   deposition when I use the term "document" I
14   mean any kind of recorded information
15   including paper records, electronic documents,
16   electronic information and database images and
17   video unless I expressly say that I intend to
18   use the word in a more narrow sense.  Is that
19   okay?
20        A.    Yes.
21        Q.    I may also use the phrase
22   "documents and video" and when I do I intend
23   to use the term "documents" in the broad sense
24   I just explained.  Is that okay?
25        A.    Yes.
```

```
 1                        Gannon
 2        Q.    When I refer to the NYPD, I'm also
 3    referring to the City of New York as a whole
 4    unless I expressly say otherwise.
 5             In other words, if I ask you
 6    whether the NYPD has a particular kind of
 7    policy, I expect you to let me know about any
 8    such policy maintained by the NYPD or by the
 9    City of New York.  Is that okay?
10        A.    Yes.
11        Q.    And when I ask about the City of
12    New York, I will expect your answer to include
13    information concerning the NYPD.  Is that
14    okay?
15        A.    Sure.
16        Q.    I'm going to review something we've
17    already gone over, but you're here to testify
18    on behalf of the City of New York, correct?
19        A.    Correct.
20        Q.    Your answers here will be sworn,
21    answers made on behalf of the City of New
22    York, correct?
23        A.    Yes.
24        Q.    Your answers in this deposition
25    will be binding on the City of New York in the
```

```
                                              Page 12

 1                        Gannon
 2      same way that any witness testifying on their
 3      own behalf would be bound by their answers,
 4      correct?
 5           A.     Correct.
 6           Q.     Is there any way you believe the
 7      statement I just made is not correct?
 8           A.     No.
 9           Q.     I'm going to now ask you about your
10      preparation and just be forewarned.  I do not
11      want to know about any specific communications
12      you had with your counsel in answers to these
13      questions.
14           A.     Okay.
15                  MS. ROBINSON:  Wylie, one question.
16           Can we go off the record?
17                  MR. STECKLOW:  Sure.
18                  MS. ROBINSON:  Just for a second.
19                  (Discussion off the record.)
20                  MR. STECKLOW:  On the record.
21           Q.     Do you agree that as a 30(B)(6)
22      witness representing the City in this
23      deposition you're under a duty to inform
24      yourself as to the subject matter of the
25      deposition?
```

```
 1                         Gannon
 2        A.    Yes.
 3        Q.    And do you believe you have
 4   fulfilled that obligation?
 5        A.    Yes, to the best of my ability.
 6        Q.    Do you understand the subject
 7   matter of this deposition?
 8        A.    I do.
 9              MR. STECKLOW:  Let's mark this as
10        Exhibit 1.
11                  (Plaintiffs' Exhibit 1, multi-page
12             document, marked for identification, as of
13             this date.)
14        Q.    I am handing you what has now been
15   marked as Exhibit 1.  I ask you to review that
16   document and let me know if you are ready and
17   prepared to testify on each and every topic in
18   that document.
19              MR. STECKLOW:  While he is doing
20        that, let's go off the record.
21              (Discussion off the record.)
22              MR. STECKLOW:  We're back on the
23        record.
24        Q.    Having reviewed Exhibit 1, are
25   there any topics on that -- within Exhibit 1
```

```
                                               Page 14

 1                          Gannon
 2     that you're not prepared to testify to today?
 3          A.    Well, it depends on the question
 4     you ask me.  For example, I don't understand
 5     what the term "non-City government" --
 6     "non-City government entities," Paragraph 27,
 7     on Page 4.  Okay.  Including -- the sentence
 8     from Page 4, Paragraph 27, "including
 9     nongovernment entities."
10          Q.    Okay.
11          A.    I don't know what that --
12                (Crosstalk.)
13          Q.    Other than that --
14          A.    But I assume you're questioning me.
15          Q.    Other than that one phrase, is
16     there anything else within this five-page
17     document that you're unprepared to testify to
18     today?
19          A.    I don't think so.
20          Q.    Did you prepare in any way for this
21     deposition?
22          A.    I met with Ms. Robinson prior to
23     coming here.
24          Q.    When did you start preparing?
25          A.    A couple of days ago.  We met once
```

```
                                      Page 15
 1                      Gannon
 2   or twice.  Also met with Chief Sweet from the
 3   Legal Bureau.  Chief Sweet.  S-W-E-E-T.
 4        Q.    So you communicate with
 5   Ms. Robinson, you said, on two different
 6   occasions?
 7        A.    Yes.
 8        Q.    And those were both within the last
 9   week?
10        A.    Yes.
11        Q.    And were they in-person meetings or
12   phone call meetings?
13        A.    In-person.
14        Q.    And how long did they each last?
15   Let's start with the first one.  How long did
16   that last?
17        A.    Approximately four, five hours, I
18   would think.
19        Q.    Okay.  And how much time elapsed
20   between first meeting and the second meeting?
21        A.    A full day, so it's a Wednesday.
22        Q.    Wednesday and then a Friday?
23        A.    Exactly.
24        Q.    So it was Wednesday of last week
25   and then Friday of last week?
```

```
 1                      Gannon
 2        A.    Friday of this week.
 3        Q.    Today?
 4        A.    Today, this morning, and then
 5   Wednesday -- yesterday was Thursday?
 6   Wednesday.
 7        Q.    So you met with her the first time
 8   this past Wednesday?
 9        A.    Correct.
10        Q.    And then you met with her this
11   morning?
12        A.    Correct.
13        Q.    How long did you meet with her this
14   morning?
15        A.    Two hours.  There may have been one
16   other time, if I recollect.  Maybe three times
17   the most.
18        Q.    And was the third one also an
19   in-person meeting?
20        A.    Yes.  All the meetings were in
21   person.
22        Q.    And was that within the last week
23   or was it prior to that?
24        A.    It was last week, too.
25        Q.    And how long was that meeting?
```

```
                                           Page 17
 1                       Gannon
 2        A.    A few hours.
 3        Q.    And that one preceded the Wednesday
 4   meeting?
 5        A.    Yes.
 6        Q.    While meeting with Ms. Robinson,
 7   did you look at any documents or video?
 8        A.    I saw a video of an event in the
 9   Bronx.
10        Q.    Is that the only video you
11   observed?
12        A.    Yes.
13        Q.    Okay.  And did you look at any
14   documents?
15        A.    I looked at -- I looked at one
16   document of a list of cases.
17        Q.    And other than that one document
18   and list of cases, did you see any other
19   documents in preparation?
20        A.    I looked at a detail request from
21   the Police Department.
22        Q.    Was that for S17?
23              (Reporter requests clarification.)
24        Q.    September 17, 2012 incident?
25        A.    I don't know if that was for the
```

```
                                    Page 18
 1                       Gannon
 2    anniversary date or itself.  I don't recall at
 3    the moment.
 4         Q.    Do you recall who the author of the
 5    Detail Report was?
 6         A.    No.  It was a -- I think it was the
 7    borough -- it was the Patrol Borough Manhattan
 8    South Detail Request.
 9         Q.    Was it chief Purtell was the
10    author?
11         A.    It was probably from Chief
12    Purtell's shop.  I don't know if he was the
13    author or not, but...
14         Q.    Other than the list of cases and
15    the Detail Report, were there any other
16    documents you reviewed during your preparation
17    for this deposition?
18         A.    I don't believe so.
19         Q.    So Exhibit 1 that you just
20    reviewed, you never saw that before today?
21         A.    I don't recall if I saw this before
22    or not.  It took me a long time to read it so
23    I don't know.
24         Q.    Okay.  Is Chief Sweet an attorney
25    or not an attorney?
```

```
 1                        Gannon
 2       A.    Well, he's a police chief.  He
 3   works -- he works in the Legal Bureau.  I'm
 4   not sure what his title is --
 5               (Reporter requested clarification.)
 6               I'm not sure if he is -- I think
 7   he's a commanding officer of the Legal Bureau
 8   now.  I'm not sure.
 9       Q.    Do you know if he's an attorney?
10       A.    I believe he is an attorney.
11       Q.    Do you know if he communicated with
12   anyone who is not an attorney in preparation
13   for today's deposition?
14       A.    No.
15       Q.    No, you did not or no, you don't
16   know?
17       A.    No.  As far as everybody I spoke
18   to, was a lawyer.
19       Q.    And that being Chief Sweet and
20   Ms. Robinson?
21       A.    Correct.
22       Q.    And there was nobody else that you
23   spoke with?
24       A.    No.
25       Q.    When you met with Chief Sweet, did
```

```
                                          Page 20

 1                      Gannon
 2    you look at any documents or video?
 3         A.    No.
 4         Q.    How long did you meet with Chief
 5    Sweet in preparation for today's deposition?
 6         A.    About two hours.
 7         Q.    In preparation for today's
 8    deposition, did you review any of your own
 9    documents, videos or files?
10         A.    No.
11         Q.    So in preparation for today's
12    deposition the only documents and videos that
13    you reviewed were the Bronx video?
14         A.    Right.
15         Q.    And the Detail Report and the list
16    of cases?
17         A.    Correct.
18         Q.    And nothing else was reviewed?
19         A.    And maybe -- maybe this.  I don't
20    remember.  I don't remember if I reviewed this
21    Exhibit Number 1.
22         Q.    Can you describe the efforts you
23    made to locate information relevant to this
24    deposition?
25         A.    Repeat that.
```

```
                                          Page 21
 1                       Gannon
 2        Q.     Can you describe the efforts you
 3    made to locate information relevant to today's
 4    deposition?
 5        A.     Other than speaking with
 6    Ms. Robinson, that was the extent of my
 7    efforts.
 8        Q.     So I'm going to go through a few
 9    subtopics.  The answers are clearly going to
10    be "no," but I'm going to put it on the
11    record.
12        A.     Sure.
13        Q.     Okay?
14              So did you make any efforts to
15    locate information relevant to today's
16    deposition in the possession of employees of
17    the City of New York?
18              (Reporter requests clarification.)
19        A.     No.
20        Q.     Did you make any efforts to locate
21    information relevant to today's deposition in
22    the custody of police units, such as
23    precincts, borough officers, task forces, the
24    Legal Bureau, other bureaus and divisions?
25        A.     No.
```

```
                                          Page 22
 1                           Gannon
 2          Q.     Did you make any efforts to locate
 3    information relevant to today's deposition and
 4    database or electronic repositories?
 5          A.     No.
 6          Q.     Just briefly I want to go through
 7    your NYPD history.  When did you attend the
 8    academy?
 9          A.     I was hired January 21, 1985.
10          Q.     And was that when you entered the
11    academy or was that when you --
12          A.     That's when I entered the academy.
13          Q.     Okay.  And so then you got assigned
14    your first assignment sometime in July of '85?
15          A.     Sometime -- yeah.  Six months
16    later, so I was assigned to a --
17                 It doesn't exist anymore, but I was
18    assigned to a neighborhood stabilization unit
19    which is kind of the transitioning to a
20    precinct at that time.  That's the way they
21    used to do it.
22          Q.     Okay.  And your rank at that point
23    was PO?
24          A.     Police Officer.
25          Q.     And at what point were you moved
```

```
                                            Page 23
 1                      Gannon
 2   out of the neighborhood stabilization unit
 3   into a precinct?
 4        A.    That would have been in 1986.  The
 5   exact date I don't recall.
 6        Q.    And where were you moved to?
 7        A.    The 9th Precinct.
 8        Q.    How long were you at the 9th for?
 9        A.    From 1986 until 1991.
10        Q.    And were you ever promoted to
11   sergeant?
12        A.    I was.
13        Q.    And when was that?
14        A.    That was in 1991.
15        Q.    And when you were promoted to
16   sergeant were you transferred out of the 9th?
17        A.    Yes.
18        Q.    And where were you transferred to?
19        A.    13th Precinct.
20        Q.    How long were you at the 13th for?
21        A.    1991 to 1998.
22        Q.    Okay.  And in 1998 were you
23   promoted again or transferred before promoted?
24        A.    I was promoted.
25        Q.    Promoted to lieutenant?
```

```
 1                    Gannon
 2       A.    To lieutenant.
 3       Q.    Okay.  And where were you
 4  transferred to?
 5       A.    Midtown North Precinct.
 6       Q.    And how long were you at Midtown
 7  North for?
 8       A.    From '98 until 2000 -- 2002.
 9       Q.    Okay.  And where were you
10  transferred to in 2002?
11       A.    Patrol Burough Manhattan South.
12       Q.    Okay.  And how long were you at
13  PBMS for?
14       A.    I was there for -- until 2004 so
15  2002 to 2004.
16       Q.    And where were you transferred in
17  2004.
18       A.    In 2004 I was transferred to the
19  Chief of Department's office.
20       Q.    And who was the Chief of Department
21  at that time?
22       A.    Chief of Department was Joseph
23  Esposito.
24       Q.    And how long were you in the Chief
25  of Department office?
```

```
                                        Page 25
 1                      Gannon
 2          A.     His office, until -- 2004 until
 3     2014 I believe it was.  '13 or '14.  I think
 4     it was 2014.
 5          Q.     And is that when Chief Esposito
 6     retired and went to OEM.
 7          A.     Correct.  I stayed there a little
 8     bit longer under Chief Banks, but -- but when
 9     Chief Esposito became the Commissioner of
10     Emergency Management I was transferred over to
11     work for him.
12          Q.     So is that your current assignment?
13          A.     Correct.
14          Q.     So you're an OEM?
15          A.     Correct.  New York City Emergency
16     Management.
17          Q.     So are you a member of the NYPD
18     currently?
19          A.     I am.
20          Q.     And what is your current rank?
21          A.     Lieutenant.
22          Q.     Had you ever been promoted out of
23     lieutenant?
24          A.     Out?
25          Q.     Were you ever promoted to captain
```

Page 26

```
 1                    Gannon
 2    or --
 3         A.    No.
 4         Q.    Okay.
 5         A.    No.
 6         Q.    And who is your current supervisor?
 7         A.    My current supervisor is Inspector
 8    Andrew D'Amora.  D-A-M-O-R-A.
 9         Q.    And what is your current position?
10         A.    I'm an aide to -- I'm an aide to
11    the commissioner basically, to make it simple.
12              Just to correct one thing.  My rank
13    officially is lieutenant special assignment,
14    but I'm a lieutenant.  It's a sub designation
15    within lieutenant.
16              (Reporter requests clarification.)
17         A.    Right.  It's not a captain rank.
18         Q.    Okay.  You previously testified
19    that you looked at a list of prior incident
20    dates.
21         A.    Correct.
22         Q.    And one of them was in March of
23    2003, correct?
24         A.    I didn't dedicate the dates to
25    memory.
```

1                     Gannon

2          Q.    Okay.   There was an incident in

3     March of 2003 in front of a commercial

4     building where a company called The Carlyle

5     Group had an office.   Did you do --

6               Are you familiar with the facts and

7     circumstances of that incident?

8          A.    No.

9          Q.    What did you do to prepare yourself

10    to answer questions about that incident?

11         A.    Nothing.

12         Q.    On March of 2003, in front of the

13    Carlyle building, there were people on two

14    sides of the sidewalk.   Do you know which

15    sidewalk the people were on, what street that

16    was?

17         A.    No.

18               MR. STECKLOW:   Okay.   We're going

19         to watch some video and I am going to ask

20         you some questions about it.

21               THE WITNESS:   Okay.

22               MR. STECKLOW:   Okay?   So the video

23         is in a few different clips so we're not

24         going to watch the full clip of each

25         video because I just don't want to waste

                              Gannon

1

2      all of the time we have today.  And so

3      we're are going to watch a few different

4      aspects of this, and this stuff has

5      obviously been turned over.

6            MS. ROBINSON:  In Raganella

7      (phonetic) 1?

8            (Reporter requests clarification.)

9            MS. ROBINSON:  I mean in Raganella

10     1?  I mean in Raganella's -- 1, yes.

11           MR. STECKLOW:  In the video.  I

12     think it was turned over by Mr. Cooper

13     prior to that thumb drive being turned

14     over.

15           MS. ROBINSON:  Okay.  And do you

16     know what the Bates stamp is on it?

17           MR. STECKLOW:  No, but we can

18     figure that out later without putting our

19     time into that now.

20           So, Joey, just get the video up and

21     let's show it to Lt. Gannon.

22           MR. SHARKEY:  Sure.

23           MR. STECKLOW:  And just as a heads

24     up, the video is from 2003.  It was on

25     VHS when we got it and so we had to have

```
                                        Page 29
 1                        Gannon
 2        it converted to digital so it's not as
 3        smooth and clean as it would be
 4        otherwise.
 5             We are going to watch the first bit
 6        of video here and I think this is just to
 7        show the setup of what was going on that
 8        day.
 9             (Video played.)
10             MR. STECKLOW:  So while watching
11        this, I think the reason we're showing
12        this and the next clip is to show that
13        the sidewalk was not blocked.  That
14        people were able to traverse it.
15             The other side of the street there
16        were people engaged in civil
17        disobedience, which is what you're seeing
18        now.
19             So we are going to watch more of
20        the other side of the street where there
21        was not civil disobedience.
22             (Video played.)
23             MR. STECKLOW:  Okay.
24             MR. SHARKEY:  One more time here.
25             (Video played.)
```

```
 1                          Gannon
 2          Q.    While he's checking that, in the
 3     first two or three clips of video you could
 4     see two sides of the street.  On one side of
 5     the street people were participating in civil
 6     disobedience by sitting on the sidewalk and
 7     the other side of the street people were
 8     engaging in first amendment free speech by
 9     standing with signs and chanting.
10                You can't hear the chanting as
11     there is no volume, but does that accurately
12     reflect what you were seeing in the video?
13          A.    Well, yeah, partially.  You could
14     see people standing on the sidewalk, I saw
15     people sitting down.
16          Q.    On the sidewalk where people were
17     standing, could you see behind them there
18     was -- there were pedestrians traversing the
19     sidewalk?
20          A.    I didn't see a lot of people going
21     back and forth.  I was focusing on the people
22     standing up on the street up and down.  It's
23     also a very limited view of what was going on.
24     I don't know if people were crossing around
25     those folks.  I don't know what was happening
```

```
                                        Page 31

 1                       Gannon

 2    without that being -- I don't know if there

 3    were --

 4               You know, people sometimes avoid

 5    larger crowds of the people, you know, in

 6    different ways.  So I can't tell you if people

 7    were being displaced --

 8               (Reporter requests clarification.)

 9        A.    I'm sorry.  I can't -- that

10    limited -- that limited view of it, I can't

11    tell whether people were going around the

12    demonstration.  Sometimes people if they see

13    activity they'll -- they'll redirect around to

14    another area rather than going through the

15    people on the sidewalk.  So I don't know.

16    It's very tough to tell.

17        Q.    It's tough to tell whether the

18    people there on the sidewalk standing with

19    signs were blocking pedestrian traffic?

20        A.    Correct.

21        Q.    And so you couldn't tell from

22    watching the video if there was ability of

23    people to traverse the sidewalk behind those

24    protesting?

25        A.    Correct.
```

```
                                         Page 32
 1                      Gannon
 2            MR. STECKLOW:  All right.  So if we
 3       can now watch, you'll see people -- those
 4       same people standing there now getting
 5       arrested.  I am just trying to show you a
 6       full story.  That they were standing
 7       there, they were protesting and then they
 8       got arrested.  Not this particular
 9       arrest, but --
10            MR. SHARKEY:  This is an old file.
11       I am just going to let this play out.
12            (Video played.)
13            MR. STECKLOW:  I am going to stop
14       it right here for a second and you can
15       see that the time is 14:31.
16       A.    7:39?
17       Q.    7:39:02 on the video itself.  I'm
18   asking from what you just saw and what you can
19   see here, does it look like there is
20   substantial blockage of the sidewalk?
21       A.    Right there it looks like they're
22   blocking the sidewalk.
23       Q.    It's sufficient to make arrests for
24   disorderly conduct?
25       A.    I don't know what's happening
```

```
 1                    Gannon
 2   outside the -- outside the shot.  I also
 3   wasn't there so it's very hard for me to
 4   determine from this one snapshot in time
 5   whether -- whether there was enough probable
 6   cause to make arrests here or not.
 7        Q.    We're not -- Lieutenant, we're not
 8   looking at this one snapshot in time.  We're
 9   looking at the video --
10        A.    Right.
11        Q.    -- that is fluid.  I'm stopping it
12   here because I wanted you to tell me from what
13   you just saw, including what is stopped here,
14   whether there is substantial blockage of the
15   sidewalk to start making arrests for
16   disorderly conduct.
17        A.    And I'll say it again.  It's
18   difficult to determine whether -- whether or
19   not they're fully blocking the sidewalk or
20   not.  What's going on outside the camera view,
21   I -- I -- it's -- you can't tell whether or
22   not.  To me there it looks like they're --
23   they're blocking the sidewalk.
24        Q.    Okay.  And I'm not asking if
25   they're blocking the sidewalk.  I am asking if
```

```
                                          Page 34

 1                         Gannon
 2     there is substantial blockage sufficient to
 3     satisfy disorderly conduct arrests.
 4           A.    I don't know.  I don't know.  I
 5     can't determine from looking at that.
 6           Q.    I'm asking you to determine from
 7     the video that you can see.
 8           A.    Right.  Same answer.
 9           Q.    That you don't know?
10           A.    Yeah.  You can't determine that
11     from looking at this.
12                 (Video played.)
13           Q.    So from watching the video now, as
14     it's moving, you can't determine whether or
15     not there is substantial blockage sufficient
16     to satisfy disorderly conduct?
17           A.    To me there it looks like people
18     are blocking the sidewalk.
19           Q.    And I'm not asking if they're
20     blocking the sidewalk because that's not the
21     standard for disorderly conduct.  Isn't that
22     correct?
23           A.    Well, if they're -- if they're
24     obstructing pedestrian traffic on the
25     sidewalk, it could be probable cause to arrest
```

```
 1                         Gannon
 2   people for disorderly conduct.
 3        Q.    So the standard, according to the
 4   City of New York, is that blocking pedestrian
 5   traffic is sufficient to arrest people for
 6   disorderly conduct?
 7        A.    It could be.  It could be.  This,
 8   it's -- I cannot determine that from looking
 9   at this -- at this video.  What they were
10   arrested for or what the -- what the
11   conditions were that these, the folks here
12   look like they're being arrested.  I can't
13   tell you that.
14        Q.    And you haven't watched this video
15   before, correct?
16        A.    No.
17        Q.    And you didn't do anything to
18   prepare for today's deposition to discuss the
19   incidents of this date in March of 2003,
20   correct?
21        A.    Correct.
22        Q.    Did you look at any information
23   related to a litigation entitled Kuntsler v.
24   City of New York?
25                (Reporter requests clarification.)
```

```
 1                      Gannon
 2      A.    No.
 3      Q.    So you believe that the arrests
 4  made there were consistent with constitutional
 5  limits on police power, correct?
 6      A.    I don't know why the -- I don't
 7  know what the determination was there to make
 8  the arrests.  I don't know what their -- I
 9  don't know what the mindset was of the
10  officers.  I don't know what the situation was
11  based on what they made the determination of
12  probable cause for arrest.  I don't know.
13      Q.    And prior to sitting here today and
14  watching this video you did absolutely nothing
15  to prepare to answer these questions about
16  what happened that day and the police conduct,
17  correct?
18      A.    Correct.
19      Q.    So do you know whether New York
20  City did anything to avoid similar future
21  arrests that may be inconsistent with
22  constitutional limits on police power?
23      A.    Repeat that.
24      Q.    A lawsuit ensued from this case,
25  from this arrest.  Do you know that?
```

```
                                            Page 37
 1                      Gannon
 2        A.    Yes.
 3        Q.    Do you know that because --
 4        A.    I shouldn't say that.  Because you
 5   just told me that, that's why.
 6        Q.    So because I just told you that you
 7   know a lawsuit ensued, but other than that you
 8   did not know a lawsuit came out of this
 9   arrest, correct?
10        A.    No.  I've never seen that video
11   before, so I don't know.
12        Q.    And you don't know anything about
13   this incident, correct?
14        A.    No.
15        Q.    And so you don't know how the City
16   of New York responded to this incident and the
17   police conduct of that day, correct?
18        A.    Well, I would -- if it was a
19   lawsuit, I would assume that the New York City
20   Law Department handled the lawsuit.
21        Q.    But I'm not asking you about how
22   they handled the lawsuit.  I'm asking about
23   the conduct of the police and how the City of
24   New York responded to the conduct of police on
25   that day.  And I'm asking if you have any
```

```
 1                         Gannon
 2    information about how the City of New York
 3    responded to the conduct of the police on that
 4    day.
 5         A.    I'm not sure -- I'm not sure I
 6    understand the question.  I'm not sure I'm
 7    following what you're trying to determine.
 8         Q.    I'm trying to determine whether or
 9    not the City of New York made any response to
10    how the police respond to sidewalk protests
11    based on what happened on that day in March of
12    2003.
13         A.    I don't know if any specific
14    changes were made as a result of those
15    arrests, no.
16         Q.    Do you believe that those arrests
17    were consistent with the constitutional limits
18    on police power?
19         A.    I don't know.  I don't know what
20    their mindset was to make the arrest.
21         Q.    Do you believe in that situation,
22    from the video you were watching, that the
23    police needed to provide dispersal orders
24    before they can make arrests?
25         A.    I don't know.  There was no audio.
```

```
                                      Page 39
 1                      Gannon
 2      I don't know if dispersal orders were given or
 3      not.  I don't -- I don't know.
 4           Q.    My question was whether or not you
 5      believed dispersal orders were required before
 6      those arrests could be made.
 7           A.    I don't know what the circumstances
 8      were.  I don't know why they arrested those
 9      folks or what their determination was, why
10      they made the arrests.  So I don't know.
11           Q.    Did the NYPD policing of this
12      sidewalk protest on that day in 2003 indicate
13      to the City of New York that the NYPD
14      procedures regarding policing of sidewalk
15      protest were sufficient to comply with
16      constitutional limits on police power?
17                 MS. ROBINSON:  Objection.  You can
18           answer.
19           A.    Read it to me one more time.  What
20      is your first name?
21           Q.    Wylie.
22           A.    Wylie.  Wylie, could you read that
23      one more time?
24           Q.    I can.  Did NYPD policing of the
25      sidewalk protest in March of 2003 indicate to
```

```
 1                          Gannon
 2    the City of New York that the NYPD procedures
 3    regarding policing of sidewalk protest were
 4    sufficient to comply with constitutional
 5    limits on police power?
 6          A.    I don't know.
 7          Q.    Did the City of New York review the
 8    procedures utilized by the NYPD in policing
 9    the sidewalk protests of April of 2003
10    regarding constitutional limits on police
11    power?
12          A.    I don't know.
13          Q.    Did the City of New York consider
14    whether the procedures utilized by the NYPD in
15    policing the sidewalk protest needed to be
16    reviewed based on the events of that day?
17          A.    I don't know.
18          Q.    Did the City of New York consider
19    whether the procedures utilized by the NYPD in
20    policing the sidewalk protest --
21                (Reporter requests clarification.)
22          Q.    Did the City of New York consider
23    whether the procedures utilized by the NYPD in
24    policing sidewalk protests needed to be
25    changed based on the events of that day?
```

```
                                          Page 41
 1                        Gannon
 2        A.     I don't know.
 3        Q.     Can you identify any changes
 4   implemented by the City of New York to ensure
 5   the NYPD policing of sidewalk protests would
 6   be consistent with constitutional limits on
 7   police power as set forth by the New York
 8   State Court of Appeals in the People v. Jones
 9   decision that was issued in November of 2007?
10              MS. ROBINSON:  Objection.  Calls
11        for a legal conclusion.  You can answer.
12        A.     I don't know.
13        Q.     I'm asking for a "yes" or "no"
14   question (sic).  I'm not asking to identify
15   the specifics.  I'm asking whether you can.
16        A.     Wylie --
17        Q.     I'll repeat it to you.
18        A.     Do you mind if I call you Wylie?
19        Q.     I have no problem.  Thank you.
20              Please identify any changes
21   implemented by the City of New York to ensure
22   the NYPD policing of sidewalk protest would be
23   consistent with constitutional limits on
24   police power as set forth by the New York
25   State Court of Appeals decision in People v.
```

```
                                          Page 42
 1                      Gannon
 2     Jones issued in November of 2007.
 3              MS. ROBINSON:  Objection.  Calls
 4          for a legal conclusion.  You can answer.
 5          A.    I don't know how to answer that
 6     question.  I don't know.
 7          Q.    Can you identify any changes
 8     implemented by the City of New York to ensure
 9     the NYPD policing of sidewalk protests would
10     be consistent with constitutional limits on
11     police power as set forth by the New York
12     State Court of Appeals decision in the People
13     v. Jones opinion issued November of 2007?
14              MS. ROBINSON:  Same objection.
15          A.    No.
16          Q.    Are you familiar with the People v.
17     Jones decision in 2007?
18          A.    No.
19              MR. STECKLOW:  Off the record for a
20          second.
21              (Discussion off the record.)
22              MR. STECKLOW:  Back on the record.
23          Q.    Can you identify any instructions
24     issued to supervisors or commanders in the
25     field to ensure that NYPD policing of sidewalk
```

Page 43

1                          Gannon
2     protest during Occupy Wall Street would be
3     consistent with constitutional limits on
4     police power as set forth by the New York
5     State Court of Appeals in the People v. Jones
6     decision from November 2007?
7                MS. ROBINSON:  Objection.  Calls
8          for a legal conclusion.  You can answer.
9          A.    No.
10         Q.    Can you identify any other
11    instructions issued to members of the service
12    to ensure that NYPD policing of sidewalk
13    protest during Occupy Wall Street would be
14    consistent with the constitutional limits of
15    police power as set forth by the New York
16    State Court of Appeals decision in People v.
17    Jones issued in November of 2007?
18                MS. ROBINSON:  Objection.  Outside
19         the scope.  You can answer.
20         A.    I can answer?  No.
21         Q.    Can you identify how the City of
22    New York sought to ensure compliance with
23    constitutional limits on police power as set
24    forth by the New York State Court of Appeals
25    in the People v. Jones decision during Occupy

```
                                        Page 44

  1                      Gannon

  2   Wall Street?

  3            MS. ROBINSON:  Objection.  Outside

  4       the scope.

  5       A.    No.

  6            MR. STECKLOW:  Off the record for a

  7       second.

  8            (Discussion off the record.)

  9            MR. STECKLOW:  Back on the record.

 10       Q.    Can you identify whether the City

 11   of New York measured compliance constitutional

 12   limits on police power as set forth by the New

 13   York State Court of Appeals decision in People

 14   v. Jones issued in November 2007 during the

 15   Occupy Wall Street movement?

 16            MS. ROBINSON:  Objection.  Outside

 17       the scope.

 18       A.    No.

 19       Q.    Can you identify whether the City

 20   of New York monitored compliance with

 21   constitutional limits on police power at set

 22   forth by the New York State Court of Appeals

 23   decision in People v. Jones during Occupy Wall

 24   Street?

 25            MS. ROBINSON:  Same objection.
```

```
                                        Page 45

 1                     Gannon

 2        A.    No, I cannot.

 3        Q.    Can you identify any instructions

 4   issued to supervisors or commanders in the

 5   field to ensure that NYPD policing of sidewalk

 6   protest during the one-year anniversary

 7   celebration of Occupy Wall Street would be

 8   consistent with constitutional limits on

 9   police power as set forth by the New York

10   State Court of Appeals decision in People v.

11   Jones issued in November of 2007?

12             MS. ROBINSON:   Same objection.   You

13        can answer.

14        A.    No.

15        Q.    Can you identify whether any

16   instructions issued to the members of the

17   service to ensure NYPD policing of sidewalk

18   protest during the one-year anniversary

19   celebration of Occupy Wall Street would be

20   consistent with the constitutional limits on

21   police power as set forth by the New York

22   State Court of Appeals in the People v. Jones

23   decision issued in November 2007?

24             MS. ROBINSON:   Same objection.   You

25        can answer.
```

```
                                        Page 46
 1                      Gannon
 2       A.     No.
 3       Q.     Can you identify whether the City
 4   of New York ensured compliance with
 5   constitutional limits of police power as set
 6   forth by the New York State Court of Appeals
 7   decision in People v. Jones during the
 8   one-year anniversary of Occupy Wall Street?
 9               MS. ROBINSON:   Same objection.
10       A.     No.
11       Q.     Can you identify how the City of
12   New York measured compliance with
13   constitutional limits on police power as set
14   forth by the New York State Court of Appeals
15   in the People v. Jones decision during the
16   one-year anniversary?
17               MS. ROBINSON:   Same objection.
18       A.     No.
19       Q.     Can you identify whether the City
20   of New York monitored compliance with
21   constitutional limits on police power as set
22   forth by the New York State Court of Appeals
23   in the People v. Jones decision during the
24   one-year anniversary of Occupy Wall Street?
25               MS. ROBINSON:    Same objection.
```

```
                                        Page 47

 1                      Gannon

 2        A.    No.

 3              MR. STECKLOW:  Go off the record

 4        for a second.

 5              (Discussion off the record.)

 6              MR. STECKLOW:  Back on the record.

 7        Q.    Can you identify how or whether the

 8   City of New York measured compliance with

 9   constitutional limits on police power as set

10   forth by the New York State Court of Appeals

11   decision in People v. Jones during the

12   one-year anniversary of Occupy Wall Street?

13              MS. ROBINSON:  Same objection.

14        A.    No.

15        Q.    What were the NYPD policies or

16   practices, if any, with respect to monitoring

17   newspaper articles, press reports, legislative

18   testimony and/or other similar types of

19   discourse for complaints about NYPD exceeding

20   constitutional limits on power?

21              MS. ROBINSON:  Objection to form.

22        A.    Read that to me one more time.

23        Q.    Sure.  If you want to look at topic

24   11, I am pretty much reading that

25   word-for-word.
```

```
                           Gannon
 1
 2                 What were the NYPD policies or
 3      practices, if any, with respect to monitoring
 4      newspapers articles, press reports,
 5      legislative testimony and/or other similar
 6      types of discourse for complaints about NYPD
 7      exceeding constitutional limits on power?
 8                 And for the record, topic 11 was
 9      from Exhibit 1 that you were looking at,
10      correct?
11          A.    Yes.  Correct.
12                 Well, the deputy commissioner for
13      public information, shorthand will be DCPI,
14      Deputy Commissioner for Public Information,
15      they on a daily basis put out newspaper
16      clippings for dissemination.  So that --
17      that's how they would monitor, I guess, print
18      reports or stuff like.  Whether it's -- not
19      just specifically for -- the last part of your
20      question was about --
21                 Read your question again, Wylie,
22      just the last part.
23          Q.    What were the NYPD policies or
24      practices, if any, with respect to monitoring
25      newspaper articles, press reports, legislative
```

```
 1                     Gannon
 2   testimony and/or other similar types of
 3   discourse for complaints about NYPD exceeding
 4   constitutional limits on power?
 5              MS. ROBINSON:  Objection to form.
 6        A.    DC -- DCPI puts out press
 7   clippings, not just limited to --
 8              You read it to me three times.  I
 9   can't remember the term you're using for --
10        Q.    Isn't it there?
11        A.    No, I don't think so.  It just says
12   other than -- what I'm reading here in the
13   umbrella, it says, "What were the NYPD's
14   policies and practices, if any, with respect
15   to monitoring newspaper articles, press
16   reports, legislative testimony and other
17   similar types of discourse."  Yours has --
18   your has a different quality to it, but --
19        Q.    For complaints about NYPD exceeding
20   constitutional limits on power.
21        A.    Right.  Mine doesn't have that last
22   section.
23        Q.    Okay.
24        A.    But DCPI, to put my point on it
25   anyway, our press people put out clippings,
```

```
 1                            Gannon
 2     daily clippings of newspaper reports but not
 3     just specific -- pretty much anything that
 4     appears in the newspaper about the Police
 5     Department they'll put it out so people can
 6     have one central location for, you know,
 7     reading what was in the paper that day or
 8     newspapers or any kind of article.  Not just
 9     limited to newspapers.
10          Q.    It's --
11          A.    That's -- that's basically what
12     that -- the answer to number 11 would be.
13     And, again, your question was different from
14     Exhibit 1 that I have here.  Just a little bit
15     different.
16          Q.    I just added on the reference of
17     what they were monitoring for.  Monitoring the
18     complaints -- for complaints about NYPD
19     exceeding constitutional limits on power.
20          A.    Correct.  That's the difference.
21          Q.    And your answer --
22                MS. ROBINSON:  Objection.
23          Q.    Okay.  Your answer explained that
24     DCPI monitors press for mentions of the Police
25     Department and then shares that?
```

```
                                           Page 51

 1                         Gannon

 2        A.     Correct.

 3        Q.     And who do they share that with?

 4        A.     Well, they share it with --

 5   nowadays with technology the way it is, Police

 6   Officers can get that information on their

 7   smart phones.  It's shared on our internal

 8   intranet page, the internal Police Department

 9   system, and it's, you know, it's the clippings

10   of the day's, you know, reports.

11        Q.     And if there is a complaint that's

12   found within the press clippings, is that --

13   does that trigger some sort of investigation,

14   response or anything or is it simply just part

15   of a DCPI collection of stories?

16        A.     It could generate a complaint.  I

17   think the DCPI's main function there is to

18   put -- collate the press reports from

19   different sources, whatever, and then put it

20   out so that everybody could be aware of what

21   was in the papers that day.  I keep saying

22   papers, but in the general discourse I guess

23   you want to put it generically, that day.

24        Q.     So that was their policy about how

25   they monitor.  Now I'm asking about what they
```

```
                                      Page 52

 1                        Gannon

 2    do once they find something raised.  How do

 3    they respond?  Do they respond?

 4            Do they send it to the Chief of

 5    Department for an investigation?  Do they send

 6    it to IAP for an investigation?  Does anything

 7    occur upon DCPI finding mentions of complaints

 8    of NYPD exceeding constitutional limits on

 9    power?

10        A.    News reports, DCPI I don't think

11    would do that.  If we got an complaint, it

12    would be -- if a complaint -- complaint about

13    something like that came into the department,

14    then depending on the nature of the complaint,

15    that would be -- that could be investigated or

16    referred to someone else depending on what the

17    nature of the complaint was.

18            That happens pretty regularly, if

19    someone were to contact the Police Department

20    and make a complaint.  Depending on the nature

21    of the complaint then that would be handled

22    in, you know, there will be -- the complaint

23    will be forwarded and handled as required,

24    depending on what the nature of the complaint

25    was.
```

```
                                            Page 53

 1                        Gannon

 2        Q.    Okay.  So I'm going to ask the more

 3     specific question.  You may have already

 4     answered it, but I want to get a more specific

 5     answer.

 6                What were the NYPD policies or

 7     practices, if any, with respect to responding

 8     to a specific complaints about NYPD exceeding

 9     constitutional limits on power from a citizen?

10        A.    Well, if you had a complaint

11     about -- for example, if you had a complaint

12     about miscoduct, that might be -- if that came

13     into the Police Department, that might be

14     forwarded over to the Internal Affairs Bureau.

15     If you had a complaint from -- it depends on

16     the nature of the complaint.  But if you had

17     other complaints about a Police Officer of how

18     the way things were handled, that would

19     probably come to the Chief of Department's

20     office and that might be funneled out to if it

21     was in a certain area.

22                For example, this demonstration

23     that we just watched the video.  This is just

24     an example, not specific to the video.  That

25     occurred in Manhattan South.  So that probably
```

```
                                        Page 54

 1                      Gannon
 2     the Chief of Department handled it down to --
 3     in the form of communication down to Manhattan
 4     South and then they would handle the
 5     communication and conduct an investigation as
 6     to what happened.  So it depends on the nature
 7     of the complaint.
 8          Q.    Does it depend on whose making the
 9     complaint?
10          A.    No.
11          Q.    So it's the same response whether
12     it's a complaint from a citizen, whether it's
13     from an elected official, whether it's from an
14     advocacy group?
15          A.    Right.  Correct.  I mean it
16     doesn't -- all the complaints that come in are
17     handled in a similar fashion.
18          Q.    So when a complaint comes in and,
19     say, it's sent directly to the commissioner --
20          A.    Right.
21          Q.    -- can you go through and tell me
22     how they determine what to do with it, where
23     to send it and how it's investigated, if it's
24     investigated?
25          A.    It really greatly depends on what
```

                         Gannon
1        the nature of the complaint is.  So the
2        easiest one to do is if there was a report of
3        misconduct by a Police Officer, serious
4        misconduct, that will go to the Internal
5        Affairs Bureau.
6                   So if it came into the
7        Commissioner's office they would treat it as a
8        communication.  They would determine what the
9        best -- who would be the best person or unit
10       or entity to -- to look into it.  In this
11       case, serious misconduct so we'll stick with
12       that theme, that would come down to the
13       Internal Affairs Bureau and then they would --
14       they would conduct the investigation.
15           Q.    Can you give me the answer if the
16       complaint was about NYPD exceeding
17       constitutional limits on power regarding
18       sidewalk protest?
19           A.    That may go to -- that could go to
20       the Legal Bureau, that could go to -- I mean
21       it really depends on if it was -- if it was --
22                 It's hard to answer with such a
23       broad topic, you know?  Something like that
24       might be -- it might go to the Legal Bureau to

```
1                        Gannon
2      take a look at.  It really depends on the
3      specificity of it.
4           Q.     How is that determination made?  If
5      something is sent to the commissioner --
6           A.     Right.
7           Q.     -- what happens at that point for a
8      determination to be made about where it goes?
9           A.     Someone on the Commissioner's
10     staff, I can't tell you who it is, but someone
11     on the Commissioner's staff goes through these
12     letters or receipts of complaints and then
13     they, you know, they sit there and determine,
14     based on previous examples, based on their
15     experience, based on sometimes it's obvious,
16     sometimes it's less than obvious and then
17     they'll direct this communication out to the
18     people who they think would handle it best.
19          Q.     And for complaints about NYPD
20     exceeding constitutional limits on power
21     regarding sidewalk protest, are you unsure
22     where they would go or you're saying they
23     would go to the Legal Bureau?
24          A.     It could go to the legal bureau.
25     It could go to -- it could go to the local
```

```
                                    Gannon
 1
 2    command.  We'll stick with the theme here.
 3    Like Patrol Bureau Manhattan South, if they
 4    had -- if they had -- if the protest was
 5    effected in a particular command, then they
 6    may refer it to the borough commander in that
 7    particular command.  It really depends on the
 8    specificity of the complaint.
 9         Q.    So I'm asking for specific
10    understanding of how the NYPD responds to this
11    and I'd like to know, if you have that answer,
12    what I don't want is speculation about what
13    might happen.  I'd really like to understand
14    if a complaint comes in, a specific complaint
15    that the NYPD exceeded their constitutional
16    limits on power at a sidewalk protest, do you
17    know how that is handled, where it goes
18    specifically and how it's investigated?
19         A.    Well, that's a broad subject
20    matter.  So it really -- it really would
21    depend.  There's no, you know, there's no box
22    to check there.  It's -- it's --
23              Likelihood I think it would go to
24    the legal bureau, but if it mentions some
25    specific officer who did it, it may be farmed
```

```
                              Gannon
 1
 2    out to the -- farmed out -- it may be
 3    transferred over to the local patrol borough
 4    where that officer works.  It just depends on
 5    the nature of the complaint.
 6              In this thing, you mention this
 7    topic, it's rather broad.  In this example
 8    it's broad so it's hard to determine where
 9    exactly it would go.
10        Q.    Is there a policy or practice in
11    place with the NYPD in order to make that
12    determination?
13        A.    Not to my knowledge.
14              MR. STECKLOW:  Let's mark this as
15        Exhibit 2.
16                  (Plaintiffs' Exhibit 2, two-page
17            letter dated April 28, 2003, marked for
18            identification, as of this date.)
19        Q.    So what I've handed you are three
20    separate letters from the New York Civil
21    Liberties Union to the commissioner of the
22    NYPD.  One is dated April 28, 2003; one is
23    dated August 30, 2005; one is dated October 20
24    of 2011.  Each one of them the NYCLU makes
25    complaints about police exceeding
```

```
 1                     Gannon
 2    constitutional limits on power and makes
 3    specific examples about sidewalk protest.
 4           How would each of these specific
 5    complaints be handled by the NYPD?
 6       A.   Give me a second to just review
 7    this.
 8           MS. ROBINSON:  Have these been
 9       disclosed?  I don't see Bates stamp
10       numbers.
11           MR. STECKLOW:  I believe they all
12       have all been disclosed.
13           MS. ROBINSON:  Can you tell me what
14       the Bates stamp numbers are?
15           MR. STECKLOW:  No.
16           MS. ROBINSON:  We're not going to
17       continue this deposition with you handing
18       us things at the last minute.
19           MR. STECKLOW:  I'm not handing you
20       things at the last minute.  Yesterday I
21       sent you video that we found and I
22       haven't shown that yet because you made
23       an objection to it even though the
24       City --
25           MS. ROBINSON:  And I'm making an
```

```
                                    Page 60

 1                     Gannon

 2       objection to this because it's not Bates

 3       stamped.

 4            MR. STECKLOW:  If it's not Bates

 5       stamped doesn't mean it hasn't been

 6       produced.

 7            MS. ROBINSON:  Well, you don't know

 8       if it's been produced.

 9            MR. STECKLOW:  I'm telling you I

10       believe it's all been produced.

11            MS. ROBINSON:  Believing it and

12       knowing it are two different things.  If

13       it has been produced then you should

14       provide the Bates stamp numbers.

15            MR. STECKLOW:  I'm representing to

16       you that I believe this has all been

17       produced.  We are not asking specifically

18       about -- we are not asking about how

19       these things are handled.  I've been told

20       that it's too general of a question so

21       now I'm trying to be more specific.

22            MS. ROBINSON:  I understand that,

23       but there is no indication that these

24       documents have been produced in this

25       case.  To the extent --
```

```
                                        Page 61

 1                        Gannon

 2            MR. STECKLOW:  The indication is

 3       that I'm telling you that I believe they

 4       have been produced.

 5            MS. ROBINSON:  You're saying you

 6       believe.  I want to know that you know

 7       that they have been produced.  I don't

 8       want to go through this deposition

 9       constantly seeing things that aren't

10       marked --

11            MR. STECKLOW:  You're going to

12       see --

13            MS. ROBINSON:  Such as the video.

14            MR. STECKLOW:  You're going to see

15       things that aren't marked.  It doesn't

16       matter.  These things were all --

17            MS. ROBINSON:  It does matter.

18            MR. STECKLOW:  The things that

19       haven't been produced, I'd let you know.

20            MS. ROBINSON:  You don't know that

21       this has been produced.

22       Q.    Let's look at this third document.

23   this one has 1,000 percent been produced by

24   the City of New York.  Okay?  Rip off the

25   first page.  Let's look at the third document.
```

```
                                            Page 62

 1                       Gannon
 2        A.      Is that the one dated October 20,
 3    2011.
 4        Q.      It is.
 5        A.      Addressed to Raymond Kelly,
 6    Commissioner of New York City Police
 7    Department.
 8                (Witness reviewing document.)
 9        A.      I'm almost done.  Thank you.
10        Q.      Looking at the second page, the
11    second to last paragraph, it states there that
12    quote, "On a related point we also have been
13    present at several locations (including two
14    this past weekend) where Police Officers
15    aggressively dispersed people standing
16    lawfully on city sidewalks.  While we
17    recognize that such dispersal orders can be
18    appropriate in limited circumstances, we urge
19    the department to be more careful with such
20    orders."
21                What, if anything, would the NYPD
22    do in response to this written complaint being
23    sent to the commissioner of New York Police
24    Department?
25        A.      Mr. Dunn didn't specify --
```

```
 1                      Gannon
 2            (Reporter requests clarification.)
 3       A.    The letter is written by or signed
 4   by Christopher Dunn.  He's the Assistant Legal
 5   Director for the New York City Liberties
 6   Union.
 7            Unfortunately, he didn't state
 8   where this occurred so I don't know where this
 9   would have been forwarded to as -- to be -- to
10   be further looked at.  It's hard to tell.
11   Mr. Dunn didn't specifically say.
12            So I can't answer directly what --
13   where they would have sent this because it
14   lacks specificity.
15       Q.    Does the NYPD have any rules in
16   place about how to handle complaints such as
17   these?
18            MS. ROBINSON:  Objection.  You can
19       answer.
20       A.    Yes.
21       Q.    Are those rules written down?
22       A.    Yes.
23       Q.    Where are they written down?
24       A.    The handling of communications
25   would be in the New York City -- the Police
```

```
                                    Page 64

  1                      Gannon

  2     Department's administrative guide.  How

  3     communications are handled, that would fit the

  4     bill here.

  5          Q.    So a complaint is considered a

  6     communication by the NYPD?

  7          A.    It would be handled as a

  8     communication.  So a complaint came in.  The

  9     process I described earlier.  You mentioned if

 10     a complaint came into the commissioner's

 11     office, the Police Commissioner's office, how

 12     would it be handled?  Somebody in the

 13     commissioner's office would determine where it

 14     would go and it would be sent down in the form

 15     of a communication to the appropriate person.

 16          Q.    And who in the commissioner's

 17     office makes that determination?

 18          A.    That I don't know.  A member of his

 19     staff.

 20          Q.    What factors do they use to make a

 21     determination about where it would go?

 22          A.    Based on their experience.

 23     Sometimes it's obvious.  Again, serious

 24     misconduct would be directed over to the

 25     Internal Affairs Bureau.
```

1                           Gannon

2              Other topics, Mr. Dunn praised our

3    response earlier on which -- which was nice of

4    him.  I don't know where he forwarded the good

5    news.  But other than that, that would be --

6    the determination would be based on the

7    experience of the person doing it and, you

8    know, like you got serious misconduct, just as

9    an example because we talked about that, that

10   would go to internal affairs.

11        Q.    You talked about that.  I'm trying

12   to talk about sidewalk protests.

13        A.    Right.

14        Q.    So specifically about the sidewalk

15   protest.

16        A.    Right.

17        Q.    What criteria does NYPD use to

18   determine how to handle a complaint such as

19   the one we're looking at in Exhibit 2?

20        A.     In this particular example it would

21   be difficult to forward this anywhere because

22   he doesn't say where it happened.  So, I don't

23   know.  I mean it's...

24        Q.    There was another date on the list

25   of dates you were shown, of August 31, 2004.

```
 1                    Gannon
 2   Are you familiar with the facts and
 3   circumstances of an incident that occurred on
 4   Fulton Street on that day during the
 5   Republican National Convention?
 6        A.    I don't know.
 7        Q.    What would you need to do to find
 8   whether or not you are familiar with the facts
 9   and circumstances of that incident?
10             MS. ROBINSON:  Objection.  Outside
11        the scope.  You can answer.
12        A.    I don't know what you're referring
13   to, so I don't know.  I don't know what you
14   could do to refresh my memory.  I'm not
15   familiar with that.
16        Q.    You looked at a list of dates that
17   your attorney provided you for incidents.
18        A.    Correct.
19        Q.    This is one of those dates.
20        A.    Correct.
21        Q.    August 31, 2004 at Fulton Street as
22   part of the republican National Convention,
23   did you do anything to prepare yourself for
24   today's deposition in relation to that
25   incident?
```

Page 67

```
 1                     Gannon
 2      A.    No.
 3            MS. ROBINSON:  Objection.  Outside
 4      the scope.
 5            MR. STECKLOW:  How is it outside
 6      the scope?
 7            MS. ROBINSON:  I gave him a list of
 8      settled lawsuits in which the court
 9      stated that the appropriate question to
10      be asked about Exhibit D2 was whether the
11      NYPD did anything in response to these
12      filed complaints.
13            MR. STECKLOW:  I don't agree with
14      that.
15            MS. ROBINSON:  Not about facts and
16      circumstances.
17            MR. STECKLOW:  Okay.  I don't agree
18      with that.
19            MS. ROBINSON:  Well, it's what --
20      it's in the order.
21      Q.    All right.  Did you -- so you
22   didn't review any -- any information
23   concerning the arrests of August 31, 2004 at
24   the Fulton Street area, correct?
25      A.    No.  Correct, yes.  That's correct.
```

```
 1                    Gannon
 2   I did not review it.
 3        Q.    Do you know whether or not the
 4   arrests were consistent with the
 5   constitutional limits on police power?
 6             MS. ROBINSON:  Objection.  Outside
 7        the scope.
 8        A.    I don't know.
 9        Q.    Do you know what, if anything, the
10   City of New York did to avoid similar future
11   arrests?
12        A.    I don't know.
13        Q.    Can you identify any changes taken
14   as a result of a lawsuit that was resolved
15   regarding that arrest date?
16        A.    Changes as a result of -- as a --
17   drafting of a lawsuit?  Sorry.
18        Q.    Can you identify any changes taken
19   as a result of the lawsuit that was settled
20   for the people arrested that day, August 31,
21   2004, on Fulton Street?
22        A.    I don't know.
23        Q.    We're looking for a "yes" or "no"
24   answer here.
25        A.    Okay.
```

                              Gannon

1

2      Q.    And it's whether you can identify

3   them.  So if you cannot it's not that I don't

4   know.  It's that you can't identify them.  So

5   that's hopefully the answer we can get to so

6   we can move through this?

7      A.    Okay.

8      Q.    So can you identify any changes

9   taken by the NYPD as a result of the lawsuit

10  filed for the people arrested on August 31,

11  2004?

12      A.    I cannot identify that.

13           THE WITNESS:  Can we go off the

14       record for a second?

15           MR. STECKLOW:  Sure.

16           (Discussion off the record.)

17           MR. STECKLOW:  The time is now

18       11:28 and we are going to take a

19       five-minute break.

20           THE WITNESS:  Thank you.

21           MR. STECKLOW:  Sure.

22           (Recess taken.)

23           MR. STECKLOW:  The time is now

24       11:44.  We are still in my office at it

25       217 Centre Street, at the continued

```
 1                      Gannon
 2        deposition of Lt. Gannon.
 3              All right.  We are now going to
 4        mark this as Exhibit 3, please.
 5                   (Plaintiffs' Exhibit 3, one-page
 6             document, marked for identification, as of
 7             this date.)
 8             MR. STECKLOW:  Off the record.
 9             (Discussion off the record.)
10        Q.    Have you seen this document before,
11   Lieutenant?
12        A.    Yes, I have.
13        Q.    And is this a document -- one of
14   the two documents that Ms. Robinson showed
15   you?
16        A.    Yes.
17             MS. ROBINSON:  Objection.  You can
18        answer.
19        A.    Yes.
20        Q.    I am now asking you about topic
21   number 5.  Topic number 5 has, I believe, four
22   various locations on it.  The date on topic
23   number 5 is 8/31/04 and the first location is
24   Fulton Street.  And the questions I have been
25   asking you prior to the break were about the
```

Page 71

1                          Gannon

2   Fulton Street address.  Are you familiar with

3   the Fulton Street arrest?

4        A.    No.

5        Q.    Can you testify as to whether the

6   City of New York did anything to avoid similar

7   future arrests after the Fulton Street

8   incident?

9        A.    My understanding is that the cases

10  on this sheet, Exhibit Number 3, have all

11  been -- have all been adjudicated in some

12  fashion.  So I mean the NYPD doesn't --

13  doesn't make policy changes based on filed

14  lawsuits.

15            So the specific Fulton Street one I

16  don't know, but I can tell as a general

17  thought that the NYPD wouldn't make policy

18  changes based on filed lawsuits.

19        Q.    Is that your answer?

20        A.    Yes.

21        Q.    Just to be clear.  You recall in

22  the beginning when we went through

23  instructions we talked about the "City of New

24  York" and "NYPD" being terms that we were

25  going to use as one entity?

```
                                              Page 72
 1                       Gannon
 2        A.    Yes.
 3        Q.    And so does your answer when you
 4   were using the term "NYPD" follow that where
 5   you are talking about both the City of New
 6   York when you say the words "NYPD"?
 7        A.    Well, the City of New York here
 8   is -- the Law Department for New York City --
 9   New York City Law, they're the one who handled
10   all the legal cases.  The NYPD doesn't get
11   involved in litigation, other than, you know,
12   usual stuff.  Witnesses or documents or stuff
13   like that.  So what I -- when I was talking
14   about this, City of New York here would be the
15   law department handles all litigation part of
16   this for the Police Department.
17        Q.    But you're not here on behalf of
18   the Law Department.  You're here on behalf of
19   the City of New York, correct?
20        A.    Yes.
21        Q.    And we went through that at the
22   beginning of this deposition, correct?
23        A.    Correct.
24        Q.    So I'm asking you, the answer you
25   just gave and you used the determine "NYPD"
```

```
                              Gannon
 1
 2    and I want to make sure that you were using
 3    that term to mean the City of New York as a
 4    whole as well as the one entity, one agency
 5    underneath it, the NYPD.
 6         A.    Yes.
 7              MS. ROBINSON:  Objection.  If the
 8         New York City Law Department falls under
 9         the City does one thing and the NYPD does
10         another thing, it can't be an umbrella.
11         He specifically has answered what the
12         NYPD does and what the Law Department
13         does.  You can't lump the NYPD and New
14         York City in one answer with respect to
15         that question.
16         Q.    Do you want to change your answer
17    based on the objection your counsel just made?
18              MS. ROBINSON:  He answered it.
19              MR. STECKLOW:  He gave me a yes.
20         I'm giving him an opportunity to change
21         his answer if he would like to.
22         Otherwise, the answer will stay.
23              MS. ROBINSON:  If you could restate
24         the question.
25              MR. STECKLOW:  I'm talking to the
```

```
                                          Page 74
 1                       Gannon
 2         witness, Amy.  I let you just do a very
 3         long speaking objection and didn't say
 4         anything about it.  I'm asking the
 5         witness if his answer is changing and if
 6         the answer is no, it's not changing,
 7         great.  If the answer is yes, it's
 8         changing, then I'll hear it.  If's that's
 9         not the response I'm going to get, then
10         that's not the response I'm going to get.
11         A.    I understand in the beginning we
12    talked about the City of New York and the
13    NYPD.  When I answered the question, NYPD I
14    was answering it as the City of New York is
15    the person who handles the Law Department.
16    The City of New York handles the litigation
17    for the filed lawsuits.  The NYPD being, you
18    know, the person -- the entity being sued.  So
19    I split those two when I answered that
20    question.
21         Q.    So how -- would the City of New
22    York make changes to NYPD policy based on
23    facts alleged in settled lawsuits?
24         A.    I don't -- now I will stick with my
25    previous answer, which was the NYPD doesn't
```

```
                            Gannon
 1
 2   make policy changes based on -- based on filed
 3   lawsuits.  I'm not sure how else to answer the
 4   question.
 5        Q.    My question was about the City of
 6   New York and since you're now, I believe,
 7   testifying that you're not grouping those
 8   together --
 9        A.    Right.
10        Q.    -- and you know our instructions in
11   the beginning were we were going to group
12   those together.  I'm now asking you about the
13   City of New York, not NYPD.
14             Does the City of New York make
15   changes to NYPD policy based on facts alleged
16   in settled lawsuits?
17        A.    No.
18        Q.    Does the City of New York make
19   changes to NYPD practice based on facts
20   alleged in settled lawsuits?
21        A.    The City -- well -- I don't know
22   how to answer that question.
23             The NYPD wouldn't make changes
24   based on filed lawsuits.  I mean it would make
25   changes based on changes in the legislation,
```

```
                                            Page 76

 1                          Gannon

 2      and changes in, you know, controlling law.

 3      But it wouldn't necessarily be made because of

 4      filed lawsuits.

 5           Q.    Does the NYPD make changes to its

 6      practices based on the facts alleged in

 7      settled lawsuits?

 8           A.    I'm sorry.  Does the NYPD --

 9           Q.    -- make changes to its practices

10      based on the facts alleged in settled

11      lawsuits?

12           A.    No.

13           Q.    Did the NYPD policing a sidewalk

14      protest on August 31, 2004 during the Fulton

15      Street arrest indicate to the City of New York

16      that the NYPD procedures regarding police in a

17      sidewalk protest were sufficient to comply

18      with constitutional limits on police power?

19                MS. ROBINSON:  Objection.  You can

20           answer if you understand.

21           A.    I don't understand.

22           Q.    Do you know whether the NYPD

23      policing of the sidewalk protest of the Fulton

24      Street August 31, 2004 date indicated that the

25      City of New York, that the NYPD procedures
```

```
                                          Page 77
 1                       Gannon
 2     regarding policing of sidewalk protests were
 3     sufficient to comply constitutional limits on
 4     police power?
 5               MS. ROBINSON:  Objection.  You can
 6          answer.
 7          A.    I don't know.
 8          Q.    Do you know whether the City of New
 9     York reviewed the procedures utilized by the
10     NYPD in policing the Fulton Street sidewalk
11     protest on August 31, 2004 regarding
12     constitutional limits on police power?
13               MS. ROBINSON:  Objection.  Outside
14          the scope.
15          Q.    You can answer.
16          A.    Oh.
17               MS. ROBINSON:  Sorry.
18          A.    I don't know.
19          Q.    Just as an instruction.  Unless
20     your attorney says "Do not answer" --
21          A.    Okay.
22          Q.    The objection is for the record and
23     you can answer?
24          A.    That's fine.  I just wasn't sure.
25          Q.    Did the City of New York -- excuse
```

                        Gannon

1
2    me.  Can you identify whether the City of New
3    York considered the procedures utilized by the
4    NYPD in policing the sidewalk protest of
5    August 31, 2004 was in need of review based on
6    those events?
7         A.    No.
8         Q.    Do you know whether the City of New
9    York considered whether the procedures
10   utilized by the NYPD in policing that sidewalk
11   protest of August 31, 2004 needed to be
12   changed based on the policing of that date?
13        A.    As a result of the litigation I
14   mentioned that we don't -- we wouldn't change
15   the policies or procedures based on the filed
16   litigation.  So I don't know if that answers
17   that question previously, but it's -- it's --
18   I would say no.
19        Q.    You are aware that a lawsuit ensued
20   regarding these arrests of August 31, 2004,
21   Fulton Street, correct?
22        A.    Correct.
23        Q.    Are you aware that the plaintiffs
24   won summary judgment on false arrest based on
25   the arrest on the sidewalk on August 31, 2004?

Page 79

1                      Gannon
2        A.    I know the cases were -- I know the
3    cases were settled.  I don't know what the
4    reason was for them settling.
5        Q.    So you're not aware that a federal
6    judge issued a decision granting summary
7    judgment to the plaintiffs indicating that
8    these arrests on the sidewalk violated their
9    constitutional rights?
10        A.    No.
11        Q.    Do you know whether following the
12    issuance of this summary judgment decision if
13    the City of New York reviewed the procedures
14    utilized by the NYPD in policing the sidewalk
15    protest of August 31, 2004, regarding
16    constitutional limits on police power?
17        A.    I don't know.
18              MR. STECKLOW:  I would like to mark
19        this as Plaintiffs' Exhibit 4.
20                  (Plaintiffs' Exhibit 4, one page
21             depicting color copies of three photos,
22             marked for identification, as of this date.)
23        Q.    Before we move on, one more
24    question about the August 31, Fulton Street
25    arrest.  Did the City of New York review the

```
                                    Page 80
 1                    Gannon
 2    procedures utilized by the NYPD in policing
 3    the sidewalk protest of August 31, 2004,
 4    regarding constitutional limits on police
 5    power?
 6         A.    I don't know.
 7         Q.    Okay.  Now I am showing you what
 8    has been marked as Plaintiffs' Exhibit 4, and
 9    I'll ask you if you've ever seen these images
10    before.
11         A.    No.
12         Q.    Do you recognize the officer in
13    this?
14         A.    Officer -- it's Inspector Winski.
15    W-I-N-S-K-I.
16         Q.    Now, there are three different
17    Winski brothers who are at one point MOS,
18    correct?
19         A.    That's correct.
20         Q.    Which particular Winski brother is
21    this?
22         A.    This is --
23         Q.    It's not a trick question.
24         A.    Ed, it's Ed Winski.  Edward.  I
25    call him inspector Winski.  His first name is
```

```
                                        Page 81
 1                      Gannon
 2   Inspector, as far as I'm concerned.
 3               MR. STECKLOW:  Off the record.
 4               (Discussion off the record.)
 5               MR. STECKLOW:  Back on the record.
 6        Q.    This is from an incident from
 7   September 20, 2011.  If you look at Exhibit 3,
 8   it's listed as number 7 on Exhibit 3.  And
 9   these images came from the article that is
10   linked on Exhibit 7.  Excuse me.  On number 7
11   on Exhibit 3.
12               Did you ever review the article
13   that's linked there?
14        A.    No.
15        Q.    Are you familiar with the facts and
16   circumstances of this incident?
17        A.    No.  Although, this is another --
18   this is a case that I think was settled and I
19   think -- I think -- I think in this particular
20   case Inspector Winski was found to have used
21   some level of -- some level of force.  But --
22   and I think that was -- I think it was settled
23   for a minor amount.
24               But other than that, I don't know
25   too much details of the event, too many
```

Page 82

1                          Gannon

2     details of the event.

3          Q.    Was this individual arrested on the

4     sidewalk -- withdrawn.

5                Was this individual sidewalk arrest

6     consistent with constitutional limits on

7     police power?

8          A.    I can't tell from the pictures

9     here.

10         Q.    Do you know whether this individual

11    sidewalk arrest was consistent with

12    constitutional limits on police power?

13         A.    I don't know the circumstances that

14    led up to the arrest.  It's hard to tell from

15    these three still photos here.

16         Q.    So do you know whether this

17    individual sidewalk arrest was consistent with

18    constitutional limits on police power?

19         A.    I can't determine that based on

20    what I see here.

21         Q.    So you don't know?

22         A.    I don't know.  I can't determine

23    what it is.  I don't know.

24         Q.    What, if anything, did the City of

25    New York do to avoid similar future arrests,

```
                                    Page 83
 1                    Gannon
 2    similar to this one?
 3         A.    Again, just to go back to my
 4    previous statement about the filed -- the
 5    filed lawsuits, the NYPD doesn't -- doesn't
 6    necessarily change its policies based on an
 7    individual -- an individual act.  Here it's
 8    clearly, you know, a one-off here with
 9    Inspector Winski.
10         Q.    Did the NYPD policing of this
11    sidewalk protest on this day indicate to the
12    City of New York that the NYPD procedures
13    regarding policing of sidewalk protest were
14    sufficient to comply with constitutional
15    limits on police power?
16         A.    I cannot -- I cannot determine that
17    based on what I see here.
18         Q.    Do you know whether the City of New
19    York reviewed the procedures utilized by the
20    NYPD in policing the sidewalk protest of
21    September 20, 2011, regarding constitutional
22    limits on police power?
23         A.    I do not.
24              MS. ROBINSON:  Just for the record,
25         in item number 7 it's a little confusing
```

```
                                        Page 84

 1                          Gannon

 2          because you have 9/20 -- it lists it as

 3          9/20/11, but the photographs are from a

 4          different date.  So I believe it's

 5          causing confusion.

 6          Q.    What date do you believe the

 7     photographs are from?

 8                MS. ROBINSON:  September 19, 2011.

 9          Not the arrest on 9/20/2011.

10                MR. STECKLOW:  So you believe that

11          this arrest occurred on September 19 and

12          not September 20?

13                MS. ROBINSON:  I believe so.

14                MR. STECKLOW:  I actually think

15          that's from the --

16                MS. ROBINSON:  And 9/20/2011, as we

17          all know, is a different incident.

18          Right?

19                MR. STECKLOW:  I think there are

20          multiple incidents on each date.  So if

21          we're talking about a different incident,

22          I'm talking about the incident that's

23          reflected in this.  These are the

24          questions I'm asking.

25          Q.    Are you answering the questions
```

```
                              Gannon
 1
 2    based on your knowledge of what happened in
 3    Exhibit 4 or some other way?
 4         A.    I was basing it on I thought
 5    Inspector Winski was part of a litigation and
 6    there was a judgment against him at a certain
 7    point.  That's what I thought these pictures
 8    reflected.
 9         Q.    Okay.  Looking at the picture
10    reflected in Exhibit 4, if this in fact
11    happened on 9/19/2011, would that change any
12    of the answers you have previously given?
13         A.    Well, it was a different -- if it
14    was a different person arrested, it would
15    certainly change the litigation part of it.  I
16    don't know.
17         Q.    So reflecting solely on the
18    individual in the orange hat in this image,
19    this is the individual arrest we're talking
20    about in these questions.  Okay?
21         A.    Okay.
22         Q.    So I'm going to review the
23    questions again.
24         A.    Sure.
25         Q.    Are you familiar with the facts and
```

```
                                        Page 86

 1                       Gannon

 2    circumstances of the incident that you can see

 3    in the three photographs of Exhibit 4?

 4         A.     No.

 5         Q.     Do you know whether the individual

 6    sidewalk arrest that's depicted in Exhibit 4

 7    is consistent with the constitutional limits

 8    on police power?

 9         A.     I can't determine that based on the

10    three pictures that I see here in exhibit

11    number 4.

12         Q.     Did the NYPD policing of the

13    sidewalk protest of the day depicted in

14    Exhibit 4 indicate to the City of New York

15    that the NYPD procedures regarding policing of

16    sidewalk protests were sufficient to comply

17    with constitutional limits on police power?

18         A.     I don't know.

19         Q.     Did the City of New York review the

20    procedures utilized by the NYPD in policing

21    the sidewalk protest that's depicted in

22    Exhibit 4?

23         A.     I don't know.

24         Q.     Can you identify any review by the

25    NYPD or the City of New York of procedures it
```

```
                                         Page 87

 1                          Gannon

 2      utilized in policing sidewalk protests based

 3      on the events of -- depicted in Exhibit 4?

 4           A.     Read that one more time please.

 5           Q.     Can you identify any review by the

 6      City of New York and/or the NYPD of procedures

 7      utilized in policing sidewalk protests based

 8      on the events depicted in Exhibit 4?

 9           A.     No, but I don't -- I don't believe

10      they would necessarily conduct a review based

11      on an arrest on a sidewalk.  A one-off with

12      Inspector Winski, I'm not sure that would

13      warrant a review, but I can't identify one.

14           Q.     Looking back at Exhibit 3, we see

15      that number 8 has a date of September 24, 2011

16      and underneath it has approximately ten

17      different lawsuits that were filed for arrests

18      on that date.  Do you see that --

19           A.     I do.

20           Q.     -- in Exhibit 3?

21           A.     I do.

22           Q.     Are you familiar with the facts and

23      circumstances of the arrest on this date?

24           A.     Somewhat, yes.

25           Q.     Do you know how many arrests were
```

```
1                       Gannon
2     made on this date?
3          A.    I don't.
4          Q.    Do you have an idea of what --
5     withdrawn.
6                Can you give an estimate of how
7     many arrests were made on this date?
8          A.    There's ten people listed, so I
9     would at least ten.  But I don't know.  I
10    don't know for sure.  Ten litigants here
11    listed on Exhibit 3.
12         Q.    Do you know if any of these cases
13    that were filed listed on Exhibit 3 under
14    number 8 had multiple plaintiffs involved?
15         A.    I don't know.
16               MR. STECKLOW:  I would like to mark
17         this as Exhibit 5.
18                   (Plaintiffs' Exhibit 5, Letter dated
19            May 5, 2014, marked for identification, as
20            of this date.)
21               MS. ROBINSON:  Exhibit 5 has a
22         Wiles (phonetic) Bates stamp, but not a
23         Packard Bates stamp.
24               MR. STECKLOW:  It's been turned
25         over.  This was part of a much longer
```

```
                                      Page 89

 1                       Gannon

 2        document that was produced by the

 3        District Attorney of New York in response

 4        to a FOIA request.  I produced the cover

 5        letter and the relevant page.

 6              MS. ROBINSON:  In Packard.

 7              MR. STECKLOW:  I produced the

 8        entire document in Packard.  For this

 9        deposition I only -- I'm trying to spare

10        some trees so I only --

11              MS. ROBINSON:  Understood.

12        Q.    Looking on the second page of this

13   document, it indicates that on September 24,

14   2011, there were 91 total arrests.  Is that

15   accurate?

16        A.    September 24?

17        Q.    2011.

18        A.    Total of 91 arrests, that's

19   correct.

20        Q.    And of those 91 arrests six of

21   those defendants warranted, correct?

22        A.    Correct.

23        Q.    And 85 received dispositions,

24   correct?

25        A.    Correct.
```

1                     Gannon

2          Q.    And of those dispositions 43 were

3     dismissed, correct?

4          A.    I don't see that.  Where is that?

5          Q.    Underneath it says, "Dispositions

6     include" and the last thing there says

7     "dismissal 43."

8          A.    Oh, probably -- yes, it does.

9     43, dismissal 43.

10         Q.    So 43 of the 85 disposed of cases

11    were dismissed outright, correct?

12         A.    Correct.

13         Q.    Another 36 were dismissed pursuant

14    to an adjournment and contemplation of

15    dismissal, correct?

16         A.    Well, they weren't dismissed,

17    right?  They were ACD.

18         Q.    What does ACD stand for?

19         A.    Adjudicated contem- -- adjudicated

20    in contemplation for dismissal.

21         Q.    It's adjournment --

22         A.    Adjournment.  Thank you.

23         Q.    -- in contemplation of dismissal?

24         A.    Right.

25         Q.    In six months subsequent to the

```
                                      Page 91
 1                          Gannon
 2     date that the ACD is entered the case is
 3     dismissed and sealed.  Isn't that correct?
 4          A.     That's correct.
 5          Q.     So 43 were dismissed outright, 36
 6     were dismissed and sealed six months later.
 7     So that means 92 percent of the 85 arrests
 8     that were disposed were dismissed within six
 9     months, correct?
10               MS. ROBINSON:  Objection.  You can
11          answer.
12          A.     I'll trust you on the math, but
13     that sounds right.
14          Q.     Based on a 50 percent outright
15     dismissal rate and a 92 percent six-month
16     later dismissal rate what, if anything, did
17     the NYC do to avoid similar future arrests
18     that are inconsistent with constitutional
19     limits on police power?
20          A.     Well, in this case why these were
21     dismissed, that's up to the District
22     Attorney's office.  It's not the -- the Police
23     Department had probable cause to make the
24     arrest.  They present the cases to the
25     District Attorney and what the District
```

Page 92

```
 1                        Gannon
 2    Attorney chooses to do is certainly up to
 3    them, but probable cause for the -- there were
 4    probable cause to make these arrests and the
 5    District Attorney chose not to -- for whatever
 6    reason took the action they took.
 7         Q.    Thank you.  I'm going to ask the
 8    question again, because I'm not asking you why
 9    the cases were dismissed.  I'm not asking you
10    if there was probable cause.
11              I'm asking you based on the fact
12    that 50 percent of these arrests were
13    dismissed outright and 92 were dismissed
14    within six months, what if anything did the
15    City of New York do to avoid similar future
16    arrests that are inconsistent with the
17    constitutional limits on police power?
18         A.    I'm not sure you can draw that
19    conclusion that it's inconsistent with
20    constitutional power.  The District Attorney's
21    office has a wide range of discretion.  So why
22    they did this, I don't know.  Whether it
23    warrant correction, I don't think it would
24    warrant any correction by the City of New York
25    because we had probably cause to make the
```

```
                                      Page 93

 1                      Gannon

 2   arrests.

 3              (Reporter requested clarification.)

 4        A.    Because the arrests were based on

 5   probable cause.

 6        Q.    Did the NYPD or City of New York

 7   make any changes of police sidewalk protests

 8   as a result of the arrest of 9/24/11?

 9        A.    Not that I'm aware of.

10              MR. STECKLOW:  Off the record for a

11        second.

12              (Discussion off the record.)

13              MR. STECKLOW:  Back on the record.

14        Q.    Based on the dismissals of

15   92 percent of the arrests of that date, can

16   you identify anything New York City did to

17   avoid arrests that are inconsistent with

18   constitutional limits on police power?

19        A.    No.

20        Q.    Did the NYPD policing of the

21   sidewalk protest on 9/24/11 indicate to the

22   City of New York that the NYPD procedures

23   regarding policing of sidewalk protests were

24   sufficient to comply with constitutional

25   limits on police power?
```

```
                                      Page 94

1                            Gannon
2         A.     Read that one again, Wylie, please.
3         Q.     Did the NYPD policing of sidewalk
4    protests of 9/24/11 indicate to the City of
5    New York that the NYPD procedures regarding
6    policing of sidewalk protests were sufficient
7    to comply with constitutional limits on police
8    power?
9         A.     I'm not sure how to answer that.
10   Could you rephrase that or is it -- are you
11   married to that question, my friend?
12        Q.     I'm not married to anything at this
13   point.
14               MR. STECKLOW:  Off the record.
15               (Discussion off the record.)
16               MR. STECKLOW:  Back on the record.
17        Q.     I'm going to say it again and then
18   help me understand which part of it is
19   confusing.  Okay?
20               Did the NYPD policing of the
21   sidewalk protest on 9/24/11 indicate to the
22   City of New York that the NYPD procedures
23   regarding the policing of sidewalk arrests
24   were sufficient to comply with constitutional
25   limits on police power?
```

```
1                        Gannon
2              MS. ROBINSON:  For the record, are
3         you referring to the cases in 8?
4              MR. STECKLOW:  Yes.  And -- not
5         just the cases in 8, but all the arrests
6         of 9/24/11.  Not everybody sued.  There
7         were 91 arrests; 6 warranted, 85 disposed
8         and I think there were probably 30 or so
9         plaintiffs among those.
10        A.    I don't think -- I don't know if
11   it's responsive to the question or not.  I
12   don't think the City of New York required any
13   changing in the way sidewalk protests were
14   handled.
15        Q.    Can you identify any review by the
16   City of New York to the procedures utilized by
17   the NYPD in policing the sidewalk protests of
18   9/24/11?
19        A.    Are these the cases involving
20   Inspector Bologna?
21        Q.    Among others.
22        A.    I know inspector -- well, what was
23   your question again?
24        Q.    Can you identify any review by the
25   City of New York of the procedures utilized by
```

```
 1                          Gannon
 2    the NYPD in policing the sidewalk protests of
 3    9/24/11?
 4         A.     With respect to Inspector Bologna,
 5    Anthony Bologna, B-O-L-O-G-N-A, I know that
 6    the inspector was disciplined for what
 7    happened and that he wasn't indemnified and it
 8    was -- again, that was kind of a one-off as
 9    far as Inspector Bologna.  I don't think it
10    changed -- it didn't change policy because it
11    was kind of out of the norm of what the policy
12    would be.  So to that specific thing I would
13    say no.  The policy and procedures weren't
14    changed.  Inspector Bologna was disciplined
15    for his actions on that date.
16                 If I'm talking about the same
17    thing, that was when Inspector Bologna used
18    pepper spray on folks that were on the scene
19    that day.  As far as that's concerned, it
20    didn't change the policy because it was kind
21    of -- it was more of an issue with Inspector
22    Bologna and he was disciplined for that.  He
23    was disciplined, he was transferred, he was
24    not indemnified.
25         Q.     Okay.  My question didn't concern
```

```
                                        Page 97

 1                      Gannon
 2      Inspector Bologna so I'm going to go back and
 3      ask it again.
 4           A.    Okay.  But you said --
 5           Q.    And you can say, look, the possible
 6      answer is there was this one aspect of it that
 7      was Bologna, now let's look at another aspect.
 8           A.    That's fine, but Bologna --
 9           Q.    Other than the review you just
10      mentioned regarding Inspector Bologna, can you
11      identify any review by the City of New York
12      for procedures utilized by the NYPD in
13      policing the sidewalk protest of 9/24/11?
14           A.    Other than Inspector -- what I
15      mentioned about Inspector Bologna, no.
16           Q.    Did the City of New York consider
17      whether the procedures utilized by the NYPD in
18      policing sidewalk protests needed to be
19      reviewed based on the events of 9/24/11, other
20      than in regards to Inspector Bologna?
21           A.    No.
22           Q.    Did the City of New York consider
23      whether procedures utilized by the NYPD in
24      policing sidewalk protests needed to be
25      changed based on the events of 9/24/11?
```

```
 1                        Gannon
 2        A.    No in that, again, Inspector
 3   Bologna being the theme here for my
 4   perspective, his actions that day were out of
 5   the norm so that individually he was, again,
 6   disciplined and what I said before,
 7   disciplined, transferred, and he was not
 8   indemnified by the City of New York for his
 9   actions that day.  So the answer would be no.
10        Q.    Okay.  Other than what you
11   responded regarding Inspector Bologna, did the
12   City of New York consider whether the
13   procedures utilized by the NYPD in policing
14   sidewalk protests needed to be changed based
15   on the events of 9/24/11?
16        A.    No.
17        Q.    Now we're going to look at what is
18   on Exhibit 3 as number 11.  Now, you
19   previously testified that you did watch video
20   of the Bronx incident, correct?
21        A.    Correct.
22             MR. STECKLOW:  We're going to queue
23        up the video.  While we're doing that,
24        I'm going to ask you to mark this as
25        Exhibit 6.
```

1                          Gannon

2                    (Plaintiffs' Exhibit 6, letter dated

3               January 19, 2012, marked for identification,

4               as of this date.)

5                    MR. STECKLOW:  We are now going to

6          watch the video.  It's going to take a

7          few minutes and I am going to ask you

8          some questions.

9                    (Video played.)

10         Q.    I believe you are familiar with

11    this.

12         A.    Yes.

13                    (Video played.)

14                    MR. STECKLOW:  Let's mark this as

15         Exhibit 7.

16                    (Plaintiffs' Exhibit 7, letter dated

17              January 1, 2012, marked for identification,

18              as of this date.)

19                    (Video played.)

20         Q.    Are you familiar with this video?

21         A.    That's the most I've seen of it, so

22    I didn't see the whole thing previously.

23         Q.    You know there were complaints

24    filed about this incident?

25         A.    I don't know that, that there were

```
 1                        Gannon
 2    complaints filed about this incident.
 3         Q.    Do you know if there was an
 4    investigation involving this incident?
 5         A.    There was an investigation.  Not
 6    about this incident.
 7         Q.    Who undertook that investigation?
 8         A.    That I don't know.
 9         Q.    What was -- what did they do in
10    that investigation?
11         A.    I know the outcome of the
12    investigation was that it was determined that
13    the folks were at some point blocking the
14    sidewalk with maybe furniture or some sort of
15    other chairs or some sort of maybe a table and
16    chairs.  Something like that.  So an internal
17    investigation revealed that it was -- they
18    were blocking the sidewalk at some point.
19         Q.    So the result in the investigation
20    was that that was appropriate police conduct?
21         A.    That they were -- that they had
22    probable cause because they were blocking the
23    sidewalk at some point.
24         Q.    I'm not asking about some point.
25    I'm asking if --
```

```
 1                      Gannon
 2            According to this video, there were
 3     five arrests.  We saw at least two of them.
 4     I'm asking if the results of the investigation
 5     were that those arrests were appropriate
 6     arrests.
 7            A.    I don't think the investigation
 8     determined what the -- whether there was
 9     probable cause or not for the arrest.  There
10     was probable cause -- well, they arrested them
11     based on probable cause.  They can't determine
12     that from the video what happened.  You know,
13     the video doesn't show you what happened as
14     far as them getting arrested.
15            Q.    The video is approximately ten
16     minutes long, correct?
17            A.    Okay.  I didn't measure it.  That's
18     fine.
19            Q.    Approximately?
20            A.    Approximately.
21            Q.    And you can see a very wide
22     sidewalk with not many people on it, correct?
23            A.    Well, at the point of the arrest
24     that we saw the video always gets there after
25     the person was arrested.  So I can't tell you
```

```
                                      Page 102

 1                        Gannon
 2    what the basis of the arrest was based on the
 3    video that I saw.
 4         Q.    Did you see any pedestrians being
 5    blocked in the video?
 6         A.    I did not, no.
 7         Q.    In order to make an arrest --
 8    withdrawn.
 9              In order to make an appropriate
10    arrest for blocking pedestrian traffic, is it
11    required that, in fact, pedestrian traffic be
12    blocked?
13         A.    In this case I don't know what was
14    the basis of it because it doesn't show that
15    on the video.  Every time the guy with the
16    video camera gets there it's -- the event is
17    already done.  So I can't tell you what they
18    were, you know, what the nature of it was
19    because we don't see that on the video.
20         Q.    That wasn't my question so I'm
21    going to go back and ask the question again.
22    Listen to my question and please answer the
23    question that I'm asking.
24              In order to effectuate a
25    constitutionally appropriate arrest for
```

```
 1                         Gannon
 2    blocking pedestrian traffic, is there a
 3    requirement that, in fact, a pedestrian be
 4    blocked on the sidewalk?
 5         A.     In general?  Yes.
 6         Q.     Not in general.  Specifically.  Is
 7    that required?
 8         A.     To be arrested for blocking
 9    pedestrian traffic do you have to block a
10    pedestrian?
11         Q.     Yes.
12         A.     Yes.
13         Q.     Were you able to see any
14    pedestrians in this video being blocked, at
15    any time?
16         A.     I did not see that in the video,
17    but that doesn't mean it didn't happen.
18         Q.     So just to be clear.  The position
19    the City of New York is taking with regards to
20    the incident that's depicted in this video on
21    December 3, 2011 is that the police acted
22    appropriately and within constitutional
23    limits?
24         A.     Yes.
25         Q.     And that the arrests were
```

1                        Gannon
2    consistent with the constitutional limits of
3    police power?
4         A.    Yes.
5              MR. STECKLOW:  Okay.  Let's take a
6         quick break.  The time is now 12:38.
7              (Recess taken.)
8              MR. STECKLOW:  The time is now 1241
9         and we are back on the record.  We are
10        still at my office at 217 Centre Street.
11        Q.    We're now going to look at, on D3,
12   I believe it is going to be number 12.  This
13   is a January 1, 2012 incident.
14        A.    Number 12 or number 13?
15        Q.    12 is January 1st, 2012.
16        A.    Correct.
17        Q.    The Peat matter?
18        A.    Yes.
19        Q.    Are you familiar with the facts and
20   circumstances of this incident?
21        A.    No.
22        Q.    I'm going to now show you what has
23   been marked as -- I'm not going to ask you to
24   read the whole thing.  Okay?  I'm just going
25   to ask you to hold this, what has been marked

Page 105

```
 1                       Gannon
 2    as Plaintiff's 7.  We have skipped 6 and I'm
 3    aware of that.  We will come back to it.
 4              So I'm not asking you to read the
 5    whole thing because I don't want to spend 10
 6    minutes watching you read it.  I'm just asking
 7    if you have ever seen this document before.
 8         A.    No.  The question was did I ever
 9    see this before, right?
10         Q.    Yes.  And what you are looking at,
11    which is Exhibit 7, is an unusual incident
12    report filed concerning the incident of
13    January 1, 2012, correct?
14         A.    An unusual occurrence report.
15         Q.    An unusual occurrence report.
16    Thank you.
17         A.    Dated January 1, 2012.
18         Q.    And the author, I believe, is
19    Deputy Inspector Brandon del Pozo?
20         A.    Correct.  Del Pozo.  D-E-L
21    P-O-Z-O.
22         Q.    Do you know whether the NYPD or the
23    City of New York undertook a review of the
24    procedures utilized by the NYPD in policing
25    the sidewalk protest of January 1, 2012
```

Page 106

1                              Gannon

2      regarding constitutional limits on police

3      power?

4          A.    I do not know.

5          Q.    Can you identify any review by the

6      City of New York of the procedures utilized by

7      the NYPD in policing the sidewalk protest of

8      January 1, 2012, regarding constitutional

9      limits on police power?

10         A.    No.

11         Q.    Did the NYPD policing of that

12     sidewalk protest comply with the

13     constitutional limits on police power?

14         A.    I don't know.

15         Q.    Did the City of New York consider

16     whether the procedures utilized by the NYPD in

17     policing sidewalk protests needed to be

18     reviewed based on the events of that sidewalk

19     protest of January 1, 2012?

20             MS. ROBINSON:  Objection.  Beyond

21         the scope.

22         Q.    You can answer.

23         A.    I don't know.

24         Q.    Did the City of New York consider

25     whether procedures utilized by the NYPD in

Page 107

1                          Gannon

2    policing sidewalk protests needed to be

3    changed based on the policing of the sidewalk

4    protest of January 1, 2012?

5              MS. ROBINSON:  Same objection.

6         A.    I don't know.

7         Q.    Okay.  We're going to move on to

8    number 13 on the list.  We're going to watch

9    the video in a second, but before we do I'm

10   going to ask you if you are familiar with the

11   facts and circumstances of the incident of

12   February 29, 2012, in front of Zucotti Park.

13             MS. ROBINSON:  Objection.  Beyond

14        the scope.  You can answer.

15        A.    February 29th?  I don't think I

16   am familiar with the events of this day.

17   Koznar?  I don't think so.  The video may

18   refresh my memory.  Off the top of my head, I

19   don't think so.

20             MR. STECKLOW:  Let's watch the

21        video.  It's two minutes.

22             (Video played.)

23             MR. STECKLOW:  Stop it for one

24        second.

25        Q.    I'll tell you when we're going to

```
                                    Page 108

 1                    Gannon

 2   see Koznar.

 3        A.    Okay.

 4        Q.    That's not -- this is not Koznar.

 5        A.    Okay.

 6              (Video played.)

 7        Q.    This is Koznar.

 8        A.    This guy with the red?

 9        Q.    Yes.

10              In watching this video, did you

11   identify any pedestrians that were being

12   blocked on the sidewalk?

13        A.    No.  I couldn't.  I couldn't

14   determine very much from that video.  It

15   doesn't really show you the whole scope of the

16   sidewalk.

17        Q.    Could you identify any pedestrians

18   that were being blocked on the sidewalk by

19   watching this video?

20        A.    I could not determine that from

21   this video.

22        Q.    Did you see any pedestrians being

23   blocked on the sidewalk in this video?

24        A.    I could not determine that at all

25   based on this video.
```

```
 1                         Gannon
 2        Q.    I'm not asking you if you
 3   determined.  I'm asking whether you saw any
 4   pedestrians being blocked on the sidewalk from
 5   watching this video.
 6        A.    As limited as the focus was on this
 7   video, it doesn't show you the whole scope of
 8   what's going on there.  I couldn't tell you if
 9   there were pedestrians on the sidewalk, they
10   were not on the sidewalk.  I can't tell from
11   this video.  That's -- I mean the quality is
12   much better than the first video.  You're
13   getting better as we go along.  That
14   determination, I couldn't tell you.  I could
15   not tell you.
16        Q.    That didn't look to you to be a
17   wide open sidewalk with people lined up on one
18   side of it with the police in the middle?
19        A.    No.
20        Q.    What did you see?
21        A.    That's the front of --
22        Q.    Zucotti Park?
23        A.    Not the front.  It's the Broadway
24   side of Zucotti.  So you couldn't even see
25   behind the folks there.  There's steps behind
```

```
                                  Page 110

 1                       Gannon

 2     that.  So you couldn't even see that in the

 3     video, where the steps are.  So I couldn't

 4     tell you if there's people walking behind them

 5     or not.  The shot was so tight.  I couldn't

 6     tell.

 7          Q.    But the steps, are those part of

 8     the sidewalk?

 9          A.    The steps are the steps.  There is

10     no steps on sidewalks.

11          Q.    I didn't ask you if pedestrians are

12     being blocked on the steps.  I'm asking if

13     they're being blocked on the sidewalk.

14               You can see -- you can see the

15     entirety of the sidewalk from the curb where

16     the police vehicles were on the sidewalk where

17     the police were to the edge of the sidewalk

18     towards the steps where the civilians were.

19     And did you see any pedestrians that were

20     being blocked by those individuals, the

21     civilians?

22          A.    I got the question.  My response is

23     that I can't tell you if there were

24     pedestrians back there because the video is so

25     tight that I can't make that determination,
```

1                           Gannon

2     whether there were or there were not.  There

3     is no -- there is no way of telling that from

4     what I saw.

5          Q.    And what investigation did you do

6     in preparation for today's deposition to

7     answer questions about this incident?

8          A.    This?  Nothing.

9          Q.    Did you believe that Mr. Koznar's

10    arrest is consistent with the constitutional

11    limits on police power?

12         A.    I have no idea.  I can't determine

13    that from the video.

14         Q.    Let's go back to the moment when

15    they grabbed Mr. Koznar.  You can see the

16    cameras focuses -- faces him.  Play it there

17    and I will tell you when to stop.

18              (Video played.)

19              MR. STECKLOW:  Stop it.

20         Q.    Now you can see behind them on the

21    steps.  Now you can see into the park at that

22    angle, correct?

23         A.    You can see into the park, correct.

24         Q.    Do you see any civilians, any

25    pedestrians, anyone being blocked by

```
                               Gannon
 1
 2    Mr. Koznar as he stands there?
 3         A.    In this particular frame?  No.
 4         Q.    So based on the stoppage of the
 5    video here and knowing that this is
 6    approximately two seconds after one officer
 7    pointed at him and said "Take him," what do
 8    you believe is the probable cause for his
 9    arrest?
10         A.    You're making the assumption that
11    at that moment in time he did something wrong.
12    Mr. -- Mr. Koznar -- is that his name?
13    Mr. Koznar?  He could have done something
14    previously and they're basing the arrest on
15    that.  I don't know what they're basing the
16    arrest on is my point.
17              It may not be that one particular
18    time when the -- I don't know who says that,
19    but whoever directs that he be arrested.  It
20    doesn't necessarily have to mean that.  One --
21    when he said that, it doesn't have to be a
22    crime committed at that point or probably an
23    offense committed at that point.
24              (Reporter requests clarification.)
25         A.    I said "crime."  I corrected it to
```

Page 113

1                          Gannon
2    be "offense."
3                It could have been an offense
4    committed at that moment.  So I don't know.
5    Based on -- based on what I'm seeing in the
6    video that you showed me so far, I cannot
7    possibly tell you what the -- why Mr. Koznar
8    was arrested.
9         Q.    Was Mr. Koznar blocking pedestrian
10   traffic from the video that you have seen?
11        A.    In this particular frame it doesn't
12   appear to be blocking pedestrian traffic.  I
13   don't know the gentleman to his left, I don't
14   know if he's part of the protest or not.  I
15   don't know who he is.  I don't know whether he
16   was walking.  I don't know.  You can't
17   determine it based on the video I've seen.
18        Q.    Well, if there's -- you're pointing
19   to one individual with a beard, correct?
20        A.    Yes.
21        Q.    Now, we have seen the sidewalk is
22   barely empty, other than Police Officers.  So
23   if that individual who was not a protestor was
24   seeking to traverse that sidewalk he would
25   have absolutely no difficulty traversing that

```
 1                          Gannon
 2     sidewalk.  So I'm trying to understand.  Do
 3     you see a basis for Mr. Koznar's arrest in the
 4     video that you have watched?
 5          A.    I can't make a determination based
 6     on what I've seen here to answer that question
 7     directly.
 8          Q.    I'm not asking you to look outside
 9     the scope.  I'm asking you looking at the
10     video, based on what you can see, do you see a
11     basis for his arrest?
12          A.    I -- I don't know what happened off
13     camera.  I just can't -- I can't give you a
14     full answer on that.  I can't give you a
15     genuine answer on that based on what happened.
16               I don't know what the officer saw
17     or more in particular the person who directed
18     the arrest, I don't know who that was who
19     directed the arrest saw.  I don't know what
20     the basis was for that arrest.  I don't know
21     what the video camera showed.  I don't feel
22     comfortable saying "yes" or "no" depending on
23     what -- based on what I've seen.
24          Q.    Is there anything in the video that
25     shows the basis for the arrest?
```

Page 115

1                        Gannon

2        A.    No.  But I -- I just don't know

3   what happened when it was off camera.

4        Q.    Do you know if the City of New York

5   undertook any investigation into the police

6   practices based on the arrest of Mr. Koznar?

7        A.    I don't.

8        Q.    Do you know if the City of New York

9   made any changes to the police practices on

10  the limits of constitutional -- withdrawn.

11            Do you know if the City of New York

12  made any changes to police practice based on

13  the arrest of Mr. Koznar?

14       A.    The City of New York wouldn't make

15  changes based on -- based on an individual

16  arrest.

17       Q.    So do you know if the City of New

18  York made any changes to the police practices

19  based on this arrest?

20       A.    I don't think so.

21       Q.    Did the City of New York consider

22  whether the procedures utilized by the NYPD in

23  policing the sidewalk protest in front of the

24  Zucotti Park needed to be reviewed based on

25  the events in this arrest?

Page 116

1                        Gannon

2        A.      No.

3        Q.      Did the City of New York consider

4    whether the procedures utilized by these

5    officers in policing the sidewalk in front of

6    the Zucotti Park needed to be changed based on

7    the events?

8        A.      Start again.  I missed the

9    beginning of the question.

10       Q.      Did the City of New York consider

11   whether the procedures utilized by the NYPD in

12   policing the sidewalk in front of Zucotti Park

13   needed to be changed based on this arrest?

14       A.      No.

15              MR. STECKLOW:  Let's go off the

16         record.  I think this is a good time to

17         break for lunch.

18           (Luncheon recess taken at 12:58 p.m.)

19                     --o0o--

20     A F T E R N O O N    S E S S I O N

21              (Time noted:  1:46 p.m.)

22   L T.   D E N N I S    G A N N O N, resumed and

23         testified as follows:

24   CONTINUED EXAMINATION

25   BY MR. STECKLOW:

1                    Gannon

2          MR. STECKLOW:  The time is now

3      1:47.  We're back on the record.  We have

4      all the same parties here except Carrie

5      Talansky has left the building and is no

6      longer here.

7          Q.   We are going to continue now and we

8      are going to look at some video that was

9      turned over by the City of New York from

10     September 17, 2012.  So can we turn that

11     around.  This, I think, it was identified as

12     LMSI video or CCTV video.  I'm not sure

13     exactly the right term to -- but I think it's

14     the stuff that comes out from the cameras that

15     are streetlights.

16              So this is from the morning of

17     September 17, 2012.  You can see it's about

18     7:41.  We are looking north on Broadway at the

19     intersection of Wall Street.

20                  (Video played.)

21         Q.   What I would like to identify in

22     the video that we are watching is you can see

23     a crosswalk at the bottom of the screen.  Is

24     that correct, Lieutenant?

25         A.    Correct.

Page 118

                              Gannon

1

2        Q.     And the crosswalk seems to be open,

3    correct?  There seem to be barricades on both

4    sides of Broadway, but at the crosswalk the

5    barricades are open to allow for access, I

6    guess, to cross the street.  Is that accurate?

7        A.     Correct.

8        Q.     Have you seen LMSI video before?

9        A.     No.

10       Q.     My understanding is that they are

11   at times monitored by individuals and they may

12   not be city employees.  It is an entity that

13   exists as in relationship between big

14   corporations downtown and the City of New York

15   and NYPD.  I think LMSI stands for Lower

16   Manhattan Security Initiative.

17       A.     Lower Manhattan Security.  Yes,

18   that's correct.  I don't know if the

19   characterization is big corporations.  I know

20   it's a -- it's a team effort.  I'm not sure --

21   I'm not sure who the parties are exactly, but

22   it is a group effort though.

23       Q.     What I am trying to point out is

24   that I believe these cameras are at times

25   monitored and people can move the camera left,

```
                                          Page 119
 1                         Gannon
 2    move it right, focus in, pull out, things like
 3    that.
 4         A.    Okay.
 5         Q.    And then I think at some point we
 6    are going -- whoever is observing is going to
 7    change the angle of --
 8         A.    Oh, I gotcha.
 9               (Reporter requested clarification.)
10         Q.    -- the camera.  Whoever is
11    observing this camera is going to change the
12    angle of the camera.
13               Right now at 7:43 a.m., would you
14    agree that the sidewalks on both the east and
15    west side of Broadway as it approaches Wall
16    Street are -- pedestrians are able to walk
17    freely on both sides?
18         A.    Yes, I would agree with that.
19         Q.    I'm going to move it so that it
20    goes a little faster so we can watch it in --
21    so now I've made it so the video will play a
22    little faster and I will stop it when I think
23    we get to a good time.  We can see pedestrians
24    crossing at the crosswalk, correct?
25         A.    Yes.
```

```
                                              Page 120

 1                          Gannon
 2               (Video played.)
 3        Q.    As we are watching it, we can see
 4   that pedestrians and vehicular traffic are
 5   able to move on the sidewalks and the road,
 6   correct?
 7        A.    Yes.
 8        Q.    Now we start to see on the west
 9   side of the street the barricade being
10   maneuvered, correct?
11        A.    Yes.
12        Q.    It's approximately 7:46 and 42
13   seconds.  We see Police Officers moving the
14   barricades on the east -- west side of the
15   street, correct?
16        A.    Correct.
17        Q.    And as I stop it again we are now
18   at 7:47 and 37 seconds.  On the west side of
19   the street the police have now closed the
20   crosswalk by putting barricades up; is that
21   correct?
22        A.    There is barriers there.  I would
23   like to see if anybody tries to cross that
24   way.  I just don't know if --
25        Q.    And on the west side of the street
```

                        Gannon
1    a line of blue shirt Police Officers seem to

2    be lining up and I believe they will, in a few

3    seconds, close off the crosswalk on the west

4    side of the street.

5          I ask you to focus on that.

6    A.    Sure.

7          (Video played.)

8    Q.    So we're now at 7:48 and although

9    the police have closed off partially the

10   crosswalk, they are allowing certain people to

11   cross street, correct?

12   A.    People are crossing the street.

13   Whether Police Officers allowed them to cross

14   the street or not, but there are some people

15   crossing the street.  It looks like there is a

16   Police Officer getting ready to plug a hole

17   that was there.

18   Q.    Are the police arresting anybody

19   who is crossing the street?

20   A.    Not in the video.

21   Q.    Okay.  So we now stopped it at

22   7:48, around 43 seconds and whoever was

23   observing this camera just moved the angle; is

24   that correct?

Page 122

1                        Gannon

2        A.     Correct.

3        Q.     And so we can no longer see the

4    west side of Broadway, correct?

5        A.     Correct.

6        Q.     You can only see the east side of

7    Broadway, correct?

8        A.     Correct.

9        Q.     And on the east side of Broadway we

10   see there are now a lot of pedestrians on the

11   sidewalk, correct?

12       A.     Yes.  I would probably describe

13   them as protestors, but there are more --

14   there are -- yeah.

15              I would say they're protestors

16   because they have banners and stuff like that.

17   So they're protestors on the east side of

18   Broadway.

19       Q.     And the people who you described as

20   protestors could no longer traverse down south

21   on Broadway as had been happening five minutes

22   earlier, correct?

23       A.     Correct.  It appears they've

24   stopped.

25              MR. STECKLOW:  And I think --

```
                                      Page 123

 1                       Gannon

 2               I'm going to let it go a little bit

 3          and then we're going to watch another

 4          video to show why it was that they

 5          stopped.

 6               (Video played.)

 7          Q.    Can you tell from this video why

 8     they stopped?

 9          A.    No.

10               MR. STECKLOW:  I am going to slow

11          it down for a second so we can see it in

12          real time.

13               (Video played.)

14          Q.    I'm asking you to look down on the

15     right-hand side.  Can you see the individual

16     who looks like he's wearing a pink top?  Now

17     you can only see his head?

18          A.    Yeah, I see the pink top.  Yes.

19          Q.    That is Plaintiff Bishop Packard.

20     See he was in sort of the front of the people

21     on Broadway who had stopped and were no longer

22     able to traverse south, correct?

23          A.    Correct.

24          Q.    And there are many people behind

25     him, correct?
```

```
                                              Page 124

 1                        Gannon
 2         A.    Yes.
 3               MR. STECKLOW:  We can now see
 4         Bishop Packard again and you may not be
 5         able to tell from this angle, but I
 6         believe at this point he had handcuffs
 7         placed on him and he's under arrest.
 8         Let's stop it here.
 9         Q.    We are now at 7:54 and 53 seconds
10    a.m.  Can you see that?
11         A.    Oh, yes.  Yes.
12         Q.    Okay.  And now the camera angle has
13    moved again slightly to show a little bit
14    wider angle, correct?
15         A.    Correct.
16         Q.    And you can see a little bit of the
17    sidewalk on the west side of Broadway,
18    correct.
19         A.    Correct.
20         Q.    So I'd like you to see if by
21    observing that you can see if people are --
22    pedestrians are able to traverse the sidewalk
23    on the west side of Broadway at this point.
24               (Video played.)
25         Q.    The angle is now completely moved
```

Page 125

```
 1                        Gannon
 2    and we can see the west side of the Broadway
 3    sidewalk, correct?
 4         A.    Correct.
 5         Q.    And are you able to see if
 6    pedestrians are able to move on the west side
 7    of Broadway at this point?
 8         A.    It appears there are pedestrians
 9    walking on the sidewalk, on the west side.
10         Q.    And the time is 7:55 and 20
11    seconds?
12         A.    Yes.  I'm sorry.  I didn't know
13    that was a question.  I thought it was a
14    statement.
15         Q.    And as we're watching we can see
16    certain individuals being allowed to move
17    outside of the police area up and down in the
18    street, correct?
19         A.    I would think that those folks are
20    unable to go up the sidewalk because of the
21    protestors on the east side of the sidewalk so
22    they're trying --
23               (Reporter requests clarification.)
24         A.    I would think they're trying to get
25    to work.  They're unable to walk on the
```

Page 126

```
                                    Gannon
 1
 2      sidewalk because it's obstructed so they're
 3      trying to figure out a way to get around it
 4      some how to go to work.
 5          Q.    And so they're?
 6          A.    I shouldn't say go to work.  Go
 7      about their business.
 8          Q.    They're being allowed to maneuver
 9      outside of the police barriers in order to get
10      to work, as you stated?
11          A.    I don't know if they're being
12      allowed to do it.  There are people clearly
13      uninterested in the sidewalk protest and
14      they're trying to go around it.  Now whether
15      they're allowed to do it or not, they are
16      doing it.  It's just a matter of, you know, if
17      they found -- if they found a way they're
18      trying to, you know, get around this event to
19      get to where they have to go.
20          Q.    Are the police preventing them from
21      doing this?
22          A.     Are the police preventing the
23      other -- we'll call them the other people for
24      now.  Are they preventing them from doing it?
25      Well, all right.  To me it looks like they're,
```

```
 1                        Gannon
 2    right there, providing an access to where
 3    people had to go around so they're trying to
 4    let them go around the demonstration area
 5    there.
 6         Q.    Okay.  I'm going to now -- now it
 7    seems like the pedestrians on the east side
 8    are starting to move north on the sidewalk.
 9         A.    Just let this run for a couple of
10    seconds.  Let me see.  To me it looks more
11    like a churning than a movement, but I just
12    want to --
13              (Watching video.)
14         A.    No.  Some people are -- yeah.  Some
15    people are walking north on the east side.
16              (Reporter requests clarification.)
17         A.    Some people are walking north on
18    the east sidewalk and there is still a group
19    that's in the original position there towards
20    the front of the demonstration.
21         Q.    Right in the middle of that group
22    seems to be a white shirt Police Officer?
23         A.    Yes.
24         Q.    And a lot of the others seem to be
25    photographers?
```

```
                                Gannon
 1
 2        A.      To tell you the truth, I can't
 3    tell.
 4        Q.      Okay.  During the preceding five or
 5    so minutes that were depicted here was that
 6    crosswalk that we talked about earlier open or
 7    closed to pedestrian traffic?
 8        A.      It appeared to be closed to
 9    pedestrian traffic, that crosswalk.
10        Q.      Now I would like us to watch a
11    video so we can see what is happening
12    underneath that's -- obviously the angle is
13    blocked by a building from what's below the
14    camera level.  So I think we do have an angle
15    from a Taru video.
16              (Reporter requested clarification.)
17              MR. STECKLOW:  From a Taru video.
18         T-A-R-U.  We are going to take a quick
19         break and go off the record.
20              (Discussion off the record.).
21              MR. STECKLOW:  The time is now 2:03
22         and we are back on the record.
23              Now I'm going to have us watch
24         another video that was from approximately
25         the same exact time, but from a different
```

```
                                             Page 129
 1                        Gannon
 2         angle, at the same location.
 3                 (Video played.)
 4         Q.    So now we're looking -- I believe
 5    we're looking north on Broadway at the
 6    intersection of Wall Street from underneath
 7    the scaffolding that was being blocked.
 8         A.    Okay.
 9         Q.    And what is it you can see as
10    you're looking more?
11         A.    I see the sidewalk full of
12    protestors.  I see a police presence in front
13    of them and I see some folks with cameras to
14    the left of -- to my left, which would be to
15    the west of the sidewalk.
16                 MR. STECKLOW:  So since the police
17         present is in front of the protestors, I
18         want you to watch it a little bit and let
19         me know if you believe that is the police
20         presence that stopped the protestors from
21         moving further south or east at this
22         point.
23                 (Video played.)
24         Q.    So the camera angle has just panned
25    down a little bit and I think we can actually
```

```
                                    Page 130
 1                     Gannon
 2    see the corner of Wall Street for a second,
 3    and we see barriers there with Police Officers
 4    behind it.  Is that accurate?
 5         A.    Yes.
 6         Q.    And for about 10 feet from that
 7    corner heading north it's all Police Officers.
 8    Is that accurate?
 9         A.    Yes.  Well, police officers
10    generically speaking, right?  Not the --
11         Q.    Not the ranked --
12         A.    Right.
13         Q.    -- police officer.  MOS.
14         A.    Yes.  Correct.
15         Q.    These are all members of the
16    service, correct?
17         A.    That's better, yes.
18         Q.    So the protestors aren't actually
19    at the barrier of Wall Street.  They are, you
20    know, some 10 or more feet beyond that as they
21    were heading south for anyone to get to that
22    particular intersection because of the police
23    presence.  That's what seems to be depicted
24    here.
25         A.    Well, I don't know why they stopped
```

```
 1                        Gannon
 2     there.  Whether they stopped and the police
 3     came in in front of them afterwards, because
 4     the previous shot they showed us we had the
 5     scaffold in the way.
 6              Here the Police Officers at the
 7     lower part are behind barriers that would --
 8     that are at the mouth of or the -- not the
 9     mouth.  The street of Wall Street there.  Is
10     that -- did I make that clear?
11          Q.    Yes.
12          A.    So -- but -- so I can't tell you
13     whether the Police Department stopped them or
14     did they stop there because it's Wall Street.
15     I don't know.  I couldn't tell from the
16     previous video and this video here.  We're
17     there, but I don't know if we're there because
18     they stopped or we stopped them.  I don't
19     know.
20              (Video played.)
21          Q.    From watching the video, it doesn't
22     seem the police are allowing people to
23     continue south on Broadway.  I have stopped
24     the video now at 1:08, time.  I'm asking you
25     if it seems like the people cannot traverse
```

Page 132

1                              Gannon
2    south because of the police presence.
3         A.    I'm going to break it up into two
4    groups here.  The protestors and regular
5    people or non-protestors.  Let me put it that
6    way.  Before, the previous video, there were
7    people traveling south that were allowed to
8    travel south.  See, these demonstrations we
9    try to -- we, NYPD, try to strike a balance as
10   to people who want to protest, that's great,
11   and people who want nothing to do with the
12   protest and just want to get to work.  It's
13   8 o'clock in the morning.  I use "work"
14   generically.  People want to go about their
15   business or get to where they have to go.
16               Here it seems like the protest
17   group has stopped at the -- at the -- at Wall
18   Street while other folks who may have been
19   walking south not really paying attention to
20   who they're with have been bleeding out and
21   walking south which we saw in the previous
22   video, and continue to walk south down to --
23   south of Wall Street.
24               There are also people coming up
25   walking north on Broadway and that were kind

```
 1                         Gannon
 2    of cutting over and going across to the west
 3    side of Broadway.  That's -- that's how I
 4    would describe what I see.
 5         Q.    Are you familiar with the
 6    allegations of this lawsuit?
 7         A.    I don't believe so, no.
 8         Q.    This is the lawsuit that you are
 9    here to testify about, correct?
10         A.    Packard.  This is Packard; is that
11    right.
12         Q.    Yes.  And so you're unfamiliar with
13    the factual basis of whether or not the
14    protestors claim the police blocked their path
15    at that point to further go east, west or
16    south?
17         A.    I'm not familiar with that.  That's
18    correct.
19         Q.    And from watching this you can't
20    count 20 or more Police Officers between the
21    protestors and Wall Street and understand that
22    the protestors had an inability of proceeding
23    any further south than they already were
24    because there are possibly at least 20
25    officers in this shot between them -- between
```

```
 1                        Gannon
 2    the protestors and Wall Street?
 3         A.    Well, you asked me previously, did
 4    the Police Department stop them from traveling
 5    south.  I told you I couldn't make that
 6    determination because I don't know whether
 7    they stopped themselves and then we came in
 8    front of them or -- or we stopped them from
 9    traveling south.  I couldn't tell you because
10    you couldn't determine that from the video.
11              Now, they're not traveling south
12    and we are in front of them.  So we may be
13    preventing them from going further south.
14         Q.    Have you spoken to any of the
15    officers that were present on the scene before
16    today's deposition in order to prepare for
17    these questions?
18         A.    No.
19         Q.    Do you know who the highest ranking
20    officer was on this scene?
21         A.    No.
22         Q.    Do you recognize the individual I'm
23    pointing to now who is in a white shirt and is
24    wearing what I have been told is the spaghetti
25    on the -- is that the right term?
```

                                                    Page 135

1                           Gannon

2          A.      Scrambled eggs.

3          Q.      -- scrambled eggs that indicates it

4    is, I believe, a high ranking officer?

5          A.      I believe that's Chief Harry Wedin.

6    W-E-D-I-N.

7          Q.      Did you see Chief Purtell in this

8    video at some point?

9          A.      I haven't seen Chief Purtell yet.

10                 MR. STECKLOW:  Off the record.

11                 (Discussion off the record.)

12                 MR. STECKLOW:  Back on the record.

13         Q.      At this point the police are not

14   allowing the protestors to move south.  In the

15   video at this point we're watching.  The

16   police are not allowing the protestors to move

17   further south.

18         A.      Right.

19         Q.      Is that accurate?

20         A.      Yes.

21         Q.      Do you have any understanding as to

22   why they would stop the protestors from

23   proceeding south?

24         A.      I do not.

25         Q.      Do you have a reason to understand

```
                                Gannon
 1
 2    why they would not allow them to proceed east
 3    on Wall Street?
 4         A.    No, I do not.
 5         Q.    Do you --
 6         A.    I'm sorry.  Let me back up.  I had
 7    my direction wrong.  I thought you were
 8    talking about crossing -- crossing Broadway to
 9    go -- that would be west, not east.
10              (Reporter requested clarification.)
11         A.    I misunderstood what he said.  I
12    thought he was talking about going west on --
13    going west to cross the street which is, upon
14    further consideration, was not what he meant.
15    He meant the opposite.  He said going east,
16    east on Wall Street.
17         Q.    I'm going to withdraw it and ask
18    the question again for a clean record.
19         A.    Okay.
20         Q.    You have already testified that at
21    this point in the video the officers are not
22    allowing the protestors to proceed south on
23    Broadway past Wall Street, correct?
24         A.    Correct.
25         Q.    Are the Police Officers allowing
```

```
 1                         Gannon
 2    them to go west in the crosswalk to the other
 3    side of the sidewalk on Broadway?
 4         A.    It appears no.
 5         Q.    Are the police officers allowing
 6    them to go east into Wall Street?
 7         A.    No.
 8         Q.    Do you have a reason -- Do you
 9    understand why they couldn't allow the
10    protestors to go south?
11         A.    No.
12         Q.    Do you have a reason or an
13    understanding as to why the officers couldn't
14    let the protestors cross Broadway and go to
15    the west side of the sidewalk?
16         A.    No.
17         Q.    Do you have a reason or an
18    understanding as to why --
19         A.    Other than -- let me clarify that.
20    Other than a large group like that.  You have
21    traffic coming south on -- south on Broadway,
22    so to let the large group cross may impede
23    traffic for more than the normal cycle of
24    lights.  So that would -- it would impact
25    traffic coming south on Broadway if you let
```

```
 1                           Gannon
 2    them go west on -- go west across Broadway.
 3         Q.    How many lanes of traffic are on
 4    Broadway around Wall Street?
 5         A.    I want to say it's four.  One, two,
 6    three, four.  I believe it's four.
 7         Q.    And how many were open to vehicular
 8    traffic at this point from the video?
 9         A.    From -- based on the previous one,
10    I believe traffic was flowing south on
11    Broadway.  I don't think it had stopped.  I
12    think it was flowing.
13         Q.    And how many lanes was traffic
14    flowing in?
15         A.    I saw at least two.  Because I saw
16    traffic.  I saw a big bus.  The previous
17    video, not this video, but the previous but --
18    it was a bus and there was other folks in two
19    lanes.  So -- that was from the previous
20    video.
21         Q.    Okay.  I believe, and we'll get
22    back to that previous video.  I believe that
23    there was one lane of traffic open.  I think
24    the second lane of traffic had a line of
25    police vehicles in it?
```

```
                                    Page 139

 1                      Gannon

 2        A.    Could be.

 3        Q.    And so my question --

 4        A.    At some point -- well, at some

 5   point.  Don't forget.  We watched that video

 6   from -- we watched that video from the --

 7        Q.    We watched about 7 to 10 minutes of

 8   the video?

 9        A.    And early on it was, you know,

10   traffic was flowing south on Broadway.

11             MR. STECKLOW:  Put the other video

12        back on.

13        Q.    While we are doing that, let me ask

14   you.  Do you have a reason as to why the

15   officers wouldn't allow the protestors to turn

16   east onto Wall Street?

17        A.    I would think because the New York

18   Stock Exchange is east on Broadway -- east on

19   Wall Street.  So on this day, I believe --

20   this is the anniversary date, correct?  Yeah.

21   So I think the anniversary date there was --

22   the protestors had made some statements as

23   they wanted to shut down Wall Street.  So to

24   let them go down Wall Street would create a

25   problem.
```

```
                                      Page 140

 1                      Gannon
 2        Q.    So the reason they weren't allowing
 3    them to turn east was to avoid creating a
 4    problem?
 5               MS. ROBINSON:  Objection.  You can
 6         answer.
 7        A.    Avoiding -- avoiding shutting down
 8    the stock exchange.
 9        Q.    And there are further intersections
10    between Wall Street and Broadway and the
11    entrance to the stock exchange, are there not?
12        A.    Say that again.
13        Q.    There are further intersections
14    after Broadway and Wall Street before you
15    would get to the entrance of the stock
16    exchange, correct?
17        A.    No.  If you go east on Broadway --
18    east from Broadway down -- from Broadway east?
19        Q.    Uh-huh.
20        A.    No, no.  The stock exchange is --
21        Q.    Isn't it the federal building there
22    with George Washington in front?
23        A.    Yeah, but that's -- if you get
24    to -- I'm sorry.  Finish your question.
25        Q.    And isn't the stock exchange
```

Page 141

1                          Gannon

2     cater-corner to that statue?

3          A.    It's opposite.  Cater-corner it's

4     on the opposite corner, but there's no --

5     there's no intersections between Broadway and

6     I don't remember what that -- where Federal

7     Hall is there is a street there, but you've

8     already passed the exchange on the right-hand

9     side.  If you hit Federal Hall -- if you reach

10    Federal Hall, the stock exchange is on the

11    right-hand side.

12         Q.    I believe --

13         A.    I believe that's correct.

14         Q.    I believe the entrance to the stock

15    exchange is on Broad Street, not on Wall

16    Street and that you actually have to turn from

17    Wall Street onto Broad to get to the entrance.

18    But I think that's far afield at this point.

19         A.    But there's no -- there's no

20    intersection.  I think that was your point.

21         Q.    The intersection is Broad Street.

22    Back onto this video.  How many lanes of

23    traffic are open to the vehicular traffic at

24    the intersection of Wall and Broadway at

25    7:45 a.m.?

Page 142

Gannon

1

2     A.     Well, there is the bus lane on the
3     west side of Broadway and there is a white bus
4     there.  I don't know what the make is there,
5     in the center lane of traffic.
6              So I see 2.  And there is a parked
7     car in the east most lane, and that's -- that
8     appears to be double marked.
9     Q.     So you see two lanes of traffic at
10    7:46 a.m.?
11    A.     Right.  The bus lane is open, which
12    is the west and most lane and the middle lane
13    is open, which has traffic in it.
14    Q.     And the double parked car you
15    believe that's a NYPD vehicle?
16    A.     I don't know.  It could be a black
17    town car.  I don't know.
18    Q.     So you believe that as the police
19    are setting up barriers here they would allow
20    a black town car to double park there?
21    A.     (No response.)
22    Q.     Now that you see --
23    A.     I don't mean to laugh.  I'm sorry.
24    I'm sorry.  Let's go off the record for a
25    second.  I don't want to be a wise crack.

```
 1                        Gannon
 2        Q.    There is a question pending.
 3        A.    Okay.
 4        Q.    Do you believe the NYPD would allow
 5   a vehicle to double park there at this moment
 6   in time?
 7        A.    In -- in Manhattan?  A black car
 8   could pull over anywhere and drop somebody off
 9   even though the Police Officer doesn't want
10   them to park there.  It would be anybody.  I
11   could be somebody picking up, somebody
12   dropping off, somebody momentarily -- or it
13   could be a police car parked there.
14             But my point, the reason I was
15   laughing is because I've been in Manhattan so
16   long.  People disregard anything and they just
17   want to stop and drop their person off.  That
18   could be a number of different things.
19        Q.    Now that the bus has moved past the
20   image, can you see that, in fact, the bus lane
21   is not open but there are Police Officers
22   there with barricades blocking the bus lane?
23        A.    What I see is there's people --
24   there's Police Officers moving barriers, but
25   the bus lane is not blocked.  Don't forget,
```

```
 1                        Gannon
 2     bus lanes aren't not occupied with anything.
 3     Bus lanes are open so that buses can drive
 4     through them.  So it's not like -- it's not
 5     like there's -- there's nobody excluding buses
 6     there.  That's a lane of traffic open for
 7     southbound buses.
 8          Q.    7:44 the bus lane is open?
 9          A.    You see the barriers are on the
10     sidewalk?
11          Q.    Yes?
12          A.    So the bus lane is open for
13     traffic.
14          Q.    At this point what we were watching
15     is further up after the big bus comes down and
16     at that point you can't see what's going on in
17     the bus lane and here you see what I believe
18     is an NYPD barrier truck.
19                Do you see the lights on top of
20     that truck that's stopped in the bus lane?
21          A.    Yes.
22          Q.    So --
23          A.    That's not --
24          Q.    Did you see the black car pull up
25     just now and move up slightly.
```

```
 1                    Gannon
 2        A.    I'm sorry.  I was looking at the
 3   barrier truck.  The black car that's double
 4   parked on the east side?
 5        Q.    Uh-huh.
 6        A.    I wasn't -- if you could rewind it
 7   for a second.  I wasn't watching.  I was
 8   watching further north.  I was watching the
 9   barrier truck.
10        Q.    At this point there is only one
11   lane of traffic proceeding south on Broadway,
12   correct?
13        A.    There's -- no.  Incorrect.  There
14   is -- there is only one lane of traffic that
15   has vehicles in it.  The bus lane is open for
16   southbound traffic.  There is two lanes there.
17   There is no obstruction in the southbound
18   lane.  The barrier truck is a full block.
19        Q.    Now that the bus has moved and you
20   can see what was in the bus lane, does it look
21   like there is an obstruction there?
22        A.    Yes.  There's -- officers are
23   moving the metal barrier in place.  That's not
24   put there to block pedestrian -- block
25   vehicular traffic.  Now if that stays there
```

                                        Page 146

1                              Gannon

2       that's a different -- if you can show that to

3       me.  But right now when you showed me that

4       video the bus lane was open.  Unoccupied --

5       the bus lane was open, but it was unoccupied

6       with traffic.

7            Q.    How many lanes of traffic are open

8       at this point at 7:46 and 40 seconds?

9            A.    There's traffic running in the

10      middle land.  Let's see what they do with

11      the -- see they're putting the barriers on the

12      sidewalk.  They're not preventing traffic from

13      going down the bus lane.  They're putting the

14      barriers together to be on the curb line.

15           Q.    At that moment in time they were

16      preventing vehicles from using the bus lane,

17      correct?  That moment in time?

18           A.    That moment in time they were

19      putting the barriers together.  For a moment

20      of time they were in the sidewalk to put those

21      things together.  Otherwise -- but we're not

22      actively blocking the bus lane there.  You

23      know what I'm saying?  I mean it's a fine

24      point, but we're not -- if those barriers were

25      in the middle of the street right now I would

```
1                         Gannon
2     agree with your point that the bus lane was
3     closed, but the bus lane now is wide open.
4     See there?  I mean -- ooh, except for those
5     people about to get hit with the car.
6               (Reporter requested clarification.)
7          A.    No.  That was a wise comment.
8     People about to get hit with the car.
9          Q.    So at this point how many lanes of
10    traffic are open to vehicles?
11         A.    Two.
12         Q.    How many lanes of traffic are being
13    used by vehicles?
14         A.    The buses in the center.  The bus
15    at the top of the screen, that looks like
16    there's a bus in the center lane.  At the top
17    of the screen, which would be north of --
18    north of Wall Street.  I forget what that
19    block is, that cross street.
20         Q.    The reason we're looking at this is
21    previously you said the reason they
22    couldn't -- one of the reasons why they might
23    not have allowed protestors to cross the
24    street is because it would obstruct vehicular
25    traffic.
```

Page 148

1                          Gannon

2         A.     Correct.

3         Q.     Isn't the NYPD, in the way that

4    they are handling the vehicular traffic,

5    they're early obstructing it?

6         A.     No.

7         Q.     So this is how Broadway traffic

8    looks on a normal basis?

9         A.     The traffic -- well, I don't know

10   what it looks like on a normal basis.  That's

11   day to day.  But traffic here, there's a bus

12   flowing south right now.  Traffic is open on

13   Broadway.

14        Q.     There's one bus flowing south.  We

15   see no other vehicular traffic --

16        A.     There's a -- there's a --

17        Q.     I only see a van coming down.

18        A.     Right.

19        Q.     So is the point being -- your point

20   that they couldn't possibly allow people to

21   use the crosswalk because it would affect

22   vehicular track, on this day vehicular traffic

23   was already being affected.  Isn't that

24   correct?

25        A.     No.  I said they wouldn't be

Gannon

1

2    allowed-- if you -- if they made the west --

3    westbound turn onto across Broadway, that

4    would impact southbound vehicular traffic,

5    which is clearly the case.

6         Q.    But isn't southbound vehicular

7    traffic already being impacted by the police

8    conduct on that day?

9         A.    Momentarily at best, but traffic

10   was not stopped.  It was flowing.

11        Q.    What directives, procedures or

12   changes were made as a result of public or

13   press response to the policing after the

14   Republican National Convention in 2004?

15        A.    Why don't you do me a favor.  I

16   need to keep saying repeat this, but we just

17   switched gears from today to 2004.  Just read

18   that again, please.

19        Q.    What directives, procedures or

20   changes were made as a result of public or

21   press response to the policing at the protest

22   of the Republican National Convention in 2004?

23        A.    Oh, they were-- there were several

24   changes from -- as a result of the Republican

25   National Convention.  We used improvements to

Page 150

                        Gannon

1

2    our mass arrest processing center, which is --

3    Ill refer to it as MAPC from now on, M-A-P-C.

4    MAPC, there were up upgrades.  They added more

5    computer terminals to process booking.  They

6    added live scan machines, which are

7    fingerprint machines.

8              We had a -- when we're doing mass

9    arrests, we took Polaroid photos of the

10   arrested individuals so that the arresting

11   officers could track -- could keep better

12   track of or help identify, I should say, the

13   people that they were arresting.  Especially

14   in mass arrests where they're processing

15   multiple arrests.

16             Oh, we -- our folks in the Legal

17   Bureau, we put a representative in MAPC and we

18   had -- we had a greater amount of attorneys in

19   the field to help, as a resource, to help the

20   incident commanders in the field.

21        Q.   Can you identify any other changes

22   made as a result of the Republican National

23   Convention policing?

24        A.   That's all that comes to mind right

25   now.

Page 151

1              Gannon

2        Q.    Were there any changes made to the

3    policing of sidewalk protests as a result of

4    public or press response to the RNC policing?

5        A.    No.   We -- the NYPD or the City

6    doesn't really make changes based on press

7    releases or press inquiries.   So I don't think

8    anything was ranged as a result of those

9    issues.

10        Q.    Were there any changes made to the

11    policing of sidewalk protests as a result of

12    RNC litigation?

13        A.    The City and the Department don't

14    make changes based on filed cases and things

15    like that.   Filed -- filed lawsuits.

16        Q.    Were any changes made in regards to

17    the policing of sidewalk protest as a result

18    of legal determinations made in RNC

19    litigation?

20        A.    I don't think so, no.

21        Q.    Did the City of New York consider

22    the policing of sidewalk protests during the

23    Republican National Convention problematic?

24        A.    Did the -- say that again.

25        Q.    Did the City of New York consider

Page 152

```
 1                         Gannon
 2     the policing of sidewalk protests during the
 3     Republican National Convention in 2004
 4     problematic?
 5              MS. ROBINSON:  Objection.  You can
 6          answer.
 7          A.    Sidewalk demonstrations, was it
 8     problematic?  I don't know how to answer that
 9     one.  I don't know.  If you give me --
10          Q.    Did the City of New York believe
11     that they exceeded the limits of
12     constitutional power on policing during the
13     policing of sidewalk protest of the Republican
14     National Convention in 2004?
15          A.    I'm not understanding the question.
16              MR. STECKLOW:  Read back not the
17          last question, but the one before,
18          please.
19              (Record read.)
20          A.    I would say no.
21          Q.    Did the policing of sidewalk
22     protests change in any way from the Republican
23     National Convention to Occupy Wall Street?
24          A.    No.
25          Q.    What steps did the city take to
```

```
 1                              Gannon
 2     provide members of service with dispersal
 3     orders in any matter including via finest
 4     messages, roll call, muster point, handouts or
 5     any other steps taken to ensure compliance by
 6     members of service on the scene with the
 7     issuance of those dispersal orders?
 8          A.    Well, there was -- there was
 9     training for, I believe, the disorder control
10     unit did training ahead of the protests so
11     that there was an understanding that when you
12     read the -- read the warnings through a, say
13     for example, a bull horn that you would in the
14     rear of the group assembled you would put
15     somebody in the rear of the group so that when
16     you made the announcement with the warnings
17     you would get an acknowledgment from the
18     officer or whoever was posted in the rear of
19     the group that the message -- the warnings
20     could be heard in the back so that everybody
21     was able to at least hearing the warnings,
22     prior to -- dispersal warnings.
23          Q.    Were written dispersal orders
24     issued?
25          A.    Were they issued?
```

Page 154

                                  Gannon
1
2        Q.     Yes.
3        A.     Well, I don't know if they were
4    issued.  They were -- they were on hand.  The
5    task forces have this -- they do this
6    protest-related issues a lot.
7               The task force have the dispersal
8    orders.  Legal, our legal representatives have
9    the dispersal orders.  So it's -- the people
10   who would be reading the dispersal orders had
11   the dispersal orders or had access to the
12   dispersal orders.  They weren't issued to
13   everybody but, you know, not everybody is
14   going to read them.
15       Q.     Who provided the written dispersal
16   orders?
17       A.     Well, I'm sure legal, our Legal
18   Bureau had the dispersal orders and I know
19   disorder control through their training had
20   the dispersal orders.
21       Q.     Who wrote the language in the
22   dispersal orders?
23       A.     Who wrote it?  I don't know.
24       Q.     How many of these cards were
25   issued?

1                        Gannon

2        A.    No.  It's a -- the ones I've seen

3    are -- it's a sheet of paper with the -- with

4    the -- so it's -- how many were issued?  I

5    don't know.

6        Q.    How were they distributed?

7        A.    I don't know.

8        Q.    What steps, if any, were taken to

9    ensure that the dispersal orders that were

10   issued or distributed were read from?

11       A.    How were they --

12       Q.    How did they ensure that these were

13   actually the orders that were read?

14       A.    Well, like I said before, the folks

15   who read those at that moment in time when

16   they're going to read the dispersal orders,

17   they're the folks that do this kind of stuff

18   for us at the Police Department all the time.

19   I don't know, you know, I don't know how we

20   assure that it was the one dispersal order --

21            (Reporter requested clarification.)

22       A.    The orders are used all the time so

23   I -- it's not like there is varying copies of

24   it.  So I mean the people who have it have the

25   proper copy because they do this kind of stuff

```
 1                      Gannon
 2   all the time.
 3            MR. STECKLOW:  Let's take a quick
 4        break.  The time is now 2:33 and we are
 5        requesting to take a quick break.
 6            (Recess taken.)
 7            MR. STECKLOW:  The time is now 2:39
 8        and we are back on the record.  We are
 9        still at my office at 217 Centre Street.
10        Q.    Lieutenant, when there is a crowd
11   and an order to disperse is given, how much
12   time does the NYPD believe should be provided
13   to the individuals to disperse?
14        A.    A reasonable amount of time.  The
15   exact time I don't know, but it -- it's -- we
16   read the warnings intentionally to give people
17   an opportunity to leave.  The more people that
18   leave the better it is when the warnings are
19   given.  But, you know, there is a sense of
20   fairness to it that it should be a reasonable
21   amount of time.
22        Q.    And so is there a specific amount
23   of time required in order to be
24   constitutionally compliant?
25        A.    I don't know.  I don't know the
```

Page 157

Gannon

1                        Gannon

2    answer to that question.

3         Q.    How does the NYPD monitor

4    compliance with giving sufficient amount of

5    time for people to leave?

6         A.    Well, supervision will be probably

7    the strongest measure.  When these orders are

8    given, usually it's a ranking officer giving

9    the instructions and giving the -- pardon me.

10   The dispersal order.

11             So there is supervision there to

12   make sure it's reasonable and it's -- it's

13   done with a -- to give people an opportunity

14   to leave if they're no longer interested in

15   staying.

16        Q.    So is there a way that the NYPD

17   monitors to ensure that there is compliance

18   with that?

19        A.    I would say they monitor it through

20   supervision.  So the person giving the orders

21   is, I would say, is usually a ranking person

22   and then there's levels of supervision above

23   him or her, and that's how we would ensure

24   it's done correctly.

25        Q.    If people are marching in a group

```
                                        Page 158
 1                          Gannon
 2     and they get penned in by the NYPD --
 3     withdrawn.
 4              If people are marching in a group
 5     and they get penned in because there is now
 6     100 people behind them and they are given an
 7     order to disperse, how should they act in
 8     order to comply?
 9         A.    That's a hypothetical.  I don't
10     know how to answer that question.  Enough time
11     to -- if people are saying, "No, no.  We want
12     to get out.  We want to get out" then we're
13     going to let them get out.
14              It's not like -- oh, it's too late,
15     you know.  People are telling us -- in that
16     scenario if people came up behind them and
17     these folks in the front were saying -- in
18     your scenario were saying "No, no.  We want to
19     leave.  We want to leave," if it was within a
20     reasonable amount of time, we would let them
21     leave.  We would ensure they left.
22         Q.    You testified earlier that one of
23     the responses to RNC policing was to have more
24     Legal Bureau attorneys on the ground at large
25     scale protests; is that correct?
```

                              Gannon

1

2        A.     Correct.

3        Q.     Why are legal bureau attorneys on

4    the ground?

5        A.     They provide a resource to the

6    incident commander.  So if some legal issues

7    arise, they're there to answer the questions

8    for the incident commander.

9               For example, during Occupy Wall

10    Street it was a -- there were things that

11    popped up in Occupy Wall Street that you

12    really couldn't anticipate.  There was an

13    issue with inside Zucotti Park where there was

14    a point where they wanted to set up maybe

15    tents or tarps and things like that and it was

16    prohibited.  And then one person set up a

17    Sukkah tent.  S-U-C-C-O-T-H (sic).  How is

18    that?  That's pretty good.

19              Sukkah tent and confirmed with

20    legal.  Now you have all sorts of issues

21    there.  Religious.  Is it -- is it a

22    structure?  Is it not a structure.  Those were

23    elements that we leave to our legal folks and

24    they provide some counsel.

25              And there was also a circumstance

Page 160

1                          Gannon
2      where unfortunately some women were sexually
3      abused inside the park.  So they put up a
4      structure towards the rear of the park where
5      women could go to kind of be safer than in the
6      general population of the park.  So, again,
7      it's a structure.  It's something where, you
8      know, it wasn't necessarily in the allowable
9      rules.
10                    But our legal folks give us
11     counsel.  What's allowable, what's not
12     allowable, and then you make a judgment.  And
13     in this case women being sexually abused maybe
14     outweighed the fact that we don't allow tents.
15     So that would be -- Occupy Wall Street was
16     a -- was a wonderland of "what if's" for legal
17     people.
18                    We'd run stuff by them.  You know,
19     the POPs -- the privately owned -- privately
20     owned public spaces, POPs we call them, P-O-P.
21     And you know, before Occupy Wall Street I
22     don't think anybody really knew the
23     functionality of a POP, other than it was
24     something that was agreed to when someone
25     builds a building, constructs a building.

                              Gannon

1            So that was one of the legal things

2    that we had to work through in that, you know,

3    there was -- they agreed to have these POPs

4    and they're open to the public with certain

5    rules and parameters.  And then, you know, so

6    the occupy folks would take advantage of that

7    fact and they would go in there and they would

8    occupy the POPs and then they would bounce

9    around.  So initially, you know, the Police

10   Department for 33 years.  Before Occupy Wall

11   Street POP was something you had with a

12   sandwich.  You know if you were down south you

13   had a drink or something like that.

14           But you wouldn't know what a POP

15   was because you never really dealt with it.

16   Our folks from legal, they are able to advise

17   us.  So that's kind of the gist.  But the core

18   of it, they're a resource for the incident

19   commander.

20       Q.    What responsibilities did Legal

21   Bureau advisors have at sidewalk protests?

22       A.    Responsibility?

23       Q.    Yes?

24       A.    To be a resource for the incident

```
 1                          Gannon
 2    commander.  They should be there in case the
 3    incident commander says, hey, what do you
 4    think about this?  What do you think about
 5    that?  They're to be with the incident
 6    commander or close to the incident or
 7    available to the incident commander so he can
 8    make determinations about, you know, whatever
 9    question he has.
10         Q.    What authority does the Legal
11    Bureau advisors have at a sidewalk protest?
12         A.    I don't know if they have
13    authority.  You know, but the incident
14    commander would be the determining call on
15    mostly everything.  But legal has a valuable
16    role in advising him as to what to do for
17    sure.
18         Q.    The Legal Bureau Advisors have a
19    role in establishing probable cause at walk
20    protests?
21         A.    They certainly could help
22    establish.  If there was a question they could
23    certainly advise, absolutely.
24         Q.    So they would be a resource if
25    requested by an incident commander?
```

```
1                      Gannon
2        A.    Yes.
3        Q.    So an incident commander would make
4    a decision about arrests at sidewalk protests
5    and probable cause but if they had a question
6    about that they would ask for help from the
7    Legal Bureau folks present?
8        A.    They certainly could, that's
9    correct.
10       Q.    But if they didn't ask for help
11   they could make these decisions on their own?
12       A.    Correct.
13       Q.    If a protestor is engaging in
14   conduct for which a protestor is arrested and
15   a non-protestor is engaging in the exact same
16   conduct, should the non-protestor be permitted
17   to leave without arrest?
18       A.    Certainly could.  You certainly
19   could.  I mean it would depend on the
20   circumstances, but it's kind of a
21   hypothetical.  We certainly could -- you know
22   it's not even selective.  It's a matter of do
23   you have enough people to do that kind of
24   thing.  But, you know.
25       Q.    On a public sidewalk can a
```

Page 164

```
 1                          Gannon
 2     protestor be lawfully ordered to cease
 3     activity or conduct at the same time that a
 4     non-protestor is permitted to continue the
 5     same activity or conduct?
 6          A.    Uh... I would think that we would
 7     treat, at that point, everybody the same.  For
 8     example --
 9              Well, I would think that people
10     conducting the same conduct would be -- would
11     be treated the same way.
12          Q.    We saw earlier on the video that
13     protestors were not permitted to go south but
14     people who were not protesting were given an
15     avenue into the street in order to proceed
16     south on Broadway towards Wall Street.  So is
17     that a fair way of applying the law in that
18     situation?
19          A.    Well, you have to remember we're in
20     New York City.  We have to kind of strike a
21     balance to the people's right to protest and
22     assemble versus the people who have absolutely
23     nothing to do or could careless about the
24     protest and they went to go about their daily
25     business.  The NYPD always tries to strike a
```

                                  Gannon

1    balance between those two things.  And we live

2    in an area that's densely populated and people

3    have other things to do.

4              So it's the right to protest versus

5    the right to not care about the protest and go

6    about your daily affairs going to work, going

7    to lunch during a daytime protest, going home.

8    So those two things we try to balance it and,

9    you know, we want to let the people who want

10   to protest, protest, but we also have to care

11   for the people who don't have anything to do

12   with the protest to go about their business.

13        Q.    Can the NYPD apply the law

14   differently based on the way people are

15   dressed?

16        A.    The way people are dressed?

17        Q.    Yes.

18        A.    Sounds like a trick question,

19   Counselor.  Could you read that to me again.

20        Q.    Can the NYPD apply the law

21   differently based on the way people are

22   dressed?

23        A.    No.

24              MR. STECKLOW:  Can we get the video

1                          Gannon

2          queued up of the incident where they stop

3          people and separate them into two groups?

4                  MR. SHARKEY:  Yes.  I have it right

5          here.

6                  MR. STECKLOW:  This is also from

7          9/17/12.

8                  (Video played.)

9          Q.    Okay.  In this scene we just saw

10   people trying to -- protestors trying to march

11   on Broadway and at some point the police took

12   a spot and just separated them into two

13   groups.  Is that accurate?

14        A.    Yes.

15        Q.    Do you understand the reason why

16   the Police Officers would do this?

17        A.    I don't.

18        Q.    Did the City of New York have an

19   explanation for why the protestors would be

20   split up like this?

21        A.    Based on what I see on the video, I

22   can't determine why they would have done that.

23                  (Video played.)

24        Q.    I would like you to keep your eye

25   on the guy with the gray T-shirt and shorts,

```
                                        Page 167

1                              Gannon
2      the gray beard and sunglasses.  Right now he
3      is against the side of the building?
4           A.    He's got a sticker on his chest
5      there or something?
6           Q.    Yes.
7                 (Video played.)
8           Q.    At this point the Police Officer is
9      approaching him.  Has this individual done
10     anything distinguishable from anybody else in
11     the picture of the protestors to warrant
12     arrest?
13          A.    I don't have any idea.
14          Q.    Can you see anything in the video
15     that would give you any idea?
16          A.    The video I've seen right now, I
17     don't have -- I don't have any idea why -- why
18     they would -- why they would have drawn
19     attention to this individual.  I don't know.
20                (Video played.)
21          Q.    Do you see the individual behind
22     them with the button-down shirt, the backpack
23     now next to him?
24          A.    The yellow shirt?
25          Q.    Yeah.  The yellow shirt, there is
```

```
 1                      Gannon
 2    the two to three -- there is two women there
 3    standing there as well?
 4        A.    Yes.
 5        Q.    And they just arrested a woman in a
 6    dress -- it's a black and white dress and
 7    sunglasses, with a bag over her back; is that
 8    correct?
 9        A.    It looks like they placed her in
10    handcuffs, yes.
11        Q.    Do you see a reason why she would
12    stand out from anybody else on the sidewalk?
13        A.    Now, remember, earlier we talked
14    about that we're assuming that something
15    happened right here.  Something could have
16    happened previous to this taping and that
17    could be.  Based on this I can't tell you why
18    they -- what was the basis for the arrest.
19    It's hard to tell.
20        Q.    At the time that they separated
21    these into two groups, did you -- from that
22    time forward until now have you heard anyone
23    give any dispersal orders?
24        A.    No.
25        Q.    And you've seen them arrest at
```

```
1                        Gannon
2    least four people at this point from this
3    group, correct?
4         A.    The fourth one here?  This woman
5    here?  Yes.  Including this woman in gray,
6    that would be four.
7         Q.    Now we heard a warning for the
8    first time in this video, correct?
9         A.    What did he say?  Do you know?
10        Q.    "If you don't move you will be
11   arrested."
12             MS. ROBINSON:  Objection.  That's
13        not what he said.
14             MR. STECKLOW:  Ms. Robinson why
15        don't you tell us what he said, since
16        I --
17             MS. ROBINSON:  "Final warning" is
18        what I heard.  It would be suggestive of
19        not being the first one.
20             MR. STECKLOW:  So what did he say?
21             MS. ROBINSON:  I don't know, but I
22        heard "final warning."  So let's be, at
23        least, accurate.
24        Q.    So the camera did show they were
25   actually at Wall Street, correct?
```

```
                                        Page 170

 1                        Gannon
 2        A.     Correct.  People are leaving.
 3        Q.     People are now being allowed to go
 4   in the direction of where they just stopped
 5   people from going, correct?
 6        A.     Yes, yes.  They're going -- that's
 7   north on Broadway.
 8        Q.     Do you know if the City of New York
 9   had any goals of the NYPD during Occupy Wall
10   Street?
11        A.     Any goals?
12        Q.     Yes.
13        A.     The goal is always to allow
14   peaceful assemblage and protest, balancing
15   that with the right -- like I said before,
16   balancing that with the rights of the other
17   folks not to be involved in the protest.  That
18   would be the goal.  That's always the goal.
19               NYPD and the City of New York, we,
20   you know, accept -- not accept, but we --
21               Peaceful protestors happens all
22   over the city for years and year and years.
23   It's not something that we're not used to
24   accommodating and promoting at certain points.
25        Q.     What criteria are used to assign
```

1                          Gannon

2      on-scene supervisors for the anniversary

3      protest of September 17, 2012?

4           A.     What criteria?

5           Q.     Yes.

6           A.     Wylie, just repeat that sentence.

7      What criteria?

8           Q.     What criteria were used to assign

9      on-scene supervisors for the anniversary

10     protest of September 17, 2012?

11          A.     Well, would depend on -- it was

12     hard, very hard to tell with Occupy Wall

13     Street how many people were going to -- were

14     going to attend an event, attend the protest.

15     They have a -- they weren't a typical -- they

16     weren't a typical group where you would sit

17     down with them and work out the details of

18     what they wanted to do and then accommodate

19     them as far as different routes, if they were

20     going to march or not.

21               They were actually, part of

22     their -- part of their guiding principles, if

23     you want to call it that during this protest,

24     was that they were leaderless, in effect.

25               So how is it determined?  You know,

```
                                       Page 172

 1                         Gannon

 2     there is open source reporting on -- where

 3     people might show up and do things and then

 4     you try to -- you try to gauge what that might

 5     be, and then assign people accordingly.

 6          Q.    I'm trying to ascertain what

 7     criteria used to determine which members of

 8     the service were assigned as on-scene

 9     supervisors for the anniversary protest.  Not

10     how many --

11          A.    Oh.

12          Q.    -- not where, but which particular

13     officers were utilized as supervisors on scene

14     for the anniversary protest.

15          A.    I missed the first part.

16          Q.    What criteria did the City of New

17     York use to make that determination?

18          A.    That would be determined by -- in

19     all likelihood, that was determined by Chief

20     Purtell, Patrol Borough Manhattan South, in

21     consultation probably which Inspector Winski.

22     He was the commanding officer of the 1st

23     Precinct at the time.  But they would

24     determine who the supervisors were.

25     Especially the higher ranking supervisors.
```

```
1                         Gannon
2         Q.     What criteria did Chief Purtell in
3    consultation with Inspector Winski utilize to
4    make that determination?
5         A.     I don't know.  You have to ask
6    those folks.
7         Q.     I ask the same question, but now
8    more broadly about Occupy Wall Street.  Let me
9    ask the question now before you give an
10   answer.
11              What criteria did the City of New
12   York use when determining which specific
13   supervisors to assign to Occupy Wall Street
14   protest during Occupy Wall Street?
15        A.     Same -- basically the same answer.
16   It would have been Chief Purtell and Patrol
17   Borough Manhattan South.  Chief Purtell would
18   make the determination as to who the
19   supervisors would be, and he'd have -- and
20   especially the higher ranking people.
21        Q.     So do you know what the criteria
22   that Chief Purtell utilized to make these
23   determinations when assigning high-ranking
24   officers to police Occupy Wall Street?
25        A.     No, but Chief Purtell, a highly
```

Page 174

```
1                          Gannon
2      experienced guy.  He would -- I don't know
3      what he would use, but it would be his
4      judgment as to who to use.
5          Q.    How does the NYPD-- withdrawn.
6                How does the NYPD and the City of
7      New York monitor, and members of the service
8      understand and are aware, of the
9      constitutional limits on police power?
10         A.    I thought there was more coming.
11               Well, we do it through supervision
12     and training.  The Legal Bureau is there.  The
13     officers are -- there are several lines of
14     supervision at these events.  Police
15     supervision is -- is closely matched.  The
16     officers really don't take independent action.
17     I mean they can if something would were to
18     happen to -- if an officer was attacked or
19     something like that.  But for the most part
20     it's measured and it's done in an orderly
21     fashion with direction being given to make
22     arrests for the most part.  So through
23     supervision and training I would say that's
24     how we answer that question.
25         Q.    It seems like supervision and
```

Page 175

1                                        Gannon

2      training may provide the knowledge.  I'm

3      asking how the NYPD monitors these individuals

4      have that knowledge.

5           A.    I don't know how you would monitor

6      that.  I mean it's training.  Training is, you

7      know, the officers are trained.  I don't know.

8      I mean it's -- I don't know how you would

9      monitor that.  I don't know.

10          Q.    How does the NYPD monitor that

11     members of service understand and are aware of

12     the New York State's constitutional limit on

13     police power as set forth in People v. Jones

14     in the New York State Court of Appeals

15     decision issued in November 2007?

16              MS. ROBINSON:  Objection.  Outside

17         the scope.  You can answer.

18          A.    Well, the legality of stuff again.

19     Our legal folks are there to make sure that,

20     you know, that everything is going according

21     to the constitution.  The officers know

22     through their training that there is

23     constitutional limits on what's allowed,

24     what's not allowed.  The supervisors who tend

25     to be more senior people, more experienced

```
 1                    Gannon
 2   people have a -- have a deeper knowledge of
 3   those things.  So I think all those things
 4   combined is how the City of New York and the
 5   Police Department would ensure that happens.
 6        Q.    Where do those higher ranking
 7   individuals gain that deeper knowledge?
 8        A.    Well, one is through experience.
 9   You know, you've done protests, you've asked
10   this question of legal in the past.  You know
11   what the answer is, you know what the
12   circumstances are.  You know, I think that's a
13   big part of it.  They also get -- you know,
14   there is also Legal Bureau bulletins we put
15   out.  The department.  I keep saying "we."
16   That the Police Department puts out.  That
17   when a case is decided, it's a controlling
18   case, that the legal bureau will makes sure
19   that there is a Legal Bureau bulletin that
20   would go out and that would be, you know,
21   disseminated to everybody and the officer --
22   all the way down from the legal bureau all the
23   way down to everybody in the office.  Nowadays
24   especially as all that stuff is available on
25   their smartphones so it's great actually.
```

Page 177

                          Gannon

1

2       Q.    How does the NYPD monitor or track

3   whether or not all these members of the member

4   of service are reading the Legal Bureau

5   bulletins?

6       A.    Well, you can-- in the -- say, for

7   example, you're an officer assigned to a

8   precinct, regular precinct, and say something

9   comes down that's a legal precedent that Legal

10  determines, boy, we got to get this out now.

11  So Legal Bureau bulletins need to be drafted.

12  It's a formal brief basically.

13           So in a short term notice we have a

14  thing called a Finest messages, F-I-N-E-S-T

15  messages.  In the old days it was a teletype.

16  It's still a machine, now it just comes out of

17  a printer.  Finest message would be put out to

18  all commands and that would -- that would say,

19  hey, this is -- this is now the rules.  These

20  are now the rules.  And then how the cop in

21  the precinct would get trained is that the

22  commanding officer is aware of the Finest

23  messages as they come through as our other

24  supervisors in the precinct.  And there is a

25  training sergeant.  A training sergeant,

Page 178

                                    Gannon

1

2     something like that.  He would start to brief

3     all the outgoing platoons of Police Officers

4     about this -- about this new legal

5     constitutional issue, whatever it would be.

6     So at its most ground level form, that's

7     probably the best way to describe it.

8          Q.    You have described how they try and

9     distribute this information.  I'm asking you a

10    different question.  The question I have asked

11    was:  How does the NYPD monitor whether or not

12    the members of service understand and are

13    aware of this information?  How do they

14    monitor -- withdrawn.

15              How do they monitor whether or not

16    these legal bureau bulletins are read by the

17    high ranking officers all the way down to the

18    members of service?

19          A.    Well, the training sergeants in the

20    precinct, let's just go with the Precinct

21    level folks for the moment.  The training

22    sergeant, his job is to train people.  So

23    he'll go through -- he'll go through several--

24    several days of training on the subject

25    because obviously people -- Police Officers

1                         Gannon

2     don't work seven days a week.  They rotate in

3     and out and their days change off.  So there

4     is a period of time where everyone would cycle

5     through the training sergeant's training and

6     at each roll call, and then he would be able

7     to educate all of them.  The higher-ups, you

8     know, a lot of that is -- the higher -- the

9     higher-ranking officers are aware of the Legal

10    Bureau bulletins.  They read the Finest

11    messages.  They're senior people so it's not

12    like -- they have to be, you know, on their

13    game as far as these changes in the law and

14    different things.  So they're self-responsible

15    for kind of doing that I guess is the best way

16    of describing it.

17         Q.    So the fact that they're

18    self-responsible, does that mean that the NYPD

19    does not know whether or not any of these

20    higher ranking officers actually read the

21    Legal Bureau bulletins?

22         A.    I don't know.  I don't know if

23    they -- yeah.  Unless you -- I don't know how

24    you would measure that.  I don't know.

25         Q.    If the NYPD were to learn that a

```
 1                        Gannon
 2     high-ranking officer was not reading Legal
 3     Bureau bulletins, what would they do?
 4          A.    Provide instruction, I would think,
 5     or education.  And for the most part if -- if
 6     there was something going on where someone
 7     wasn't aware of it, Legal, I have stated that
 8     description at the scene rather of Occupy Wall
 9     Street where something is going on.  Legal is
10     there to say, oh, you know, to interject
11     themselves and say, hey, this Rule A is now
12     Rule B.  Make sure you're aware of it, you
13     know, and things like that.
14               Especially something where it was
15     so broad as to be published in a -- so
16     important rather to be published in the Legal
17     Bureau bulletin.
18          Q.    You previously testified that Legal
19     Bureau is there to be a resource when
20     requested by the white shirt supervising
21     commanders, correct?
22          A.    Correct.
23          Q.    So they're not going to step in
24     unless they're requested for that information,
25     correct?
```

Page 181

                          Gannon

1        A.    But they can -- they can -- no.

2   Yeah.   That -- that is correct if you're

3   dealing with a situation, but Legal Bureau at

4   any time can come in and provide advice if

5   they see something that's -- that needs to

6   be -- needs to be addressed.   I mean it's a --

7   legal is -- they are -- they're a nice asset

8   to have.

9        Q.    Do you know how many Legal Bureau

10  bulletins have been issued about disorderly

11  conduct in sidewalk protests?

12       A.    I do not.

13       Q.    Does the NYPD measure knowledge of

14  New York State's constitutional limits on

15  police power as set forth in People v. Jones

16  during reviews of members of the service?

17            MS. ROBINSON:   Objection.   Calls

18       for a legal conclusion.   You can answer.

19       A.    I don't know.

20       Q.    I am going to ask the same question

21  with different ranks.   Does the NYPD measure

22  knowledge of New York State's constitutional

23  limits on police power as set forth in the

24  People v. Jones decision during reviews of

```
                                    Page 182

 1                      Gannon

 2     sergeants?

 3              MS. ROBINSON:  Objection.  Outside

 4         the scope.

 5         A.    I don't know.

 6         Q.    Does the NYPD measure knowledge of

 7     New York State's constitutional limits on

 8     police powers as set forth in People v. Jones

 9     during reviews of lieutenants?

10              MS. ROBINSON:  Objection.  Outside

11         the scope.

12         A.    I don't know.

13         Q.    Does the NYPD measure knowledge of

14     New York State's constitutional limits on

15     police powers as set forth in People v. Jones

16     during reviews of captains?

17              MS. ROBINSON:  Objection.  Same

18         objection.

19         A.    I don't know.

20         Q.    Does the NYPD measure knowledge of

21     New York State's constitutional limits on

22     police powers as set forth in People v. Jones

23     during reviews of inspectors?

24              MS. ROBINSON:  Same objection.

25         A.    I don't know.
```

1                    Gannon

2        Q.    Does the NYPD measure knowledge of

3   New York's State's constitutional limits on

4   police powers as set forth in People v. Jones

5   during reviews of chiefs?

6             MS. ROBINSON:  Same objection.

7        A.    I don't know.

8        Q.    Did the NYPD measure knowledge of

9   New York State's constitutional limits on

10  police power as set forth in People v. Jones

11  during the assignment of the supervising

12  officers at Occupy Wall Street?

13            MS. ROBINSON:  Same objection.  You

14       can answer.

15       A.    I'm thinking actually.  Could you

16  read that back again or could you say it?

17            MR. STECKLOW:  You can read it

18       back.

19            (Record read.)

20            MS. ROBINSON:  Same objection.

21       A.    I don't know.

22       Q.    What process is in place to review

23  policing of sidewalk protests and determine

24  whether such policing was within the

25  constitutional limits of police power?

1                           Gannon

2        A.    I mean there's -- when arrests are

3    made based on probable cause, a supervisor

4    will authorize the arrest to follow up on the

5    arrest to make sure that probable cause has

6    been established.  Is that what you're looking

7    at?  Is that what you're kind of thinking

8    there?

9              There's levels of supervision that

10   would ensure that the constitutional right of,

11   you know, we're not violating the first or the

12   fourth amendment.  Supervisors ensure that

13   probable cause has been established.  So

14   that's a protection against constitutional

15   violations, to make sure that the -- to make

16   sure that the officers have a probable cause

17   to make arrest.

18       Q.    Is there any other process in place

19   for the City of New York to review the

20   policing of sidewalk protest by the NYPD in

21   determining whether such policing was within

22   the constitutional limits of police power?

23       A.    I don't think so, no.

24       Q.    I'm going to show you what has been

25   marked as -- previously marked as Exhibit 6.

```
 1                      Gannon
 2            This involves the Bronx incident
 3     that we previously watched the video of and
 4     you had said that you had -- you had said that
 5     you also watched that video before you were in
 6     this deposition?
 7          A.   Yes.
 8          Q.   Have you seen this document before?
 9          A.   I have not.  You didn't show me
10     this earlier.  No, I have not.
11          Q.   This is a document dated
12     January 19, 2012 from a City council member to
13     the commissioner of the NYPD raising concerns
14     about the conduct of the police of what
15     occurred in the Bronx video that we watched
16     earlier, correct?
17          A.   Just give me a chance just to read
18     this real quick.
19               (Witness perused document.)
20               Okay.
21               MR. STECKLOW:  Can you read back
22          the question.
23               (Record read.)
24          A.   It's a letter.  Yes, it is a
25     letter.  I agree it's a letter.  What's the
```

```
 1                        Gannon
 2    question?  I'm not sure I follow the question.
 3    Is this --
 4         Q.    Do we need to read the question
 5    again?
 6         A.    Yeah.  I'm getting a little tired.
 7    I'm sorry.
 8              MR. STECKLOW:  Yes.  Read the
 9         question again.
10              (Record read.)
11         A.    Correct.
12         Q.    What actions, if any, did the NYPD
13    undertake in response to this complaint?
14         A.    Specifically?  I don't know.
15         Q.    Are you aware that a state senator
16    named Liz Kruger also made a similar complaint
17    about the same exact incident and filed a
18    letter with the commissioner of the NYPD?
19         A.    I'm not aware of that.
20         Q.    Do you know if the commissioner or
21    the NYPD took any action in response to State
22    Senator Kruger's letter?
23         A.    I'm not aware of that.
24         Q.    In July of 2012 a group of
25    academics from Fordham Law, Columbia Law, NYU
```

Page 187

```
 1                            Gannon
 2      Law and Harvard Law School submitted a
 3      130-page report to the NYPD entitled
 4      "Suppressing Protest:  Human Rights Violations
 5      in the U.S. Response to Occupy Wall Street."
 6              What investigation did the NYPD
 7      undertake upon receiving that document?
 8              MS. ROBINSON:  Objection.  Beyond
 9          the scope.  You can answer.
10      A.    I don't know.
11      Q.    These individuals who authored that
12      report sought to have a meeting with the NYPD
13      to discuss the findings concerning the
14      policing of Occupy Wall Street, including
15      issues with sidewalk protest.  Did the NYPD
16      agree to meet with these academics?
17      A.    I don't know.
18      Q.    Did the NYPD make any changes to
19      its policing of Occupy Wall Street in response
20      to this report?
21      A.    The NYPD wouldn't make any changes
22      based on a -- policy changes based on a report
23      such as that.
24              MR. STECKLOW:  Okay.  Let's take
25          another five-minute break and this is
```

Page 188

```
 1                           Gannon
 2          when I can say, yes, wrapping up.  The
 3          time is now 3:20 and we are taking a
 4          break.
 5                  (Recess taken.)
 6                  MR. STECKLOW:  The time is now 3:34
 7          and the plaintiffs have no further
 8          questions for the witness.  I do
 9          understand that the defense has some
10          questions.
11                  MS. ROBINSON:  Yes.
12      EXAMINATION BY
13      MS. ROBINSON:
14          Q.    Okay.  Lieutenant, I'm going to
15      show you what plaintiff has marked as Exhibit
16      3 in the deposition.  You have a copy of it
17      there.
18                  Did the NYPD make any policy
19      changes as -- in response to the lawsuits
20      filed on this Exhibit?
21          A.    No.  The NYPD doesn't make --
22      change policy or make policy decisions based
23      on filed lawsuits.
24          Q.    When a representative or politician
25      of any kind sends a letter to the commissioner
```

```
                                          Page 189
 1                         Gannon
 2    of the NYPD regarding alleged police
 3    misconduct, how is that letter handled?
 4         A.    That letter will be -- that letter
 5    will be forwarded down to Internal Affairs
 6    Bureau for investigation.
 7         Q.    And those cases are, in fact,
 8    investigated?
 9         A.    Yes.
10         Q.    And when we watched the LMSI video,
11    you recall watching the LMSI video?
12         A.    Yes.
13         Q.    With regard to the 9/17/2012
14    anniversary of the protest.  It showed the
15    people on the sidewalk who wanted to leave
16    were permitted to leave, correct?
17         A.    Correct.
18              MS. ROBINSON:  That's all I have
19         for right now.
20              MR. STECKLOW:  Okay.  It's 3:36.
21         This deposition is closed.
22              (Time noted:  3:36 p.m.)
23
24
25
```

Page 190

1

2    STATE OF _____ )

3                             ) :ss

4    COUNTY OF _____)

5

6            I, LT. DENNIS GANNON, the witness

7    herein, having read the foregoing testimony of

8    the pages of this deposition, do hereby

9    certify it to be a true and correct

10   transcript, subject to the corrections, if

11   any, shown on the attached page.

12

13               _____

14                    LT. DENNIS GANNON

15

16   Sworn and subscribed to before

17   me, this    day of , 2018.

18

19   _____

20        Notary Public

21

22

23

24

25

Page 191

1

2                    C E R T I F I C A T E

3

4            I, ELIZABETH SANTAMARIA, a Court

5    Reporter, do hereby certify that prior to the

6    commencement of the examination, LT. DENNIS

7    GANNON was sworn by me to testify the truth,

8    the whole truth and nothing but the truth.

9            I DO FURTHER CERTIFY that the

10   foregoing is a true and accurate transcript of

11   the proceedings as taken stenographically by

12   and before me at the time, place and on the

13   date hereinbefore set forth.

14            I DO FURTHER CERTIFY that I am

15   neither a relative nor employee nor attorney

16   nor counsel of any of the parties to this

17   action, and that I am neither a relative nor

18   employee of such attorney or counsel, and that

19   I am not financially interested in this

20   action.

21

22

23        ELIZABETH SANTAMARIA

24

25

```
                                                  Page 192

 1
 2    ---------------- I N D E X ------------------
 3    WITNESS                 EXAMINATION BY         PAGE
 4    LT. DENNIS GANNON   MR. STECKLOW                  5
 5                            MS. ROBINSON            188
 6
 7     ----------- INFORMATION REQUESTS -----------
 8                        (None)
 9
10                 E X H I B I T S
11    PLAINTIFF'S                      FOR IDEN.
12    Exhibit 1   Multi-page document      13
13    Exhibit 2   Two-page letter dated     58
14                April 28, 2003
15    Exhibit 3   One-page document         70
16    Exhibit 4   One page depicting color  79
17                copies of three photos
18    Exhibit 5   Letter dated 5/5/2014     88
19    Exhibit 6   Letter dated 1/19/2012    99
20    Exhibit 7   Letter dated 1/1/2012     99
21                     --o0o--
22              (Retained by Counsel)
23
24
25
```

Page 193

1

2                    INSTRUCTIONS TO WITNESS

3

4              Please read your deposition over

5      carefully and make any necessary corrections.

6      You should state the reason in the appropriate

7      space on the errata sheet for any corrections

8      that are made.

9              After doing so, please sign the

10     errata sheet and date it.

11             You are signing same subject to the

12     changes you have noted on the errata sheet,

13     which will be attached to your deposition.

14             It is imperative that you return

15     the original errata sheet to the deposing

16     attorney within thirty (30) days of receipt of

17     the deposition transcript by you. If you fail

18     to do so, the deposition transcript may be

19     deemed to be accurate and may be used in

20     court.

21

22

23

24

25

Page 194

1                       E R R A T A

2

3

4

5        I wish to make the following changes,

6     for the following reasons:

7

8     PAGE LINE

9     ___  ___ CHANGE:_____

10    REASON:_____

11    ___  ___ CHANGE:_____

12    REASON:_____

13    ___ ___ CHANGE:_____

14    REASON:_____

15    ___ ___ CHANGE: _____

16    REASON:_____

17    ___ ___ CHANGE: _____

18    REASON:_____

19

20    _____      _____

      LT. DENNIS GANNON                    DATE

21

22    SUBSCRIBED AND SWORN TO BEFORE

23    ME THIS ___DAY OF_____, 201 .

24

      _____      _____

25    NOTARY PUBLIC             COMMISSION EXPIRES

**1**

**1**   13:10,11,15,24
    13:25 18:19 20:21
    28:7,10,10 48:9
    50:14 99:17
    104:13 105:13,17
    105:25 106:8,19
    107:4 192:12
**1,000**   61:23
**1/1/2012**   192:20
**1/19/2012**   192:19
**10**   105:5 130:6,20
    139:7
**100**   3:16 158:6
**10007**   3:17
**10013**   3:7
**10:14**   1:18 5:11
**11**   47:24 48:8
    50:12 98:18
**11:28**   69:18
**11:44**   69:24
**12**   104:12,14,15
**1241**   104:8
**12:38**   104:6
**12:58**   116:18
**13**   25:3 104:14
    107:8 192:12
**130**   187:3
**13th**   23:19,20
**14**   25:3
**14:31**   32:15
**17**   17:24 117:10,17
    171:3,10
**188**   192:5
**19**   84:8,11 99:3
    185:12
**1985**   22:9
**1986**   23:4,9
**1991**   23:9,14,21
**1998**   23:21,22

**1:08**   131:24
**1:46**   116:21
**1:47**   117:3
**1st**   104:15 172:22

**2**

**2**   58:15,16 65:19
    142:6 192:13
**20**   58:23 62:2 81:7
    83:21 84:12
    125:10 133:20,24
**2000**   24:8
**2002**   24:8,10,15
**2003**   26:23 27:3,12
    28:24 35:19 38:12
    39:12,25 40:9
    58:17,22 192:14
**2004**   24:14,15,17
    24:18 25:2 65:25
    66:21 67:23 68:21
    69:11 76:14,24
    77:11 78:5,11,20
    78:25 79:15 80:3
    149:14,17,22
    152:3,14
**2005**   58:23
**2007**   41:9 42:2,13
    42:17 43:6,17
    44:14 45:11,23
    175:15
**201**   194:23
**2011**   58:24 62:3
    81:7 83:21 84:8
    87:15 89:14,17
    103:21
**2012**   17:24 99:3,17
    104:13,15 105:13
    105:17,25 106:8
    106:19 107:4,12
    117:10,17 171:3
    171:10 185:12
    186:24

**2014**   25:3,4 88:19
**2018**   1:16 190:17
**21**   22:9
**212**   3:8,18
**217**   2:6 3:6 5:12
    69:25 104:10
    156:9
**24**   7:13,14 87:15
    89:13,16
**27**   14:6,8
**28**   58:17,22 192:14
**29**   107:12
**29th**   107:15
**2:33**   156:4

**3**

**3**   70:4,5 71:10
    81:7,8,11 87:14,20
    88:11,13 98:18
    103:21 188:16
    192:15
**30**   12:21 58:23
    95:8 193:16
**31**   65:25 66:21
    67:23 68:20 69:10
    76:14,24 77:11
    78:5,11,20,25
    79:15,24 80:3
**33**   161:11
**356-1000**   3:18
**36**   90:13 91:5
**37**   120:18
**3:20**   188:3
**3:36**   189:20,22

**4**

**4**   14:7,8 79:19,20
    80:8 85:3,10 86:3
    86:6,11,14,22 87:3
    87:8 192:16
**40**   146:8

**42**   120:12
**43**   90:2,7,9,9,10
    91:5 121:23

**5**

**5**   70:21,21,23
    88:17,18,19,21
    192:4,18
**5/5/2014**   192:18
**50**   91:14 92:12
**5037**   191:22
**53**   124:9
**566-8000**   3:8
**58**   192:13

**6**

**6**   12:21 95:7 98:25
    99:2 105:2 184:25
    192:19
**6th**   3:6

**7**

**7**   1:16 81:8,10,10
    83:25 99:15,16
    105:2,11 139:7
    192:20
**70**   192:15
**79**   192:16
**7:39**   32:16
**7:39:02**   32:17
**7:41**   117:18
**7:43**   119:13
**7:44**   144:8
**7:45**   141:25
**7:46**   120:12
    142:10 146:8
**7:47**   120:18
**7:48**   121:9,23
**7:54**   124:9
**7:55**   125:10

[8 - answer]                                                                                          Page 2

| | | | |
|---|---|---|---|
| **8** | abused  160:3,13 | administrative | 126:15 132:7 |
| **8**  87:15 88:14 95:3 | academics  186:25 | 64:2 | 147:23 149:2 |
| 95:5 132:13 | 187:16 | advantage  161:7 | 170:3 175:23,24 |
| **8/31/04**  70:23 | academy  22:8,11 | advice  181:5 | allowing  121:11 |
| **85**  22:14 89:23 | 22:12 | advise  161:17 | 131:22 135:14,16 |
| 90:10 91:7 95:7 | accept  170:20,20 | 162:23 | 136:22,25 137:5 |
| **88**  192:18 | access  118:5 127:2 | advising  162:16 | 140:2 |
| **9** | 154:11 | advisors  161:22 | amadon  1:6 |
| **9/17/12**  166:7 | accommodate | 162:11,18 | amendment  30:8 |
| **9/17/2012**  189:13 | 171:18 | advocacy  54:14 | 184:12 |
| **9/19/2011**  85:11 | accommodating | affairs  53:14 55:6 | amount  81:23 |
| **9/20**  84:2 | 170:24 | 55:14 64:25 65:10 | 150:18 156:14,21 |
| **9/20/11**  84:3 | accurate  89:15 | 165:7 189:5 | 156:22 157:4 |
| **9/20/2011**  84:9,16 | 118:6 130:4,8 | affect  7:18,22 8:2 | 158:20 |
| **9/24/11**  93:8,21 | 135:19 166:13 | 8:7 148:21 | amy  3:19 5:22 |
| 94:4,21 95:6,18 | 169:23 191:10 | afield  141:18 | 74:2 |
| 96:3 97:13,19,25 | 193:19 | agency  73:4 | andrew  26:8 |
| 98:15 | accurately  7:8,23 | aggressively  62:15 | angle  111:22 |
| **91**  89:14,18,20 | 8:3,8,12 30:11 | ago  14:25 | 119:7,12 121:24 |
| 95:7 | acd  90:17,18 91:2 | agree  12:21 67:13 | 124:5,12,14,25 |
| **92**  91:7,15 92:13 | acknowledgment | 67:17 119:14,18 | 128:12,14 129:2 |
| 93:15 | 153:17 | 147:2 185:25 | 129:24 |
| **98**  24:8 | act  83:7 158:7 | 187:16 | anniversary  18:2 |
| **99**  192:19,20 | acted  103:21 | agreed  4:4,9,13 | 45:6,18 46:8,16,24 |
| **9th**  23:7,8,16 | action  92:6 174:16 | 7:3 160:24 161:4 | 47:12 139:20,21 |
| **a** | 186:21 191:17,20 | ahead  153:10 | 171:2,9 172:9,14 |
| **a.m.**  1:18 5:11 | actions  96:15 98:4 | aide  26:10,10 | 189:14 |
| 119:13 124:10 | 98:9 186:12 | alcohol  7:13 | announcement |
| 141:25 142:10 | actively  146:22 | allegations  133:6 | 153:16 |
| ability  7:18,22 8:2 | activity  31:13 | alleged  74:23 | answer  6:17,24 |
| 8:7 13:5 31:22 | 164:3,5 | 75:15,20 76:6,10 | 7:6 9:11,14,17 |
| able  9:6 29:14 | added  50:16 150:4 | 189:2 | 11:12 27:10 34:8 |
| 103:13 119:16 | 150:6 | allow  118:5 136:2 | 36:15 39:18 41:11 |
| 120:5 123:22 | address  71:2 | 137:9 139:15 | 42:4,5 43:8,19,20 |
| 124:5,22 125:5,6 | addressed  62:5 | 142:19 143:4 | 45:13,25 50:12,21 |
| 153:21 161:17 | 181:7 | 148:20 160:14 | 50:23 53:5 55:16 |
| 179:6 | adjournment | 170:13 | 55:23 57:11 63:12 |
| absolutely  36:14 | 90:14,21,22 | allowable  160:8 | 63:19 66:11 68:24 |
| 113:25 162:23 | adjudicated  71:11 | 160:11,12 | 69:5 70:18 71:19 |
| 164:22 | 90:19,19 | allowed  121:14 | 72:3,24 73:14,16 |
| | | 125:16 126:8,12 | 73:21,22 74:5,6,7 |

74:25 75:3,22
76:20 77:6,15,20
77:23 91:11 94:9
97:6 98:9 102:22
106:22 107:14
111:7 114:6,14,15
140:6 152:6,8
157:2 158:10
159:7 173:10,15
174:24 175:17
176:11 181:19
183:14 187:9
**answered**   53:4
73:11,18 74:13,19
**answering**   74:14
84:25
**answers**   6:19
11:20,21,24 12:3
12:12 21:9 78:16
85:12
**anthony**   96:5
**anticipate**   159:12
**anybody**   120:23
121:19 143:10
160:22 167:10
168:12
**anymore**   22:17
**anyway**   49:25
**appeals**   41:8,25
42:12 43:5,16,24
44:13,22 45:10,22
46:6,14,22 47:10
175:14
**appear**   113:12
**appeared**   128:8
**appears**   50:4
122:23 125:8
137:4 142:8
**apply**   165:14,21
**applying**   164:17

**approaches**
119:15
**approaching**
167:9
**appropriate**   62:18
64:15 67:9 100:20
101:5 102:9,25
193:6
**appropriately**
103:22
**approximately**
15:17 87:16
101:15,19,20
112:6 120:12
128:24
**april**   40:9 58:17
58:22 192:14
**area**   31:14 53:21
67:24 125:17
127:4 165:3
**ari**   1:5
**arrest**   32:9 34:25
35:5 36:12,25
37:9 38:20 68:15
71:3 76:15 78:24
78:25 79:25 82:5
82:11,14,17 84:9
84:11 85:19 86:6
87:11,23 91:24
93:8 101:9,23
102:2,7,10,25
111:10 112:9,14
112:16 114:3,11
114:18,19,20,25
115:6,13,16,19,25
116:13 124:7
150:2 163:17
167:12 168:18,25
184:4,5,17
**arrested**   32:5,8
35:10,12 39:8

68:20 69:10 82:3
85:14 101:10,14
101:25 103:8
112:19 113:8
150:10 163:14
168:5 169:11
**arresting**   121:19
150:10,13
**arrests**   32:23 33:6
33:15 34:3 36:3,8
36:21 38:15,16,24
39:6,10 67:23
68:4,11 71:7
78:20 79:8 82:25
87:17,25 88:7
89:14,18,20 91:7
91:17 92:4,12,16
93:2,4,15,17 94:23
95:5,7 101:3,5,6
103:25 150:9,14
150:15 163:4
174:22 184:2
**article**   50:8 81:9
81:12
**articles**   47:17 48:4
48:25 49:15
**ascertain**   172:6
**asked**   67:10 134:3
176:9 178:10
**asking**   10:9 32:18
33:24,25 34:6,19
37:21,22,25 41:13
41:14,15 51:25
57:9 60:17,18
70:20,25 72:24
74:4 75:12 84:24
92:8,9,11 100:24
100:25 101:4
102:23 105:4,6
109:2,3 110:12
114:8,9 123:14

131:24 175:3
178:9
**aspect**   97:6,7
**aspects**   28:4
**assemblage**
170:14
**assemble**   164:22
**assembled**   153:14
**asset**   181:8
**assign**   170:25
171:8 172:5
173:13
**assigned**   22:13,16
22:18 172:8 177:7
**assigning**   173:23
**assignment**   22:14
25:12 26:13
183:11
**assistant**   63:4
**assume**   14:14
37:19
**assuming**   168:14
**assumption**
112:10
**assure**   155:20
**attached**   190:11
193:13
**attacked**   174:18
**attend**   22:7 171:14
171:14
**attention**   132:19
167:19
**attorney**   5:13
18:24,25 19:9,10
19:12 66:17 77:20
89:3 91:25 92:2,5
191:15,18 193:16
**attorney's**   91:22
92:20
**attorneys**   3:4,13
5:21 150:18

158:24 159:3
**audio** 38:25
**august** 58:23
65:25 66:21 67:23
68:20 69:10 76:14
76:24 77:11 78:5
78:11,20,25 79:15
79:24 80:3
**author** 18:4,10,13
105:18
**authored** 187:11
**authority** 162:10
162:13
**authorize** 184:4
**available** 162:7
176:24
**avenue** 164:15
**avins** 3:11 5:13
**avoid** 31:4 36:20
68:10 71:6 82:25
91:17 92:15 93:17
140:3
**avoiding** 140:7,7
**aware** 7:17,21
8:14 51:20 78:19
78:23 79:5 93:9
105:3 174:8
175:11 177:22
178:13 179:9
180:7,12 186:15
186:19,23

**b**

**b** 3:23 12:21 96:5
180:12 192:10
**back** 9:19 13:22
30:21 42:22 44:9
47:6 81:5 83:3
87:14 93:13 94:16
97:2 102:21 104:9
105:3 110:24
111:14 117:3

128:22 135:12
136:6 138:22
139:12 141:22
152:16 153:20
156:8 168:7
183:16,18 185:21
**backpack** 167:22
**bag** 168:7
**balance** 132:9
164:21 165:2,9
**balancing** 170:14
170:16
**bankruptcy** 1:2
**banks** 25:8
**banners** 122:16
**barely** 113:22
**barricade** 120:9
**barricades** 118:3
118:5 120:14,20
143:22
**barrier** 130:19
144:18 145:3,9,18
145:23
**barriers** 120:22
126:9 130:3 131:7
142:19 143:24
144:9 146:11,14
146:19,24
**based** 36:11 38:11
40:16,25 56:14,14
56:15 64:22 65:6
71:13,18 73:17
74:22 75:2,2,15,19
75:24,25 76:6,10
78:5,12,15,24
82:19 83:6,17
85:2 86:9 87:2,7
87:10 91:14 92:11
93:4,14 97:19,25
98:14 101:11
102:2 106:18

107:3 108:25
112:4 113:5,5,17
114:5,10,15,23
115:6,12,15,15,19
115:24 116:6,13
138:9 151:6,14
165:15,22 166:21
168:17 184:3
187:22,22 188:22
**basically** 26:11
50:11 173:15
177:12
**basics** 6:5,12
**basing** 85:4
112:14,15
**basis** 48:15 102:2
102:14 114:3,11
114:20,25 133:13
148:8,10 168:18
**bates** 28:16 59:9
59:14 60:2,4,14
88:22,23
**beard** 113:19
167:2
**beck** 1:5
**beginning** 71:22
72:22 74:11 75:11
116:9
**behalf** 1:7 9:23
10:9 11:18,21
12:3 72:17,18
**believe** 10:8 12:6
13:3 18:18 19:10
25:3 36:3 38:16
38:21 59:11 60:10
60:16 61:3,6
70:21 75:6 84:4,6
84:10,13 87:9
99:10 104:12
105:18 111:9
112:8 118:24

121:3 124:6 129:4
129:19 133:7
135:4,5 138:6,10
138:21,22 139:19
141:12,13,14
142:15,18 143:4
144:17 152:10
153:9 156:12
**believed** 39:5
**believing** 60:11
**berger** 1:5
**best** 13:5 55:10,10
56:18 149:9 178:7
179:15
**better** 109:12,13
130:17 150:11
156:18
**beyond** 106:20
107:13 130:20
187:8
**big** 118:13,19
138:16 144:15
176:13
**bill** 64:4
**binding** 11:25
**bishop** 123:19
124:4
**bit** 25:8 29:5 50:14
123:2 124:13,16
129:18,25
**black** 142:16,20
143:7 144:24
145:3 168:6
**bleeding** 132:20
**block** 103:9
145:18,24,24
147:19
**blockage** 32:20
33:14 34:2,15
**blocked** 29:13
102:5,12 103:4,14

108:12,18,23
109:4 110:12,13
110:20 111:25
128:13 129:7
133:14 143:25
**blocking** 31:19
32:22 33:19,23,25
34:18,20 35:4
100:13,18,22
102:10 103:2,8
113:9,12 143:22
146:22
**blue** 121:2
**bologna** 95:20
96:4,5,9,14,17,22
97:2,7,8,10,15,20
98:3,11
**booking** 150:5
**borough** 18:7,7
21:23 57:6 58:3
172:20 173:17
**bottom** 117:23
**bounce** 161:9
**bound** 12:3
**box** 57:21
**boy** 177:10
**brandon** 105:19
**break** 69:19 70:25
104:6 116:17
128:19 132:3
156:4,5 187:25
188:4
**brief** 177:12 178:2
**briefly** 22:6
**broad** 10:23 55:24
57:19 58:7,8
141:15,17,21
180:15
**broadly** 173:8
**broadway** 109:23
117:18 118:4

119:15 122:4,7,9
122:18,21 123:21
124:17,23 125:2,7
129:5 131:23
132:25 133:3
136:8,23 137:3,14
137:21,25 138:2,4
138:11 139:10,18
140:10,14,17,18
140:18 141:5,24
142:3 145:11
148:7,13 149:3
164:16 166:11
170:7
**bronx** 17:9 20:13
98:20 185:2,15
**brother** 80:20
**brothers** 80:17
**building** 27:4,13
117:5 128:13
140:21 160:25,25
167:3
**builds** 160:25
**bull** 153:13
**bulletin** 176:19
180:17
**bulletins** 176:14
177:5,11 178:16
179:10,21 180:3
181:11
**bureau** 3:23 5:25
15:3 19:3,7 21:24
53:14 55:6,14,21
55:25 56:23,24
57:3,24 64:25
150:17 154:18
158:24 159:3
161:22 162:11,18
163:7 174:12
176:14,18,19,22
177:4,11 178:16

179:10,21 180:3
180:17,19 181:4
181:10 189:6
**bureaus** 21:24
**burough** 24:11
**bus** 138:16,18
142:2,3,11 143:19
143:20,22,25
144:2,3,8,12,15,17
144:20 145:15,19
145:20 146:4,5,13
146:16,22 147:2,3
147:14,16 148:11
148:14
**buses** 144:3,5,7
147:14
**business** 126:7
132:15 164:25
165:13
**button** 167:22

**c**

**c** 3:2 150:3 159:17
159:17 191:2,2
**call** 15:12 41:18
80:25 126:23
153:4 160:20
162:14 171:23
179:6
**called** 9:8 27:4
177:14
**calls** 41:10 42:3
43:7 181:18
**camera** 33:20
102:16 114:13,21
115:3 118:25
119:10,11,12
121:24 124:12
128:14 129:24
169:24
**cameras** 111:16
117:14 118:24

129:13
**capacity** 10:3
**captain** 25:25
26:17
**captains** 182:16
**car** 142:7,14,17,20
143:7,13 144:24
145:3 147:5,8
**cards** 154:24
**care** 165:6,11
**careful** 62:19
**carefully** 193:5
**careless** 164:23
**carlyle** 27:4,13
**carrie** 3:23 5:24
117:4
**carter** 3:14
**case** 36:24 55:12
60:25 81:18,20
91:2,20 102:13
149:5 160:13
162:2 176:17,18
**cases** 17:16,18
18:14 20:16 71:9
72:10 79:2,3
88:12 90:10 91:24
92:9 95:3,5,19
151:14 189:7
**cater** 141:2,3
**cause** 33:6 34:25
36:12 91:23 92:3
92:4,10,25 93:5
100:22 101:9,10
101:11 112:8
162:19 163:5
184:3,5,13,16
**causing** 84:5
**cctv** 117:12
**cease** 164:2
**celebration** 45:7
45:19

**center** 142:5
147:14,16 150:2
**central** 50:6
**centre** 2:6 3:6 5:12
69:25 104:10
156:9
**certain** 53:21 85:6
121:11 125:16
161:5 170:24
**certainly** 85:15
92:2 162:21,23
163:8,18,18,21
**certification** 4:7
**certify** 190:9
191:5,9,14
**chairs** 100:15,16
**chance** 185:17
**change** 9:18 73:16
73:20 78:14 83:6
85:11,15 96:10,20
119:7,11 152:22
179:3 188:22
194:9,11,13,15,17
**changed** 40:25
78:12 96:10,14
97:25 98:14 107:3
116:6,13
**changes** 9:2,6,7
38:14 41:3,20
42:7 68:13,16,18
69:8 71:13,18
74:22 75:2,15,19
75:23,25,25 76:2,5
76:9 93:7 115:9
115:12,15,18
149:12,20,24
150:21 151:2,6,10
151:14,16 179:13
187:18,21,22
188:19 193:12
194:5

**changing** 74:5,6,8
95:13
**chanting** 30:9,10
**characterization**
118:19
**charles** 1:6
**check** 57:22
**checking** 30:2
**chest** 167:4
**chief** 15:2,3 18:9
18:11,24 19:2,19
19:25 20:4 24:19
24:20,22,24 25:5,8
25:9 52:4 53:19
54:2 135:5,7,9
172:19 173:2,16
173:17,22,25
**chiefs** 183:5
**chooses** 92:2
**chose** 92:5
**chris** 1:6
**christopher** 63:4
**church** 3:16
**churning** 127:11
**circumstance**
159:25
**circumstances**
27:7 39:7 62:18
66:3,9 67:16
81:16 82:13 86:2
87:23 104:20
107:11 163:20
176:12
**citizen** 53:9 54:12
**city** 1:10 3:15 5:23
9:23 10:3,9 11:3,9
11:11,18,21,25
12:22 14:5,6
21:17 25:15 35:4
35:24 36:20 37:15
37:19,23 38:2,9

39:13 40:2,7,13,18
40:22 41:4,21
42:8 43:21 44:10
44:19 46:3,11,19
47:8 59:24 61:24
62:6,16 63:5,25
68:10 71:6,23
72:5,7,8,9,14,19
73:3,8,9,14 74:12
74:14,16,21 75:5
75:13,14,18,21
76:15,25 77:8,25
78:2,8 79:13,25
82:24 83:12,18
86:14,19,25 87:6
92:15,24 93:6,16
93:22 94:4,22
95:12,16,25 97:11
97:16,22 98:8,12
103:19 105:23
106:6,15,24 115:4
115:8,11,14,17,21
116:3,10 117:9
118:12,14 151:5
151:13,21,25
152:10,25 164:20
166:18 170:8,19
170:22 172:16
173:11 174:6
176:4 184:19
185:12
**civil** 29:16,21 30:5
58:20
**civilians** 110:18,21
111:24
**claim** 133:14
**clarification** 7:10
17:23 19:5 21:18
26:16 28:8 31:8
35:25 40:21 63:2
93:3 112:24 119:9

125:23 127:16
128:16 136:10
147:6 155:21
**clarify** 137:19
**clean** 29:3 136:18
**clear** 6:25 71:21
103:18 131:10
**clearly** 21:9 83:8
126:12 149:5
**clerk** 5:15
**clip** 27:24 29:12
**clippings** 48:16
49:7,25 50:2 51:9
51:12
**clips** 27:23 30:3
**close** 121:4 162:6
**closed** 120:19
121:10 128:7,8
147:3 189:21
**closely** 174:15
**collate** 51:18
**collection** 51:15
**color** 79:21 192:16
**columbia** 186:25
**combined** 176:4
**come** 53:19 54:16
55:13 105:3
177:23 181:5
**comes** 54:18 57:14
117:14 144:15
150:24 177:9,16
**comfortable**
114:22
**coming** 14:23
132:24 137:21,25
148:17 174:10
**command** 57:2,5,7
**commander** 57:6
159:6,8 161:20
162:2,3,6,7,14,25
163:3

commanders
42:24 45:4 150:20
180:21
commanding 19:7
172:22 177:22
commands 177:18
commencement
191:6
comment 147:7
commercial 27:3
commission
194:25
commissioner
25:9 26:11 48:12
48:14 54:19 56:5
58:21 62:6,23
185:13 186:18,20
188:25
commissioner's
55:8 56:9,11
64:10,11,13,16
committed 112:22
112:23 113:4
communicate 15:4
communicated
19:11
communication
54:3,5 55:9 56:17
64:6,8,15
communications
12:11 63:24 64:3
company 27:4
complaint 51:11
51:16 52:11,12,12
52:14,17,20,21,22
52:24 53:10,11,15
53:16 54:7,9,12,18
55:2,17 57:8,14,14
58:5 62:22 64:5,8
64:10 65:18
186:13,16

complaints 47:19
48:6 49:3,19
50:18,18 52:7
53:8,17 54:16
56:12,19 58:25
59:5 63:16 67:12
99:23 100:2
completely 124:25
compliance 43:22
44:11,20 46:4,12
46:20 47:8 153:5
157:4,17
compliant 156:24
comply 39:15 40:4
76:17 77:3 83:14
86:16 93:24 94:7
94:24 106:12
158:8
computer 150:5
concern 96:25
concerned 81:2
96:19
concerning 11:13
67:23 105:12
187:13
concerns 185:13
conclusion 41:11
42:4 43:8 92:19
181:19
condition 7:18,22
conditions 35:11
conduct 32:24
33:16 34:3,16,21
35:2,6 36:16
37:17,23,24 38:3
54:5 55:15 87:10
100:20 149:8
163:14,16 164:3,5
164:10 181:12
185:14

conducting 164:10
confirmed 159:19
confusing 83:25
94:19
confusion 84:5
connor 1:5
consider 40:13,18
40:22 97:16,22
98:12 106:15,24
115:21 116:3,10
151:21,25
consideration
136:14
considered 64:5
78:3,9
consistent 36:4
38:17 41:6,23
42:10 43:3,14
45:8,20 68:4 82:6
82:11,17 86:7
104:2 111:10
constantly 61:9
constitution
175:21
constitutional
36:4,22 38:17
39:16 40:4,10
41:6,23 42:10
43:3,14,23 44:11
44:21 45:8,20
46:5,13,21 47:9,20
48:7 49:4,20
50:19 52:8 53:9
55:18 56:20 57:15
59:2 68:5 76:18
77:3,12 79:9,16
80:4 82:6,12,18
83:14,21 86:7,17
91:18 92:17,20
93:18,24 94:7,24
103:22 104:2

106:2,8,13 111:10
115:10 152:12
174:9 175:12,23
178:5 181:15,23
182:7,14,21 183:3
183:9,25 184:10
184:14,22
constitutionally
102:25 156:24
constructs 160:25
consultation
172:21 173:3
consumed 7:12
contact 52:19
contem 90:19
contemplation
90:14,20,23
continue 59:17
117:7 131:23
132:22 164:4
continued 69:25
116:24
control 153:9
154:19
controlling 76:2
176:17
convention 66:5
66:22 149:14,22
149:25 150:23
151:23 152:3,14
152:23
converted 29:2
cooper 28:12
cop 177:20
copies 79:21
155:23 192:17
copy 8:24 155:25
188:16
core 161:18
corner 130:2,7
141:2,3,4

**corporation** 3:15
**corporations**
118:14,19
**correct** 8:18,20,21
9:3,4,9,23,24
11:18,19,22 12:4,5
12:7 16:9,12
19:21 20:17 25:7
25:13,15 26:12,21
26:23 31:20,25
34:22 35:15,20,21
36:5,17,18 37:9,13
37:17 48:10,11
50:20 51:2 54:15
66:18,20 67:24,25
67:25 72:19,22,23
78:21,22 80:18,19
89:19,21,22,24,25
90:3,11,12,15 91:3
91:4,9 98:20,21
101:16,22 104:16
105:13,20 111:22
111:23 113:19
117:24,25 118:3,7
118:18 119:24
120:6,10,15,16,21
121:12,25 122:2,4
122:5,7,8,11,22,23
123:22,23,25
124:14,15,18,19
125:3,4,18 130:14
130:16 133:9,18
136:23,24 139:20
140:16 141:13
145:12 146:17
148:2,24 158:25
159:2 163:9,12
168:8 169:3,8,25
170:2,5 180:21,22
180:25 181:3
185:16 186:11

**corrected** 112:25
**correction** 92:23
92:24
**corrections** 190:10
193:5,7
**correctly** 157:24
**council** 185:12
**counsel** 3:15 4:5
12:12 73:17
159:24 160:11
191:16,18 192:22
**counselor** 165:20
**count** 133:20
**county** 190:4
**couple** 14:25
127:9
**court** 1:2 2:7 4:17
5:16,18 6:18 8:17
41:8,25 42:12
43:5,16,24 44:13
44:22 45:10,22
46:6,14,22 47:10
67:8 175:14 191:4
193:20
**cover** 89:4
**cowan** 1:5
**crack** 142:25
**create** 139:24
**creating** 140:3
**crime** 112:22,25
**criteria** 65:17
170:25 171:4,7,8
172:7,16 173:2,11
173:21
**cross** 118:6 120:23
121:12,14 136:13
137:14,22 147:19
147:23
**crossing** 30:24
119:24 121:13,16

121:20 136:8,8
**crosstalk** 14:12
**crosswalk** 117:23
118:2,4 119:24
120:20 121:4,11
128:6,9 137:2
148:21
**crowd** 156:10
**crowds** 31:5
**curb** 110:15
146:14
**current** 25:12,20
26:6,7,9
**currently** 25:18
**custody** 21:22
**cutting** 133:2
**cycle** 137:23 179:4

**d**

**d** 5:2 26:8 105:20
116:22 135:6
192:2
**d'amora** 26:8
**d2** 67:10
**d3** 104:11
**daily** 48:15 50:2
164:24 165:7
**database** 10:16
22:4
**date** 13:13 18:2
23:5 35:19 58:18
65:24 68:15 70:7
70:22 76:24 78:12
79:22 84:4,6,20
87:15,18,23 88:2,7
88:20 91:2 93:15
96:15 99:4,18
139:20,21 191:13
193:10 194:20
**dated** 58:17,22,23
58:23 62:2 88:18
99:2,16 105:17

185:11 192:13,18
192:19,20
**dates** 26:20,24
65:25 66:16,19
**day** 15:21 29:8
36:16 37:17,25
38:4,11 39:12
40:16,25 50:7
51:21,23 66:4
68:20 83:11 86:13
96:19 98:4,9
107:16 139:19
148:11,11,22
149:8 190:17
194:23
**day's** 51:10
**days** 8:23 14:25
177:15 178:24
179:2,3 193:16
**daytime** 165:8
**dc** 49:6
**dcpi** 48:13 49:6,24
50:24 51:15 52:7
52:10
**dcpi's** 51:17
**dealing** 181:4
**dealt** 161:16
**december** 103:21
**decided** 176:17
**decision** 41:9,25
42:12,17 43:6,16
43:25 44:13,23
45:10,23 46:7,15
46:23 47:11 79:6
79:12 163:4
175:15 181:25
**decisions** 163:11
188:22
**dedicate** 26:24
**deemed** 193:19

**deeper** 176:2,7
**defendant** 1:11
  3:13
**defendants** 89:21
**defense** 188:9
**del** 105:19,20
**dellerba** 1:6
**demonstration**
  31:12 53:22 127:4
  127:20
**demonstrations**
  132:8 152:7
**dennis** 1:15 2:4
  5:9 190:6,14
  191:6 192:4
  194:20
**densely** 165:3
**department** 5:23
  17:21 24:20,22,25
  37:20 50:5,25
  51:8 52:5,13,19
  53:13 54:2 62:7
  62:19,24 72:8,15
  72:16,18 73:8,12
  74:15 91:23
  131:13 134:4
  151:13 155:18
  161:11 176:5,15
  176:16
**department's**
  24:19 53:19 64:2
**depend** 54:8 57:21
  163:19 171:11
**depending** 52:14
  52:16,20,24
  114:22
**depends** 14:3
  53:15 54:6,25
  55:22 56:2 57:7
  58:4

**depicted** 86:6,13
  86:21 87:3,8
  103:20 128:5
  130:23
**depicting** 79:21
  192:16
**deposed** 6:7
**deposing** 193:15
**deposition** 1:15
  2:4 4:7,14 6:5
  8:23 9:16 10:2,13
  11:24 12:23,25
  13:7 14:21 18:17
  19:13 20:5,8,12,24
  21:4,16,21 22:3
  35:18 59:17 61:8
  66:24 70:2 72:22
  89:9 111:6 134:16
  185:6 188:16
  189:21 190:8
  193:4,13,17,18
**deputy** 48:12,14
  105:19
**describe** 20:22
  21:2 122:12 133:4
  178:7
**described** 64:9
  122:19 178:8
**describing** 179:16
**description** 180:8
**designation** 26:14
**detail** 17:20 18:5,8
  18:15 20:15
**details** 81:25 82:2
  171:17
**determination**
  36:7,11 39:9 56:4
  56:8 58:12 64:17
  64:21 65:6 109:14
  110:25 114:5
  134:6 172:17

  173:4,18
**determinations**
  151:18 162:8
  173:23
**determine** 33:4,18
  34:5,6,10,14 35:8
  38:7,8 54:22 55:9
  56:13 58:8 64:13
  65:18 72:25 82:19
  82:22 83:16 86:9
  101:11 108:14,20
  108:24 111:12
  113:17 134:10
  166:22 172:7,24
  183:23
**determined**
  100:12 101:8
  109:3 171:25
  172:18,19
**determines** 177:10
**determining**
  162:14 173:12
  184:21
**difference** 50:20
**different** 15:5
  27:23 28:3 31:6
  49:18 50:13,15
  51:19 60:12 80:16
  84:4,17,21 85:13
  85:14 87:17
  128:25 143:18
  146:2 171:19
  178:10 179:14
  181:22
**differently** 165:15
  165:22
**difficult** 33:18
  65:21
**difficulty** 113:25
**digital** 29:2

**direct** 56:17
**directed** 64:24
  114:17,19
**direction** 136:7
  170:4 174:21
**directives** 149:11
  149:19
**directly** 54:19
  63:12 114:7
**director** 63:5
**directs** 112:19
**disciplined** 96:6
  96:14,22,23 98:6,7
**disclosed** 59:9,12
**discourse** 47:19
  48:6 49:3,17
  51:22
**discretion** 92:21
**discuss** 35:18
  187:13
**discussion** 12:19
  13:21 42:21 44:8
  47:5 69:16 70:9
  81:4 93:12 94:15
  128:20 135:11
**dismissal** 90:7,9
  90:15,20,23 91:15
  91:16
**dismissals** 93:14
**dismissed** 90:3,11
  90:13,16 91:3,5,6
  91:8,21 92:9,13,13
**disobedience**
  29:17,21 30:6
**disorder** 153:9
  154:19
**disorderly** 32:24
  33:16 34:3,16,21
  35:2,6 181:11
**dispersal** 38:23
  39:2,5 62:17

153:2,7,22,23
154:7,9,10,11,12
154:15,18,20,22
155:9,16,20
157:10 168:23
**disperse** 156:11,13
158:7
**dispersed** 62:15
**displaced** 31:7
**disposed** 90:10
91:8 95:7
**dispositions** 89:23
90:2,5
**disregard** 143:16
**disseminated**
176:21
**dissemination**
48:16
**distinguishable**
167:10
**distribute** 178:9
**distributed** 155:6
155:10
**district** 1:3 89:3
91:21,25,25 92:5
92:20
**divisions** 21:24
**document** 9:12
10:13 13:12,16,18
14:17 17:16,17
61:22,25 62:8
70:6,10,13 89:2,8
89:13 105:7 185:8
185:11,19 187:7
192:12,15
**documents** 10:15
10:22,23 17:7,14
17:19 18:16 20:2
20:9,12 60:24
70:14 72:12

**doing** 13:19 65:7
98:23 126:16,21
126:24 139:13
150:8 179:15
193:9
**double** 142:8,14
142:20 143:5
145:3
**downtown** 118:14
**drafted** 177:11
**drafting** 68:17
**draw** 92:18
**drawn** 167:18
**dress** 168:6,6
**dressed** 165:16,17
165:23
**drink** 161:14
**drive** 28:13 144:3
**drop** 143:8,17
**dropping** 143:12
**drugs** 7:12
**duly** 5:3
**dunn** 62:25 63:4
63:11 65:2
**duty** 12:23

**e**

**e** 3:2,2 5:2 15:3,3
105:20 116:20,20
116:22 135:6
177:14 191:2,2
192:2,10 194:1
**earlier** 64:9 65:3
122:22 128:6
158:22 164:12
168:13 185:10,16
**early** 139:9 148:5
**easiest** 55:3
**east** 119:14 120:14
122:6,9,17 125:21
127:7,15,18
129:21 133:15

136:2,9,15,16
137:6 139:16,18
139:18 140:3,17
140:18,18 142:7
145:4
**ed** 80:24,24
**edge** 110:17
**educate** 179:7
**education** 180:5
**edward** 1:5 80:24
**effect** 4:16 171:24
**effected** 57:5
**effectuate** 102:24
**effort** 118:20,22
**efforts** 20:22 21:2
21:7,14,20 22:2
**eggs** 135:2,3
**elapsed** 15:19
**elected** 54:13
**electronic** 10:15
10:16 22:4
**elements** 159:23
**elizabeth** 1:22 2:7
5:18,20 191:4,23
**emergency** 25:10
25:15
**employee** 191:15
191:18
**employees** 21:16
118:12
**empty** 113:22
**engaged** 29:16
**engaging** 30:8
163:13,15
**ensued** 36:24 37:7
78:19
**ensure** 41:4,21
42:8,25 43:12,22
45:5,17 153:5
155:9,12 157:17
157:23 158:21

176:5 184:10,12
**ensured** 46:4
**entered** 22:10,12
91:2
**entire** 89:8
**entirety** 110:15
**entities** 14:6,9
**entitled** 35:23
187:3
**entity** 1:10 55:11
71:25 73:4 74:18
118:12
**entrance** 140:11
140:15 141:14,17
**errata** 193:7,10,12
193:15
**especially** 150:13
172:25 173:20
176:24 180:14
**esposito** 24:23
25:5,9
**esq** 3:9,11,19,20
3:23
**establish** 162:22
**established** 184:6
184:13
**establishing**
162:19
**estimate** 88:6
**event** 17:8 81:25
82:2 102:16
126:18 171:14
**events** 40:16,25
78:6 87:3,8 97:19
97:25 98:15
106:18 107:16
115:25 116:7
174:14
**everybody** 19:17
51:20 95:6 153:20
154:13,13 164:7

176:21,23
**exact** 6:10 23:5
  128:25 156:15
  163:15 186:17
**exactly** 15:23 58:9
  117:13 118:21
**examination** 5:5
  116:24 188:12
  191:6 192:3
**example** 10:7 14:4
  53:11,22,24 58:7
  65:9,20 153:13
  159:9 164:8 177:7
**examples** 56:14
  59:3
**exceeded** 57:15
  152:11
**exceeding** 47:19
  48:7 49:3,19
  50:19 52:8 53:8
  55:17 56:20 58:25
**exchange** 139:18
  140:8,11,16,20,25
  141:8,10,15
**excluding** 144:5
**excuse** 77:25
  81:10
**exhibit** 13:10,11
  13:15,24,25 18:19
  20:21 48:9 50:14
  58:15,16 65:19
  67:10 70:4,5
  71:10 79:19,20
  80:8 81:7,8,10,11
  85:3,10 86:3,6,10
  86:14,22 87:3,8,14
  87:20 88:11,13,17
  88:18,21 98:18,25
  99:2,15,16 105:11
  184:25 188:15,20
  192:12,13,15,16

192:18,19,20
**exist** 22:17
**exists** 118:13
**expect** 11:7,12
**experience** 56:15
  64:22 65:7 176:8
**experienced** 174:2
  175:25
**expires** 194:25
**explained** 10:24
  50:23
**explanation**
  166:19
**expressly** 10:4,17
  11:4
**extent** 21:6 60:25
**eye** 166:24

## f

**f** 116:20 177:14
  191:2
**faces** 111:16
**fact** 85:10 92:11
  102:11 103:3
  143:20 160:14
  161:8 179:17
  189:7
**factors** 64:20
**facts** 27:6 66:2,8
  67:15 74:23 75:15
  75:19 76:6,10
  81:15 85:25 87:22
  104:19 107:11
**factual** 133:13
**fail** 193:17
**fair** 164:17
**fairness** 156:20
**falls** 73:8
**false** 78:24
**familiar** 27:6
  42:16 66:2,8,15
  71:2 81:15 85:25

87:22 99:10,20
  104:19 107:10,16
  133:5,17
**far** 19:17 81:2
  96:9,19 101:14
  113:6 141:18
  171:19 179:13
**farmed** 57:25 58:2
**fashion** 54:17
  71:12 174:21
**faster** 119:20,22
**favor** 149:15
**february** 107:12
  107:15
**federal** 79:5
  140:21 141:6,9,10
**feel** 114:21
**feet** 130:6,20
**field** 42:25 45:5
  150:19,20
**figure** 28:18 126:3
**file** 32:10
**filed** 67:12 69:10
  71:13,18 74:17
  75:2,24 76:4
  78:15 83:4,5
  87:17 88:13 99:24
  100:2 105:12
  151:14,15,15
  186:17 188:20,23
**files** 20:9
**filing** 4:6
**final** 169:17,22
**financially** 191:19
**find** 52:2 66:7
**finding** 52:7
**findings** 187:13
**fine** 77:24 97:8
  101:18 146:23
**finest** 153:3
  177:14,17,22

179:10
**fingerprint** 150:7
**finish** 6:17 140:24
**first** 5:2 15:15,20
  16:7 22:14 29:5
  30:3,8 39:20
  61:25 70:23 80:25
  109:12 169:8,19
  172:15 184:11
**fit** 64:3
**five** 14:16 15:17
  69:19 101:3
  122:21 128:4
  187:25
**floor** 3:6
**flowing** 138:10,12
  138:14 139:10
  148:12,14 149:10
**fluid** 33:11
**focus** 109:6 119:2
  121:6
**focuses** 111:16
**focusing** 30:21
**foia** 89:4
**folks** 30:25 35:11
  39:9 96:18 100:13
  109:25 125:19
  129:13 132:18
  138:18 150:16
  155:14,17 158:17
  159:23 160:10
  161:7,17 163:7
  170:17 173:6
  175:19 178:21
**follow** 72:4 184:4
  186:2
**following** 38:7
  79:11 194:5,6
**follows** 5:4 116:23
**force** 4:15 81:21
  154:7

forces  21:23 154:5
fordham  186:25
foregoing  190:7
    191:10
forewarned  12:10
forget  139:5
    143:25 147:18
form  4:10 47:21
    49:5 54:3 64:14
    178:6
formal  177:12
forster  3:20 5:23
forth  30:21 41:7
    41:24 42:11 43:4
    43:15,24 44:12,22
    45:9,21 46:6,14,22
    47:10 175:13
    181:16,24 182:8
    182:15,22 183:4
    183:10 191:13
forward  65:21
    168:22
forwarded  52:23
    53:14 63:9 65:4
    189:5
found  51:12 59:21
    81:20 126:17,17
four  15:17 70:21
    138:5,6,6 169:2,6
fourth  169:4
    184:12
frame  112:3
    113:11
free  30:8
freely  119:17
friday  15:22,25
    16:2
friend  94:11
front  27:3,12
    107:12 109:21,23
    115:23 116:5,12

123:20 127:20
129:12,17 131:3
134:8,12 140:22
    158:17
fulfilled  13:4
full  15:21 27:24
    32:6 114:14
    129:11 145:18
fully  33:19
fulton  66:4,21
    67:24 68:21 70:24
    71:2,3,7,15 76:14
    76:23 77:10 78:21
    79:24
function  51:17
functionality
    160:23
funneled  53:20
furniture  100:14
further  4:9,13
    63:10 129:21
    133:15,23 134:13
    135:17 136:14
    140:9,13 144:15
    145:8 188:7 191:9
    191:14
future  8:24 36:20
    68:10 71:7 82:25
    91:17 92:15

**g**

g  5:2 96:5 116:22
gain  176:7
galvin  3:20 5:23
game  179:13
gannon  1:15 2:4
    5:1,9,22 6:1 7:1
    8:1 9:1 10:1 11:1
    12:1 13:1 14:1
    15:1 16:1 17:1
    18:1 19:1 20:1
    21:1 22:1 23:1

24:1 25:1 26:1
27:1 28:1,21 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1,2 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1

147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:6,14
191:7 192:4
194:20
gauge  172:4
gears  149:17
general  51:22
    60:20 71:16 103:5
    103:6 160:6
generate  51:16
generically  51:23
    130:10 132:14
gentleman  113:13
genuine  114:15
george  1:5 140:22
getting  32:4
    101:14 109:13
    121:17 186:6
gist  161:18
give  55:16 59:6
    88:6 114:13,14
    152:9 156:16
    157:13 160:10
    167:15 168:23
    173:9 185:17
given  8:24,25 39:2
    85:12 156:11,19
    157:8 158:6

164:14 174:21
**giving**   9:13 73:20
157:4,8,9,20
**go**   9:19 12:16
13:20 21:8 22:6
47:3 54:21 55:5
55:20,20,21,25
56:22,23,24,25,25
57:23 58:9 61:8
64:14,21 65:10
69:13 83:3 97:2
102:21 109:13
111:14 116:15
123:2 125:20
126:4,6,6,14,19
127:3,4 128:19
132:14,15 133:15
136:9 137:2,6,10
137:14 138:2,2
139:24 140:17
142:24 160:5
161:8 164:13,24
165:6,13 170:3
176:20 178:20,23
178:23
**goal**   170:13,18,18
**goals**   170:9,11
**goes**   56:8,11 57:17
119:20
**going**   6:4,4,13
9:16 11:16 12:9
21:8,9,10 27:18,19
27:24 28:3 29:5,7
29:19 30:20,23
31:11,14 32:11,13
33:20 53:2 59:16
61:11,14 69:18
70:3 71:25 74:9
74:10 75:11 85:22
92:7 94:17 97:2
98:17,22,24 99:5,6

99:7 102:21
104:11,12,22,23
104:24 107:7,8,10
107:25 109:8
117:7,8 119:6,6,11
119:19 123:2,3,10
127:6 128:18,23
132:3 133:2
134:13 136:12,13
136:15,17 144:16
146:13 154:14
155:16 158:13
165:7,7,8 170:5,6
171:13,14,20
175:20 180:6,9,23
181:21 184:24
188:14
**good**   5:10 6:2,3
65:4 116:16
119:23 159:18
**gotcha**   119:8
**government**   14:5
14:6
**grabbed**   111:15
**granting**   79:6
**gray**   166:25 167:2
169:5
**great**   74:7 132:10
176:25
**greater**   150:18
**greatly**   54:25
**ground**   158:24
159:4 178:6
**group**   27:5 54:14
75:11 118:22
127:18,21 132:17
137:20,22 153:14
153:15,19 157:25
158:4 169:3
171:16 186:24

**grouping**   75:7
**groups**   132:4
166:3,13 168:21
**guess**   48:17 51:22
118:6 179:15
**guide**   64:2
**guiding**   171:22
**guy**   102:15 108:8
166:25 174:2

**h**

**h**   159:17 192:10
**hall**   141:7,9,10
**hand**   123:15 141:8
141:11 154:4
**handcuffs**   124:6
168:10
**handed**   58:19
**handing**   13:14
59:17,19
**handle**   54:4 56:18
63:16 65:18
**handled**   37:20,22
52:21,23 53:18
54:2,17 57:17
59:5 60:19 64:3,7
64:12 72:9 95:14
189:3
**handles**   72:15
74:15,16
**handling**   63:24
148:4
**handouts**   153:4
**happen**   57:13
103:17 174:18
**happened**   36:16
38:11 54:6 65:22
85:2,11 96:7
101:12,13 114:12
114:15 115:3
168:15,16

**happening**   30:25
32:25 122:21
128:11
**happens**   52:18
56:7 170:21 176:5
**hard**   33:3 55:23
58:8 63:10 82:14
168:19 171:12,12
**harry**   135:5
**harvard**   187:2
**hat**   85:18
**he'll**   178:23,23
**head**   107:18
123:17
**heading**   130:7,21
**heads**   28:23
**hear**   6:21 30:10
74:8
**heard**   153:20
168:22 169:7,18
169:22
**hearing**   153:21
**held**   2:5
**help**   7:6 94:18
150:12,19,19
162:21 163:6,10
**hereinbefore**
191:13
**hereto**   4:6
**hey**   162:3 177:19
180:11
**hicks**   1:6
**high**   135:4 173:23
178:17 180:2
**higher**   172:25
173:20 176:6
179:7,8,9,20
**highest**   134:19
**highly**   173:25
**hired**   22:9

history  22:7
hit  141:9 147:5,8
hold  104:25
hole  121:17
home  165:8
hopefully  69:5
horn  153:13
hours  7:13,14
  15:17 16:15 17:2
  20:6
huh  140:19 145:5
human  187:4
hypothetical
  158:9 163:21

**i**

iap  52:6
idea  88:4 111:12
  167:13,15,17
iden  192:11
identification
  13:12 58:18 70:6
  79:22 88:19 99:3
  99:17
identified  117:11
identify  41:3,14
  41:20 42:7,23
  43:10,21 44:10,19
  45:3,15 46:3,11,19
  47:7 68:13,18
  69:2,4,8,12 78:2
  86:24 87:5,13
  93:16 95:15,24
  97:11 106:5
  108:11,17 117:21
  150:12,21
if's  74:8 160:16
image  85:18
  143:20
images  10:16 80:9
  81:9

impact  137:24
  149:4
impacted  149:7
impede  137:22
imperative  193:14
implemented  41:4
  41:21 42:8
important  180:16
improvements
  149:25
inability  133:22
incident  17:24
  26:19 27:2,7,10
  37:13,16 66:3,9,25
  71:8 81:6,16
  84:17,21,22 86:2
  98:20 99:24 100:2
  100:4,6 103:20
  104:13,20 105:11
  105:12 107:11
  111:7 150:20
  159:6,8 161:19,25
  162:3,5,6,7,13,25
  163:3 166:2 185:2
  186:17
incidents  35:19
  66:17 84:20
include  11:12 90:6
including  5:22
  10:15 14:7,8
  33:13 62:13 153:3
  169:5 187:14
inconsistent  36:21
  91:18 92:16,19
  93:17
incorrect  145:13
indemnified  96:7
  96:24 98:8
independent
  174:16

indicate  39:12,25
  76:15 83:11 86:14
  93:21 94:4,21
indicated  76:24
indicates  89:13
  135:3
indicating  79:7
indication  60:23
  61:2
individual  82:3,5
  82:10,17 83:7,7
  85:18,19 86:5
  113:19,23 115:15
  123:15 134:22
  167:9,19,21
individually  1:7
  98:5
individuals  110:20
  118:11 125:16
  150:10 156:13
  175:3 176:7
  187:11
inform  12:23
information  10:14
  10:16 11:13 20:23
  21:3,15,21 22:3
  35:22 38:2 48:13
  48:14 51:6 67:22
  178:9,13 180:24
  192:7
initially  161:10
initiative  118:16
inquiries  151:7
inside  159:13
  160:3
inspector  26:7
  80:14,25 81:2,20
  83:9 85:5 87:12
  95:20,22 96:4,6,9
  96:14,17,21 97:2
  97:10,14,15,20

98:2,11 105:19
  172:21 173:3
inspectors  182:23
instruction  77:19
  180:4
instructions  42:23
  43:11 45:3,16
  71:23 75:10 157:9
  193:2
intend  10:17,22
intentionally
  156:16
interested  157:14
  191:19
interject  180:10
internal  51:7,8
  53:14 55:5,14
  64:25 65:10
  100:16 189:5
intersection
  117:19 129:6
  130:22 141:20,21
  141:24
intersections
  140:9,13 141:5
intranet  51:8
investigated  52:15
  54:23,24 57:18
  189:8
investigation
  51:13 52:5,6 54:5
  55:15 100:4,5,7,10
  100:12,17,19
  101:4,7 111:5
  115:5 187:6 189:6
involved  72:11
  88:14 170:17
involves  185:2
involving  95:19
  100:4

**issuance** 79:12
153:7
**issue** 96:21 159:13
178:5
**issued** 41:9 42:2
42:13,24 43:11,17
44:14 45:4,11,16
45:23 79:6 153:24
153:25 154:4,12
154:25 155:4,10
175:15 181:11
**issues** 151:9 154:6
159:6,20 187:15
**item** 83:25

**j**

**january** 22:9 99:3
99:17 104:13,15
105:13,17,25
106:8,19 107:4
185:12
**job** 178:22
**joey** 28:20
**jon** 3:11 5:13
**jones** 41:8 42:2,13
42:17 43:5,17,25
44:14,23 45:11,22
46:7,15,23 47:11
175:13 181:16,25
182:8,15,22 183:4
183:10
**joni** 3:20 5:23
**joseph** 3:24 5:14
24:22
**judge** 79:6
**judgment** 78:24
79:7,12 85:6
160:12 174:4
**july** 22:14 186:24

**k**

**k** 80:15
**keep** 51:21 149:16
150:11 166:24
176:15
**kelly** 62:5
**kind** 10:14 11:6
22:19 50:8 96:8
96:11,20 132:25
155:17,25 160:5
161:18 163:20,23
164:20 179:15
184:7 188:25
**knew** 160:22
**know** 6:11,16,20
6:22,23,23,24 7:7
9:11,13,19,22 10:8
11:7 12:11 13:16
14:11 17:25 18:12
18:23 19:9,11,16
27:14 28:16 30:24
30:25 31:2,4,5,15
32:25 34:4,4,9
36:6,7,8,9,10,12
36:19,25 37:3,7,8
37:11,12,15 38:13
38:19,19,25 39:2,3
39:7,8,10 40:6,12
40:17 41:2,12
42:5,6 50:6 51:9
51:10 52:22 55:24
56:13 57:11,17,21
60:7 61:6,6,19,20
63:8 64:18 65:4,8
65:23 66:6,12,13
66:13 68:3,8,9,12
68:22 69:4 71:16
72:11 74:18 75:10
75:21 76:2,22
77:7,8,18 78:8,16
79:2,2,3,11,17

80:6 81:24 82:10
82:13,16,21,22,23
83:8,18 84:17
85:16 86:5,18,23
87:25 88:9,10,12
88:15 92:22 95:10
95:22 96:5 99:23
99:25 100:3,8,11
101:12 102:13,18
105:22 106:4,14
106:23 107:6
112:15,18 113:4
113:13,14,15,15
113:16 114:12,16
114:18,19,20
115:2,4,8,11,17
118:18,19 120:24
125:12 126:11,16
126:18 129:19
130:20,25 131:15
131:17,19 134:6
134:19 139:9
142:4,16,17
146:23 148:9
152:8,9 154:3,13
154:18,23 155:5,7
155:19,19,19
156:15,19,25,25
158:10,15 160:8
160:18,21 161:3,6
161:10,13,15
162:8,12,13
163:21,24 165:10
167:19 169:9,21
170:8,20 171:25
173:5,21 174:2
175:5,7,7,8,9,20
175:21 176:9,10
176:11,12,13,20
179:8,12,19,22,22
179:23,24 180:10

180:13 181:10,20
182:5,12,19,25
183:7,21 184:11
186:14,20 187:10
187:17
**knowing** 60:12
112:5
**knowledge** 58:13
85:2 175:2,4
176:2,7 181:14,23
182:6,13,20 183:2
183:8
**koznar** 107:17
108:2,4,7 111:15
112:2,12,13 113:7
113:9 115:6,13
**koznar's** 111:9
114:3
**kruger** 186:16
**kruger's** 186:22
**kuntsler** 35:23

**l**

**l** 5:2 96:5 105:20
116:22
**lacks** 63:14
**land** 146:10
**lane** 138:23,24
142:2,5,7,11,12,12
143:20,22,25
144:6,8,12,17,20
145:11,14,15,18
145:20 146:4,5,13
146:16,22 147:2,3
147:16
**lanes** 138:3,13,19
141:22 142:9
144:2,3 145:16
146:7 147:9,12
**language** 154:21
**large** 137:20,22
158:24

**larger** 31:5
**larry** 1:6
**late** 158:14
**laugh** 142:23
**laughing** 143:15
**law** 5:3,23 8:17
  37:20 72:8,9,15,18
  73:8,12 74:15
  76:2 164:17
  165:14,21 179:13
  186:25,25 187:2,2
**lawfully** 62:16
  164:2
**lawsuit** 36:24 37:7
  37:8,19,20,22
  68:14,17,19 69:9
  78:19 133:6,8
**lawsuits** 67:8
  71:14,18 74:17,23
  75:3,16,20,24 76:4
  76:7,11 83:5
  87:17 151:15
  188:19,23
**lawyer** 19:18
**leaderless** 171:24
**learn** 179:25
**leave** 156:17,18
  157:5,14 158:19
  158:19,21 159:23
  163:17 189:15,16
**leaving** 170:2
**led** 82:14
**left** 113:13 117:5
  118:25 129:14,14
  158:21
**legal** 3:23 5:24
  15:3 19:3,7 21:24
  41:11 42:4 43:8
  55:21,25 56:23,24
  57:24 63:4 72:10
  150:16 151:18

154:8,8,17,17
158:24 159:3,6,20
159:23 160:10,16
161:2,17,21
162:10,15,18
163:7 174:12
175:19 176:10,14
176:18,19,22
177:4,9,9,11 178:4
178:16 179:9,21
180:2,7,9,16,18
181:4,8,10,19
**legality** 175:18
**legislation** 75:25
**legislative** 47:17
  48:5,25 49:16
**letter** 58:17 63:3
  88:18 89:5 99:2
  99:16 185:24,25
  185:25 186:18,22
  188:25 189:3,4,4
  192:13,18,19,20
**letters** 56:12 58:20
**level** 81:21,21
  128:14 178:6,21
**levels** 157:22
  184:9
**liberties** 58:21
  63:5
**lieutenant** 6:2
  23:25 24:2 25:21
  25:23 26:13,14,15
  33:7 70:11 117:24
  156:10 188:14
**lieutenants** 182:9
**lights** 137:24
  144:19
**likelihood** 57:23
  172:19
**limit** 175:12

**limited** 30:23
  31:10,10 49:7
  50:9 62:18 109:6
**limits** 36:5,22
  38:17 39:16 40:5
  40:10 41:6,23
  42:10 43:3,14,23
  44:12,21 45:8,20
  46:5,13,21 47:9,20
  48:7 49:4,20
  50:19 52:8 53:9
  55:18 56:20 57:16
  59:2 68:5 76:18
  77:3,12 79:16
  80:4 82:6,12,18
  83:15,22 86:7,17
  91:19 92:17 93:18
  93:25 94:7,25
  103:23 104:2
  106:2,9,13 111:11
  115:10 152:11
  174:9 175:23
  181:15,24 182:7
  182:14,21 183:3,9
  183:25 184:22
**line** 121:2 138:24
  146:14 194:8
**lined** 109:17
**lines** 174:13
**lining** 121:3
**linked** 81:10,13
**list** 17:16,18 18:14
  20:15 26:19 65:24
  66:16 67:7 107:8
**listed** 81:8 88:8,11
  88:13
**listen** 102:22
**lists** 84:2
**litigants** 88:10
**litigation** 35:23
  72:11,15 74:16

78:13,16 85:5,15
  151:12,19
**little** 25:7 50:14
  83:25 119:20,22
  123:2 124:13,16
  129:18,25 186:6
**live** 150:6 165:2
**liz** 186:16
**lmsi** 117:12 118:8
  118:15 189:10,11
**local** 56:25 58:3
**locate** 20:23 21:3
  21:15,20 22:2
**location** 50:6
  70:23 129:2
**locations** 62:13
  70:22
**long** 15:14,15
  16:13,25 18:22
  20:4 23:8,20 24:6
  24:12,24 74:3
  101:16 143:16
**longer** 25:8 88:25
  117:6 122:3,20
  123:21 157:14
**look** 17:7,13 20:2
  32:19 35:12,22
  47:23 55:11 56:2
  61:22,25 81:7
  97:5,7 98:17
  104:11 109:16
  114:8 117:8
  123:14 145:20
**looked** 17:15,15
  17:20 26:19 63:10
  66:16
**looking** 33:8,9
  34:5,11 35:8 48:9
  62:10 65:19 68:23
  85:9 87:14 89:12
  105:10 114:9

117:18 129:4,5,10
145:2 147:20
184:6
**looks**  32:21 33:22
34:17 121:16
123:16 126:25
127:10 147:15
148:8,10 168:9
**lot**  30:20 122:10
127:24 154:6
179:8
**lower**  118:15,17
131:7
**lt**  1:15 2:4 5:9,22
28:21 70:2 190:6
190:14 191:6
192:4 194:20
**lump**  73:13
**lunch**  116:17
165:8
**luncheon**  116:18

**m**

**m**  3:9 26:8 150:3
**machine**  177:16
**machines**  150:6,7
**main**  51:17
**maintained**  11:8
**making**  33:15 54:8
59:25 112:10
**management**
25:10,16
**maneuver**  126:8
**maneuvered**
120:10
**manhattan**  18:7
24:11 53:25 54:3
57:3 118:16,17
143:7,15 172:20
173:17
**mapc**  150:3,4,17

**march**  26:22 27:3
27:12 35:19 38:11
39:25 166:10
171:20
**marching**  157:25
158:4
**mark**  13:9 58:14
70:4 79:18 88:16
98:24 99:14
**marked**  13:12,15
58:17 61:10,15
70:6 79:22 80:8
88:19 99:3,17
104:23,25 142:8
184:25,25 188:15
**married**  94:11,12
**mass**  150:2,8,14
**matched**  174:15
**math**  91:12
**matter**  12:24 13:7
57:20 61:16,17
104:17 126:16
153:3 163:22
**meachem**  1:6
**mean**  10:14 28:9
28:10 54:15 55:21
60:5 65:23 71:12
73:3 75:24 103:17
109:11 112:20
142:23 146:23
147:4 155:24
163:19 174:17
175:6,8 179:18
181:7 184:2
**means**  91:7
**meant**  136:14,15
**measure**  101:17
157:7 179:24
181:14,22 182:6
182:13,20 183:2,8

**measured**  44:11
46:12 47:8 174:20
**medications**  7:25
8:5
**meet**  16:13 20:4
187:16
**meeting**  15:20,20
16:19,25 17:4,6
187:12
**meetings**  15:11,12
16:20
**member**  25:17
64:18 177:3
185:12
**members**  43:11
45:16 130:15
153:2,6 172:7
174:7 175:11
177:3 178:12,18
181:17
**memory**  26:25
66:14 107:18
**mental**  7:21
**mention**  58:6
**mentioned**  64:9
78:14 97:10,15
**mentions**  50:24
52:7 57:24
**message**  153:19
177:17
**messages**  153:4
177:14,15,23
179:11
**met**  14:22,25 15:2
16:7,10 19:25
**metal**  145:23
**michelle**  1:5
**middle**  109:18
127:21 142:12
146:10,25

**midtown**  24:5,6
**mind**  41:18 150:24
**mindset**  36:9
38:20
**mine**  49:21
**minor**  81:23
**minute**  59:18,20
69:19 187:25
**minutes**  99:7
101:16 105:6
107:21 122:21
128:5 139:7
**miscoduct**  53:12
**misconduct**  55:4,5
55:12 64:24 65:8
189:3
**missed**  116:8
172:15
**misunderstood**
136:11
**moment**  18:3
111:14 112:11
113:4 143:5
146:15,17,18,19
155:15 178:21
**momentarily**
143:12 149:9
**monitor**  48:17
51:25 157:3,19
174:7 175:5,9,10
177:2 178:11,14
178:15
**monitored**  44:20
46:20 118:11,25
**monitoring**  47:16
48:3,24 49:15
50:17,17
**monitors**  50:24
157:17 175:3
**month**  91:15

months  22:15
  90:25 91:6,9
  92:14
morning  5:10 6:2
  6:3 16:4,11,14
  117:16 132:13
mos  80:17 130:13
mouth  131:8,9
move  69:6 79:23
  107:7 118:25
  119:2,19 120:5
  125:6,16 127:8
  135:14,16 144:25
  169:10
moved  22:25 23:6
  121:24 124:13,25
  143:19 145:19
movement  44:15
  127:11
moving  34:14
  120:13 129:21
  143:24 145:23
multi  13:11
  192:12
multiple  84:20
  88:14 150:15
municipal  1:10
muster  153:4

**n**

n  3:2 5:2,2,2,2,2
  80:15 96:5 116:20
  116:20,20,22,22
  116:22,22,22
  135:6 177:14
  192:2
name  5:7,11,17
  39:20 80:25
  112:12
named  186:16
narrow  10:18

national  66:5,22
  149:14,22,25
  150:22 151:23
  152:3,14,23
nature  52:14,17
  52:20,24 53:16
  54:6 55:2 58:5
  102:18
necessarily  76:3
  83:6 87:10 112:20
  160:8
necessary  193:5
need  6:16 9:13
  66:7 78:5 149:16
  177:11 186:4
needed  38:23
  40:15,24 78:11
  97:18,24 98:14
  106:17 107:2
  115:24 116:6,13
needs  181:6,7
neighborhood
  22:18 23:2
neither  191:15,17
never  18:20 37:10
  161:16
new  1:3,10,17,17
  2:6,6 3:7,7,15,17
  3:17 9:23 10:4,10
  11:3,9,12,18,21,25
  21:17 25:15 35:4
  35:24 36:19 37:16
  37:19,24 38:2,9
  39:13 40:2,7,13,18
  40:22 41:4,7,21,24
  42:8,11 43:4,15,22
  43:24 44:11,12,20
  44:22 45:9,21
  46:4,6,12,14,20,22
  47:8,10 58:20
  61:24 62:6,23

63:5,25 68:10
  71:6,23 72:5,7,8,9
  72:14,19 73:3,8,13
  74:12,14,16,21
  75:6,13,14,18
  76:15,25 77:8,25
  78:2,8 79:13,25
  82:25 83:12,18
  86:14,19,25 87:6
  89:3 92:15,24
  93:6,16,22 94:5,22
  95:12,16,25 97:11
  97:16,22 98:8,12
  103:19 105:23
  106:6,15,24 115:4
  115:8,11,14,17,21
  116:3,10 117:9
  118:14 139:17
  151:21,25 152:10
  164:20 166:18
  170:8,19 172:16
  173:11 174:7
  175:12,14 176:4
  178:4 181:15,23
  182:7,14,21 183:3
  183:9 184:19
news  52:10 65:5
newspaper  47:17
  48:15,25 49:15
  50:2,4
newspapers  48:4
  50:8,9
nice  65:3 181:8
non  14:5,6 132:5
  163:15,16 164:4
nongovernment
  14:9
norm  96:11 98:5
normal  137:23
  148:8,10

north  24:5,7
  117:18 127:8,15
  127:17 129:5
  130:7 132:25
  145:8 147:17,18
  170:7
notary  2:8 4:15
  190:20 194:25
note  10:12
noted  116:21
  189:22 193:12
notice  177:13
november  41:9
  42:2,13 43:6,17
  44:14 45:11,23
  175:15
nowadays  51:5
  176:23
number  6:10
  20:21 50:12 70:21
  70:21,23 71:10
  81:8,10 83:25
  86:11 87:15 88:14
  98:18 104:12,14
  104:14 107:8
  143:18
numbers  59:10,14
  60:14
nyc  91:17
nyclu  58:24
nypd  3:23 5:24
  11:2,6,8,13 22:7
  25:17 39:11,13,24
  40:2,8,14,19,23
  41:5,22 42:9,25
  43:12 45:5,17
  47:15,19 48:2,6,23
  49:3,19 50:18
  52:8 53:6,8 55:17
  56:19 57:10,15
  58:11,22 59:5

62:21 63:15 64:6
65:17 67:11 69:9
71:12,17,24 72:4,6
72:10,25 73:5,9,12
73:13 74:13,13,17
74:22,25 75:13,15
75:19,23 76:5,8,13
76:16,22,25 77:10
78:4,10 79:14
80:2 83:5,10,12,20
86:12,15,20,25
87:6 93:6,20,22
94:3,5,20,22 95:17
96:2 97:12,17,23
98:13 105:22,24
106:7,11,16,25
115:22 116:11
118:15 132:9
142:15 143:4
144:18 148:3
151:5 156:12
157:3,16 158:2
164:25 165:14,21
170:9,19 174:5,6
175:3,10 177:2
178:11 179:18,25
181:14,22 182:6
182:13,20 183:2,8
184:20 185:13
186:12,18,21
187:3,6,12,15,18
187:21 188:18,21
189:2
**nypd's**  49:13
**nyu**  186:25

**o**

**o**  5:2 26:8 96:5,5
105:21,21 116:20
116:20,20,22
159:17 160:20

**o'clock**  132:13
**o0o**  116:19 192:21
**oath**  8:15,16,19
**objection**  39:17
41:10 42:3,14
43:7,18 44:3,16,25
45:12,24 46:9,17
46:25 47:13,21
49:5 50:22 59:23
60:2 63:18 66:10
67:3 68:6 70:17
73:7,17 74:3
76:19 77:5,13,22
91:10 106:20
107:5,13 140:5
152:5 169:12
175:16 181:18
182:3,10,17,18,24
183:6,13,20 187:8
**objections**  4:10
**obligation**  13:4
**observed**  17:11
**observing**  119:6
119:11 121:24
124:21
**obstruct**  147:24
**obstructed**  126:2
**obstructing**  34:24
148:5
**obstruction**
145:17,21
**obvious**  56:15,16
64:23
**obviously**  28:5
128:12 178:25
**occasions**  15:6
**occupied**  144:2
**occupy**  43:2,13,25
44:15,23 45:7,19
46:8,24 47:12
152:23 159:9,11

160:15,21 161:7,9
161:11 170:9
171:12 173:8,13
173:14,24 180:8
183:12 187:5,14
187:19
**occur**  52:7
**occurred**  53:25
63:8 66:3 84:11
185:15
**occurrence**  105:14
105:15
**october**  58:23 62:2
**oem**  25:6,14
**offense**  112:23
113:2,3
**office**  5:12,14
24:19,25 25:2
27:5 53:20 55:8
64:11,11,13,17
69:24 91:22 92:21
104:10 156:9
176:23
**officer**  5:3 19:7
22:24 53:17 55:4
57:25 58:4 80:12
80:14 112:6
114:16 121:17
127:22 130:13
134:20 135:4
143:9 153:18
157:8 167:8
172:22 174:18
176:21 177:7,22
180:2
**officers**  21:23
36:10 51:6 62:14
113:22 116:5
120:13 121:2,14
130:3,7,9 131:6
133:20,25 134:15

136:21,25 137:5
137:13 139:15
143:21,24 145:22
150:11 166:16
172:13 173:24
174:13,16 175:7
175:21 178:3,17
178:25 179:9,20
183:12 184:16
**offices**  2:5
**official**  54:13
**officially**  26:13
**oh**  77:16 90:8
119:8 124:11
149:23 150:16
158:14 172:11
180:10
**okay**  8:22 9:10,20
9:21 10:5,11,19,24
11:9,14 12:14
14:7,10 15:19
17:13 18:24 21:13
22:13,22 23:22
24:3,9,12 26:4,18
27:2,18,21,22
28:15 29:23 33:24
49:23 50:23 53:2
61:24 67:17 68:25
69:7 77:21 80:7
85:9,20,21 94:19
96:25 97:4 98:10
101:17 104:5,24
107:7 108:3,5
119:4 121:22
124:12 127:6
128:4 129:8
136:19 138:21
143:3 166:9
185:20 187:24
188:14 189:20

**old** 32:10 177:15
**once** 14:25 52:2
**ones** 155:2
**ooh** 147:4
**open** 109:17 118:2
  118:5 128:6 138:7
  138:23 141:23
  142:11,13 143:21
  144:3,6,8,12
  145:15 146:4,5,7
  147:3,10 148:12
  161:5 172:2
**opinion** 42:13
**opportunity** 9:2
  73:20 156:17
  157:13
**opposite** 136:15
  141:3,4
**orange** 85:18
**order** 58:11 67:20
  102:7,9,24 126:9
  134:16 155:20
  156:11,23 157:10
  158:7,8 164:15
**ordered** 164:2
**orderly** 174:20
**orders** 38:23 39:2
  39:5 62:17,20
  153:3,7,23 154:8,9
  154:10,11,12,16
  154:18,20,22
  155:9,13,16,22
  157:7,20 168:23
**original** 127:19
  193:15
**outcome** 100:11
**outgoing** 178:3
**outright** 90:11
  91:5,14 92:13
**outside** 33:2,2,20
  43:18 44:3,16

66:10 67:3,5 68:6
  77:13 114:8
  125:17 126:9
  175:16 182:3,10
**outweighed**
  160:14
**owned** 160:19,20

**p**

**p** 3:2,2 105:21
  150:3 160:20,20
**p.m.** 116:18,21
  189:22
**packard** 1:5 88:23
  89:6,8 123:19
  124:4 133:10,10
**page** 13:11 14:7,8
  14:16 51:8 58:16
  61:25 62:10 70:5
  79:20 89:5,12
  187:3 190:11
  192:3,12,13,15,16
  194:8
**pages** 190:8
**panned** 129:24
**paper** 10:15 50:7
  155:3
**papers** 51:21,22
**paragraph** 14:6,8
  62:11
**parameters** 161:6
**pardon** 157:9
**park** 107:12
  109:22 111:21,23
  115:24 116:6,12
  142:20 143:5,10
  159:13 160:3,4,6
**parked** 142:6,14
  143:13 145:4
**part** 48:19,22
  51:14 66:22 72:15
  85:5,15 88:25

94:18 110:7
  113:14 131:7
  171:21,22 172:15
  174:19,22 176:13
  180:5
**partially** 30:13
  121:10
**participating** 30:5
**particular** 11:6
  32:8 57:5,7 65:20
  80:20 81:19 112:3
  112:17 113:11
  114:17 130:22
  172:12
**parties** 4:6 117:4
  118:21 191:16
**passed** 141:8
**path** 133:14
**patrol** 18:7 24:11
  57:3 58:3 172:20
  173:16
**paying** 132:19
**pbms** 24:13
**peaceful** 170:14
  170:21
**peat** 104:17
**pedestrian** 31:19
  34:24 35:4 102:10
  102:11 103:2,3,9
  103:10 113:9,12
  128:7,9 145:24
**pedestrians** 30:18
  102:4 103:14
  108:11,17,22
  109:4,9 110:11,19
  110:24 111:25
  119:16,23 120:4
  122:10 124:22
  125:6,8 127:7
**pending** 143:2

**penned** 158:2,5
**people** 27:13,15
  29:14,16 30:5,7,14
  30:15,16,20,21,24
  31:4,5,6,11,12,15
  31:18,23 32:3,4
  34:17 35:2,5 41:8
  41:25 42:12,16
  43:5,16,25 44:13
  44:23 45:10,22
  46:7,15,23 47:11
  49:25 50:5 56:18
  62:15 68:20 69:10
  88:8 101:22
  109:17 110:4
  118:25 121:11,13
  121:15 122:19
  123:20,24 124:21
  126:12,23 127:3
  127:14,15,17
  131:22,25 132:5,7
  132:10,11,14,24
  143:16,23 147:5,8
  148:20 150:13
  154:9 155:24
  156:16,17 157:5
  157:13,25 158:4,6
  158:11,15,16
  160:17 163:23
  164:9,14,22 165:3
  165:10,12,15,17
  165:22 166:3,10
  169:2 170:2,3,5
  171:13 172:3,5
  173:20 175:13,25
  176:2 178:22,25
  179:11 181:16,25
  182:8,15,22 183:4
  183:10 189:15
**people's** 164:21

**pepper** 96:18
**percent** 61:23 91:7
  91:14,15 92:12
  93:15
**period** 179:4
**permitted** 163:16
  164:4,13 189:16
**person** 15:11,13
  16:19,21 55:10
  64:15 65:7 74:15
  74:18 85:14
  101:25 114:17
  143:17 157:20,21
  159:16
**perspective** 98:4
**perused** 185:19
**phillips** 1:6
**phone** 15:12
**phones** 51:7
**phonetic** 28:7
  88:22
**photographers**
  127:25
**photographs** 84:3
  84:7 86:3
**photos** 79:21
  82:15 150:9
  192:17
**phrase** 10:21
  14:15
**physical** 7:17
**picking** 143:11
**picture** 85:9
  167:11
**pictures** 82:8 85:7
  86:10
**pink** 123:16,18
**place** 58:11 63:16
  145:23 183:22
  184:18 191:12

**placed** 124:7
  168:9
**plaintiff** 123:19
  188:15
**plaintiff's** 105:2
  192:11
**plaintiffs** 1:8 3:4
  13:11 58:16 70:5
  78:23 79:7,19,20
  80:8 88:14,18
  95:9 99:2,16
  188:7
**platoons** 178:3
**play** 32:11 111:16
  119:21
**played** 29:9,22,25
  32:12 34:12 99:9
  99:13,19 107:22
  108:6 111:18
  117:20 120:2
  121:8 123:6,13
  124:24 129:3,23
  131:20 166:8,23
  167:7,20
**please** 5:7 10:12
  41:20 70:4 87:4
  94:2 102:22
  149:18 152:18
  193:4,9
**pllc** 2:5 3:5
**plug** 121:17
**po** 22:23
**point** 22:22,25
  49:24 56:7 62:12
  80:17 85:7 94:13
  100:13,18,23,24
  101:23 112:16,22
  112:23 118:23
  119:5 124:6,23
  125:7 129:22
  133:15 135:8,13

135:15 136:21
138:8 139:4,5
141:18,20 143:14
144:14,16 145:10
146:8,24 147:2,9
148:19,19 153:4
159:14 164:7
166:11 167:8
169:2
**pointed** 112:7
**pointing** 113:18
  134:23
**points** 170:24
**polaroid** 150:9
**police** 17:21 19:2
  21:22 22:24 36:5
  36:16,22 37:17,23
  37:24 38:3,10,18
  38:23 39:16 40:5
  40:10 41:7,24
  42:11 43:4,15,23
  44:12,21 45:9,21
  46:5,13,21 47:9
  50:4,24 51:5,8
  52:19 53:13,17
  55:4 58:25 62:6
  62:14,23 63:25
  64:11 68:5 72:16
  76:16,18 77:4,12
  79:16 80:4 82:7
  82:12,18 83:15,22
  86:8,17 91:19,22
  92:17 93:7,18,25
  94:7,25 100:20
  103:21 104:3
  106:2,9,13 109:18
  110:16,17 111:11
  113:22 115:5,9,12
  115:18 120:13,19
  121:2,10,14,17,19
  125:17 126:9,20

126:22 127:22
129:12,16,19
130:3,7,9,13,22
131:2,6,13,22
132:2 133:14,20
134:4 135:13,16
136:25 137:5
138:25 142:18
143:9,13,21,24
149:7 155:18
161:10 166:11,16
167:8 173:24
174:9,14 175:13
176:5,16 178:3,25
181:16,24 182:8
182:15,22 183:4
183:10,25 184:22
185:14 189:2
**policies** 47:15 48:2
  48:23 49:14 53:6
  78:15 83:6
**policing** 39:11,14
  39:24 40:3,8,15,20
  40:24 41:5,22
  42:9,25 43:12
  45:5,17 76:13,23
  77:2,10 78:4,10,12
  79:14 80:2 83:10
  83:13,20 86:12,15
  86:20 87:2,7
  93:20,23 94:3,6,20
  94:23 95:17 96:2
  97:13,18,24 98:13
  105:24 106:7,11
  106:17 107:2,3
  115:23 116:5,12
  149:13,21 150:23
  151:3,4,11,17,22
  152:2,12,13,21
  158:23 183:23,24
  184:20,21 187:14

187:19
policy 11:7,8
  51:24 58:10 71:13
  71:17 74:22 75:2
  75:15 96:10,11,13
  96:20 187:22
  188:18,22,22
politician 188:24
pop 160:23 161:12
  161:15
popped 159:11
pops 160:19,20
  161:4,9
populated 165:3
population 160:6
position 26:9
  103:18 127:19
possession 21:16
possible 97:5
possibly 113:7
  133:24 148:20
posted 153:18
power 36:5,22
  38:18 39:16 40:5
  40:11 41:7,24
  42:11 43:4,15,23
  44:12,21 45:9,21
  46:5,13,21 47:9,20
  48:7 49:4,20
  50:19 52:9 53:9
  55:18 56:20 57:16
  59:2 68:5 76:18
  77:4,12 79:16
  80:5 82:7,12,18
  83:15,22 86:8,17
  91:19 92:17,20
  93:18,25 94:8,25
  104:3 106:3,9,13
  111:11 152:12
  174:9 175:13
  181:16,24 183:10

183:25 184:22
powers 182:8,15
  182:22 183:4
pozo 105:19,20
practice 58:10
  75:19 115:12
practices 47:16
  48:3,24 49:14
  53:7 76:6,9 115:6
  115:9,18
praised 65:2
preceded 17:3
precedent 177:9
preceding 128:4
precinct 22:20
  23:3,7,19 24:5
  172:23 177:8,8,21
  177:24 178:20,20
precincts 21:23
preparation 12:10
  17:19 18:16 19:12
  20:5,7,11 111:6
prepare 14:20
  27:9 35:18 36:15
  66:23 134:16
prepared 13:17
  14:2
preparing 14:24
presence 129:12
  129:20 130:23
  132:2
present 3:22 62:13
  91:24 129:17
  134:15 163:7
press 47:17 48:4
  48:25 49:6,15,25
  50:24 51:12,18
  149:13,21 151:4,6
  151:7
pretty 47:24 50:3
  52:18 159:18

preventing 126:20
  126:22,24 134:13
  146:12,16
previous 56:14
  74:25 83:4 131:4
  131:16 132:6,21
  138:9,16,17,19,22
  168:16
previously 9:18
  26:18 78:17 85:12
  98:19 99:22
  112:14 134:3
  147:21 180:18
  184:25 185:3
principles 171:22
print 48:17
printer 177:17
prior 14:22 16:23
  26:19 28:13 36:13
  70:25 153:22
  191:5
privately 160:19
  160:19
probable 33:5
  34:25 36:12 91:23
  92:3,4,10 93:5
  100:22 101:9,10
  101:11 112:8
  162:19 163:5
  184:3,5,13,16
probably 18:11
  53:19,25 90:8
  92:25 95:8 112:22
  122:12 157:6
  172:21 178:7
problem 41:19
  139:25 140:4
problematic
  151:23 152:4,8
procedures 39:14
  40:2,8,14,19,23

76:16,25 77:9
  78:3,9,15 79:13
  80:2 83:12,19
  86:15,20,25 87:6
  93:22 94:5,22
  95:16,25 96:13
  97:12,17,23 98:13
  105:24 106:6,16
  106:25 115:22
  116:4,11 149:11
  149:19
proceed 136:2,22
  164:15
proceeding 133:22
  135:23 145:11
proceedings
  191:11
process 64:9 150:5
  183:22 184:18
processing 150:2
  150:14
produced 60:6,8
  60:10,13,17,24
  61:4,7,19,21,23
  89:2,4,7
prohibited 159:16
promoted 23:10
  23:15,23,23,24,25
  25:22,25
promoting 170:24
proper 155:25
protection 184:14
protest 39:12,15
  39:25 40:3,15,20
  41:22 43:2,13
  45:6,18 55:19
  56:21 57:4,16
  59:3 65:15 76:14
  76:17,23 77:11
  78:4,11 79:15
  80:3 83:11,13,20

86:13,21 93:21
94:21 97:13
105:25 106:7,12
106:19 107:4
113:14 115:23
126:13 132:10,12
132:16 149:21
151:17 152:13
154:6 162:11
164:21,24 165:5,6
165:8,11,11,13
170:14,17 171:3
171:10,14,23
172:9,14 173:14
184:20 187:4,15
189:14
**protesting** 31:24
32:7 164:14
**protestor** 113:23
163:13,14,15,16
164:2,4
**protestors** 122:13
122:15,17,20
125:21 129:12,17
129:20 130:18
132:4,5 133:14,21
133:22 134:2
135:14,16,22
136:22 137:10,14
139:15,22 147:23
164:13 166:10,19
167:11 170:21
**protests** 38:10
40:9,24 41:5 42:9
65:12 77:2 86:16
87:2,7 93:7,23
94:4,6 95:13,17
96:2 97:18,24
98:14 106:17
107:2 151:3,11,22
152:2,22 153:10

158:25 161:22
162:20 163:4
176:9 181:12
183:23
**provide** 38:23
60:14 153:2 159:5
159:24 175:2
180:4 181:5
**provided** 66:17
154:15 156:12
**providing** 127:2
**public** 2:8 4:15
48:13,14 149:12
149:20 151:4
160:20 161:5
163:25 190:20
194:25
**published** 180:15
180:16
**pull** 119:2 143:8
144:24
**pursuant** 90:13
**purtell** 18:9 135:7
135:9 172:20
173:2,16,17,22,25
**purtell's** 18:12
**put** 21:10 48:15
49:24,25 50:5
51:18,19,23 132:5
139:11 145:24
146:20 150:17
153:14 160:3
176:14 177:17
**puts** 49:6 176:16
**putting** 28:18
120:20 146:11,13
146:19

| q |
| --- |

**quality** 49:18
109:11

**question** 4:11 6:20
6:21,24 7:6 9:6,10
12:15 14:3 38:6
39:4 41:14 42:6
48:20,21 50:13
53:3 60:20 67:9
73:15,24 74:13,20
75:4,5,22 78:17
79:24 80:23 92:8
94:11 95:11,23
96:25 102:20,21
102:22,23 105:8
110:22 114:6
116:9 125:13
136:18 139:3
140:24 143:2
152:15,17 157:2
158:10 162:9,22
163:5 165:19
173:7,9 174:24
176:10 178:10,10
181:21 185:22
186:2,2,4,9
**questioning** 14:14
**questions** 6:17
12:13 27:10,20
36:15 70:24 84:24
84:25 85:20,23
99:8 111:7 134:17
159:7 188:8,10
**queue** 98:22
**queued** 166:2
**quick** 104:6
128:18 156:3,5
185:18
**quickly** 6:13
**quote** 62:12

| r |
| --- |

**r** 3:2 26:8 116:20
128:18 191:2
194:1,1

**raganella** 28:6,9
**raganella's** 28:10
**raised** 52:2
**raising** 185:13
**range** 92:21
**ranged** 151:8
**rank** 22:22 25:20
26:12,17
**ranked** 130:11
**ranking** 134:19
135:4 157:8,21
172:25 173:20,23
176:6 178:17
179:9,20 180:2
**ranks** 181:22
**rate** 91:15,16
**raymond** 62:5
**reach** 141:9
**read** 18:22 39:19
39:22 47:22 48:21
49:8 87:4 94:2
104:24 105:4,6
149:17 152:16,19
153:12,12 154:14
155:10,13,15,16
156:16 165:20
178:16 179:10,20
183:16,17,19
185:17,21,23
186:4,8,10 190:7
193:4
**reading** 47:24
49:12 50:7 154:10
177:4 180:2
**ready** 13:16
121:17
**real** 123:12 185:18
**really** 10:8 54:25
55:22 56:2 57:7
57:13,20,20
108:15 132:19

151:6 159:12
160:22 161:16
174:16
**rear** 153:14,15,18
160:4
**reason** 7:7 8:10
29:11 79:4 92:6
135:25 137:8,12
137:17 139:14
140:2 143:14
147:20,21 166:15
168:11 193:6
194:10,12,14,16
194:18
**reasonable** 156:14
156:20 157:12
158:20
**reasons** 147:22
194:6
**recall** 18:2,4,21
23:5 71:21 189:11
**receipt** 193:16
**receipts** 56:12
**received** 89:23
**receiving** 187:7
**recess** 69:22 104:7
116:18 156:6
188:5
**recognize** 62:17
80:12 134:22
**recollect** 16:16
**recollection** 9:11
**record** 5:8 12:16
12:19,20 13:20,21
13:23 21:11 42:19
42:21,22 44:6,8,9
47:3,5,6 48:8
69:14,16 70:8,9
77:22 81:3,4,5
83:24 93:10,12,13
94:14,15,16 95:2

104:9 116:16
117:3 128:19,20
128:22 135:10,11
135:12 136:18
142:24 152:19
156:8 183:19
185:23 186:10
**recorded** 10:14
**recording** 9:12
**records** 10:15
**red** 108:8
**redirect** 31:13
**refer** 9:25 11:2
57:6 150:3
**reference** 50:16
**referred** 52:16
**referring** 10:2
11:3 66:12 95:3
**reflect** 30:12
**reflected** 84:23
85:8,10
**reflecting** 85:17
**refresh** 66:14
107:18
**refreshed** 9:12
**regard** 189:13
**regarding** 39:14
40:3,10 55:18
56:21 68:15 76:16
77:2,11 78:20
79:15 80:4 83:13
83:21 86:15 93:23
94:5,23 97:10
98:11 106:2,8
189:2
**regards** 97:20
103:19 151:16
**regular** 132:4
177:8
**regularly** 52:18

**related** 35:23
62:12 154:6
**relation** 66:24
**relationship**
118:13
**relative** 191:15,17
**releases** 151:7
**relevant** 20:23
21:3,15,21 22:3
89:5
**religious** 159:21
**remember** 7:6
9:17 20:20,20
49:9 141:6 164:19
168:13
**repeat** 20:25 36:23
41:17 149:16
171:6
**rephrase** 94:10
**report** 18:5,15
20:15 55:3 105:12
105:14,15 187:3
187:12,20,22
**reported** 1:22
**reporter** 2:7 5:16
5:18 6:18 7:10
17:23 19:5 21:18
26:16 28:8 31:8
35:25 40:21 63:2
93:3 112:24 119:9
125:23 127:16
128:16 136:10
147:6 155:21
191:5
**reporting** 172:2
**reports** 47:17 48:4
48:18,25 49:16
50:2 51:10,18
52:10
**repositories** 22:4

**representative**
10:3 150:17
188:24
**representatives**
154:8
**representing**
12:22 60:15
**republican** 66:5
66:22 149:14,22
149:24 150:22
151:23 152:3,13
152:22
**request** 17:20 18:8
89:4
**requested** 7:10
19:5 93:3 119:9
128:16 136:10
147:6 155:21
162:25 180:20,24
**requesting** 156:5
**requests** 17:23
21:18 26:16 28:8
31:8 35:25 40:21
63:2 112:24
125:23 127:16
192:7
**required** 39:5
52:23 95:12
102:11 103:7
156:23
**requirement**
103:3
**reserved** 4:11
**resolved** 68:14
**resource** 150:19
159:5 161:19,25
162:24 180:19
**respect** 47:16 48:3
48:24 49:14 53:7
73:14 96:4

respective  4:5
respond  38:10
  52:3,3
responded  37:16
  37:24 38:3 98:11
responding  53:7
responds  57:10
response  38:9
  51:14 54:11 62:22
  65:3 67:11 74:9
  74:10 89:3 110:22
  142:21 149:13,21
  151:4 186:13,21
  187:5,19 188:19
responses  158:23
responsibilities
  161:21
responsibility
  161:23
responsible
  179:14,18
responsive  95:11
restate  73:23
result  38:14 68:14
  68:16,19 69:9
  78:13 93:8 100:19
  149:12,20,24
  150:22 151:3,8,11
  151:17
results  101:4
resumed  116:22
retained  192:22
retired  25:6
return  193:14
revealed  100:17
review  9:2 11:16
  13:15 20:8 40:7
  59:6 67:22 68:2
  78:5 79:25 81:12
  85:22 86:19,24
  87:5,10,13 95:15

95:24 97:9,11
  105:23 106:5
  183:22 184:19
reviewed  13:24
  18:16,20 20:13,18
  20:20 40:16 77:9
  79:13 83:19 97:19
  106:18 115:24
reviewing  62:8
reviews  181:17,25
  182:9,16,23 183:5
rewind  145:6
right  5:13,14
  20:14 26:17 32:2
  32:14,21 33:10
  34:8 49:21 54:15
  54:20 56:6 65:13
  65:16 67:21 70:3
  75:9 84:18 90:17
  90:24 91:13 105:9
  117:13 119:2,13
  123:15 126:25
  127:2,21 130:10
  130:12 133:11
  134:25 135:18
  141:8,11 142:11
  146:3,25 148:12
  148:18 150:24
  164:21 165:5,6
  166:4 167:2,16
  168:15 170:15
  184:10 189:19
rights  79:9 170:16
  187:4
rip  61:24
rnc  151:4,12,18
  158:23
road  120:5
robinson  3:19
  5:22 12:15,18
  14:22 15:5 17:6

19:20 21:6 28:6,9
  28:15 39:17 41:10
  42:3,14 43:7,18
  44:3,16,25 45:12
  45:24 46:9,17,25
  47:13,21 49:5
  50:22 59:8,13,16
  59:25 60:7,11,22
  61:5,13,17,20
  63:18 66:10 67:3
  67:7,15,19 68:6
  70:14,17 73:7,18
  73:23 76:19 77:5
  77:13,17 83:24
  84:8,13,16 88:21
  89:6,11 91:10
  95:2 106:20 107:5
  107:13 140:5
  152:5 169:12,14
  169:17,21 175:16
  181:18 182:3,10
  182:17,24 183:6
  183:13,20 187:8
  188:11,13 189:18
  192:5
role  162:16,19
roll  153:4 179:6
room  5:16
rotate  179:2
routes  171:19
rule  180:11,12
rules  63:15,21
  160:9 161:6
  177:19,20
run  127:9 160:18
running  146:9

**s**

s  3:2 5:2 15:3
  80:15 116:20,20
  116:20,22 159:17
  177:14 192:10

s17  17:22
safer  160:5
sandwich  161:13
santamaria  1:22
  2:7 5:19,20 191:4
  191:23
satisfy  34:3,16
saw  17:8 18:20,21
  30:14 32:18 33:13
  101:3,24 102:3
  109:3 111:4
  114:16,19 132:21
  138:15,15,16
  164:12 166:9
saying  51:21 56:22
  61:5 114:22
  146:23 149:16
  158:11,17,18
  176:15
says  49:11,13
  77:20 90:5,6
  112:18 162:3
scaffold  131:5
scaffolding  129:7
scale  158:25
scan  150:6
scenario  158:16
  158:18
scene  96:18
  134:15,20 153:6
  166:9 171:2,9
  172:8,13 180:8
school  187:2
scope  43:19 44:4
  44:17 66:11 67:4
  67:6 68:7 77:14
  106:21 107:14
  108:15 109:7
  114:9 175:17
  182:4,11 187:9

**scrambled** 135:2,3
**screen** 117:23
    147:15,17
**sealed** 91:3,6
**sealing** 4:6
**second** 12:18
    15:20 32:14 42:20
    44:7 47:4 59:6
    62:10,11 69:14
    89:12 93:11 107:9
    107:24 123:11
    130:2 138:24
    142:25 145:7
**seconds** 112:6
    120:13,18 121:4
    121:23 124:9
    125:11 127:10
    146:8
**section** 49:22
**security** 118:16,17
**see** 17:18 30:4,14
    30:17,20 31:12
    32:3,15,19 34:7
    59:9 61:12,14
    82:20 83:17 86:2
    86:10 87:14,18
    90:4 99:22 101:21
    102:4,19 103:13
    103:16 105:9
    108:2,22 109:20
    109:24 110:2,14
    110:14,19 111:15
    111:20,21,23,24
    114:3,10,10
    117:17,22 119:23
    120:3,8,13,23
    122:3,6,10 123:11
    123:15,17,18,20
    124:3,10,16,20,21
    125:2,5,15 127:10
    128:11 129:9,11

129:12,13 130:2,3
132:8 133:4 135:7
142:6,9,22 143:20
143:23 144:9,16
144:17,19,24
145:20 146:10,11
147:4 148:15,17
166:21 167:14,21
168:11 181:6
**seeing** 29:17 30:12
    61:9 113:5
**seeking** 113:24
**seen** 37:10 70:10
    80:9 99:21 105:7
    113:10,17,21
    114:6,23 118:8
    135:9 155:2
    167:16 168:25
    185:8
**selective** 163:22
**self** 179:14,18
**senator** 186:15,22
**send** 52:4,5 54:23
**sends** 188:25
**senior** 175:25
    179:11
**sense** 10:18,23
    156:19
**sent** 54:19 56:5
    59:21 62:23 63:13
    64:14
**sentence** 14:7
    171:6
**separate** 58:20
    166:3
**separated** 166:12
    168:20
**september** 1:16
    17:24 81:7 83:21
    84:8,11,12 87:15
    89:13,16 117:10

117:17 171:3,10
**sergeant** 23:11,16
    177:25,25 178:22
**sergeant's** 179:5
**sergeants** 178:19
    182:2
**serious** 55:4,12
    64:23 65:8
**service** 43:11
    45:17 130:16
    153:2,6 172:8
    174:7 175:11
    177:4 178:12,18
    181:17
**set** 41:7,24 42:11
    43:4,15,23 44:12
    44:21 45:9,21
    46:5,13,21 47:9
    159:14,16 175:13
    181:16,24 182:8
    182:15,22 183:4
    183:10 191:13
**setting** 142:19
**settled** 67:8 68:19
    74:23 75:16,20
    76:7,10 79:3
    81:18,22
**settling** 79:4
**setup** 29:7
**seven** 179:2
**sexually** 160:2,13
**share** 51:3,4
**shared** 51:7
**shares** 50:25
**sharkey** 3:24 5:15
    28:22 29:24 32:10
    166:4
**sheet** 71:10 155:3
    193:7,10,12,15
**shirt** 121:2 127:22
    134:23 166:25

167:22,24,25
    180:20
**shop** 18:12
**short** 177:13
**shorthand** 48:13
**shorts** 166:25
**shot** 33:2 110:5
    131:4 133:25
**show** 28:21 29:7
    29:12 32:5 101:13
    102:14 104:22
    108:15 109:7
    123:4 124:13
    146:2 169:24
    172:3 184:24
    185:9 188:15
**showed** 70:14
    113:6 114:21
    131:4 146:3
    189:14
**showing** 29:11
    80:7
**shown** 59:22 65:25
    190:11
**shows** 114:25
**shut** 139:23
**shutting** 140:7
**sic** 41:14 159:17
**side** 29:15,20 30:4
    30:7 109:18,24
    119:15 120:9,14
    120:18,25 121:5
    122:4,6,9,17
    123:15 124:17,23
    125:2,6,9,21 127:7
    127:15 133:3
    137:3,15 141:9,11
    142:3 145:4 167:3
**sides** 27:14 30:4
    118:4 119:17

**sidewalk** 27:14,15
29:13 30:6,14,16
30:19 31:15,18,23
32:20,22 33:15,19
33:23,25 34:18,20
34:25 38:10 39:12
39:14,25 40:3,9,15
40:20,24 41:5,22
42:9,25 43:12
45:5,17 55:19
56:21 57:16 59:3
65:12,14 76:13,17
76:23 77:2,10
78:4,10,25 79:8,14
80:3 82:4,5,11,17
83:11,13,20 86:6
86:13,16,21 87:2,7
87:11 93:7,21,23
94:3,6,21,23 95:13
95:17 96:2 97:13
97:18,24 98:14
100:14,18,23
101:22 103:4
105:25 106:7,12
106:17,18 107:2,3
108:12,16,18,23
109:4,9,10,17
110:8,13,15,16,17
113:21,24 114:2
115:23 116:5,12
122:11 124:17,22
125:3,9,20,21
126:2,13 127:8,18
129:11,15 137:3
137:15 144:10
146:12,20 151:3
151:11,17,22
152:2,7,13,21
161:22 162:11
163:4,25 168:12
181:12 183:23

184:20 187:15
189:15
**sidewalks** 62:16
110:10 119:14
120:5
**sign** 193:9
**signature** 191:22
**signed** 4:14,16
63:3
**signing** 193:11
**signs** 30:9 31:19
**similar** 36:20
47:18 48:5 49:2
49:17 54:17 68:10
71:6 82:25 83:2
91:17 92:15
186:16
**similarly** 1:7
**simple** 26:11
**simply** 51:14
**sit** 56:13 171:16
**sitting** 5:12 30:6
30:15 36:13
**situated** 1:7
**situation** 36:10
38:21 164:18
181:4
**six** 22:15 89:20
90:25 91:6,8,15
92:14
**skipped** 105:2
**slightly** 124:13
144:25
**slow** 123:10
**smart** 51:7
**smartphones**
176:25
**smooth** 29:3
**snapshot** 33:4,8
**solely** 85:17

**somebody** 64:12
143:8,11,11,12
153:15
**somewhat** 87:24
**sorry** 31:9 68:17
76:8 77:17 125:12
136:6 140:24
142:23,24 145:2
186:7
**sort** 51:13 100:14
100:15 123:20
**sorts** 159:20
**sought** 43:22
187:12
**sounds** 91:13
165:19
**source** 172:2
**sources** 51:19
**south** 18:8 24:11
53:25 54:4 57:3
122:20 123:22
129:21 130:21
131:23 132:2,7,8
132:19,21,22,23
133:16,23 134:5,9
134:11,13 135:14
135:17,23 136:22
137:10,21,21,25
138:10 139:10
145:11 148:12,14
161:13 164:13,16
172:20 173:17
**southbound** 144:7
145:16,17 149:4,6
**southern** 1:3
**space** 193:7
**spaces** 160:20
**spaghetti** 134:24
**spare** 89:9
**speaking** 21:5
74:3 130:10

**special** 26:13
**specific** 12:11
38:13 50:3 53:3,4
53:8,24 57:9,14,25
59:3,4 60:21
71:15 96:12
156:22 173:12
**specifically** 48:19
57:18 60:17 63:11
65:14 73:11 103:6
186:14
**specificity** 56:3
57:8 63:14
**specifics** 6:6 41:15
**specify** 62:25
**speculation** 57:12
**speech** 30:8
**spend** 105:5
**split** 74:19 166:20
**spoke** 19:17,23
**spoken** 134:14
**spot** 166:12
**spray** 96:18
**ss** 190:3
**stabilization** 22:18
23:2
**staff** 56:10,11
64:19
**stamp** 28:16 59:9
59:14 60:14 88:22
88:23
**stamped** 60:3,5
**stand** 90:18
168:12
**standard** 34:21
35:3
**standing** 30:9,14
30:17,22 31:18
32:4,6 62:15
168:3

**stands**  112:2
  118:15
**start**  6:4 14:24
  15:15 33:15 116:8
  120:8 178:2
**starting**  127:8
**state**  5:7 41:8,25
  42:12 43:5,16,24
  44:13,22 45:10,22
  46:6,14,22 47:10
  63:7 175:14
  186:15,21 190:2
  193:6
**state's**  175:12
  181:15,23 182:7
  182:14,21 183:3,9
**stated**  67:9 126:10
  180:7
**statement**  12:7
  83:4 125:14
**statements**  139:22
**states**  1:2 62:11
**statue**  141:2
**stay**  73:22
**stayed**  25:7
**staying**  157:15
**stays**  145:25
**stecklow**  2:5 3:5,9
  5:6,11 12:17,20
  13:9,19,22 27:18
  27:22 28:11,17,23
  29:10,23 32:2,13
  42:19,22 44:6,9
  47:3,6 58:14
  59:11,15,19 60:4,9
  60:15 61:2,11,14
  61:18 67:5,13,17
  69:15,17,21,23
  70:8 73:19,25
  79:18 81:3,5
  84:10,14,19 88:16

88:24 89:7 93:10
93:13 94:14,16
95:4 98:22 99:5
99:14 104:5,8
107:20,23 111:19
116:15,25 117:2
122:25 123:10
124:3 128:17,21
129:16 135:10,12
139:11 152:16
156:3,7 165:25
166:6 169:14,20
183:17 185:21
186:8 187:24
188:6 189:20
192:4
**stenographically**
  191:11
**step**  180:23
**steps**  109:25 110:3
  110:7,9,9,10,12,18
  111:21 152:25
  153:5 155:8
**stick**  55:12 57:2
  74:24
**sticker**  167:4
**stipulated**  4:4,9,13
**stock**  139:18 140:8
  140:11,15,20,25
  141:10,14
**stop**  32:13 107:23
  111:17,19 119:22
  120:17 124:8
  131:14 134:4
  135:22 143:17
  166:2
**stoppage**  112:4
**stopped**  33:13
  121:22 122:24
  123:5,8,21 129:20
  130:25 131:2,13

131:18,18,23
132:17 134:7,8
138:11 144:20
149:10 170:4
**stopping**  33:11
**stories**  51:15
**story**  32:6
**street**  2:6 3:6,16
  5:12 27:15 29:15
  29:20 30:4,5,7,22
  43:2,13 44:2,15,24
  45:7,19 46:8,24
  47:12 66:4,21
  67:24 68:21 69:25
  70:24 71:2,3,7,15
  76:15,24 77:10
  78:21 79:24
  104:10 117:19
  118:6 119:16
  120:9,15,19,25
  121:5,12,13,15,16
  121:20 125:18
  129:6 130:2,19
  131:9,9,14 132:18
  132:23 133:21
  134:2 136:3,13,16
  136:23 137:6
  138:4 139:16,19
  139:23,24 140:10
  140:14 141:7,15
  141:16,17,21
  146:25 147:18,19
  147:24 152:23
  156:9 159:10,11
  160:15,21 161:12
  164:15,16 169:25
  170:10 171:13
  173:8,13,14,24
  180:9 183:12
  187:5,14,19

**streetlights**  117:15
**strike**  132:9
  164:20,25
**strongest**  157:7
**structure**  159:22
  159:22 160:4,7
**stuff**  28:4 48:18
  72:12,12 117:14
  122:16 155:17,25
  160:18 175:18
  176:24
**sub**  26:14
**subject**  12:24 13:6
  57:19 178:24
  190:10 193:11
**submitted**  187:2
**subscribed**  190:16
  194:22
**subsequent**  90:25
**substantial**  32:20
  33:14 34:2,15
**subtopics**  21:9
**sued**  74:18 95:6
**sufficient**  32:23
  34:2,15 35:5
  39:15 40:4 76:17
  77:3 83:14 86:16
  93:24 94:6,24
  157:4
**suggestive**  169:18
**sukkah**  159:17,19
**summary**  78:24
  79:6,12
**sunglasses**  167:2
  168:7
**supervising**
  180:20 183:11
**supervision**  157:6
  157:11,20,22
  174:11,14,15,23
  174:25 184:9

**supervisor** 26:6,7
  184:3
**supervisors** 42:24
  45:4 171:2,9
  172:9,13,24,25
  173:13,19 175:24
  177:24 184:12
**suppressing** 187:4
**sure** 6:15 9:15
  10:6 11:15 12:17
  19:4,6,8 21:12
  28:22 38:5,5,6
  47:23 69:15,21
  73:2 75:3 77:24
  85:24 87:12 88:10
  92:18 94:9 117:12
  118:20,21 121:7
  154:17 157:12
  162:17 175:19
  176:18 180:12
  184:5,15,16 186:2
**sweet** 15:2,3 18:24
  19:19,25 20:5
**swetman** 1:6
**switched** 149:17
**sworn** 4:16 5:3
  8:15 11:20 190:16
  191:7 194:22
**system** 51:9

**t**

**t** 5:2 15:3 116:20
  116:22 128:18
  159:17 166:25
  177:14 191:2,2
  192:10 194:1
**table** 100:15
**take** 6:18 56:2
  69:18 99:6 104:5
  112:7 128:18
  152:25 156:3,5
  161:7 174:16

187:24
**taken** 68:13,18
  69:9,22 104:7
  116:18 153:5
  155:8 156:6 188:5
  191:11
**talansky** 3:23 5:24
  117:5
**talk** 65:12
**talked** 65:9,11
  71:23 74:12 128:6
  168:13
**talking** 72:5,13
  73:25 84:21,22
  85:19 96:16 136:8
  136:12
**taping** 168:16
**tarps** 159:15
**taru** 128:15,17
**task** 21:23 154:5,7
**team** 118:20
**technology** 51:5
**teletype** 177:15
**tell** 8:19 31:6,11
  31:16,17,21 33:12
  33:21 35:13 54:21
  56:10 59:13 63:10
  71:16 82:8,14
  101:25 102:17
  107:25 109:8,10
  109:14,15 110:4,6
  110:23 111:17
  113:7 123:7 124:5
  128:2,3 131:12,15
  134:9 168:17,19
  169:15 171:12
**telling** 60:9 61:3
  111:3 158:15
**ten** 87:16 88:8,9
  88:10 101:15

**tend** 175:24
**tent** 159:17,19
**tents** 159:15
  160:14
**term** 10:13,23
  14:5 49:9 72:4
  73:3 117:13
  134:25 177:13
**terminals** 150:5
**terms** 71:24
**testified** 26:18
  98:19 116:23
  136:20 158:22
  180:18
**testifies** 5:4
**testify** 7:8,19,23
  8:2,7,11 10:9
  11:17 13:17 14:2
  14:17 71:5 133:9
  191:7
**testifying** 12:2
  75:7
**testimony** 47:18
  48:5 49:2,16
  190:7
**thank** 41:19 62:9
  69:20 90:22 92:7
  105:16
**theme** 55:13 57:2
  98:3
**thing** 26:12 58:6
  73:9,10 90:6
  96:12,17 99:22
  104:24 105:5
  163:24 177:14
**things** 53:18 59:18
  59:20 60:12,19
  61:9,15,16,18
  119:2 143:18
  146:21 151:14
  159:10,15 161:2

165:2,4,9 172:3
  176:3,3 179:14
  180:13
**think** 14:19 15:18
  18:6 19:6 25:3
  28:12 29:6,11
  49:11 51:17 52:10
  56:18 57:23 81:18
  81:19,19,19,22,22
  84:14,19 92:23
  95:8,10,12 96:9
  101:7 107:15,17
  107:19 115:20
  116:16 117:11,13
  118:15 119:5,22
  122:25 125:19,24
  128:14 129:25
  138:11,12,23
  139:17,21 141:18
  141:20 151:7,20
  160:22 162:4,4
  164:6,9 176:3,12
  180:4 184:23
**thinking** 183:15
  184:7
**third** 16:18 61:22
  61:25
**thirty** 193:16
**thought** 71:17
  85:4,7 125:13
  136:7,12 174:10
**three** 5:21 16:16
  30:3 49:8 58:19
  79:21 80:16 82:15
  86:3,10 138:6
  168:2 192:17
**thumb** 28:13
**thursday** 16:5
**tight** 110:5,25
**time** 4:11 5:10
  6:14 15:19 16:7

16:16 18:22 22:20
24:21 28:2,19
29:24 32:15 33:4
33:8 39:19,23
47:22 69:17,23
87:4 102:15
103:15 104:6,8
112:11,18 116:16
116:21 117:2
119:23 123:12
125:10 128:21,25
131:24 143:6
146:15,17,18,20
155:15,18,22
156:2,4,7,12,14,15
156:21,23 157:5
158:10,20 164:3
168:20,22 169:8
172:23 179:4
181:5 188:3,6
189:22 191:12
**times** 6:9,10,11
16:16 49:8 118:11
118:24
**tired** 186:6
**title** 19:4
**today** 7:9,19,23
8:3,8,12 9:22 14:2
14:18 16:3,4
18:20 28:2 36:13
149:17
**today's** 19:13 20:5
20:7,11 21:3,15,21
22:3 35:18 66:24
111:6 134:16
**told** 37:5,6 60:19
134:5,24
**top** 107:18 123:16
123:18 144:19
147:15,16

**topic** 13:17 47:23
48:8 55:24 58:7
70:20,21,22
**topics** 13:25 65:2
**total** 89:14,18
**tough** 31:16,17
**town** 142:17,20
**track** 148:22
150:11,12 177:2
**traffic** 31:19 34:24
35:5 102:10,11
103:2,9 113:10,12
120:4 128:7,9
137:21,23,25
138:3,8,10,13,16
138:23,24 139:10
141:23,23 142:5,9
142:13 144:6,13
145:11,14,16,25
146:6,7,9,12
147:10,12,25
148:4,7,9,11,12,15
148:22 149:4,7,9
**train** 178:22
**trained** 175:7
177:21
**training** 153:9,10
154:19 174:12,23
175:2,6,6,22
177:25,25 178:19
178:21,24 179:5,5
**transcript** 8:25
190:10 191:10
193:17,18
**transferred** 23:16
23:18,23 24:4,10
24:16,18 25:10
58:3 96:23 98:7
**transitioning**
22:19

**travel** 132:8
**traveling** 132:7
134:4,9,11
**traverse** 29:14
31:23 113:24
122:20 123:22
124:22 131:25
**traversing** 30:18
113:25
**treat** 55:8 164:7
**treated** 164:11
**trees** 89:10
**trial** 4:12 9:7
**trick** 80:23 165:19
**tries** 120:23
164:25
**trigger** 51:13
**truck** 144:18,20
145:3,9,18
**true** 190:9 191:10
**trust** 91:12
**truth** 8:19 128:2
191:7,8,8
**truthfully** 7:8,19
7:23 8:3,8,11
**try** 6:13 132:9,9
165:9 172:4,4
178:8
**trying** 32:5 38:7,8
60:21 65:11 89:9
114:2 118:23
125:22,24 126:3
126:14,18 127:3
166:10,10 172:6
**turn** 117:10
139:15 140:3
141:16 149:3
**turned** 28:5,12,13
88:24 117:9
**twice** 15:2

**two** 15:5 16:15
20:6 27:13 30:3,4
58:16 60:12 62:13
70:14 74:19 101:3
107:21 112:6
132:3 138:5,15,18
142:9 145:16
147:11 165:2,9
166:3,12 168:2,2
168:21 192:13
**type** 8:16
**types** 47:18 48:6
49:2,17
**typical** 171:15,16

**u**

**u** 128:18 159:17
**u.s.** 187:5
**uh** 140:19 145:5
164:6
**umbrella** 49:13
73:10
**unable** 125:20,25
**unclear** 6:22
**underneath** 73:5
87:16 90:5 128:12
129:6
**understand** 6:20
8:22 9:5 13:6 14:4
38:6 57:13 60:22
74:11 76:20,21
94:18 114:2
133:21 135:25
137:9 166:15
174:8 175:11
178:12 188:9
**understanding**
57:10 71:9 118:10
135:21 137:13,18
152:15 153:11
**understood** 9:14
89:11

**undertake** 186:13
  187:7
**undertook** 100:7
  105:23 115:5
**unfamiliar** 133:12
**unfortunately**
  63:7 160:2
**uninterested**
  126:13
**union** 58:21 63:6
**unit** 22:18 23:2
  55:10 153:10
**united** 1:2
**units** 21:22
**unoccupied** 146:4
  146:5
**unprepared** 14:17
**unsure** 56:21
**unusual** 105:11,14
  105:15
**upgrades** 150:4
**ups** 179:7
**urge** 62:18
**use** 10:13,18,21,23
  64:20 65:17 71:25
  132:13 148:21
  172:17 173:12
  174:3,4
**usual** 72:12
**usually** 157:8,21
**utilize** 173:3
**utilized** 40:8,14,19
  40:23 77:9 78:3
  78:10 79:14 80:2
  83:19 86:20 87:2
  87:7 95:16,25
  97:12,17,23 98:13
  105:24 106:6,16
  106:25 115:22
  116:4,11 172:13
  173:22

**v**

**v** 35:23 41:8,25
  42:13,16 43:5,16
  43:25 44:14,23
  45:10,22 46:7,15
  46:23 47:11
  175:13 181:16,25
  182:8,15,22 183:4
  183:10
**valuable** 162:15
**van** 148:17
**various** 70:22
**varying** 155:23
**vehicle** 142:15
  143:5
**vehicles** 110:16
  138:25 145:15
  146:16 147:10,13
**vehicular** 120:4
  138:7 141:23
  145:25 147:24
  148:4,15,22,22
  149:4,6
**verbally** 6:18
**versus** 164:22
  165:5
**vhs** 28:25
**video** 5:15 10:17
  10:22 17:7,8,10
  20:2,13 27:19,22
  27:25 28:11,20,24
  29:6,9,22,25 30:3
  30:12 31:22 32:12
  32:17 33:9 34:7
  34:12,13 35:9,14
  36:14 37:10 38:22
  53:23,24 59:21
  61:13 98:19,23
  99:6,9,13,19,20
  101:2,12,13,15,24
  102:3,5,15,16,19

103:14,16,20
107:9,17,21,22
108:6,10,14,19,21
108:23,25 109:5,7
109:11,12 110:3
110:24 111:13,18
112:5 113:6,10,17
114:4,10,21,24
117:8,12,12,20,22
118:8 119:21
120:2 121:8,21
123:4,6,7,13
124:24 127:13
128:11,15,17,24
129:3,23 131:16
131:16,20,21,24
132:6,22 134:10
135:8,15 136:21
138:8,17,17,20,22
139:5,6,8,11
141:22 146:4
164:12 165:25
166:8,21,23 167:7
167:14,16,20
169:8 185:3,5,15
189:10,11
**videos** 20:9,12
**view** 30:23 31:10
  33:20
**violated** 79:8
**violating** 184:11
**violations** 184:15
  187:4
**volume** 30:11
**vs** 1:9

**w**

**w** 3:14 15:3 80:15
  135:6
**wait** 6:16
**waived** 4:8

**walk** 119:16
  125:25 132:22
  162:19
**walking** 110:4
  113:16 125:9
  127:15,17 132:19
  132:21,25
**wall** 43:2,13 44:2
  44:15,23 45:7,19
  46:8,24 47:12
  117:19 119:15
  129:6 130:2,19
  131:9,14 132:17
  132:23 133:21
  134:2 136:3,16,23
  137:6 138:4
  139:16,19,23,24
  140:10,14 141:15
  141:17,24 147:18
  152:23 159:9,11
  160:15,21 161:11
  164:16 169:25
  170:9 171:12
  173:8,13,14,24
  180:8 183:12
  187:5,14,19
**want** 12:11 22:6
  27:25 47:23 51:23
  53:4 57:12 61:6,8
  73:2,16 105:5
  127:12 129:18
  132:10,11,12,14
  138:5 142:25
  143:9,17 158:11
  158:12,18,19
  165:10,10 171:23
**wanted** 33:12
  139:23 159:14
  171:18 189:15
**warning** 169:7,17
  169:22

**warnings** 153:12 153:16,19,21,22 156:16,18
**warrant** 87:13 92:23,24 167:11
**warranted** 89:21 95:7
**washington** 140:22
**waste** 6:14 27:25
**watch** 27:19,24 28:3 29:5,19 32:3 98:19 99:6 107:8 107:20 119:20 123:3 128:10,23 129:18
**watched** 35:14 53:23 114:4 139:5 139:6,7 185:3,5,15 189:10
**watching** 29:10 31:22 34:13 36:14 38:22 105:6 108:10,19 109:5 117:22 120:3 125:15 127:13 131:21 133:19 135:15 144:14 145:7,8,8 189:11
**way** 6:22 12:2,6 14:20 22:20 51:5 53:18 85:3 95:13 111:3 120:24 126:3,17 131:5 132:6 148:3 152:22 157:16 164:11,17 165:15 165:17,22 176:22 176:23 178:7,17 179:15

**ways** 31:6
**we've** 11:16
**wearing** 123:16 134:24
**wedin** 135:5
**wednesday** 15:21 15:22,24 16:5,6,8 17:3
**week** 15:9,24,25 16:2,22,24 179:2
**weekend** 62:14
**went** 25:6 71:22 72:21 164:24
**west** 119:15 120:8 120:14,18,25 121:4 122:4 124:17,23 125:2,6 125:9 129:15 133:2,15 136:9,12 136:13 137:2,15 138:2,2 142:3,12 149:2
**westbound** 149:3
**whatsoever** 8:10
**white** 127:22 134:23 142:3 168:6 180:20
**wide** 92:21 101:21 109:17 147:3
**wider** 124:14
**wiles** 88:22
**winski** 80:14,17 80:20,24,25 81:20 83:9 85:5 87:12 172:21 173:3
**wise** 142:25 147:7
**wish** 194:5
**withdraw** 136:17
**withdrawn** 82:4 88:5 102:8 115:10 158:3 174:5

178:14
**witness** 9:8 12:2 12:22 27:21 62:8 69:13,20 74:2,5 185:19 188:8 190:6 192:3 193:2
**witnesses** 72:12
**woman** 168:5 169:4,5
**women** 160:2,5,13 168:2
**won** 78:24
**wonderland** 160:16
**word** 10:18 47:25 47:25
**words** 11:5 72:6
**work** 25:11 125:25 126:4,6,10 132:12 132:13 161:3 165:7 171:17 179:2
**works** 5:15 19:3,3 58:4
**wrapping** 188:2
**written** 62:22 63:3 63:21,23 153:23 154:15
**wrong** 112:11 136:7
**wrote** 154:21,23
**wylie** 2:5 3:5,9,10 5:11 12:15 39:21 39:22,22 41:16,18 48:21 94:2 171:6
**wylielaw.com** 3:10

**x**

**x** 1:4,12 192:2,10

**y**

**yeah** 22:15 30:13 34:10 122:14 123:18 127:14 139:20 140:23 167:25 179:23 181:3 186:6
**year** 45:6,18 46:8 46:16,24 47:12 170:22
**years** 161:11 170:22,22
**yellow** 167:24,25
**yesterday** 16:5 59:20
**york** 1:3,10,17,17 2:6,6 3:7,7,15,17 3:17 9:23 10:4,10 11:3,9,12,18,22,25 21:17 25:15 35:4 35:24 36:19 37:16 37:19,24 38:2,9 39:13 40:2,7,13,18 40:22 41:4,7,21,24 42:8,11 43:4,15,22 43:24 44:11,13,20 44:22 45:9,21 46:4,6,12,14,20,22 47:8,10 58:20 61:24 62:6,23 63:5,25 68:10 71:6,24 72:6,7,8,9 72:14,19 73:3,8,14 74:12,14,16,22 75:6,13,14,18 76:15,25 77:9,25 78:3,9 79:13,25 82:25 83:12,19 86:14,19,25 87:6 89:3 92:15,24 93:6,16,22 94:5,22

95:12,16,25 97:11
97:16,22 98:8,12
103:19 105:23
106:6,15,24 115:4
115:8,11,14,18,21
116:3,10 117:9
118:14 139:17
151:21,25 152:10
164:20 166:18
170:8,19 172:17
173:12 174:7
175:12,14 176:4
181:15,23 182:7
182:14,21 183:9
184:19
**york's**   183:3

**z**

**z**   105:21
**zachary**   3:14
**zucotti**   107:12
109:22,24 115:24
116:6,12 159:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.