15-CV-7130 (AT) (SDA)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE PACKARD, EDWARD BECK, ARI COWAN and
MICHELLE BERGER, *individually and on behalf of a class of all
others similarly situated*,

Plaintiffs,

-against-

THE CITY OF NEW YORK,

Defendant.

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, New York 10007*

*Of Counsel:  Amy Robinson*
*Tel: (212) 356-3518*
*NCLIS 2015-043830*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMARY STATEMENT ....................................................................... 1

STANDARD OF REVIEW .......................................................................... 3

ARGUMENT

      POINT I

            PLAINTIFFS' MOTION FOR SUMMARY
            JUDGMENT MUST BE DISMISSED AS A
            MATTER OF LAW ................................................................ 4

      POINT II

            OFFICERS WERE THOROUGHLY TRAINED
            ON FIRST AMENDMENT PRINCIPLES AND
            THE DISORDERLY CONDUCT STATUTE ........................................... 6

      POINT III

            PLAINTIFFS CANNOT SHOW THAT ANY
            ALLEGED LACK OF TRAINING AMOUNTED
            TO DELIBERATE INDIFFERENCE .................................................... 199

          A.  Unsubstantiated Allegations In Lawsuits and
              Settlement Agreements Do Not Support
              Plaintiffs' Monell Claim .................................................. 211

          B.  Purported Disposition Statistic Do Not Support
              Plaintiffs' Monell Claim .................................................. 244

          C.  Plaintiffs' Allegation That Defendant Ignored
              Complaints Is False ........................................................ 25

      POINT IV

            PLAINTIFFS FAILED TO ARUGE MUCH LESS
            PROVE A DIRECT CAUSAL LINK BETWEEN
            ANY INJURY THEY SUSTAINED AND AN
            ALLEGED LACK OF TRAINING AMOUNTING
            TO DELIBERATE INDIFFERENCE .................................................... 288

**Page**

CONCLUSION ............................................................................................................. 299

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Pages**

Barret v. City of Newburgh,
    2017 U.S. App. LEXIS 26045 (2d Cir. 2017) ..........................................................................5

Berg v. City of New York,
    2018 U.S. App. 20646 (2d Cir. 2018)...............................................................................17

Board of Comm'rs of Bryan Cty., v. Brown,
    520 U.S. 397 (1997)...............................................................................................20, 27

Brown v. City of New York,
    2017 U.S. App. LEXIS 11937 (2d Cir. 2017) ..........................................................................17

Caravalho v. City of New York,
    2018 U.S. App. 10785 (2d Cir. 2018)...........................................................................17, 24

Cifarelli v. Village of Babylon,
    93 F.3d 47 (2d Cir. 1996)............................................................................................3

City of Canton v. Harris,
    489 U.S. 378 (1989)........................................................................................5, 19, 28

City of Los Angeles v. Heller,
    475 U.S. 796 (1986)................................................................................................5

Collins v. City of New York,
    923 F. Supp. 2d 462 (E.D.N.Y. 2013) ................................................................................21

Connick v. Thompson,
    563 U.S. 51 (2011)..........................................................................................19, 20, 27

Dinler v. City of New York,
    2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sept. 30, 2012)..................................................22

Garcia v. City of New York,
    2015 U.S. App. LEXIS 2762 (2d Cir. 2015) ..........................................................................17

Gonzalez v. City of New York,
    2017 U.S. Dist. LEXIS 5688 (S.D.N.Y. 2018).......................................................................24

Green v. City of N.Y.,
    465 F.3d 65 (2d Cir. 2006)..........................................................................................19

Hays v. City of New York,
    2017 U.S. Dist. LEXIS 28090 ......................................................................................17

**Cases**                                                                                       **Pages**

Hessler v. City of New York,
    13-CV-821, Dkt. No. 61 .................................................................................24

Higginbotham v. City of New York,
    2018 U.S. App. LEXIS 20637 (2d Cir. 2018) .......................................................17

Holmes v. City of New York,
    2018 U.S. Dist. LEXIS 53419 (S.D.N.Y. 2018).....................................................24

Jean-Laurent v. Wilkerson,
    461 F. App'x 18 (2d Cir. 2012) ...........................................................................21

Jones v. City of New York,
    2013 U.S. Dist. LEXIS 162235 (E.D.N.Y. Nov. 14, 2013)..............................15, 21

Kass v. City of New York,
    2017 U.S. App. LEXIS 13259 (2d Cir. 2017) .......................................................17

Kinsella v. Rumsfeld,
    320 F.3d 309 (2d Cir. 2003)..................................................................................3

Lebowitz v. City of New York,
    2015 U.S. App. LEXIS 9106 (2d Cir. 2015) ........................................................17

Mack v. Town of Walkill,
    253 F. Supp. 2d 552 (S.D.N.Y. 2003)..................................................................24

Mangino v. Village of Patchogue,
    739 F. Supp. 2d 205 (E.D.N.Y. 2010) .................................................................24

Martinez v. City of New York,
    2008 U.S. Dist. LEXIS 49203 (S.D.N.Y. 2008)......................................................5

Martinez v. Muentes,
    340 Fed. Appx. 700 (2d Cir. 2009)........................................................................5

McNamara v. City of New York,
    2011 U.S. Dist. LEXIS 53829 (S.D.N.Y. 2011)....................................................22

Monell v. Dep't of Social Servs.,
    436 U.S. 658 (1978)..........................................................................................4, 5

Oklahoma City v. Tuttle,
    471 U.S. 808 (1985) (plurality opinion) ...............................................................19

**<u>Cases</u>**                                                                                                    **<u>Pages</u>**

Osterhoudt v. City of New York,
    2012 U.S. Dist. LEXIS 139700 (E.D.N.Y. 2012)....................................................21

Overton v. N.Y. State Div. of Military & Naval Affairs,
    373 F.3d 83 (2d Cir. 2004)...............................................................................................3

People v. Carcel,
    3 NY2d 327 (NY Court App. 1957) .............................................................................15

Pesola v. City of New York,
    2017 U.S. Dist. LEXIS 140967 (S.D.N.Y. 2017)..................................................18, 24

Pluma v. City of New York,
    2017 U.S. App. LEXIS 6096 (2d Cir. 2017) ................................................................17

Rasmussen v. City of New York,
    766 F. Supp. 2d 399 (E.D.N.Y. 2011) .........................................................................22

Roe v. City of Waterbury,
    542 F.3d 31 (2d Cir. 2008)........................................................................................4, 27

Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,
    391 F.3d 77 (2d Cir. 2004)...............................................................................................3

Segal v. City of New York,
    2006 U.S. App. LEXIS 20118 (2d Cir. 2006) ................................................................5

Shamir v. City of New York,
    2015 U.S. App. LEXIS 18420 (2d Cir. 2017) ..............................................................17

Sherrard v. City of New York,
    15-CV-7318, Dkt. No 123 .............................................................................................17

Singleton v. City of New York,
    632 F.2d 185 (2d Cir. 1980).........................................................................................23

Snider v. Dylag,
    188 F.3d 51 (2d Cir. 1999)..............................................................................................4

Soto v. City of New York,
    13-CV-8474, Dkt. Nos. 203, 204 .................................................................................17

Staten v. Vill. of Monticello,
    2015 U.S. Dist. LEXIS 145401 (S.D.N.Y. 2015).........................................................5

**Cases**                                                                                   **Pages**

Tardif v. City of New York,
    2017 U.S. Dist. LEXIS 41318 (S.D.N.Y. 2017) .................................................18, 24

Thimmesch v. City of New York,
    2013 U.S. Dist. LEXIS 53587 (S.D.N.Y. 2013) ...............................................18, 24

Triano v. Town of Harrison, N.Y.,
    895 F. Supp. 2d 526 (S.D.N.Y. 2012)......................................................................28

Walker v. City of New York,
    2014 U.S. Dist. LEXIS 42272 (S.D.N.Y. 2014) .....................................................22

Walker v. New York,
    974 F.2d 293 (2d Cir. 1992)......................................................................................19

Wiles v. City of New York,
    2018 U.S. App. LEXIS 5610 (2d Cir. 2018) ...........................................................17

**Statutes**

42 U.S.C. § 1983.................................................................................................4, 19, 27

Fed. R. Civ. P. 56(a) ..................................................................................................3

New York State Penal Law Section 240.20(5) ....................................10, 12, 15, 18

PL §722 .......................................................................................................................15

Defendant, by its attorney, Zachary W. Carter, respectfully submits this memorandum of law in opposition to plaintiffs' motion for summary judgment. Plaintiffs' motion is limited to seeking judgment on their failure-to-train <u>Monell</u> claim.

## PRELIMINARY STATEMENT

Plaintiffs' motion for summary judgment fails at the outset, because plaintiffs have not argued, much less proven, what the United States Supreme Court and the Second Circuit Court of Appeals have determined to be a prerequisite to every <u>Monell</u> claim—an independent, underlying constitutional violation. Plaintiffs ignore the prerequisite to their <u>Monell</u> claim in their motion and argue only that was there a failure to train officers on the First Amendment and the application of the disorderly conduct statute.  Plaintiffs' attempt to either, (1) establish that defendant can be liable under <u>Monell</u> on a failure to train theory without proving an underlying violation of a constitutional right despite Supreme Court precedent or (2) establish that an alleged failure to train is the constitutional violation without citation to a single case in support of this theory. Moreover, plaintiffs cannot establish that their arrests were unlawful, because, as fully set forth in Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, probable cause existed for their arrests.  <u>See</u> Defs MSJ MOL, Dkt. No. 259, at 8-19.  Thus, as plaintiffs have failed to prove or argue the prerequisite to their <u>Monell</u> claim, plaintiffs' motion fails as a matter of law.

Assuming <u>arguendo</u> that plaintiffs had attempted to prove their false arrest claim, and were successful in doing so, without proof, the hurdles plaintiffs face in order to establish their failure-to-train municipal liability claim are insurmountable.  First, even if the Court were to ignore Supreme Court and Second Circuit precedent and allow plaintiffs' motion to proceed without proving an underlying constitutional violation, plaintiffs cannot show on the record of this case that there was any failure to train officers as the overwhelming record evidence shows

that the NYPD thoroughly trained its officers on the First Amendment and the application of disorderly conduct statute.  Additionally, in order for plaintiffs' motion to succeed, the Court would have to find for the first time, at the end of the nearly eight-year long Occupy Wall Street "OWS" litigation, and in fact in the last filed case of the OWS litigation, that the NYPD failed to adequately train its officers even though no federal judge or jury has made a finding of municipal liability under any theory in any OWS case, despite many, many <u>Monell</u> claims, and even though the Second Circuit has ruled in all ten of ten OWS cases appealed, that probable cause and/or probable cause existed for hundreds of OWS arrests.  Despite plaintiffs' allegations, this is the established history of OWS, and with this history of determinations that probable cause supported arrests made by hundreds, if not thousands, of officers during OWS, it is simply not possible to find that the NYPD failed to adequately train its officers on policing OWS demonstrations.

Second, even if the Court were to ignore Supreme Court and Second Circuit precedent allowing plaintiffs' motion to proceed, and find that defendant failed to adequately train its officers, despite the record in this case and of the OWS litigation overall, plaintiffs must then prove that the failure to train amounted to deliberate indifference to their constitutional rights.  In an effort to establish this prong of the <u>Monell</u> analysis, plaintiffs point to alleged deficiencies in policing protests prior to the date of incident.  However, plaintiffs' attempt to establish these alleged deficiencies with unsubstantiated complaints in other non-OWS protest cases, a Republican National Convention ("RNC") case, and purported New York District Attorney's Office ("DA") disposition statistics pertaining to OWS arrests—all of which do not plausibly support plaintiffs' <u>Monell</u> claim as held by this Court in this case. Thus, there can be no finding of deliberate indifference, and plaintiffs' motion must be dismissed.

Third, even if the Court were to ignore Supreme Court and Second Circuit precedent, find that defendant failed to adequately train its officers, and that this failure to train amounted to deliberate indifference to plaintiffs' constitutional rights, then plaintiffs must prove that this lack of training amounting to deliberate indifference was the moving force behind their alleged injury as opposed to any other possible reason.  Plaintiffs have not only failed to prove or argue the existence of an injury, they have failed to prove a failure to train amounting to deliberate indifference and they have failed to prove or argue a causal connection between an alleged failure to train amounting to deliberate indifference and the alleged injury.

Accordingly, for the foregoing reasons, explained in detail below, plaintiffs' motion for summary judgment must be dismissed.

## STANDARD OF REVIEW

In ruling on a summary judgment motion, all evidence must be viewed in the light most favorable to the non-moving party.  Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004).  On review the Court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought[.]"  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  A court can only grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  A material fact is one that might affect the outcome of a suit under governing law.  Kinsella v. Rumsfeld, 320 F.3d 309, 311 (2d Cir. 2003).

**ARGUMENT**

**POINT I**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT MUST BE DISMISSED
AS A MATTER OF LAW**

   Plaintiffs' motion for summary judgment must be dismissed, because plaintiffs

have failed to establish, address or even argue in their motion the prerequisite to every <u>Monell</u>

claim—the existence of an independent underlying constitutional violation. In relevant

part, Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .<u>42 U.S.C. § 1983</u>.

To establish liability under § 1983, a plaintiff must allege that "(1) the challenged conduct was

attributable at least in part to a person who was acting under color of state law and  (2) the

conduct deprived the plaintiff of a right guaranteed under the Constitution of the United

States." <u>Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)</u> (citation omitted).  Further, "to impose

liability on a municipality under § 1983, the Second Circuit states that a plaintiff is required to

prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right;

(3) causation; (4) damages; and (5) that an official policy of the municipality caused the

constitutional injury.  <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 36 (2d Cir. 2008) citing <u>Monell v.

Dep't of Social Servs.</u>, 436 U.S. 658, 690-91, 98 (1978).  "The 'official policy' element can be

satisfied where a plaintiff proves that a failure by policymakers to provide adequate training or

supervision to subordinates to such an extent that it amounts to deliberate indifference to the

rights of those who come into contact with the municipal employees." Staten v. Vill. of Monticello, 2015 U.S. Dist. LEXIS 145401, at *9 (S.D.N.Y. 2015).

When a plaintiff lacks any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must be dismissed. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Martinez v. City of New York, 2008 U.S. Dist. LEXIS 49203, at *12 (S.D.N.Y. 2008) (noting that "[a] municipality cannot be liable for acts by its employees which are not constitutional violations."), aff'd Martinez v. Muentes, 340 Fed. Appx. 700 (2d Cir. 2009).  In their motion for summary judgment, plaintiffs fail to establish, address or much less argue that any independent underlying constitutional violation occurred.  As a result, plaintiffs' motion must fail.  Further, plaintiffs have not cited to a single case, which supports the finding of municipal liability without first establishing an underlying constitutional violation.  In fact, the law is clear—"Monell does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." See Segal v. City of New York, 2006 U.S. App. LEXIS 20118, at **34-35 (2d Cir. 2006) (emphasis in original) citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978) (involving a policy that was "the moving force of the constitutional violation"); see also City of Canton v. Harris, 489 U.S. 378 (1989) (involving a failure to train municipal employees that led to the constitutional injury; Barret v. City of Newburgh, 2017 U.S. App. LEXIS 26045, at **3-4 (2d Cir. 2017) (plaintiff's Monell claim alleging a failure by the city to train and supervise its force can survive only as an extension of her underlying excessive force action against the police officers).

Plaintiffs have not moved on any underlying violation of their constitutional rights much less proven that an underlying constitutional violation occurred. Even if they had moved on an underlying constitutional violation, plaintiffs cannot demonstrate an underlying constitutional violation, because there was probable cause for their arrests as fully set forth in the defendant's Memorandum of Law in Support of Summary Judgment.  Defs MSJ MOL, Dkt. No. 259, at 8-21.

Accordingly, as plaintiffs' failed to prove much less argue an independent, underlying constitutional violation, plaintiffs' motion for summary judgment must be dismissed as a matter of law.

## POINT II

### OFFICERS WERE THOROUGHLY TRAINED ON FIRST AMENDMENT PRINCIPLES AND THE DISORDERLY CONDUCT STATUTE

Even if the Court determines that plaintiffs' failure-to-train <u>Monell</u> claim can proceed without proving or arguing an underlying constitutional violation, plaintiffs' argument that the City failed to adequately train its officers is not supported by the evidence and certainly not by plaintiffs' case.  In short, plaintiffs cannot demonstrate that the training of police officers was not adequate. The record shows that NYPD officers received extensive and thorough training on First Amendment principles and the application of the disorderly conduct statute, PL §240.20(5), blocking vehicular or pedestrian traffic and PL §240.20(6), failure to comply with a lawful order to disperse, in policing demonstrations.[1] & [2]   NYPD officers received this training from the NYPD at the Police Academy and through Command Level training in their precincts.

---

[1] Plaintiffs also argue that there was an alleged failure to train officers on the application of the obstructing governmental administration ("OGA") statute; however, as noted by the Honorable Analisa Torres' in the Order Adopting Report and Recommendation, none of the plaintiffs were arrested for OGA.  <u>See</u> Dkt. 269 at 5. Further, none of the class members arrested on the same date, at the same

The NYPD Police Academy utilized a plethora of sources to train officers on the Constitution, including the First Amendment and the application of the disorderly conduct statute, including the NYPD Police Student's Guide, the Recruit Training Manual, the NYPD Patrol Guide, Police Academy Training Memoranda, NYPD Legal Bureau Bulletins, Penal Law and PowerPoint presentations.  The following are excerpts from the NYPD Police Student's Guide, Chapter: Introduction to Law and Justice, 2012, which both defines the Constitution of the United States, including the First Amendment for officers, and outlines the applicability of the Constitution, including the First Amendment, to policing demonstrations:[3]

> As a newly sworn police officer, you have taken an oath to uphold and defend the Constitution of the United States. These are not just empty words to be recited at ceremonial occasions. As police officers in a free society, you must strive to preserve law and order while respecting our most precious freedoms. Ex. A at D031208.

> Our Founders were weary of living under tyrannical rule and sought to limit the power of the government and still maintain order; the Constitution was the result. The Constitution presents a major challenge to the law enforcement community: How do the police protect the citizenry and enforce the social contract without violating the rights and freedoms that make life in this country the envy of the world? Effective policing requires more than mere knowledge of the law and the Constitution.   Police officers must respect the rule of law and the rights guaranteed to all under the Constitution.

> You, as a police officer, are responsible to enforce and ensure these protections for all people. The people grant your authority as a police officer and, ultimately, it is the people to whom you and all other governmental employees are accountable.

---

location and at the approximate time as plaintiffs were arrested for OGA.  However, the record shows that officers received thorough training on OGA.  See Exs. T, T1-5, U, U1-5, V.

[2] Ex. _" refers to an exhibit attached to the Declaration of Amy Robinson in Opposition to Plaintiffs' Motion for Summary Judgment

[3] Exhibits A1-A5 contain the NYPD Police Student's Guide, Chapter: Introduction to Law and Justice for the years 2007—2011.

The Constitution contains seven (7) articles and twenty-seven (27) amendments. A copy of the preamble of the Constitution - as well as the Bill of Rights - is included at the end of this chapter.  Id. at D031209.

*** 

The central tenet of our democracy is the freedom to agree or disagree with governmental actions and policies. Because we are free to speak, write and vote as we please, changes in our government are brought about by voting rather than by revolution. The Constitution guarantees the right of everyone to express his or her views, however unpopular these views may be. If we refuse to let people with whom we disagree speak their minds, we deny a fundamental right in a democracy.

When the right of every individual to express himself freely is not protected, our system of law and government, and our basic philosophy of the rights of individuals will have failed. When the infringement of constitutionally protected rights is permitted because of "special cases" or "special circumstances," for example, denial of a fair trial to a "notorious criminal, II the next step may be a breach of basic rights whenever the government chooses. Our legal system does not exist to guarantee rights only to "certain people. II Rather, the Constitution and its amendments protect the rights of ALL of the people, all of the time.

Nothing is more important to the protection of our liberties than a police force that is knowledgeable and respectful of the Constitution. Although the Constitution severely limits the powers of the police, those limits must be respected rather than viewed as an obstacle to effective law enforcement. The fact is that the goals of law enforcement can be accomplished within the limits placed on us by the Bill of Rights. The amendments discussed in this chapter are of particular relevance to police officers in that they deal with the rights of the accused and other issues affecting policing.  Id. at D031210.

*** 

The First Amendment is simple and clear:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The five freedoms contained in this amendment are basic to the American way of life. Freedom of religion, speech, press, and the right to peaceably assemble and petition the government for a redress of grievances are cornerstones of our democracy. However, none of these freedoms is absolute and must be balanced with the rights of society as a whole.

Freedom of speech and freedom of the press permit the free exchange of ideas for bringing about political and social changes desired by the people. It also keeps the

8

people fully informed about the acts or misconduct of public officials, as well as keeping the public generally well informed. A well-informed public is the best insurance for the continuation of our democratic society.  Id. at D031211.

***

The applicability of the First Amendment to police action at the scene of demonstrations is discussed a later section of your Student's Guide- "Maintaining Public Order".  Id. at D031213.

These excerpts clearly show that officers received thorough instruction on the Constitution, including the First Amendment.  As further evidence of the NYPD's thorough training on First Amendment principles and the application of the disorderly conduct statute, PL §§240.20(5) and (6), to demonstrations specifically, below are excerpts from Exhibit D, the NYPD Police Student's Guide, Chapter: Maintaining Public Order, Demonstrations, 2012:[4]

**WHY IS IT IMPORTANT FOR POLICE OFFICERS TO KNOW THE MATERIAL IN THIS CHAPTER?**
As a police officer, you will regularly encounter situations that require you to use knowledge and expertise not expressly related to enforcing criminal laws. You may be requested to answer questions relating to civil matters or to intervene in civil disputes. Although most civil disputes require referral of the parties to the appropriate civil court, the handling of large-scale acts of civil disobedience is more complicated.

The role of the Police Department includes protecting the right of protesters to peaceably express their views, and protecting the right of nonprotesters to go about their daily life unaffected by public disorder. Most protests and demonstrations are conducted in a peaceful manner. However, acts of civil disobedience may sometimes evolve into disruptive and/or violent conduct requiring immediate police action.

***

**DEMONSTRATIONS**
It is important in our democratic society that the rights of assembly and the freedom to peaceably protest be protected. At the same time, these rights cannot be used as an excuse for violence nor may the exercise of those rights unnecessarily interfere with other important rights, such as those of nondemonstrators.

---

[4] Exhibits D1-D5 contain the NYPD Police Student's Guide, Chapter: Maintaining Public Order, Demonstrations for the years 2005—2011.  Exhibit I contains a Legal Bureau Bulletin, which was required reading for all officers, which provides further guidance on PL §240.20(6).

Regardless of your personal feelings towards the demonstrators or the object of their protest, you must remain neutral. A lack of professionalism or the use of unnecessary force against civilians damages the relationship between the Department and the community, as well as the Department's image. An officer who engages in such conduct subjects himself to administrative, civil, and possibly criminal sanctions.

**First Amendment Rights**

All people in America are free to assemble and discuss issues or events they think are important, or to support a particular course of action or belief. It does not matter whether the ideas of the speaker are right or wrong. What is important is that the speaker has the right to express them.

The courts have broadly interpreted the rights that are protected under the First Amendment.

*** 

**GUIDELINES FOR DEMONSTRATIONS**

You should be guided by the following general rules dealing with demonstrations:

- To the extent possible, the job of the police is to protect both the demonstrators' right of assembly and the right of non-demonstrators to peaceful and unobstructed passage. To do this, police barricades are most helpful. Properly utilized barricades permit a section of the sidewalk to be used for the demonstrators and another area for passage without obstruction. If it becomes necessary to arrest the demonstrators for impeding pedestrian traffic, they should first be warned that while they have a right to express their belief, the present location is improper and they should move to another designated area located nearby where the passage of pedestrian and vehicular traffic would not be obstructed.

- The group should be permitted to demonstrate as near to the target of their protest as is consistent with safety and reasonable requirements of unobstructed passage. This is referred to as the ***"sight and sound"*** requirement. However, in the interests of public safety, where it is clear that violence or even a riot will occur if the demonstration is located in a particular place, the police must designate a safer area, as close to the main point of the demonstration as possible. This has been held not to violate the rights of the demonstrators. (Emphasis in original).

- The obstruction of a street, sidewalk or building entrance may be either intentional or merely incidental to a group assembling together to communicate their views. There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views. Even a lone individual handing out political or religious leaflets, something that is clearly legal may be blocking the passage of others. This is not what the law means when it talks in terms of

10

> *obstruction*. Incidental obstruction is not illegal if it is less than a ***serious annoyance*** or only ***mere inconveniencing*** of pedestrians. The statute dealing with obstruction is Penal Law§ 240.20 (5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic ***with intent to cause public inconvenience, annoyance or alarm***. Certain activity such as handing out leaflets (on its own) is never an obstruction. (Emphasis in original).

Although we have rights that are protected by the First Amendment, there are situations when the quality of life is adversely affected. No individual's rights can supersede public safety or the quality of life within a community. Disorderly Conduct involves acts which disrupt public order. As police officers, we must have knowledge in handling these situations in order to protect the public welfare. Ex. D, D028298-028299.

***

A person is guilty of Disorderly Conduct when, with intent to cause public inconvenience, annoyance, or alarm or recklessly creates a risk thereof:

A person congregates with at least two other persons in a public place and refuses to comply with a lawful order of the police to disperse. Ex. D, D28300.

Example: A group of people gather outside City Hall to protest tax increases. They have no intention of causing public inconvenience, annoyance, or alarm. However, because of their reckless actions, pedestrians are inconvenienced and annoyed. If they refused to move after being directed by a police officer, they would be charged with Disorderly Conduct. If their actions caused interference with vehicular or pedestrian traffic, then they could also be charged with subdivision 5 as well as subdivision 6.

Note: For this subdivision to apply there must be a minimum of three people present. However, only the person who refuses to comply violates the statute.
.
You should remember that there must be intent to cause public inconvenience, annoyance or alarm, or he/she must recklessly create a risk thereof in order to arrest a person for violating one of the seven subdivisions of this law. Ex. D, 28301.

***

**CONCLUSION**

When you leave the Academy and work in the field, there will be times when you will be called upon to police large crowds. Such occasions include demonstrations, public events, civil disorder and strikes. As part of the N.Y.P.D. values, we pledge to protect the lives and property of our fellow citizens and impartially enforce the law. It is imperative that we maintain a balance between citizen's constitutional rights and our responsibility to protect persons and property. As part of effective policing, you must be able to effectively utilize

11

good communication and judgment skills in order to ensure that order is maintained. Ex. D, D028305.

Each chapter of the Police Student's Guide, including the Introduction to Law and Justice and Maintaining Public Order: Demonstrations, has a corresponding Lesson Plan, which shows that officers' training on the First Amendment and disorderly conduct involved lecture, question and answer and group discussion through instruction at the NYPD Police Academy. See Exs. B, B1-5; E, E1-5.  Police officers were evaluated by quiz on their comprehension of the contents of each Lesson Plan/Chapter.  Ex. N, Perkins Dep., 134:3-7, 135:6-15.  If the quizzes indicated that an officer had a problem understanding the material, the officer was then recommended for tutoring.  Id. at 135:15-18.  In addition to lecture, question and answer, group discussion and quizzes on each chapter, three trimester exams were given during the course of Academy training, which covered every chapter reviewed in a given trimester.  Id. at 135:19-136:8.  Furthermore, NYPD Police Academy instruction was given by state certified instructors. Ex. N, Perkins Dep. 119:7-15.  The instructors were trained by officers designated as master instructors by the state.  Id.  The NYPD's lesson plans and course materials were reviewed for national accreditation every four years by the Commission on Accreditation for Law Enforcement Agencies, ("CALEA"), and the NYPD received these accreditations.  Id.: Ex. M. Additionally, officers received college credit for these courses through the National College Credit Recommendation Service ("NCCRS").  Ex. M.

Officers also received what is called "Command Level training" at their precincts. Command Level training is training given on specific topics by the Specialized Training Section of the Police Academy to precinct-level training sergeants —"a training the trainer situation." Ex. N, Perkins Dep., 50: 2:18.  These training sergeants take the training back to their individual commands and train every member of their respective commands.  Id. at 130:15-18.  An example

of this type of training included the 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct." Ex. G. The Training Memo provided guidance to officers specifically on the application of PL §240.20(5), that statute under which plaintiffs were charged, including, that something more than a "mere inconvenience of pedestrians is required to support the charge," and that an obstruction must be "substantial." Id. Commanding Officers at each precinct were directed to ensure that each member of their commands (precincts) was informed of and received Command Level training on this Training Memo. Id. at 1. Executive officers in commands received command level training. Ex. N, Perkins Dep., 50:19-23. The Training Memo stands until it is revoked. Id. at 51:3-5.

Thus, the record shows that officers received thorough First Amendment training and training on the application of the disorderly conduct statute at the Police Academy by state certified instructors, utilizing many sources, and they further received Command Level Training at their precincts specifically relating to §240.20(5).

A reading of plaintiffs' motion papers, however, would lead one to believe that NYPD Police Academy training and Command Level training did not exist, and that it was the NYPD Disorder Control Unit ("DCU"), which was tasked with providing officers' training on the First Amendment and the standards for applying the disorderly conduct statute, and that the DCU failed in this task. Pls MOL at 14-27. Plaintiffs' devotion of fourteen pages of argument in their memorandum of law—in fact their entire argument on training—to the proposition that a small, discrete unit of the NYPD was responsible for this training is ridiculous. This is especially true in light of the fact that the overwhelming record in this case, including the testimony of two 30(b)(6) witnesses from the DCU and thousands of pages of training documents, show that the DCU was not tasked with providing training on the Constitution of the

United States, the application of the disorderly conduct statute, the standards for probable cause or the contents of dispersal orders for that matter.  Ex. O, Raganella Dep., 36:2-3; 185:9-186:5; Ex. P, Vega Dep., 67:4-8, 69:17:22, 112:14-114:11.  The primary training function of the DCU, which consists of a handful of officers now and during OWS, (Ex. P, Vega Dep., 145:6-9) was to provide instruction to officers on line and wedge formations for mass arrests, high profile vehicle rescues, critical response vehicle deployment, setting up a vehicle command post, high crime area mobilizations, HazMat/COBRA training (chemical, biological and radiological awareness), HazMat deployment, active shooter training, testing response readiness to detonation of an improvised explosive device, and so on.  Ex. P, Vega Dep., 34-17-36:16, 39:2-16; 55:17-20; 57: 60:12-23.  The role of the DCU at a protest or demonstration was simple—to provide tactical support to the incident command, including forming lines and wedges and disseminating masks, mesh netting, flexi-cuffs, pepper spray and the like.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.   It bears noting that no member of the DCU gave any orders to officers to make arrests during OWS, and no member of the DCU made any arrests or made any arrest decisions during OWS.  Ex. P, Vega Dep., 165:16-166:4.

This is not to say that the DCU provided no instruction to officers on the First Amendment as it pertains to protests as argued by plaintiffs. Pls MOL at 19.  Indeed, the Commanding Officer of the DCU testified that training was given in 2011 on the First Amendment rights of protesters pursuant to the DCU Lesson Plan, Legalities at Protests/Demonstrations.  Ex. O, Raganella Dep., 279:7-25; Ex. J.  In this DCU training, officers received instruction on how the First Amendment affects their job performance at a protest or demonstration and on how the rights of free speech and assembly pertain to current NYPD

14

policies.  Ex. J.  The DCU also trained Probationary Lieutenants and Probationary Sergeants on

policing in the First Amendment context, including instructing these officers that:

> It is the policy of the New York City Police Department to protect the rights of
> peaceful assembly and free speech, as well as the right to safe and unhindered
> passage for all people. The successful implementation of this policy requires a
> balance between the Department's mandate to preserve public order and its
> obligation to protect the First Amendment rights of varied and often competing
> groups. In all cases, the Police Department must remain neutral in its oversight of
> peaceful assemblies.

See Exs. K and L at 2, bullet 1.  Thus, while the DCU provided instruction on the First

Amendment as it pertained to demonstrations, the record, as shown above, clearly shows that the

NYPD both at the Police Academy and through Command Level training at all of the NYPD

precincts performed the primary training of officers on the Constitution, including the First

Amendment and on the disorderly conduct statute.  Plaintiffs' attempt to direct the Court to the

absence of this training in documents generated by the DCU, a unit which was not primarily

tasked with providing this training, and then arguing that officers did not receive this training

because it is not contained in these documents is farcical.

Moreover, plaintiffs' argument that the City did not incorporate a 2007 New York

State Court of Appeals decision, People v. Jones, into any of its training is false.  See Pls MOL at

1, 20.  First, the NYPD Police Student's Guide, Maintaining Public Order: Demonstrations,

from *2005 through 2012*, specifically includes the standards for application of PL §240.20(5) as

set forth People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly

conduct statute, PL §722.  People v. Jones simply applied the standard set forth in Carcel to the

current statute, §240.20(5).  This is evidenced by the fact that the NYPD Police Student's Guide,

Demonstrations in ***2005***, which obviously predates the Jones decision, specifically states that

under PL §240.20(5) (Emphasis in original):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.  This is not what the law means when it talks in terms of **obstruction**.  Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.  The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.

Exs. D, D1-7; see also Ex. N, Perkins Dep., 49:18-50:18; 158:17-159:24.  In addition to Police Academy training, officers received Command Level training on the 2007 Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," referenced above, which specifically outlines the decision in People v. Jones.

Further, plaintiffs' argument that executive officers are not trained on the First Amendment or disorderly conduct (Pls MOL at 22) is just plain wrong as they receive training at the Academy, and they receive Command Level training not to mention years of on-the-job experience policing and supervising hundreds of demonstrations in New York City.  Executive officers are also aided on the scene of demonstrations by members of the NYPD Legal Bureau who assist incident commanders directly in the field with questions they may have, including questions pertaining to probable cause to make arrests.  Ex. Q, Gannon's Dep., 163:3-12.  Plaintiffs' argument that two non-party executive officers, Chief Purtell and Inspector Winski, who both policed many OWS protests, did not understand the First Amendment and the disorderly conduct statute is not supported by the evidence in this case.   Further, there is no evidence that either officer made the arrests or ordered arrests to be made on September 17, 2012.

Moreover, plaintiffs' argument that the City "removed" a 2002 lesson plan, "Legalities of Civil Disorder" and the 2004 RNC Legal Guidelines from any training is also false.  See Pls MOL at 23, 25.  First, the record does not reflect that a lesson plan, "Legalities of

Civil Disorder" existed, so therefore it could not have been removed from training in 2002. Second, there is zero record evidence that the RNC Legal Guidelines were ever, at any time, "removed" from NYPD training.  Additionally, plaintiffs' argument that the City or the NYPD should have created legal guidelines for OWS is preposterous.  See Pls MOL at 23.  The City was aware that the Republican National Convention was coming to New York City years in advance, and it was therefore able to prepare RNC-specific legal guidelines.  As admitted by plaintiffs, the NYPD was made aware that OWS was going to occur only weeks in advance.  See Pls 56.1, ¶249.  In fact, during that time, the NYPD tried to identify the leaders of the OWS movement and contacted the ACLU to try to facilitate and accommodate OWS as they had done with the RNC—but the NYPD was rebuffed.  Ex. S, Purtell Dep., 31:6-24.  Chief Purtell, the NYPD Commanding Officer of Patrol Bureau Manhattan South, personally tried to reach out to OWS organizers and the ACLU to facilitate marches and demonstrations.  Id. at 31:19-32:8.  The NYPD tried to open a dialogue with people who seemed to be leading the group through the NYPD Community Affairs Division. Id. at 32:9-17.  This was all to no avail.  The NYPD learned of planned OWS demonstrations, including the first anniversary, through social media and internet open source resources.  Id. at 186:7:15; Ex. Q, Gannon Dep., 171:8-172:5.  In any event, with very little advance notice that OWS was going to happen, and with no cooperation from its organizers to organize and facilitate demonstrations, the NYPD could hardly have prepared a thirty-six paged recitation of legal guidelines prior to OWS as was done prior to the RNC.

Moreover, plaintiffs can provide no proof that the NYPD's method or quantity of training on First Amendment principles or the application of the disorderly conduct statute at OWS demonstrations was inadequate especially given its record with respect to determinations by the Second Circuit, this Court and numerous federal juries that probable cause or arguable

probable cause existed for arrests at OWS demonstrations, including two Second Circuit decisions and two juries making this determination for arrests during the first anniversary of OWS.[5]  In fact, in ten OWS cases that were appealed to the Second Circuit the Court determined that probable cause and/or arguable probable cause existed for the arrests made during OWS.[6] Id. The Second Circuit cases alone represent many, many hundreds of OWS arrests.  Not only has probable cause or arguable probable cause been determined to have existed for arrests made during the first anniversary of OWS, probable cause or arguable probable cause was determined to exist for arrests made during the six-month anniversary of OWS and for arrests made during the second anniversary of OWS.[7]  Additionally, despite various and repeated Monell claims, not a single judge or jury has found that the City employed inadequate training in any other protest case, including any OWS case, any RNC case, any Iraq War case or any case arising from the World Economic Forum—all protests cited by plaintiffs.

The facts simply contradict plaintiffs' claimed theory of Monell.  The record evidence shows that the NYPD thoroughly trained its officers on the First Amendment and

---

[5] Wiles v. City of New York, 2018 U.S. App. LEXIS 5610 (2d Cir. 2018); Shamir v. City of New York, 2015 U.S. App. LEXIS 18420 (2d Cir. 2017); Soto v. City of New York, 13-CV-8474, Dkt. Nos. 203, 204; Sherrard v. City of New York, 15-CV-7318, Dkt. No 123.

[6] Berg v. City of New York, 2018 U.S. App. 20646 (2d Cir. 2018); Caravalho v. City of New York, 2018 U.S. App. 10785 (2d Cir. 2018) (summary order); Higginbotham v. City of New York, 2018 U.S. App. LEXIS 20637 (2d Cir. 2018) (summary order); Wiles v. City of New York, 2018 U.S. App. LEXIS 5610 (2d Cir. 5610); Kass v. City of New York, 2017 U.S. App. LEXIS 13259 (2d Cir. 2017); Pluma v. City of New York, 2017 U.S. App. LEXIS 6096 (2d Cir. 2017) (summary order); Brown v. City of New York, 2017 U.S. App. LEXIS 11937 (2d Cir. 2017); Shamir v. City of New York, 2015 U.S. App. LEXIS 18420 (2d Cir. 2017); Lebowitz v. City of New York, 2015 U.S. App. LEXIS 9106 (2d Cir. 2015) (summary order); Garcia v. City of New York, 2015 U.S. App. LEXIS 2762 (2d Cir. 2015).

[7] Caravalho v. City of New York, 2018 U.S. App. 10785 (2d Cir. 2018) (summary order); Kass v. City of New York, 2017 U.S. App. LEXIS 13259 (2d Cir. 2017); Hays v. City of New York, 2017 U.S. Dist. LEXIS 28090 (S.D.N.Y. 2017; Tardif v. City of New York, 2017 U.S. Dist. LEXIS 41318 (S.D.N.Y. 2017); Pesola v. City of New York, 2017 U.S. Dist. LEXIS 140967 (S.D.N.Y. 2017); Thimmesch v. City of New York, 2013 U.S. Dist. LEXIS 53587 (S.D.N.Y. 2013).

disorderly conduct.  This training was given by state certified instructors, utilizing many sources, and the training was performed through lecture, classroom discussion, question and answer and PowerPoint presentations. Officers were quizzed and examined on their training.  Further, officers received Command Level Training at their precincts specifically addressing PL §240.20(5).  Additionally, officers received refresher training from the DCU on the First Amendment.  On this record, plaintiffs cannot show that the NYPD's training on the First Amendment and disorderly conduct was not adequate.  Accordingly, plaintiffs' failure-to-train Monell claim must be dismissed.

### POINT III

### PLAINTIFFS CANNOT SHOW THAT ANY ALLEGED LACK OF TRAINING AMOUNTED TO DELIBERATE INDIFFERENCE

Even if the Court determines that a Monell claim can be considered without establishing the prerequisite to every Monell claim—proof of an independent underlying constitutional violation, and even if the Court determines that probable cause did not exist for plaintiffs arrests, despite a total lack of any argument by plaintiffs that they were unlawfully arrested, and even if the Court determines that, despite the overwhelming evidence shown above, the NYPD failed to adequately train its officers on First Amendment principles and the application of the disorderly conduct statute, plaintiffs cannot show that any alleged lack of training amounted to deliberate indifference of the constitutional rights of citizens.

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. Connick v. Thompson, 563 U.S. 51, 61 (2011).  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. Oklahoma City v. Tuttle, 471 U.S. 808, 822-823 (1985)

19

(plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989). Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id., at 389.

To succeed on a theory of liability based on the City's failure train, a plaintiff must make three showings to establish the requisite "deliberate indifference": First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Green v. City of N.Y., 465 F.3d 65, 80-81 (2d Cir. 2006) citing Walker v. New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotation marks omitted)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Board of Comm'rs of Bryan Cty., v. Brown, 520 U.S. 397, 410 (1997). A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Connick, 563 U.S. 51, 52 citing, Bryan Cty., 520 U.S. 397, 409.

As to the first prong, clearly defendant was aware that some officers would be called upon to police demonstrations. Plaintiffs did not plead or argue the second prong.

Plaintiffs rely on the third prong of the test arguing, that despite notice to the City that its training program was deficient, it chose not to act and was therefore deliberately indifferent to plaintiffs' unlawful arrests.  Pls. MOL at 5.  Plaintiffs attempt to prove deliberate indifference with citation to various allegations in unrelated lawsuits and settlements, purported DA disposition statistics pertaining to OWS arrests and two letters sent to the NYPD pertaining to an unrelated 2011 OWS protest in the Bronx, which plaintiffs claim the City ignored.  As shown below, the Court in this case determined that citations to other lawsuits and DA disposition statistics do not support plaintiffs' <u>Monell</u> claim.  Furthermore, plaintiffs' claim that the City ignored complaints regarding what plaintiffs call the "Bronx incident," is untrue.

## A.  Unsubstantiated Allegations In Lawsuits and Settlement Agreements Do Not Support Plaintiffs' Monell Claim

Plaintiffs argue that the City ignored alleged deficiencies in its policing of protests as shown by "a history of arresting sidewalk protesters absent criminal conduct as evidenced by civil litigation."  Pls MOL at 5.  Plaintiffs' argument fails as the Honorable Analisa Torres has already held in this case that "the lawsuits [cited by plaintiffs] do not plausibly support plaintiffs' *Monell* claim."  <u>See</u> Decision, dated March 2, 2017, Dkt. No. 59, at 13.  "[T]he Court is unable to rely on plaintiffs' citations to similar lawsuits…" <u>Id.</u> at 16.  And, even if the Court disregards the Court's determination, plaintiffs' citations to lawsuits, involving unsubstantiated allegations contained in court complaints, do not establish a history of arresting protesters unlawfully nor are they probative of the existence of an entire NYPD-wide failure to train.  And, even had the lawsuits cited by plaintiffs nudged their <u>Monell</u> claim into plausibility at the motion to dismiss stage, which they did not, citations to lawsuits and settlement agreements will not suffice to overcome summary judgment.  <u>See</u> <u>Osterhoudt v. City of New York</u>, 2012 U.S. Dist. LEXIS 139700, at *7 (E.D.N.Y. 2012).

21

Allen, Haus and Kunstler, which involve unrelated protests that occurred nine to ten years before the date of incident instant case, are not "examples of wrongful arrests" as plaintiffs argue—but are simply allegations that were never substantiated or adjudicated.  These cases were settled with no finding that the arrests in those cases were unlawful and with no admission of liability, and thus, they do not support plaintiffs' Monell claim.  See Jean-Laurent v. Wilkerson, 461 F. App'x 18, 22-23 (2d Cir. 2012) (summary order) ("[Plaintiff's] citation to various lawsuits involving inmate claims for the excessive use of force is not probative of the existence of an underlying policy that could be relevant here."); see also Collins v. City of New York, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) (finding the plaintiff's reference to a "litany of other police-misconduct cases" to be insufficient to plausibly allege Monell liability because they involved different issues "or something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"); Jones v. City of New York, 2013 U.S. Dist. LEXIS 162235, at *13 (E.D.N.Y. Nov. 14, 2013) ("[T]he existence of other lawsuits against the City alleging similar violations of constitutional rights also does not establish a policy or custom as necessary under Monell.").  Plaintiffs argument that an OWS lawsuit pertaining to a demonstration on New Year's Eve 2011 supports their Monell claim is also without merit as that lawsuit, in which plaintiffs' counsel was the attorney of record, settled with no admission of liability.  Walker v. City of New York, 2014 U.S. Dist. LEXIS 42272, at *3 (S.D.N.Y. 2014) ("A lawyer's citations to actions she has brought and subsequently settled without adjudication or admission of liability is clearly an insufficient basis for a Monell claim.") citing Rasmussen v. City of New York, 766 F. Supp. 2d 399, 409 (E.D.N.Y. 2011).

Plaintiffs further cite to Dinler in which the Honorable Richard Sullivan found on summary judgment that probable cause was lacking for the arrests made during the RNC.

Plaintiffs' reliance on this case is misplaced for so many reasons.  First, the Honorable Analisa Torres specifically held, in this case, that the RNC lawsuits do not plausibly support plaintiffs' Monell claim as the RNC involved mass arrests, and the instant case does not involve mass arrests.[8]  See Decision, dated March 2, 2017, Dkt. No. 59, at 13.  Second, Judge Sullivan's decision in Dinler pertained to the arrests of 200 individuals ordered by one officer, on one day, at one location out of a total of 1,800 arrests over several days at eight locations during the RNC. See McNamara v. City of New York, 2011 U.S. Dist. LEXIS 53829, at **9, 14 (S.D.N.Y. 2011). Thus, approximately eleven percent of all of the RNC arrests were determined to have been made without probable cause.  Eleven percent does not even establish a history of constitutional violations during the RNC much less during OWS.  Third, the decision in Dinler was issued on September 30, 2012—after the date of incident in the instant case, and therefore, any changes made by defendant pertaining to protests following Dinler would clearly have no impact on the policing of an incident on September 17, 2012.  For all of these reasons, Dinler fails to support plaintiffs' Monell claim.

Allegations in settled lawsuits with no admission of liability and one decision on summary judgment involving a fraction of individuals arrested during the RNC eight years before the incident in the instant case hardly establishes a pattern of constitutional violations, which would provide notice to defendant that untrained employees were violating the constitutional rights of citizens thereby alerting the NYPD to deficiencies in its training program. Thus, these lawsuits do not demonstrate that the City knew or should have known about a widespread pattern of constitutional violations by untrained officers.

---

[8] In Dinler, "mass arrest" referred to arrests of large groups of protesters, including innocent bystanders. See Dinler v. City of New York, 2012 U.S. Dist. LEXIS 141851, at *31-32 (S.D.N.Y. Sept. 30, 2012).

**B.      Purported Disposition Statistic Do Not Support Plaintiffs' <u>Monell</u> Claim**

Plaintiffs argue that defendant ignored "favorable disposition" statistics of OWS arrests from the DA's Office and declined prosecutions that would have indicated a problem with training.  Pls MOL at 8-9.  What plaintiffs ignore is Judge Torres' holding in this case that the Court cannot deduce that the majority of the OWS arrests were unlawful, because the majority of cases were dismissed or resolved via an ACD—"as the District Attorney's Office has prosecutorial discretion and may choose to dismiss or settle cases for reasons other than the unlawfulness of the individual arrest."  <u>See</u> Decision, dated March 2, 2017, Dkt. No. 59, at 13, 16.  Moreover, an ACD is not a favorable disposition.  An ACD leaves open the question of the accused's guilt.  <u>See</u> <u>Singleton v. City of New York</u>, 632 F.2d 185, 193 (2d Cir. 1980) ("Proceedings are terminated in favor of the accused only when their final disposition is such as to indicate the accused is not guilty. An adjournment in contemplation of dismissal, like a consent decree, involves the consent of both the prosecution and the accused and leaves open the question of the accused's guilt.") (internal citations and quotation marks omitted).

Additionally, plaintiffs' favorable disposition percentages are utterly false and misleading, because plaintiffs have not established if, or how many dismissals, other than ACDs, were due to facial insufficiency, due to the People's inability to establish proof beyond a reasonable doubt, were made on speedy trial grounds or for any other jurisdictional reason having nothing to do with whether an officer at the scene had probable cause to make the arrest. A termination of a criminal proceeding due to facial insufficiency of the charging instrument is also not a favorable termination.  This type of dismissal is not indicative of probable cause or lack thereof; it is a jurisdictional dismissal and does not address the merits of the underlying matter.  <u>See</u> <u>Mangino v. Village of Patchogue</u>, 739 F. Supp. 2d 205, 230 (E.D.N.Y. 2010) citing <u>Mack v. Town of Walkill</u>, 253 F. Supp. 2d 552, 562 (S.D.N.Y. 2003) ("Having dismissed the

action on procedural grounds, Justice Freehill never reach[ed] the merits of the case, and plaintiff's innocence was not established by the dismissal…")).  Interestingly, plaintiffs cite to four OWS dates of arrest in support of their favorable disposition and declined prosecution arguments, September 24, 2011, November 17, 2011, December 31-January 1, 2011, and March 17, 2012.  Pls MOL at 8-9.  The determinations that have been made pertaining to those dates, however, were determinations by this Court, two federal juries and the Second Circuit that probable cause existed for arrests on those dates.[9]

Finally, plaintiffs cannot offer any evidence whatsoever demonstrating a link between the rate of various types of dismissal or declined prosecutions and the absence of probable cause.  Simply put, declined prosecutions and dismissals of charges do not equate with a judicial determination of probable cause for the arrest.  There is nothing to support plaintiffs' allegation that a declined prosecution or a dismissal corresponds to judicial finding of a lack of probable cause. Accordingly, plaintiffs' "favorable disposition" argument fails to support their Monell claim.

**C.    Plaintiffs' Allegation That Defendant Ignored Complaints Is False**

Plaintiffs argue that defendant ignored two letters to the NYPD Commissioner from State Senator Liz Krueger and from Council Member Jessica Lappin concerning police conduct at an OWS protest on December 3, 2011, during what plaintiffs refer to as the "Bronx Incident."  Pls MOL at 10-11.  Despite plaintiffs' argument that the NYPD ignored these letters, they further argue that the NYPD investigation of this incident was "superficial."  Pls MOL at

---

[9] See Caravalho v. City of New York, 2018 U.S. App. 10785 (2d Cir. 2018) (summary order); Tardif v. City of New York, 2017 U.S. Dist. LEXIS 41318 (S.D.N.Y. 2017); Pesola v. City of New York, 2017 U.S. Dist. LEXIS 140967 (S.D.N.Y. 2017); Thimmesch v. City of New York, 2013 U.S. Dist. LEXIS 53587 (S.D.N.Y. 2013); Hessler v. City of New York, 13-CV-821, Dkt. No. 61); Holmes v. City of New York, 2018 U.S. Dist. LEXIS 53419 (S.D.N.Y. 2018); Gonzalez v. City of New York, 2017 U.S. Dist. LEXIS 5688 (S.D.N.Y. 2018).

11-12. Both arguments are meritless. The "Bronx Incident," which is entirely unrelated to the instant case, was one in which five protesters, who set up tables and chairs on a sidewalk in the Bronx, received C-summonses for disorderly conduct. The NYPD Commissioner, in response to the letters from Krueger and Lappin regarding this incident, referred the matter to the Internal Affairs Bureau, Special Investigations Unit, ("IAB") for investigation of possible misconduct. Ex. W. The investigation into this incident, far from being "superficial" involved the investigative work of one Deputy Chief, one Inspector, one Deputy Inspector, six Detectives and one Sergeant in IAB. The investigation also required that four officers who were present on the date of the "Bronx Incident" be formally interviewed with retained legal representation. The twelve-person IAB investigation team reviewed video of the incident, the memo book entries of the officers, paperwork involved in issuing the summonses, the disciplinary histories of all of the officers involved, interviews of the officers involved with their legal representation, conferral with the Bronx precinct Integrity Control Officer, conferral with the Bronx precinct Assistant Integrity Control Officer and conferral with the clerk of the Bronx Criminal Court. While plaintiffs argue that there was no mention of pedestrians being impeded during the protest, (Pls MOL at 12) during their formal interviews, two officers stated that they observed protesters with tables and chairs set up on the sidewalk, and the protesters were given warnings, which they ignored. Id. at D21449-21450, 21426. The investigation concluded that misconduct pertaining to this incident was unsubstantiated. Id. at D21424.

Plaintiffs' also argue that two witnesses in this case, Inspector Raganella and Lt. Gannon, reviewed a 12-minute video of the Bronx Incident arrests and could not identify any pedestrian blockage. Pls MOL at 12-13. It must be noted that, not only is there no record of either witness having viewed the video, there is no record of either witness viewing 12 minutes

of this or any other video.  Moreover, Raganella specifically testified that he only saw a "small snippet of video," he did not see what happened before the video began recording, "I don't know what [the Captain] saw and observed prior to the video starting,"  "I wasn't there.  I didn't see what they were speaking of or how it was actually occurring."  Raganella Dep. 22:15-25:9.[10]

Plaintiffs' further argument that defendant ignored a 295-page report, which contains allegations pertaining to OWS arrests and which plaintiffs claim was e-mailed to the NYPD on July 25, 2012, is similarly misplaced.  Pls MOL at 13-14.  First, the report is undated.  Second, while an e-mail was received by the NYPD referencing the report, there is no evidence in the record of the report itself having been e-mailed to the NYPD on July 25, 2012.  Even assuming arguendo that the report was received by the NYPD on July 25, 2012, it is not likely that the NYPD would have reasonably had time to review a 295-page report and make changes to policies in policing protests in response to the report, which was submitted mere weeks before the date of incident in this case.

As shown above, the record evidence demonstrates that no deficiencies in the NYPD's training program pertaining to the First Amendment or disorderly conduct existed.  Even if there were a lack of training in this regard, plaintiffs cannot establish that the NYPD was put on notice of any alleged deficiency by allegations in lawsuits, settlements years later with no admission of liability and letters of complaint that were fully investigated.  Accordingly, plaintiffs' Monell claim must be dismissed.

---

[10] Raganella's deposition in this case was taken on July 12, 2018, and a flash drive dated August 30, 2018, was provided to defendant entitled, "plaintiff's exhibit 1" to Raganella's deposition, which contained one main file, 3 sub files, 22 sub sub files, 21 sub sub sub files of multiple videos and screen shots.  Not a single one of the multitude of videos or screen shots on plaintiffs' purported exhibit 1 to Raganella's deposition is identified in any manner whatsoever in Raganella's deposition transcript.  Raganella's deposition transcript does not indicate that he viewed the more than 50 videos and screen shots contained on the flash drive, or anything approaching that number.  See Ex. O, Raganella Dep., (throughout).

## POINT IV

### PLAINTIFFS FAILED TO ARUGE MUCH LESS PROVE A DIRECT CAUSAL LINK BETWEEN ANY INJURY THEY SUSTAINED AND AN ALLEGED LACK OF TRAINING AMOUNTING TO DELIBERATE INDIFFERENCE

Even if the Court determines that a <u>Monell</u> claim can be considered without establishing the prerequisite to every <u>Monell</u> claim—proof of an independent underlying constitutional violation, and even if the Court determines that probable cause did not exist for plaintiffs arrests despite a total lack of any argument by plaintiffs that they were unlawfully arrested, and even if the Court determines that, despite the overwhelming evidence shown above, the NYPD failed to adequately train its officers on First Amendment principles and the application of the disorderly conduct statute, and even if the Court determines that this lack of training amounted to deliberate indifference, in order to establish municipal liability, plaintiffs must demonstrate that this failure to train amounting to deliberate indifference was the "moving force" behind the alleged injury.  <u>Roe v. City of Waterbury</u>, 542 F.3d at 37 quoting <u>Board of Bryan Cty. Comm'rs v. Brown</u>, 520 U.S. 397, 404, (1997) (plaintiffs must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.). To establish municipal liability under § 1983, plaintiffs must prove that the alleged failure to train caused the alleged constitutional injury.  <u>Connick v. Thompson</u>, 131 S. Ct. at 1359 (internal quotation marks omitted). If the training is so inadequate that it the policymakers of the municipality can reasonably be said to have been deliberately indifferent to this need, "the city may be held liable if it actually causes injury." <u>Canton</u>, 489 U.S. 378, 390 (1989); <u>see</u> <u>also</u> <u>Triano v. Town of Harrison, N.Y.</u>, 895 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) (a plaintiff must show that there is a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation.") citing <u>Canton</u>, 489 U.S. 378 (1989).

It could not be more clear, and yet plaintiffs not only failed to prove or argue an injury, they failed to prove or argue that defendant's alleged lack of training amounting to deliberate indifference was the moving force behind their injury. This failure is fatal to their motion. Plaintiffs cannot prove any injury, they cannot prove fault, and they cannot prove causation—and they have not tried. Even if plaintiffs had proved that an injury occurred, they cannot prove that the injury was caused by the NYPD's training program, and not for any other reason, such as, a well-trained officer who made a mistake.

Accordingly, plaintiffs have failed to show that a genuine issue of fact exists with respect to a direct causal link between an injury they have not proved and an alleged lack of training amounting to a deliberate indifference to their constitutional rights. Thus, plaintiffs' Monell claim must be dismissed.

## CONCLUSION

Plaintiffs have failed to prove or move on the prerequisite to every Monell claim—an independent, underlying constitutional violation. Plaintiffs failed to demonstrate that officer training on the First Amendment and the disorderly conduct statute was anything but thorough. Plaintiffs' citations to various allegations in settled lawsuits, disposition statistics and letters do not establish deliberate indifference. Adding to all of that, plaintiffs failed to argue much less prove a direct causal link between inadequate training amounting to deliberate indifference and any injury. For the foregoing reasons, defendant respectfully requests that the Court deny plaintiffs' motion for summary judgment in its entirety, together with costs, fees and such other and further relief as the Court deems just and proper.

Dated:     New York, New York
            May 10, 2019

                       ZACHARY W. CARTER
                        Corporation Counsel of the City of New York
                       *Attorney for Defendant*
                       New York City Law Department
                       100 Church Street
                       New York, New York 10007
                       (212) 356-3518


                       By:            /s/
                            Amy Robinson
                            Special Federal Litigation Division


TO:    All Attorneys of Record (*via ECF*)