UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

GEORGE PACKARD, EDWARD BECK, ARI COWAN and
MICHELLE BERGER, individually and on behalf of a class of
all others similarly situated,

**PLAINTIFFS' RESPONSE TO DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT**

          Plaintiffs,

15-CV7130 (AT) (SDA)

     -against-

THE CITY OF NEW YORK,

          Defendant.

------------------------------------------------------------------------------x

     Plaintiffs, by and through their attorneys and in accordance with this honorable

Court's Order dated November 13, 2018, ECF No. 216, submit this Opposition Rule 56.1

Statement in response to Defendant's 56.1 Statement ("Defendant's Statement") provided

electronically to Plaintiffs on November 26, 2018.

### September 17, 2012

  1.  September 17, 2012, was the one year anniversary of Occupy Wall Street

("OWS").  Members of the OWS movement planned a number of demonstrations around lower

Manhattan on that day to commemorate this anniversary.  Wiles v. City of New York, 2018 U.S.

Dist. LEXIS 148024, at 4-5 (S.D.N.Y. 2016), aff'd 2016 U.S. App. LEXIS 5610 (2nd Cir. 2018).

    **PLAINTIFFS' RESPONSE 1-1:**  ADMIT.

  2.  From September 15-17, 2012, thousands of individuals came to New York City to

participate in demonstrations in connection with the anniversary.  Compl. ¶106.

    **PLAINTIFFS' RESPONSE 2-1:**  ADMIT.

3.     The New York City Police Department ("NYPD") was aware of and even quoted from OWS organizers' internet plans in their detail request calling it the "All roads lead to Wall Street," demonstration, and citing the "Storm Wall Street" plan to conduct acts of civil disobedience as well as plans for "roving intersection occupations."   Exhibit C: D000784-000792; Exhibit D 032331-032350.

**PLAINTIFFS' RESPONSE 3-1:** <u>DENY</u>.  D784-792 is a "Detail Request" relating to a "DEMO/SLEEP-IN".  The words quoted in ¶ 3 of Defendant's Statement are not contained anywhere in D784-792.  D784 states: "A group of protestors organized a sleep-in, in the Wall Street area in an attempt to bring awareness to over-spending by Wall Street.  The campaign was organized via social media."

**PLAINTIFFS' RESPONSE 3-2:** <u>DENY</u>.  Exhibit D 032331-032350 does not refer in any manner to OWS organizers, to social media, or to the internet; nor does it refer to any other source for the words quoted in ¶ 3 of Defendant's Statement.  Nowhere in Exhibit D 032331-032350, other than the gratuitous, unsourced statement, "the group will attempt to "Storm Wall Street" by conducting roving intersection occupations", there is no support that OWS organizers reported to be planning acts of civil disobedience.  Nonetheless, Exhibit D 032331-032350.   states that "[I]n anticipation of acts of civil disobedience, the following detail is requested."

**PLAINTIFFS' RESPONSE 3-3:** <u>DENY</u>.  The NYPD was aware that the large majority of OWS Anniversary protestors would not engage in organized activity or in acts of civil disobedience.  Defendant's 30(b)(6) witness Inspector Anthony

2

Raganella testified that the majority of OWS protestors "were disorganized". (Raganella Dep., 198:10-12).  Inspector Raganella informed the Commanding Officers of eight Patrol Boroughs (*Id*. at 196:4-14) that OWS protestors "are not very unified or organized" and that "although they are very annoying . . . it is very easy for us to lose our patience after many hours of playing cat and mouse with them."  (*Id*. at Ex. 25).

4.      Chief Thomas Purtell, the NYPD Commanding Officer of Patrol Bureau Manhattan South, testified that the NYPD had information that demonstrators were planning to shut down Wall Street and prevent the New York Stock Exchange from opening during the period, September 15-17, 2012. Exhibit WW: Purtell Dep., 17:21-18:4; 57:12-18; 69:13-17, 74:14-20.

**PLAINTIFFS' RESPONSE 4-1:**  <u>DENY</u>.  Chief Purtell testified that, "I don't recall . . . how we knew about it, but it was kind of widely known and reported in the press, various forms of media."  (Docket 266-46 Purtell Dep. 57:19-22).

**PLAINTIFFS' RESPONSE 4-2:**  <u>DENY</u>.  Chief Purtell testified only that NYPD activity "*revolved around the initial determination* that this group was determined to deny access to the Stock Exchange and prevent the Stock Exchange from opening that morning." (Docket 266-46 Purtell Dep. 74:14-20, emphasis added).

**PLAINTIFFS' RESPONSE 4-3:**  <u>DENY</u>.  The cited testimony shows only that from "report[ing] in the press, various forms of media", the NYPD made an "initial determination" around which its activity for the day "revolved."  It does

not support the assertion made in ¶ 4 of Defendant's Statement "that the NYPD had information" that OWS protestors were planning to prevent the New York Stock Exchange from opening for three days.  (Docket 266-46 Purtell Dep., 57:12-22; 74:14-20.)

**PLAINTIFFS' RESPONSE 4-4**:  <u>DENY</u>.  In 2012, September 15 and 16 were, respectively, a Saturday and Sunday.  The New York Stock Exchange is not open on weekends.  The NYPD could not have "information" that protestors planned to prevent the stock exchange from opening on Saturday and Sunday.

### George Packard

5.      On September 17, 2012, George Packard came to New York City to participate in an OWS protest.  Exhibit A Compl., ¶19.

**PLAINTIFFS' RESPONSE 5-1:**  <u>ADMIT IN PART</u>.  Bishop Packard testified that on September 17, 2012 he spoke to other protestors during the march "who looked a little worried because there were so many policemen along the barricades, and they were very afraid."  He counselled them that, "This is – there is nothing to be afraid of.  You're exercising your constitutional rights.  There's some things you should keep in mind.  [. . .]  And I emphasized this is a nonviolent, peaceful protest.  We have no intention of getting arrested.  We are just going to circle Wall Street and - - as a testimony, silent testimony to the anniversary of Occupy."  (Docket 266-99 Packard Dep. 279:22 - 280:1).

**PLAINTIFFS' RESPONSE 5-2:**  Paragraph 19 of the Complaint speaks for itself and does not support any assertion made in ¶ 5 of Defendant's Statement.

6.      Packard testified that at approximately 6:30 a.m., on September 17, 2012, he arrived at the "Red Cube" in Zuccotti Park. (Docket 266-99  Packard Dep., 174:16-20, 260:11-16).

**PLAINTIFFS' RESPONSE 6-1:**  <u>DENY</u>.  Bishop Packard did not testify that he was at the Red Cube "in Zuccotti Park."  He testified that he was "across from Zuccotti Park" and "across Broadway" from Zuccotti Park.  (Docket 266-99 Packard Dep. 174:16-22.)

**PLAINTIFFS' RESPONSE 6-2:**  <u>ADMIT IN PART</u>.  Bishop Packard arrived at the Red Cube across Broadway from Zuccotti Park at 6:30am.  (Docket 266-99 Packard Dep. 174:16-22; 260:11-16.)

7.      Packard remained at what he testified to as a "marshalling location" for an "affinity group" which included five hundred protesters from "Occupy Faith."  (Docket 266-99 Packard Dep., 174:16-19; 260:11-25; 262:22-263:4).

**PLAINTIFFS' RESPONSE 7-1:**  <u>DENY</u>.  Bishop Packard did not testify that Occupy Faith included five hundred protestors.  Instead, he testified that "the religious leaders who support Occupy formed an affinity group called Occupy Faith." (Docket 266-99 Packard Dep. 260:23-25.)  When asked to identify its members he testified that "I can give you their churches" and identified five churches in New York in addition to "a number from Jersey."  (Docket 266-99 *Id*. at 261:21-262:4.)  He stated that Occupy Faith consisted of 25-30 clergy members. (Docket 266-99 *Id*. at 262:14.)

**PLAINTIFFS' RESPONSE 7-2:**  <u>DENY</u>.  Bishop Packard testified that "other groups -- the *other affinity groups*, I'll call them that, realized they didn't have any

organizational core, so they all started gravitating towards us.  And so . . . we wound up with 500 people at the Red Cube . . . ."  (Docket 266-99 *Id*. at 262:9-17) (emphasis added.)

8.      Packard testified that he led the group of five hundred protesters in a march from the Red Cube in Zuccotti Park on the sidewalk going south on Broadway towards the Wall Street area. Docket 266-99 Packard Dep., 178:2-5; 262:22-263:4; 287:18-21).

> **PLAINTIFFS' RESPONSE 8-1:**  <u>DENY</u>.  Bishop Packard did not lead a march headed to the New York Stock Exchange or to Wall Street.  He testified that "We [we]re just going to circle Wall Street and - - as a testimony, silent testimony to the anniversary of Occupy."  (Docket 266-99 Packard Dep. 279:24 - 280:1).  He also testified "we were trying to go to the marshaling area and the Vietnam Memorial."  (Docket 266-99 *Id*. at 277:3-5.)

> **PLAINTIFFS' RESPONSE 8-2:**  <u>DENY</u>.  Bishop Packard "was leading a group of individuals in expressive speech activity on the sidewalk in downtown Manhattan."  (Complaint ¶ 109.)  When they "approached a sidewalk that led to the New York Stock Exchange and Wall Street, the group was stopped by NYPD Police Officers."  (*Id*. at ¶ 110.)

> **PLAINTIFFS' RESPONSE 8-3:**  <u>DENY</u>.  Many among the approximately 500 marchers behind Bishop Packard were there for the "specific purpose" of "celebrat[ing] a year of awesome work by people standing up for what they believed in."  (*See*, *e.g.*, Docket 266-113 Cowan Dep. 147:7-11).  Plaintiff Beck attended "to see what was going on, just take in the sites, take a day off from protesting." (Docket 266-110 Beck Dep. 26:4-5.)  Plaintiff Berger

6

attended "to celebrate that people actually did come out and want to be heard .

. . ."  (Docket 266-115 Berger Dep. 82:1-7).

**PLAINTIFFS' RESPONSE 8-4:**  <u>DENY</u>.  Nowhere did Bishop Packard

testify or plead that he led a march headed to the New York Stock Exchange

or to Wall Street specifically.

**PLAINTIFFS' RESPONSE 8-5:**  <u>ADMIT IN PART</u>.  The group of about

500 individuals that Bishop Packard led was heading south towards the

Vietnam Memorial. (Docket 266-99 Packard Dep. 178:4-5; 277:3-5, 287:18-

21.)

9.     Video shows that this was a planned action that the NYPD and the press were

prepared for.  Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:08-7:12.

**PLAINTIFFS' RESPONSE 9-1:**  <u>DENY</u>.  The video does not show anything

that can support an inference that Bishop Packard led a group of protestors

headed to the Stock Exchange "in a planned action that the NYPD and the

press were prepared for."  (Exhibit F ARGUS Video 1, SEC Broadway-Wall,

7:08-7:12.)  There is no testimony or documentary evidence that can support

an inference that Bishop Packard was leading a planned action headed to the

New York Stock Exchange.

**PLAINTIFFS' RESPONSE 9-2:**  <u>DENY</u>.  The video shows the NYPD

placing barricades on Broadway.  The video does not show that the NYPD

was "prepared for" a march which in fact celebratory and "just going to circle

Wall Street" and "go to the marshaling area and the Vietnam Memorial" when

they were stopped at the intersection of Broadway and Wall Street by the

NYPD.  (Docket 266-99 Packard Dep. 277:3-5; 279:24 - 280:1; Exhibit A

Complaint ¶ 110.)

**PLAINTIFFS' RESPONSE 9-3:**  <u>DENY</u>.  Regarding the press, the video

shows only that the NYPD formed a pen of barricades at the intersection of

Broadway and Wall Street to contain the press in front of TD Bank.  (Exhibit

F ARGUS Video 1, SEC Broadway-Wall, 7:08-7:12.)

10.     At 7:08 a.m., video shows barriers being delivered to the ultimate protest location

for Packard and his group of five hundred protesters right in front of TD Bank.  Exhibit F

ARGUS Video 1, SEC Broadway-Wall, 7:08-7:12.

**PLAINTIFFS' RESPONSE 10-1:**  <u>DENY</u>.  The intersection of Broadway

and Wall Street was not "the ultimate protest location" to which Bishop

Packard and the group he led were headed.  Bishop Packard and the group he

led intended in fact to "circle Wall Street" and "go to the marshaling area and

the Vietnam Memorial."  (Docket 266-99 Packard Dep. 277:3-5; 279:24-

280:1.)

**PLAINTIFFS' RESPONSE 10-2:**  <u>DENY</u>.  Only approximately 25-30 of

the five hundred protestors were members of Bishop Packard's affinity group.

(Docket 266-99 Packard Dep. 261:21-262:14.)

11.     Video shows that the barriers were off-loaded from a truck, and the NYPD began

immediately creating a press enclosure to accommodate journalists—directly in front of the TD

Bank.  Id.

**PLAINTIFFS' RESPONSE 11-1:**  <u>DENY</u>.  The video does not show that the

pen formed of barricades directly in front of the TD Bank, in which the NYPD

8

contained journalists, was intended to or did in fact "accommodate

journalists."

**PLAINTIFFS' RESPONSE 11-2:**  <u>DENY</u>. Chief Purtell testified that he did

not know if the barriers were put in place for press.  (Docket 266-46 Purtell

Dep. 87:12-21.)

12.     Video shows that the process of creating the press enclosure right in front of the

TD Bank was completed by 7:11 a.m.  Exhibit G ARGUS Video 1 Still, SEC Broadway-Wall,

7:11:57:



**PLAINTIFFS' RESPONSE 12-1:**  <u>DENY</u>.  The video still does not show

that the pen formed of barricades, in which the NYPD contained journalists,

was intended to or did in fact "accommodate journalists."

**PLAINTIFFS' RESPONSE 12-2:**  DENY.  Chief Purtell testified that he did not know if the barriers were put in place for press.  (Docket 266-46 Purtell Dep. 87:12-21.)

**PLAINTIFFS' RESPONSE 12-3:**  ADMIT IN PART.  The video shows that the NYPD had completed a pen formed of barricades at the intersection of Broadway and Wall Street in front of TD Bank by 7:11am.  (Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:11:57.)

13.     Video shows that at 7:12 a.m., press began filling the enclosure in anticipation of the protest that would be occurring in front of the TD Bank. Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:12 – 7:48.

**PLAINTIFFS' RESPONSE 13-1:**  DENY.  The video does not show that the press entered the pen in which the NYPD contained them "in anticipation of the protest that would be occurring in front of the TD Bank."   The video shows that the NYPD caused the press to congregate, and be contained in a pen, in front of the TD Bank at the intersection of Broadway and Wall Street.

**PLAINTIFFS' RESPONSE 13-2:**  DENY.  The video does not show that any protest was planned to occur "in front of the TD Bank."

**PLAINTIFFS' RESPONSE 13-3:**  ADMIT IN PART.  The video shows that at 7:12 journalists began filling the pen at the intersection of Broadway and Wall Street, in front of the TD Bank, into which the NYPD directed them. (Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:12.)

14.     Video shows that right on time, Packard and the mass of protesters behind him showed up at that location and stopped right in front of the press enclosure and TD Bank densely

filling up the entire sidewalk preventing pedestrians from passing.  Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:47-7:48.

> **PLAINTIFFS' RESPONSE 14-1:**  <u>DENY</u>.  The video does not show that Bishop Packard or anyone else arrived at the intersection of Broadway and Wall Street "right on time" for anything or pursuant to any planned schedule. (Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:47-7:48.)  Defendant's assertion that they did so is not supported by any testimony or documentary evidence.

> **PLAINTIFFS' RESPONSE 14-2:**  <u>DENY</u>.  The video shows that the large majority of protestors were on the sidewalk north of Bishop Packard and not in front of the TD Bank.  (*Id*.)

> **PLAINTIFFS' RESPONSE 14-3:**  <u>DENY</u>.  In fact, multiple photographs show that Bishop Packard was stopped by NYPD officers who blocked the sidewalk, preventing pedestrians, including the group of pedestrians led by Bishop Packard, from proceeding.  (Docket 266-100 PACKARD28132, Docket 266-101 PACKARD28133, Docket 266-102 PACKARD28136, Docket 266-103 PACKARD28137, Docket 266-104 PACKARD28138; (NYPD Sgt. Arthur Smarch appears in the center of Docket 266-101 PACKARD28133).)

> **PLAINTIFFS' RESPONSE 14-4:**  <u>DENY</u>.  After and because the NYPD blocked the group of pedestrians led by Bishop Packard from proceeding on the sidewalk, the sidewalk became dense with people.  (Exhibit F ARGUS Video 1, SEC Broadway-Wall, Video Still, 7:51:11, *see infra*, Defendant's

Statement No. 26.)  Bishop Packard "said to [Chief Purtell], 'It's impossible for me to get everybody to turn around here.  There's too many people to do this'."  (Docket 266-99 Packard Dep. 175:17-19.)

15.     When Packard, and the marchers he was leading, reached near the corner of Wall Street and Broadway, Packard approached Chief Purtell and said that he wanted to proceed down Wall Street.  Exhibit E. Packard Dep., 153:6-10; 172:1-5.

> **PLAINTIFFS' RESPONSE 15-1:**  <u>ADMIT IN PART</u>.  Bishop Packard did say to Chief Purtell that he wanted to proceed down Wall Street.  (Docket 266-99 Packard Dep. 172:1-5.)

> **PLAINTIFFS' RESPONSE 15-2:**  Chief Purtell answered, "You can't go down there."  Bishop Packard responded, "Well, can we cross Broadway and proceed south on Broadway? [Chief Purtell] said No. He said that was blocked."  Chief Purtell told Bishop Packard that "I could not go down Broadway.  I couldn't proceed south on Broadway, and I could not cross Broadway because there were barriers all along the route."  (Docket 266-99 *Id.* at 172:6-21.)

> **PLAINTIFFS' RESPONSE 15-3:**  Bishop Packard then asked Chief Purtell "what am I going to do? I have nearly 500 people in a double file behind me.  And he said, You have to turn around and go back the way you came.  And I said, I can't.  That's not possible for me to do" given the fact that it was "impossible for me to get everybody to turn around here.  There's too many people to do this'."  (Docket 266-99 *Id.* at 172:23 – 173:3; 175:17-19.)

**PLAINTIFFS' RESPONSE 15-4:** At the time Chief Purtell and the NYPD blocked the passage of the approximately 500 pedestrians celebrating the anniversary of Occupy by engaging in a peaceful First Amendment sidewalk protest, prohibiting and preventing them from continuing south on Broadway, Broadway "was an open corridor, and they had policemen by the side. It was absolutely secure" and there "was an absolutely clear path down south Broadway, away from any commotion down on Wall Street." (Docket 266-99 *Id*. at 176:2-9.)

16.     Packard testified that Purtell instructed Packard to turn around and go back the way he came—reverse his present course and go back north. Exhibit E Packard Dep., 172:22-173:1; 173:20-23.

**PLAINTIFFS' RESPONSE 16-1:** <u>ADMIT IN PART</u>. Chief Purtell did order Bishop Packard to turn the group of 500 marchers around and go back north on Broadway. (Docket 266-99 Packard Dep. 173:23-23.)

**PLAINTIFFS' RESPONSE 16-2:** After Bishop Packard answered Chief Purtell that he would not be able to get the group of 500 marchers to turn around, "[t]here was this long pause, no more conversation. [ . . . ] So I was waiting for an answer, and I didn't get an answer. And it was during this period that people, in ones and twos, started to sit down." (Docket 266-99 Packard Dep. 174:1-9.)

17.     Video shows that reversing their course is exactly what the crowd of five hundred protesters did and the end of their demonstration. Exhibit F ARUGS Video 1, SEC Broadway-Wall, 7:55:50-8:00:00.

**PLAINTIFFS' RESPONSE 17-1:**  <u>DENY</u>.  The video does not show a "crowd of five hundred protesters" turning around and proceeding north. (Exhibit F  ARGUS Video 1, SEC Broadway-Wall, 7:55:50-8:00:00.)

**PLAINTIFFS' RESPONSE 17-2:**  <u>ADMIT IN PART</u>.  As a direct and foreseeable result of Chief Purtell's actions, the 500 marchers involved in a peaceful First Amendment sidewalk protest were prevented from continuing to engage in that First Amendment activity.  Plaintiffs admit that the NYPD imposed a time, place and manner restriction and caused "the end of their demonstration" as asserted in ¶ 17 of Defendant's Statement.

18.    Packard testified that he had no further communications with Purtell.  Exhibit E Packard Dep., 176:19-177:4.

**PLAINTIFFS' RESPONSE 18-1:**  <u>ADMIT IN PART</u>.  After Bishop Packard answered Chief Purtell that he would not be able to get the group of 500 marchers to turn around, "[t]here was this long pause, no more conversation.  [. . . ]  So I was waiting for an answer, and I didn't get an answer."  (Docket 266-99 Packard Dep. 174:1-9.)

19.    When asked if he did as instructed by Purtell to reverse course and head north, Packard testified, "[n]o.  We did not change course."  Docket 266-99 Packard Dep., 174:10-15).

**PLAINTIFFS' RESPONSE 19-1:**  <u>ADMIT IN PART</u>.  After being ordered by Chief Purtell to reverse course and head north, Bishop Packard asked Chief Purtell "what am I going to do? I have nearly 500 people in a double file behind me.  And he said, You have to turn around and go back the way you came.  And I said, I can't.  That's not possible for me to do" given the fact that

14

it was "impossible for me to get everybody to turn around here.  There's too many people to do this'."  (Docket 266-99  *Id*. at 172:23 – 173:3; 175:17-19.)

20.     Packard testified that, "I stepped back and turned around and said, we're just not going anywhere, folks.  Talking to the people with me."  Exhibit E Packard Dep. 277:2-18.

> **PLAINTIFFS' RESPONSE 20-1:**  <u>ADMIT IN PART</u>.  Bishop Packard
> testified that, after he told Chief Purtell that he would not be able to turn 500
> people around, and while waiting for Chief Purtell who had "stepped back and
> consulted" with someone on a communication device, he told the people
> behind them "we're just not going anywhere, folks."  (Docket 266-99 Packard
> Dep. 277:2-18.)

21.     Video shows that at approximately five minutes after Purtell instructed Packard to turn around and go back north on Broadway, Packard sat down in the middle of the sidewalk with approximately twelve or more protesters lock arms together.  Packard Dep., 151:2:8; 152:1-6; 177:11-14; Exhibit I PACKARD28167; Exhibit J PACKARD28149.

> **PLAINTIFFS' RESPONSE 21-1:**  <u>DENY</u>.  Exhibit J PACKARD 28149 is a
> picture that does not show Bishop Packard.
>
> **PLAINTIFFS' RESPONSE 21-2:**  <u>DENY</u>. PACKARD28167 (Docket 266-
> 106) shows that Bishop Packard is not sitting with arms locked.
>
> **PLAINTIFFS' RESPONSE 21-3:**  <u>DENY</u>. PACKARD28167 (Docket 266-
> 106) and PACKARD28179 (Docket 266-107) show that Bishop Packard was
> seated approximately two feet from the building and not in the middle of the
> sidewalk.

**PLAINTIFFS' RESPONSE 21-4:**  <u>DENY</u>.  Contrary to Defendant's assertion, in none of the cited testimony did Bishop Packard say that he sat down in the middle of the sidewalk, or that he locked arms with anyone. (Docket 266-99 Packard Dep., 151:2:8; 152:1-6; 177:11-14.)

**PLAINTIFFS' RESPONSE 21-5:**  <u>DENY</u>.  Bishop Packard testified that "I don't perceive that we were in the middle of the sidewalk. We were making particular effort not to sit in the middle of the sidewalk." (Docket 266-99 Packard Dep., 166:5-7.)

**PLAINTIFFS' RESPONSE 21-6:**  <u>DENY</u>.  Defendant states that "video shows" support for its assertions, but Defendant cites no video.

**PLAINTIFFS' RESPONSE 21-7:**  <u>ADMIT IN PART</u>.  Bishop Packard testified that he was not the first person to sit down, and "that it seemed to be five minutes and started to move into seven minutes and maybe a little closer to ten minutes" before "others sat down, and I sat down too."  (Docket 266-99 Packard Dep. 177:16-23.)

22.     Video shows that Packard sat down on the sidewalk directly in front of the entrance door to TD Bank:



Exhibit K PACKARD28179 Photo (the TD green door handle is clearly depicted). See also Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:52:15-16.

**PLAINTIFFS' RESPONSE 22-1:** <u>DENY</u>. PACKARD28167 (Docket 266-106) and PACKARD28179 (Docket 28179) show that Bishop Packard was seated less than two feet from the building and not in the middle of the sidewalk.

**PLAINTIFFS' RESPONSE 22-2:** <u>DENY</u>. Exhibit F. ARGUS Video 1, SEC Broadway-Wall, 7:52:15-16 does not show Bishop Packard sitting down, much less the location in which he sat.

23.     Despite Packard's repeated denials that he heard orders to leave the area or be arrested, photographs show that prior to his arrest, police gave orders using a bullhorn within approximately two feet of Packard.



Exhibit I PACKARD28167 Photo (Insp. Winski giving orders as Packard is sitting on sidewalk).

**PLAINTIFFS' RESPONSE 23-1:** <u>DENY</u>.  Exhibit I - PACKARD28167 is

a photograph that shows an NYPD Executive Officer, identified by Defendant

as Inspector Winski, with a bullhorn near Bishop Packard.  It is impossible to

discern from the photograph what Inspector Winski is saying.


24.     Video of the incident depicts Inspector Edward Winski give the following orders using a bullhorn:

*"Folks, clear the sidewalk.  You are blocking pedestrian traffic, and you're subject to arrest.  If you do not move, you will be arrested."* Exhibit L AP Video, 00:24-00:33.

**PLAINTIFFS' RESPONSE 24-1:**  The video shows the police had already begun to arrest protestors when they first gave an order to disperse.  (Exhibit L AP Video, 00:24-00:33.)

**PLAINTIFFS' RESPONSE 24-2:**  Consistent with the video, when the first order to disperse was given, Bishop Packard believed that "the arrest was commencing" because there "were police all over the place . . . in our midst as they are in that picture" and he believed he was under arrest.  (Docket 266-99 Packard Dep. 224:25 – 225:11; 225:24 – 226:1.)

**PLAINTIFFS' RESPONSE 24-3:**   Chief Purtell also testified that Bishop Packard was under arrest at this time.  Chief Purtell testified that "I can't tell if his hands are cuffed. He seems to be in the presence of a police officer.  I'm going to make the assumption he is under arrest."  (Docket 266-46 Purtell Dep. 104:2-6.)

**PLAINTIFFS' RESPONSE 24-4:**  Bishop Packard testified that he did not hear the dispersal order recorded on the video.  (Docket 266-99 Packard Dep. 230:19 – 231:6.)  Bishop Packard testified that "I don't recall hearing a disperse -- dispersal call, until I'm well on my way into the paddy wagon." (Docket 266-99 *Id*. 230:7-9.)

25.      At least four of the twelve or more protesters sitting with Packard were arrested in Packard's presence prior to his arrest—he remained sitting.   Exhibit M PACKARD28155, Exhibit N Packard28163, Exhibit O Packard28171, Exhibit P Packard28177.

**PLAINTIFFS' RESPONSE 25-1:**  <u>DENY</u>.  Exhibit M PACKARD28155, Exhibit N Packard28163, Exhibit O Packard28171, Exhibit P28177 collectively show the arrests of three people, not four.

**PLAINTIFFS' RESPONSE 25-2:**  <u>DENY</u>.  Exhibit M PACKARD28155 shows an arrest but does not show whether Bishop Packard is sitting or standing.  The position of his leg in that photograph suggests that he was standing.

**PLAINTIFFS' RESPONSE 25-3:**  <u>DENY</u>.  Exhibit O Packard28171, Exhibit P Packard28177both show the arrest of the same individual.

**PLAINTIFFS' RESPONSE 25-4:**  <u>DENY</u>.  All of the cited photographs show people in zip-tie cuffs.  Bishop Packard testified that he believed himself to be under arrest before any of the protestors were placed in cuffs.  (Docket 266-99 Packard Dep. 224:9 – 225:3; 225:24 – 226:1.)

**PLAINTIFFS' RESPONSE 25-5:**  <u>ADMIT IN PART</u>.  Exhibit N PACKARD28163 shows the physical removing of an individual who was already under arrest in the process from a sitting to a standing position while Bishop Packard is sitting.

26.    Video shows that the entire sidewalk was blocked by the protesters, including Packard:



Exhibit H ARGUS Video 1, SEC Broadway-Wall, Video Still, 7:35:11 (Packard encircled).

**PLAINTIFFS' RESPONSE 26-1:** <u>DENY</u>.  The video itself does not show what was blocking the sidewalk.  The video shows that a large group of people north of Bishop Packard and Bishop Packard are blocked.

**PLAINTIFFS' RESPONSE 26-2:** <u>DENY</u>.  In fact, multiple photographs show that Bishop Packard was stopped by NYPD officers who blocked passage on the sidewalk, preventing pedestrians, including the group of pedestrians led by Bishop Packard, from proceeding.  (Docket 266-100 PACKARD28132, Docket 266-101 PACKARD28133, Docket 266-102 PACKARD28136, Docket 266-1003 PACKARD28137, Docket 266-104 PACKARD28138.)

**PLAINTIFFS' RESPONSE 26-3:**  <u>DENY</u>  At deposition, Chief Purtell did not dispute that police officers blocked the sidewalk from the building line all the way across the sidewalk to the press barrier.  (Docket 266-46 Purtell Dep. 116:16.24.)

**PLAINTIFFS' RESPONSE 26-4:**  <u>DENY</u>  Bishop Packard testified that "When we were in line and I was talking to the officer, we were not blocking any sidewalk" and that "I did not think we were blocking traffic."  (Docket 266-99 Packard Dep. 211:4-5; 224:6-8.)

**PLAINTIFFS' RESPONSE 26-5:**  As shown in the photograph, the time stamp is 7:51:11 and not 7:35:11 as stated by Defendant.

27.    (WITHDRAWN BY DEFENDANT) Video shows that from 7:00 to 10:00 a.m. on September 17, 2012, the only blockage of south Broadway was caused by the approximately twelve minutes that Packard and the five hundred protesters he was leading stopped in front of the TD Bank at approximately 7:48 a.m.  ARGUS Video 1, SEC Broadway-Wall (7:00-8:00 a.m.); ARGUS Video 2, SEC Broadway-Wall (1) (8:00-9:00 a.m.), (2) (9:00-10:00 a.m.).

**PLAINTIFFS' RESPONSE 27-1:**  <u>DENY</u>.  Multiple photographs show that Bishop Packard and the five hundred protesters he was leading were stopped by the NYPD at the intersection of Broadway and Wall Street and did not voluntarily stop in front of the TD Bank.  (PACKARD28132, PACKARD28133, PACKARD28136, PACKARD28137, PACKARD28138.) Chief Purtell testified that he has "no idea if they are stationary by personal choice."  (Purtell Dep. 96:18-19.)

**PLAINTIFFS' RESPONSE 27-2:**  <u>DENY</u>.  The video shows that on September 17, 2012, the only blockage of south Broadway occurred on the east side of the street and was caused by the NYPD arbitrarily stopping Bishop Packard and the march he was leading despite the fact that south of Wall Street, Broadway was "was an open corridor, and they had policemen by the side.  It was absolutely secure" and there "was an absolutely clear path down south Broadway, away from any commotion down on Wall Street." (Packard Dep. 176:2-9.)

**PLAINTIFFS' RESPONSE 27-3:**  <u>DENY</u>.  The testimony of Chief Purtell establishes that the sidewalk on the west side of Broadway was clear and that pedestrian was able to move.  (Purtell Dep. 88:20 – 89:2.)  Chief Purtell testified that while the sidewalk was crowded on the east side of Broadway, "across the street . . . is apparently wide open; people can get down there with greater ease."  (*Id*. at 92:22 – 93:6.)  Chief Purtell testified that at 7:55am the sidewalk on the west side of the street was accessible, "that there's no barriers or obstructions or demonstrators clogging the sidewalk."  (*Id*. at 105: 19 – 106:11.)

**PLAINTIFFS' RESPONSE 27-4:**  <u>DENY</u>.  Chief Purtell testified that from 7:45 to 7:55, "vehicular traffic was flowing, "albeit down to one lane, maybe two.  That would be a normal day."  (*Id*. at 107:6-13.)

**PLAINTIFFS' RESPONSE 27-5:**  <u>DENY</u>.  Chief Purtell testified that both lanes of traffic were moving 7:56 and thirty seconds.  (*Id*. at 109:6-10.)

28.     Video shows that the NYPD formed a line in the street in order to allow people who did not want to be involved in the protest to walk into the street, past the protesters, and continue on their way south on Broadway in safety.  Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:54:48 (line forming on far left of screen), 7:55:06-7:55:28 (pedestrians passing in the street going southbound); 7:55:42 (pedestrians passing in the street going northbound).

> **PLAINTIFFS' RESPONSE 28:1** <u>DENY</u>.  The video shows police blocking the crosswalk on the west side of Broadway with barricades and preventing people from crossing Broadway. (Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:48:15-7:48:33).

> **PLAINTIFFS' RESPONSE 28:2** <u>DENY</u>.  Photographs show multiple pedestrians walking into the street because the police were blocking the sidewalk.  (Docket 266-100 PACKARD28132, Docket 266-101 PACKARD28133, Docket 266-102 PACKARD28136, Docket 266-103 PACKARD28137, Docket 266-104 PACKARD28138.)

29.     Video shows that throughout Packard's and the other protesters' stoppage in front of the TD Bank and the press enclosure, people who were not involved in the protest had to walk into the street to continue to make their way south on Broadway.  Id.

> **PLAINTIFFS' RESPONSE 29:1** <u>DENY</u>.  Photographs show multiple pedestrians walking into the street because the police were blocking the sidewalk.  (Docket 266-100 PACKARD28132, Docket 266-101 PACKARD28133, Docket 266-102 PACKARD28136, Docket 266-103 PACKARD28137, Docket 266-104 PACKARD28138.)

**PLAINTIFFS' RESPONSE 29-2:**  <u>DENY</u>.  The testimony of Chief Purtell establishes that the sidewalk on the west side of Broadway was clear and that pedestrians were able to move.  (Docket 266-46 Purtell Dep. 88:20 – 89:2.) Chief Purtell testified that while the sidewalk was crowded on the east side of Broadway, "across the street . . . is apparently wide open; people can get down there with greater ease."  (Docket 266-46 *Id*. at 92:22 – 93:6).  Chief Purtell testified that at 7:55am the sidewalk on the west side of the street was accessible, "that there's no barriers or obstructions or demonstrators clogging the sidewalk."  (Docket 266-46 *Id*. at 105: 19 – 106:11.)

30.     Video shows that many, many people had to walk into the street to proceed south past the protesters.  Exhbiit F ARGUS Video 1, SEC Broadway-Wall, 7:55:06-757:48.

**PLAINTIFFS' RESPONSE 30:1**  <u>DENY</u>.  The testimony of Chief Purtell establishes that the sidewalk on the west side of Broadway was clear and that pedestrians were able to move.  (Docket 266-46 Purtell Dep. 88:20 – 89:2.) Chief Purtell testified that while the sidewalk was crowded on the east side of Broadway, "across the street . . . is apparently wide open; people can get down there with greater ease."  (Docket 266-46 *Id*. at 92:22 – 93:6).  Chief Purtell testified that at 7:55am the sidewalk on the west side of the street was accessible, "that there's no barriers or obstructions or demonstrators clogging the sidewalk."  (Docket 266-46 *Id*. at 105: 19 – 106:11.)

**PLAINTIFFS' RESPONSE 30:2**  <u>DENY</u>.  The video shows multiple pedestrians walking into the street because the police were blocking the sidewalk, even after the protestors had been forced to leave the vicinity.

25

(Exhibit F ARGUS Video 1, SEC Broadway-Wall, 7:58:07-7:58:50.)

Moreover, throughout the morning, pedestrians were walking in the street

portion of Broadway.  (*See, e.g., Id*. at 7:00:00-7:00:19.)

31.     Packard was arrested and charged with disorderly conduct for blocking pedestrian

traffic. Exhibit R D000573.

> **PLAINTIFFS' RESPONSE 31:1**  <u>ADMIT IN PART</u>.  Packard was charged
>
> with disorderly conduct despite the fact that he was not blocking pedestrian
>
> traffic.  (Docket 106 PACKARD28179, Docket 266-100 PACKARD28132,
>
> Docket 266-101 PACKARD28133, Docket 266-102 PACKARD28136,
>
> Docket 266-103 PACKARD28137, Docket 266-104 PACKARD28138;
>
> Docket 266-99 Packard Dep. 160:22-24; 164:1-3; 176:2-9; 211:4-5; 224:6-8.)

32.     Packard admits that he was sitting on the sidewalk at the time of his arrest.

Exhibit E Packard Dep158:13-16.

> **PLAINTIFFS' RESPONSE 32:1**  <u>ADMIT</u>.
>
> **PLAINTIFFS' RESPONSE 32:2**  Sitting on the sidewalk without more is
>
> not grounds for arrest under the disorderly conduct statute.

33.     Packard stated to a reporter that "arrests are not arrests anymore. They are badges

of honor."  Packard Dep., 144:14-20.

> **PLAINTIFFS' RESPONSE 33-1:**  <u>DENY</u>, to the extent Defendant implies
>
> that the quoted statement refers to the arrest at issue in this case.  Bishop
>
> Packard testified regarding the arrest at issue here that, "I don't think it was a
>
> badge of honor."  (Docket 266-99 Packard Dep. 273:1-25.)

34.     In defining what he meant by the statement, "arrests are badges of honor," Packard testified that, "in civil disobedience, I think you need to get on the street and made a – sometimes make a demonstration of your voice."  Exhibit E, Packard Dep. 144:18-23

> **PLAINTIFFS' RESPONSE 34-1:**  <u>DENY</u>, to the extent Defendant implies
>
> that the quoted statement refers to the arrest at issue in this case.  Bishop
>
> Packard testified regarding the arrest at issue here that, "I don't think it was a
>
> badge of honor."  (Docket 266-99 Packard Dep. 273:1-25.)

35.     Packard was in custody for eight hours and forty-five minutes (not eighteen hours) and released with a Desk Appearance Ticket ("DAT"). Exhibit E, Packard Dep., 186:11-16; Exhibit R 00015, Exhibit S D000279, Ex A 19.

> **PLAINTIFFS' RESPONSE 35-1:**  <u>ADMIT</u>.

36.     Packard accepted an Adjournment in Contemplation of Dismissal ("ACD") at his first court appearance to resolve the blocking pedestrian traffic charge in connection with his arrest on September 17, 2012.   PExhibit E Packard Dep., 135:10-22; Exhibit R D000576, D00015.

> **PLAINTIFFS' RESPONSE 36-1:**  <u>ADMIT</u>.

37.     Since his arrest on September 17, 2012, Packard continues to be involved with various protest activities, including the "blue surge" protest, Black Lives Matter, anti-fracking protests, a Palestinian rights protest; Flood Wall Street and various protests against Donald Trump's election.  Exhibit E Packard Dep. 77:4-21; 78:2-4; 82:20-23; 86:3-4; 252:15-253:7.

> **PLAINTIFFS' RESPONSE 37-1:**  <u>OBJECTION</u> on the grounds that Bishop
>
> Packard's subsequent protest activities are inadmissible because not relevant

under Fed. R. of Evid. 401. Further, under R. 404(b) they are "not admissible

to prove [his] character in order to show that on a particular occasion [he]

acted in accordance with the character."

## Edward Beck

38.      On September 17, 2012, Edward Beck, a resident of Allentown, Pennsylvania,

travelled to New York City Beck, and his purpose in attending the OWS first anniversary events

was, "to see what was gong on, just take in the sites, having a day off from protesting."  Exhibit

T, Beck Dep. 25:11-15.

> **PLAINTIFFS' RESPONSE 38-1:**  <u>DENY</u>, to the extent Defendant implies
>
> that the quoted statement indicates that Mr. Beck was not participating in
>
> expressive speech activity protected by the First Amendment at the time of his
>
> arrest, this is false.   Mr. Beck testified that in New York City on September 17,
>
> 2012, he was engaging in protest activity protected by the First Amendment.
>
> (Docket 266-110 55:15-18).  Otherwise admit the allegations contained in this
>
> paragraph.

39.      Beck testified that he arrived in the Wall Street area between 9:00 a.m. and 10:00

a.m., on September 17, 2012.  Exhibit T Beck Dep., 25:22-24, 28:15-23.

> **PLAINTIFFS' RESPONSE 39-1:**  <u>ADMIT</u>.

40.      Beck testified that when he arrived in the Wall Street area on September 17, 2012,

"the sidewalks were full of people."  Exhibit T Beck Dep., 29:2-5.

**PLAINTIFFS' RESPONSE 40-1:**  <u>ADMIT IN PART</u>.  Mr. Beck's

testimony suggests and supports an inference that the sidewalks were full of

people celebrating the anniversary of Occupy Wall Street.

41.      Prior to his arrest, Beck was on a section of sidewalk near 26 Broadway across the

street from the landmark "Charging Bull," with fifty to one hundred other protesters.  Exhibit T

Beck Dep., 30:4-12.

**PLAINTIFFS' RESPONSE 41-1:**  <u>DENY</u>.  Mr. Beck testified that between

50 and 100 people "were at that location."  Mr. Beck did no testify that he was

with all of these people did nor did he testify that all of them were protestors.

(Docket 266-110 Beck Dep., 30:4-14.)

**PLAINTIFFS' RESPONSE 41-2:**  Mr. Beck testified that the sidewalks

across from the Charging Bull on Broadway were not blocked by the presence

of 50 to 100 people but instead that, "People were moving back and forth all

the time."  (Docket 266-110 Beck Dep., 30:10-11.)

42.      Video shows Beck with a large group of protesters one block from his arrest location

in front of Kings College at Broadway and Exchange Place and present when the following

orders were given via bullhorn: "If you continue to block the sidewalk, you will be arrested.

Please keep moving.  Keep moving.  If you continue to block the sidewalk, you will be arrested.

Please keep moving."  Exibit U, TARU DeFranco Video, 9:09:00 at 01:14:56;

**PLAINTIFFS' RESPONSE 42-1:**  <u>DENY</u>.  Mr. Beck testified that "We

were always moving up until the arrest, prior to mine" but that "The police

department came up on the sidewalk, stood shoulder-to-shoulder, and blocked it."  (Docket 266-110 Beck Dep. 30:18-25.)

**PLAINTIFFS' RESPONSE 42-2:**  <u>DENY</u>.  Any sidewalk blockage was created by the NYPD who moments before Beck's arrest simply stopped and separated protesters and began to make arrests.  (VIDEO CITE)

**PLAINTIFFS' RESPONSE 42-3:**  <u>DENY</u>.   Any sidewalk blockage was caused by the NYPD failing to facilitate the protest march and creating crowded sidewalks and then issuing orders about crowded sidewalks.  As explained by Michelle Berger in her deposition, "I personally think it was the NYPD trying to control when somebody can cross when they could not. What direction to go into. That caused such a thick population of people on each street corner. I believe if the officers would have just allowed people to you know walk on the sidewalk to do whatever they were there for.  Whether it be peaceful in protest to walk on the sidewalk or go to work it would not have gotten as hectic in that intersection as it was. People could have just gone freely like any normal New York day." (Docket 266-115, Berger Dep. 119:17 – 120:2).

43.     Prior to his arrest, video shows that Beck and the fifty to one hundred other protesters blocked the sidewalk from building to curb:



Exhibit X TARU McDonald Video Still, 9:39:40 at 00:36.



Ex. U, ARGUS Video 1, Video Still, ESide of Broadway 1 S of Morris at 19:22.

**PLAINTIFFS' RESPONSE 43-1:**  DENY.  Exhibit X TARU McDonald Video Still, 9:39:40 at 00:36 indisputably shows that at least half of the sidewalk from building to curb is occupied by journalists and NYPD personnel.  There is one person between Mr. Beck and the building wall.

**PLAINTIFFS' RESPONSE 43-2:**  DENY.  Mr. Beck testified that "We were always moving up until the arrest, prior to mine" but that "The police department came up on the sidewalk, stood shoulder-to-shoulder, and blocked it."  (Docket 266-110 Beck Dep. 30:18-25.)

**PLAINTIFFS' RESPONSE 43-3:**  DENY..  A bird's eye-view of the sidewalk shows that it is not blocked building to curb, and that pedestrians are able to use the sidewalk.   (Docket 266-111 LMSI Video: East Side of Broadway 1 S of Morris St.mp4, Packard Disc 39, 18:50-19:50).

**PLAINTIFFS' RESPONSE 43-4:**  DENY.  Exhibit U, Video Still is an image of the location and close in time to the arrest of Mr. Beck, not prior to his arrest and one block further south on Broadway.

44.      Protesters on the sidewalk can be heard screaming "God bless America" and "this is what a police state looks like," they created a human microphone, chanted, and carried a four-foot long banner on the sidewalk. While stopped on the sidewalk blocking it from building to curb, Beck continually shouted, "who do you protect, who do you serve." Ex. W, TARU McDonald Video, 9:39:40, 00:32-00:41. At least three pedestrians can be seen walking into the street to avoid the protesters, including Beck. Ex. Z, TARU Marini Video, 9:34:29, 00:50-00:54. See also Ex. Y, ARGUS Video 1, Video Still, ESide of Broadway 1 S of Morris at 18:54:



**PLAINTIFFS' RESPONSE 44-1:** <u>DENY</u>.   Exhibit W TARU McDonald

Video Still, 9:39:40 at 00:36 indisputably shows that at least half of the

sidewalk from building to curb is occupied by journalists and NYPD

personnel.  There is one person between Mr. Beck and the building wall.

**PLAINTIFFS' RESPONSE 44-2:** <u>DENY</u>.   Mr. Beck was not blocking the

sidewalk.  Mr. Beck stopped walking because NYPD officers blocked passage

on the sidewalk.  (Docket 266-110 Beck Dep. 30:18-25.)

**PLAINTIFFS' RESPONSE 44-3:**   <u>DENY</u>.   Mr. Beck was not blocking the

sidewalk.  The sidewalk was wide open just North of Mr. Beck.  Mr. Beck

stopped walking because NYPD officers began interacting with the protestors,

including making arrests.  (Docket 266-111 LMSI Video: East Side of

Broadway 1 S of Morris St.mp4, Packard Disc 39, 18:50-19:50).

**PLAINTIFFS' RESPONSE 44-4:** <u>ADMIT</u>.   Mr. Beck shouted, "who do

you protect, who do you serve?"

45.      Within feet of Beck, NYPD Captain Iocco gives the orders, "Guys, keep moving,

you're blocking the sidewalk.  Keep moving.  Keep moving, you're blocking the sidewalk.  Keep

moving":



Ex. Z, TARU Marini Video, 9:34:29 at 00:18-00:00:24; Ex. AA, Video Still at 00:21.

**PLAINTIFFS' RESPONSE 45-1:** <u>DENY</u>.  Mr. Beck testified that he was

not told he was blocking the sidewalk until after he had been arrested.

(Docket 266-110 Beck Dep. 37:10-12.)

**PLAINTIFFS' RESPONSE 45-2:** <u>DENY</u>.  Exhibit Z TARU Marini Video,

9:34:29 at 00:18-00:00:24, Video Still at 00:18 shows that the sidewalk was

indisputably not blocked.  It does not show any officer within feet of Beck.

**PLAINTIFFS' RESPONSE 45-3:** <u>DENY</u>.  Exhibit Z TARU Marini Video,

9:34:29 at 00:00:24 – 1:02 shows that there is much more space on the

sidewalk than on a typical afternoon in midtown, on a mid-afternoon subway platform at Herald Square, or a Saturday morning Farmers' Market at Grand Army Plaza or in Union Square.  Any New Yorker could easily walk down that sidewalk without any trouble at all without incurring anything more than mere inconvenience, if that.  The video shows may non-protestors pedestrians standing, watching, while others easily traverse the sidewalk.  (*Id*. at 00:41 – 00:48.)



TARU Marini Video, 9:34:29 at 00:18-00:00:24, Video Still at 00:18.

46.      Video shows that Beck ignores Iocco's orders.  Exhibit Z, TARU Marini Video, 9:34:29 at 00:18-00:00:24.

**PLAINTIFFS' RESPONSE 46-1:** <u>DENY</u>   The video shows Mr. Beck comply with the order and move on.  (*Id*. at 00:41 – 00:35.)

> **PLAINTIFFS' RESPONSE 46-2:** <u>DENY</u>.  Mr. Beck testified that he was
>
> not told he was blocking the sidewalk until after he had been arrested.
>
> (Docket 266-110 Beck Dep. 37:10-12.)

47.     Video shows that as Iocco, with the assistance of two officers, move in to arrest

another protester, Beck interferes in the arrest of that protester literally crossing his arm over

Iocco's arm and pushing Iocco entirely out of the way obstructing Iocco in making the arrest:



TARU Marini Video, 9:37:05 at 01:16-01:29, Video Still at 01:20.

> **PLAINTIFFS' RESPONSE 47-1:**  <u>DENY</u>. Exhibit Z TARU Marini Video,
>
> 9:37:05 at 01:16-01:29, Video Still at 01:20 does not show Mr. Beck
>
> interfering with the police.
>
> **PLAINTIFFS' RESPONSE 47-2:**  <u>DENY</u>.  Exhibit Z TARU Marini Video,
>
> 9:37:05 at 01:16-01:29, Video Still at 01:20 depicts a moment from the arrest

of a friend of Mr. Beck.  Mr. Beck did not interfere in that arrest or take hold

of his friend during the arrest.  (Beck Dep. 31:4-14.)

**PLAINTIFFS' RESPONSE 47-3:**  <u>DENY</u>.  Mr. Beck testified that while

being arrested, Mr. Beck's friend fell.  He further testified that "When he fell,

he fell into me, and I put my hands down to catch him, keep him from falling

back into the concrete sidewalk or the building, which I was standing next to.

I didn't try to pick him up." (Docket 266-110 Beck Dep. 31:17-22.)  Exhibit Z

TARU Marini Video, 9:37:05 at 01:16-01:29, Video Still at 01:20 shows Mr.

Beck with his hands down to catch his friend in an effort to prevent him from

falling into the sidewalk, as he testified.

**PLAINTIFFS' RESPONSE 47-4**  <u>DENY</u>.  In real time, nobody believed Mr.

Beck to be interfering with any arrest.  No police officer made any notation of

any interference by Mr. Beck in any arrest.  No police officer informed the

Manhattan DA office that Mr. Beck was interfering with an arrest.  Mr. Beck

was not charged with interfering with any arrest in his arrest documentation

filled out by the NYPD, or in the criminal court documentation filled out by

the Manhattan DA office.  See *infra* Plaintiff's 56.1 statement 429, Exhibit

149.

48.     Beck was arrested and charged with disorderly conduct for blocking pedestrian

traffic.  Exhibit BB, D00021.

**PLAINTIFFS' RESPONSE 48-1:**  <u>ADMIT IN PART</u>.  Mr. Beck was

arrested and charged with disorderly conduct for blocking pedestrian traffic

despite the facts that he was not blocking pedestrian traffic and that there was

no blockage of pedestrian traffic.

**PLAINTIFFS' RESPONSE 48-2:**  The DAT states that Mr. Beck was

arrested for his "conduct, in conjunction with the conduct of the other

individuals standing with the defendant . . . . ."  Exhibit BB D00021.

49.      Beck was in custody for approximately thirteen hours (not eighteen hours) and released with a DAT. Exhibit CC, D000249.

**PLAINTIFFS' RESPONSE 49-1:**  <u>ADMIT</u>.

50.      The blocking pedestrian traffic charge in connection with his arrest on September 17, 2012, was dismissed on speedy trial grounds.  Ex, DD000581.

**PLAINTIFFS' RESPONSE 50-1:**  <u>ADMIT</u>.

51.      Beck testified that since his arrest on September 17, 2012, Beck continued to be involved with many protest activities.  Exhibit T Beck Dep., 11:21-23, 12:13-25, 22:19-23:4.

**PLAINTIFFS' RESPONSE 51-1:**  <u>DENY</u>.  Mr. Beck testified that since his

arrest, he has participated in only three, local, demonstrations in his hometown

of Allentown PA and has not returned to New York to participate in any

further Occupy Wall Street activities or demonstrations.  (Docket 266-110

Beck Dep., 11:21-23, 12:13-25, 22:19-23:4).

**PLAINTIFFS' RESPONSE 51-2:**  <u>OBJECTION</u> on the grounds that Mr.

Beck's subsequent protest activities are inadmissible because not relevant

under Fed. R. of Evid. 401.  Further, under R. 404(b) they are "not admissible

to prove [his] character in order to show that on a particular occasion [he]

acted in accordance with the character."

## Ari Cowan

52.     On September 17, 2012, Ari Cowan arrived in Zuccotti Park and thereafter participated in an OWS march and protest in the Wall Street area of New York City.  Exhibit A Compl. ¶22; Exhbit EE Cowan Dep., 139:14-19, 147:1-4.

> **PLAINTIFFS' RESPONSE 52-1:**  ADMIT.

53.     Cowan testified that he was an organizer of the protest in which he participated on September 17, 2012.  Exhibit EE Cowan Dep., 139:4-140:6.

> **PLAINTIFFS' RESPONSE 53-1:**  DENY.  Mr. Cowan did not testify that
>
> he was an organizer of the protest at which he was arrested.  (Docket 266-113
>
> Cowan Dep. 139:4-140:6.)
>
> **PLAINTIFFS' RESPONSE 53-2:**  DENY.  Mr. Cowan testified that
>
> "September 17th, 2012, was a celebration of the anniversary of the start of
>
> Occupy Wall Street and a day of public protest to demonstrate that people
>
> were still upset about continued economic inequality, et cetera and a venue to
>
> express their political opinions in a visible way around Wall Street in New
>
> York City."  *(*Docket 266-113 Cowan Dep. 139:14-19.)  He was asked "Did
>
> you help organize any of the events?"  He testified "I don't recall which events
>
> specifically I helped organize on that day." (Docket 266-113 Cowan Dep at
>
> 140:3-11.)

54.        Cowan testified that he describes himself as an anarchist.  Exhibit EE Cowan Dep., 100:2-4.

> **PLAINTIFFS' RESPONSE 54-1:**  <u>OBJECTION</u> on the grounds that
>
> evidence of Mr. Cowan's political preferences is inadmissible because it is not
>
> relevant under Fed. R. of Evid. 401 to any issue in this case.  Further, it is not
>
> relevant under R. 403 because it has zero probative value and is offered by
>
> Defendant solely for its prejudicial value.
>
> **PLAINTIFFS' RESPONSE 54-2:**  Mr. Cowan testified that he does not
>
> believe in the violent overthrow of the U.S. Government.  (Docket 266-113
>
> Cowan Dep. 164:22-165:2.)
>
> **PLAINTIFFS' RESPONSE 54-2:**  Mr. Cowan testified that "I'm an
>
> anarchist that believes that I would like  to live in a world where people who
>
> have similar ideas of  how they'd like to live can live together mutually and
>
> can  support each other and be responsible to each other and  govern each
>
> other without an institutionalized entity that  exercises laws over them, but
>
> that they hold each other  responsible and accountable."  (Docket 266-113
>
> Cowan Dep. 165:5-11.)

55.        Cowan testified that one tactic he uses during protests to effect change is, "marching through the streets and there would be some civil disobedience.  Could be, like described, you know, property destruction."  Exhibit EE Cowan Dep., 90:5-13.

> **PLAINTIFFS' RESPONSE 55-1:**  <u>DENY</u>.  Mr. Cowan did not testify that
>
> he uses civil disobedience or property destruction as a tactic to effect change.
>
> (Docket 266-113 Cowan Dep. 90:5-13.)

**PLAINTIFFS' RESPONSE 55-2:**  <u>DENY</u>.  In answering theoretical questions concerning strategy, tactics and ideology, (Docket 266-113 Cowan Dep. 89:4 – 90-:25), Mr. Cowan testified "that there are many different tactics that can be taken to effect change and to make a message come across." (Docket 266-113 Cowan Dep. 89:15-17.)  Asked for specifics, Mr. Cowan testified that "some specifics would be marching through the streets and there would be some civil disobedience.  Could be, like described in here, you know, property destruction.  And other tactics would be, I guess, armed revolts.  Other tactics would be voting.  Other tactics would be contacting your political representatives."  (Docket 266-113 Cowan Dep. 90:5-13.)

**PLAINTIFFS' RESPONSE 55-3:**  <u>DENY</u>.  Mr. Cowan testified that the choice of tactics "would totally depend on the situation."  (Docket 266-113 Cowan Dep. 90:20-21) and that on the date of his arrest he believed the sole appropriate tactic to be "lawful political protest expressing my First Amendment rights."  (Docket 266-113 Cowan Dep. 91:9-15.)

56.     Cowan testified that he was willing to break the law to convey his message.  Exhibit EE Cowan Dep., 91:1-3.

**PLAINTIFFS' RESPONSE 56-1:**  <u>DENY</u>.  Mr. Cowan did not testify that he was willing to break the law on September 17, 2012 to convey his message. (Docket 266-113 Cowan Dep.  91:1-3.)

**PLAINTIFFS' RESPONSE 56-2:**  <u>DENY</u>.  Mr. Cowan testified that "I would like to state for the record that on the event in question, specifically the protest of September 17th, 2012, I was engaging in -- I had no intention to

engage in anything other than the lawful political protest expressing my First Amendment rights because I believe that that was the effective tactic to be used in this situation."  (Docket 266-113 Cowan Dep. 91:9-15.)

57.      Cowan testified that, "if you're participating in civil disobedience where the goal is to get arrested, then that's part of the purpose."  Exhibit EE Cowan Dep., 135:18-25.

> **PLAINTIFFS' RESPONSE 57-1:**  <u>DENY</u>.  Mr. Cowan did not testify that he was engaged in civil disobedience on September 17, 2012 or that his goal was to be arrested on that date.  Mr. Cowan testified that "I would like to state for the record that on the event in question, specifically the protest of September 17th, 2012, I was engaging in -- I had no intention to engage in anything other than the lawful political protest expressing my First Amendment rights because I believe that that was the effective tactic to be used in this situation."  (Docket 266-113 Cowan Dep. 91:9-15.)
>
> **PLAINTIFFS' RESPONSE 57-2:**  <u>OBJECTION</u> on the grounds that evidence concerning Mr. Cowan's single prior arrest involving civil disobedience is inadmissible because it is not relevant under Fed. R. of Evid. 401 to any issue in the case.  Further, under R. 404(b) it is "not admissible to prove [his] character in order to show that on a particular occasion [he] acted in accordance with the character."

58.        Video shows Cowan with a group of protesters carrying a sign while marching with a

large group of protesters on a sidewalk on Broadway at Liberty Street yelling, "they got bailed

out, we got sold out."  Ex FF RT Video at 00:01.[1]

> **PLAINTIFFS' RESPONSE 58-1:**  Defendant's footnote 1, stating that it
>
> obtained on You Tube a "a duplicate of plaintiffs' Cowan video" is false.  The
>
> video referred to by Defendants was not produced in discovery, is not a
>
> "duplicate", and was edited to omit important footage that is included in the
>
> video produced in discovery.  Plaintiffs object to Defendant's reliance on
>
> material not produced in discovery.
>
> **PLAINTIFFS' RESPONSE 58-2:**  DENY.  To the extent the defense argues
>
> that this video shows a blockage of the sidewalk by the protesters including
>
> Mr. Cowan, object as the video is incomplete and does not show how the
>
> protesters were directed to this narrower sidewalk by the NYPD.  (Docket
>
> 266-113 Cowan Dep 149:17-23).

59.        Video shows that the sign Cowan is carrying with other protesters is approximately

five to six feet in length and four to five feet high.  Id.

> **PLAINTIFFS' RESPONSE 59-1:**  DENY.  The video shows that the sign is
>
> no more then three feet high.

60.        Video shows Cowan later carrying the sign with the group of protesters at the second

location after the group has made a left onto Cortlandt Way from Broadway (Bento Sushi at 173

observable). Ex FF, RT Video at 00:09-00:17.

> **PLAINTIFFS' RESPONSE 60-1:**  Admit.

---

[1] Defendants obtained on YouTube a duplicate of plaintiffs' Cowan video, which is a visually clearer video.

61.      Video shows that Cowan and the large group of protesters carrying the sign continuing the march down the sidewalk on Cortlandt Way at the third location, yelling "a anti anticapitalista." Ex. FF, RT Video, 00:17-00:27.

> **PLAINTIFFS' RESPONSE 61-1:** <u>DENY</u>.  To the extent the defense argues
>
> that this video shows a blockage of the sidewalk by the protesters including
>
> Mr. Cowan, object as the video is incomplete and does not show how the
>
> protesters were directed to this narrower sidewalk by the NYPD.  (Docket
>
> 266-113 Cowan Dep 149:17-23).   Otherwise admit.

62.      Video shows, that at this location, Cowan and the other protesters with whom he is carrying the sign are now blocking the entire sidewalk from wall to curb:



Exhibit FF, RT Video, 00:09-00:27; RT Video Still, 00:18.

**PLAINTIFFS' RESPONSE 61-1:**  <u>DENY</u>.  The video shows that there are no pedestrians on the sidewalk and the protestors are not blocking the sidewalk.  (Exhibit FF RT Video 00:09-00:27.)

63.      Video shows an officer in a white shirt using a bullhorn give the following orders:

"*Hey folks, listen up.  You have to leave room for people to move on the sidewalk.*"  Exhibit FF RT Video, 00:16.

**PLAINTIFFS' RESPONSE 63-1:**  <u>DENY</u>.  The video shows that despite the order, there are no pedestrians on the sidewalk and the protestors are not blocking the sidewalk.  (Exhibit FF RT Video 00:16.)

64.      Video shows the officer using a bullhorn give the following additional order:

"*Let's go.  Listen, you have to leave room for people to walk in the sidewalk.*" Exhibit FF RT Video, 00:22.

**PLAINTIFFS' RESPONSE 64-1:**  <u>DENY</u>.  The video shows that there are no pedestrians on the sidewalk and the protestors are not blocking the sidewalk.  (Exhibit FF RT Video 00:22.)

65.      Video shows that Cowan ignores these orders.  Exhibit FF RT Video, 00:16-00:30.

**PLAINTIFFS' RESPONSE 65-1:**  <u>DENY</u>.  Mr. Cowan testified that "The police officer used a megaphone to say that we were blocking pedestrian traffic and had to wait for the pedestrians to walk. *So we did. And pedestrians walked in both directions during this part of the march.*"  (Docket 266-113 Cowan Dep. 150:8-11) (emphasis added.)  Mr. Cowan testified that he personally remembered pedestrians being able to walk past the protestors. (Docket 266-113 Cowan Dep at 151:19-21.)

45

**PLAINTIFFS' RESPONSE 64-2:**  DENY.  The video shows that there are a few feet of sidewalk between the protestors and the curb.  The video shows police standing on the sidewalk between the protestors and the curb.  The video shows an open lane for pedestrians to walk on the sidewalk.  (Exhibit 133 RT Video, 00:16-00:30.)

66.     Video shows Cowan and the other protesters with whom he is carrying the sign are thereafter on Church Street near Cortland Street continuing to block the entire sidewalk.  Exhibit FF RT Video, 00:28-00:30.

**PLAINTIFFS' RESPONSE 66:1:**  DENY.  The video shows that there are a few feet of sidewalk between the protestors and the curb.  The video shows police standing on the sidewalk between the protestors and the curb.  The video shows an open lane for pedestrians to walk on the sidewalk.  (Exhibit 133 RT Video, 00:16-00:30.)

**PLAINTIFFS' RESPONSE 66:2:**  DENY.  Mr. Cowan testified that he and the other protestors "[m]arched down one of the larger streets and had our path blocked by police officers from crossing one of the intersections to continue along that street and were forced to turn left onto a side street and then made our way down the side street, which was smaller, and were basically guided towards where there was scaffolding and the road narrowed further."  (Docket 266-113 Cowan Dep., at 149:17-23.)

67.     Cowan testified that he heard an officer with a megaphone say that he was blocking pedestrian traffic.  Cowan Dep., 150:8-10.

**PLAINTIFFS' RESPONSE 67-1:**  <u>ADMIT IN PART</u>.  Mr. Cowan testified that "The police officer used a megaphone to say that we were blocking pedestrian traffic and had to wait for the pedestrians to walk. *So we did. And pedestrians walked in both directions during this part of the march.*"  (Docket 266-113 Cowan Dep. 150:8-11) (emphasis added.)  Mr. Cowan testified that he personally remembered pedestrians being able to walk past the protestors. (Docket 266-113 151:19-21.)

68.     Video shows Cowan being placed under arrest, and his arresting officer says to him, "we told you at least five times."  Exhibit FF RT Video, 00:30-00:37.

**PLAINTIFFS' RESPONSE 68-1:**  <u>DENY</u>.  The video referred to by Defendant was not produced in discovery, is not "a duplicate" of the video that was produced by Plaintiffs in discovery, and is edited to omit important footage at this juncture.  Plaintiffs rely in their Response to Defendant's Statement No. 68 upon the video that was produced in discovery.  (Exhibit 133.

**PLAINTIFFS' RESPONSE 68-2:**  Mr. Cowan testified that "we were basically guided towards where there was scaffolding and the road narrowed further."  (Docket 266-113 Cowan Dep., at 149:17-23.)

**PLAINTIFFS' RESPONSE 68-3:**  <u>DENY IN PART</u>.  The video produced in discovery confirms Mr. Cowan's testimony and shows that as the protestors approached the end of the scaffold and the resulting widening of the sidewalk, at least five police officers formed a line to block the scaffolding exit, prevented the protestors from exiting, and arrested protestors, including Mr.

47

Cowan.  Immediately after an officer tells Mr. Cowan "we told you at least five times," Mr. Cowan can be heard on the video produced in discovery responding to that officer: "I was just trying to walk."  (Exhibit 133 RT Video 1:19 – 1:28.)  The video which Defendants claim is a "duplicate" of the video produced in discovery omits all of this.

**PLAINTIFFS' RESPONSE 68-4:**  The video shows that while the protestors were under the scaffold, unable to move left or right because of the scaffold structure, the police ordered them to move left or right.  The video shows an NYPD Community Affairs officer in a blue jacket assault a journalist with press credentials who was filming the arrests, shoving him hard in the chest and knocking him backward into the street.   (Exhibit 133 Raganella Dep, Ex. 1, Video OWS Arrests, at 1:19 – 1:28.) The video which Defendants claim is a "duplicate" of the video produced in discovery omits all of this

69.     Cowan was charged with disorderly conduct for blocking pedestrian traffic and failing to obey a lawful order to disperse. Exhibit HH D000564.

**PLAINTIFFS' RESPONSE 69:1**  <u>ADMIT IN PART</u>.  Mr. Cowan was charged with disorderly conduct despite the fact that he was not blocking pedestrian traffic.  (Docket 266-113 Cowan Dep. 150:8-11; 151:19 – 21)

70.     Cowan was in custody for approximately six hours (not twenty-four hours) and released with a DAT. Exhibit JJ  D000259; Exhibit II D000224. A 22.

**PLAINTIFFS' RESPONSE 70:1**  <u>DENY</u>.  Exhibit II D000224 shows that Mr. Cowan was arrested at 9:30am.   Exhibit II D000224 and Exhibit JJ

D000259 show that Mr. Cowan was released and issued a Desk Appearance

Ticket at 10:00pm.  Mr. Cowan was thus held for approximately twelve hours.

71.      Cowan accepted an ACD at his first court appearance to resolve the blocking

pedestrian traffic charge in connection with his arrest on September 17, 2012.  Exhibit EE,

Cowan Dep. 155:13-18, Exhibit KK, D000582.

   **PLAINTIFFS' RESPONSE 71:1** <u>ADMIT</u>.

72.      Since his arrest on September 17, 2012, Cowan continues to be involved with many

protest activities, including pipeline demonstrations in Texas, demonstrations in Oakland,

demonstrations pertaining to people who have been wrongly evicted, demonstrations against the

election of Trump and demonstrations for labor rights.  Exhibit EE, Cowan Dep., 52:2-53:13.

   **PLAINTIFFS' RESPONSE 72-1:** <u>DENY</u>.  Mr. Cowan did not testify that

   he has been involved in "many" protest activities since his arrest.  He testified

   that he participated in only four activities, with two protests in Oakland on

   local issues, and also in Texas against the XL pipeline.  (Docket 266-113

   Cowan Dep. 32:4-24, 52:6-53:4.)  He testified that he participated in

   demonstrations – not protests – "celebrating" labor rights and against the

   election of Donald Trump.  (Docket 226-113 Cowan Dep. 53:1-4.)

   **PLAINTIFFS' RESPONSE 72-2:**  Prior to his arrest on September 17, 1012,

   Mr. Cowan participated in "many" large- and small-scale protests and

   demonstrations on numerous issues in San Francisco, Berkeley, Oakland,

   western Massachusetts, and Washington D.C.   (Docket 226-113 Cowan Dep.

   46:14 - 47:11.)

**PLAINTIFFS' RESPONSE 72-3:**  <u>OBJECTION</u> on the grounds that

evidence of Mr. Cowan's subsequent protest activities is inadmissible because

it is not relevant under Fed. R. of Evid. 401.  Further, under R. 404(b) it is

"not admissible to prove [his] character in order to show that on a particular

occasion [he] acted in accordance with the character."

### Michelle Berger

73.     Michelle Berger, a resident of Pennsylvania, travelled by car with two friends to New

York City on September 16, 2017, to protest in connection with OWS.  Exh A. Compl. ¶21; Exh

LL, Berger Dep., 74:22-25, 75:13-17, 76:5-10, 120:22-23.

**PLAINTIFFS' RESPONSE 73:1**  <u>ADMIT</u>.  Ms. Berger came to New York

City to "be an advocate of universal health care. I was planning on

participating in the peaceful protest but unfortunately I was not given the

opportunity before getting arrested."  (Docket 266-115 Berger Dep. 120:22 –

121:1.)

74.     When she arrived in New York City, Berger was dropped off in Zuccotti Park.

Exhibit LL Berger Dep., 7523-76:1.

**PLAINTIFFS' RESPONSE 73:1**  <u>ADMIT</u>.

75.     Berger spent the night of September 16th in Zuccotti Park.  Exhibit LL Berger Dep.,

78:15-17.

**PLAINTIFFS' RESPONSE 74:1**  <u>ADMIT IN PART</u>.  Ms. Berger spent the

night in or near Zuccotti Park.  Ms. Berger testified that she "was walking

around Zuccotti Park" during the night of September 16 – 17, 2012.  (Docket

266-115 Berger Dep., 78:15-17.)

76.     On September 17, 2012, at approximately 7:56 a.m., video shows Berger is present at

the intersection of Pine and Nassau Street—standing in the street with a cup of coffee in her

hand—and displaying a peace sign to the police camera operator:



Exhibit MM TARU Hujel Video, 7:56:48, Video still at 01:19.

**PLAINTIFFS' RESPONSE 76:1** <u>DENY</u>.  Defendant's Video still above is

at 1:10 of the TARU Hujel Video 7:56:48, not 1:19 as stated in Defendant's

Statement No. 75.  The video shows that Ms. Berger is not standing in the

street; rather, she is walking, crossing the street to reach the sidewalk at the

left of the frame.  She enters the video frame at 1:08 and leaves at 1:12.  After

the moment depicted in the still shot above, she takes another step toward the

sidewalk and then the camera pans away.  (Exhibit MM TARU Hujel Video, 7:56:48, at 1:08 – 1:12.)

77.       Video shows that police gave orders via a bullhorn stating, "if you do not get on the sidewalk, you will be arrested. Guys, if you stay in the crosswalk, you will be arrested."  Exhibit MM TARU Hujel Video, 7:56:48 at 00:16.

> **PLAINTIFFS' RESPONSE 77:1**  <u>DENY</u>.  The voice in the Hujel video appears to say, "If you're not in the sidewalk or crosswalk you'll be arrested." Docket 266-116 TARU Hujel Video, 7:56:48 at 00:00 – 00:14.
>
> **PLAINTIFFS' RESPONSE 76:2**  <u>DENY</u>.  Ms. Berger is not in the video at 00:00 to 00:14.  She does not appear until over a minute later.  (Docket 266-116 TARU Hujel Video, 7:56:48 at 00:00 – 01:08.)  There is no evidence that she could or would have heard any order given over a minute prior to that time.

78.       Video shows that after giving numerous orders to stay on the sidewalk, police were able to get the protesters out of the street temporarily.  Exhibit MM TARU Hujel Video, 7:56:48 at 02:27.

> **PLAINTIFFS' RESPONSE 78:1**  <u>DENY</u>.  The video indisputably shows that many, may people are in the street, including civilians taking photographs and video, watching, crossing the street, carrying a bicycle, and standing waving in a friendly manner at the TARU officer who is recording the scene ("NYPD videographer").  (Docket 266-116 TARU Hujel Video, 7:56:48 at 01:58 - 03:30.)

**PLAINTIFFS' RESPONSE 78:2** <u>DENY</u>.  At 02:46 of the video (Docket

266-116 TARU Hujel Video), the police pull a legal observer in a green hat

who has both feet on the sidewalk off of the sidewalk and arrest him.  Just

prior to his arrest, at 02:40 (Docket 266-116 TARU Hujel Video), the legal

observer had one foot on the sidewalk and one foot in the street, observing the

arrest of a protestor and taking notes on a pad.  At 04:00 (Docket 266-116

TARU Hujel Video) he is in handcuffs, being led away, and says to another

legal observer, "I was on the sidewalk."  (Docket 226-116 TARU Hujel

Video, 7:56:48 at 02:40 - 02:50; 04:00 – 04:10.)

**PLAINTIFFS' RESPONSE 77:3**  Ms. Berger is not in the video at this time.

79.      Video shows that approximately one minute later, the protesters went back into the

street at Pine and Nassau completely filling the streets and chanting, "whose streets, our streets."

Exhibit MM TARU Hujel Video, 7:56:48, 03:21-03:40.

**PLAINTIFFS' RESPONSE 79:1** <u>DENY</u>.  The video indisputably shows

that protestors did not come off the sidewalk and fill the streets.  Rather, a

new group of protestors arrived, coming down Pine Street.  (Docket 266-116

TARU Hujel Video, 7:56:48 at 03:21-03:40.)

**PLAINTIFFS' RESPONSE 79:2**  Ms. Berger is not in the video at this time.

80.      Video shows that the protesters in the streets were blocking vehicular traffic.  Exhibit

MM TARU Hujel Video, 7:56:48, 04:13, 05:55.

**PLAINTIFFS' RESPONSE 80:1** <u>DENY</u>.  The video shows that a single

vehicle is moving through the intersection with the aid of the police.   It is the

only vehicle present.  There is no "traffic" as that word is understood in New

York City.  (Docket 266-116  TARU Hujel Video, 7:56:48, 04:13 – 4:29).

The video shows that police barricades block access to the intersection from

Nassau Street, which runs one-way.  (Docket 266-116  TARU Hujel Video

06:30.)

**PLAINTIFFS' RESPONSE 80:2**  Ms. Berger is not in the video at this time.

81.      Video shows Berger in the street blocking vehicular traffic:



Ex, OO, TARU Lee Video Still, 6:65:42 at 06:43.

**PLAINTIFFS' RESPONSE 81:1**  <u>DENY</u>.  The video shows a line of police

officers blocking all vehicle access to the intersection from Pine Street and

barricades blocking access from Nassau Street.  Both Pine and Nassau are

one-way streets.  (Docket 266-116 TARU Hujel Video, 7:56:48 at 06:43-

06:48.)  The video still above demonstrates that Ms. Berger is standing in

front of the NYPD videographer who took the video, behind an Executive

level officer in a white shirt, and beside at least two officers in blue shirts, one of whom is wearing a baseball cap.  She is not preventing any traffic from moving in the intersection or on either street leading to the intersection, *i.e.*, Ms. Berger is not blocking vehicular traffic.

**PLAINTIFFS' RESPONSE 81:2** <u>DENY</u>.  Video shows that the police are occupying and using the intersection of Pine and Nassau Streets to zip-tie people who have been arrested and are waiting with people in custody, in the center of the intersection, blocking any potential vehicle access.  (Exhibit OO TARU Lee Video 6:56:42, at 004:02.)  The same video demonstrates that the NYPD videographer recording the video is standing in the middle of a crowd of police officers who are in the center of the intersection.  (Exhibit OO TARU Lee Video at 05:00 – 05:20.)  Ms. Berger is not blocking vehicular traffic.

82.     Video shows officers giving orders to get onto the sidewalk and out of the street, "Guys, get off the street," Exhibit MM, TARU Hujel Video, 06:39.

**PLAINTIFFS' RESPONSE 82:1** <u>ADMIT IN PART</u>.  On Exhibit OO TARU Lee Video 6:56:42, at 06:39 (not Hujel as cited in Defendant's Statement) officers can be heard giving orders to get on the sidewalk.  However, given the crowding on the sidewalk, it is impossible to get onto it at that point.  The police do not give instructions or tell the protestors how or where to get on the sidewalk.  They give an order with which compliance was not possible.

83.      Video shows that Berger is standing is still standing in the street with the cup of coffee in her hand seven minutes after TARU first captures her standing in the street—there is no crosswalk beneath her feet:



Exhibit PP TARU Hujel Still 7:56:48, Exhibit MM, 7:56:48 at 6:53-7:36, (video shows Berger standing in the same spot in the intersection at 6:53-6:59, 7:05, 7:17-7:18, 7:23, 7:34-7:36).

**PLAINTIFFS' RESPONSE 83:1**  <u>DENY</u>.  The video at 06:53 – unlike the still screen capture in Defendant's Statement No. 83 – shows that Ms. Berger is not standing still and is in a mass of people.  (Docket 266-116 TARU Hujel Video, 7:56:48 at 06:51 – 06:55.)

**PLAINTIFFS' RESPONSE 83:2**  <u>DENY</u>.  Ms. Berger is not in the video at 07:05.   (Docket 226-116 TARU Hujel Video, 7:56:48 at 07:05 – 07:10.)

**PLAINTIFFS' RESPONSE 83:3**  <u>DENY</u>.  The video at 07:17 – 07:18 shows that Ms. Berger is standing in the middle of a crowd of police officers

56

watching the protestors.  The video does not show her feet or whether she is

standing in a crosswalk.  (Docket 226-116 TARU Hujel Video, 7:56:48 at

07:17 – 07:20.)

**PLAINTIFFS' RESPONSE 83:4**  <u>DENY</u>.  The video at 07:33 – 07:34 shows

Ms. Berger in the crosswalk as the police violently seize her.  (Docket 226-

116 TARU Hujel Video, 7:56:48 at 07:33 – 07:34.)

84.      Video shows that Berger remains in the street:



Exhibit QQ TARU Hujel Video Still, 7:56:48 at 07:19.

**PLAINTIFFS' RESPONSE 84:1**  <u>DENY</u>.  The video at 07:17 – 07:18 shows

that Ms. Berger is standing in the middle of a crowd of police officers

watching the protestors.  The video does not show her feet or whether she is

standing in a crosswalk.  (Docket -TARU Hujel Video, 7:56:48 at 07:17 –

07:20.)

85.     Berger testified that she heard police giving multiple orders, "to get on the sidewalk," and "stay on the sidewalk."  Exhibit LL Berger Dep., 84:8-23, 86:3-4, 86:18-20.

> **PLAINTIFFS' RESPONSE 85:1**  <u>DENY</u>.  Ms. Berger testified that people were "told by police to get on the sidewalk, get into the crosswalk." (Docket 266-115 Berger Dep., 84:9-11.)   Ms. Berger testified that every order she heard included an instruction to stay on the sidewalk <u>*or*</u> crosswalk. (Docket 266-115 Berger Dep., 84:8-23, 86:3-4, 86:18-20.)  She gave no testimony that omitted the crosswalk.
>
> **PLAINTIFFS' RESPONSE 85:2**  <u>DENY</u>.  Ms. Berger was asked "You heard the police officers instructing people to stay on the sidewalk?" Her full answer was: "Correct. The sidewalk and crosswalk."  (Docket 266-115 Berger Dep., 84:21-23.)
>
> **PLAINTIFFS' RESPONSE 85:3**  <u>DENY</u>.  Ms. Berger was asked "Did you hear any conversations amongst police officers prior to your arrest on September 17th 2012?"  She answered "I heard the police officers instructing people to stay on the sidewalk and crosswalk." (Docket 266-115 Berger Dep., 86:1-4.)
>
> **PLAINTIFFS' RESPONSE 85:4**  <u>DENY</u>.  Ms. Berger was asked, "Did you hear any conversation between police officers and the participants of the demonstration?"  Her full answer was: "Again, other than the police officers instructing people to go on the sidewalk, on the crosswalk, this way, that way

and people were either saying okay or they were saying I am trying to. I need

to get over here."  (Docket 266-115 Berger Dep. 86:6-11.)

**PLAINTIFFS' RESPONSE 85:5**  <u>DENY</u>.  Ms. Berger testified "there are

multiple police officers shouting stay on the sidewalk, stay on the crosswalk. I

was one of them that said okay, I am or I am trying."  (Docket 266-115 Berger

Dep. 86:18-20.)

86.        Berger testified that police were "shouting" these orders.  Exhibit LL Berger Dep.,

86:18-20.

**PLAINTIFFS' RESPONSE 86:1**  <u>ADMIT IN PART</u>.  Ms. Berger testified

"there are multiple police officers shouting stay on the sidewalk, stay on the

crosswalk. I was one of them that said okay, I am or I am trying."  (Docket

266-115 Berger Dep. 86:18-20.)

87.        Berger testified that police gave instructions to "stay on the sidewalk," and "they kept

repeating it and repeating it and repeating it."  BExhibit LL erger Dep. 87:12-17.

**PLAINTIFFS' RESPONSE 87:1**  <u>DENY</u>.  Ms. Berger repeatedly throughout

her deposition testified that the police ordered the protestors to stay on the

sidewalk *or crosswalk*.  (Docket 266-115 *See, e.g.*, Berger Dep., 84:9-11,

84:21-23, 86:1-4, 86:6-11, 86:18-20.)  After all of that testimony Ms. Berger

was asked again "Prior to your arrest did you personally hear orders of police

officers to stay on the sidewalk *and the crosswalk*?" She replied in full:

"Yes." (*Id*. at 87:2-5) (emphasis added.)

**PLAINTIFFS' RESPONSE 87:2**  <u>DENY</u>.  Ms. Berger was asked, "Is there

any police order you did not comply with?"  She replied in full:  "No."

(Docket 266-115  Berger Dep. 87:9-11.)   When she was arrested, she told the

officer who had custody of her, "All I was doing was trying to cross the road."

(Docket 266-118 TARU Blanck Video, 8:03:52, 01:43-01:45.)

88.     While Berger testified that police also gave instructions to get onto the crosswalk,

multiple videos show that police did not give these orders at any time.  Exh MM, TARU Hujel

Video, 7:56:48 (throughout): Ex. RR, TARU Lee Video , 6:56:42 (throughout); Ex. SS, TARU

Blanck Video, 8:03:52 (throughout).  In fact, an officer using a bullhorn can be heard and seen

givng the following order, "Guys, if you don't travers the crosswalk, you will be arrested." Ex.

MM, TARU Hujel Video, 7:56:48 at 00:12-00:16.

> **PLAINTIFFS' RESPONSE 88:1**  <u>DENY</u>.  Ms. Berger testified throughout
>
> her deposition as to her memory that orders included crosswalk and sidewalk.
>
> Ms. Berger repeatedly throughout her deposition testified that the police
>
> ordered the protestors to stay on the sidewalk *or crosswalk*.  (Docket 266-115
>
> *See, e.g.*, Berger Dep., 84:9-11, 84:21-23, 86:1-4, 86:6-11, 86:18-20.)  After
>
> all of that testimony Ms. Berger was asked again "Prior to your arrest did you
>
> personally hear orders of police officers to stay on the sidewalk *and the*
>
> *crosswalk*?" She replied in full:  "Yes." (*Id*. at 87:2-5) (emphasis added.)
>
> **PLAINTIFFS' RESPONSE 88:2**  <u>DENY</u>.  The voice in the Hujel video
>
> appears to say, "If you're not in the sidewalk or crosswalk you'll be arrested."
>
> (Docket 266-116 TARU Hujel Video, 7:56:48 at 00:00 – 00:14.)

89.     Video shows police instructing the crowd, "folks, you need to clear the sidewalk,"

"get on the sidewalk," "get on the sidewalk," "get on the sidewalk," "get on the sidewalk," Let's

go, on the sidewalk," "on the sidewalk." Ex RR TARU Lee Video, 6:56:42 at 6:50-7:06.

**PLAINTIFFS' RESPONSE 88:1**  ADMIT IN PART.  Officers can be heard

giving orders to get on the sidewalk.  However, given the crowding on the

sidewalk, it is clearly impossible to get onto it at that point.  The police do not

give instructions or tell the protestors how or where to get on the sidewalk.

They give an order with which compliance was not possible.  (Exhibit 134

TARU Ellis Video, 7:59:47 at 02:53.)

90.      Video shows Berger standing in the street screaming, "[w]rongful arrest."  Exhibit

MM TARU Hujel Video, 7:56:48 at 7:34.

**PLAINTIFFS' RESPONSE 90:1**  DENY.  Ms. Berger is seen standing in the

crosswalk as close to the curb as possible given the massing of the crowd.

(Docket 266-116 TARU Hujel Video, 7:56:48 at 7:34.)

91.      Video shows that Berger is arrested in the street immediately after one of her friends

also standing in the street is arrested.  Exhibit MM TARU Hujel Video, 7:56:48 at 7:33.

**PLAINTIFFS' RESPONSE 91:1**  DENY.  The video at 07:33 – 07:34 shows

Ms. Berger in the crosswalk as the police violently seize her.  (Docket 266-

116 TARU Hujel Video, 7:56:48 at 07:33 – 07:34.)

92.      Video shows that while officers are trying to place Berger under arrest, Berger shouts,

"get off, get off, get off." Exhibt MM TARU Hujel Video, 7:56:48 at 7:33.

**PLAINTIFFS' RESPONSE 92:1**  DENY.  The words "get off, get off" are

not heard in the video at 07:33 – 07:34.  (Docket 266-116 TARU Hujel Video,

7:56:48 at 7:33.)

**PLAINTIFFS' RESPONSE 92:2** <u>DENY</u>.  At 07:33 of the video, Ms. Berger is heard saying "wrongful arrest" while standing in the crosswalk.   (Docket 266-116 TARU Hujel Video, 7:56:48 at 7:33.)  In response and as a result of her words, the police immediately and violently seize her.  (*Id*. at 07:34.)  She is pulled to the ground by the police.  (*Id*. at 07:34.)  An officer can be heard saying the word  "resisting."  (*Id*. at 07:45.)  She holds up her arms and cooperates with the police pulling her up off the ground.  (*Id*. at 07:45 – 07:49.)

93.     Video shows that Berger is screaming throughout her arrest and resists being arrested, while officers are telling her, "easy, easy, stop resisting, stop resisting."  Exhibit RR TARU Lee Video, 6:56:42, 07:10-0718.

**PLAINTIFFS' RESPONSE 93:1** <u>DENY</u>.  The video does not show Ms. Berger resisting arrest.  (Docket 266-117 TARU Lee Video, 6:56:42, 07:10-07:18.)  Ms. Berger was not charged with resisting arrest.

**PLAINTIFFS' RESPONSE 93:2** <u>DENY</u>.  Ms. Berger is heard saying "wrongful arrest" while standing in the crosswalk.   (Docket 266-116 TARU Hujel Video, 7:56:48 at 7:33.)  In response and as a result of her words, the police immediately and violently seize her.  (*Id*. at 07:34.)  She is pulled to the ground by the police.  (*Id*. at 07:34.)  An officer can be heard saying the word "resisting."  (*Id*. at 07:45.)  She holds up her arms and cooperates with the police pulling her up off the ground.  (*Id*. at 07:45 – 07:49.)

94.     Video shows that it takes at least four officers to place Berger under arrest.  Exhibit MM TARU Hujel Video, 7:56:48, 07:44-07:53.

**PLAINTIFFS' RESPONSE 94:1** <u>DENY</u>.  The video does not show that four officers were required to place Ms. Berger under arrest.  The few seconds of video cited by Defendant does not show that four officers were required to place Ms. Berger under arrest.  It shows that officers pull Ms. Berger to her feet after she is violently seized and pulled to the ground.  (Docket 266-116 TARU Hujel Video, 7:56:48, 07:44-07:46.)

**PLAINTIFFS' RESPONSE 94:2** <u>DENY</u>.  Video shows that one officer pulls Ms. Berger to the ground.  (Exhibit 134 TARU Ellis Video, 7:59:47, at 3:11.)  Video shows that two officers pulled Ms. Berger to her feet while she was surrounded by four officers.  (Exhibit 134 TARU Ellis Video, 7:59:47, at 3:21 – 3:24.)

95.      Video shows that just after Berger's arrest, traffic is able to flow again at the intersection of Pine and Nassau Streets.  Exhibit SS TARU Blanck Video, 8:03:52, 02:48-end.

**PLAINTIFFS' RESPONSE 95:1** <u>DENY</u>.  The video does not show, as Defendant absurdly implies, that Ms. Berger's arrest allowed traffic "to flow again at the intersection of Pine and Nassau Streets."  Rather, Ms. Berger was under arrest and in custody at 1:45 of the cited video (Docket 226-118 TARU Blanck Video, 8:03:52) and, approximately 45 seconds later, one lone truck slowly goes through the intersection.  There is no "traffic" at the intersection.

**PLAINTIFFS' RESPONSE 95:2** <u>DENY</u>.   Between the time that Ms. Berger is taken into custody and the passage of one lone truck through the intersection, at least 30 NYPD personnel are in the center of the intersection.  Specifically, 5 Community Affairs officers in blue shirts (seen at 02:27), 7

uniformed Police Officers (also seen at 02:27), 6 NYPD videographers (seen

at 02:30), including the videographer recording the video, and 18 Executive

Level Officers (seen at 2:34) are seen in the middle of the intersection,

blocking vehicular access to the intersection. (Docket 226-118 TARU Blanck

Video, 8:03:52).

96.      WITHDRAWN BY DEFENSE Berger testified that after she was in the police

transport vehicle, a police officer told her to "calm down," and "everything would be okay."

Berger replied, "yes I know, I am just upset." Berger Dep., 91:12-21.

> **PLAINTIFFS' RESPONSE 95:1** <u>DENY</u>. Defendant egregiously misstates
>
> Ms. Berger's testimony. Ms. Berger did not testify that a police officer told
>
> her anything or spoke to her at all throughout the entire time she was in the
>
> transport vehicle. (Berger Dep. 90:18 – 92:4.)
>
> **PLAINTIFFS' RESPONSE 95:2** <u>DENY</u>. Defendant egregiously misstates
>
> Ms. Berger's testimony. Ms. Berger testified about speaking in the transport
>
> vehicle with other arrested protestors, not with a police officer. Ms. Berger
>
> testified that other arrested protestors in the transport vehicle "were sitting
>
> down. Their hands were still handcuffed. I was you know upset over the
>
> matter. You know they can see that and they're saying it will be okay. Calm
>
> down. And that's about the only discussion we had in the van. [ . . . ] When
>
> they told me everything would be okay I said yes I know, I am just upset. You
>
> know I did not expect this." (Berger Dep., 91:12-22.)

97.        Berger was arrested for violation of the disorderly conduct statute, was in custody for

eight hours (not the claimed twelve hours) and released with a DAT.  Exhibit UU, D000254,

Exhibit TT, D00231,; Exhibit A.

> **PLAINTIFFS' RESPONSE 97:1**  <u>ADMIT IN PART</u>.  Ms. Berger was
>
> issued a summons that states she was arrested for "Dis/Con".  Exhibit TT
>
> D00231.
>
> **PLAINTIFFS' RESPONSE 97:2**  <u>ADMIT IN PART</u> that D254 states Ms.
>
> Berger was arrested at 8:50am and issued a Desk Appearance Ticket at
>
> 4:55pm.
>
> **PLAINTIFFS' RESPONSE 97:3**  <u>ADMIT IN PART</u>.  Exhibit VV D00225
>
> is a "Declination to Prosecute" from the New York County District Attorney's
>
> Office that states "the arresting Officer, Kyle Riegel was informed by
>
> Lieutenant Bryan Nyhus that the defendant was in a group with other
>
> protestors for blocking pedestrian traffic.  [sic]"

98.        The District Attorney's Office declined to prosecute Berer on the grounds that her

arresting officer, Officer Riegel, did not observe Berger's conduct before her arrest but was

informed by Lt. Nyhus of the conduct leading to her arrest.  Three months after the incident, Lt

Nyhus could not recall Berger, and thus DANY declined to prosecute. Ex VV, D00225.

> **PLAINTIFFS' RESPONSE 98:1**  <u>ADMIT IN PART</u>.  THE DANY declined
>
> to prosecute the case.
>
> **PLAINTIFFS' RESPONSE 98:2**  Deny.
>
> However, the arrest paperwork for Ms. Berger indicates that she was arrested
>
> for standing in the middle of the sidewalk and refusing to disperse, with no

reference to being in a street or crosswalk.  See *infra* Plaintiffs 56.1 statement,

paragraph 406 and Exhibit 136 (D000226).

99.      Since her arrest on September 17, 2012, Berger continues to be involved with many

protest activities, including a gay rights demonstration, a demonstration, demonstrations at

various churches in the Bethlehem, Pennsylvania area, OWS in Pennsylvania. Exhibit LL Berger

Dep., 45:17-46:6.

> **PLAINTIFFS' RESPONSE 99-1:**  <u>DENY</u>.  Ms. Berger did not testify that
>
> she was involved in "many protest activities."  To the contrary, Ms. Berger
>
> testified that she participated in one, single, protest: "There was a gay rights
>
> demonstration that I was at.  It was a gay rights protest once and that's all I
>
> can remember."  (Docket 266-115 Berger Dep. 45:17-21.)  This one, single,
>
> demonstration, consisting of approximately twelve people, went "church to
>
> church."  (Docket 266-115 Berger Dep 46:3-9.)
>
> **PLAINTIFFS' RESPONSE 98-2:**  <u>OBJECTION</u> on the grounds that
>
> evidence of Ms. Berger's subsequent protest activities is inadmissible because
>
> it is not relevant under Fed. R. of Evid. 401.  Further, under R. 404(b) it is
>
> "not admissible to prove [her] character in order to show that on a particular
>
> occasion [she] acted in accordance with the character."

### Training

100.     The record shows that defendant thoroughly trained police officers on First Amendment

principles in policing demonstrations and the application of the disorderly conduct and

obstructing governmental administration statutes. Exs. XX—OOO.

**PLAINTIFFS' RESPONSE 100-1:**  <u>DENY</u>. Supervisors at demonstrations receive no training, after recruit training, on what conduct meets the standard of substantial disruption establishing probable cause for a disorderly conduct arrest based on blockage of pedestrian traffic. (Doc. No. 265[2] ¶177: Ex. 1: Raganella Dep. 39:21-40:7.)

**PLAINTIFFS' RESPONSE 100-2:**  <u>DENY</u>. NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011. None of these trainings involved First Amendment training or training on policing of sidewalk protests. (Doc. No. 265 ¶¶180, 181: Ex. 32: Vega Dep. 99:23 - 105:5.).

**PLAINTIFFS' RESPONSE 100-3:**  <u>DENY</u>. The City testified that the following subjects are "relevant training subjects": "Policing public assemblies, marches or demonstrations"; "The constitutional right of individuals and/or groups to protest on streets or sidewalks"; "Arresting protestors engaged in first amendment speech"; "Arresting protestors"; "First amendment principles as they concern policing public assemblies, demonstrations, or protests"; "Application of the disorderly conduct statute in the context of the first and fourth amendment rights of protestors"; "Application of the obstruction of governmental administration statute in the context of the first and fourth amendment rights of protestors". (hereinafter the "Relevant Training Subjects") (Doc. No. 265 ¶146: Ex. 30: Perkins Dep. 11:18-12:3; Ex. 54: Perkins Dep. Exh. 1 at p. 2.)

**PLAINTIFFS' RESPONSE 100-4:**  <u>DENY</u>. The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects. (Doc. No. 265 ¶148: Ex. 30: Perkins Dep. 128:19-25.)

---

[2].     Plaintiffs' Local Civil Rule 56.1 Statement, filed April 5, 2019.

**PLAINTIFFS' RESPONSE 100-5:**  <u>DENY</u>. The NYPD's Training Course Catalogue "is a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street. (Doc. No. 265 ¶150: Ex. 30: Perkins Dep. 43:13 – 44:8; Ex. 55: D021127- D021238.)

**PLAINTIFFS' RESPONSE 100-6:**  <u>DENY</u>. The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects. (Doc. No. 265 ¶151: Ex. 30: Perkins Dep. 45:24 – 46:14; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 100-7:**  <u>DENY</u>. No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion. (Doc. No. 265 ¶173: Ex. 30: Perkins Dep. 54:15-19.)

**PLAINTIFFS' RESPONSE 100-8:**  <u>DENY</u>. The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep. 47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep. 54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau, in any relevant training subject; (Doc. No. 265 ¶395: Ex. 30: Perkins Dep. 85:2-10).

101.    Police Academy instruction was given by state-certified instructors at the NYPD Police Academy. Ex. KKK, Perkins Dep. 119:7-15. The instructors were trained by officers designated as master instructors by the state. Id. at 119:7-120:6. Furthermore, the NYPD's lesson plans and course materials are reviewed for national accreditation every four years by the Commission on Accreditation for Law Enforcement Agencies, ("CALEA"), and the NYPD received these accreditations. Id. at 120:24-121:19; Ex. XX, CALEA Certificates. Additionally,

officers received college credit for these courses through the National College Credit

Recommendation Service ("NCCRS"). Ex. XX.

> **PLAINTIFFS' RESPONSE 101-1:** <u>DENY</u>. Supervisors at demonstrations receive no
>
> training, after recruit training, on what conduct meets the standard of substantial
>
> disruption establishing probable cause for a disorderly conduct arrest based on blockage
>
> of pedestrian traffic. (Doc. No. 265[3] ¶177: Ex. 1: Raganella Dep. 39:21-40:7.)

> **PLAINTIFFS' RESPONSE 101-2:** <u>DENY</u>. NYPD members with a rank of Captain
>
> and above attended DCU training 272 times between 2009 and 2011. None of these
>
> trainings involved First Amendment training or training on policing of sidewalk
>
> protests. (Doc. No. 265 ¶¶180, 181: Ex. 32: Vega Dep. 99:23 - 105:5.).

> **PLAINTIFFS' RESPONSE 101-3:** <u>DENY</u>. The City testified that the following
>
> subjects are "relevant training subjects": "Policing public assemblies, marches or
>
> demonstrations"; "The constitutional right of individuals and/or groups to protest on
>
> streets or sidewalks"; "Arresting protestors engaged in first amendment speech";
>
> "Arresting protestors"; "First amendment principles as they concern policing public
>
> assemblies, demonstrations, or protests"; "Application of the disorderly conduct
>
> statute in the context of the first and fourth amendment rights of protestors";
>
> "Application of the obstruction of governmental administration statute in the context
>
> of the first and fourth amendment rights of protestors". (hereinafter the "Relevant
>
> Training Subjects") (Doc. No. 265 ¶146: Ex. 30: Perkins Dep. 11:18-12:3; Ex. 54:
>
> Perkins Dep. Exh. 1 at p. 2.)

---

[3].      Plaintffs' Local Civil Rule 56.1 Statement, filed April 5, 2019.

**PLAINTIFFS' RESPONSE 101-4:**  <u>DENY</u>. The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects. (Doc. No. 265 ¶148: Ex. 30: Perkins Dep. 128:19-25.)

**PLAINTIFFS' RESPONSE 101-5:**  <u>DENY</u>. The NYPD's Training Course Catalogue "is "a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street. (Doc. No. 265 ¶150: Ex. 30: Perkins Dep. 43:13 – 44:8; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 101-6:**  <u>DENY</u>. The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects. (Doc. No. 265 ¶151: Ex. 30: Perkins Dep. 45:24 – 46:14; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 101-7:**  <u>DENY</u>. No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion. (Doc. No. 265 ¶173: Ex. 30: Perkins Dep. 54:15-19.)

**PLAINTIFFS' RESPONSE 101-8:**  <u>DENY</u>. The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep. 47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep. 54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau, in any relevant training subject; (Doc. No. 265 ¶395: Ex. 30: Perkins Dep. 85:2-10).

102.     The Police Academy utilized numerous written materials in its training on First Amendment principles and the application of the disorderly conduct statute, including

the Police  Student's Guide, the Recruit Training Manual, the Patrol Guide, NYPD Legal

Bureau Bulletins and Police Academy Training Memoranda. Exs. YY—JJJ.

**PLAINTIFFS' RESPONSE 102-1:**  <u>DENY</u>. Supervisors at demonstrations receive no

training, after recruit training, on what conduct meets the standard of substantial

disruption establishing probable cause for a disorderly conduct arrest based on blockage

of pedestrian traffic. (Doc. No. 265[4] ¶177: Ex. 1: Raganella Dep. 39:21-40:7.)

> **PLAINTIFFS' RESPONSE 102-3:**  <u>DENY</u>. NYPD members with a rank of Captain
>
> and above attended DCU training 272 times between 2009 and 2011. None of these
>
> trainings involved First Amendment training or training on policing of sidewalk
>
> protests. (Doc. No. 265 ¶¶180, 181: Ex. 32: Vega Dep. 99:23 - 105:5.).
>
> **PLAINTIFFS' RESPONSE 102-4:**  <u>DENY</u>. The City testified that the following
>
> subjects are "relevant training subjects": "Policing public assemblies, marches or
>
> demonstrations"; "The constitutional right of individuals and/or groups to protest on
>
> streets or sidewalks"; "Arresting protestors engaged in first amendment speech";
>
> "Arresting protestors"; "First amendment principles as they concern policing public
>
> assemblies, demonstrations, or protests"; "Application of the disorderly conduct
>
> statute in the context of the first and fourth amendment rights of protestors";
>
> "Application of the obstruction of governmental administration statute in the context
>
> of the first and fourth amendment rights of protestors". (hereinafter the "Relevant
>
> Training Subjects") (Doc. No. 265 ¶146: Ex. 30: Perkins Dep. 11:18-12:3; Ex. 54:
>
> Perkins Dep. Exh. 1 at p. 2.)

---

[4].      Plaintffs' Local Civil Rule 56.1 Statement, filed April 5, 2019.

**PLAINTIFFS' RESPONSE 102-5:**  <u>DENY</u>. The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects. (Doc. No. 265 ¶148: Ex. 30: Perkins Dep. 128:19-25.)

**PLAINTIFFS' RESPONSE 102-6:**  <u>DENY</u>. The NYPD's Training Course Catalogue "is "a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street. (Doc. No. 265 ¶150: Ex. 30: Perkins Dep. 43:13 – 44:8; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 102-7:**  <u>DENY</u>. The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects. (Doc. No. 265 ¶151: Ex. 30: Perkins Dep. 45:24 – 46:14; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 102-8:**  <u>DENY</u>. No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion. (Doc. No. 265 ¶173: Ex. 30: Perkins Dep. 54:15-19.)

**PLAINTIFFS' RESPONSE 102-9:**  <u>DENY</u>. The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep. 47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep. 54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau, in any relevant training subject; (Doc. No. 265 ¶395: Ex. 30: Perkins Dep. 85:2-10).

103. Instruction on the Constitution and the Bill of rights, specifically including the First

Amendment, was provided in various chapters of the Police Student's Guide, including Introduction to Law and Justice and Maintaining Public Order: Demonstrations. As with all chapters of the Police Student's Guide, these chapters have corresponding Lesson Plans and PowerPoint presentations. Exs. ZZ, BBB, DDD, HHH, III, JJJ.

**PLAINTIFFS' RESPONSE 103-1:**  <u>DENY</u>. Supervisors at demonstrations receive no training, after recruit training, on what conduct meets the standard of substantial disruption establishing probable cause for a disorderly conduct arrest based on blockage of pedestrian traffic. (Doc. No. 265[5] ¶177: Ex. 1: Raganella Dep. 39:21-40:7.)

**PLAINTIFFS' RESPONSE 103-2:**  <u>DENY</u>. NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011. None of these trainings involved First Amendment training or training on policing of sidewalk protests. (Doc. No. 265 ¶¶180, 181: Ex. 32: Vega Dep. 99:23 - 105:5.).

**PLAINTIFFS' RESPONSE 103-3:**  <u>DENY</u>. The City testified that the following subjects are "relevant training subjects": "Policing public assemblies, marches or demonstrations"; "The constitutional right of individuals and/or groups to protest on streets or sidewalks"; "Arresting protestors engaged in first amendment speech"; "Arresting protestors"; "First amendment principles as they concern policing public assemblies, demonstrations, or protests"; "Application of the disorderly conduct statute in the context of the first and fourth amendment rights of protestors"; "Application of the obstruction of governmental administration statute in the context of the first and fourth amendment rights of protestors". (hereinafter the "Relevant Training Subjects") (Doc. No. 265 ¶146: Ex. 30: Perkins Dep. 11:18-12:3; Ex. 54: Perkins Dep. Exh. 1 at p. 2.)

---

[5].     Plaintiffs' Local Civil Rule 56.1 Statement, filed April 5, 2019.

**PLAINTIFFS' RESPONSE 103-4:** <u>DENY</u>. The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects. (Doc. No. 265 ¶148: Ex. 30: Perkins Dep. 128:19-25.)

**PLAINTIFFS' RESPONSE 103-5:** <u>DENY</u>. The NYPD's Training Course Catalogue "is "a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street. (Doc. No. 265 ¶150: Ex. 30: Perkins Dep. 43:13 – 44:8; Ex. 55: D021127- D021238.)

**PLAINTIFFS' RESPONSE 103-6:** <u>DENY</u>. The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects. (Doc. No. 265 ¶151: Ex. 30: Perkins Dep. 45:24 – 46:14; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 103-7:** <u>DENY</u>. No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion. (Doc. No. 265 ¶173: Ex. 30: Perkins Dep. 54:15-19.)

**PLAINTIFFS' RESPONSE 103-8:** <u>DENY</u>. The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep. 47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep. 54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau, in any relevant training subject; (Doc. No. 265 ¶395: Ex. 30: Perkins Dep. 85:2-10).

104. The lesson plans show that officers' training included lecture, question and answer and group discussion. Id. Officers were evaluated by quiz and trimester exams on their comprehension of training. Id.; Ex. KKK, Perkins Dep., 134:23-136:11.

**PLAINTIFFS' RESPONSE 104-1:**  <u>DENY</u>. Supervisors at demonstrations receive no training, after recruit training, on what conduct meets the standard of substantial disruption establishing probable cause for a disorderly conduct arrest based on blockage of pedestrian traffic. (Doc. No. 265[6] ¶177: Ex. 1: Raganella Dep. 39:21-40:7.)

**PLAINTIFFS' RESPONSE 104-2:**  <u>DENY</u>. NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011. None of these trainings involved First Amendment training or trinaing on policing of sidewalk protests. (Doc. No. 265 ¶¶180, 181: Ex. 32: Vega Dep. 99:23 - 105:5.).

**PLAINTIFFS' RESPONSE 104-3:**  <u>DENY</u>. The City testified that the following subjects are "relevant training subjects": "Policing public assemblies, marches or demonstrations"; "The constitutional right of individuals and/or groups to protest on streets or sidewalks"; "Arresting protestors engaged in first amendment speech"; "Arresting protestors"; "First amendment principles as they concern policing public assemblies, demonstrations, or protests"; "Application of the disorderly conduct statute in the context of the first and fourth amendment rights of protestors"; "Application of the obstruction of governmental administration statute in the context of the first and fourth amendment rights of protestors". (hereinafter the "Relevant Training Subjects") (Doc. No. 265 ¶146: Ex. 30: Perkins Dep. 11:18-12:3; Ex. 54: Perkins Dep. Exh. 1 at p. 2.)

**PLAINTIFFS' RESPONSE 104-4:**  <u>DENY</u>. The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects. (Doc. No. 265 ¶148: Ex. 30: Perkins Dep. 128:19-25.)

---

[6]. Plaintffs' Local Civil Rule 56.1 Statement, filed April 5, 2019.

**PLAINTIFFS' RESPONSE 104-5:** <u>DENY</u>. The NYPD's Training Course Catalogue "is "a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street. (Doc. No. 265 ¶150: Ex. 30: Perkins Dep. 43:13 – 44:8; Ex. 55: D021127- D021238.)

**PLAINTIFFS' RESPONSE 104-6:** <u>DENY</u>. The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects. (Doc. No. 265 ¶151: Ex. 30: Perkins Dep. 45:24 – 46:14; Ex. 55: D021127-D021238.)

**PLAINTIFFS' RESPONSE 104-7:** <u>DENY</u>. No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion. (Doc. No. 265 ¶173: Ex. 30: Perkins Dep. 54:15-19.)

**PLAINTIFFS' RESPONSE 104-8:** <u>DENY</u>. The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep. 47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep. 54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau, in any relevant training subject; (Doc. No. 265 ¶395: Ex. 30: Perkins Dep. 85:2-10).

PLAINTIFFS' AFFIRMATIVE STATEMENTS OF MATERIAL FACTS [7]
IN SUPPORT OF THEIR OPPOSITION TO THE DEFENDANT
<u>MOTION FOR SUMMARY JUDGMENT</u>

397.    Plaintiff Packard testified that he instructed the group he was leading to "pair off in twos" and stay to the left so as not to block the sidewalk.  (Docket 266-99, page 308 Packard Dep. 280:21 – 281:7.)

398.    When the group sat down, they intentionally sat towards the left and not in the middle of the sidewalk.  (Docket 266-99, page 310 Packard Dep. 282:1-10.)

399.    Packard testified that "we were making particular effort not to sit in the middle of the sidewalk." ((Docket 266-99, page 194 Packard Dep. 166:6-7.)

400.    When the NYPD began to make arrests, it "was a surprise to [him]," because "we were sitting, not blocking traffic." ((Docket 266-99, page 164 Packard Dep. 164:1.)

401.    Packard testified that "I don't believe we were blocking the sidewalk." ((Docket 266-99, page 343 Packard Dep. 160:23-24.)

402.    There were instructions given by march leaders before the start of the protest march Plaintiff Cowan was in "of not blocking sidewalks from pedestrians, allowing pedestrians continuing to walk through and to not hostiley engaging with the police."  (Docket 266-113, page 142 Cowan Dep. 142:21-143:16).

403.    The march route was determined by the NYPD, which directed the marchers which way to go at every intersection and "basically guided towards where there was scaffolding and the road narrowed further."  (Docket 266-113, page 149 Cowan Dep. 149:8-23.)

---

[7] The numbering of these paragraphs follow the numbering of the Plaintiff's affirmative 56.1 statement of material facts filed on April 5, 2019, Docket 265.

404.    Plaintiff Beck heard only police instructions to stay on the sidewalk, not to keep moving, and that no police officer said to the crowd, "you're blocking the sidewalk."  (Docket 266-110, Page 31 Beck Depo 29:11-23).

405.    There is no evidence at all that a dispersal order was given to Ari Cowan or Edward Beck.  Their criminal complaints do not allege such, and there is no other evidence of such an order.  (Exhibit 135 - D019, D021-22, D024, D213, D215-216, D219.)

406.    The District Attorney declined to prosecute Ms. Berger because the police could not identify whether she was in a group that was told to disperse, and she testified that she was not. (Exhibit 136   D225, D226, D232.)

407.    Bishop Packard testified that he heard no dispersal order until he "was being put in the paddy wagon" and that he was not free to leave and was under arrest even before handcuffs were placed on him. (Docket 266-99, Page 180 (152:7-15); Page 245 (217:1-4); Page 252-253 (224:25 – 225:11.)

408.    Bishop Packard testified that "[i]t was a surprise to me, we were sitting, not blocking traffic, and it was a surprise to me that we were arrested, because there was not statement that there was an arrest coming." (Docket 266-99, Page 192 Packard Dep. 164:1-3.)

409.    Ms. Berger stated very succinctly, "I would say it's a peaceful protest, … People were excited to be there.  Again, advocating for higher wages.  Some advocating for health care.  I knew it was going to be a peaceful march." (Docket 266-115, Page 78 Berger Depo 78:11-14).

410.    On the date of the arrest (September 17, 2012) of each of the proposed class representatives, each plaintiff was engaged in First Amendment-protected conduct.  (Docket 266-99, Page 307 Packard Dep. 279:22 - 280:1; Docket 266-110, Page 57 Beck Dep., 55:3-21;

Docket 26-113, Page 91:9-15, Page 139:14-19, Docket 266-115, Page 120-121, Berger Dep. 120:22 – 121:1.).

411.     DCU taught officers to use military style formations to police demonstrations. (Docket 266-1 Raganella Dep., 154:8-12.).

412.     The City of New York explained that the disperse and demoralize strategy "is meant to discourage an unlawful or violent group from continuing in the conduct that they're doing, and to disperse them" (Docket 266-1 Raganella Dep., 154:16-21.).

413.     One month prior to the start of OWS, DCU conducted a mobilization training for 228 officers, including six executive officers. This large scale mobile exercise was designed "to train and test NYPD's ability to rapidly respond to and quell any civil disorder incidents." The exercise consisted of (i) high profile vehicle rescue, (ii) lines, wedges and other disorder control formations, and (iii) mass arrest techniques and deployment of protective millennium masks. (Exhibit 137 D25546-25549).

414.     On August 29, 2011, just two weeks prior to the start of OWS, DCU Commanding Officer submitted that DCU was ready to conduct training pursuant to 17 various lesson plans. No lesson plan or training was prepared relating to standards for constitutional policing of sidewalk protest.  (Exhibit 138 D25550.).

415.     During the first few months of OWS, DCU conducted training for 1412 officers including 12 executive officers. DCU implemented training in preparation for OWS "to train and test NYPD's ability to rapidly respond to and quell any civil disorder incidents" and consisted of (i) lines, wedges and other disorder control formations, (ii) mass arrest techniques, and (iii) protective shields and mesh barrier equipment review.  (Exhibit 139 D25580-25585.).

416.   In anticipation of OWS demonstrations for the one-year anniversary on September 17, 2012, DCU scheduled training for up to 720 members of the NYPD over 6 days from September 4, 2012 – September 14, 2012, also "to train and test NYPD's ability to rapidly respond to and quell any civil disorder incidents."  (Exhibit 140 D25600-25601.).

417.   As part of these trainings, cadets portrayed demonstrators as bad actors using bull horns and smoke devices (D25586), throwing bottles at the police (D4681, 25512) and creating disorder (collectively Exhibit 141).

418.   In September 2011, Inspector Raganella responded to an email forwarding publicly available information regarding the start of OWS "Thanks bro, been working with this INTEL. Ten of these IDIOTS did a test run a couple of weeks ago and they all got collared within 5 minutes.  Hopefully, no one shows up." (Exhibit 142 D19460 (Emphasis added)).

419.   On October 6, 2011, a video was posted to YOUTUBE showing a member of the NYPD saying, while policing OWS, "My little nightstick's gonna get a workout tonight."  (Exhibit 143 Packard 00431).

420.   On October 14, 2011, a protester was 'sucker punched' in the face by a high ranking executive officer of the NYPD.  (Exhibit 144 - Packard 025412 – 25429, photographs Packard 25431-25435).

421.   On October 14, 2011, a legal observer was knocked down by an NYPD scooter, and while he was still on the ground the officer parked the scooter on the legal observer's leg and walked away. (Exhibit 145 - Packard 24245-24260).

422.   On October 15, 2011, the NYPD used its mounted unit to enter the crowd at an OWS protest in Times Square, risking serious injury to protesters.  (Exhibit 146 - Packard 00465 – 00469.).

423.    On December 15, 2011, numerous individuals complained to the NYPD due to public

comments by members of the NYPD, including, "On my way to wall street … Let the savagery

begin."  Another officer wrote about his desire to crack protesters over the head.  (Exhibit 147 -

D15169-15184).

424.    On November 15, 2011, City Councilmember Ydanis Rodriguez was assaulted by police

officers and arrested, resulting in "a gash over his eye that . . . was the result of police brutality."

(Exhibit 148 – Suppressing Protest Report Appendix I Packard 25933.).

425.    On March 17, 2012, a police officer "smashed his megaphone into the back of" a

protester's head. (Exhibit 148 – Suppressing Protest Report Appendix I Packard Packard

25948.).

426.    Multiple sources reported that on March 20, 2012 the police threw a woman to the

ground, causing a concussion requiring an ambulance to be called to the scene. ((Exhibit 148 –

Suppressing Protest Report Appendix I Packard 25951-25952.).

427.    On March 24, 2012, a police officer stomped on the head of a protester while on the

sidewalk (Exhibit 148 – Suppressing Protest Report Appendix I Packard 25953.).

428.    On June 13, 2012, in an incident reported by the New York Times, an NYPD "officer

kicked a man in the head while he was being held to the ground."  (Exhibit 148 – Suppressing

Protest Report Appendix I Packard 25955.).

429.    None of the arrest document, booking worksheet, arresting officer's memobook, or other

paperwork – the real-time evidence – indicates that Mr. Beck attempted to interfere in an arrest.

(Exhibit 149 - D0022, D0026, D0030, D0032.)

430.    NYPD protocol requires that clear, audible warnings be given before arresting

demonstrator who is sitting down.  (Exhibit 150 - D004392.)

431.    The arrest removing the plaintiffs from the demonstration and ability to continue to participate in the one year anniversary of OWS was a particularly harmful deprivation.  (Docket 266-113 Cowan Dep. 158:17-23; "It prevented me from being able to participate in my First Amendment guaranteed right of public protest for the duration of the specific day in question, which is a day I'll never be able to get back, the day that was precious to me. It was a celebration of an entire year's work."

Dated:  New York, New York
        May 10, 2019

**WYLIE STECKLOW PLLC**

 _/s/ Wylie M. Stecklow
Wylie Stecklow, Esq.
Jon Avins, Esq.
217 Centre Street, Sixth Floor
New York, NY 10013
(212) 566-8000
ECF@Wylielaw.com
*Attorneys for Plaintiffs*


**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**

Jeffrey G. Smith
Kevin G. Cooper
270 Madison Ave.
New York, NY 10016
Tel.:    (212) 545-4600
Fax:    (212) 686-0114
Smith@whafh.com
KCooper@whafh.com
*Attorneys for Plaintiffs*


**THE SULTZER LAW GROUP, P.C.**
Janine Pollack
351 W. 54th St., Suite 1C
New York, New York 10019
pollackj@thesultzerlawgroup.com

Telephone: (212) 969-7810
Fax: (888) 749-7747
*Attorneys for Plaintiffs*

To: New York City Law Department