UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

GEORGE PACKARD, EDWARD BECK, ARI COWAN
and MICHELLE BERGER, *individually and on behalf of a
class of all others similarly situated*,

                                    Plaintiffs,

                     -against-

THE CITY OF NEW YORK,

                             Defendant.

---------------------------------------------------------------------- x

**DEFENDANT'S RESPONSES TO PLAINTIFFS' LOCAL CIVIL RULE 56.1 STATEMENT**

15-CV-7130 (AT) (SDA)

       Defendant City of New York, by its attorney Zachary Carter, Corporation Counsel of the City of New York, responds to plaintiffs' Local Civil Rule 56.1 Statement.

1.     The NYPD is 100% sure that at some point, some of its officers will be required to police sidewalk protest.  (Raganella Dep. 267:5-21.)

**DEFENDANTS' RESPONSE:**  Admit that some NYPD officers will be required to police protests.

2.     The New York State Court of Appeals issued its decision in *People v. Jones* in 2007. (D025777-778.)

**DEFENDANTS' RESPONSE:**  Admit but deny that the statement is a material fact.

3.     The NYPD compiles newspaper and other media reports concerning the NYPD, including but not limited to its policing of OWS.  (Gannon Dep. 49:11-51:9; D005707; D005709; D0057010; D0057012; D005758.)

**DEFENDANTS' RESPONSE:**  Admit but deny that the statement is a material fact.

4.     On October 20, 2011, the NYCLU wrote to the NYPD to bring to its attention concerns regarding "the policing of the Occupy Wall Street demonstration," including, among other

things, incidents "where police officers aggressively dispersed people standing lawfully on city sidewalks." (D015205-15206.)

**DEFENDANTS' RESPONSE:** Deny that the statement is a material fact.

5.     On December 13, 2011, State Senator Liz Krueger wrote to the NYPD "regarding concerns" about "police procedures used at protests conducted by the Occupy Wall Street Movement." State Senator Krueger stated in the letter that review of video of an Occupy Wall Street sidewalk protest conducted in the Bronx (herinafter "the Bronx Incident") shows NYPD "practices that appear to interfere with peaceful and legal protest behavior . . . ." (D015189.)

**DEFENDANTS' RESPONSE:** Deny that the statement is a material fact.

6.     In her letter of December 13, 2011, State Senator Liz Krueger references video of the Bronx Incident. (D015189; Raganella Ex. 1 – NYPD Wrongfully Arrested Participants of Occupy The Bronx Festivities.mp4.)

**DEFENDANTS' RESPONSE:** Deny that the statement is a material fact. Object to "Raganella Ex. 1," as there is no record of the cited video in Raganella's deposition. Note that Raganella was deposed on July 12, 2018. Further note that plaintiffs' provided defendant with a flash drive dated August 30, 2018, entitled, "plaintiff's exhibit 1," containing one main file, 3 sub files, 22 sub sub files, and 21 sub sub sub files—all purportedly related to Raganella's deposition. Note further that not a single of the multitude of videos and screen shots on "plaintiff's exhibit 1" is identified in any manner whatsoever in Raganella's deposition. For example, that there is no record in Raganella's deposition of "NYPD Wrongfully Arrested Participants of Occupy The Bronx Festivities.mp4"—or any other video. Further note that Raganella did not view the more than 50 videos and screen shots, or anything approaching that number, during his deposition, and there is no record of any video he did view.

7.      State Senator Krueger's December 13, 2011 letter states that it concerns the arrest of protestors at a "demonstration that does not appear to be blocking the sidewalk."  (D015189.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.

8.      On January 19, 2012, City Council Member Jessica Lappin wrote to the NYPD about "serious concerns regarding police behavior at sidewalk protests conducted by the Occupy Wall Street Movement."   The letter concerned "a Bronx demonstration in which protestors were arrested for blocking the sidewalk."  (D014892.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.

9.      On April 13, 2012, the Global Justice Clinic, which included lawyers, professors and students from law schools at Fordham, Harvard, NYU and Stanford, among others, sent a letter to the NYPD requesting a meeting regarding a report the Clinic was preparing at that time regarding "U.S. officials' response to the Occupy protests."  (D014960.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.

10.     The finished report by the Global Justice Clinic, entitled "Suppressing Protest:  Human Rights Violations in the U.S. Response to Occupy Wall Street", features photographs of NYPD police actions against OWS protestors on its cover.  (PACKARD25779.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.

11.     The finished Suppressing Protest Report was emailed to the NYPD by its authors on July 25, 2012.  (D015000.)

**DEFENDANTS' RESPONSE:**   Deny as the cited document was ***not*** e-mailed to the NYPD on July 25, 2012.  Note that a "press release"—not the cited document—was sent via e-mail to the Office of the Police Commissioner on July 25, 2012. Further deny that there is any record of

when the cited document was received by Commissioner Kelly.  Further deny that the statement is a material fact.

12.     On October 13, 2011, the NYPD received a petition with the signatures of 165,766 Americans which stated, in part, that "I stand with the protestors of Occupy Wall Street, and I demand that the NYPD respect their constitutional right to peaceful assembly."  (D15076-D15116.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.

13.     The NYPD received numerous other complaints from civilians and religious groups regarding the policing of OWS demonstrators.  (D014914; D015203; D021291; D021302.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.

14.     All complaints concerning NYPD policing are treated in the same way, regardless of whether the complaint is made by a citizen or an elected official.  (Gannon Dep. 54:8-17.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement and note that the statement wholly mischaracterizes the cited testimony.  Gannon actually testified that complaints are investigated depending on the nature of the complaint. Ex. Q, Gannon Dep., 53:6-55:6.  Further deny that the statement is a material fact.

15.     The handling of any complaint received by the NYPD concerning a constitutional violation is "hard to answer" because that is "such a broad topic."  (Gannon Dep. 55:16-56:3.)

**DEFENDANTS' RESPONSE:**  Deny that the sentence contains a fact let alone a material fact. Deny that the cited testimony supports the sentence and note that the sentence wholly mischaracterizes the cited testimony.

16.     The handling of any complaint received by the NYPD concerning a constitutional violation is "hard to answer" because "[t]here's no, you know, there's no box to check there." (Gannon Dep. 57:21-22.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a fact let alone a material fact.

17.     *Allen v. City of NY*, 03CV2829, *Haus v. City of NY*, 03CV4915, *Kunstler v City of NY*, 04CV1145, *Dinler v. City of NY*, 04CV7921, alleged unconstitutional policing by the NYPD of various First Amendment sidewalk protests from 2002 through 2004.  (Packard Docket # 150-1, #1, 2, 3, 4.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that unsubstantiated, unrelated allegations support plaintiffs' claims as the Honorable Analisa Torres held, in this case, that "the lawsuits [cited by plaintiffs] do not plausibly support plaintiffs' *Monell* claim."  See Decision, dated March 2, 2017, Dkt. No. 59, at 13.  "[T]he Court is unable to rely on plaintiffs' citations to similar lawsuits…"  Id. at 16.  Further deny that plaintiffs' counsels' correspondence at Dkt. No. 150 constitutes evidence in this case.

18.     In *Kunstler v City of NY,* the plaintiffs alleged that demonstrators protesting against U.S. involvement in the Iraq War on April 7, 2003 sought to participate in free speech activity in front of, and across from, an office building in New York City in which Carlyle Corporation had corporate offices.  (Packard Docket 150-1 #3; Packard Docket 150-3, Page 9, Paragraph 25.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 17.

19.     In *Kunstler v City of NY,* the plaintiffs alleged that on April 7, 2003 the protesters were split into two groups, one of which intended to participate in civil disobedience and risk arrest. The plaintiffs alleged that a second group, across the street from the first, intended only to

participate in sidewalk protest and not to risk arrest. (Packard Docket 150-3, Page 10, Paragraphs 31-33; PACKARD 28109-28113 - Kunstler Videos.)

**DEFENDANTS' RESPONSE:** See Response to Statement No. 17.

20.    In *Kunstler v City of NY,* the plaintiffs alleged that the NYPD arrested the individuals participating in the sidewalk protest on April 7, 2003. (Packard Docket 150-3, Page 12, Paragraphs 41-45; PACKARD 28109-28113 - Kunstler Videos.)

**DEFENDANTS' RESPONSE:** See Response to Statement No. 17.

21.    A lawsuit was brought against the NYPD by these arrested individuals, including first named plaintiff Sarah Kunstler. (Packard Docket 150-3.)

**DEFENDANTS' RESPONSE:** See Response to Statement No. 17.

22.    The City of New York defended the Kunstler lawsuit, utilizing City Law Department attorneys including current the lead City attorney and current Deputy Chief of NYC Law Department Special Federal Litigation Elizabeth Dollin. (Packard Docket 149, Footnote 4.)

**DEFENDANTS' RESPONSE:** See Response to Statement No. 17.

23.    The City of New York paid in excess of $2,000,000 to settle the claims underlying the lawsuit. (*Kunstler et al v. City of NY*, 04CV01145 (RWS), Docket 173.)

**DEFENDANTS' RESPONSE:** See Response to Statement No. 17. Further object on the grounds that the Honorable Robert W. Sweet ordered that the cited document shall not be admissible in any other litigation. Accordingly, this "fact" should be stricken. See 04-CV-1145 (RWS), Docket 173.

24.    In *Dinler v. City of New York,* the plaintiffs alleged that, on August 31, 2004, individuals sought to protest the Republican National Convention on Fulton Street in downtown Manhattan by engaging in a sidewalk protest. (Packard Docket #150-1 #5; Packard Docket #149, Page 3,

*Dinler v. City of New York*, 2012WL14513352; TARU 61, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact as the Honorable Analisa Torres held, in this case, that "the lawsuits [cited by plaintiffs] do not plausibly support plaintiffs' *Monell* claim…the Court is unable to rely on plaintiffs' citations to similar lawsuits…" See Decision, dated March 2, 2017, Dkt. No. 59, at 13, 16.  Further note that Judge Torres specifically found that the Republican National Convention lawsuits involved mass arrests, which is not at issue here.   Id. at 13.  Further deny that plaintiffs' counsels' correspondence at Dkt. Nos. 149, 150 constitutes evidence in this case.  Further deny that the cited video was produced in this case.

25.     In *Dinler v. City of New York,* the plaintiffs alleged that within minutes of the commencement of the march, protesters were arrested and charged with disorderly conduct, obstructing the sidewalk.   (Packard Docket #149, Page 3, *Dinler v. City of New York*, 2012WL14513352, *30.; TARU 61, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w)

**DEFENDANTS' RESPONSE:**   See Response to Statement No. 24.

26.     A lawsuit (hereinafter the "Fulton Street RNC Litigation") was filed by those arrested individuals.   (Packard Docket #150-1 #5; Packard Docket #149, Page 3, *Dinler v. City of New York*, 2012WL14513352, *7.)

**DEFENDANTS' RESPONSE:**   See Response to Statement No. 24.

27.     The City of New York defended this lawsuit, utilizing City Law Department attorneys including Peter Farrell (Packard Docket #149, Page 3, *Dinler v. City of New York*,

2012WL14513352, * 4), who is currently Deputy Chief of NYC Law Department Special Federal Litigation.  (Packard Docket # 149, Page 3, Footnote 4.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that plaintiffs' counsels' correspondence constitutes evidence in this case.

28.     Video of the incident, and other evidence of record, was available to all parties and their counsel since at least the date the cross-motions for summary judgment were fully briefed, November 23, 2011.    (Packard Docket #149, Page 3, *Dinler v. City of New York*, 2012WL14513352,*8; TARU 61, Aug. 31 2004 (produced to Defendants on 9-6-18 via email 4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that plaintiffs' counsels' correspondence constitutes evidence in this case.  Further deny that the cited video was produced in this case.

29.     Judge Richard Sullivan issued a summary judgment decision in favor of the arrested individuals, finding that there was no probable cause for these arrests.  (Packard Docket #149, Page 3, *Dinler v. City of New York*, 2012WL14513352,*39.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as, (1) the Honorable Analisa Torres specifically found that the RNC lawsuits do not plausibly support plaintiffs' Monell claim as the RNC involved mass arrests, and the instant case does not involve mass arrests.  See Decision, dated March 2, 2017, Dkt. No. 59, at 13, (2) Judge Sullivan's decision on summary judgment in Dinler, pertained to the arrests of 200 individuals on one day, at one location out of a total of 1,800 arrests over several days at eight locations during the RNC, McNamara v. City of New York, 2011 U.S. Dist. LEXIS 53829, at **9, 14 (S.D.N.Y. 2011), (3) Dinler v. City of New York, 2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sept. 30, 2012), was

issued **after the date of incident** in this litigation, and therefore, (3) any changes made by defendant pertaining to protests following the "Fulton Street RNC Litigation" would clearly have no impact on the policing of an incident on September 17, 2012.  Further deny that plaintiffs' counsel's letter to the Court constitutes evidence in this case.

30.     Judge Sullivan's decision relied in significant part on video of the incident.  (Packard Docket #149, Page 3, *Dinler v. City of New York*, 2012WL14513352,*34-35; TARU 61, Aug. 31 2004    (produced    to    Defendants    on    9-6-18    via    email    4:19pm) https://www.youtube.com/watch?v=eke2dlkAL4w.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 29.  Further deny that the cited video was produced in this case.

31.     On December 31, 2011, Occupy Wall Street protesters gathered in Zuccotti Park for New Years Eve.  (D13942; PACKARD 25178, Paragraph 19;)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

32.     After the park closed, many protesters began to march away from Zuccotti Park on the sidewalk.  (D13942; PACKARD 25178, Paragraph 20.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

33.     One group marched to the East Village of Manhattan on the sidewalk, shadowed by members of the NYPD.  (D13943; PACKARD 25179, Paragraphs 28-29.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the cited document supports the statement.

34.     When it reached the sidewalk at the corner of 11th Street and 2nd Avenue, this group was directed by members of the NYPD to turn North on Second Avenue on the East side of the sidewalk.  (Raganella Ex. 1 PLAINTIFF - PEAT - VID - 007 - 1_9824271_19508535-1a.mpg;

Raganella Ex. 1 PLAINTIFF - PEAT - VID - 002 Sarah Knuckey video - IMG_0776.MOV; PACKARD 26058, Paragraphs 4 & 5.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the cited videos were produced in this case.  Note that Raganella's deposition in this case was taken on July 12, 2018.  Further note that plaintiffs' provided defendant with a flash drive dated August 30, 2018, entitled, "plaintiff's exhibit 1," containing one main file, 3 sub files, 22 sub sub files, 21 sub sub sub files and various screen shots—all purportedly related to Raganella's deposition.  Note further that not a single of the multitude of videos and screen shots on "Raganella 1" is identified in any manner whatsoever in Raganella's deposition.  For example, there is no record in Raganella's deposition that he viewed PLAINTIFF—PEAT— VID—OO7—1_9824271_19508535-1a.mpg—or any other video.  Further note that Raganella did not view more than 50 videos and screen shots, or anything approaching that number, during his deposition.

35.     On Second Avenue near 13th Street, members of the NYPD blocked the path of the protesters and encircled them with police officers on foot, on scooters and utilizing the building line.  (Raganella Ex. 1 PLAINTIFF - PEAT - VID - 007 - 1_9824271_19508535-1a.mpg; Raganella Ex. 1 PLAINTIFF - PEAT - VID - 002 Sarah Knuckey video - IMG_0776.MOV; PACKARD 25179, Paragraphs 30-35; PACKARD 26058, Paragraph 25.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 34.

36.     According to an NYPD memorandum dated January 1, 2012, when the marchers were on Second Avenue near 13th Street, a "decision was made to effect the arrest of the protestors and terminate the march".  (D13943.)

**DEFENDANTS' RESPONSE:**  Deny and note that the quoted excerpt of a sentence from a twenty-nine paged confidential document subject to the protective order in this case wholly mischaracterizes the full sentence.  Deny further that the statement contains a material fact.

37.    Many of the protesters were arrested and issued Desk Appearance Tickets.  (PACKARD 26058-26059, Paragraphs 27-29; PACKARD 25179, Paragraphs 36 and 42; D13943, Paragraphs 7 & 8.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

38.    According to the New York County District Attorney's Office, of 61 total arrests made on January 1, 2012 at an OWS protest, there were 22 total dispositions; 7 dismissals; 1 acquittal; 8 Adjournments in Contemplation of Dismissal; 36 Declined Prosecutions; 2 warrants; and 1 consolidated case.  (PACKARD07373.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as the Honorable Analisa Torres held, in this case, that the, "Court cannot adduce that the majority of the OWS arrests were unlawful from these statistics, as the District Attorney's Office has prosecutorial discretion an may choose to dismiss or settle cases for reasons other than the lawfulness of the individual arrest."  See Decision, dated March 2, 2017, Dkt. No. 59, at 13.

39.    Fourteen individuals arrested on Second Avenue near 13th Street whose cases the District Attorney declined to prosecute then filed a lawsuit against members of the NYPD, alleging that dispersal orders issued by the NYPD failed to provide a path of egress.  (PACKARD 25174-25210; PACKARD 25179, Paragraphs 29-35.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 38.

40.     The City settled this case for 14 plaintiffs, who were each held for approximately five hours, by paying nearly six hundred thousand ($600,000) dollars.  (Packard Docket 149, page 3, Footnote 2.)

**DEFENDANTS' RESPONSE:**     Deny that the statement pertaining to unsubstantiated allegations made in an unrelated litigation contains a material fact.  Further deny that plaintiffs' counsel's letter at Dkt. No. 149 constitutes evidence in this case.  Further deny that there was any purported payment in the amount of $600,000 to the fourteen plaintiffs to settle the case.

41.     In *Allen v. City of New York,* the plaintiffs alleged that on February 3, 2002, a group of approximately 200 hundred marchers sought to protest the World Economic Forum and engage in a sidewalk protest in Manhattan.  (Packard Docket 150-2, paragraphs 31-34.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 17.

42.     In *Allen v. City of New York,* the plaintiffs alleged that the protesters stayed on the sidewalk, marched 2 abreast, and that other pedestrians were able to walk in the opposite direction on the sidewalk during the protest march.  (Packard Docket 150-2, paragraphs 36-40.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 17.

43.     The plaintiffs in *Allen v. City of New York* alleged that even though the marchers followed all of the rules and stayed on the sidewalk and did not block pedestrian traffic, virtually an entire group was arrested by executive officers including Chief Monahan.  (Packard Docket 150-2.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 17.

44.     As a rule, the City does not make changes to NYPD procedures based on press coverage, pending litigation, or legal determinations made in litigation, and it did not do so as a result of the arrest of protestors at the 2004 RNC.  (Gannon Dep. 151:5-9.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Gannon actually testified, "[w]e—the NYPD or the City doesn't really make changes based on *press releases or press inquiries*. So I don't think anything was ranged as a result of those issues."

45.     The City of New York has stated that the NYPD did not change its policies and practices with respect to filed lawsuits and settled litigation.  (Perkins Dep. 94:14-18.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.  Further deny that Perkins ever so testified.

46.     The NYPD compiles press clippings concerning complaints about NYPD policing of First Amendment protests to alert the department and not to take any action concerning the identified complaints.  (Gannon Dep. 48:23-50:9, 53:6-54:7.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony supports the statement in any way whatsoever.

47.     The City of New York does not make changes to its policing of First Amendment sidewalk protests as a result of facts alleged in settled lawsuits.  (Gannon Dep. 76:5-12.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony supports the statement.  Gannon was asked, "[d]oes the NYPD make changes *to its practices* based on the facts alleged in settled lawsuits?—make changes *to its practices* based on the facts alleged in settled lawsuits."  Gannon replied, "No."

48.     The City of New York did not know of any specific changes to how the NYPD policed sidewalk protests as a result of the arrests that resulted in the *Kunstler* litigation.  (Gannon Dep. 38:8-15.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 17.  Further deny that a sub-class of protests called, "sidewalk protests," is recognized in law.

49.    The City of New York did not know whether the NYPD policing of the sidewalk protest that resulted in the *Kunstler* litigation indicated to the City of New York that the NYPD procedures regarding policing of sidewalk protest were sufficient to comply with constitutional limits on police power.  (Gannon Dep. 39:24-40:6.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 17.  Further deny that a sub-class of protests called, "sidewalk protests," is recognized in law.

50.    The City of New York could not identify any review of the procedures utilized by the NYPD in policing the sidewalk protest that resulted in the *Kunstler* litigation.  (Gannon Dep. 40:13-17.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 17.  Further deny that a sub-class of protests called, "sidewalk protests," is recognized in law.

51.    The City of New York did not make any changes to the policing of sidewalk protest as a result of the Fulton Street RNC Litigation.  (Gannon Dep. 151:10-15.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as, (1) the Honorable Analisa Torres specifically found that the RNC lawsuits do not plausibly support plaintiffs' <u>Monell</u> claim as the RNC involved mass arrests, and the instant case does not involve mass arrests. <u>See</u> Decision, dated March 2, 2017, Dkt. No. 59, at 13, (2) Judge Sullivan's decision on summary judgment in <u>Dinler</u>, pertained to the arrests of 200 individuals on one day, at one location out of a total of 1,800 arrests over several days at eight locations during the RNC, <u>McNamara v. City of New York</u>, 2011 U.S. Dist. LEXIS 53829, at \*\*9, 14 (S.D.N.Y. 2011), (3) <u>Dinler v. City of New York</u>, 2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sept. 30, 2012), was issued ***after the date of incident*** in this litigation, and therefore, (3) any changes made by

defendant pertaining to protests following the "Fulton Street RNC Litigation" would clearly have no impact on the policing of an incident on September 17, 2012.

52.   The City of New York was unable to identify any changes made in regards to the policing of sidewalk protest as a result of legal determinations made in the Fulton Street RNC Litigation. (Gannon Dep. 151:16-20.)

**DEFENDANTS' RESPONSE:**   <u>See</u> Response to Statement No. 51.

53.   The City of New York does not believe that it exceeded the limits of constitutional power in policing of sidewalk protest during the Republican National Convention of 2004.   (Gannon Dep. 152:10-20.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact as the RNC litigation involved mass arrests, and the Honorable Analisa Torres specifically found that the instant case does not involve mass arrests.  <u>See</u> Decision, dated March 2, 2017, Dkt. No. 59, at 13.  Further deny that the cited testimony supports the statement in any event as  Gannon actually testified that he did not understand the question, and plaintiffs' counsel had the prior question read back to Gannon: "[d]id the City of New York consider the policing of sidewalk protests during the Republican National Convention in 2004 problematic."  Gannon replied, "I would say no."

54.   The City of New York did not make any changes in the way it policed sidewalk protest in the time period from the Republican National Convention until Occupy Wall Street.   (Gannon Dep. 152:21-24; 68:18-22.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.  Note that Gannon testified that there were several changes in policing following the RNC, including improvements and upgrades to the Mass Arrest Processing Center ("MAPC"), the use of photos

to keep track of officers and arrestees, the staffing of Legal Bureau attorneys at MAPC and additional Legal Bureau attorneys in the field.  Gannon Dep. 149:19-150:20.

55.     The City of New York could not identify if it had updated its lesson plans due to the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation.  (Perkins Dep. 97:4-11.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 51.  Further note that, (1) questioning pertaining the "Fulton Street RNC Litigation," as identified in plaintiffs' Exhibit D2 to plaintiffs' 30(b)(6) notice was beyond the scope of Perkins' deposition as another 30(b)(6) was provided to testify with respect to the cases/incidents/settlements listed in Plaintiffs' 30(b)(6) Deposition Notice (as revised) Exhibit D2, (2) Perkins is a designated 30(b)(6) witness with respect to training conducted at the NYPD Police Academy only and (3) Perkins is not a designated 30(b)(6) witness with respect to any other NYPD command that performs training or updates lesson plans.

56.     The City of New York could not identify any update to a lesson plan on substantial blockage of a sidewalk due to the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation.  (Perkins Dep. 98:2-9.)

**DEFENDANTS' RESPONSE:**  See Response to Statement Nos. 51 and 55.

57.     The City of New York could not identify any update to a lesson plan regarding whether a pedestrian is impeded or merely inconvenienced due to the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation.  (Perkins Dep. 98:18-99:2.)

**DEFENDANTS' RESPONSE:**  See Response to Statement Nos. 51 and 55.

58.     The City of New York did not know if it utilized the policing that led to false arrests on August 31, 2004 on Fulton Street to update curriculum, lessons or classes.  (Perkins Dep. 99:14-18.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement Nos. 51 and 55.

59.     The City of New York did not know if it had examined the summary judgment decision issued by Judge Richard Sullivan in the Fulton Street RNC Litigation to update training in curriculum, lesson or classes regarding the policing of sidewalk protest.  (Perkins Dep. 99:19-100:2.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement Nos. 51 and 55.

60.     The City could not identify any changes made to training as a result of the granting of summary judgment against it in the Fulton Street RNC Litigation.  (Perkins Dep. 97:4-11.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement Nos. 51 and 55.

61.     The City of New York could not identify any review undertaken of the NYPD's policing of the January 1, 2012 march and arrest.  (Gannon Dep. 105:22 – 106:10.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further note that this Court determined that probable cause existed for OWS arrests made on January 1, 2012. <u>See</u> <u>Gonzalez v. City of New York</u>, 2016 U.S. Dist. LEXIS 134474 (S.D.N.Y. 2016) (probable cause existed to arrest protester who marched through the streets of lower Manhattan). <u>See</u> <u>also</u>, <u>Pluma v. City of New York</u>, 2017 U.S. App. LEXIS 6096 (2d Cir. 2017) (qualified immunity shielded officers from OWS protester's claims. Further note that theses determinations demonstrate that no review of the policing of the New Year's protest was necessary.

62.     The City of New York did not know whether the policing of the sidewalk protest on January 1, 2012 complied with constitutional limits on police power.  (Gannon Dep. 106:11-14.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 61.

63.     The City of New York did not consider whether the police procedures utilized in policing sidewalk protest on January 1, 2012 needed to be reviewed based on the events of this specific sidewalk protest.  (Gannon Dep. 106:15-23.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 61.

64.     The NYPD Legal Bureau creates Legal Bureau Bulletins to inform NYPD officers on legal implications of their job based on a legal issue or court case.  (Raganella Dep. 262:9-17.)

**DEFENDANTS' RESPONSE:**  Admit.

65.     The NYPD issued a Legal Division Bulletin dated April 15, 1971 advising members of service that an arrest under the disorderly conduct statute is proper when a person refuses to move on "even though it is not shown that pedestrians . . . were obstructed."  (D019537; Vega Dep. 17:20-18:2 50:18-25; Raganella Dep. 264:7 - 266:18.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact and note, (1) that the 1971 Legal Bureau Bulletin refers to a case in which a criminal defendant was charged with disorderly conduct under PL §240.20(2)  for using obscene language or gesture in a public place and under PL §240.20(6), refusing to obey a lawful order to disperse, (2) that ***neither*** PL section has anything to do with pedestrian traffic or obstructing pedestrian traffic, and (3) that the 1971 Legal Bureau Bulletin has nothing to do with obstructing pedestrian traffic.

66.     Between April 15, 1971 and February 2017, the NYPD did not issue any Legal Division or Legal Bureau Bulletins to members of service regarding the conduct for which an arrest for obstruction of vehicular or pedestrian traffic is justified.  (Vega Dep. 17:20-18:2 50:18-25; Vega Exhibits 4 & 5; Raganella Dep. 264:7 -266:18, Raganella Exhibits 34 & 35.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

67.    The NYPD issued an updated Legal Bureau Bulletin dated February 2017 that "specifically explains the circumstances under which an officer can charge a person with . . . 'obstruction of vehicular or pedestrian traffic". (D20862.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny the implication that the NYPD did not train officers on obstructing vehicular or pedestrian traffic as the NYPD Police Student's Guide, Maintaining Public Order: Demonstrations, from *2005 through 2012* specifically includes the standards for application of PL §240.20(5).

68.    The NYPD did not create a Legal Bureau Bulletin on disorderly conduct which included *People v. Jones* until February 2017.   (Vega 17:20-18:2 50:18-25; Vega Exhibits 4 & 5; Raganella 264:7 - 266:18; Raganella Exhibits 34 & 35.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.   Further note that the NYPD Police Student's Guide, Maintaining Public Order: Demonstrations, from *2005 through 2012* specifically includes the standards for application of PL §240.20(5) as set forth in in the 2007 People v. Jones decision, which applied the standard set forth in People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly conduct statute, §722 to the current statute, §240.20(5). Further note that the NYPD Police Student's Guide, Demonstrations, from *2005 through 2012* specifically states that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.   This is not what the law means when it talks in terms of **obstruction**. Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Exs D, D1-7.

Note further that the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which references the decision in People v. Jones.  Ex. G.  Commanding Officers were directed to ensure that each member of their commands (precincts) was informed of and received command level training on this Training Memo.  Id.  Note further that the designated 30(b)(6) witness provided with respect to NYPD training on the disorderly conduct statute, Heather Perkins, testified that the NYPD Police Academy specifically trained on PL §240.20(5)— including the "substantial blockage" and "mere inconvenience" standards.  Ex. N, Perkins Dep. 49:18-50:18; 158:17-159:24.

69.     The NYPD maintained a three-page document explaining what conduct justifies an arrest for Resisting Arrest.  (DD006065-667.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as none of the putative class representatives was charged with resisting arrest.

70.     The City is unaware that the NYCLU wrote a letter dated October 20, 2011 to NYPD Commissioner Ray Kelly regarding policing of the Bronx Incident.  (Raganella Dep. 43:11-22.)

**DEFENDANTS' RESPONSE:**  Deny and note that, (1) the City is so aware as it produced the letter and the Commissioner's response to the letter, (2) Raganella is not a 30(b)(6) witness with respect to correspondence received by Commissioner Kelly, and (3) defendant provided a 30(b)(6) witness pertaining to the so-called Bronx incident identified in plaintiffs' Exhibit D2 to plaintiffs' 30(b)(6) notice, who was not Raganella.

71.     The City of New York is unaware of any actions taken by the NYPD in response to State Senator Liz Krueger's letter dated December 13, 2011 regarding the policing of the Bronx Incident.  (Gannon Dep. 186:15-23.)

**DEFENDANTS' RESPONSE:**  Deny and note that the City is aware of the actions taken by the NYPD in response to Senator Krueger's letter as it produced the letter and the Commissioner's response to the letter (D15187-15195) and the entire Internal Affairs Bureau investigation files pertaining to the so-called incident with accompanying report (D21424-21484).

72.    The City of New York is unaware of any actions taken by the NYPD in response to City Council Member Jessica Lapin's letter dated January 19, 2012 regarding the policing of the Bronx Incident.  (Gannon Dep. 185-186.)

**DEFENDANTS' RESPONSE:**  Deny and note that the City is aware of the actions taken by the NYPD in response to Council Member Lappin's letter as it produced the letter and the entire Internal Affairs Bureau investigation files pertaining to the so-called incident with accompanying report (D21424-21484).

73.    The NYPD Disorder Control Unit (hereinafter "DCU") updated no training on the basis of the matters raised in, or in response to, City Council Member Jessica Lapin's letter regarding the policing of the Bronx Incident.  (Raganella Dep. 47:22-24.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as the NYPD Disorder Control Unit ("DCU"), which consisted of a handful of officers at the time of OWS, (Ex. P, Vega Dep., 145:6-9) was not tasked with providing any training on any matter raised in Lappin's letter.  Further note, that the DCU's  primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.  Further note that no member of the DCU gave any orders to arrest

during OWS, and no member of the DCU made any arrests during OWS.  Ex. P, Vega Dep., 165:16-166:4.

74.    DCU updated no training on the basis of the matters raised in, or in response to, State Senator Liz Krueger's letter regarding the policing of the Bronx Incident.  (Raganella Dep. 47:22-24.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 73.

75.    The City testified that the Bronx Incident arrests of sidewalk protestors were within the constitutional limits on policing of First Amendment sidewalk protests.  (Gannon 103:18-104:4.)

**DEFENDANTS' RESPONSE:**  Admit but deny that the statement contains a material fact.

76.    The City testified that the Bronx Incident arrest of sidewalk protestors on a clear sidewalk where there was no blockage of pedestrian traffic were within the limits constitutional limits on policing of First Amendment sidewalk protests despite the fact that the City could not identify any pedestrian blockage.  (Gannon Dep. 102:4-6.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement, and in fact deny that the testimony exists.

77.    The City could not identify within a twelve-minute video of the incident any pedestrian blockage during the Bronx Incident and acknowledges that pedestrian blockage is necessary to justify a disorderly conduct arrest for obstructing pedestrian traffic.  (Gannon Dep. 102:24-103:12.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement. Further deny that there is any evidence in the record that Gannon viewed a twelve-minute video or that Gannon viewed any portion of the cited video at all.

78.     The City testified that an investigation of the Bronx Incident did not determine "whether there was probable cause or not" for arrests at the Bronx Incident.  (Gannon Dep. 101:7-14.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Note that the incident in question—entirely related to the instant case—was one in which a handful of protesters, who set up tables and chairs on a sidewalk in the Bronx, received C-summonses for disorderly conduct for blocking pedestrian traffic.  Note further that in response to the letters from Lappin and Krueger regarding this incident, the NYPD Police Commissioner referred the matter to the Internal Affairs Bureau, Special Investigations Unit, for investigation of possible misconduct.  The investigation into this incident involved the investigative work of one Deputy Chief, one Inspector, one Deputy Inspector, six detectives and one sergeant in the Internal Affairs Bureau.  Note further that the investigation also required that four officers who were present on the date of the "Bronx Incident" were all formally interviewed and were required to hire legal counsel for these interviews pertaining to the incident.   The twelve-person IAB investigation team reviewed video of the incident, the memo book entries of the officers, paperwork involved in issuing the summonses, the disciplinary histories of all of the officers involved, interviews of the officers involved with their legal representation, conferral with the Bronx precinct Integrity Control Officer, conferral with the Bronx precinct Assistant Integrity Control Officer and conferral with the clerk of the Bronx Criminal Court.  During their formal interviews, three officers stated that they observed protesters with tables and chairs set up on the sidewalk, and they were given warnings, which the protesters ignored. The investigation concluded that the allegation of misconduct pertaining to this incident was unsubstantiated.

79.     Deputy Inspector Raganella, the head of DCU, testified in regard to the Bronx Incident that "there was no need to move those people under the circumstances of the few minutes that I saw there."  (Raganella Dep. 26:21-24.)

**DEFENDANTS' RESPONSE:**     Deny and note that the quoted testimony is a mischaracterization of Raganella's overall testimony in which he testified over and over again, that he only saw a "small snippet of video," he did not see what happened before the video began recording, "I don't know what [the Captain] saw and observed prior to the video starting,"  "I wasn't there.   I didn't see what they were speaking of or how it was actually occurring." Raganella Dep. 22:15-25:9.    Object to the purported video on the grounds that there is no evidence of the video viewed by Raganella as the record simply notes, "[w]hereupon, the witness was shown a video."  Raganella Dep., 21:4-19.  Further note that Raganella's deposition in this case was taken on July 12, 2018, and a flash drive dated August 30, 2018, was provided to defendant entitled, "plaintiff's exhibit 1" to Raganella's deposition containing one main file, 3 sub files, 22 sub sub files, 21 sub sub sub files and multiple screen shots.  Note further that not a single one of the multitude of videos or screen shots on plaintiffs' exhibit 1 to Raganella's deposition is identified in any manner whatsoever in Raganella's deposition.  Further note that Raganella did not view more than 50 videos and screen shots, or anything approaching that number, during his deposition.

80.     Deputy Inspector Raganella, the head of DCU, testified in regard to the Bronx Incident that "From what I saw on the video, no, [conduct of the police] does not comport with the training."  (Raganella Dep. 27:6-7.)

**DEFENDANTS' RESPONSE:** See Response to Statement No. 79.

81.    The City of New York could not identify any changes made by Defendant in policing or procedures used in policing sidewalk protests in response to the multi-plaintiff class action and two million dollar settlement arising out of the 2003 Kunstler arrests.  (Gannon Dep. 39:24 – 40:46.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 17.

82.    The NYPD did not update its training based on the allegations or the $2 million settlement in the Kunstler litigation.  (Perkins Dep. 88:3-7; 89:3-8.)

**DEFENDANTS' RESPONSE:**   See Response to Statement No. 17. Further note that, (1) questioning pertaining the Kunstler litigation as identified in plaintiffs' Exhibit D2 to plaintiffs' 30(b)(6) notice is beyond the scope of Perkins' deposition as another 30(b)(6) was provided to testify with respect to the cases/incidents/settlements listed in   Exhibit D2, (2) Perkins is a designated 30(b)(6) witness with respect to training conducted at the NYPD Police Academy only and (3) Perkins is not a designated 30(b)(6) witness with respect to any other NYPD command.

83.    The City of New York could not identify any changes the NYPD made in its policing of First Amendment sidewalk protests as a result of arrests made on January 1, 2012.  (Gannon Dep. 105:22-106:4.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact.

84.    The City of New York could not identify any changes the NYPD made in its use of the subsection of the disorderly conduct statute dealing with obstruction of pedestrian traffic in its policing of First Amendment sidewalk protests as a result of the rule announced in the New York State Court of Appeals decision in *People v. Jones*.  (Gannon Dep. 41:3-42.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 68.

85.     An NYPD memo dated December 2007 and entitled "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct" (hereinafter the "Jones Memo") describes the facts of the case and the rule announced in the New York State Court of Appeals decision in *People v. Jones*.  (D025777-778.)

**DEFENDANTS' RESPONSE:**  Admit but note that the People v. Jones decision, applies the standard, which was set forth in People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly conduct statute, §722, to the statute now found at §240.20(5).  Further note that the NYPD Police Student's Guide, Demonstrations, from ***2005 through 2012*** specifically states that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.  This is not what the law means when it talks in terms of **obstruction**.  Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.  The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Exs. D, D1-7.

86.     The Jones memo states that: "Under this decision . . . not only must the defendant's conduct result in a **substantial** obstruction of pedestrian or vehicular movement, defendant must have either intended to create the obstruction or be aware of the condition his behavior is causing and refuse to change his behavior."  (D257778, emphasis in original.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 85.

87.     The City testified that a court's decision on constitutional issues "restricts or permits our action as police officers based on what the court decides."  (Perkins Dep. 41:21-42:3.)

**DEFENDANTS' RESPONSE:**  Admit.

88.     The City testified that "You can never train enough", in part because laws change and those changes need to be reflected in updated training.  (Raganella Dep. 112:16-113:6.)

**DEFENDANTS' RESPONSE:**   Admit only that Raganella testified, "you can never train enough."

89.     The Jones Memo was not incorporated into Academy training.   (Perkins Dep. 50:2-5; 51:6-14.)

**DEFENDANTS' RESPONSE:**   Deny and note that the NYPD Police Student's Guide, Maintaining Public Order: Demonstrations, from *2005 through 2012* specifically includes the training on the standards for application of PL §240.20(5) as set forth in in the 2007 People v. Jones decision, which applies the standards that were originally set forth in People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly conduct statute, §722 to the statute found at §240.20(5).    Further note that the NYPD Police Student's Guide, Demonstrations, from *2005 through 2012* specifically states that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.  This is not what the law means when it talks in terms of **obstruction**. Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.  The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Exs D, D1-7.

Note further that the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which references the decision in People v. Jones.  Ex. G.  Commanding Officers were directed to ensure that each member of their commands (precincts) was informed of and received command level training on this Training Memo.  Id.  Note further that the designated 30(b)(6)

witness provided with respect to NYPD training on the disorderly conduct statute, Heather Perkins, testified that the NYPD Police Academy specifically trains on PL §240.20(5)—including the "substantial blockage" and "mere inconvenience" standards.  Ex. N, Perkins Dep. 49:18-50:18; 158:17-159:24.

90.    The NYPD did not update any lesson plans or other training materials with the information contained in the Jones Memo.  (Perkins Dep. 53:11-15.)

**DEFENDANTS' RESPONSE:**  Deny.  See Response to Statement No. 89.

91.    A September 30, 2009 memo (hereinafter "Schwach Memo") from Lt. Robert Schwach, the "Commanding Officer, Disorder Control Unit", entitled "Proposal For Borough Task Force Training" proposed "a two-day disorder control training course" after four members of service from DCU attended a course given by the Department of Homeland Security.  (D25605-608.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact.  Further note that the course attended by members of the DCU was entitled, "Managing Civil Actions in Threat Incidents."  Further note that Schwach recommended a 16-hour training course to include a 45-minute lecture on "Legalities of Civil Disorder."

92.    The Schwach Memo included sessions on "Legalities of Civil Disorder" to include, among other things, "[a] review of the first amendment, disorderly conduct, riot, etc., and review of arrest warnings and proper legal procedures at protests."  ((D004757.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact and note that Memo referenced one, 45 minute lecture on the "Legalities of Civil Disorder," out of a total of 16 hours of DCU training—not "sessions."

93.    In 2000, Lt. Robert Schwach prepared a lesson plan on "Legalities at protest/demonstrations."  (D004307.)

**DEFENDANTS' RESPONSE:**  Admit that Schwach prepared a lesson plain on "Legalities at protests/demonstrations," and not a lesson plan called "Legalities of Civil Disorder."

94.     The Instructor's Guide for the training on "Legalities at protest/demonstrations" prepared by Lt. Robert Schwach included a "Learning Outcome" stating "The rights of free speech and assembly as they pertain to current NYPD polices."  (D029994.)

**DEFENDANTS' RESPONSE:**  Admit that the document states this in part.

95.     The Schwach Memo was not approved and not implemented.  (Vega Dep. 80:21-81:12.)

**DEFENDANTS' RESPONSE:**  Admit only that the memo was not approved in 2000.

96.     The training session on the Legalities of Civil Disorder as recommended in the Schwach Memo was not taught.  (Vega Dep. 84:13-21.)

**DEFENDANTS' RESPONSE:**  Deny and note that the Commanding Officer of the Disorder Control Unit testified that training was given in 2011 on the constitutional rights of protesters pursuant to the Lesson Plan, Legalities at Demonstrations.  Raganella 279:7-25.

97.     The NYPD made no "specific updates to training between August 2010 and September 17th of 2012."  (Raganella Dep. 30:5-7.)

**DEFENDANTS' RESPONSE:**  Deny that cited testimony supports the statement and further deny that Raganella is a designated 30(b)(6) witness with respect to any training or updates to training performed outside of the NYPD Disorder Control Unit.  Note further that Raganella is not a designated 30(b)(6) witness with respect to any other NYPD command, such as the NYPD Police Academy or the many other divisions within the NYPD, that provide training, so he cannot and did not testify as to training and updates to training by the entire NYPD.

98.     The NYPD made no updates to training concerning First Amendment sidewalk protestors' right to free assembly or free speech between August 2010 and September 17th of 2012.  (Raganella Dep. 30:9-12.)

**DEFENDANTS' RESPONSE:**  Deny that cited testimony supports the statement and further deny that Raganella is a designated 30(b)(6) witness with respect to any training or updates to training performed outside of the NYPD Disorder Control Unit.  Note further that Raganella is not a designated 30(b)(6) witness with respect to any other NYPD command, such as the NYPD Police Academy or the many other divisions within the NYPD that provide training, so he cannot and did not testify as to training and updates to training by the entire NYPD.  Further deny that "sidewalk protesters" are a special category of protesters recognized under the law.

99.     The City of New York did not conclude as a result of arrests of protestors demonstrating against the Republican National Convention on August 31, 2004 on Fulton Street that any procedures used by NYPD in policing First Amendment sidewalk protests needed to be reviewed.  (Gannon Dep. 77:25-78:7.)

**DEFENDANTS' RESPONSE:**  Deny as the Honorable Analisa Torres specifically found that the RNC involved mass arrests, and the instant case does not involve mass arrests.  See Decision, dated March 2, 2017, Dkt. No. 59, at 13.  Further note that 30(b)(6) witness Lt. Gannon testified that there were several changes in policing as a result of the RNC, including improvements and upgrades to the Mass Arrest Processing Center ("MAPC"), the use of photos to keep track of officers and arrestees, the staffing of Legal Bureau attorneys at MAPC and additional Legal Bureau attorneys in the field.  Gannon Dep. 149:19-150:20.

100.    The City is not aware of any incidents or of anything else from September 2011 to August 2012 that caused it to update or modify any lesson plan regarding the balance of mere inconvenience of pedestrians versus a full impedance of pedestrians.  (Raganella 217:7-13.)

**DEFENDANTS' RESPONSE:**  Deny that cited testimony supports the statement and further deny that Raganella is a designated 30(b)(6) witness with respect to any training performed or lesson plans created outside of the NYPD Disorder Control Unit.  Note further that Raganella is not a designated 30(b)(6) witness with respect to any other NYPD command, such as the NYPD Police Academy, or the many other divisions within the NYPD that provide training, so he cannot and did not testify as to the City's awareness of updates or modifications to lesson plans by any unit other that the DCU.   Further note that the NYPD Police Student's Guide, Maintaining Public Order: Demonstrations, from ***2005 through 2012*** specifically stated that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.   This is not what the law means when it talks in terms of **obstruction**. Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).        D27828,      D17678,      D17749,      D17310,      D27542,      D28285.

101.    The City is not aware of any incidents or of anything else from September 2011 to August 2012 that caused it to update or modify any lesson plan regarding the clear and present danger standard.  (Raganella 217:17-24.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the cited testimony supports the statement as Raganella is a designated 30(b)(6) witness only with respect to the NYPD Disorder Control Unit; Raganella is not a designated 30(b)(6) witness

- 31 -

with respect to any other NYPD command, such as the NYPD Training Academy. Thus, note further that Raganella the City's awareness of any update or modification of any lesson plan outside of the DCU was beyond the scope of Raganella's deposition.

102.    The City is not aware of any incidents or of anything else from September 2011 to August 2012 that caused it to update or modify any lesson plan regarding the requirement that a means of egress be provided to First Amendment sidewalk protestors who are subject to a dispersal order.  (Raganella 218:9-17.)

**DEFENDANTS' RESPONSE:** <u>See</u> Response to Statement No. 101.

103.    The City of New York could not identify any changes to its policing of First Amendment sidewalk protests as a result of the dismissal of charges on 92% of arrests of protestors made on September 24, 2011.  (Gannon Dep. 93:14 – 19.)

**DEFENDANTS' RESPONSE:**  Deny that the statement is a material fact.  Further deny that plaintiffs' version of the statistics for September 24, 2011, required the NYPD to change its policing of First Amendment sidewalk protests as none of these arrests have been determined to be unlawful.  Note further, as held by the Honorable Analisa Torres in this case, this Court cannot deduce that the majority of the OWS arrests were unlawful, because the vast majority of cases were dismissed or resolved via an ACD—"as the District Attorney's Office has prosecutorial discretion and may choose to dismiss or settle cases for reasons other than the unlawfulness of the individual arrest."  <u>See</u> Decision, dated March 2, 2017, Dkt. No. 59, at 13, 16.  Note further that plaintiffs' alleged percentage includes adjournments in contemplation of dismissal.  Note further that an adjournment in contemplation of dismissal leaves open the question of the accused's guilt. <u>See</u> <u>Singleton v. City of New York</u>, 632 F.2d 185, 193 (2d Cir. 1980) ("Proceedings are terminated in favor of the accused only when their final disposition is

such as to indicate the accused is not guilty. An adjournment in contemplation of dismissal, like a consent decree, involves the consent of both the prosecution and the accused and leaves open the question of the accused's guilt.") (internal citations and quotation marks omitted).

104.    The City of New York is unaware of any actions taken by the NYPD in response to the Suppressing Protest Report bringing to its attention constitutional violations in its policing of First Amendment sidewalk protests.  (Gannon Dep. 186:24-187:23.)

**DEFENDANTS' RESPONSE:**   Deny that this statement, which pertains to alleged and unsubstantiated "constitutional violations," contains a material fact. Further deny that the cited testimony supports the statement and note that Gannon actually testified that, [t]he NYPD wouldn't make any changes based on a—policy changes based on a report such as that."

105.    The NYPD did not update its training based on the allegations in multiple litigations arising out of the policing of the 2004 RNC, or the $18 million in settlements of those litigations, because it does not update training based on settled of filed lawsuits.  (Perkins Dep. 93:22-95:3.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.  Further deny that the cited testimony supports the statement as questioning pertaining to allegations in the RNC lawsuits as identified in plaintiffs' Exhibit D2 to plaintiffs' 30(b)(6) notice is beyond the scope of Perkins' deposition as another 30(b)(6) was provided to testify with respect to the cases/incidents/settlements listed in Exhibit D2.  Further note, that as held by the Honorable Analisa Torres in this case, "the lawsuits [cited by plaintiffs] do not plausibly support plaintiffs' *Monell* claim…the Court is unable to rely on plaintiffs' citations to similar lawsuits…"  See Decision, dated March 2, 2017, Dkt. No. 59, at 13, 16.  Further note that the Honorable Analisa Torres specifically found that the RNC involved mass arrests, and the instant case does not involve mass arrests.  See Decision, dated March 2, 2017, Dkt. No. 59, at 13.

106.   All changes made by the NYPD to its procedures in response to multiple litigations arising from the policing of the 2004 RNC related to the processing of arrestees after arrest, not to procedures or standards used to decide whether to arrest.  (Gannon Dep. 149:11-150:25.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact as, (1) the Honorable Analisa Torres specifically found that the RNC lawsuits do not plausibly support plaintiffs' Monell claim as the RNC involved mass arrests, and the instant case does not involve mass arrests.  See Decision, dated March 2, 2017, Dkt. No. 59, at 13, (2) Judge Sullivan's decision on summary judgment in Dinler, pertained only to the arrests of 200 individuals on one day, at one location out of a total of 1,800 arrests over several days at eight locations during the RNC, McNamara v. City of New York, 2011 U.S. Dist. LEXIS 53829, at **9, 14 (S.D.N.Y. 2011), (3) Dinler v. City of New York, 2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sept. 30, 2012), was issued ***after the date of incident*** in this litigation, and therefore, (4) any changes made by defendant pertaining to protests following the "Fulton Street RNC Litigation" would clearly have no impact on the policing of an incident on September 17, 2012.

107.   The City testified that it is not important for the Police Academy to know about complaints lodged against policing at protests.  (Perkins Dep. 125:9-12.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.

108.   The Legal Bureau provided training in preparation for 2004 RNC Convention.  (Vega Dep. 108:6-110:16.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.

109.   The 2004 RNC Legal Bureau Training included training on First Amendment standards (Vega Dep. 108:13-15).

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.

- 34 -

110.    The 2004 RNC Legal Bureau Training included training on protestor conduct necessary to make a disorderly conduct arrest (Vega Dep. 107:11-13; 108:2-4.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

111.    The 2004 RNC Legal Bureau Training included training on the constitutional policing of sidewalk protests (Vega Dep. 110:13-16.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the cited testimony supports the statement as Vega was asked, "[y]ou were trained in 2004 in these field tactics, as well as disorderly control and sidewalk protest issues; correct."  Vega replied, "[y]es."

112.    The "Instructor Assessment Guide" for "RNC Role-Play" stated that a dispersal order must be given "[b]efore arresting a protestor for impeding pedestrian" traffic.  (D20972.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the statement contains a material fact.

113.    Training regarding impeding pedestrian traffic during protests that was provided in preparation for the NYPD's policing the RNC was not provided any time after 2004.  (Perkins Dep. 76:1- 77:9.)

**DEFENDANTS' RESPONSE:**   Deny and note that plaintiffs are attempting to mischaracterize Perkins' testimony.  When asked if the information provided at the RNC trainings concerning impeding pedestrian traffic at protests was incorporated into any lesson plans, Perkins testified that the information is included in the lesson plans and student materials for all recruits.  Perkins Dep. 76:19-77:7.  Further note NYPD Police Student's Guide, Demonstrations, from ***2005 through 2012*** specifically stated that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.  This is not what the law means when it talks in terms of **obstruction**.

Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.  The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  D17678, D17749, D17310, D27542.

114.    In preparation for the RNC, the NYPD trained both executive and non-executive level officers on the requirements of providing an alternative avenue of protest as part of a dispersal order.  (Vega 112:17 - 114:11.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the cited testimony supports the statement as there is zero mention of executive or non-executive level training, and there is zero mention of dispersal orders in the cited testimony.  Further note that Vega specifically testified that the DCU does not train on alternative avenues of protest (Vega Dep., 113:23-114:2).  Further note that Vega is a designated 30(b)(6) witness pertaining to training conducted at the Disorder Control Unit only, and therefore cannot and did not testify on behalf of the City or the NYPD with respect to training conducted by any other NYPD command, such as the NYPD Police Academy.  Further note that the Disorder Control Unit does not train provide training on the contents of dispersal orders.  Vega Dep. 112:14-114:2; Raganella Dep. 185:9-186:5.

115.    This training did not occur in 2011 at any time prior to Occupy Wall Street after the RNC training.  (Vega 112:17 - 114:11.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Note that Vega is a designated 30(b)(6) witness pertaining to training conducted at the Disorder Control Unit only, and therefore cannot and did not testify on behalf of the City or the NYPD with respect to training conducted by any other NYPD command, such as the NYPD Police Academy. Further note that the DCU, which consisted of a handful of officers at the time of OWS, (Ex. P,

Vega Dep., 145:6-9) was not tasked with providing training on the contents of dispersal orders. Further note, that the DCU's primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16). Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray. Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15. Further note that no member of the DCU gave any orders to arrest during OWS, and no member of the DCU made any arrests during OWS. Ex. P, Vega Dep., 165:16-166:4

116.    The NYPD used "Legal Guidelines for the Republican National Convention" to provide that training. (D015270-D015310; D032133- D032155.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Deny that the DCU was ever tasked with training officers using the RNC Legal Guidelines.

117.    The NYPD did not incorporate training regarding First Amendment protest activity and sidewalk protest standards into any training delivered after the RNC. (Perkins Dep. 76:1-77:9; Vega Dep. 110:6 – 111:13.).

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement. Note that the NYPD thoroughly trained its officers on the United States Constitution, including the First Amendment and on the standards for application of the disorderly conduct statute. Exhibits A, A1-5 contain the NYPD Police Academy Police Student's Guide, Introduction to Law and Justice chapter, for the years 2007-2012, which shows, *inter alia,* the thorough training that officers received on the Constitution, including the First Amendment. Exhibits B, B1-5 contain the NYPD Police Academy Introduction to Law and Justice Lesson

Plans for the years 2007-2012, which further demonstrates that officers were trained on the

Constitution, including the First Amendment.   Exhibits D, D1-7 contain the NYPD Police

Academy Police Student's Guide, Demonstrations, for the years 2005-2012.   Note further that

the NYPD Police Student's Guide, Demonstrations, from *2005 through 2012* specifically trains

on the application of PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more
> persons use public areas to communicate their views.   Even a lone individual handing out
> political or religious leaflets, something that is clearly legal, may be blocking the passage
> of others.   This is not what the law means when it talks in terms of **obstruction**.
> Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere
> inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law
> §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian
> traffic **with intent to cause public inconvenience, annoyance or alarm**.   (Emphasis in
> original). Exs. D, D1-7.

Exhibits E, E1-5 contain the NYPD Police Academy Police Student's Guide, Demonstrations

Lesson Plans, for the years 2007-2012, which further demonstrates the thorough training officers

received on the disorderly conduct statute.   The lesson plans show that officers' training included

lecture, question and answer, group discussion.   The lesson plans further show that officers were

evaluated by quiz on their comprehension of the contents of the lesson plans and further shows

that the materials provided during training included the Police Student's Guide, the Penal Law

and a PowerPoint presentation.   Exhibit G contains the NYPD Police Academy Training Memo,

2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct."

Note further that Commanding Officers were directed to ensure that each member of their

commands (precincts) was informed of and received training on this Training Memo.   Id.

118.    The NYPD did not incorporate training regarding First Amendment protest activity and

sidewalk protest standards into training delivered in preparation for OWS.   (Perkins Dep. 76:1-

77:9; Vega Dep. 110:6 – 111:13.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 117.

119.    In 2007, the U.S. Department of Justice requested that the NYPD allow it to incorporate "Legal Guidelines for the Republican National Convention" in a training that the U.S. DOJ developed regarding managing security at major events.  (D015268.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

120.    The NYPD's "Command Officer, Office of Management and Planning" recommended that the U.S. DOJ request be granted in part because it "it will showcase our efforts at "Best Practices."."  (D015269.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

121.    The RNC Guidelines instructed that carrying signs at a demonstration is protected First Amendment activity.  (Raganella Dep. 293:16-294:4.)

**DEFENDANTS' RESPONSE:**  Deny that cited testimony supports the statement as Raganella was reading aloud from a document and not testifying.  Further deny that the statement contains a material fact.

122.    DCU issued no such instruction in preparation for OWS.  (Raganella Dep. 294:4-7.)

**DEFENDANTS' RESPONSE:**    Deny that the cited testimony supports the statement whatsoever as Raganella was asked if the contents of a sentence he was asked to read aloud was taught at disorder control to which he answered, "I don't recall."  Further deny that the record shows that Disorder Control Unit gave any instruction pertaining to carrying signs at a demonstration prior to the RNC demonstrations.  Further deny that the record shows that the Disorder Control Unit has ever been tasked with instructing officer on carrying signs.  Further note that the record shows that the DCU's  primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega

Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.

123.    The DCU is "a paramilitary organization, and some of the training and maneuvers that we use are based on military maneuvers that the armed services use."  (Raganella Dep. 127:21-25.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Raganella never testified that NYPD Disorder Control Unit is a paramilitary organization.

124.    DCU training is designed to deal with "confrontations with raucous crowds that developed into riots."  (Purtell Dep. 167:20-21)

**DEFENDANTS' RESPONSE:**  Deny that the testimony supports the statement as Purtell, who is a non-party and non-30(b)(6) witness testified that the Disorder Control Unit in the ***early 1990s*** came out of—out of confrontations with raucous crowds that developed into riots.

125.    The primary goal of DCU training for policing of demonstrations is to maintain order. (Raganella Dep. Exh. 5.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement and note the following testimony given by Raganella:

> Q. And you teach that the primary police role at demonstrations is to maintain order and prevent delays to non-demonstrators?
> A. That is not what we teach.
> Q. What do you teach?
> A. The primary role at any police event is to protect life.
> Q. Okay. So, do you agree or disagree that the primary police role at demonstrations is to maintain order and prevent delays to non-demonstrators?
> A. I would disagree with that. Ex. O, Raganella Dep. 167:3-15.

126.   DCU training material states that a "mass arrest" situation is one in which demonstrators want to be arrested and are passive.  (D00437.)

**DEFENDANTS' RESPONSE:**  Deny that that this statement is in any way made on the cited page of a confidential document subject to the protective order in this case.

127.   DCU training material states that civil disorder is a "riotous situation.  (D00437.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 126.

128.   DCU training material for "dealing with demonstrations and disorders" instructs that "Team approach intimidates a crowd and reduces the need for force."  (D004380.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Note that the cited document is a confidential document subject to the protective order in this case.

129.   DCU training material does not distinguish between tactics needed to deal with demonstrations and disorders.  (D004380.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited page of a confidential document subject to the protective order in this case supports the statement.

130.   The City of New York testified that "95 percent of protests history has shown do not become riotous, do not become dangerous."  (Vega Dep. 153:15-23.)

**DEFENDANTS' RESPONSE:**  Deny that that this statement contains a material fact.

131.   The City of New York testified that when DCU conducts training "we get them ready for what could be the worst thing. But we remind them that the stats say between 95, 99 percent of the time, every protest nothing happens. We're getting you ready for that one to five percent in case something happens."  (Vega Dep. 93:20-94:2.)

**DEFENDANTS' RESPONSE:**  Deny that that this statement contains a material fact.

132.    DCU teaches that "All crowds can grow from Peaceful to Violent Dependent on Internal or external stimulus."  (D003981.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that a single page of a 2001 confidential document subject to the protective order in this case contains training which was in effect in 2012.  Further deny that the statement contains a material fact.

133.    A DCU training slide entitled "Demonstrator Tactics" shows a picture of rioters. (D004024.)

**DEFENDANTS' RESPONSE:**  Deny that the single page of a confidential document subject to the protective order in this case supports the statement or contains a material fact.

134.    A DCU training slide states that "Disorders are by nature military engagements" and that "Tactics to control disorders are copied from the military."  (D004224.)

**DEFENDANTS' RESPONSE:**   Deny that the statement pertaining to civil disorders (not demonstrations) contained in a confidential document subject to the protective order is this case is a material fact.  Further deny that the demonstrations on September 17, 2012, were civil disorders.

135.    DCU does not do any instruction on probable cause.  (Vega Dep. 69:17-22.)

**DEFENDANTS' RESPONSE:**   Admit that the Disorder Control Unit is not tasked with providing training on probable cause.  Note that the NYPD Police Academy, which is so tasked, provides extensive training on the standards for probable cause and the principles of the Fourth Amendment.   Perkins Dep. 157:7-158:11. Further note, that the DCU's  primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident

command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.   Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.  Further note that no member of the DCU gave any orders to arrest during OWS, and no member of the DCU made any arrests during OWS.  Ex. P, Vega Dep., 165:16-166:4.

136.    For policing large groups, DCU teaches a "Disperse & Demoralize" strategy.  (Raganella Dep. 153:21-154:11; D003900; D003992.)

**DEFENDANTS' RESPONSE:**  Deny and note that the statement is a mischaracterization of Raganella's overall testimony in which Raganella actually testified that "demoralizing" a crowd does not apply to protest groups engaged in First Amendment activity—***it refers only to riots***. Raganella Dep. 157:19-158:6.  Further note that approximately 95 percent of actions are demonstrations and 5 percent are disorders/riots.  Ex. P, Vega Dep., 158:3-18.

137.    The DCU lesson plan for the "Disperse & Demoralize" strategy does not state that the strategy is inapplicable to the policing of First Amendment sidewalk protests.  The City testified that is not necessary because DCU instructors "understand that inherently."  (Raganella Dep. 157:9-22.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 136.

138.    DCU trains officers to police demonstrations by using a strategy that "intimidates a crowd and reduces the need for force."  (Vega Dep. 159:19-160:2.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact.

139.    A DCU memo dated August 29, 2011 entitled "Submission of Disorder Control Lesson Plans" lists 17 lesson plans.  It includes Lesson Plans on, among other things: "Civil Disorder"; "Rapid Mobilization"; "Containing the Event – Barrier Plans"; "Use of Protective Shields"; "Gas

Mask Deployment"; "Looting Scenario Training"; "Man Portable Air Defense Systems"; and "Incident Command Post Setup and Operations".  (D025550.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact.

140.    In 2002, the NYPD policed a protest related to the World Economic Forum.  (Packard Docket 150-5.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contained in what appears to be a 2002 NYPD law enforcement privileged document contains a material fact.  Further deny that either plaintiffs' counsel's letter or any of the attachments thereto at Docket No. 150 constitute evidence in this case.

141.    Inspector Thomas Graham, an executive officer of the NYPD, wrote an after action report regarding policing of the World Economic Forum entitled, "After Action Report on World Economic Forum Meetings and Demonstrations."  (Packard Docket 150-5.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 140.

142.    Within this memorandum, the NYPD stated that the staging of large amounts of personnel and equipment that was observed by protesters was a deterrent.  (Packard Docket 150-5, page 3 of 7.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 140.

143.    Within this memorandum, the NYPD stated that the wearing of disorder helmets proved to be a deterrent to confrontation.  (Packard Docket 150-5, page 4 of 7.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 140.

144.    Within this memorandum, the NYPD stated that arrests made at West 59th Street set a "tone" with the demonstrators and their possible plans at other demonstrations.  (Packard Docket 150-5, page 4 of 7.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 140.

145.    Among the recommendations in this memorandum was to use undercover officers to distribute misinformation to the crowds.  (Packard Docket 150-5, page 6 of 7.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 140.

146.    The City testified that the following subjects are "relevant training subjects":  "Policing public assemblies, marches or demonstrations"; "The constitutional right of individuals and/or groups to protest on streets or sidewalks"; "Arresting protestors engaged in first amendment speech"; "Arresting protestors"; "First amendment principles as they concern policing public assemblies, demonstrations, or protests"; "Application of the disorderly conduct statute in the context of the first and fourth amendment rights of protestors"; "Application of the obstruction of governmental administration statute in the context of the first and fourth amendment rights of protestors".  (hereinafter the "Relevant Training Subjects") (Perkins Dep. 11:18-12:3; Perkins Dep. Exh. 1 at p. 2.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports this statement.  Note that neither the "City" nor Perkins testified that the contents of Statement No. 146 were "relevant training subjects."   Further note that plaintiffs listed the contents of Statement No. 146 as "relevant training subjects" in their 30(b)(6) notice, and Perkins testified that she was prepared to testify as to these enumerated subjects.

147.    The City's 30(b)(6) witness was ready to testify about the Relevant Training Subjects. (Perkins Dep. 13:19-23; Perkins Dep. Exh. 1 at p. 2.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

148.    The NYPD Police Academy City provides no post-Academy training to NYPD members of service in any of the Relevant Training Subjects.  (Perkins Dep. 128:19-25.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement as Perkins actually testified that the NYPD Police Academy does not provide a refresher course on the "relevant training subjects."   Note that the NYPD Police Academy provided training in its December 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which was sent out to all commands (precincts) for command level training by either a member of the specialized training section or a member of the Legal Bureau who presented it to all of the members of service. Perkins Dep. 50:2-51:5

149.    Command level training is training delivered at roll call by "training sergeants [who] take it out to the commands."  (Perkins Dep. 50:8-18; 55:9-11.)

**DEFENDANTS' RESPONSE:**  Admit only that in the cited testimony Perkins testified that the December 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," was sent out to all commands for command level training by either a member of the specialized training section or a member of the Legal Bureau who presented it to the group at roll call training, and that the memo stands.  Perkins Dep. 50:2-51:5.

150.    The NYPD's Training Course Catalogue "is "a catalogue of all of the active lesson plans that -- all of the active courses that can be taught by the department" and was in effect during Occupy Wall Street.  (Perkins Dep. 43:13 – 44:8; D21127-21238.)

**DEFENDANTS' RESPONSE:**  Admit that the NYPD's Training Course Catalogue contains the lesson plans for courses, but dent that the catalogue contains all training conducted by the NYPD.

151.    The NYPD's Training Course Catalogue has no training on the Relevant Training Subjects.  (Perkins Dep. 45:24 – 46:14; D21127-21238.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited testimony supports the statement as Perking actually testified that the catalogue *does include* NYPD Police Academy recruit training on the "relevant training subjects."  Perkins Dep. 44:9-23.  Further note that the Police Academy Lessons Plans that specifically pertain to the "relevant training subjects" include, Maintaining Public Order: Demonstrations, Introduction to Law and Justice, Authority to Arrest and Introduction to Penal Law.  Perkins Dep. 36:6-22.

152.    The NYPD provides no training to Members of Service, other than that provided by the DCU, on the policing of First Amendment sidewalk protests.  (11:18-12:3; 128:19-25; Perkins Dep. Exh. 1 at p. 2; D21127-21238.).

**DEFENDANTS' RESPONSE:**   Deny and deny that the cited testimony supports the statement as Perkins actually testified that the Police Academy does not provide a refresher course on the "relevant training subjects"—Perkins did not so testify with respect to the entire NYPD nor was she designated to testify on behalf of the entire NYPD in this litigation.  Further note that the NYPD Police Academy provided extensive training on the First Amendment, demonstrations and the application of the disorderly conduct statute.  Exs. A, A1-5; B, B1-5; Ex. C; D, D1-; E, E1-5;F; G;.H; I.

153.    DCU's "Six Month Plan (June 1 to December 1, 2011)" contains no training with regard to the First Amendment rights of sidewalk protestors.  (D004683-686.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further note that the document predates OWS. Further note that the Commanding Officer of the Disorder Control Unit testified that training was given in 2011 on the constitutional rights of protesters

pursuant to the Lesson Plan, Legalities at Demonstrations.  Ex. O, Raganella Dep., 279:7-25.

Further note that the DCU trained both probationary lieutenants and probationary sergeants on

policing in the First Amendment context, including instructing the officers that: "[i]t is the policy

of the New York City Police Department to protect the rights of peaceful assembly and free

speech, as well as the right to safe and unhindered passage for all people. The successful

implementation of this policy requires a balance between the Department's mandate to preserve

public order and its obligation to protect the First Amendment rights of varied and often

competing groups. In all cases, the Police Department must remain neutral in its oversight of

peaceful assemblies."  Ex. K; Ex. L.

154.    The DCU memo dated August 29, 2011 entitled "Submission of Disorder Control Lesson

Plans" lists no lesson plan on the First Amendment rights of sidewalk protestors.  (D025550.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 153.

155.    DCU does not do any instruction on policing in First Amendment contexts.  (Vega Dep.

69:23-70:9.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 153.

156.    DCU training was "about giving them a dispersal and getting them out.  It wasn't getting

into a finesse of demonstrations."  (Purtell Dep. 167:23-25)

**DEFENDANTS' RESPONSE:**  Deny that these two sentences contain a material fact.

157.    DCU does not teach what is required to make a dispersal order compliant with the First

Amendment.  (Vega Dep. 73:18-21; 74:13-17.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as the Disorder

Control Unit is not tasked with providing training with respect to drafting dispersal orders.  The

NYPD Legal Bureau drafts dispersal orders.  Ex. P, Vega Dep., 72:22-73:17.

158.    DCU did not provide training related to First Amendment activity in 2011.  (Vega Dep. 111:8-13.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited testimony supports the statement as Vega was asked, "[w]as there any training that you participated in that was related to sidewalk protest standards or First Amendment activity."   Vega replied, "no."   Further note that Vega's lack of personal participation in such training in 2011 does not establish that such training was not provided.  Further note that the Commanding Officer of the Disorder Control Unit testified that training was given in 2011 on the constitutional rights of protesters pursuant to the Lesson Plan, Legalities at Demonstrations.  Ex. O, Raganella 279:7-25.  Further note that in 2011 the DCU trained both probationary lieutenants and sergeants on policing in the First Amendment context, including instructing the officers that: "[i]t is the policy of the New York City Police Department to protect the rights of peaceful assembly and free speech, as well as the right to safe and unhindered passage for all people. The successful implementation of this policy requires a balance between the Department's mandate to preserve public order and its obligation to protect the First Amendment rights of varied and often competing groups. In all cases, the Police Department must remain neutral in its oversight of peaceful assemblies."  Ex. K; Ex. L.

159.    The "types of training conducted by the [DCU]" listed in a March 2, 2011 memo entitled "Consolidation of Training Conducted by the Disorder Control Unit" shows no training on the First Amendment rights of sidewalk protestors, or the application of the disorderly conduct statute to sidewalk protestors.  (D025519-520.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 153.

160.    The City of New York testified that the training delivered by DCU from 2009 through 2012 included nothing on the First Amendment, the disorderly conduct statute, dispersal orders, or how to properly police sidewalk protests.  (Vega Dep. 99:23-102:15.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited testimony supports the statement as Vega actually testified that tabletop exercise training, functional exercise training, advanced COBRA training and Command Post training do not include training on so-called "sidewalk protests" or disorderly conduct.  Further note that the Commanding Officer of the Disorder Control Unit testified that training was given in 2011 on the constitutional rights of protesters pursuant to the Lesson Plan, Legalities at Demonstrations.  Ex. O, Raganella 279:7-25.  Further note that the Disorder Control Unit trained both probationary lieutenants and sergeants on policing in the First Amendment context, including instructing the officers that: "[i]t is the policy of the New York City Police Department to protect the rights of peaceful assembly and free speech, as well as the right to safe and unhindered passage for all people. The successful implementation of this policy requires a balance between the Department's mandate to preserve public order and its obligation to protect the First Amendment rights of varied and often competing groups. In all cases, the Police Department must remain neutral in its oversight of peaceful assemblies."  Ex. K; Ex. L.

161.    DCU "do[es] not teach anything when it came to" the disorderly conduct statute and how it is in play during sidewalk protests.  (Vega Dep. 67:4-8; 76:17-20.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Vega actually testified that training on setting up a command post did not include instruction on the disorderly conduct statute or "sidewalk protests."  Ex. P, Vega Dep. 66:22-8. Further deny that the statement contains a material fact.

- 50 -

162.    DCU does not train officers that the mere inconveniencing of pedestrian traffic does not constitute probable cause for a disorderly conduct arrest.  (Raganella Dep. 276:23-277:6.)

**DEFENDANTS' RESPONSE:**  Deny that the citation to testimony supports the statement as it contains no testimony.  Further deny that the statement contains a material fact.  Note that the NYPD Police Academy provided training in the NYPD's Police Student's Guide, Maintaining Public Order: Demonstrations, from *2005 through 2012*, which specifically stated that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.   This is not what the law means when it talks in terms of **obstruction**.  Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Exs D, D1-7.

Note further that the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which references the decision in <u>People v. Jones</u>.  Ex. G.  Commanding Officers were directed to ensure that each member of their commands (precincts) was informed of and received command level training on this Training Memo.  <u>Id.</u>  Note further that the designated 30(b)(6) witness provided with respect to NYPD training on the disorderly conduct statute, Heather Perkins, testified that the NYPD Police Academy specifically trained on PL §240.20(5)— including the "substantial blockage" and "mere inconvenience" standards.  Ex. N, Perkins Dep. 49:18-50:18; 158:17-159:24.

163.   The City testified that "It's impossible to train on" the difference between merely inconveniencing a pedestrian and substantially impeding a pedestrian.  (Raganella Dep. 37:19-24.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the "City" so testified as Raganella is a designated 30(b)(6) witness with respect to training conducted at the NYPD Disorder Control Unit only; Raganella is not a designated 30(b)(6) witness with respect to training conducted by any other NYPD command, such as the NYPD Police Academy.  Note further that the NYPD Police Academy provided specific training on PL §240.20(5) in the Police Student's Guide, Demonstrations, *2005—2012*, which stated:

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.  This is not what the law means when it talks in terms of **obstruction**.  Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.  The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Ex. D, D1-7.

Note further that the NYPD Police Academy provided training on PL §240.20(5) to all NYPD members of service in the 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which outlines "mere inconvenience" and "obstruction of pedestrian traffic," and remains in effect.  Ex. G.

164.   DCU does not "train on probable cause.  That's not part of our training."  (Raganella 36:2-3.)

**DEFENDANTS' RESPONSE:**  Admit that DCU was not tasked with providing training with respect to the standards for probable cause. Note further that the NYPD Police Academy provides extensive training on the standards for probable cause and the principles of the Fourth

Amendment.  Perkins Dep. 157:7-158:11.  The DCU, which consisted of a handful of officers at the time of OWS, (Ex. P, Vega Dep., 145:6-9) trained primarily on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).   Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15. Note that the DCU did not give orders to arrest during OWS, and the DCU in fact made no arrests during OWS.  Ex. P, Vega Dep. 165:16-166:4.

165.    DCU does not train on when an arrest should be made; it trains only on how to make an arrest and post-arrest processing.  (Raganella 57:11-18.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 164.

166.    Training on probable cause is given solely during recruit training at the Police Academy. (Raganella 36:6-7; 58:5-10; Vega Dep. 70:23-71:4.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited testimony supports the statement as neither Raganella nor Vega are designated 30(b)(6) witnesses with respect to training conducted at the NYPD Disorder Control Unit only and thus training conducted by the NYPD Police Academy is beyond the scope of their depositions.

167.    DCU did not change or update in any fashion the training it delivers for policing demonstrations and protests as a result of the Court of Appeals decision in *People v. Jones* or the Jones Memo.  (Raganella Dep. 81:22-83:7; 266:19-22.)

**DEFENDANTS' RESPONSE:**  Admit that DCU was not tasked with changing or updating its training as a result of <u>People v. Jones</u>.  Note further that the NYPD Police Academy Police Student's Guide, Maintaining Public Order: Demonstrations, from ***2005 through 2012***

- 53 -

specifically includes the training on the standards for application of PL §240.20(5) as set forth in in the 2007 People v. Jones decision, which applies the standards that were originally set forth in People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly conduct statute, §722 to the statute found at §240.20(5).   Further note that the NYPD Police Student's Guide, Demonstrations, from *2005 through 2012* specifically states that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.   This is not what the law means when it talks in terms of **obstruction**.  Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.   (Emphasis in original).  Exs D, D1-7.

Note further that the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which references the decision in People v. Jones.   Ex. G.  Note further that the DCU, which consisted of a handful of officers at the time of OWS, (Ex. P, Vega Dep., 145:6-9) trained primarily on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).   Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.   Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.

168.    The City testified that between 2004 and 2011, the DCU made no updates or changes to training as a result of changes in statutes or decisional law governing application of statutes. (Vega Dep. 146:3-12.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the record shows that there were any changes in statutes or decisional law governing Disorder Control Unit training from 2004 to 2011.

169.    DCU updated its training to instruct that arrests of protestors are authorized if they are wearing masks.  (Raganella Dep. 81:10-18.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony in any way supports the statement.  Further deny that the statement contains a material fact.

170.    DCU does not give training on dispersal orders.  (Raganella Dep. 77:21-78:15.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 157. Note further that the DCU, which consisted of a handful of officers at the time of OWS, (Ex. P, Vega Dep., 145:6-9) trained primarily on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.   Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.  Note that the DCU did not give orders to arrest during OWS, and the DCU in fact made no arrests during OWS.  Ex. P, Vega Dep. 165:16-166:4.

171.    DCU lesson plans contain nothing about disorderly conduct.  (Raganella Dep. 87:2-9.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited testimony supports the statement as Raganella actually testified regarding a single lesson plan: "[f]rom my first review of this, I do not see anything regarding disorderly conduct in here specifically."   Ex. O, Raganella Dep., 86:10-87:9.

172.    The City of New York testified that no training was delivered by DCU to captains, deputy inspectors, inspectors and chiefs from 2009 through 2012 on the First Amendment, the disorderly conduct statute, dispersal orders, or how to properly police sidewalk protests.  (Vega Dep. 99:23-102:24.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Vega actually testified that DCU tabletop exercise, functional exercises, the advanced COBRA refresher training, setting up a Command Post training and Unusual Disorder Plan training did not involve the First Amendment or disorderly conduct.

173.    No post-Academy training in any of the Relevant Training Subjects is required to apply for or gain a promotion.  (Perkins Dep. 54:15-19.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact.

174.    No training concerning impeding pedestrian traffic at protests was provided to members with a rank of Captains and above after 2004.  (Perkins Dep. 76:18-77:2.)

**DEFENDANTS' RESPONSE:**  Deny and note the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which specifically provided training on impeding pedestrian traffic.  Ex. G.  Note further that Commanding Officers were directed to ensure that each member of their commands (precincts) was informed of and received training on this Training Memo.  Id.  Note further that Captains and above are members of commands.

175.    The City could not identify any training in any of the Relevant Training Subjects provided to members with a rank of Captains and above after 2004 in which Legal Bureau personnel participated.  (Perkins Dep. 85:2-5.)

- 56 -

**DEFENDANTS' RESPONSE:**  Admit only that the City could not identify additional training on policing demonstrations or enforcement of the disorderly conduct statute to given to, (1) executive officers, (2) at the NYPD Police Academy, and (3) by the Legal Bureau.  Deny that this statement contains a material fact.

176.    In 2011, DCU provided one classroom training for officers with a rank of Captain and above.  Probable cause is not covered in that training.  (Vega Dep. 32:16-33:7.)

**DEFENDANTS' RESPONSE:**  Admit that DCU training concerning setting up a vehicle Command Post does not include the standards for probable cause to arrest training.  Note further that the DCU was not tasked with providing training with respect to the standards for probable cause. Note further that the NYPD Police Academy provides extensive training on the standards for probable cause and the principles of the Fourth Amendment.  Ex. N, Perkins Dep. 157:7-158:11.  The DCU, which consisted of a handful of officers at the time of OWS, (Ex. P, Vega Dep., 145:6-9) trained primarily on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15. Note that the DCU did not give orders to arrest during OWS, and the DCU in fact made no arrests during OWS.  Ex. P, Vega Dep. 165:16-166:4.

177.    Supervisors at demonstrations receive no training, after recruit training, on what conduct meets the standard of substantial disruption establishing probable cause for a disorderly conduct arrest based on blockage of pedestrian traffic.  (Raganella Dep. 39:21-40:7.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony supports the statement. Raganella is only a designated 30(b)(6) witness with respect to training provided by the NYPD Disorder Control Unit.  Any other training provided by any other unit of the NYPD is beyond the scope of Raganella's deposition. Note that the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which specifically provided training on impeding pedestrian traffic.  Ex. G.  Note further that Commanding Officers were directed to ensure that each member of their commands (precincts) was informed of and received training on this Training Memo.  Id.  Note further that supervisors are members of commands.

178.    Questions in training for Executive Officers on disorder control do not have anything on the First Amendment or on policing sidewalk protests.  (D005752-005755.)

**DEFENDANTS' RESPONSE:**   Deny that statement makes any sense.  Further deny that the random document supports the statement.

179.    NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011.  None of these trainings included training on standards of the disorderly conduct statute.  (Vega Dep. 99:23 - 105:5.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony supports the statement as Vega never testified that NYPD Captains and above attended training 272 times between 2009 and 2011.  Note that Vega actually testified pertaining to DCU tabletop exercise training, functional exercise training, advanced COBRA training and Command Post training.

180.    NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011.  None of these trainings included training on policing of sidewalk protests.  (Vega Dep. 99:23 - 105:5.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 179.

181.   NYPD members with a rank of Captain and above attended DCU training 272 times between 2009 and 2011.  None of these trainings involved First Amendment training.  (Vega Vega Dep. 99:23 - 105:5.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 179.

182.   NYPD Legal Bureau attorneys have a passive role and no authority during the policing of First Amendment sidewalk protests.  (Gannon Dep. 163:3-12.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony in any way supports the statement.  Gannon's actual testimony at Ex. Q, Gannon's Dep., 163:3-12 is as follows:

Q.  So an incident commander would make a decision about arrests at sidewalk protests and probable cause but if they had a question about that they would ask for help from the Legal Bureau folks present?
A.  They certainly would, yes.
Q.  But if they didn't ask for help they could make these decisions on their own?
A.  Correct.

183.   NYPD Legal Bureau attorneys are consulted during the policing of First Amendment sidewalk protests only if the incident commander chooses to do so.  (Gannon Dep. 163:3-12.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 182.

184.   Deputy Inspector Anthony Raganella testified that "I did not witness [OWS protestors] to be inherently violent or physical towards us."  (Raganella Dep 198:5-7.)

**DEFENDANTS' RESPONSE:**  Admit but deny that the statement contains a material fact.

185.   Deputy Inspector Raganella, the head of DCU, testified that the City of New York "did training for officers in regard to demonstrations and protest.  I can't say that it was specific to Occupy Wall Street."  (Raganella 70:17-20.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.   Note that Raganella is only a designated 30(b)(6) witness with respect to training provided by the NYPD Disorder Control Unit.   Any other training provided by any other unit of the NYPD, such as the NYPD Police Academy, is beyond the scope of Raganella's deposition.

186.   DCU made no updates to training in response to the NYPD's knowledge weeks in advance that OWS was organizing protests.  (Raganella 110:10-16.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.   Further deny that the record shows that any updates to training on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations or providing masks, mesh netting, flexi-cuffs and pepper spray were required in advance of OWS.

187.   On November 8, 2011, the Commanding Officer of DCU wrote an email stating that "OWS has the DCU in training overdrive and we are loving every minute of it."  (D005679.)

**DEFENDANTS' RESPONSE:**   Admit that the document so states in part.

188.   DCU increased the amount of training in 2010 and 2011 in part because of OWS but the content of that training was neither updated nor modified in anticipation of Occupy Wall Street. (Raganella Dep. 114:19-115:4; 121:11-15.)

**DEFENDANTS' RESPONSE:**   See Response to Statement No. 186.

189.   The DCU created an Occupy Wall Street Training Agenda to prepare the NYPD to police OWS protestors.  (D004729-734.)

**DEFENDANTS' RESPONSE:**   Deny and further deny that the Disorder Control Unit created an "Occupy Wall Street Training Agenda."   Further deny that the cited document, which contains results of Disorder Control training, is an "Occupy Wall Street Training Agenda."

190.   The Occupy Wall Street Training Agenda did not include any instruction on First Amendment activity or the requirements for dispersal orders.  (D004729-734.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact. Further deny that the cited document, which contains results of Disorder Control training, is an "Occupy Wall Street Training Agenda."  Note that the DCU's  primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.

191.   DCU did not provide training on providing alternative locations to protest in dispersal orders.  Such training was provided before the RNC.  (Vega Dep. 113:7-114:8.)

**DEFENDANTS' RESPONSE:**  Deny that the Disorder Control Unit is tasked with providing such training and further deny that the Disorder Control Unit provided such training before the RNC or at any other time.  Note that the DCU's  primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.

192.   Training delivered with the Occupy Wall Street Training Agenda was designed to "get them ready for what could be the worst thing."  (Vega Dep. 93:20-21.)

**DEFENDANTS' RESPONSE:**  Deny that a DCU "Occupy Wall Street Training Agenda" exists.  Further state that that the quoted testimony is a mischaracterization of Vega's overall testimony, which actually was:

Q.  This document [D004729-734] summarizes training that Disorder Control gave to members of the service, specifically related to the Occupy Wall Street movement?
A.  Yes, sir.
Q.  And for the members of the service to properly police the Occupy Wall Street movement?
A.  I don't know about the properly police part. Our part was to get them ready for civil disobedience, civil disturbance, demonstrations and protests. So, that's what we conducted our training for.
Q.  Do all demonstrations and protests involve civil disobedience and civil disorder?
A.  No.
Q.  How would you distinguish that the trainings to these members of the service?
A.  When we go over any training, we get them ready for what could be the worst thing. But we remind them that the stats say between 95, 99 percent of the time, every protest nothing happens.

193.    In training provided in preparation for Occupy Wall Street, DCU "went over the same -- we gave them the same exact training that everybody else got."  (Vega Dep. 94:15-17.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further deny that the statement contains a material fact.

194.    From September 17, 2011 to September 17, 2012 DCU trained over 12,000 members of service.  No training it delivered to these over 12,000 officers covered sidewalk protests. (Raganella Dep. 131:6-24.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that "sidewalk protests" are recognized as a special subcategory of protests.  Note that the NYPD Police Academy provided specific training on PL §240.20(5) in the Police Student's Guide, Demonstrations, *2005—2012*, which stated:

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.  This is not what the law means when it talks in terms of **obstruction**.

> Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.  The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Exs. D, D1-7.

Note further that the NYPD Police Academy provided training on PL §240.20(5) to all NYPD members of service in the 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which outlines "mere inconvenience" and "obstruction of pedestrian traffic," and remains in effect.  Ex. G.  Note further that the DCU's primary training function was on line and wedge formations, high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was simple—it provided tactical support to the incident command—and disseminated masks, mesh netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15

195.    A large scale Mobilization Exercise conducted by the DCU in August, 2011 on Randall's Island did not include any instruction on First Amendment activity, requirements for dispersal orders, or policing sidewalk protests.  (Vega 89:16-91:2.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

196.    A December 20, 2011 memo from DCU's Commanding Officer concerning "Training Conducted For Occupy Wall Street Movement" shows that from November 7 to December 9, 2011, DCU "conducted a series of Mobilization Exercises (MobEx) . . . in an effort to be better prepared regarding the Occupy Wall Street movement."  (D004729.)

**DEFENDANTS' RESPONSE:**  Admit that the document so states in part, but deny that the statement contains a material fact.

197.    The December 20, 2011 memo concerning "Training Conducted For Occupy Wall Street Movement" states that in the November 7 to December 9, 2011 MobEx exercises, DCU provided training to 1,412 member of service, including 12 with a rank of Captain or above.  (D004732.)

**DEFENDANTS' RESPONSE:**  Admit that the document so states in part, but deny that the statement contains a material fact.

198.    Training conducted by the DCU from November 7, to December 9, 2011 "For Occupy Wall Street Movement" covered three topic areas: "i. Lines, wedges, and other disorder control formations"; "ii. Mass arrest techniques"; and "iii. Protective Shield and Mash [sic] Barrier Equipment Review".  (D25580-585.)

**DEFENDANTS' RESPONSE:**  Admit that NYPD Disorder Control Unit provides training for the topic areas cited, but deny that the statement contains a material fact.

199.    Training conducted by the DCU from November 7, to December 9, 2011 "For Occupy Wall Street Movement" did not include anything on the disorderly conduct statute.  The First Amendment, or blockage of pedestrian traffic.  (D25580.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

200.    The NYPD issued no specific instructions to incident commanders at OWS protests, including during the class period, to ensure that NYPD policing would be consistent with constitutional powers.  (Gannon Dep. pp. 42:23-43:9.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony in any way supports the statement as Gannon was asked for a legal conclusion pertaining to the 2007 New York State Court of Appeals decision in People v. Jones.  Further deny that Gannon testified as to the "class period."

- 64 -

201.   According to an August 27, 2012 memo entitled "Mobilization exercises For Impact XVIII In Preparation For Occupy Wall Street Anniversary", training for supervisors on "protocols and legalities" for crowd control was to be delivered.  (D25600-601.)

**DEFENDANTS' RESPONSE:** Deny that the cited document supports the statement as the cited memorandum specifically pertains to "scheduled mobilization exercises (MobExes) at Pike and South St underneath the FDR underpass, confines of PBMS, to train IMPACT XVIII personnel." Note that there is no mention anywhere in the cited of "training for supervisors on 'protocols and legalities.'"

202.   Training for supervisors on "protocols and legalities" for crowd control was not delivered as part of the "Mobilization exercises For Impact XVIII In Preparation For Occupy Wall Street Anniversary".   (Vega Dep. 69:23-70:9; 73:18-21; 74:13-17; 84:13-21; 99:23-102:15; 148:17-149:12; 110:6 – 11:13; Perkins Dep. 76:1- 77:9.)

**DEFENDANTS' RESPONSE:**  Deny that any of the cited testimony of Vega or Perkins in any way supports the statement.  Deny that there is in fact any testimony, which supports the statement.  Further deny that Perkins testified at to this memorandum at any time.  Note that Perkins is not a designated 30(b)(6) witness as to any training conducted by the Disorder Control Unit in any event.

203.   On March 8, 2012, the Commanding officer of DCU sent an email conveying Chief Esposito's orders to "TRAIN, TRAIN, TRAIN … "Especially with the shields" in preparation for May Day and OWS protests.  The email did not include any instruction to train on permissible conduct by demonstrators at sidewalk protestors of other First Amendment demonstrations.  (D005562.)

**DEFENDANTS' RESPONSE:**  Deny that what is not included in an e-mail contains a material fact.

204.    As a result of Chief Esposito's instruction to "TRAIN, TRAIN, TRAIN", DCU added a training component on shields.  It did not add components on First Amendment activity, disorderly conduct statute training, sidewalk protest standards.  (Vega Dep. 148:17-149:12.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 203.

205.    According to an April 3, 2012 memo from the Commanding Officer of DCU, training conducted by the DCU "in preparation for potential May Day protests and/or Occupy Wall Street demonstrations" did not include any instruction to train on permissible conduct by demonstrators at sidewalk protests or other First Amendment demonstrations.  The training covered three topic areas: "i. Encirclement Maneuvers" "ii. Lines, wedges, and other disorder control formations, including use of protective shields"; and "iii. Mass arrest techniques and deployment of Millennium Masks".  (D25592-593.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 203.

206.    A November 11, 2011 memo from the Commanding Officer of DCU describes a "High Profile Zuccotti Park Mobilization Exercise" in which DCU conducted a MobEx training that culminated at Zuccotti Park.  The memo noted that "in consideration of their intended purpose, these types of MobExes should continue in the Zuccotti Park vicinity concurrent with the duration of the Occupy Wall Street demonstrations."  (D25566-567.)

**DEFENDANTS' RESPONSE:**  Deny that this statement contains a material fact.

207.    On October 17, 2011 DCU sent a budget request for "Emergency Purchase Of Equipment During the Occupy Wall Street Demonstrations" for $110,400 exclusively for flex-cuffs, OC spray, pepper ball system, and orange barrier mesh system items.  (D014372.)

- 66 -

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

208.    In preparing to police Zuccotti Park from September 28, 2011 through October 10, 2011, the NYPD issued through the Citywide Incident Management System at least thirty Sector/Group Assignment Lists mandating that "[a]ll responding MOS are to have their Department issued PPE including their MSA Millennium gas mask and their Department issued helmet and night sticks.   Disorder Control personnel will be equipped with Arrest kits, Barrier Mesh, Megaphones,MK-46 and MK-9 Pepper spray canisters."  (D025616-D25650.)

**DEFENDANTS' RESPONSE:**  Deny the statement contains a material fact.

209.    The City testified that "if you have someone go to training constantly then you are kept up to date on how to do your job" and that "Crowd control training is a perishable skill.  If you don't practice it . . . you forget what you learned when it comes to that."  (Vega Dep. 62:19-63:3.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

210.    According to a January 15, 2010 memo, "Each spring the Disorder Control Unit endeavors to conduct disorder control refresher sessions for members of the service assigned to Patrol Borough Task Forces."  (D005503.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

211.    A document entitled "DCU Level I & II Mobilzations & CRV Training for Task Forces-2010/2011" memo updated on August 25, 2011 states that the "numbers that follow are inclusive of all MOS who attended" DCU training from April 2010 until August 24, 2011 and states that DCU provided training to 9,972 members of service in that time.  (D14538-D15459.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

212. A DCU memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" dated March 2, 2011 "outlines all training conducted by the [DCU] beginning in the calendar year 2009, through this report date, 2011." (D025519.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

213. The DCU memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" dated March 2, 2011 shows 11,707 "TOTAL MOS" under the heading "2011 YTD MOS trained." (D025519, D025527.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

214. In addition to 2009-2011 training, the DCU memo entitled "Consolidation of Training Conducted By The Disorder Control Unit" dated March 2, 2011 also shows 5,124 "TOTAL MOS" for 2012 under the heading "2012 YTD MOS trained." (D025519, D025527.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

215. The City of New York testified that, from 2009 through 2012, the total number of officers DCU trained was 24,835, from 2009 through 2012, including 22 chiefs, 29 inspectors, 37 deputy inspectors, and 184 captains. (Vega Dep. 103:2-24.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

216. In addition, from 2009 through 2012, DCU trained 1,456 Lieutenants, 3,402 Sergeants, 18,352 Police Officers from 2009 through 2012. (Vega Dep. 103:2-24.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

217. On March 8, 2012, in an email recounting instructions from Chief Esposito, Deputy Inspector Raganella, Commanding Officer of DCU, relayed that "In regard to OWS demos and protestors …. Chief Espo's exact words to me were 'TRAIN, TRAIN, TRAIN ….. Especially with the shields'." (D005562.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

218.    On March 26, 2012, the Commanding Officer of DCU wrote an email stating that "DCU has been tasked by the Chief of Patrol with training 900 IMPACT officers over the next 3 weeks . . . ." (D005662.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

219.    On April 4, 2012, the Commanding Officer of DCU wrote an email to "Task Force C.O.s" stating that "as per Chief Espo, DCU is mandated to conduct a minimum of two (2) MobExes per week with all 8 task forces . . . . please make sure that maximum personnel attend….." (D029503.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

220.    On April 19, 2012 Terence McManus wrote an email to "Commanders" stating: "Please ensure that ALL AVAILABLE personnel attend the upcoming training which will be conducted by DCU."  (D005655.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

221.    As the City testified, the "Disorder Control Unit is tasked with conducting tactical reviews and assessing department strategies at major events."   (Raganella Dep. 251:10-13 D005630; D014380.)

**DEFENDANTS' RESPONSE:**  Deny that the sentence Raganella was asked to read from a document out loud is testimony.  Raganella Dep. 251:10-13.

222.    No changes to training with regard to sidewalk protests were ever made as a result of DCU's assesment of department strategies at major events.  (Raganella Dep. 253:25-254:7.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further deny that the Disorder Control Unit was tasked with providing training with respect to "sidewalk

protests."  Note that the DCU's  primary training function was on line and wedge formations,

high profile vehicle rescue, critical response vehicles and mobilizations (Ex. P, Vega Dep. 34-

17-36:16, 39:2-16).  Further note that the role of the DCU at a protest or demonstration was

simple—it provided tactical support to the incident command—and disseminated masks, mesh

netting, flexi-cuffs and pepper spray.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P,

Vega Dep. 165: 10-15.  Further note  that the NYPD Police Academy provided specific training

on PL §240.20(5) in the Police Student's Guide, Demonstrations, *2005—2012*, which stated:

> There is always some incidental blocking of the street or sidewalk whenever one or more
> persons use public areas to communicate their views.  Even a lone individual handing out
> political or religious leaflets, something that is clearly legal, may be blocking the passage
> of others.   This is not what the law means when it talks in terms of **obstruction**.
> Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere
> inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law
> §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian
> traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in
> original).  Exs. D, D1-7.

Note further that the NYPD Police Academy provided training on PL §240.20(5) to all NYPD

members of service in the 2007 NYPD Police Academy Training Memo, "Enforcement of New

York State Penal Law Section 240.20(5) Disorderly Conduct," which outlines "mere

inconvenience" and "obstruction of pedestrian traffic," and remains in effect.  Ex. G.

223.    Deputy Inspector Raganella was not "tasked with updating or modifying training

regarding" sidewalk protests.  (Raganella Dep. 191:6-12; 192:10-12.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 222.

224.    When the Commanding Officer of DCU, Deputy Inspector Raganella, observed the

policing of OWS protests and saw tactics used re "holding a line, escorting a group, or preparing

to engage" that were not consistent with training, he wrote an email on March 8, 2012 to all

Patrol Borough Task Force Commanders to correct that.  (Raganella Dep. 211:17 - 212:11; 192:17-21; D005630.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

225.    The Commanding Officer of DCU, Deputy Inspector Raganella, did not write any similar memo regarding police non-compliance with First Amendment rights of sidewalk protestors at OWS demonstrations.  (Raganella Dep. 211:17 - 212:11; 192:17-21; D005630.)

**DEFENDANTS' RESPONSE:**  Deny that Raganella did not write a particular memorandum contains a material fact.

226.    On November 3, 2011, Deputy Inspector Raganella, the Commanding officer of DCU, was made aware that 9 or 10 officers made 16 arrests at an OWS demonstration, and responded that this constituted a problem that needed to be corrected.  (D005506.)

**DEFENDANTS' RESPONSE:**  Deny that the cited e-mail in any way supports the statement.

227.    On November 3, 2011, Deputy Inspector Raganella, the Commanding officer of DCU, wrote an email stating that Chief Esposito was "not at all happy with some mass arrest incidents made by task force(s) lately" because certain cameras and bullhorns were not available.  No mention was made of possible violations to First Amendment rights of sidewalk protestors. (D005659.)

**DEFENDANTS' RESPONSE:**  Deny that what is not contained in the e-mail is a material fact. Further note that the e-mail is marked, "Confidential Material Subject to Protective Order."

228.    On October 4, 2011, Deputy Inspector Raganella, the Commanding officer of DCU, wrote an email reporting that "Chief Espo and Chief Hall were less than pleased" with the response at the October 1, 2011 police response on the Brooklyn Bridge.  The sole topic

mentioned was equipment; no mention was made of the NYPD's response to First Amendment sidewalk protests.  (D005629.)

**DEFENDANTS' RESPONSE:**  Deny that what is not in the cited e-mail contains a material fact.  Further deny that the named Chiefs' alleged displeasure concerning equipment provided on October 1, 2011, is of no moment as the Second Circuit determined that all 732 OWS arrests made on that date were supported by probable cause.  See Garcia v. City of New York, 2015 U.S. App. LEXIS 2762 (2d Cir. 2015).

229.    On October 10, 2011, the commanding Officer of DCU sent an email to "Task Force C.O.s" requesting feedback on "how to better utilize the task forces for the OWS demos" in preparation for making recommendations to the Chief of Patrol.  (D019454.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further note that the e-mail is marked, "Confidential Material Subject to Protective Order."

230.    On October 14, 2011, the commanding Officer of DCU sent a memo entitled "Recommendations Regarding the Use of Patrol Borough Task Forces During Occupy Wall Street Demonstration" to the Chief of Patrol, stating, "[c]onsistent with O.G.101-04, the Disorder Order Control Unit (DCU) is tasked with . . . assessing Department strategies at major events." None of the recommendations in the October 14, 2011 memo relate to the Department's policing of First Amendment sidewalk protests.  (D014374-375; *See also* D014376; D014378.)

**DEFENDANTS' RESPONSE:**  Deny that what is not contained in the cited memorandum constitutes a material fact.

231.    On October 7, 2011, the Commanding officer of the DCU sent an email to "Task Force COs" regarding "a couple of issues related to the Occupy Wall Street (OWS) demos that we need to look at."  (D005630.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

232.    In his October 7, 2011 email, Deputy Inspector Raganella stated that OWS demonstrators are "not inherently violent or physical" but "can be very annoying."  (D005630.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

233.    Deputy Inspector Raganella's October 7, 2011 email contains nothing concerning the First Amendment rights of sidewalk protestors.  (D005630.)

**DEFENDANTS' RESPONSE:**  Deny that what is not contained in the cited e-mail constitutes a material fact.

234.    In his October 7, 2011 email, Deputy Inspector Raganella stated that "[w]hen task force personnel are out on foot . . . they must be equipped with not only flex cuffs and batons but also their Millennium Masks."  (D005630.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

235.    In his October 7, 2011 email, Deputy Inspector Raganella stated that "I observed many officers" policing OWS demonstrators.  (D005630.)

**DEFENDANTS' RESPONSE:**  Deny that the cited e-mail contains this statement.

236.    DCU Chief Raganella never saw Unusual Incident Reports from incidents during OWS which occurred on November 17, 2011, January 1, 2012, or March 17, 2012.  (Raganella Dep. 93:15-94:9; 259:5-261:7; D013848; D013839.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the record shows that Raganella was required to see Unusual Occurrence Reports Memoranda during OWS.  Further deny that Raganella was ever a named recipient on any Unusual Occurrence Report Memoranda.

237.    Deputy Inspector Raganella testified that a large number of Declined Prosecutions issued by the District Attorney's office, would indicate "some deficiency in the way that we were

conducting the arrests. That we had an issue that needed to be addressed." (Raganella Dep. 318:20-319:6.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact. Further note questioning pertaining to declined prosecutions by the District Attorney's Office is beyond the scope of Raganella's deposition.

238.   In 2005, weekly submission "of decline prosecution affidavits [were] used for training purposes . . . ." (D018169.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact. Further deny that a 2005 internal Criminal Justice Bureau Memorandum contains a material fact.

239.   Deputy Inspector Raganella sent an email on May 3, 2012 in response to a report that no Declined Prosecution were likely to be issued on arrests made at the 2012 May Day protests, writing "Wow! Excellent! Thanks brother!" (D019439-19441.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

240.   Deputy Inspector Raganella testified that a large number of Declined Prosecutions would cause him to "have investigated further with Captain Hailey and may have even consulted with our legal bureau to find out what the issue was, and if it was in fact something that needed to be addressed in training or not." (Raganella Dep. 319:7-18.)

**DEFENDANTS' RESPONSE:** Deny that Raganella's testimony pertaining to what he might have done with respect to a date not at issue in this case contains a material fact. Further deny that there is any evidence that the Disorder Control Unit was tasked with provided decline to prosecute analysis. Further note questioning pertaining to declined prosecutions by the District Attorney's Office is beyond the scope of Raganella's deposition.

241.    Deputy Inspector Raganella testified that he did not investigate whether a large number of Declined Prosecutions were issued other than for the May Day 2012 arrests.  (Raganella Dep. 319:7-18.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the cited testimony supports the statement as Raganella was asked if he had seen "any number" of decline-to-prosecutes, what he would have done—not a "large number."  Further note questioning pertaining to declined prosecutions by the District Attorney's Office is beyond the scope of Raganella's deposition.

242.    According to the New York County District Attorney's Office, of 91 total arrests made on September 24, 2011 at OWS protests, there were 85 total dispositions; 43 dismissals; and 36 Adjournments in Contemplation of Dismissal.  (PACKARD07362; Gannon Dep. 90:10-91:13)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact as the Honorable Analisa Torres held in this case that this Court cannot deduce that the majority of the OWS arrests were unlawful, because the vast majority of cases were dismissed or resolved via an ACD—"as the District Attorney's Office has prosecutorial discretion and may choose to dismiss or settle cases for reasons other than the unlawfulness of the individual arrest."  See Decision, dated March 2, 2017, Dkt. No. 59, at 13, 16.  Note further that plaintiffs' alleged percentage includes adjournments in contemplation of dismissal. Note further that an adjournment in contemplation of dismissal leaves open the question of the accused's guilt. See Singleton v. City of New York, 632 F.2d 185, 193 (2d Cir. 1980) ("Proceedings are terminated in favor of the accused only when their final disposition is such as to indicate the accused is not guilty. An adjournment in contemplation of dismissal, like a consent decree, involves the consent of both the prosecution and the accused and leaves open the question of the accused's guilt.") (internal

citations and quotation marks omitted)  Further deny that Gannon's cited testimony supports the statement.

243.    According to the New York County District Attorney's Office, of 254 total arrests made on November 17, 2011 at an OWS protest, there were 226 total dispositions; 168 dismissals; 2 Trial Order of Dismissal; 169 Adjournments in Contemplation of Dismissal; 24 Declined Prosecutions; and 4 warrants.  (PACKARD07369.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 242.

244.    According to the New York County District Attorney's Office, of 61 total arrests made on January 1, 2012 at OWS protests, there were 22 total dispositions; 7 dismissals; 1 acquittal; 8 Adjournments in Contemplation of Dismissal; 36 Declined Prosecutions; 2 warrants; and 1 consolidated case.  (PACKARD07373.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 242.

245.    According to the New York County District Attorney's Office, of 67 total arrests made on March 17, 2012 at OWS protests, there were 40 total dispositions; 6 dismissals; 24 Adjournments in Contemplation of Dismissal; 3 Declined Prosecutions; 3 warrants; and 1 pending case.  (PACKARD07378.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 242.

246.    According to the New York County District Attorney's Office, of 63 total arrests made from March 20 to 25, 2012 at OWS protests, there were 48 total dispositions; 5 dismissals; 1 acquittal; 26 Adjournments in Contemplation of Dismissal; 11 Declined Prosecutions; 2 warrants; and 2 consolidated cases.  (PACKARD07379-7380.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 242.

247.    The "NYPD has a book that's about 65 pages long called The Disorder Control Guidelines Booklet."  It was initially published in 1993 and was revised in 1997.  (Vega Dep. 86:9-12.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

248.    In January, 2012, Deputy Inspector Raganella, the head of DCU, reviewed the Disorder Control Guidelines booklet, which had last been updated in October, 1997.  He recommended updating arrest techniques but no update to policing of sidewalk protests, the clear and present danger standard, or the extent of blockage of pedestrian traffic required to make an arrest for disorderly conduct.  (Raganella Dep. 161:10-17; D00564; Vega Dep. 86:7-14 & Exh. 6.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony of Raganella supports the statement as it contains zero mention by Raganella of recommending updating arrest techniques. Deny further that D00564, which is a criminal court complaint, supports the statement.  Deny further that the cited testimony of Vega in any way supports the statement.

249.    The NYPD knew weeks in advance that OWS was organizing protests.  (Raganella Dep. 107:12-108:10.)

**DEFENDANTS' RESPONSE:**   Admit only that Raganella so testified with respect to the Disorder Control unit—and not with respect to the entire NYPD.

250.    Inspector Winski admitted that the NYPD was aware that the Occupy Wall Street movement would begin on September 17, 2011 with a demonstration in the vicinity of Wall Street.  (PACKARD 22916 [Winski Dep.] 72:19 – 73:2.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.

251.    Chief Purtell testified that the appropriate role of the NYPD in policing the OWS protests during the class period was to achieve "a flexibility, trying to facilitate First Amendment speech

rights and the ability to assemble, and balance that with the rest of the community's needs for access -- access and to facilitate vehicular and pedestrian traffic throughout the area." (Purtell Dep. 39:5-11.)

**DEFENDANTS' RESPONSE:** Deny that the cited testimony contains any mention whatsoever regarding, "the appropriate role of the NYPD in policing the OWS protests during the class period." Note that what Chief Purtell was actually asked, "was there a unified policy towards Occupy Wall Street from the NYPD, to your knowledge?" Further note that non-party Purtell is not a designated 30(b)(6) of any kind in this case, and his testimony pertaining to NYPD policy is therefore not binding on the defendant.

252.   Inspector Edward Winski, in conjunction with Chief Purtell, assigned on-scene supervisors for the policing of First Amendment sidewalk protests during OWS, including the class period.  (Gannon Dep. 172-173.)

**DEFENDANTS' RESPONSE:** Deny that the cited testimony contains any mention of "on-scene supervisors for the policing of First Amendment sidewalk protests during OWS, including the class period." Note that Gannon actually testified that in all likelihood Chief Purtell in consultation with Inspector Winski would determine who the supervisors were. Deny that the testimony contains a material fact.

253.   Inspector Winski testified that he tried to choose police officers to police First Amendment sidewalk protests during OWS from the 1st Precinct.  (Packard 23102 [Winski Dep.] 106:15-20).

**DEFENDANTS' RESPONSE:** Deny that the cited non-party/non-witness testimony supports the statement whatsoever, as (1) Winski's testimony in an unrelated case/unrelated date of incident pertained a plaintiff who was arrested in Zuccotti Park nowhere near a sidewalk, (2) the

testimony contains zero mention of, "choosing police officers to police First Amendment sidewalk protests during OWS," and (3) Inspector Winski actually testified that he thought he testified in yet another unrelated case/unrelated date of incident that he assigned officers from his precinct to the Zuccotti Park detail.  Deny that Winski's testimony in an unrelated case/unrelated date of incident pertaining to testimony he gave in yet another unrelated case/unrelated date of incident concerning assignment of officers at Zuccotti Park—where none of the plaintiffs in the instant case were arrested—contains a material statement of fact.

254.    Inspector Winski testified that he tried to choose officers who were professional and had thick skin.  (Packard 23103 [Winski Dep.] 107:17-24.)

**DEFENDANTS' RESPONSE:**   Deny that non-party/non-witness Winski's testimony in an unrelated case/unrelated date of incident pertaining to testimony he gave in yet another unrelated case/unrelated date of incident concerning assignment of officers at Zuccotti Park—where none of the plaintiffs were arrested—contains a material statement of fact.

255.    Inspector Winski testified that to him, "professional is the way you talk to people, the way you do paperwork and the way you look."  (Packard 23104 [Winski Dep.] 108:22-25.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 254.

256.    In selecting officers to police Occupy Wall Street demonstrations, Inspector Winski did not take into consideration whether a police officer understood the Constitution of the United States.  (Packard 23111 [Winski Dep.] 115:15-18.)

**DEFENDANTS' RESPONSE:**  Deny that the cited non-party/non-witness testimony supports the statement as Winski's testimony makes zero reference to "Occupy Wall Street demonstrations"—the testimony specifically refers Zuccotti Park only.  Deny that Winski's testimony in an unrelated case/unrelated date of incident pertaining to testimony he gave in yet

another unrelated case/unrelated date of incident concerning assignment of officers at Zuccotti Park—where none of the plaintiffs in the instant case were arrested—contains a material statement of fact.

257.    In selecting officers to police Occupy Wall Street demonstrations, Inspector Winski did not take into consideration whether a police officer understood the rights guaranteed by the First Amendment to the U.S. Constitution.  (Packard 23111 [Winski Dep.] 115:19-23.)

**DEFENDANTS' RESPONSE:**  See Response to Statement 256.

258.    Inspector Winski does not recall reading any Legal Bureau Bulletins between June 10, 2013 and April 6, 2016.  [Packard 22915 [Winski Dep.] 66:3 - 67:10; Packard 23300 – 23302 [Winski Dep.] 304:15 - 306:6.)

**DEFENDANTS' RESPONSE:**  Deny that non-party/non-witness Winski's testimony in an unrelated case/unrelated date of incident contains a material statement of fact.

259.    Inspector Winski testified that a person is subject to arrest for blocking pedestrian traffic under the disorderly conduct statute if he obstructs pedestrian traffic in a public place for any period of time.  (Packard 22940 166:6-17, 167:19-23.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 258.

260.    Inspector Winski has been a defendant in lawsuits arising from conduct at Occupy Wall Street at least nine (9) times.  *Rodriguez v. Winski,* 12CV3389 (settled); PACKARD 24985 – 24995 - *Gold v. NYC,* 13CV02142(VSB)(settled); PACKARD 23713-23755 - *Adsluf v. NYC,* 13CV02295(LGS) (settled);  PACKARD 25974 – 26000 - *Tardif v. NYC,* 13CV04056 (KMW)(KNF) (Jury trial – defense verdict); PACKARD 233958-23984 - *Guest v. NYC,* 13CV04174 (PKC) (Summary judgment dismissal of federal claims); *Gersbacher v. NYC,* 14CV07600 (GHS)(KNF)(Jury trial - Verdict of liability with nominal damages); *Vincent v.*

*Winski,* 14CV07744 (Settled); *Pesola v. NYC,* 15CV01917 (PKC)(SN)(Excessive Force claim against Winski not dismissed, case remains open); PACKARD 23756-23762 - *Allen v. NYC,* 15CV01918(PKC)(SN)(Case dismissed on Rule 12b6 motion); *Marom v. NYC 15CV02107 (PKC)(SN) (Summary Judgment fully briefed and pending).*

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a non-party/non-witness contains a material fact.  Further note that there has been only one determination made against Winski pertaining to all of OWS, and in that case, the jury awarded the plaintiff—one cent.  See Gersbacher v. City of New York, 14-CV-7600 (GHW).  Note further that Pesola v. City of New York, 15-CV-1917 does not remain open, but was resolved in defendants' favor and costs were awarded to defendants. Note further that Winski was dismissed from Tardif v. City of New York, 13-CV-4056; Marom v. City of New York, 15-CV 2017, and Guest v. City of New York, 13-CV-4174.

261.   Inspector Winski provided instruction or guidance to the majority of officers present at Occupy Wall Street from the 1st Precinct regarding the application of the disorderly conduct statute.  (PACKARD 22940 [Winski Dep.] 168:15-22.)

**DEFENDANTS' RESPONSE:**  Deny that non-party/non-witness Winski's testimony in an unrelated case/unrelated date of incident contains a material statement of fact.  Note that there is no evidence that Winski ordered the arrest of or made any arrest of any plaintiff in the instant case.

262.   Inspector Winski instructed many of the officers policing Occupy Wall Street on how to enforce the disorderly conduct statute with regard to individuals involved in First Amendment expressive speech activity.  (Packard 22940 [Winski Dep.] 168:15-169:5.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 261.

263.    On September 19, 2011, Inspector Winski was part of the NYPD policing of Occupy Wall Street.  The NYPD had created a small pathway for protesters to march that became tight. When an individual in an Orange Hat was unable to move quickly enough, Inspector Winski reached across the barrier and tackled the individual placing him under arrest.  (Packard 150-1, #7, Packard 00336-00340; Raganella Exhibit 4, Gannon Exhibit 4.)

**DEFENDANTS' RESPONSE:**  Deny that the citations to record in any way support this statement.  Further deny that plaintiffs' counsel's letter at Dkt. No. 150 constitutes evidence in this case.  Deny that the totally unsubstantiated allegation made by the New York Times and plaintiffs' counsel pertaining to a non-party regarding a non-date of incident is a statement of material fact.

264.    The NYPD initially stated "that the man was charged with jumping a police barrier and resisting arrest."  (Packard 00336-00340; Raganella Exhibit 4, Gannon Exhibit 4.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to what a New York Times reporter and photographer may have stated about a non-party regarding a non-date of incident contains a material fact.

265.    A reporter and photographer for the New York Times witnessed and documented the episode between the man in the Orange Hat and Inspector Winski, and reported that they did not see the man attempt to jump a barrier.  (Packard 00336-00340; Raganella Exhibit 4, Gannon Exhibit 4.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 264.

266.    Subsequent to the NY Times reporting, the NYPD changed its explanation and said the man was not charged with jumping a barrier but with committing disorderly conduct on the

sidewalk by impeding pedestrian traffic.  (Packard 00336-00340; Raganella Exhibit 4, Gannon Exhibit 4.)

**DEFENDANTS' RESPONSE:**  Deny that the unsubstantiated allegation made by the New York Times and plaintiffs' counsel pertaining to a non-party regarding a non-date of incident is either supported by the citation to record or contains a material fact.

267.    The City of New York could not identify any review undertaken of Inspector Winski's conduct on Septmber 19, 2011.  (Gannon Dep. 85:25 – 87:13, Gannon Dep. Exhibit 4.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a non-party regarding a non-date of incident contains a material fact.  Deny that the record demonstrates that any review was required to be undertaken.

268.    The City of New York does not know whether the policing of sidewalk protest on September 19, 2011 depicted in Gannon Exhibit 4 indicated to the City of New York that the NYPD's procedures regarding policing of sidewalk protests were sufficient to comply with constitutional limits on police power.  (Gannon Dep. 86:12-18, Gannon Exhibit 4.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a non-party regarding a non-date of incident contains a material fact.

269.    The City of New York does not know whether it reviewed the procedures used in policing the sidewalk protest of September 19, 2011.  (Gannon Dep. 86:19-23, Gannon Dep. Exhibit 4; Packard 00336-00340.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a non-party regarding a non-date of incident contains a material fact.  Further note that plaintiffs have failed to establish that any review of their own unsubstantiated claim pertaining to a totally unrelated incident required any review of procedures.

270.   One day later, September 20, 2011, Inspector Winski was involved in an enforcement action inside Zuccoti Park.  (*Gersbacher v. Winski,* 14CV07600(GHW)[Docket 1, paragraphs 3-4.; Docket 202.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a non-party regarding a non-date of incident contains a material fact.

271.   A Federal Jury found that Inspector Winski used excessive force and violated the constitutional rights of an Occupy Wall Street protester on September 20, 2011.  (*Gersbacher v. Winski,* 14CV07600(GHW)(Docket 202.)

**DEFENDANTS' RESPONSE:**  Deny that a one-cent jury award in 2018 against a non-party pertaining to an unrelated incident in an unrelated case is a material fact.

272.   The City of New York made no change to its policing of First Amendment sidewalk protests as a result of Inspector Winski's actions on September 20, 2011 because "the NYPD doesn't -- doesn't necessarily change its policies based on an individual -- an individual act." (Gannon Dep. 81:6-23; 82:24-83:9.)

**DEFENDANTS' RESPONSE:**  Deny that whether the City of New York made changes to its policing in 2018 pertaining to a one-cent jury award in 2018 against a non-party regarding a non-date of incident contains a material fact.

273.   When the NYPD cleared Zuccoti Park on November 15, 2011, Chief Purtell ordered Inspector Winski to stay away from the park, over the complaints of Inspector Winski.  (Packard 22931 130:19-132:13.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to two non-parties regarding a non-date of incident contains a material fact.

274.    Chief Purtell chose captains and inspectors to be incident commanders at OWS protests based on "my own personnel experience, by working with them, knowing them over the years." (Purtell Dep. 28:7-9; 28:12-14.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

275.    The City of New York did not know whether the New York State Court of Appeals decision in *People v. Jones* required any changes in the NYPD's use of the subsection of the disorderly conduct statute dealing with obstruction of pedestrian traffic in its policing of First Amendment sidewalk protests.  (Gannon Dep. 41:3 – 42:13.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that Gannon is a designated 30(b)(6) witness pertaining to training on the disorderly conduct statute or any training pertaining to People v Jones.  Further note that the NYPD Police Student's Guide, Maintaining Public Order: Demonstrations, from *2005 through 2012* specifically provides training on the standard for application of PL §240.20(5) as set forth in in the 2007 People v. Jones decision.  People v. Jones applies the standard set forth in People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly conduct statute, §722 to the current statute, §240.20(5).  Further note that the NYPD Police Student's Guide, Demonstrations, from *2005 through 2012* specifically states that under PL §240.20(5):

> There is always some incidental blocking of the street or sidewalk whenever one or more persons use public areas to communicate their views.  Even a lone individual handing out political or religious leaflets, something that is clearly legal, may be blocking the passage of others.   This is not what the law means when it talks in terms of **obstruction**.  Incidental obstruction is not illegal if it is less than a **serious annoyance** or only **mere inconveniencing** of pedestrians.   The statute dealing with obstruction is Penal Law §240.20(5) (Disorderly Conduct), which prohibits obstructing vehicular or pedestrian traffic **with intent to cause public inconvenience, annoyance or alarm**.  (Emphasis in original).  Exs D, D1-7.

- 85 -

Note further that the NYPD Police Academy issued a Police Academy Training Memo in December 2007, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which references the decision in <u>People v. Jones</u>. Ex. G.  Commanding Officers were directed to ensure that each member of their commands (precincts) was informed of and received command level training on this Training Memo.  <u>Id.</u>  Note further that the designated 30(b)(6) witness provided with respect to NYPD training on the disorderly conduct statute, Heather Perkins, testified that the NYPD Police Academy specifically trained on PL §240.20(5)— including the "substantial blockage" and "mere inconvenience" standards.  Ex. N, Perkins Dep. 49:18-50:18; 158:17-159:24.

276.   The City of New York did not know whether the NYPD made any changes in the NYPD's use of the subsection of the disorderly conduct statute dealing with obstruction of pedestrian traffic in its policing of First Amendment sidewalk protests as a result of the New York State Court of Appeals decision in *People v. Jones*.  (Gannon Dep. 41:3-42:13.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 275.

277.   NYPD Lieutenant Konstantinidis was responsible for supervising officers at Zuccotti Park during OWS a few days a week.  (PACKARD 22674 (Konstantinidis Dep.) 30:15-22; PACKARD 22677 (Konstantinidis Dep.); 33:12-14; PACKARD 22708 (Konstantinidis Dep.) 64:3-6.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a non-party/non-witness pertaining to Zuccotti Park contains a material fact.

278.   NYPD Lieutenant Konstantinidis, who was responsible for supervising officers at Zuccotti Park during OWS a few days a week, testified that he did not remember training the

First Amendment rights of protestors and that "I don't know" what the First Amendment means in police work.  (PACKARD 22701-702 (Konstantinidis Dep.) 57:6 – 58:22.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 278.

279.    Incident commanders and other on-scene supervisors are responsible for ensuring "that probable cause has been established" to make an arrest of protestors at First Amendment sidewalk protests.  (Gannon Dep. 184:9-17.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony makes any reference to so-called, "sidewalk protests," but admit that Gannon actually testified, "[t]here's levels of supervision that would ensure that the constitutional right of, you know, we're not violating the first or the fourth amendment.  Supervisors ensure that probable cause has been established.  So that's a protection against constitutional violations, to make sure that the—to make sure that the officers have probable cause to make arrests."  Ex. Q, Gannon Dep. 184:9-17.

280.    The City takes no steps other than on scene supervisors' assessment of probable cause to review whether policing is within constitutional limits on police power.  (Gannon Dep. 184:18-23.)

**DEFENDANTS' RESPONSE:**    Deny. The quoted testimony is a mischaracterization of Gannon's overall testimony in which he repeatedly testified that Legal Bureau attorneys helped Incident Commanders in the field during OWS, including assistance in establishing probable cause for an arrest.  Ex. Q, Gannon Dep. 150:16-20, 158:22-159:8, 161:21-162:9, 163:3-9, 175:18-176:5, 180:18-181:9.

281.    Police Officers at First Amendment sidewalk protests make arrests at the direction of on-scene supervisors.  Decisions to make an arrest are "under the preview [sic] of an incident commander's discretion."  (Raganella Dep.  61:9-17.)

**DEFENDANTS' RESPONSE:**   Deny and deny further that the cited testimony supports the statement and note that Raganella testified as follows:

Q.  I'm asking about the decisions to make the arrest, and handling the sidewalk protest, did the officers follow the training of DCU in regards to those topics?
A. We don't give training on those topics. That's under the preview of an incident commander's discretion.

282.    Arrests at OWS protests "would be directed by supervisors, unless it was extenuating circumstances."  (Purtell Dep. 42:17-18.)

**DEFENDANTS' RESPONSE:**   Deny that the cited testimony supports the statement as Purtell actually testified that, [officers] were told that arrests would be directed by supervisors, unless it was extenuating circumstances."   Note that in fact, there are numerous OWS cases in which arrest decisions were made by officers below the rank of Captain.   See e.g., Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024 (S.D.N.Y. 2016), aff'd 2018 U.S. App. LEXIS 5610 (2d Cir. 2018) (arrest decisions made by police officers); Brown v. City of New York, 2014 U.S. Dist. LEXIS 83513 (S.D.N.Y. 2014), aff'd. 798 F3d. 94 (2d Cir. 2018) (arrests decision made by police officers); Kass v. City of New York, 2015 U.S. Dist. LEXIS 165253 (S.D.N.Y. 2015), aff'd 2017 U.S. App. LEXIS 13259 (2d Cir. 2017) (arrest decision made by police officers); Lebowitz v. City of New York, 2014 U.S. Dist. LEXIS 25515 (S.D.N.Y. 2014), aff'd 2015 U.S. App. LEXIS 9106 (2d Cir. 2015) (arrest decision made by police officer); Holmes v. City of New York, 2018 U.S. Dist. LEXIS  53419 (S.D.N.Y. 2018) (arrest decision made by detective); Collins v. City of New York, 295 F. Supp. 3d 350 (S.D.N.Y. 2018) (arrest decisions made by lieutenant and police officers); Poo Soto v. City of New York, 13-CV-8474, Dkt. 204, Judgment jury verdict, dated April 13, 2018 (lieutenant made arrest decision); Mediavilla v. City of New York, 259 F. Supp. 3d 82 (S.D.N.Y. 2016) (arrest decision made by lieutenant).

283.    "If a supervisor [at a First Amendment sidewalk protest] believes that there's a substantial disruption, they can instruct the officers to make the arrests."  (Raganella Dep. 38:11-15; 39:12-20.)

**DEFENDANTS' RESPONSE:**   Deny that there is any reference to, "First Amendment sidewalk protest" in the cited testimony or in the questions eliciting the testimony, and further deny that the statement contains a material fact.

284.    In reviewing video of the policing of a First Amendment sidewalk protest on September 17, 2012, at which the police separated protestors from each other into two groups, the City could not identify why police separated the protestors into two groups.  (Gannon Dep. 166:9-22; PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

**DEFENDANTS' RESPONSE:**    Deny that there is any record of Gannon having viewed the cited video during his deposition.  Deny that the statements contain a material fact

285.    In reviewing video of the policing of a First Amendment sidewalk protest on September 17, 2012, at which the police separated protestors from each other into two groups, the City could not identify any valid basis for those arrests.  (Gannon Dep. 167:8-19; PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

**DEFENDANTS' RESPONSE:**   Deny and further deny that there is any record of Gannon having viewed the cited video during his deposition.  Further deny that the cited testimony supports any part of the statement.

286.    In reviewing video of the policing of a First Amendment sidewalk protest on September 17, 2012, at which the police separated protestors from each other into two groups, the City, by its 30(b)(6) witness, testified that it heard no dispersal order given before four arrests were made.

(Gannon Dep. 168:20 -169:6; PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

**DEFENDANTS' RESPONSE:**  Deny and further deny that there is any record of Gannon having viewed the cited video during his deposition.  Further deny that Gannon testified that he "heard no dispersal order given before four arrests were made."

287.    Chief Purtell testified that he heard no instructions to disperse or other instructions before arrests were made.    (Purtell Dep. 138:21-139:2; PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

**DEFENDANTS' RESPONSE:**  Deny and further deny that there is any record of Purtell having viewed the cited video during his deposition.

288.    Chief Purtell observed the arrest of three OWS demonstrators on video and admitted that he could not identify in the video any probable cause for their arrests.  (Purtell Dep. 137:5-138:10; PACKARD Disc 18 Video 20120917163228.mpg [TARU Malone Video].)

**DEFENDANTS' RESPONSE:**  Deny that there is any record of Purtell having viewed the cited video during his deposition.  Further deny that the cited testimony supports the statement.

289.    Chief Purtell testified that the NYPD does not give dispersal orders to sidewalk protestors who are standing on the sidewalk.  (Purtell Dep. 187:16-21.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement in any way as Purtell actually testified, "[those] orders were specifically directed, not at people who were standing on the sidewalk but people who literally had sat down and were committing, in our interpretation, disorderly conduct by blocking the sidewalk in that instance."

290.    Chief Purtell had no training on dispersal orders of any kind since 1993 or 1994.  (Purtell Dep. 160:21-161:8.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that there is any evidence that non-party Purtell ordered the arrest of any of the plaintiffs, made the arrest of any of the plaintiffs or gave a dispersal order to any of the plaintiffs.

291.    Chief Purtell has never had training at any time regarding dispersal of First Amendment demonstrators.  (Purtell Dep. 165:20-166:7.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement.  Further deny that there is any evidence that Purtell ordered the arrest of any of the plaintiffs, made the arrest of any of the plaintiffs or gave a dispersal order to any of the plaintiffs.

292.    Chief Purtell has never had training at any time regarding provision of alternative avenues of protest for demonstrators who are ordered to disperse.  (Purtell Dep. 165:7-166:7.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Deny that the statement contains a material fact.  Further deny that there is any evidence that Purtell ordered the arrest of any of the plaintiffs, made the arrest of any of the plaintiffs or gave a dispersal order to any of the plaintiffs.

293.    During OWS and the class period, Chief Purtell understood that a dispersal order was not required to provide an alternative forum.  Chief Purtell's thought that an order solely commanding protestors to "leave – to leave the area" was a constitutionally complaint dispersal order in the context of a First Amendment protest.  (Purtell Dep. 166:12-167:6.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further deny that the cited testimony has any reference whatsoever to, "the class period," "alternative forum," or "constitutionally compliant dispersal order in the context of a First Amendment protest."  Further deny that there is any evidence that Purtell ordered the arrest of any of the plaintiffs, made the arrest of any of the plaintiffs or gave a dispersal order to any of the plaintiffs.

294.    Chief Purtell testified that he never set up an alternative avenue of protest, "never set up a free speech zone", to facilitate First Amendment speech at an OWS protest.  (Purtell Dep. 73:5-15.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that Purtell testified, "that he never set up an alternative avenue of protest."  Further deny that there is any evidence that the NYPD established so-called "free speech zones." Further deny that there is any evidence that Purtell ordered the arrest of any of the plaintiffs, made the arrest of any of the plaintiffs or gave a dispersal order to any of the plaintiffs.

295.    Chief Purtell is unaware of what conduct justifies an arrest under the disorderly conduct statute, including the subsection regarding blockage of pedestrian traffic.  (Purtell Dep. 162:15-163:3.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement as Purtell actually testified that he did not recall if the disorderly conduct statute, subdivision five requires intent.

296.    Deputy Inspector Raganella, the head of DCU, testified that dispersal orders and arrest warnings do not include providing an alternative avenue for protest "[u]nless it was written down and documented somehow on the actual arrest warnings, probably not."  (Raganella Dep. 185:15-20.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony contains any statement pertaining to dispersal orders.

297.    During the class period, the City provided written dispersal orders for use during OWS protests.  (Raganella Dep. 271:12-24.)

**DEFENDANTS' RESPONSE:** Admit.

298.    Written dispersal orders were distributed by DCU at Mobilization Exercises.  (Raganella Dep. 272:20-273:2.)

**DEFENDANTS' RESPONSE:**  Admit that Raganella testified that pre-written arrest warnings could have been distributed by the Disorder Control Unit at mobilization exercises, but deny that the statement contains a material fact.

299.    DCU copied these dispersal orders from pre-existing orders "where it was a piece of paper on a shelf that we continually make copies of."  (Raganella Dep. 273:7-20; 274:23-275:2.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony contains any statement pertaining to dispersal orders.  Deny that the statement contains a material fact.

300.    These dispersal orders were pre-printed cards that "had been in use for years."  (Purtell Dep. 53:23-54:2 55:13-16.)

**DEFENDANTS' RESPONSE:**  Deny that either the cited testimony or the questions eliciting the testimony contain any reference to dispersal orders on pre-printed cards.  Deny that the record establishes what Purtell was referring to when he testified, "I had seen it.  I don't recall if it was directly sent to me, but this had been in use for years."

301.    An NYPD pre-printed card with a dispersal order contains no place for instructions for demonstrator egress or for instructions on how to access an alternative forum for protest.  (D19526.)

**DEFENDANTS' RESPONSE:**  Admit only that the cited arrest warning card to leave Zuccotti Park due to blockage of the entrance does not contain an alternative forum.

302.    The DCU created a handout for use during OWS entitled "Police Officer's Guideline at Demonstrations".  (Raganella Dep. 289:21-24; D025703.)

**DEFENDANTS' RESPONSE:**   Admit that the Disorder Control Unit created a one-paged document pertaining to required equipment, radios, vehicles and barriers.

303.    The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" does not include anything on the First Amendment requirements of policing sidewalk protests.  (Raganella Dep. 289:25-290:8; D025703).

**DEFENDANTS' RESPONSE:**  See Response to Statement Nos. 170, 302.

304.    The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" does not include anything on the requirement that a means of egress be provided to protestors subject to a dispersal order, (Raganella Dep. 290:9-14; D025703.)

**DEFENDANTS' RESPONSE:**  See Response to Statement Nos. 170, 302.

305.    The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" does not include anything on the requirement that an alternative avenue of protest be provided to protestors subject to a dispersal order.  (Raganella Dep. 290:22-291:6; D025703.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 170, 302.

306.    The handout for use at OWS protests entitled "Police Officer's Guideline at Demonstrations" states that "Sidewalks must remain clear to pedestrian traffic."  (D25704.)

**DEFENDANTS' RESPONSE:**  Admit that the cited one-paged document states, "[s]idewalks must remain clear to pedestrian traffic (specifically around Zuccotti Park)," but deny that this statement contains a material fact.

307.    Deputy Inspector Raganella concluded based on the video of Ari Cowan's arrest, that the arrest was not consistent with training.  (Raganella Dep. 229:25-230:9.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement in any way.  Further deny that the record establishes that Raganella gave any testimony pertaining to Ari Cowan's arrest.  Further deny that the record establishes that Raganella was shown video depicting Ari Cowan's arrest.

308.    The march in which Ari Cowan was participating consisted of a peaceful crowd that was not riotous.  (Raganella Dep. 228:7-10.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement in any way.  Further deny that the record establishes that Raganella gave any testimony pertaining to Ari Cowan's arrest.  Further deny that the record establishes that Raganella was shown video depicting Ari Cowan's arrest.

309.    A September 5, 2012 NYPD Intelligence Briefing regarding the One Year Anniversary of OWS cites no plans for violence by OWS protestors or any intent to shut down the Stock Exchange.  (D19374-376.)

**DEFENDANTS' RESPONSE:**  Deny that the statement pertaining to a confidential document contains a material fact.  Further deny that OWS protesters had no intent to shut down the Stock Exchange.  Note that the NYPD was aware of OWS organizers' plans via "social media networks" as reflected in the NYPD detail requests pertaining to the anniversary calling it the "Occupy Wall Street Demo/Sleep-In" and "All roads lead to Wall Street Demonstration.  The NYPD cited to the "Storm Wall Street" plan to conduct "roving intersection occupations."  Ex. C, D000784-000792; Ex. D, D032331-032350.  Chief Purtell, the NYPD Commanding Officer of Patrol Bureau Manhattan South, testified that the NYPD had information that demonstrators were planning to shut down Wall Street and prevent the New York Stock Exchange from

opening during the period, September 15-17, 2012.  Ex. WW, Purtell Dep., 17:21-18:4, 57:12-18, 69:13-17, 74:14-20.

310.   The Commanding Officer of DCU was on duty all day on September 12, 2012.  (D19504.)

**DEFENDANTS' RESPONSE:**  Admit but deny that the statement contains a material fact.

311.   Chief Purtell was the Incident Commander on September 12, 2012.  (D19541.)

**DEFENDANTS' RESPONSE:**  Deny knowledge or information as to whether Chief Purtell was the Incident Commander on a date of incident not at issue in this case.

312.   At 7:47:45am on September 17, 2012, pedestrians were able to walk on the sidewalk on both sides of Broadway near Wall Street.  (Purtell Dep. 91:21-92:6.)

**DEFENDANTS' RESPONSE:**  Admit that Purtell so testified as to what he observed on an unidentified video but deny that the statement contains a material fact.

313.   At 7:49:00am on September 17, 2012, the sidewalk on the east side of Broadway was "congested with demonstrators."  (Purtell Dep. 96:9-97:10; 94:21-95:25.)

**DEFENDANTS' RESPONSE:**  Admit that Purtell so testified as to what he observed at timestamp 7:40:00 a.m., on an unidentified video.

314.   Chief Purtell attended no trainings specific to OWS.  (Purtell Dep. 158:12-16.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Purtell actually testified that he did not attend any specialized trainings after the beginning of OWS.  Further deny that the statement contains a material fact.

315.   Chief Purtell testified "I don't recall" if he ordered the sidewalk on the east side of Broadway south of Wall Street blocked.  (Purtell Dep. 97:25-98:6.)

**DEFENDANTS' RESPONSE:**  Deny that the statement makes sense, and further deny that it has anything to do with Purtell's cited testimony:

Q.  If you were to have given an order to the police to not allow people to traverse further south, could you explain why that order would have been given?
A.        I        don't        recall        if        I        gave        that        order.

316.    Chief Purtell testified that at 7:50:00am on on September 17, 2012, the marchers were "still predominantly stationary.  I don't know what their intent is at this point."  (Purtell Dep. 97:15-24.)

**DEFENDANTS' RESPONSE:**   Admit that Purtell so testified as to what he observed at timestamp 7:50:00 a.m., on an unidentified video.

317.    Chief Purtell testified that at 7:55:12am on September 17, 2012, "there's no barriers or obstructions or demonstrators clogging the sidewalk" on the west side of Broadway for at least one "hundred to two hundred yards."  (Purtell Dep. 105:19-106:15.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Purtell actually testified, "[i]t seems there's no barriers or obstructions or demonstrators clogging the sidewalk—[f]rom the hundred to 200 yards that are visible in this video," referring to what he observed on video entirely unidentified in the deposition.

318.    Chief Purtell testified that throughout the ten minutes starting at 7:45am on September 17, 2012, vehicular traffic was flowing on Broadway, "albeit down to one lane, maybe two.  That would be a normal day."  (Purtell Dep. 107:6-13.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement in any way.  Deny that there Purtell testified, "that throughout the ten minutes starting at 7:45 a.m. on September 17, 2012, vehicular traffic was flowing on Broadway."  Further deny that there is evidence of any video that Purtell viewed during his deposition.

319.    Chief Purtell testified that at 7:56:30 on September 17, 2012, both lanes of traffic were moving.  (Purtell Dep. 109:6-10.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further deny that the record reflects that Purtell testified to anything he observed at timestamp 7:56:30 on an unidentified video.

320.    Chief Purtell testified that by 7:58:04am on September 17, 2012, the sidewalk on the east side of Broadway north of Wall Street had opened up.  (Purtell Dep. 109:19-110:3.)

**DEFENDANTS' RESPONSE:**   Admit that Purtell so testified as to what he observed at timestamp 7:58:04 a.m., on an unidentified video.

321.    Chief Purtell testified that before Bishop Packard and others with him were arrested on September 17, 2012, he did not know if dispersal orders were given before arrests were made.  "I can't determine if they were given an opportunity to leave or not."  (Purtell Dep. 112:16-22.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further deny that Purtell so testified.  Purtell actually testified: "I didn't hear the—I don't know if they were given the warnings prior to this video.  I do not know how many times they were given the video—given the warnings."  Further deny that the record identifies the video that Purtell was viewing when he gave this testimony.

322.    On September 17, 2012, Chief Purtell would not allow the demonstrators to proceed south on Broadway.  (Purtell Dep. 118:19-23; 132:10-19; 177:17-25.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement.

323.    Chief Purtell does not deny that he would not allow the demonstrators to go down Wall Street on September 17, 2012.  (Purtell Dep. 119:12-15.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further

deny that Purtell so testified.  Purtell actually testified as follows:

Q.  Are you aware that he testified that you told him he could not turn left onto Wall Street?
A.                          I             don't            recall            that            either.

324.    Chief Purtell could not identify any reason why the protestors should not have been

allowed to cross to the west side of Broadway at Wall Street on September 17, 2012.  (Purtell

Dep. 127:14-20.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement as Purtell

actually testified as follows:

Q.  So if individuals wanted to head south, why not given them access to the crosswalk that was
going west, away from the Stock Exchange, so they could cross to the other side of the sidewalk
and head south?
A.  I don't recall.

325.    Chief Purtell did not deny that police officers were blocking the sidewalk from the

building line all the way across the sidewalk to a pen which the NYPD had set up to contain the

press on September 17, 2012.  (Purtell Dep. 116:16-24.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further

deny that Purtell so testified.

326.    The NYPD set up a barrier on the sidewalk at the intersection of Broadway and Wall

Street extending 4.5 to 5 feet out from the building line onto the sidewalk on September 17,

2012.  (Purtell Dep. 120:10-121:13.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further

deny that Purtell so testified.  Further note that Purtell is testifying as to what he is observing in a

video that is not identified in any way.

327.   Bishop Packard testified that on September 17, 2012 he spoke to other protestors during the march "who looked a little worried because there were so many policemen along the barricades, and they were very afraid."  He counselled them that, "This is – there is nothing to be afraid of.  You're exercising your constitutional rights.  There's some things you should keep in mind.  [. . .]  And I emphasized this is a nonviolent, peaceful protest.  We have no intention of getting arrested.  We are just going to circle Wall Street and - - as a testimony, silent testimony to the anniversary of Occupy."  (Packard Dep. 279:22 - 280:1).

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Note that when Packard refers to "we," he is referring to the group of five hundred protesters he led in a march from the Red Cube in Zuccotti Park on the sidewalk going south on Broadway headed to the TD Bank.  Compl., ¶¶109, 110; Packard Dep., 178:2-5; 287:18-21.

328.   Bishop Packard testified that "We [we]re just going to circle Wall Street and - - as a testimony, silent testimony to the anniversary of Occupy."  (Packard Dep. 279:24 - 280:1).  He also testified that "we were trying to go to the marshaling area and the Vietnam Memorial."  (Id. at 277:3-5.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Note that when Packard refers to "we," he is referring to the group of five hundred protesters he led in a march from the Red Cube in Zuccotti Park on the sidewalk going south on Broadway headed to the TD Bank.  Compl., ¶¶109, 110; Packard Dep., 178:2-5; 287:18-21.

329.   Multiple photographs show that Bishop Packard was stopped by NYPD officers who blocked the sidewalk, preventing pedestrians, including the group of pedestrians led by Bishop Packard, from proceeding.   (PACKARD28132,   PACKARD28133,   PACKARD28136,

PACKARD28137, PACKARD28138; (NYPD Sgt. Arthur Smarch appears in a suit and red tie in the center of PACKARD28133).)

**DEFENDANTS' RESPONSE:**  Deny.  Further deny that photographs show that Packard was stopped by NYPD officers.

330.   Chief Purtell testified that he has "no idea if they are stationary by personal choice" on September 17, 2012.  (Purtell Dep. 96:18-19.)

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statement.  Further deny that Purtell so testified.  Note that Purtell is testifying at 96:18-19 as to what he is observing on an unidentified video.   Further note that Purtell actually testified, "[i]t looks like the demonstrators are stationary.  I have no idea if they are stationary by personal choice or if there's an obstruction in the roadway—on the sidewalk."

331.   After and because the NYPD blocked the group of pedestrians led by Bishop Packard from proceeding on the sidewalk, the sidewalk became dense with people.  (ARGUS Video 1, SEC Broadway-Wall, Video Still, 7:51:11.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited video still supports the statement.

332.   Bishop Packard testified that he "said to [Chief Purtell], 'It's impossible for me to get everybody to turn around here.  There's too many people to do this'."  (Packard Dep. 175:17-19.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

333.   Chief Purtell answered, "You can't go down there."  Bishop Packard responded, "Well, can we cross Broadway and proceed south on Broadway?  [Chief Purtell] said No.  He said that was blocked."  Chief Purtell told Bishop Packard that "I could not go down Broadway.  I

couldn't proceed south on Broadway, and I could not cross Broadway because there were barriers all along the route."  (Packard Dep. 175:17-19.)

**DEFENDANTS' RESPONSE:**  Deny and note that when Packard, and the marchers he was leading, reached near the corner of Wall Street and Broadway, Packard approached Chief Purtell and allegedly said that he wanted to proceed down Wall Street.  Packard Dep., 153:6-10; 172:1-5. Packard testified that Purtell instructed him to turn around and go back the way he came—reverse his present course and go back north.  Packard Dep., 172:22-173:1; 173:20-23. Video shows that reversing their course is exactly what the crowd of five hundred protesters did and the end of their demonstration. ARUGS Video 1, SEC Broadway-Wall, 7:55:50-8:00:00. Packard testified that he had no further communications with Purtell.  Packard Dep., 176:19-177:4.

334.    After Bishop Packard answered Chief Purtell that he would not be able to get the group of 500 marchers to turn around, "[t]here was this long pause, no more conversation.  [ . . . ]  So I was waiting for an answer, and I didn't get an answer.  And it was during this period that people, in ones and twos, started to sit down."  (Packard Dep. 174:1-9.)

**DEFENDANTS' RESPONSE:**  Admit only that Packard so testified but deny that the statement contains a material fact.

335.    PACKARD28167 and PACKARD28179 show that Bishop Packard was seated approximately two feet from the building and not in the middle of the sidewalk.

**DEFENDANTS' RESPONSE:**  Deny and note that the photographs speak for themselves—the protesters, including Packard, were sitting in a circle, in the middle of the sidewalk, directly in front of the entrance to TD Bank.

336.    Bishop Packard testified that "We were making particular effort not to sit in the middle of the sidewalk."  (Packard Dep., 166:5-7.)

**DEFENDANTS' RESPONSE:** Admit only that Packard so testified, but note that the photographs speak for themselves—the protesters, including Packard, were sitting in a circle, in the middle of the sidewalk, directly in front of the entrance to TD Bank.

337.   Bishop Packard testified that "When we were in line and I was talking to the officer, we were not blocking any sidewalk" and that "I did not think we were blocking traffic." (Packard Dep. 211:4-5; 224:6-8.)

**DEFENDANTS' RESPONSE:** Deny that the statement contains a material fact.

338.   No dispersal order is heard on the video prior to the time at which the police begin to arrest protestors. (AP Video, 00:24-00:33.)

**DEFENDANTS' RESPONSE:** Deny and note that plaintiffs' own photograph shows Inspector Winski giving orders with a bullhorn while Packard remains sitting in the middle of the sidewalk. See Defs MSJ, Ex. I:[1]

---

[1] References to "Defs MSJ, Ex. _, refer to the exhibits attached to the Declaration of Amy Robinson in Support of Defendant's Motion for Summary Judgment.



339.    When the first order to disperse was given, Bishop Packard believed that "the arrest was commencing" because there "were police all over the place . . . in our midst as they are in that picture" and he believed he was under arrest.  (Packard Dep. 224:25 – 225:11; 225:24 – 226:1.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 338.

340.    Chief Purtell also testified that Bishop Packard was under arrest at this time.  Chief Purtell testified that "I can't tell if his hands are cuffed.  He seems to be in the presence of a police officer.  I'm going to make the assumption he is under arrest."  (Purtell Dep. 104:2-6.)

**DEFENDANTS' RESPONSE:**  Deny that the statement makes any sense.  Further deny that there is a single reference in Purtell's deposition transcript as to what video he was even viewing when he made this statement.

341.    Bishop Packard testified that "I don't recall hearing a disperse -- dispersal call, until I'm well on my way into the paddy wagon."  (Packard Dep. 230:7-9.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further note that in Statement No. 339 Packard believed that the first order to disperse was given when his arrest was commencing, and in this Statement No. 341, Packard does not recall hearing an order until he is well on his way to a patrol wagon.  Note further that plaintiffs' photograph shows Inspector Winski giving orders with a bullhorn while Packard remains sitting in the middle of the sidewalk graphs.  <u>See</u> Defs MSJ, Ex. I.

342.     The testimony of Chief Purtell establishes that the sidewalk on the west side of Broadway was clear and that pedestrians were able to move.  (Purtell Dep. 88:20 – 89:2.)  Chief Purtell testified that while the sidewalk was crowded on the east side of Broadway, "across the street . . . is apparently wide open; people can get down there with greater ease." (Purtell Dep. at 92:22 – 93:6).  Chief Purtell testified that at 7:55am the sidewalk on the west side of the street was accessible, "that there's no barriers or obstructions or demonstrators clogging the sidewalk." (Purtell Dep. at 105: 19 – 106:11.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Photographs show that Packard sat down on the sidewalk directly in front of the TD Bank.  See Defs MSJ, Ex. I; Ex. K.  Object on the grounds that Purtell is viewing a video as he gives this testimony, but there is no record of any video that Purtell viewed during his deposition.

343.     Chief Purtell testified that from 7:45 to 7:55, "vehicular traffic was flowing, "albeit down to one lane, maybe two.  That would be a normal day."  (Purtell Dep. 107:6-13.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Object on the grounds that Purtell is viewing a video as he gives this testimony, but there is no record of any video that Purtell viewed during his deposition.

344.    Chief Purtell testified that at 7:56 and thirty seconds both lanes of traffic were moving. (Purtell Dep. 109:6-10.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Object on the grounds that Purtell is viewing a video as he gives this testimony, but there is no record of any video that Purtell viewed during his deposition.

345.    Video shows police blocking the crosswalk on the west side of Broadway with barricades and preventing people from crossing Broadway.  (ARGUS Video 1, SEC Broadway-Wall, 7:48:15-7:48:33).

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that either police or barricades prevented people from crossing the sidewalk as the cited video clearly shows three people doing so.

346.    Photographs show multiple pedestrians walking into the street because the police were blocking the sidewalk.  (PACKARD28132, PACKARD28133, PACKARD28136, PACKARD28137, PACKARD28138.)

**DEFENDANTS' RESPONSE:**  Deny and note that video shows that the entire sidewalk was blocked by the hundreds of protesters, including Packard—and not by police officers.  See Defs MSJ, Ex. H.  Further deny that the five cited photographs of Inspector Winski support the statement.  Note further that video shows the NYPD formed a human line in the street in order to allow people who did not want to be involved in the protest to walk into the street, past the protesters, and continue on their way south on Broadway in safety.  See Defs MSJ, Ex. F, ARGUS Video 1, SEC Broadway-Wall, 7:54:48 (line forming on far left of screen); 7:55:06-7:55:28 (pedestrians passing in the street going southbound); 7:55:42 (pedestrians passing in the street going northbound).

347.    Chief Purtell pushed a protestor towards other officers, who was then arrested.   (Purtell Dep. 133:18-134:13; PACKARD Disc 8 Video 20120917075547.mts, at 00:00 - 01:46).

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Object on the grounds that Purtell is viewing a video as he gives this testimony, but there is no record of any video that Purtell viewed during his deposition.

348.    Chief Purtell admitted in testimony that upon reviewing a video of the arrest of the protestor he pushed, he could not articulate the basis for the arrest or identify probable cause justifying the arrest.    (Purtell Dep. 133:18-134:13;  PACKARD Disc 8 Video 20120917075547.mts, at 00:00 - 01:46).

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.   Further deny that the testimony supports the statement. Object on the grounds that Purtell is viewing a video as he gives this testimony, but there is no record of any video that Purtell viewed during his deposition.

349.    Mr. Beck testified that when he arrived in the Financial District on September 17, 2012, the sidewalks across from the Charging Bull on Broadway were not blocked by the presence of 50 to 100 people but instead that, "People were moving back and forth all the time."  (Beck Dep., 30:10-11.)

**DEFENDANTS' RESPONSE:**  Deny and further deny that the cited testimony supports the statement.  Beck actually testified that ***at the time of his arrest*** there were "50, 80, 100.  People moving back and forth all the time."   See Defs MSJ, Ex. T Beck Dep., 30:4-14.  Further note that Beck never testified that he arrived in the Financial District across from the Charging Bull on Broadway.  Beck actually testified that he arrived somewhere in downtown Manhattan and did not know what the street names were.  Id. at 28:15-23.

- 107 -

350.    Mr. Beck testified that "We were always moving up until the arrest, prior to mine" but that "The police department came up on the sidewalk, stood shoulder-to-shoulder, and blocked it." (Beck Dep. 30:18-25.)

**DEFENDANTS' RESPONSE:**    Admit only that Beck so testified, but deny that Beck was moving on as ordered.  Note that any denial that Beck was blocking pedestrian traffic is not genuine.  Prior to his arrest, video and a video still show that Beck and the fifty to one hundred other protesters blocked the sidewalk from building to curb.  See Defs MSJ, Ex. X, TARU McDonald Video Still, 9:39:40 at 00:36.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024, *18-19 (S.D.N.Y. 2016).  See Defs MSJ, Ex. X, TARU McDonald Video Still, 9:39:40 at 00:36:



351.    Mr. Beck stopped walking because NYPD officers blocked passage on the sidewalk. (Beck Dep. 30:18-25.)

**DEFENDANTS' RESPONSE:**  Admit only that Beck so testified, but deny that Beck was blocked from moving on by police officers.  Note that video shows that all that Beck had to do was keep moving on by walking north, but he did not do that.  Instead, video shows that he continued to block the sidewalk by standing face-to-face with officers who were standing in the street—not the sidewalk.  See Defs MSJ, Ex. U, Argus Video 1, Video Still, ESide of Broadway 1 S of Morris at 19:22:



352.    Mr. Beck stopped walking because NYPD officers began interacting with the protestors, including making arrests.  (LMSI Video: ESide of Broadway 1 S of Morris St.mp4, Packard Disc 39, 18:50-19:50).

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the video cited supports the statement.

353.    Mr. Beck testified that he was not told he was blocking the sidewalk until after he had been arrested.  (Beck Dep. 37:10-12.)

**DEFENDANTS' RESPONSE:**   Deny that the statement contains a material fact.  Further deny that Beck did not receive orders to move on before he was arrested.  Note that video shows Beck with a large group of protesters one block from his arrest location in front of Kings College at Broadway and Exchange Place and present when the following orders were given via bullhorn: "If you continue to block the sidewalk, you will be arrested.  Please keep moving.  Keep moving. If you continue to block the sidewalk, you will be arrested.  Please keep moving."  See Defs MSJ, Ex. U, TARU DeFranco Video, 9:09:00 at 01:14-01:56.  Note further that prior to his arrest at Morris and Broadway NYPD Captain Iocco gives the orders, "Guys, keep moving, you're blocking the sidewalk.  Keep moving.  Keep moving, you're blocking the sidewalk.  Keep moving"—within feet of Beck.  See Defs MSJ, Ex. Z, TARU Video, 9:34:29 at 00:18-00:00:24; Ex. AA, Video Still at 00:21.

354.    A bird's eye-view of the sidewalk shows that it is not blocked building to curb, and that pedestrians are able to use the sidewalk.  (LMSI Video: ESide of Broadway 1 S of Morris St.mp4, Packard Disc 39, 18:50-19:50).

**DEFENDANTS' RESPONSE:**   Deny and note that the cited video shows at least three pedestrians walking into the street to avoid the protesters, including Beck.  See Defs MSJ, Ex. Z, TARU Marini Video, 9:34:29, 00:50-00:54.  See Defs MSJ, Ex. Y, ARGUS Video 1, Video Still, ESide of Broadway 1 S of Morris at 18:54:



355.    TARU Marini Video, 9:34:29 at 00:00:24 – 1:02 shows that there is much more space on the sidewalk than on a typical afternoon in midtown, on a mid-afternoon subway platform at Herald Square, or a Saturday morning Farmers' Market at Grand Army Plaza or in Union Square.   Any New Yorker could easily walk down that sidewalk without any trouble at all without incurring anything more than mere inconvenience, if that.   The video shows may non-protestors pedestrians standing, watching, while others easily traverse the sidewalk.   (TARU Marini Video, 9:34:29 at 00:41 – 00:48.)

**DEFENDANTS' RESPONSE:**   See Response to Statement No. 354.

356.    The video shows Mr. Beck comply with the order and move on.   (TARU Marini Video, 9:34:29 at 00:41 – 00:35.)

**DEFENDANTS' RESPONSE:**   Deny and further deny that the cited video supports the statement, as video clearly shows that Beck never moved on—he remained in the same area until his arrest.

357.    TARU Marini Video, 9:37:05 at 01:16-01:29, Video Still at 01:20 depicts a moment from the arrest of a friend of Mr. Beck.  Mr. Beck did not interfere in that arrest or take hold of his friend during the arrest.  (Beck Dep. 31:4-14.)

**DEFENDANTS' RESPONSE:**   Deny and further deny that the cited video supports the statement.  Note that the cited video shows that as Iocco, with the assistance of two officers, move in to arrest another protester, Beck interferes in the arrest of that protester literally crossing his arm over Iocco's arm and pushing Iocco entirely out of the way obstructing Iocco in making the arrest:



See Defs MSJ, Ex. Z, TARU Marini Video, 9:37:05 at 01:16-01:29; Ex. AA, Video Still at 01:20.

358.   Mr. Beck testified that while being arrested, Mr. Beck's friend fell.  He further testified that "When he fell, he fell into me, and I put my hands down to catch him, keep him from falling back into the concrete sidewalk or the building, which I was standing next to.  I didn't try to pick him up."  (Beck Dep. 31:17-22.)  TARU Marini Video, 9:37:05 at 01:16-01:29, Video Still at 01:20 shows Mr. Beck with his hands down to catch his friend in an effort to prevent him from falling into the sidewalk, as he testified.

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

359.   Ari Cowan testified that "September 17th, 2012, was a celebration of the anniversary of the start of Occupy Wall Street and a day of public protest to demonstrate that people were still upset about continued economic inequality, et cetera and a venue to express their political opinions in a visible way around Wall Street in New York City."  (Cowan Dep. 139:14-19.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

360.   Mr. Cowan testified that "I would like to state for the record that on the event in question, specifically the protest of September 17th, 2012, I was engaging in -- I had no intention to engage in anything other than the lawful political protest expressing my First Amendment rights because I believe that that was the effective tactic to be used in this situation."  (Cowan Dep. 91:9-15.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

361.   Video shows that despite a police order to leave room on the sidewalk for pedestrians, there are no pedestrians on the sidewalk.  (RT Video 00:16-00:22.)

**DEFENDANTS' RESPONSE:**  Deny and note that pedestrians could not traverse the human wall created by Cowan and the other protesters from building to curb.  See Defs MSJ, Ex. FF, RT Video, 00:09-00:27; See Defs MSJ, Ex. GG, RT Video Still, 00:18:



362.    Video shows the protestors were not blocking the sidewalk.  (RT Video 00:16-00:22.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 361.

363.    Mr. Cowan testified that "The police officer used a megaphone to say that we were blocking pedestrian traffic and had to wait for the pedestrians to walk.  *So we did. And pedestrians walked in both directions during this part of the march.*"  (Cowan Dep. 150:8-11) (emphasis added.)  Mr. Cowan testified that he personally remembered pedestrians being able to walk past the protestors.  (Cowan Dep. 151:19-21.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 361 and note that Cowan admits that the officer who used the megaphone told Cowan personally that he was blocking pedestrian traffic.  See Defs MSJ, Ex. EE, Cowan Dep., 150:8-10.

364.    Video shows that there are a few feet of sidewalk between the protestors and the curb. The video shows police standing on the sidewalk between the protestors and the curb.  The video shows an open lane for pedestrians to walk on the sidewalk.  (RT Video, 00:16-00:30.)

- 114 -

**DEFENDANTS' RESPONSE:**   Deny and further deny that the cited video supports the statement.   Note further that the cited video shows Cowan and the protesters created a human wall blocking the sidewalk from building to curb while an officer using a megaphone instructs Cowan and the other protesters that they need to leave room for pedestrians.

365.    Immediately after Mr. Cowan was arrested, an officer told him, "we told you at least five times."  Mr. Cowan can be heard on video responding to that officer:  "I was just trying to walk." (Raganella Dep, Ex. 1, Video OWS Arrests, at 1:19 – 1:28.)

**DEFENDANTS' RESPONSE:**   Admit that an officer told Cowan, "we told you at least five time," which can be heard on RT video.  See Defs MSJ, Ex.  FF, RT Video, 00:30-00:37.  Object to the video cited by plaintiffs the grounds that there is no record of any such video in Raganella's deposition transcript.   Note that Raganella's deposition in this case was taken on July 12, 2018.  Further note that defendant received a flash drive dated August 30, 2018, entitled, "plaintiff's exhibit 1," to Raganella's deposition containing one main file, 3 sub files, 22 sub sub files, 21 sub sub sub files and multiple screen shots.   Note further that not a single one of the multitude of videos or screen shots on plaintiffs' exhibit 1 to Raganella's deposition is identified in any manner whatsoever in Raganella's deposition.   Further note that Raganella did not view more than 50 videos and screen shots, or anything approaching that number, during his deposition.

366.    Ms. Berger testified that she came to New York City on September 16, 2012 to "be an advocate of universal health care.  I was planning on participating in the peaceful protest but unfortunately I was not given the opportunity before getting arrested."  (Berger Dep. 120:22 – 121:1.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

367.    A voice in the Hujel video appears to say, "If you're not in the sidewalk or crosswalk you'll be arrested."  See Defs MSJ, TARU Hujel Video, 7:56:48 at 00:00 – 00:14.

**DEFENDANTS' RESPONSE:**  Deny that quoted statement exists or can be heard on the cited video or any other video in this case. Note that what the officer using the bullhorn actually states in the video is, "if you do not get on the sidewalk, you will be arrested. Guys, if you stay in the crosswalk, you will be arrested,"   "Guys, if you don't traverse the crosswalk, you will be arrested."

368.    Video shows a line of police officers blocking all vehicle access to the intersection from Pine Street and barricades blocking access from Nassau Street.  Both Pine and Nassau are one-way streets.  (TARU Hujel Video, 7:56:48 at 06:43-06:48.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited video supports the statement. Video clearly shows vehicular traffic traversing and later unable to traverse the intersection.  See Defs MSJ, Ex. MM, TARU Hujel Video, 7:56:48, 0033-01:19 (vehicles traversing one part of the intersection.) See Defs MSJ, Ex. OO, TARU Lee Video, 6:56:42 at 6:43 (vehicle now at a complete stop).

369.    Video shows that Ms. Berger is standing in front of the NYPD videographer who took the video, behind an Executive level officer in a white shirt, and beside at least two officers in blue shirts, one of whom is wearing a baseball cap.  She is not preventing any traffic from moving in the intersection or on either street leading to the intersection, *i.e.*, Ms. Berger is not blocking vehicular traffic.  (TARU Hujel Video, 6:65:42 at 06:43.)

**DEFENDANTS' RESPONSE:**  Deny and deny that the cited video exists.  Note that video clearly shows Berger with a group of protesters in the street blocking vehicular traffic.  See Defs MSJ, Ex, OO, TARU Lee Video Still, 6:56:42 at 06:43.

370.     Video shows that the police are occupying and using the intersection of Pine and Nassau Streets to zip-tie people who have been arrested and are waiting with people in custody, in the center of the intersection, blocking any potential vehicle access.  (TARU Lee Video 6:56:42, at 004:02.)

**DEFENDANTS' RESPONSE:**  Deny that police are "occupying" or "blocking any potential vehicle access," and note that police are in the intersection responding to a condition—namely the utter chaos created by OWS demonstrators in blocking both vehicular and pedestrian traffic at the intersection of Pine and Nassau Streets as shown in video and video stills.  See Defs MSJ, Ex. MM (throughout); See Defs MSJ, Ex. RR (throughout); See Defs MSJ, Ex. SS (throughout).

371.     Video demonstrates that the NYPD videographer recording the video is standing in the middle of a crowd of police officers who are in the center of the intersection.  (*Id*. at 05:00 – 05:20.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 370.

372.     Video shows that Ms. Berger is standing in the middle of a crowd of police officers watching the protestors.  The video does not show her feet or whether she is standing in a crosswalk.  (TARU Hujel Video, 7:56:48 at 07:17 – 07:20.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that purportedly not being able to see Berger's feet for three seconds is material.

373.     Video shows Ms. Berger in the crosswalk as the police seize her.  (TARU Hujel Video, 7:56:48 at 07:33 – 07:34.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact as, under New York State law, *the crosswalk is the street*.  New York Vehicle and Traffic Law §110.

374.    Ms. Berger testified that people were "told by police to get on the sidewalk, get into the crosswalk."  (Berger Dep., 84:9-11.)  Ms. Berger testified that every order she heard included an instruction to stay on the sidewalk _or_ crosswalk.  (Berger Dep., 84:8-23, 86:3-4, 86:18-20.)

**DEFENDANTS' RESPONSE:**  Deny that Berger testified that "every order she heard included an instruction to stay on the sidewalk _or_ crosswalk," as the instruction does not exist.  Further deny that police gave any order at any time to stay on the crosswalk.   See Defs MSJ, Ex. MM, TARU Hujel Video, 7:56:48 (throughout); See Defs MSJ, Ex. RR, TARU Lee Video[2], 6:56:42 (throughout); See Defs MSJ, Ex. SS, TARU Blanck Video, 8:03:52 (throughout).  Note in fact, that an officer using a bullhorn can be heard and seen giving the following order, "Guys, if you don't traverse the crosswalk, you will be arrested."   See Defs MSJ, Ex. MM, TARU Hujel Video, 7:56:48 at 00:12-00:16.  Note further that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024, *18-19 (S.D.N.Y. 2016).  Note further that under New York Vehicle and Traffic Law, the crosswalk is the street.  VTL §110.

375.    Ms. Berger was asked "You heard the police officers instructing people to stay on the sidewalk?"  Her full answer was:  "Correct.  The sidewalk and crosswalk."  (Berger Dep., 84:21-23.)

**DEFENDANTS' RESPONSE:**  See Response to Statement No. 375.

376.    Ms. Berger testified that she heard "police officers instructing people to go on the sidewalk, on the crosswalk, this way, that way and people were either saying okay or they were saying I am trying to.  I need to get over here."  (Berger Dep. 86:6-11.)

---

[2] NYPD TARU Detective Lee's video stamp is one hour off actual time.

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 375.

377.    Ms. Berger was asked "Did you hear any conversations amongst police officers prior to your arrest on September 17th 2012?"  She answered "I heard the police officers instructing people to stay on the sidewalk and crosswalk."  (Berger Dep., 86:1-4.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 375.

378.    Ms. Berger testified "there are multiple police officers shouting stay on the sidewalk, stay on the crosswalk.  I was one of them that said okay, I am or I am trying."  (Berger Dep. 86:18-20.)

**DEFENDANTS' RESPONSE:**  <u>See</u> Response to Statement No. 375.

379.    When Ms. Berger was arrested, she told the officer who had custody of her, "All I was doing was trying to cross the road."  (TARU Blanck Video, 8:03:52, 01:43-01:45.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

380.    George Packard was charged with violation of PL 240.20(5), obstructing pedestrian or vehicular traffic.   The criminal Complaint against him and others states that "numerous pedestrians ha[d] to walk around the defendants in order to pass the area of the sidewalk where the defendants were standing."  (D000005.)

**DEFENDANTS' RESPONSE:**  Admit that Packard was so charged, but deny that there is *any* mention in Packard's criminal court complaint that he was "standing," as the document actually states that he was "**<u>sitting</u>**."  Ex. R at 1.

381.    The charge against George Packard was dismissed on June 3, 2013.  (D000576.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact, but note that Packard accepted an Adjournment in Contemplation of Dismissal ("ACD") at his first court

appearance on December 4, 2012, and that in accordance with the ACD, the charge against him was dropped six months later. See Defs MSJ, Ex. R at 3.

382.    Edward Beck was charged with violation of PL 240.20(5), obstructing pedestrian or vehicular traffic.  The criminal Complaint against him states that "numerous pedestrians [had] to walk into the street to get past the group standing stationary on the sidewalk."  (D000544.)

**DEFENDANTS' RESPONSE:**  Admit.

383.    The charge against Mr. Beck was dismissed on February 27, 2014.  (D000581.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

384.    Ari Cowan was charged with violation of PL 240.20(5), obstructing pedestrian or vehicular traffic, and PL 240.20(6), failure to comply with an order to disperse.  The criminal Complaint against him states that "approximately 10 pedestrians attempting to walk the other direction [were] unable to do so."  (D000564.)

**DEFENDANTS' RESPONSE:**  Admit only that Cowan was so charged.  Deny that the quoted statement exists as Cowan's criminal court complaint actually states, "I saw approximately 10 pedestrians attempting to walk the other direction ***on the sidewalk*** unable to do so."

385.    The charges against Mr. Cowan were dismissed on June 10, 2013.  (D000582.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact but note that Cowan accepted an ACD at his first court appearance on December 11, 2012, and that in accordance with the ACD; the charge against him was dropped six months later.  See Defs MSJ, Ex. KK.

386.    Michelle Berger was arrested for violation of PL 240.20(5), obstructing pedestrian or vehicular traffic, and PL 240.20(6), failure to comply with an order to disperse.  The Arrest Report states that she was "standing in the middle of the sidewalk."  (D000232.)

**DEFENDANTS' RESPONSE:**  Admit that Berger was so arrested, but deny that the statement contains a material fact.

387.    The New York County District Attorney declined to prosecute Ms. Berger.    The "Declination of Prosecution" states that the arresting officer "did not personally observe the alleged conduct" and a Lieutenant who "informed" the arresting officer that Ms. Berger was blocking pedestrian traffic "does not have a specific recollection of this defendant."  (D000225.)

**DEFENDANTS' RESPONSE:**  Admit and note that the Lieutenant could not recall Berger nearly three months after the date of incident.  See Defs MSJ, Ex. VV.

388.    An IAB investigation was conducted for the Bronx Incident and a report was issued that did not mention pedestrians actually being impeded or being on the sidewalk.    Ex. 126: D0214424-D021426; Ex. 127: D0214446.    The report did not discuss the lawfulness of the orders given to the protestors, nor did the report review that tactics used by the police officers. *Id.*

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.  Further deny that the extensive IAB investigation into an unrelated incident "did not mention pedestrians actually being impeded or being on the sidewalk."  Note further that the incident in question— entirely related to the instant case—was one in which a handful of protesters, who set up tables and chairs on a sidewalk in the Bronx, received C-summonses for disorderly conduct.  Note further that in response to the letters from Lappin and Krueger regarding this incident, the NYPD Police Commissioner referred the matter to the Internal Affairs Bureau, Special Investigations Unit, for investigation of possible misconduct.  The investigation into this incident involved the investigative work of one Deputy Chief, one Inspector, one Deputy Inspector, six detectives and one sergeant in the Internal Affairs Bureau.  Note further that the investigation also required that

four officers who were present on the date of the "Bronx Incident" were all formally interviewed and were required to hire legal counsel for these interviews pertaining to the incident. The twelve-person IAB investigation team reviewed video of the incident, the memo book entries of the officers, paperwork involved in issuing the summonses, the disciplinary histories of all of the officers involved, interviews of the officers involved with their legal representation, conferral with the Bronx precinct Integrity Control Officer, conferral with the Bronx precinct Assistant Integrity Control Officer and conferral with the clerk of the Bronx Criminal Court. During their formal interviews, three officers stated that they observed protesters with tables and chairs set up on the sidewalk, and the protesters were given warnings, which they ignored. The investigation concluded that the allegation of misconduct pertaining to this incident was unsubstantiated.

389.    The IAB investigators of the Bronx Incident failed to interview the on-scene Captain. *Id.*

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

390.    On September 15 – 17, 2012, protestors from around the country came to New York to celebrate the First Anniversary of Occupy Wall Street. (Ex 128: PACKARD00809-11).

**DEFENDANTS' RESPONSE:**  Admit.

391.    The geographic focus of the protest was downtown Manhattan. (Ex 129: PACKARD00806-08).

**DEFENDANTS' RESPONSE:**  Admit that the geographic focus of the first anniversary protests was the Wall Street area, including the New York Stock Exchange in downtown Manhattan.

392.    Defendant made choices on the types of training to have its employees attend in anticipation of Occupy Wall Street, including tactical and formation training, but not substantive training such as how to properly police sidewalk protest. Ex. 130: D019531. As the City

prepared, the NYPD did not provide training on the First Amendment, or the application of the disorderly conduct and obstructing governmental administration statutes.  Ex. 46: Purtell Tr. at 48:15-49:14; 72:18-73:4.

**DEFENDANTS' RESPONSE:**  Deny and note that the record shows that every officer in the NYPD received thorough training on First Amendment principles and the application of the disorderly conduct statute in policing demonstrations.   Police Academy instruction was given by state-certified instructors at the NYPD Police Academy.  Ex. M, Perkins Dep. 119:7-15.  The instructors were trained by officers designated as master instructors by the state.  <u>Id.</u> Furthermore, the NYPD's lesson plans and course materials are reviewed for national accreditation every four years by the Commission on Accreditation for Law Enforcement Agencies, ("CALEA"), and the NYPD received these accreditations.  <u>Id.</u>: Ex. M.  Additionally, officers received college credit for these courses through the National College Credit Recommendation Service ("NCCRS").   Ex. M.  Note further that the Police Academy utilized numerous written materials in its training on First Amendment principles and the application of the disorderly conduct statute, including the Police Student's Guide, the Recruit Training Manual, the Patrol Guide, NYPD Legal Bureau Bulletins and Police Academy Training Memoranda.  Exs. A-I.  Instruction on the Constitution and the Bill of rights, specifically including the First Amendment, was provided in various chapters of the Police Student's Guide, including Introduction to Law and Justice and Maintaining Public Order: Demonstrations. As with all chapters of the Police Student's Guide, these chapters have corresponding Lesson Plans and PowerPoint presentations. Exs. A-F.  The lesson plans show that officers' training included lecture, question and answer and group discussion.    Exs. B, B1-5; E, E1-7.   Officers were evaluated by quiz and exams on their comprehension of this training.  <u>Id.</u>

393.    According to the New York County District Attorney's Office, between September 17, 2012 and October 13, 2011, here were 861 arrests of individuals participating in Occupy Wall Street in New York City (Ex. 29: PACKARD07361-07397 @07360-7363), and between October 14, 2011 and October 20 2011, there were an additional 106 arrest.  (Ex. 29: PACKARD07361-07397 @ 07363-7364.)

**DEFENDANTS' RESPONSE:**  Deny that the statement contains a material fact.

394.    Starting in 1998, the NYPD changed from a communication and cooperation model of protest policing to a command and control model, that includes five general elements, aversion to disruption, controlled access, divide and conquer, shock and awe, and zero tolerance.  (Ex. 322; PACKARD07127-07148, Vitale, Alex, *From Negotiated Management to Command and Control: How the New York Polices Department Polices Protest, Policing & Society, September 2005)*.

**DEFENDANTS' RESPONSE:**  Deny that Mr. Vitale's opinion is a material fact.

395.    The NYPD did not train on the relevant training subjects outside of the academy training for recruits (Ex. 30: Perkins Dep. 47:11-24); and does not provide Academy training in the relevant training subjects for executive level training (Ex. 30: Perkins Dep. 54:5-19) and the City of New York could not identify any executive level training that at the Academy or outside the Academy, that included the Legal Bureau, in any relevant training subject; (Ex. 30: Perkins Dep. 85:2-10).

**DEFENDANTS' RESPONSE:**  Deny that the cited testimony supports the statements.  First, note that Perkins actually testified as to the contents of a *course* catalogue, which does not include all of the different types of training conducted by the NYPD. Ex. N, Perkins Dep., 46:15-22.   Second, note that the NYPD provided command level training outside of the

Academy, which is training given by the specialized training section of the Police Academy to command level training sergeants who in turn took the training back to their precincts and trained all of the members of their respective precincts.  Id. at 49:18-50:5.  Note further that an example of this type of training included the 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct." Id.  Third, note that executive officers in their commands receive command level training.  Id.

396.    The NYPD removed a lesson plan entitled *Demonstrations* from its curriculum in 2004. (Ex. 30: Perkins Dep. 37:4-24).

**DEFENDANTS' RESPONSE:**  Deny as this statement is a falsification of the witness's cited testimony.  Perkins specifically testified that the 2002 lesson plan was ***replaced*** in 2004 and incorporated into the NYPD Police Academy, Police Student's Guide, Maintaining Public Order.

## **DEFENDANT'S AFFIRMATIVE STATEMENT OF FACTS**[3]

1.    The record shows that NYPD officers received extensive and thorough training on First Amendment principles and the application of the disorderly conduct statute, PL §240.20(5), blocking vehicular or pedestrian traffic and PL §240.20(6), failure to comply with a lawful order to disperse, in policing demonstrations.  Exs. A, A1-5; B, B1-5; C; D, D1-7; E, E1-5; F; G; H; I.[4]

2.    NYPD officers received this training from the NYPD both at the Police Academy and through Command Level training at their precincts.  Id.

3.    The NYPD Police Academy utilized a plethora of sources to train officers on the Constitution, including the First Amendment, and the application of the disorderly conduct statute, including the NYPD Police Student's Guide, the Recruit Training Manual, the NYPD

---

[3] Although plaintiffs did not argue or attempt to prove in their motion that their arrests were unlawful, probable cause existed for their arrests as fully set forth in Defendant's Memorandum of Law in Support of its Motion for Summary Judgment.  See Dkt. No. 259, at 8-19.
[4] Ex. _" refers to an exhibit attached to the Declaration of Amy Robinson in Opposition to Plaintiffs' Motion for Summary Judgment.

Patrol Guide, Police Academy Training Memoranda, NYPD Legal Bureau Bulletins, Penal Law and PowerPoint presentations.  Id.

4.      The NYPD Police Student's Guide, Chapter: Introduction to Law and Justice, 2007-2012, both defines the Constitution of the United States, including the First Amendment for officers, and outlines the applicability of the Constitution, including the First Amendment, to policing demonstrations.  Exs. A, A1-5; B, B1-5; C.

5.      NYPD Police Student's Guide, Chapter: Maintaining Public Order, Demonstrations, 2005-2012, provided training to officers on the First Amendment and disorderly conduct, and specifically on the standards for enforcement of PL §240.20(5).  Exs. D, D1-7; E, E1-5; F.

6.      Each chapter of the Police Student's Guide, including the Introduction to Law and Justice and Maintaining Public Order: Demonstrations, has a corresponding Lesson Plan, which shows that officers' training on the First Amendment and disorderly conduct involved lecture, question and answer and group discussion through instruction at the NYPD Police Academy.  Exs. B, B1-5; E, E1-5.

7.      Police officers were evaluated by quiz on their comprehension of the contents of each Lesson Plan/Chapter.  Ex. N, Perkins Dep., 134:3-7, 135:6-15.

8.      If the quizzes indicated that an officer had a problem understanding the material, the officer was then recommended for tutoring.  Id. at 135:15-18.

9.      In addition to lecture, question and answer, group discussion and quizzes on each chapter, three trimester exams were given during the course of Academy training, which covered every chapter reviewed in a given trimester.  Id. at 135:19-136:8.

10.     NYPD Police Academy instruction was given by state certified instructors.  Ex. N, Perkins Dep. 119:7-15.

11.     The instructors were trained by officers designated as master instructors by the state.  Id. The NYPD's lesson plans and course materials were reviewed for national accreditation every four years by the Commission on Accreditation for Law Enforcement Agencies, ("CALEA"), and the NYPD received these accreditations.  Id.; Ex. M.

12.     NYPD police officers received college credit for these courses through the National College Credit Recommendation Service ("NCCRS").  Ex. M.

13.     Officers also received what is called "Command Level training" at their precincts, which is training given on specific topics by the Specialized Training Section of the Police Academy to precinct-level training sergeants —"a training the trainer situation."   Ex. N, Perkins Dep., 50: 2:18.

14.     The training sergeants take the training back to their individual commands and train every member of their respective commands.  Id. at 130:15-18.

15.     An example of Command Level training included the 2007 NYPD Police Academy Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct."  Ex. G.

16.     The Training Memo provided guidance to officers specifically on the application of PL §240.20(5), that statute under which plaintiffs were charged, including, that something more than a "mere inconvenience of pedestrians is required to support the charge," and that an obstruction must be "substantial."  Id.

17.     Commanding Officers at each precinct were directed to ensure that each member of their commands (precincts) was informed of and received Command Level training on this Training Memo.  Id.  at 1.

18.     Executive officers in commands received command level training.  Ex. N, Perkins Dep., 50:19-23.  The Training Memo stands until it is revoked.  Id. at 51:3-5

19.     The NYPD Disorder Control Unit, ("DCU") was not tasked with providing training on the Constitution of the United States, the application of the disorderly conduct statute, the standards for probable cause or the contents of dispersal orders for that matter.  Ex. O, Raganella Dep., 36:2-3; 185:9-186:5; Ex. P, Vega Dep., 67:4-8, 69:17:22, 112:14-114:11.

20.     The primary training function of the DCU, which consists of a handful of officers now and during OWS, (Ex. P, Vega Dep., 145:6-9) was to provide instruction to officers on line and wedge formations for mass arrests, high profile vehicle rescues, critical response vehicle deployment, setting up a vehicle command post, high crime area mobilizations, HazMat/COBRA training (chemical, biological and radiological awareness), HazMat deployment, active shooter training, testing response readiness to detonation of an improvised explosive device, and so on. Ex. P, Vega Dep., 34-17-36:16, 39:2-16; 55:17-20; 57: 60:12-23.

21.     The role of the DCU at a protest or demonstration was simple—to provide tactical support to the incident command, including forming lines and wedges and disseminating masks, mesh netting, flexi-cuffs, pepper spray and the like.  Ex. O, Raganella Dep. 189:22-190:16, 191:6-192:3; Ex. P, Vega Dep. 165: 10-15.

22.     No member of the DCU gave any orders to officers to make arrests during OWS, and no member of the DCU made any arrests or made any arrest decisions during OWS.  Ex. P, Vega Dep., 165:16-166:4.

23.     Although the DCU was not primarily tasked with providing training on the Constitution, training was given in 2011 on the First Amendment rights of protesters pursuant to the DCU Lesson Plan, Legalities at Protests/Demonstrations.  Ex. O, Raganella Dep., 279:7-25; Ex. J.

24.     In this DCU training, officers received instruction on how the First Amendment affects their job performance at a protest or demonstration and on how the rights of free speech and assembly pertain to current NYPD policies.  Ex. J.

25.     The DCU also provided training on the First Amendment to Probationary Lieutenants and Sergeants.  Exs. K and L, bullet 1.

26.     The NYPD Police Student's Guide, Maintaining Public Order: Demonstrations, from *2005 through 2012*, specifically includes the standards for application of PL §240.20(5) as set forth People v. Carcel, 3 NY2d 327, 332 (NY Court App. 1957) under the former disorderly conduct statute, PL §722.  People v. Jones applied the standard set forth in Carcel to the current statute, §240.20(5).  This is evidenced by the fact that the NYPD Police Student's Guide, Demonstrations in *2005*, which obviously predates the Jones decision, specifically applies the standards set forth in Jones.  Exs. D, D1-7; see also Ex. N, Perkins Dep., 49:18-50:18; 158:17-159:24.

27.     In addition to Police Academy training, officers received Command Level training on the 2007 Training Memo, "Enforcement of New York State Penal Law Section 240.20(5) Disorderly Conduct," which specifically outlines the decision in People v. Jones.  Ex. G.

28.     Executive officers are also aided on the scene of demonstrations by members of the NYPD Legal Bureau who assist incident commanders directly in the field with questions they may have, including questions pertaining to probable cause to make arrests.  Ex. Q, Gannon's Dep., 163:3-12.

29.     There is no record evidence that the City "removed" a 2002 lesson plan, "Legalities of Civil Disorder" and the 2004 RNC Legal Guidelines from any training.

30.     With only a few weeks' notice that OWS was going to occur, the NYPD tried to identify the leaders of the OWS movement and contacted the ACLU to try to facilitate and accommodate OWS as they had done with the RNC—but the NYPD was rebuffed.  Ex. S, Purtell Dep., 31:6-24.

31.     Chief Purtell, the NYPD Commanding Officer of Patrol Bureau Manhattan South, personally tried to reach out to OWS organizers and the ACLU to facilitate marches and demonstrations—to no avail. Id. at 31:19-32:8.

32.     The NYPD tried to open a dialogue with people who seemed to be leading the group through the NYPD Community Affairs Division—to no avail. Id. at 32:9-17.

33.     The NYPD learned of planned OWS demonstrations, including the first anniversary, through social media and internet open source resources.  Id. at 186:7:15; Ex. Q, Gannon Dep., 171:8-172:5.

34.     The NYPD Commissioner, in response to letters from State Senator Krueger and Council Member Lappin regarding the, "Bronx incident," referred the matter to the Internal Affairs Bureau, Special Investigations Unit, ("IAB") for investigation of possible misconduct.  Ex. W, (pending application to file under seal).

35.     The investigation into this incident involved the investigative work of one Deputy Chief, one Inspector, one Deputy Inspector, six Detectives and one Sergeant in IAB.  Id.

36.     The IAB investigation required that four officers who were present on the date of the "Bronx Incident" be formally interviewed with retained legal representation.  Id.

37.     The twelve-person IAB investigation team reviewed video of the incident, the memo book entries of the officers, paperwork involved in issuing the summonses, the disciplinary histories of all of the officers involved, interviews of the officers involved with their legal

representation, conferral with the Bronx precinct Integrity Control Officer, conferral with the Bronx precinct Assistant Integrity Control Officer and conferral with the clerk of the Bronx Criminal Court.  Id.

38.     During their formal interviews, two officers involved in the "Bronx incident" stated that they observed protesters with tables and chairs set up on the sidewalk, and the protesters were given warnings, which they ignored. Id., at D21449-21450, D21426.

39.     The investigation concluded that misconduct pertaining to this incident was unsubstantiated. Id., at D21424.

40.     There is no record of either Inspector Raganella or Lt. Gannon having reviewed a 12-minute video of the Bronx incident during their depositions.

41.     Pertaining to a portion of the Bronx incident video, which Raganella did view, Raganella specifically testified that he only saw a "small snippet of video," he did not see what happened before the video began recording, "I don't know what [the Captain] saw and observed prior to the video starting,"  "I wasn't there.  I didn't see what they were speaking of or how it was actually occurring."  Ex. O, Raganella Dep. 22:15-25:9.

42.     Raganella's deposition in this case was taken on July 12, 2018, and a flash drive dated August 30, 2018, was provided to defendant entitled, "plaintiff's exhibit 1" to Raganella's deposition, which contained one main file, 3 sub files, 22 sub sub files, 21 sub sub sub files of multiple videos and screen shots.  Not a single one of the multitude of videos or screen shots on plaintiffs' purported exhibit 1 to Raganella's deposition is identified in any manner whatsoever in Raganella's deposition transcript.  Raganella's deposition transcript does not indicate that he viewed the more than 50 videos and screen shots contained on the flash drive, or anything approaching that number.  Ex. O, Raganella Dep., (throughout).

43.

43.     The record shows that officers received thorough training on the obstructing

governmental administration statute.  Exs. T, T1-5, U, U1-5, V.

Dated:          New York, New York
                May 14, 2019

                                    ZACHARY CARTER
                                    Corporation Counsel - City of New York
                                    *Attorney for Defendant*
                                    100 Church Street
                                    New York, New York 10007
                                    (212) 356-3518


                              By:     /s/ _____
                                    AMY ROBINSON
                                    New York City Law Department


TO:     All Attorneys of Record for Plaintiffs *(via ECF)*

- 132 -